**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY, and S.N., *individually and on behalf of all similarly situated individuals*,<br><br>                Plaintiffs,<br><br>    v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>           Defendant. | Case No. 3:24-cv-1447-VAB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT** |

## INTRODUCTION

1.    Plaintiffs Binah Gordon, Kay Mayers, Alma Avalle, Jamie Homnick, Gennifer Herley, and S.N.[1] ("Plaintiffs") bring this putative class action civil rights lawsuit on behalf of themselves and all similarly situated individuals against Defendant Aetna Life Insurance Company ("Aetna"), for denying them health insurance coverage for medically necessary gender-affirming facial reconstruction surgeries and procedures (collectively, "GAFR")[2] under Aetna's categorical coverage exclusion on such treatments, in violation of the prohibition of discrimination on the basis of sex in federally funded health programs and activities under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557").

2.    Ms. Gordon, Ms. Mayers, Ms. Avalle, Dr. Homnick, Dr. Herley, and Ms. N are transgender women. At all times relevant to this Complaint, Plaintiffs are or were enrolled in

---

[1] Out of concern for her privacy and safety, Ms. N prefers to go by her initials in this lawsuit rather than her full name. On September 26, 2024, the Court granted Ms. N's motion to proceed pseudonymously. Protective Order No. 32.

[2] GAFR procedures are also commonly referred to as "facial feminization surgeries," "gender affirming facial surgeries," and "facial gender affirming procedures," among other similar terms.

health insurance plans offered, underwritten, or administered by Aetna (hereafter, "Aetna plans"). Ms. Gordon, a 42-year-old Nebraska resident, was covered at all relevant times by an Aetna plan under the Federal Employee Health Benefits ("FEHB") program available to her through her tribal employer. Ms. Mayers, a 52-year-old Alaska resident, Ms. Avalle, a 26-year-old New York resident, Dr. Homnick, a 40-year-old New York resident, Dr. Herley, a 62-year-old New York resident, and Ms. N, a 48-year-old Pennsylvania resident, are or were at all relevant times enrolled in Aetna-administered plans offered by their respective employers.

3.      Plaintiffs' Aetna plans generally provide coverage for medically necessary surgery—including facial reconstructive surgery for diagnoses other than gender dysphoria—but Aetna's Clinical Policy Bulletin on Gender Affirming Surgery, CPB 0615 ("CPB 0615"), categorically excludes GAFR as "not medically necessary and cosmetic" when intended to treat gender dysphoria in transgender people by correcting facial sex characteristics to make them congruent with their gender identity (hereinafter referred to "GAFR Exclusion").[3]  None of Plaintiffs' employer-based plans specifically excluded GAFR; rather, Aetna, in administering claims under those plans, applies the GAFR Exclusion to categorically deny coverage for GAFR in every case regardless of actual medical necessity.

---

[3] A transgender person is someone whose sex assigned at birth does not match the person's gender identity. A cisgender person is not transgender—*i.e.*, their gender identity and assigned sex align. Women who were assigned male at birth are transgender women. Men who were assigned female at birth are transgender men. Transgender people whose gender identity is not exclusively male or female, regardless of what sex they were assigned at birth, are nonbinary people. The term "transfeminine" refers to both transgender women and nonbinary people who were assigned male at birth.

4.      Plaintiffs were all assigned male at birth, but all have a female gender identity—that is, they are and know themselves to be female.[4] They have all lived consistently with their female gender identity for many years. Plaintiffs have all been diagnosed with and been treated for gender dysphoria, a serious medical condition marked by clinically significant distress or impairment resulting from the incongruence between one's gender identity and assigned sex.[5] They all began their gender transitions in adulthood, having already developed masculine facial features and other typically male secondary sex characteristics caused by puberty.

5.      For Plaintiffs and other transfeminine people, the presence of typically male facial characteristics that are incongruent with their gender identities causes significant, sometimes debilitating gender dysphoria and distress. Because the face is one of the most visible indicators of sex, being perceived as male—both by oneself and by others—can be an extreme source of gender dysphoria. The visible and noticeable discordance between Plaintiffs' genuine, lived female identities and their typically masculine facial features also places them at significant risk of discrimination, harassment, violence, and other mistreatment by neighbors, coworkers, strangers, and others who perceive them either as transgender or, incorrectly, as men who do not conform to male stereotypes.

6.      Many transgender people with gender dysphoria need gender-affirming medical care to reduce the clinical symptoms of gender dysphoria by bringing their primary and

---

[4] Gender identity refers to a person's innate, internal sense of being male, female, or another category, and is a basic part of every person's core identity. Everyone has a gender identity. One's gender identity cannot be voluntarily changed. Gender identity is also sometimes referred to as "experienced gender".

[5] Sex assigned at birth, or assigned sex, refers to the sex one is identified to be around the time of one's birth. An infant is typically assigned "male" or "female" based on the appearance of the infant's external physical sex characteristics (*i.e.*, external genitalia).

secondary sex characteristics into alignment with their gender identity. Generally accepted medical treatments for gender dysphoria include gender-affirming hormone treatments and surgeries. Like many transgender people, Plaintiffs have all received gender-affirming treatments and surgeries to treat their gender dysphoria and to further their gender transitions.

7.      Consistent with the prevailing standards of care for the treatment of gender dysphoria, and the medical consensus that gender-affirming care is medically necessary for many transgender people, many health insurance companies provide coverage to transgender enrollees who need this care.

8.      Other gender-affirming surgeries are covered under Aetna plans. As reflected in Aetna's Clinical Policy Bulletin on Gender Affirming Surgery (0615) ("CPB 0615"), a nationwide policy that governs coverage for surgical treatments for gender dysphoria under most Aetna plans, Aetna covers gender-affirming chest reconstruction (including breast augmentation and breast removal), genital reconstruction, and gonadectomy surgeries for transgender participants when specified medical necessity criteria are met.

9.      When it comes to GAFR surgeries and procedures that are medically necessary for transfeminine plan holders, however, Aetna ignores the medical consensus and prevailing standards of care and categorically excludes coverage for those treatments under CPB 0615. CPB 0615 contains a categorical coverage exclusion that excludes all "facial gender affirming procedures" "that may be performed as a component of gender transition" from coverage under most health insurance plans offered or administered by Aetna. The GAFR Exclusion in CPB 0615 wrongfully characterizes those treatments as "cosmetic" and "not medically necessary," in all cases.

10.     GAFR is a classification of medical procedures recognized as medically necessary treatments for gender dysphoria in transgender people by the World Professional Association of Transgender ("WPATH") Standards of Care for the Health of Transgender and Gender Diverse People (the "WPATH Standards of Care"), the prevailing standards of care for the treatment of gender dysphoria. The WPATH Standards of Care recognizes that GAFR is used to correct the effects of testosterone on a transfeminine person's face to alleviate the symptoms and pain caused by gender dysphoria. GAFR is not a singular, prescriptive surgery, but rather a shorthand reference to a constellation of reconstructive facial surgeries and procedures, done individually or collectively, that are intended to treat gender dysphoria. Those same surgeries and procedures, in other contexts, are commonly performed to treat other medical conditions or, when not medically necessary to treat a medical condition, for cosmetic purposes.

11.     Aetna's treatment of GAFR as "not medically necessary" in all instances is at odds with the prevailing standards of care for gender dysphoria and further belied by the fact that Aetna is required to cover GAFR in several states—and, under state-specific addenda to CPB 0615, applies objective medical necessity criteria to coverage requests for GAFR by transgender beneficiaries in those places.

12.     Contrary to Aetna's blanket characterization of GAFR as "not medically necessary and cosmetic," GAFR procedures are considered reconstructive and, therefore, medically necessary when used to treat gender dysphoria in transgender people. That is because GAFR is a medically necessary treatment for gender dysphoria and related distress, meant solely to align a person's facial characteristics with their gender identity, and not to "improve" appearance. Aetna already covers other gender-affirming surgeries—including breast

augmentation for transfeminine people—as reconstructive and medically necessary when used to treat gender dysphoria, even where those same procedures might be "cosmetic" in other contexts.

13.     Transgender people are represented in every gender, race, religion, occupation, and vary in age, sexual orientation, and nationality. Transgender people live in every part of the country, and like cisgender people, engage in a variety of family, professional, and community roles. Unfortunately, throughout history, transgender people have been targeted for discrimination, harassment, and violence by businesses, government entities, and individuals, including in healthcare settings. This discrimination persists today; in just the last month, the Trump Administration has issued multiple executive orders attacking the rights and inherent dignity of transgender people, mirroring the steep escalation of anti-transgender policies at the state level in recent years.[6] For transfeminine people with masculinized facial features—often the first thing a stranger might notice when encountering them—the presence of those features exposes them to a pronounced risk of anti-transgender violence and discrimination, particularly in the current climate where hostility toward transgender people is on the rise.

14.     Like other gender-affirming surgeries for transgender people, GAFR allows those who need it and can obtain it to live fully in accordance with their gender identity, to alleviate gender dysphoria and related distress associated with physical sex characteristics that are incongruent with that gender identity, and to reduce the risk of being subjected to gender-based and anti-transgender discrimination, harassment, violence, and mistreatment because of those characteristics.

---

[6] *See* Odette Yousef, *Trump's anti-trans effort is an agenda cornerstone with echoes in history*, NPR (Feb. 6, 2025, 10:27 AM), https://www.npr.org/2025/02/06/nx-s1-5288145/trump-anti-trans-executive-order; *see also* Exec. Order 14168, 90 FR 8615 (Jan. 30, 2025).

15.     For Plaintiffs and others like them, GAFR is an essential component of their gender transition and medical treatments for gender dysphoria. GAFR is widely recognized as a safe, effective, and medically necessary component of a medical gender transition for many transfeminine people. Plaintiffs' medical providers recommended GAFR to treat their gender dysphoria and related distress—and, as a result, to improve their overall life-functioning and well-being.

16.     CPB 0615 discriminates on its face by categorically excluding facial surgeries only when performed "as a component of gender transition," regardless of medical necessity. By design, it treats transgender plan holders differently—and worse—than their cisgender counterparts. When Aetna plan holders require facial reconstructive surgery for other reasons— for example, when needed after a traumatic injury or cancer treatment—Aetna generally makes an individualized medical necessity determination for coverage decisions. But when the surgery is needed by transgender people to treat gender dysphoria by changing sex characteristics, Aetna incorrectly designates the procedure as "not medically necessary and cosmetic," automatically refusing coverage—even when GAFR otherwise meets the plan definition of medical necessity.

17.     Coverage for gender-affirming surgeries under all six Plaintiffs' health insurance plans is or was at all relevant times governed by CPB 0615. Aetna applied the GAFR Exclusion to categorically deny coverage for GAFR to all six Plaintiffs despite their well-documented medical need for those surgeries. After their medical providers determined that GAFR was medically necessary to treat Plaintiffs' gender dysphoria by correcting masculinized facial features, their treating surgeons submitted prior authorization requests for those services to Aetna. In each case, Aetna categorically denied coverage for those services as "not medically necessary" based on the GAFR Exclusion.

18.     By enforcing CPB 0615 to deny insurance coverage for GAFR to Plaintiffs and other transfeminine plan holders, Aetna has forced these individuals to experience delayed or denied medically necessary health care for gender dysphoria, exposing them to prolonged, avoidable, and often severe suffering, distress, social stigma, discrimination and harassment, and impaired life functioning. Some Aetna plan holders—including Ms. Gordon and Ms. N—found a way to pay out-of-pocket for these medically necessary services, at considerable personal expense, to escape the suffering they experienced before they obtained the surgeries. Others are unable to do so: They remain unable to obtain GAFR without insurance coverage through their Aetna plan and face ongoing and significant harm to their health and well-being as a result.

19.     Plaintiffs bring this class action lawsuit on behalf of themselves and all similarly situated individuals under Section 1557, which provides that, on the basis of sex, "no person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" receiving federal financial assistance, including health insurance companies like Aetna. Aetna's GAFR Exclusion under CPB 0615, which categorically denies all GAFR surgeries and procedures for transgender people, violates Section 1557. Through this action, Plaintiffs seek a declaratory judgment that Aetna's GAFR Exclusion violates Section 1557; a permanent injunction barring Aetna from enforcing the GAFR Exclusion, or any other policy, practice, or procedure that categorically excludes coverage for GAFR under health insurance plans offered or administered by Aetna; compensatory damages for all Aetna plan holders who have been forced to pay for GAFR treatments out of pocket because of Aetna's refusal to cover those treatments; and their reasonable attorneys' fees and costs.

## PARTIES

20.    Plaintiff Binah Gordon is an adult resident of Lincoln, Nebraska. Ms. Gordon is a transgender woman. At all relevant times, Ms. Gordon was enrolled in the Aetna HealthFund ® High Deductible Health Plan (HDHP) —Self Only health insurance plan through the Federal Employee Health Benefits (FEHB) program, for which she was eligible to enroll through her tribal employer. At all relevant times, Ms. Gordon's health plan was designed, offered, and administered by Defendant Aetna Life Insurance Company.

21.    Plaintiff Kay Mayers is an adult resident of Anchorage, Alaska. Ms. Mayers is a transgender woman. Ms. Mayers is, and at all relevant times has been, enrolled in a self-funded Aetna Open Choice PPO through her employer. Ms. Mayers's health plan was designed, offered, and administered by Defendant Aetna Life Insurance Company.

22.    Plaintiff Alma Avalle is an adult resident of Brooklyn, New York. Ms. Avalle is a transgender woman. Ms. Avalle is, and at all relevant times has been, enrolled in a self-funded Aetna Open Choice POS II through her employer. Ms. Avalle's health plan was designed, offered, and administered by Defendant Aetna Life Insurance Company.

23.    Plaintiff Jamie Homnick is an adult resident of Rochester, New York. Dr. Homnick is a transgender woman. Dr. Homnick is, and at all relevant times has been, enrolled in a self-funded Aetna Traditional Choice through her employer. Dr. Homnick's health plan was designed, offered, and administered by Defendant Aetna Life Insurance Company.

24.    Plaintiff Gennifer Herley is an adult resident of Nassau County, New York. Dr. Herley is a transgender woman. Dr. Herley is, and at all relevant times has been, enrolled in a self-funded MTA NYC Open Access CPOS II Basic Option plan through her wife's former employer, the New York Metropolitan Transportation Authority. At all relevant times, Dr.

Herley's health plan was designed, offered, and administered by Defendant Aetna Life Insurance Company.

25.    Plaintiff S.N. is an adult resident of Erie, Pennsylvania. Ms. N is a transgender woman. Ms. N was, at all relevant times, enrolled in a self-funded Aetna Choice POS II High Deductible Health Plan through her employer. At all relevant times, Ms. N's health plan was designed, offered, and administered by Defendant Aetna Life Insurance Company.

26.    Defendant Aetna Life Insurance Company ("Aetna") is an insurance company incorporated in Connecticut with its principal place of business in Hartford, Connecticut. Aetna designs, markets, sells, supplies, issues, underwrites, and administers health insurance plans to individuals, employers, universities, and government agencies throughout the United States, including fully funded plans, self-funded plans, federal Health Insurance Marketplace plans, Medicare plans, Medicaid plans, Federal Employee Health Benefits ("FEHB") plans, and student health plans. Aetna is a recipient of federal financial assistance, including Medicare and Medicaid reimbursements. Aetna is a wholly owned subsidiary of CVS Health Corporation, which, at all times relevant to this Complaint, has received federal financial assistance, including grants and reimbursements from the United States Departments of Health and Human Services, Justice, and Veterans Affairs, and the Executive Office of the President, as well as Medicare and Medicaid reimbursements. As a federal funding recipient, Aetna is subject to Section 1557's nondiscrimination requirements.

### JURISDICTION AND VENUE

27.    This Court has jurisdiction under 28 U.S.C. § 1331. A federal question is presented because this action arises under 42 U.S.C. § 18116(a).

28.     This Court has general jurisdiction over Defendant because Defendant is incorporated in Connecticut.

29.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District. Accordingly, Defendant conducted and continues to conduct substantial business in this District.

## FACTS

### Named Plaintiffs

<u>Binah Gordon</u>

30.     Plaintiff Binah Gordon is a 42-year-old resident of Lincoln, Nebraska. Ms. Gordon is a transgender woman. She is a language curriculum specialist employed by a tribal community college in rural Nebraska.

31.     Ms. Gordon has suffered from symptoms of gender dysphoria since childhood. Although she experienced gender dysphoria for most of her life and knew herself to be a woman for many years, she did not begin her gender transition until 2019. That year, she was formally diagnosed with gender dysphoria.

32.     Under the care of her medical providers, Ms. Gordon subsequently received various gender-affirming medical treatments to treat her gender dysphoria and manage her gender transition, including feminizing hormone therapy since 2019, gender-affirming genital reconstruction surgery in 2021, and voice therapy.

33.     While these medical interventions provided Ms. Gordon some relief from her gender dysphoria, she continued to suffer from severe gender dysphoria specifically related to certain typically masculine facial features. These facial features caused her profound daily distress; exacerbated symptoms of post-traumatic stress disorder ("PTSD") related to experiences

of discrimination, harassment, and abuse related to her gender dysphoria and being misidentified as male by others; and caused her to experience profound fear and anxiety about her safety and well-being.

34.     Ms. Gordon experienced ongoing and persistent symptoms of hypervigilance and social withdrawal related to the gender dysphoria arising from her masculinized facial features. The daily distress caused by this dysphoria drastically limited her capacity to feel comfortable at work and in her community. She was constantly afraid of leaving her home in Lincoln, Nebraska for fear of being perceived as transgender because of her masculine facial features. She was also afraid of making the two-hour commute between her home in Lincoln and her job in a rural, socially conservative part of Nebraska. She hoped to find weeknight housing near her job to minimize this commute. Because of her severe anxiety and distress about revealing her transgender status and facing discrimination, however, she experienced significant difficulty in meeting with rental housing providers and was unable to find weeknight housing for several years.

35.     Given the severity of Ms. Gordon's gender dysphoria related to her facial features, her treating providers determined that gender-affirming facial reconstructive surgeries were medically necessary to treat her gender dysphoria by correcting her masculine facial features, and that GAFR would reduce her dysphoria, as well as her associated distress and PTSD, and also improve her well-being and overall functioning.

36.     In October 2021, Ms. Gordon's primary care provider determined that GAFR was medically necessary to treat the severe gender dysphoria associated with her facial features and recommended that Ms. Gordon obtain GAFR as a treatment for her gender dysphoria and to improve her quality of life. In a letter of support, that provider explained that for Ms. Gordon,

these treatments must be considered reconstructive, not cosmetic, because their primary purpose would be to treat gender dysphoria.

37.     In June 2022, Ms. Gordon's treating psychotherapist evaluated Ms. Gordon. The therapist confirmed Ms. Gordon's gender dysphoria diagnosis and a related diagnosis of PTSD. The therapist identified depression, anxiety, distress, panic episodes, and a history of self-harming behavior and suicidality as symptoms of her gender dysphoria and PTSD. In a letter recommending GAFR surgery, the therapist wrote:

> Binah's symptoms persist as she encounters a world in which her physical appearance is scrutinized. Her residual masculine facial features and 6'1 tall frame reveal Binah's identity as a transgender woman. Therefore, symptoms of hypervigilance persist as Binah is aware she is at heightened risk for experiencing the hate crime of gender-based physical violence as a transgender woman.

The therapist determined that Ms. Gordon met the eligibility and readiness criteria for GAFR under the WPATH Standards of Care, as well as other behavioral health criteria. The therapist concluded that GAFR "is clinically indicated and medically necessary in this case, as it will assist Binah with achieving greater alignment between her physical body and her gender" and "will facilitate Binah's progress in managing her PTSD, as her hypervigilance for safety will be significantly reduced."

38.     In March 2022, Ms. Gordon had a consultation with a surgeon at UW Health in Wisconsin who specializes in GAFR and has significant experience treating transgender patients. The surgeon determined that Ms. Gordon met the medical necessity criteria for several GAFR procedures under the WPATH Standards of Care. The surgeon concluded that "[t]his surgery has the potential to make a demonstrable difference in this patient's quality of life" and that Ms. Gordon's medical team, including himself, "deem it an integral component of [her] gender affirmation process that would otherwise leave a source of dysphoria untreated." The surgeon also observed that GAFR "is the only available treatment to correct the area of contention"—*i.e.*,

the severe dysphoria that Ms. Gordon experienced because of her typically masculine facial features.

39.     Following this surgical consultation, Ms. Gordon's employer switched its employee health coverage to the FEHB program, effective July 1, 2022. Ms. Gordon selected an Aetna plan from among several options.

40.     After her Aetna plan went into effect in July 2022, and after obtaining the requisite letters of medical necessity from her treating providers for GAFR, Ms. Gordon moved forward with the prior authorization process to obtain coverage from Aetna for the planned surgery. UW Health submitted a request for prior authorization to Aetna for coverage of the recommended GAFR surgeries in the summer of 2022. The UW Health surgeon was an in-network provider under Ms. Gordon's Aetna plan at the time the prior authorization requested was submitted.

41.     Aetna denied coverage for each of the requested services on September 30, 2022. For each denied procedure, Aetna stated that the requested procedure "is considered cosmetic by our CPB [0615] and your plan because it is meant to improve appearance, not to correct a physical problem that affects your daily activities." In subsequent letters to Aetna challenging its coverage denials, the UW Health surgeon emphasized that GAFR as a treatment for gender dysphoria "is not a cosmetic or experimental treatment – it is medically necessary and constitutes standard of care to treat the gender dysphoria experienced by Binah."

42.     Ms. Gordon formally appealed the denial to Aetna on March 27, 2023. In her appeal, Ms. Gordon detailed the profound, lifelong, life-threatening distress and impairment associated with the gender dysphoria arising from her typically masculine facial features. She described that her inability to obtain GAFR had significantly increased her symptoms of

dysphoria, distress, impairment, and PTSD, exposing her unnecessarily to stigma, discrimination, and potential violence in her employment, housing, and daily life. In her appeal, Ms. Gordon provided numerous citations to medical literature concluding that GAFR is an effective treatment for gender dysphoria for transfeminine individuals, like her, with gender-incongruent facial features.

43.    Ms. Gordon's appeal was denied in full on April 21, 2023, in a letter from Aetna. That letter reiterated the justification from the original denials: that the procedures Ms. Gordon sought were not covered under her plan pursuant to the GAFR Exclusion.

44.    After each of Aetna's coverage denials, Ms. Gordon's gender dysphoria increased markedly. She experienced multiple daily panic attacks, multi-day episodes of depression and suicidality, PTSD-induced flashbacks of traumatic episodes, social avoidance, and other significant physical and psychological impairments that severely limited her daily life-functioning.

45.    On June 27, 2023, Ms. Gordon requested that the U.S. Office of Personnel Management ("OPM") conduct an external review of Aetna's decision to deny her prior authorization.

46.    In her OPM review request, Ms. Gordon explained the harms that she was suffering resulting from her inability to get GAFR without Aetna coverage, writing:

> Aetna's denial of this medically necessary care based on a discriminatory exclusion that incorrectly assumes that [GAFR] is 'cosmetic' unconscionably keeps me trapped in the triple-stigmatized social status of a visibly and identifiably halfway-transitioned transgender person, which exposes me to the risk of gender miscategorization, misgendering, mistreatment, violence and discrimination in employment, housing, and other aspects of my daily life, and imposes an inescapable miasma of distress and impairment on every moment of my day.

47.    Unfortunately, months went by without any decision from OPM, during which time Ms. Gordon continued to experience these debilitating harms. She was caught in a catch-22:

she could not afford the out-of-pocket cost of GAFR at UW Health, where she had planned to obtain the surgery, but could not bear the prospect of waiting indefinitely for, and maybe never obtaining, GAFR. Ms. Gordon attempted to raise funds for her surgery through an online fundraising campaign, but only received several thousands of dollars in donations, not enough to cover the anticipated surgery and travel costs. Ms. Gordon and her partner even contemplated moving away from Nebraska to a state with stronger protections against health care discrimination for transgender people, which would have come at the cost of her career and forced her partner to move away from his lifelong home.

48.    Only after a close friend of Ms. Gordon's generously offered to give her about $30,000 toward the surgery costs, Ms. Gordon reluctantly decided to obtain her GAFR without insurance coverage. She arranged to obtain the necessary procedures at the Facialteam clinic in Marbella, Spain, which specializes in GAFR for transfeminine people. The cost of the surgery at Facialteam was significantly less than the out-of-pocket cost at UW Health, and Facialteam was able to schedule her surgery for December 2023, allowing Ms. Gordon to obtain this medically necessary care without a protracted further delay.

49.    Ms. Gordon had the GAFR surgeries on December 11, 2023, at Facialteam. Ms. Gordon's out-of-pocket costs were approximately $35,000 for the surgery-related expenses, plus several thousand dollars in travel costs. Ms. Gordon feels deeply indebted to her friend for their generosity, without which she would have been unable to obtain the surgery, and she intends to pay the friend back someday whenever she is able.

50.    Unbeknownst to Ms. Gordon, OPM issued its determination on November 21, 2023, mostly reversing Aetna's denials, concluding that the GAFR procedures sought by Ms. Gordon were medically necessary and ordering Aetna to cover them. Unfortunately, OPM did

not notify Ms. Gordon of its decision until January 4, 2024, nearly a month after she had already been forced to pay out of pocket for her surgeries given the severe, escalating, and debilitating distress caused by Aetna's refusal to cover the surgeries and the related delay in obtaining this critical health care.

51.     Ms. Gordon's GAFR surgeries were effective and life-changing. Since receiving the surgeries, she has experienced a significant decline in her symptoms of gender dysphoria and PTSD, is less socially isolated, and feels safer and less of a target of discrimination, harassment, and violence in her community. She no longer worries about experiencing harassment or disrespectful treatment at work. She has more recently obtained the final gender-affirming surgery recommended by her providers—breast augmentation—likely concluding the surgical course of treatment for her gender dysphoria. She attributes the sharp reduction in gender dysphoria and the marked improvement in her overall well-being and life functioning to the GAFR surgery she obtained in December 2023.

<u>Kay Mayers</u>

52.     Plaintiff Kay Mayers is a 52-year-old resident of Anchorage, Alaska. She is a transgender woman. Ms. Mayers works as an information technology specialist for a public employer in Anchorage.

53.     Ms. Mayers has experienced gender dysphoria since childhood and has known herself to be female for most of her life.

54.     Ms. Mayers came out as transgender, was diagnosed with gender dysphoria, and began her gender transition several years ago under the supervision of medical providers. In 2021, she began her social transition and started to dress and outwardly present to friends in a

feminine way. In mid-2022, she fully came out as transgender to her family, coworkers, and others in her life.

55.     As part of her medical gender transition, Ms. Mayers has received feminizing hormone treatments and several gender-affirming surgical treatments for gender dysphoria since 2021.

56.     In 2021, Ms. Mayers also began feminizing hormone replacement therapy as a treatment for gender dysphoria.

57.     In October 2022, Ms. Mayers began seeking breast augmentation and gender-affirming genital surgery, which were excluded under her employer's health plan. In June 2023, after her employer had removed those exclusions from the plan, she received those surgeries from a plastic surgeon in California who specializes in gender-affirming care. Those surgeries were covered by Aetna.

58.     Ms. Mayers still experiences severe gender dysphoria and distress associated with her typically masculine facial features.

59.     Ms. Mayers has at times felt imperiled by her masculinized facial features when interacting with her community. She has taken precautions to protect her safety in Anchorage's public spaces, where she has witnessed anti-transgender sentiment expressed openly. In one restaurant, Ms. Mayers was greeted by a 'welcome' chalk board on the wall that read, "We now live in a world where your kid cannot pretend to be an Indian, but a grown man can pretend to be a woman." When dining out at any restaurant, Ms. Mayers chooses not to drink fluids, so that she can avoid using the restroom.

60.     Ms. Mayers has experienced physical violence associated with her gender presentation. As a child with long hair, she and her sister had their hair done up in "Fair Hair"

style at the Alaska State Fair in Palmer, Alaska. The style was feminine in presentation and Ms. Mayers was subsequently assaulted by an adult for wearing it while being perceived as a boy. She fears her masculinized facial features could inspire another incident.

61.    Ms. Mayers's treating providers unanimously agree that GAFR is medically necessary for her because of the extreme distress she suffers due to her facial features and the associated risks to her safety and life-functioning. With the support of her providers, she began to seek GAFR surgeries last year to treat this dysphoria and distress.

62.    Ms. Mayers's health plan document for 2024 states that "[c]overed services include certain services and supplies for gender affirming (sometimes called sex change) treatment," but defers to Aetna's CPB 0615 "for detailed information about this benefit, including eligibility and medical necessity requirements." Because Aetna's GAFR Exclusion blocked coverage of her surgery and she cannot afford to pay out of pocket for it, she is continuing to suffer without the care she needs.

63.    Ms. Mayers consulted with several surgeons, including an in-network plastic surgeon in San Francisco who she chose to provide her GAFR services if covered by her insurance. Following a consultation, that surgeon determined that Ms. Mayers met the criteria for the GAFR procedures under the applicable standards of care and submitted a prior authorization request to Aetna for the recommended procedures.

64.    The surgeon's prior authorization request included letters of medical necessity from Ms. Mayers's primary care provider, primary gender dysphoria mental health provider, and a psychiatric mental health nurse practitioner at an LGBTQ health clinic in Alaska. All three providers determined that the requested GAFR procedures were medically necessary treatments for Ms. Mayers's severe gender dysphoria related to her facial features. Her primary care

physician wrote that all of Ms. Mayers's providers and surgeons "agree with the medical necessity of [GAFR] for this patient based on her current gender incongruence and significantly increased risks to her safety and ability to function independently as an adult woman in society at this time," concluding that GAFR is "the only choice" to treat her "extreme gender dysphoria." The psychiatric nurse practitioner at the Alaska clinic echoed this, writing that GAFR would "reduce the discongruence between her cognitive gender and body contour, improving her overall health and wellbeing, as well as her sense of safety." All three providers shared their clinical conclusion that the requested surgeries are medically necessary to treat Ms. Mayers's gender dysphoria.

65.     Aetna denied the pre-certification request on March 12, 2024. Aetna denied coverage for each GAFR procedure, citing the GAFR Exclusion.

66.     Aetna's denial of coverage left Ms. Mayers unable to obtain critical health care. She appealed the denial to Aetna and filed this lawsuit. On or about October 15, 2024, Aetna again denied her claim citing the GFAR Exclusion. In or around December 2024, however, Aetna reversed its denial and preauthorized coverage for some GAFR procedures. Ms. Mayers has not yet been able to have GAFR but hopes to in the coming months.

67.     Aetna's denials delayed her access to care for approximately a year. Ms. Mayers is suffering, and will continue to suffer, severe gender dysphoria and distress because of her inability to obtain her planned surgeries. So long as the GAFR Exclusion remains in place and her surgery is incomplete she faces an ongoing risk of harm.

<u>Alma Avalle</u>

68.     Plaintiff Alma Avalle is a 26-year-old resident of Brooklyn, New York. Ms. Avalle is a transgender woman. She is employed by a large media company.

69.     Ms. Avalle has suffered from gender dysphoria since childhood, and her symptoms became markedly more pronounced as she entered puberty. Ms. Avalle felt alienated from her body and experienced significant distress at the development of male secondary sex characteristics during puberty. Ms. Avalle attempted to discuss her feelings with peers and other members of her community, but she did not find anyone during childhood and adolescence who understood or related to her experience.

70.     In college, Ms. Avalle came to understand that the distress she had experienced since childhood was gender dysphoria. During this time, Ms. Avalle met other transgender people and learned that medical transition could address her significant and persistent discomfort. In or around 2018, Ms. Avalle started to identify as transgender, shifting her physical presentation to align with her identity. Ms. Avalle recalls this time as transformative in her understanding of herself.

71.     In February 2021, Ms. Avalle was hired into her dream job as a writer for a food and entertainment magazine that is owned by a large media company. Through this job, Ms. Avalle gained access to her employer-sponsored insurance.

72.     In July 2021, Ms. Avalle sought and began treatment for gender dysphoria. She began seeing Dr. Sophia Brenner, Psy.D., for weekly psychotherapy sessions focused on addressing her gender dysphoria. That same month, she received a diagnosis of gender dysphoria and began living openly as woman.

73.     With her career underway and a measure of stability afforded by a steady paycheck and an ongoing relationship with her therapist, Ms. Avalle began researching clinics that provide gender-affirming care around October 2021.

74.     In December 2021, Ms. Avalle began gender-affirming hormone replacement therapy under the supervision of Dr. Lara Alberts, MD, at Callen-Lorde Community Health Center in New York City. Despite undergoing gender-affirming hormone replacement therapy, Ms. Avalle's gender dysphoria persists—particularly in relation to her typically masculine facial features. Ms. Avalle describes feeling incredible difficulty seeing her face, as it closely resembles the male members of her family.

75.     Ms. Avalle began to consider GAFR as a treatment for her own gender dysphoria after seeing other transgender women in her network who had undergone GAFR and experienced relief from their dysphoria. In late 2022, Ms. Avalle began discussing GAFR as a treatment option with her team of healthcare providers; they unanimously agreed that GAFR was medically necessary in Ms. Avalle's case.

76.     Ms. Avalle then learned that her Aetna health insurance policy follows CPB 0615, which includes the GAFR Exclusion. She also learned that Aetna characterizes the procedures she seeks as "cosmetic" in patients with gender dysphoria, without consideration of medical necessity. Ms. Avalle considers Aetna's mischaracterization of GAFR as both wildly condescending and misaligned with prevalent standards of care.

77.     Though she was aware that she would likely be denied coverage, Ms. Avalle still took steps to pursue coverage through Aetna because her health was at stake. She met with a surgeon, Dr. Nicholas Bastidas, to confirm her eligibility for GAFR and pursue prior approval for its coverage. Dr. Bastidas determined that GAFR was medically necessary to treat Ms. Avalle's gender dysphoria.

78.     In July 2023, Ms. Avalle underwent a CT scan of her skull in preparation for surgery. Ms. Avalle found the consultation process emotionally difficult because it required her

to examine her face closely and articulate to a doctor exactly which parts of her face triggered her gender dysphoria. Dr. Bastidas' practice estimated that the GAFR Ms. Avalle needs would cost her tens of thousands of dollars. Unable to pay for GAFR out of pocket, Ms. Avalle began a fundraising campaign, appealing to her community to donate to help her afford the treatment.

79.    In July 2024, Dr. Bastidas submitted a request to Aetna for pre-certification of Ms. Avalle's GAFR. On July 26, 2024, Aetna issued a denial of precertification based on the GAFR Exclusion. In September 2024, Dr. Bastidas submitted an appeal requesting Aetna overturn the denial of precertification for Ms. Avalle's GAFR. On September 22, 2024, Aetna upheld its denial determination, reiterating that GAFR is always "cosmetic" and not medically necessary pursuant to the GAFR Exclusion.

80.    After the appeals process, Dr. Bastidas' practice came back to Ms. Avalle with a refined quote of $56,000 for her GAFR and related care. Despite raising nearly $23,000 over several months through the generous support of friends and her community for her fundraising campaign, Ms. Avalle's funds would cover less than half of the cost of GAFR needed.

81.    Since having her application for prior authorization denied by Aetna, and after contending with the slow progress to raise funds to pay out of pocket for her desperately needed GAFR, Ms. Avalle has experienced severe depression. It is incredibly difficult for her to have gone through the pre-surgical process and yet remain unable to access that care because of Aetna's arbitrary and discriminatory carve out of GAFR coverage.

82.    Ms. Avalle struggled to stave off gender dysphoria at work and it took a toll on her productivity. Ms. Avalle persisted in her duties for as long as she could, yet she knew that she could accomplish so much more if she did not have to overcome the burden of her dysphoria.

Ultimately, Ms. Avalle's depression became so severe she had to take a medical leave of absence from work. She is currently on leave for an indefinite period of time.

83.    As a result of Aetna's denial of her care, Ms. Avalle has considered leaving her job and remaining unemployed in order to acquire health insurance through New York Medicaid, which covers GAFR. Ms. Avalle is suffering, and will continue to suffer, severe gender dysphoria and distress resulting from Aetna's coverage denials of her planned surgeries. She lacks the resources to pay for these surgeries out of pocket and, absent coverage, will remain unable to obtain these surgeries and will suffer unnecessary distress as a result.

<u>Jamie Homnick</u>

84.    Plaintiff Jamie Homnick is a 40-year-old resident of Rochester, New York. Dr. Homnick is a transgender woman. She holds a Ph.D. in Chemistry and works as an engineer at a pharmaceutical manufacturing firm. She is married and lives with her wife and three children.

85.    She recalls feeling gender dysphoria from a young age. Her family taunted her for walking in a way they perceived as feminine. She disliked her brothers' typical gendered toys like G.I. Joes and, by age 8, she recognized a feeling that she was a girl. She always hated her face, and she experienced significant distress at the development of male secondary sex characteristics as she underwent puberty. The community she was raised in was socially conservative, and she felt compelled to hide herself and her feelings from others throughout childhood and adolescence.

86.    Dr. Homnick began to dress and present as a woman privately after she moved across the country to Rochester in 2021. In 2022, she first came out to her wife and children, then to other family members, and then publicly, including at work where she has found a measure of support from her immediate supervisors. Unfortunately, she did not receive universal

support; her coming out also precipitated a painful break in communication with some close family members.

87.     In October 2023, she began gender-affirming hormone replacement therapy and took voice training lessons. The following month, she began facial hair removal treatments. During this time, Dr. Homnick began presenting authentically, as a woman, at home and at work. She has felt GAFR was something she needed even before starting gender-affirming hormone replacement therapy, and it remains the gender dysphoria treatment that she feels is most likely to alleviate her severe distress. By June 2024, her primary care provider and therapist had written letters recommending GAFR as medically necessary in Dr. Homnick's case. In August 2024, she consulted with Dr. Clinton Morrison, a surgeon at University of Rochester Medical Center, and later that month had a CT scan in preparation for surgery.

88.     Dr. Homnick heard from a friend that certain health insurance plans cover GAFR, and she was further delighted when she learned that New York state had recently required insurers to end the categorical exclusion of coverage for GAFR in the state. When Dr. Morrison sent a letter seeking prior authorization for GAFR to Aetna, however, it was denied in September 2024. Dr. Morrison appealed the decision a few days later, but Aetna rejected her appeal shortly thereafter. In November 2024, Dr. Homnick filed her formal appeal with Aetna; the following day, Aetna rejected that appeal. She was crestfallen to hear that her employer's healthcare plan, a self-funded plan, may be exempt from the obligation created by New York insurance law to cover GAFR. Nevertheless, Dr. Homnick continued to self-advocate, reaching out to her company's Human Resources department throughout Fall 2024, seeking an exception to the exclusion in her case. The company declined her request.

89.    Dr. Homnick's employer-based plan covers gender affirming surgeries, but Aetna's CPB 0615 blocks coverage of GAFR.

90.    With her options for accessing GAFR dwindling, Dr. Homnick suffers in several areas of life. She experiences distress that has made her struggle to take care of her family and herself. The denial of care has also had negative effects on her at work.  An award-winning product developer, honored by her peers for her technical excellence and innovation, Dr. Homnick now struggles to stave off gender dysphoria at work, and she is concerned that it is taking a toll on her productivity.  Dr. Homnick persists in her duties but knows that she could accomplish so much more if she did not have to overcome the burden of gender dysphoria.

91.    Dr. Homnick's gender dysphoria is severe, and she has experienced severe depression and suicidality as a symptom of it. She finds it necessary to take safety precautions in her home.

92.    Dr. Homnick is not presently positioned to pay for her care out of pocket and therefore has no plans to obtain her medically necessary GAFR so long as it is excluded from her insurance plan coverage by Aetna's CPB 0615. She will suffer unnecessary distress as a result.

<u>Gennifer Herley</u>

93.    Plaintiff Gennifer Herley is a 62-year-old resident of Nassau County, New York. Dr. Herley is a transgender woman. She holds a Ph.D. in Organizational Psychology and is the Founder and Executive Director of TransNewYork, an organization serving economically marginalized members of the transgender community.

94.    Dr. Herley has experienced gender dysphoria since childhood. Due to her parents' discouragement of her exploring her femininity—such as experimenting in her dress—she hid her identity from herself, family, and community throughout her adolescence and young

adulthood. In her late twenties or early thirties, Dr. Herley found a community that celebrated the unique diversity of gender and its place in society, which set her on a path to start living more authentically and to regularly see a therapist to help her navigate that path.

95.    Dr. Herley began hormone replacement therapy in 2017.  Beginning in 2018, she started the process of living in a manner more consistent with her gender identity, including using a feminine name and pronouns, changing her style of dress, and communicating her transition to colleagues, friends, and family.

96.    Dr. Herley underwent breast augmentation surgery in February 2020, and in January 2023 she had vaginoplasty surgery. Both procedures were aimed at and temporarily effective at alleviating some of her symptoms of gender dysphoria.

97.    Dr. Herley has also paid out-of-pocket for other forms of gender-affirming care, including electrolysis for facial hair removal, a hair transplant, and feminine makeup tattooing. These procedures were aimed at and temporarily effective at alleviating her symptoms of gender dysphoria.

98.    Dr. Herley takes steps every day to alter and hide her appearance to alleviate the symptoms of her gender dysphoria associated with her typically male facial features. She dresses in feminine clothing to avoid triggering anxiety and distress related to gender dysphoria. She wears makeup and avoids footwear that would make her 6-foot-tall frame appear taller. She often questions if she presents femininely enough for others to view her as a woman.

99.    Despite these procedures and her daily efforts to change her appearance, Dr. Herley continues to experience severe and intensifying gender dysphoria related to her facial features. Her typically masculine facial features often trigger distress and anxiety.

100.    On November 20, 2024, based on recommendations from her medical team, Dr. Herley had a consultation with Dr. Eduardo Rodriguez, a plastic surgeon in New York City who specializes in gender-affirming care for transgender individuals. Dr. Rodriguez determined that Dr. Herley satisfied the criteria, under the applicable standards of care, for obtaining medically necessary GAFR. Dr. Herley submitted a request for prior authorization for GAFR, but Defendant Aetna denied her request in mid-December 2024 pursuant to the GAFR Exclusion.

101.    Dr. Herley, as a result of this denial, remains unable to obtain the health care she needs and has experienced increased symptoms of depression and anxiety related to her gender dysphoria. She feels strongly that her transition is incomplete without GAFR.

<u>S.N.</u>

102.    Plaintiff S.N. is a 48-year-old resident of Erie, Pennsylvania. Ms. N is a transgender woman. She is a travel physical therapist and works on short-term clinical assignments around the country.

103.    Ms. N has experienced gender dysphoria since childhood.

104.    Ms. N has made a full social and legal transition and, since 2009, has lived in her authentic identity as a woman in all spheres of her personal and professional life.

105.    Ms. N has received gender-affirming treatments for gender dysphoria for the last 15 years. Ms. N began gender-affirming hormone therapy to treat her gender dysphoria in 2009 and has continued hormone treatment since then. In 2012, she had breast augmentation surgery, and in 2015, she had a jaw reduction procedure—both aimed at alleviating her gender dysphoria by bringing her secondary sex characteristics into better alignment with her gender. She paid out of pocket for both of these surgeries.

106.    After a decade of other forms of treatment for gender dysphoria, Ms. N still experienced gender dysphoria related to her masculine, gender-incongruent facial and vocal features. She experienced significant gender dysphoria, related distress, and anti-transgender harassment from strangers because of her masculinized facial and vocal features. Embarrassed about her masculine voice and fearful of revealing her transgender identity, Ms. N was afraid to speak in public and, wherever possible, avoided talking altogether to avoid scrutiny by others.

107.    In 2019, Ms. N began to seek additional treatment for her gender dysphoria connected to her gender incongruent facial features. That year, her treating medical providers determined that GAFR surgeries were medically necessary, clinically appropriate treatments for her gender dysphoria and that, without those procedures, she would continue to experience emotional distress, social anxiety, and fears for her safety associated with her masculinized facial features.

108.    In October 2019, her treating therapist, a licensed professional counselor, evaluated her for GAFR. The therapist determined that GAFR surgeries were medically necessary and clinically appropriate treatments for Ms. N's gender dysphoria. In a letter recommending GAFR, the therapist observed that Ms. N had suffered emotional distress, social anxiety, and fear for her safety, as well as high levels of stigmatization, discrimination, and victimization from being perceived as transgender due to her typically masculine facial features. The therapist noted that Ms. N's "masculine facial structure causes her acute emotional distress on a daily basis," that "[t]his distress is debilitating and detrimental to her mental health and psychosocial functioning," and that "[t]he incongruency between her authentic gender identity and her sex assigned at birth . . . negatively impacted both her self-worth and her level of interpersonal and occupational functioning." He added that "[h]er confidence and comfort

interacting in the world is severely limited by her sense of not appearing feminine and, as a result, being perceived as a male." He concluded that the recommended GAFR treatments would significantly improve Ms. N's quality of life and that, without GAFR, Ms. N would continue to experience emotional distress, social anxiety, and fear for her safety.

109.    Ms. N's treating physician shared these conclusions, recommending GAFR for Ms. N to reduce her daily distress around certain masculinized facial features and to further her gender transition. The physician referred Ms. N to an in-network surgeon in Boston for the recommended GAFR procedures. In his letter of medical necessity, the physician stated that Ms. N "would be a good surgical candidate" because "her facial features still lack[] adequate female characteristics and Facial Feminization Surgery would be the next step in her transition that may enable her to live more fully as a female."

110.    In April 2022, Ms. N had a consultation with the surgeon in Boston who recommended several GAFR procedures to feminize her facial features and treat her gender dysphoria. On October 3, 2022, the Boston surgeon performed those surgeries and submitted a health insurance claim to Aetna on that date for charges totaling $41,948.00. The claim forms each listed the diagnostic code for gender dysphoria as the basis for the surgeries.

111.    On December 8, 2022, Ms. N received an Explanation of Benefits ("EOB") from Aetna denying coverage for each of her GAFR surgical procedures, leaving her responsible for the full charges of $41,948.00. The EOB, in brief remarks explaining the denials, stated that "[c]harges for cosmetic surgery and other cosmetic services are excluded from coverage under your plan."

112.    Ms. N's Aetna plan document for 2022 provided that "[c]overed services include certain services and supplies for gender affirming (sometimes called sex change) treatment," and

referred to Aetna's clinical policy bulletins "for detailed information on this covered benefit, including eligibility and medical necessity requirements."

113.    On December 9, 2022, Ms. N appealed the claim denial and requested an external review, explaining on the appeal form that "facial feminization is a medical necessity, and not cosmetic[], when transitioning from male to female," and attaching documentation from her treating providers confirming the medical necessity of the surgeries.

114.    On December 22, 2022, while her appeal was pending, Ms. N submitted a complaint letter to Aetna, explaining why GAFR was medically necessary for her and how it had improved her health and well-being since she had received it.

115.    In the complaint letter, she recounted incidents of harassment she experienced by strangers who perceived her to be transgender because of her masculine facial features. She wrote, "I can remember shopping at my local [S]hop[R]ite grocery store, a husband and a wife was near my area where I was shopping, I heard the husband spoke 'GO AWAY FAGGOT, GO AWAY!!!' I looked at him and he kept on saying those words. So I just walked away." In a second incident, she wrote, "I was also in [V]irginia [B]each this last summer, I was walking in my sundress, I walked past a group of ladies, and I heard them say, She looks like a guy! If I heard it, so did the people near them. I just walked away, as I always do." She added, "I had so many experiences where I was being bullied because of how I look. And I know that facial feminization can help me achieve a better life. Who wants to be bullied all the time?"

116.    Ms. N's complaint letter to Aetna also shared the benefits of the surgery she had received on October 3, 2022. She wrote, "But, NOW, I can mention my experiences AFTER my facial feminization, a person who sees me automatically addressed me as Ms. I never heard any derogatory remarks about my look. Now, I can pass as a female, as long as I do not talk,"

referencing her prominent Adam's apple (trachea) and describing her voice was "somewhere between male and female."

117.    On January 17, 2023, Aetna denied Ms. N's appeal. In upholding its decision, Aetna referred to CPB 0615's GAFR Exclusion and stated that it "consider[s] [her] requested facial reconstruction surgeries performed as a component of a gender transition as not medically necessary and cosmetic." Aetna also refused to cover the cost of anesthesia connected with the surgeries, stating that "[w]e do not cover procedures/services used in the performance of non-covered services, such as the anesthesia services in this case."

118.    Because of Aetna's coverage denials, Ms. N was compelled to pay the full $41,948.00 cost of the October 2022 GAFR surgeries. She paid out of pocket using her debit card using personal savings, which imposed a significant financial burden on her.

119.    On January 10, 2023, Ms. N also received voice feminization surgery and a tracheal shaving from a surgeon in Portland, Oregon to treat her gender dysphoria. Aetna denied her claims and appeals—though she eventually secured partial reimbursement—citing the GFAR exclusion.

**GAFR is a Safe, Effective, Medically Necessary Treatment for Gender Dysphoria for Many Transfeminine People**

*Background on Gender Dysphoria*

120.    Many transgender people experience gender dysphoria. Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 513 (5th ed., text revision 2022) ("DSM-5-TR"); Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5"). The DSM-5-TR defines gender dysphoria in adults as the "marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6

months' duration, as manifested by" factors that may include an incongruence between one's gender identity and primary or secondary sex characteristics, a strong desire to be rid of such sex characteristics and/or to have the primary and/or secondary sex characteristics matching their gender identity, and a strong desire to be (and to be treated as) the sex matching their gender identity.

121.    The World Health Organization also recognizes gender dysphoria, which it calls "gender incongruence," as a medical condition. World Health Org., *International Classification of Diseases, Eleventh Revision* 1168 (2019) ("ICD-11"). The ICD-11 describes the condition as "characterized by a marked and persistent incongruence between an individual's experienced gender and the assigned sex, which often leads to a desire to 'transition', in order to live and be accepted as a person of the experienced gender, through hormonal treatment, surgery or other health care services to make the individual's body align, as much as desired and to the extent possible, with the experienced gender."

122.    All transgender people and no cisgender people are at risk for experiencing gender dysphoria. People with gender dysphoria are always transgender; indeed, in the language of the DSM-5-TR, an incongruence between one's assigned sex and gender identity—the definition of being transgender—is the "core component of the diagnosis." However, to constitute gender dysphoria, this incongruence must come with "clinically significant distress or impairment in social, occupational, or other important areas of functioning."

123.    In addition to referring to the diagnosable medical condition, the term "gender dysphoria" can also refer to a symptom of that condition—in particular, the "clinically significant distress" associated with an incongruence between one's gender identity and assigned sex or primary or secondary sex characteristics. Primary sex characteristics include internal and

external genitalia, gonads, and reproductive organs. Secondary sex characteristics include breasts, hormonal balance, voice pitch, bone structure, facial features, and facial and body hair, among others. The dysphoria and distress associated with these characteristics can be exceptionally painful and debilitating.

124.    Untreated or undertreated gender dysphoria, particularly when coupled with a history of familial or social rejection, discrimination, or violence, can have serious consequences for transgender people's health, leading to anxiety, depression, abuse of substances, difficulty with social functioning, suicidal thinking, suicide attempts, self-surgery, self-harm, or avoidance of seeking medical care, exercising, bathing, or doing other important activities. Fortunately, when transgender people receive adequate treatment for gender dysphoria, especially when accompanied by social and familial acceptance and support, these outcomes can be prevented, ameliorated, or resolved.

125.    A transgender person's gender dysphoria can be alleviated when the person is able to live authentically and be treated by others consistently with the person's gender identity. Many transgender people undergo a gender transition, which may include social, pharmacological, and surgical components. During a social transition, a transgender person begins to align their gender expression with their gender identity. This may include wearing different clothes, using a new name and pronouns, and interacting with peers and one's social environment in a manner that matches the person's gender identity. Many transgender people also need medical treatments, which may include gender-affirming hormone therapy and gender-affirming surgical treatments that help bring one's incongruent primary and secondary sex characteristics into alignment with one's gender identity.

126.    Distress associated with gender dysphoria often arises when a transgender person is prevented or impeded from socially transitioning or from obtaining gender-affirming medical and surgical treatments for gender dysphoria.

127.    Gender-affirming medical treatments, including surgeries, are widely recognized by the medical profession as safe, effective treatments for gender dysphoria.

128.    GAFR is widely recognized as a form of medically necessary surgical care for gender dysphoria.

*The Prevailing Standards of Care for Treating Gender Dysphoria Recognize GAFR as Medically Necessary*

129.    WPATH, an interdisciplinary professional and educational organization devoted to transgender health, established and publishes the internationally accepted WPATH Standards of Care for the treatment of gender dysphoria. WPATH released the current version of these standards, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC-8"), on September 15, 2022. The previous version, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version* ("SOC-7") was published in 2012 and in effect until SOC-8 was published in 2022.

130.    The WPATH Standards of Care establish the accepted guidelines for practitioners to evaluate when particular treatments may be medically necessarily for a given individual. Major medical and mental health organizations, including the American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association, have endorsed the WPATH Standards of Care as the authoritative standards of care for gender dysphoria treatment, and have recognized that gender-affirming medical and surgical treatments are safe and effective treatments for gender dysphoria, and access to such treatments improves the health and well-being of transgender people.

131.    The WPATH Standards of Care recognize that gender-affirming healthcare, including hormonal and surgical treatments, can effectively treat gender dysphoria by alleviating the distress caused by gender incongruence and allowing a person to live in alignment with their gender identity. In SOC-8, WPATH explains that the purpose of the Standards of Care "is to provide clinical guidance to health care professionals to assist transgender and gender diverse (TGD) people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment," which "may include but is not limited to hormonal and surgical treatments, voice and communication therapy, primary care, hair removal, reproductive and sexual health, and mental health care." SOC-8 instructs that "[h]ealthcare systems should provide medically necessary gender affirming health care for TGD people."

132.    Under the WPATH Standards of Care, probative factors in a medical necessity determination for specific treatments include, but are not limited to, a diagnosis of gender dysphoria, capacity to consent to treatment, the absence of contraindications, and persistence of gender dysphoria following other forms of treatment.

133.    Gender-affirming hormone therapy is a pharmacological treatment for gender dysphoria which involves a physician prescribing medications to achieve hormonal congruence with the person's gender identity. For example, a transfeminine person who experiences gender dysphoria caused by hormonal masculinization would be prescribed medications that reduce testosterone levels and increase estrogen levels. This results in the development of many typically female sex characteristics, as common effects of estrogen include breast formation, body fat redistribution, slowed growth of body and facial hair, decreased muscle mass and strength, skin dryness, and reduced perspiration. However, hormone treatment in adults cannot

fully reverse the effect of high levels of testosterone during puberty, particularly the development of typically masculine facial features and voice pitch.

134.    Sometimes one or more forms of surgical treatment are also medically necessary to alleviate dysphoria experienced by transgender individuals. Some surgical procedures that have been proven safe and effective for the treatment of gender dysphoria in transfeminine people include vaginoplasty, breast augmentation, and GAFR.

135.    Cosmetic treatments are medical interventions undertaken to improve appearance, not to treat or prevent a diagnosable condition. Surgical gender-affirming treatments that have been deemed medically necessary for a patient in accordance with WPATH Standards of Care—including GAFR treatments—are not cosmetic. They are not undertaken to improve appearance, but to align physical sex characteristics with a person's gender identity and treat the diagnosed condition of gender dysphoria.

136.    The WPATH Standards of Care recognize that GAFR is medically necessary to correct masculine facial features in transfeminine people that cause or exacerbate gender dysphoria.

137.    During puberty, the presence of sex hormones causes distinct physical differences to develop in specific characteristics of the face, masculinizing its features if testosterone is the driving hormone of puberty and feminizing if the driving hormone is estrogen.

138.    For transfeminine people who experience testosterone dominant puberty, those characteristics of the face include, among others, facial hair growth, prominence of the brow bone (or "bossing"), receding hairline and hair loss, masculinized jaw and nose structure, laryngeal prominence (the "Adam's apple"), a masculinized philtrum (the vertical groove in the

upper lip), and lack of fat distribution to the cheeks, lips, and temples (midfacial volume). They also include vocal cord development resulting in masculinized voice features.

139.    Multiple surgeries identified by WPATH Standards of Care are available for gender-affirming facial reconstruction to correct these characteristics, including, among other procedures, chondrolaryngoplasty, rhinoplasty, contouring or augmentation of the jaw, chin, and forehead, facelift, hair removal, and hair transplantation.

140.    GAFR can alleviate the psychological harm experienced from gender dysphoria by repairing the post-puberty effects testosterone has had on the masculinization of structural and soft tissue characteristics of the face, including the throat and vocal cords.

141.    The WPATH Standards of Care have long recognized that GAFR procedures are reconstructive and medically necessary for the treatment of gender dysphoria. WPATH expressly names GAFR as among the surgeries that are medically necessary to treat gender dysphoria in both the seventh and eighth versions of its Standards of Care. In 2016, WPATH released a statement that reiterated that GAFR procedures are medically necessary, indeed sometimes "the only effective treatment" for gender dysphoria, and recommended that they be covered by insurance for that purpose.[7] WPATH's position is bolstered by extensive evidence-based, peer-reviewed medical literature establishing that FGAS effectively treats and alleviate gender dysphoria for the transgender people who need it.[8]

---

[7] WPATH, *Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.* (Dec. 21, 2016), https://www.wpath.org/newsroom/medical-necessity-statement [https://perma.cc/95VF-S3GY].

[8] *See., e.g.*, Shane D. Morrison et al., *Facial Feminization: Systematic Review of the Literature,* 137 Plastic & Reconstructive Surgery 1759, 1769 (2016) (concluding that FGAS is "safe and effective" after performing a review of 15 studies of 1121 patients).

**Aetna's Discriminatory Exclusion on GAFR Under CPB 0615**

142.    Aetna publishes, implements, and enforces CPBs, which govern the coverage of various medical services under health benefits plans offered, underwritten, or administered by Aetna and its affiliates. These CPBs include CPB 0615, which governs coverage for gender-affirming surgeries under Aetna plans. Upon information and belief, Defendant applies CPB 0615 only to transgender people seeking gender-affirming surgical treatments related to gender transition. Other reconstructive surgeries obtained by cisgender people to help align their secondary sex characteristics with their gender identity—for example, breast reconstruction after a cisgender woman's mastectomy for breast cancer to restore breasts with a typically female appearance—are not subject to CPB 0615.

143.    CPB 0615 states that Aetna "considers gender affirming surgery medically necessary" when specified criteria for certain procedures are met. For transfeminine people, these covered procedures include breast augmentation, gonadectomy, and various genital reconstructive surgeries.

144.    CPB 0615 categorically excludes other gender-affirming surgeries and procedures, describing them "as not medically necessary and cosmetic" in all cases. These categorically excluded services include "Facial Gender Affirming Procedures," including gender-affirming surgeries on the face, brow, hair line, nose, cheek, lip, lower jaw, chin, and vocal cords.

145.    CPB 0615 cross-references another Aetna CPB, Cosmetic Surgery (CPB 0031). CPB 0031 states that "Aetna plans exclude coverage of cosmetic surgery and procedures that are not medically necessary, but generally provide coverage when the surgery or procedure is needed to improve the functioning of a body part *or otherwise medically necessary* even if the surgery or

procedure also improves or changes the appearance of a portion of the body." CPB 0031 (emphasis added). CPB 0031 indicates that many facial surgeries provided to cisgender people—including those excluded under CPB 0615 as treatments for gender dysphoria—are, in fact, covered when medically necessary for other conditions. Despite covering the procedures that comprise GAFR to treat clinical conditions unrelated to being transgender, Aetna excludes GAFR procedures by mischaracterizing them as "cosmetic" when they are provided to transgender people to treat gender dysphoria by changing face- and voice-related sex characteristics.

146.    Aetna's categorical determination that GAFR is "cosmetic" and "not medically necessary" in all cases is inconsistent with the medical research specifically cited by Aetna itself in CPB 0615. The CPB explains that "[g]ender dysphoria refers to discomfort or distress that is caused by a discrepancy between an individual's gender identity and the gender assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)," that "[t]his condition may cause clinically significant distress or impairment in social, occupational, or other important areas of functioning," and that "[g]ender affirming surgery is performed to change primary and/or secondary sex characteristics." CPB 0615 (Background). "For transfeminine (assigned male at birth) gender transition, surgical procedures may include genital reconstruction (vaginoplasty, penectomy, orchidectomy, clitoroplasty), breast augmentation (implants, lipofilling), and cosmetic surgery (facial reshaping, rhinoplasty, abdominoplasty, thyroid chondroplasty (laryngeal shaving), voice modification surgery (vocal cord shortening), [and] hair transplants." *Id.* The CPB cited multiple studies concluding that facial surgeries for transfeminine people are safe and effective in reducing gender dysphoria associated with masculine features. *Id.*

40

147.    Aetna has also been specifically required to cover GAFR by a growing number of states that recognize these services as medically necessary treatments for gender dysphoria. An addendum to Aetna's CPB on Gender Affirming Surgeries indicates that, at the time of this Complaint, four states—Colorado, Maryland, Oregon, and Washington—expressly require Aetna to affirmatively cover GAFR for many Aetna plans regulated by those states. Illinois also requires Aetna to cover all gender-affirming procedures when medically necessary for individual participants and prohibits it from categorically excluding certain services, such as GAFR, as "cosmetic." In a sixth state—New York—Aetna began to cover medically necessary GAFR on September 16, 2024. California requires Aetna to cover outpatient GAFR procedures. *Id.* As stated in the CPB 0615 addendum:

    a.    In Colorado, "fully insured small group and individual health plans regulated by the State of Colorado Division of Insurance are required by legislation to cover medically necessary gender affirming care for gender dysphoria," including 11 specified GAFR procedures that are covered when specified medical necessity criteria are met. *Id.*

    b.    In Maryland, "fully insured small group and individual health plans regulated by Maryland Medicaid Program" must cover a range of GAFR procedures when specified medical necessity criteria are met. *Id.*

    c.    In Oregon, for members of plans governed by the State of Oregon, GAFR procedures, "when performed as a component of gender-affirming treatment, will be approved for coverage without medical necessity review[.]" *Id.*

d.  In Washington, for plans regulated by the Washington Department of Insurance, various GAFR procedures "must be reviewed for medical necessity" based on specified medical necessity criteria. *Id.*

e.  In Illinois, "for commercial fully insured and self-funded non-ERISA group and individual health insurance plans regulated by the Illinois Department of Insurance, all gender affirming care must be reviewed for medical necessity using evidence-based sources reflecting generally accepted standards of care. Aetna will not categorically exclude coverage for treatment of gender-affirming care that falls within generally accepted standards of care, *nor will it apply a cosmetic exclusion* or consider such care as experimental or investigational." *Id.*

f.  In New York, beginning on September 16, 2024, plans regulated by the State of New York Department of Financial Services will cover various GAFR procedures when performed as a component of gender-affirming treatment when specified medical necessity criteria are met. *Id.*

g.  In California, for members of HMO/HNO plans regulated by the California Department of Managed Health Care, and traditional and PPO plans regulated by the California Department of Insurance, outpatient procedures for gender-affirming services are not subject to prior authorization. *Id.*

148.    On January 1, 2024, the United States Office of Personnel Management (OPM) began to require Aetna and other insurers to cover GAFR surgeries under all Federal Employee Health Benefit (FEHB) plans administered by those insurers.[9]

149.    The false premise for Aetna's GAFR Exclusion in CPB 0615—that GAFR is always "cosmetic" and thus never medically necessary—is belied by the fact that Aetna now uses and routinely applies medical necessity criteria to review requests for GAFR services in multiple states and other plans Aetna administers.

150.    Aetna has an unfortunate history of intentionally and wrongfully characterizing medically necessary gender-affirming surgical care as "cosmetic" and categorically excluding coverage for that care on that basis. Until 2021, for example, CPB 0615 categorically excluded coverage for breast augmentation surgeries for transfeminine people, similarly labeling those surgeries as "cosmetic" and not medically necessary. In January 2021, Aetna removed this categorical exclusion from CPB 0615. Since then, Aetna covers breast augmentation surgery for transfeminine people with gender dysphoria when certain clinical criteria for medical necessity specified in CPB 0615 are met. Despite making this change, Aetna has continued to maintain and enforce the categorical exclusion on GAFR based on the same characterization of those surgeries as "cosmetic" and "not medically necessary" that it previously applied to breast augmentation surgeries.

151.    Aetna's blanket miscategorization of GAFR treatments for gender dysphoria as "cosmetic" and categorical exclusion of coverage for GAFR under Aetna plans as "not medically

---

[9] In or around January 2025, OPM stated that it will reverse its position beginning in 2026. Laurie Bodenheimer, *FEHB Program Carrier Letter Number 2025-01A: Addendum to Call Letter for Plan Year 2026*, Off. Personnel Mgmt. Healthcare and Ins. (Jan. 31, 2025), https://www.opm.gov/healthcare-insurance/carriers/fehb/2025/2025-1a.pdf.

necessary" conflicts with the prevailing standards of care for treating gender dysphoria, ignores the medical consensus that these treatments are medically necessary for many transgender people, and deprives transgender people who need it of this critically important and often life-saving care with no valid justification.

## INJURIES TO PLAINTIFFS

152.    All Plaintiffs have experienced delayed or denied medically necessary care for gender dysphoria because of Aetna's discriminatory categorical coverage exclusion on GAFR. As a result, all Plaintiffs suffered exacerbated gender dysphoria, associated distress, and stigma and mistreatment. Plaintiffs also endured serious distress from the knowledge that they were being denied insurance coverage on the basis of sex because they are transgender.

153.    As a result of Aetna's administration of exclusions of coverage for GAFR, Plaintiffs have suffered harm, including but not limited to emotional distress, stigmatization, humiliation, a loss of dignity, and financial harm. By administering health care coverage to Plaintiffs that discriminates on the basis of sex, Aetna has intentionally violated Section 1557, for which the Named Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages and consequential damages.

154.    Ms. Gordon and Ms. N have been injured by Aetna's discriminatory acts requiring them to pay out of pocket for GAFR procedures that their healthcare providers determined were medically necessary to treat their gender dysphoria.

155.    To date, Ms. Gordon and Ms. N have incurred tens of thousands of dollars in medical costs for their GAFR procedures due to Aetna's discrimination.

156.    On information and belief, many thousands of other individuals subject to Aetna's discrimination have likewise been required to pay out-of-pocket expenses for GAFR that treats

their gender dysphoria that should be covered by their health plans and that is provided to others within their health plans.

157.    Ms. Mayers, Ms. Avalle, Dr. Homnick, and Dr. Herley have not been able to get the medically necessary GAFR procedures that they need because of Aetna's discriminatory actions and their inability to pay out of pocket. As a result, they all continue to suffer from severe gender dysphoria, related distress, stigma, and the risk of discrimination, violence, and harassment by others.

158.    On information and belief, many thousands of other individuals subject to Aetna's discrimination have suffered further and additional harm, including experiences of delayed or denied GAFR, from Aetna's categorical exclusion of those procedures for individuals diagnosed with gender dysphoria; Aetna does not categorically exclude the same procedures for those who may require them to treat other health conditions.

159.    Without declaratory and injunctive relief from Aetna's ongoing, discriminatory maintenance and enforcement of the GAFR Exclusion, Ms. Mayers, Ms. Avalle, Dr. Homnick, Dr. Herley, and proposed class members have suffered and will continue to suffer from irreparable harm.

## CLASS ALLEGATIONS

160.    Plaintiffs seek prospective injunctive relief and damages on behalf of two classes of similarly situated individuals under Rule 23(b)(2) and (b)(3), respectively, of the Federal Rules of Civil Procedure ("Plaintiff Classes").

161.    The Plaintiff Class under Rule 23(b)(3) (the "Damages Class") comprises all transgender individuals in the United States who were assigned male at birth; have been diagnosed with gender dysphoria; were referred for GAFR surgeries by their treating providers

as medically necessary treatments for gender dysphoria consistent with the WPATH Standards of Care; and, at any time between four years prior to filing of the first Complaint (September 10, 2020) to the date of final judgment, incurred out-of-pocket expenses and/or other compensable damages while covered by a health plan offered, underwritten, or administered by Aetna, because they were denied coverage or deterred from seeking coverage for GAFR based on Aetna's categorical exclusion on GAFR in CPB 0615.

162.    The Plaintiff Class under Rule 23(b)(2) (the "Injunctive Relief Class") comprises all transgender individuals in the United States who were assigned male at birth, have been diagnosed with gender dysphoria, and who are or will be covered by a health plan offered, underwritten, or administered by Aetna that is subject to Aetna's categorical exclusion of GAFR in CPB 0615, and for whom GAFR is or will be a medically necessary treatment for their gender dysphoria while covered by an Aetna plan.

163.    Aetna's GAFR Exclusion, as set forth in CPB 0615, imposes on transgender individuals for whom GAFR surgery is a medically necessary treatment for gender dysphoria the burden to either undergo and pay out of pocket for their needed surgeries, if possible, or to forgo these medically necessary treatments altogether. In this way, Aetna forces Class Members to make the painful choice between incurring delay and expense of out-of-pocket medical procedures or forgoing treatment—thus imposing an immediate and ongoing threat to the Rule 23(b)(2) class's rights under Section 1557 to be free from discrimination on the basis of sex in health programs and activities receiving federal financial assistance.

164.    Numerosity: The Classes are so numerous that joinder of all individual members would be impracticable. Upon information and belief, in addition to Plaintiffs, the proposed

classes include at least thousands of individuals who have either been denied coverage for GAFR or were deterred from pursuing coverage for GAFR because of the GAFR Exclusion.

165.    Upon information and belief, around 39 million people in the United States are enrolled in Aetna health insurance plans and services. Assuming that the demographics of adult Aetna members correspond to the demographics of adults in the United States overall, approximately 30,381,000 of those members are adults, of which approximately 486,096 are transgender, likely roughly half of whom were assigned male at birth.[10] Based on these statistics, there are approximately 243,048 adult transfeminine people enrolled in health insurance plans offered, underwritten, or administered by Aetna. According to 2015 data from a large national survey, six percent of transfeminine respondents had already had GAFR and another 39 percent were sure they needed it.[11] Conservatively assuming that just one percent of transfeminine survey respondents had GAFR in the last four years, and that 75 percent of Aetna plans held by transfeminine people were subject to the GAFR Exclusion during the lookback period, the damages class would have approximately 1,700 members. Similarly, conservatively assuming that 75 percent of Aetna plans are subject to the GAFR Exclusion, the injunctive relief class likely has over 70,000 members.

---

[10] GAFR is typically only performed on adults. In 2020, 77.9% of the United States population, or 258.3 million people, is 18 or over. *See* Stella U. Ogunwole et al., *U.S. Adult Population Grew Faster Than Nation's Total Population From 2010 to 2020*, U.S. Census Bureau (Aug. 12, 2021), https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html [https://perma.cc/ST7M-UPTL]. Around 1.6% of adults in the U.S. are transgender. *See* Anna Brown, *About 5% of young adults in U.S. are transgender or nonbinary*, Pew Research Center (June 7, 2022), https://www.pewresearch.org/short-reads/2022/06/07/about-5-of-young-adults-in-the-u-s-say-their-gender-is-different-from-their-sex-assigned-at-birth/ [https://perma.cc/G6MT-TUYE].

[11] Sandy James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey*, at 102 (2015), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf [https://perma.cc/9MHB-CTHT].

166.    Commonality and Predominance of Common Questions: Plaintiffs and all members of the proposed classes have been harmed by Defendant's categorical exclusion of GAFR procedures to treat gender dysphoria. This action requires a determination of whether the GAFR Exclusion violates Section 1557 of the Affordable Care Act. The questions of fact and law arising from the adjudication of this issue are common to all members of the Classes, including:

a.    Whether the GAFR Exclusion, facially and as applied to members of the proposed Classes, violates the prohibitions on discrimination on the basis of sex under Section 1557;

b.    Whether Aetna incorporates via common contractual provisions its clinical policy bulletins, including CPB 0615, as the default policies applicable to all health plans offered, underwritten, or administered by Aetna;

c.    Whether Aetna is a recipient of federal financial assistance and is therefore subject to Section 1557's nondiscrimination requirements;

d.    Whether GAFR, when provided to treat gender dysphoria in transfeminine people by changing sex characteristics, is reconstructive and medically necessary, or cosmetic and not medically necessary;

e.    Whether Aetna categorically excludes coverage for Class Members seeking GAFR to treat their gender dysphoria under health plans offered, underwritten, or administered by Aetna.

167.    Common issues of law and fact predominate over any individual issues arising from Class Members' claims against Aetna for unlawful discrimination in violation of Section 1557.

168.    Typicality: Plaintiffs' claims for relief are typical of the claims of the Plaintiffs' Classes. Plaintiffs are all adult transfeminine people, have all been diagnosed with gender dysphoria, were enrolled at relevant times in health insurance plans offered or administered by Aetna, and have either been denied coverage for GAFR or were deterred from seeking coverage pursuant to the GAFR Exclusion. Class Members are all adult transfeminine people with diagnoses of gender dysphoria who have or at relevant times had health coverage with Aetna subject to the GAFR Exclusion and were either denied coverage for GAFR by Aetna pursuant to the GAFR Exclusion or were deterred from seeking coverage due to their or their treating providers' awareness of the GAFR Exclusion. The Named Plaintiffs and the putative classes seek to establish that the GAFR Exclusion violates Section 1557. Ms. Gordon, Ms. N, and the Rule 23(b)(3) class all seek to recover their out-of-pocket expenses and related damages incurred in being forced to pay out of pocket for GAFR because of Aetna's enforcement and application of the GAFR Exclusion. Ms. Mayers, Ms. Avalle, Dr. Homnick, Dr. Herley, and the Rule 23(b)(2) class all seek injunctive relief to remove the GAFR Exclusion and permit them to obtain coverage for medically necessary GAFR under health insurance plans offered, underwritten, or administered by Aetna. Ms. Mayers, Ms. Avalle, Dr. Homnick, Dr. Herley and other members of the Rule 23(b)(2) class are and will continue to be subject to discrimination on the basis of sex by Aetna's continued maintenance and enforcement of the GAFR Exclusion, and they are and will continue to be injured as a result.

169.    Adequacy of Representation: Plaintiffs can protect the interests of all members of the classes fairly and adequately, as they have no conflicts of interest with any members of the Classes. Plaintiffs have retained counsel who are experienced in litigating both discrimination cases and complex class action cases.

170.    Superiority: A class action is superior to any other method for the fair and efficient resolution of this legal dispute. Prosecution of thousands of individual actions by individual members of the Plaintiffs' Classes would create the substantial risk of inconsistent or varying adjudications, which would establish potentially incompatible standards of conduct for Aetna. Moreover, such individual actions would be inefficient, and burden the individual plaintiffs, the court system, and Defendant with greater costs than resolving these claims together. Class members may have difficulty obtaining counsel willing to proceed on a contingency basis and lack the resources to pay out of pocket for counsel. Finally, some class members would be reluctant to have their transgender identity and details about their medical care made public, as filing a separate lawsuit would do.

171.    Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed classes.

## CAUSE OF ACTION

### Unlawful Discrimination on the Basis of Sex in Violation of Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116

172.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

173.    Section 1557 of the Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116, in relevant part, provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" on the basis of sex and other protected classifications. 42 U.S.C. § 18116.

174.    Defendant Aetna Life Insurance Company is subject to Section 1557 because it receives, and at all relevant times has received, federal financial assistance.

175.    Aetna's maintenance and enforcement of the GAFR Exclusion, both facially and as applied to Plaintiffs and the proposed Classes, violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving Federal financial assistance because it excludes coverage for medically necessary services for transgender individuals that it covers for other medically necessary purposes, based in part on the false and stereotypical characterization of those services as "cosmetic."

176.    Plaintiffs and members of the Proposed Classes have been and are continuing to be injured by Defendant's enforcement and application of the GAFR Exclusion and have suffered damages as a result.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Certify a Plaintiff Class under Rule 23(b)(3) (the "Damages Class") of all transgender individuals in the United States who were assigned male at birth; have been diagnosed with gender dysphoria; were referred for GAFR surgeries by their treating providers as medically necessary treatments for gender dysphoria consistent; and, at any time between four years prior to filing the first Complaint (September 10, 2020) to the date of final judgment, incurred out-of-pocket expenses and/or other compensable damages while covered by a health plan offered, underwritten, or administered by Aetna, because they were denied coverage or deterred from seeking coverage for GAFR based on the GAFR Exclusion.

b.    Certify a Plaintiff Class under Rule 23(b)(2) (the "Injunctive Relief Class") of all transgender individuals in the United States who were assigned male at birth, have been diagnosed with gender dysphoria, and who are or will be covered by a health plan offered, underwritten, or administered by Aetna that is subject to the GAFR Exclusion, and for whom

GAFR is or will be a medically necessary treatment for their gender dysphoria while covered by an Aetna plan.

      c.      Name Plaintiffs Binah Gordon and S.N. as representatives of the Damages Class;

      d.      Name Plaintiff Kay Mayers, Alma Avalle, Jamie Homnick, and Gennifer Herley as representatives of the Injunctive Relief Class;

      e.      Appoint Plaintiffs' undersigned attorneys at Wardenski P.C., Advocates for Trans Equality Education Fund, and Cohen Milstein Sellers & Toll PLLC as class counsel for the Plaintiff Classes;

      f.      On behalf of Plaintiffs and the Plaintiff Classes, enter a declaratory judgment that Aetna's GAFR Exclusion, both facially and as applied to Plaintiffs and members of the proposed classes, violates Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex;

      g.      On behalf of Plaintiff Kay Mayers, Alma Avalle, Jamie Homnick, Gennifer Herley, and all similarly situated individuals in the proposed Injunctive Relief Class, issue a permanent injunction enjoining Aetna from any enforcement of GAFR Exclusion, or any other Aetna policy or practice that categorically excludes coverage for GAFR surgeries;

      h.      Award compensatory damages to Plaintiffs Binah Gordon and S.N., and to all similarly situated individuals in the Damages Class, as permitted under Section 1557, in an amount that would fully compensate them for their actual damages resulting from Defendant's unlawful conduct, including but not limited to reimbursement for GAFR surgeries and procedures for which they paid out of pocket because of Aetna's maintenance and enforcement of the GAFR Exclusion;

  i.  Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42

U.S.C. § 1988; and

  j.  Award such other and further relief as the Court may deem just and proper.


DATED: February 28, 2025     Respectfully submitted,

          */s/ Christine E. Webber*
          Christine E. Webber (admitted *pro hac vice*)
          Aniko R. Schwarcz (admitted *pro hac vice*)
          Harini Srinivasan (admitted *pro hac vice*)
          COHEN MILSTEIN SELLERS & TOLL PLLC
          1100 New York Ave, NW, Suite 800
          Washington, DC 20005
          Phone: (202) 408-4600
          Fax: (202) 408-4699
          cwebber@cohenmilstein.com
          aschwarcz@cohenmilstein.com
          hsrinivasan@cohenmilstein.com

          Joseph J. Wardenski [ct31674]
          WARDENSKI P.C.
          134 West 29th Street, Suite 709
          New York, NY 10001
          Phone: (347) 913-3311
          Fax: (347) 467-7237
          joe@wardenskilaw.com

          Gabriel Arkles (admitted *pro hac vice*)
          Ezra Cukor (admitted *pro hac vice*)
          Sydney Duncan (admitted *pro hac vice*)
          ADVOCATES FOR TRANS EQUALITY
          EDUCATION FUND
          520 Eighth Avenue, Suite 2204
          New York, NY 10018
          Phone:(646) 993-1688
          Fax: (646) 993-1686
          garkles@transgenderlegal.org
          ecukor@transgenderlegal.org
          sduncan@transgenderlegal.org

          *Attorneys for Plaintiffs*