## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BINAH GORDON *et al*., | |
| Plaintiffs, | |
| v. | No. 3:24-cv-01447-VAB |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION BY PLAINTIFFS JAMIE HOMNICK AND GENNIFER HERLEY

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................... 1

II.    BACKGROUND ....................................................................................................... 2

III.   LEGAL STANDARD ............................................................................................... 17

IV.    ARGUMENT............................................................................................................ 18

      A.     Plaintiffs, Drs. Homnick and Herley, Are Suffering Ongoing, Irreparable
            Harm. ................................................................................................................ 18

      B.     Plaintiffs Are Likely to Succeed on the Merits....................................................... 23

            1.     Section 1557's nondiscrimination requirement applies to Aetna. ........... 23

            2.     The Challenged Exclusion Violates Section 1557's ban on sex
                  discrimination. ....................................................................................... 24

            3.     The GAFR Exclusion Facially Discriminates Because of Sex ................. 25

                a.     Alternatively, Plaintiffs establish a likelihood of success on
                       the merits through direct and circumstantial evidence of sex
                       discrimination. ............................................................................ 30

      C.     The Balance of the Equities Weighs in Favor of the Plaintiffs............................. 31

      D.     The Public Interest is Best Served by Issuing a Preliminary Injunction............... 33

      E.     The Bond Requirement Should be Waived. .......................................................... 34

V.     CONCLUSION......................................................................................................... 35

i

# TABLE OF AUTHORITIES

Page

## CASES

*A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023)........................................ 27

*A.H. by & through Hester v. French*, 985 F.3d 165 (2d Cir. 2021)............................................... 18

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987)............................................. 31

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107 (2d Cir. 2004) .................... 28

*Berton v. Aetna Inc.*, No. 23-cv-01849, 2024 WL 869651 (N.D. Cal. Feb. 29, 2024)........... 25, 30

*Bontrager v. Indiana Fam. & Soc. Servs. Admin.*, 697 F.3d 604 (7th Cir. 2012) ................. 21, 33

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ............................................................. 26, 27, 28

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018)...................................................... 28, 29

*C. P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145, 2023 WL 8777349 (W.D. Wash. Dec. 19, 2023)........................................................... 20, 21, 32, 33

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022).................................................................... 29

*Cano v. S.C. Dep't of Corr.*, No. 922-cv-04247-DCCMHC, 2023 WL 10286851 (D.S.C. July 31, 2023) ........................................................................................................................... 22

*City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978) ...................... 26

*Clark v. Quiros*, No. 3:19-CV-575, 2024 WL 3552472 (D. Conn. July 26, 2024) ..................... 21

*Clarkson Co. v. Shaheen*, 544 F.2d 624 (2d Cir. 1976)............................................................. 34

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351 (2d Cir. 2024) ........................................................................................................................... 18

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016)........................................................... 25, 27

*Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996)......................................................... 34

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ............................................................... 21

## TABLE OF AUTHORITIES

Page

*Eng v. Smith*, 849 F.2d 80 (2d Cir. 1988) ................................................................. 19

*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018) ............................................. 34

*Fain v. Crouch*, 618 F. Supp. 3d 313, 327 (S.D.W. Va. 2022) .................................. 28

*Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931 (W.D. Wis. 2018)..... 20, 21, 22, 27, 28

*Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) .......................... 29

*Grand River Enter. Six River Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) ...................... 19

*Grimm v. Gloucester Cnty. Sch. Bd.*, 973 F.3d 586 (4th Cir. 2020) .............................................. 27

*Hammons v. Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567 (D. Md. 2021) ....................................... 27

*Hicklin v. Precynthe*, No. 4:16-cv-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018).......... 21, 22

*IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224 (E.D.N.Y. 2024)........................................ 35

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991)................................................................................ 25

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023) ................................................................. 18

*K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254 (S.D. Fla. 2011) ....................................... 32

*Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024)............................................................... 26, 27, 29

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. Aug. 10, 2022)............................................... 28

*Kadel v. Folwell*, No. 1:19-cv-272, 2022 WL 11166311 (M.D.N.C. Oct. 19, 2022).................. 33

*Karnoski v. Trump*, No. C17-1297, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ............... 20

*Klaneski v. Bristol Hosp., Inc.*, No. 3:22-CV-1158, 2023 WL 4304925 (D. Conn. June 30, 2023 ................................................................................................................ 26, 27

*L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018).............................................................. 32

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) ....................... 19, 20, 34

# TABLE OF AUTHORITIES

<u>Page</u>

*Laforest v. Honeywell Intern., Inc.*, No. 03-cv-6248T, 2003 WL 23180220 (W.D.N.Y. Sep. 19, 2003) .................................................................................................................. 34

*Nat'l Org. for Women-New York City v. U.S. Dep't of Def.*, No. 23-cv-6750, 2024 WL 4635480 (S.D.N.Y. Oct. 31, 2024) .......................................................................... 24

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........................... 19

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ....................... 19

*Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015) ................................................. 22, 34

*Olson v. Wing*, 281 F. Supp. 2d 476 (E.D.N.Y. 2003) ................................................................ 20

*Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129 (2d Cir. 2024) .................................... 30

*Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090 (S.D. Cal. 2017) ............. 27

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ................................................................... 30

*Rashid v. Pierce*, No. 23-cv-1235, 2024 WL 3495792 (D. Conn. July 22, 2024) ...................... 18

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ............................................................... 32

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ........................................................................................................................ 26

*Tolbert v. Queens Coll.*, 242 F.3d 58 (2d Cir. 2001) .................................................................. 30

*Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018) .............................................. 29

*Tovar v. Essentia Health*, 857 F.3d 771 (8th Cir. 2017) ............................................................ 24

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) ...................................................................................................... 25, 27

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................... 18, 31

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) ..................................................................... 26

# TABLE OF AUTHORITIES

Page

## STATUTES

20 U.S.C. § 1681 ................................................................................................ 26

42 U.S.C. § 18116 .............................................................................................. 24

42 U.S.C. § 2000e .............................................................................................. 26

## OTHER AUTHORITIES

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022) 2,3

*Declaratory Ruling on Petition for Health Insurers' Categorization of Certain Gender-Affirming Procedures as Cosmetic*, Connecticut Commission on Human Rights & Opportunities (Apr. 17, 2020) ............................................................................................ 29, 30

Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health (2022 ...................................... 4, 5, 6, 10

I.       INTRODUCTION

Plaintiffs Dr. Jamie Homnick and Dr. Gennifer Herley are transgender women who require gender-affirming facial reconstruction ("GAFR") as a medically necessary treatment for their severe gender dysphoria. Despite the clear consensus among medical professionals and major healthcare organizations—including the World Professional Association for Transgender Health—recognizing GAFR as essential care, Defendant Aetna Life Insurance Company ("Aetna") categorically denies coverage for these procedures. Aetna's Clinical Policy Bulletin 0615 ("CPB 0615") excludes all gender-affirming facial procedures from coverage as "cosmetic" and "not medically necessary," regardless of medical evidence or individual need (hereinafter, the "GAFR Exclusion"). This blanket exclusion contradicts established medical standards and results in direct harm to Plaintiffs.

Drs. Homnick and Herley experience daily distress, anxiety, and depression due to the incongruence between their gender and facial features. Their healthcare providers have determined that GAFR is essential to alleviate their gender dysphoria and have submitted coverage requests to Aetna, only for coverage to be denied based on CPB 0615's blanket exclusion. Aetna's refusal to cover these medically necessary procedures has caused Plaintiffs significant and ongoing harm, worsening their mental health, exacerbating their gender dysphoria, and increasing their risk of discrimination and harassment. Against the backdrop of the current climate where transgender people are facing escalating hostility and attacks on their rights, Plaintiffs' inability to access medically necessary care not only deepens their distress, but also heightens their fears for their safety and well-being. The ability to move through the world consistent with their gender identity is critical for their mental health and personal security.

Plaintiffs seek a preliminary injunction to halt Aetna's enforcement of the GAFR Exclusion in CPB 0615 against them while this case is pending. Without immediate relief, they will continue

to suffer irreparable harm, including severe emotional distress and an increased risk of self-harm. The denial of this critical care is discriminatory under Section 1557 of the Affordable Care Act ("Section 1557"), which prohibits sex-based discrimination in healthcare programs receiving federal funds. Aetna's policy explicitly targets transgender people by denying coverage for facial reconstruction when sought for gender affirmation, even though Aetna covers the same or similar procedures for non-transgender individuals when medically necessary. This clear case of sex discrimination must be enjoined to prevent further suffering and ensure that Plaintiffs receive the medically necessary care they need and are entitled to under the law.

Plaintiffs satisfy all four elements required for a preliminary injunction. First, they face irreparable harm due to Aetna's ongoing denial of coverage for their medically necessary treatment. Second, they are highly likely to succeed on the merits of their claim that Aetna's categorical exclusion of GAFR violates Section 1557. Third, the balance of equities strongly favors Plaintiffs, as the harm they suffer far outweighs any potential inconvenience to Aetna from ceasing enforcement of an unlawful policy. Finally, the public interest is best served by ensuring compliance with federal anti-discrimination laws and allowing Plaintiffs to receive the critical medical care prescribed by their medical providers.

For these reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction preventing Aetna from enforcing the categorical exclusion of GAFR in CPB 0615 against them during the pendency of this litigation.

## II.    BACKGROUND

### Gender Dysphoria and Gender Affirming Facial Reconstruction

Transgender people are people who do not identify their sex as the sex they were assigned at birth. Many transgender people experience gender dysphoria. Ex. 1, Declaration of Jens U. Berli ("Berli Decl.") (Expert Witness) ¶ 11. Gender dysphoria is a serious medical condition recognized

by the American Psychiatric Association. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text revision 2022) [hereinafter, "DSM"]. Gender dysphoria is the clinically significant distress caused by the incongruence between a person's gender identity—their innate understanding of their own sex—and the sex they were assigned at birth. Berli Decl. ¶ 11; Ex. 2, Declaration of R. Nicholas Gorton ("Gorton Decl.") (Expert Witness) ¶ 12. It is a condition that, by definition, only transgender people can have. "Thus, for example when transgender patients look in the mirror and perceive their body as gendered differently than their internal gender identity, they suffer distress." Gorton Decl. ¶ 14. "Severe gender dysphoria is a deeply scarring condition. It limits people from being able fully to partake in the human experience[.]" Berli Decl. ¶ 11. Distress due to gender dysphoria can "include depression, suicidal thoughts, or impairment or functioning in their daily lives." Gorton Decl. ¶ 12. "Appropriate treatment is therefore critical." *Id.* Fortunately, as Plaintiffs' experts, Dr. Jens U. Berli[1] and Dr. R. Nicholas Gorton[2] attest, well established treatment protocols are effective for ameliorating or even resolving the symptoms of gender dysphoria. *See* Berli Decl. ¶ 11; Gorton Decl. ¶ 17.

The World Professional Association for Transgender Health's (WPATH's) Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (the "Standards of Care") provide the internationally recognized and authoritative treatment protocol for gender dysphoria. Berli Decl. ¶¶ 15, 26; Gorton Decl. ¶ 4; *see also* Eli Coleman, et al.,

---

[1] Dr. Jens U. Berli is the Division Head of Plastic & Reconstructive Surgeries at Oregon Health & Science University, as well as associate professor, with nearly a decade of experience in providing surgical treatment for gender incongruence for over 2,000 patients. Berli Decl. ¶¶ 1, 5. Dr. Berli has published over 50 peer reviewed journal articles on gender-affirming surgeries, including articles and book chapters on facial gender confirmation surgery. *Id.* ¶ 6; *see also* Ex. 1-A (CV).

[2] Dr. R. Nicholas Gorton is a primary care and emergency medicine physician and the Medical Director of Lyon-Martin Health Services, a well-reputed LGBT clinic that has been serving transgender patients for over 30 years. Gorton Decl. ¶ 6; *see also* Ex. 2-A (CV). Courts have accepted his expert testimony in many cases. *See* Gorton Decl. ¶ 6.

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health (2022), https://doi.org/10.1080/26895269.2022.2100644 [hereinafter, "SOC-8"]. WPATH grounds its Standards of Care in the best available scientific evidence and expert professional consensus. *See* Berli Decl. ¶ 12. Major health professional organizations— including the American Medical Association, the American Psychological Association, the American College of Obstetrics and Gynecologists, and the American Academy of Family Physicians—recognize the medical necessity of surgical treatments for gender dysphoria, in line with WPATH's Standards of Care. *Id.* ¶ 15.

Treatment for gender dysphoria includes social transition, hormone therapy, and surgical procedures to align a person's primary and secondary sex characteristic with their gender identity. *See* Berli Decl. ¶ 14; *see also* SOC-8 at S39, S110−35. As with other health conditions, treatment for gender dysphoria must be tailored according to the patient's symptoms, needs, and overall health. Berli Decl. ¶ 14. For many transgender people, surgery is "essential and medically necessary to alleviate their gender dysphoria." *Id.*; *see also* Gorton Decl. ¶ 36 ("GAFR is medically necessary treatment for gender dysphoria for transfeminine patients when clinically indicated to treat their [gender dysphoria].").

For many transgender people, "GAFR is crucial to alleviating gender dysphoria." Berli Decl. ¶ 16. When a transfeminine person (a woman, girl, or nonbinary person assigned male at birth) goes through endogenous puberty, testosterone causes her face to develop typically male features—including an Adam's apple, and changes in the bones and cartilage of the forehead, brow, jaw and nose—that lead her to be perceived as male by herself and others; this can exacerbate gender dysphoria. *Id.*; *see also* Gorton Decl. ¶¶ 15−16. "[B]ecause the face is the most social aspect of our body and the basis for the self and other's day-to-day perception of whether a

person is male or female[,]. . . . [h]aving typically male facial features can be an unavoidable and extreme source of dysphoria." Berli Decl. ¶¶ 29−30. "[H]aving a face that is perceived as male puts transgender women and transfeminine people at risk for both psychological and physical harm." *Id.* ¶ 16. But "GAFR can significantly diminish this facial-focused dysphoria and allow patients to do the simple act of looking in a mirror without exacerbating their [gender dysphoria]." Gorton Decl. ¶ 17.

GAFR "corrects the effects of testosterone" on facial development, changing these typically male facial features into typically female ones to increase the "likelihood that a transfeminine person will be perceived as female." Berli Decl. ¶¶ 17−18. Indeed, GAFR is "the only treatment that is effective at reversing a large extent of the effects of testosterone," and for many transgender women, it is the only way to align their outward appearance with their gender identity. *Id.* ¶¶ 19−21. "There are no services that can produce equivalent therapeutic results." *Id.* ¶ 28. For some transfeminine people, "it may be completely impossible to adequately treat their [gender dysphoria] without this surgery." Gorton Decl. ¶ 9.

Medical opinions of professional societies, generally accepted standards of care, and medical literature supports that GAFR is an effective treatment for gender dysphoria. *See* Berli Decl. ¶¶ 18−20; *see also* Gorton Decl. ¶ 11. GAFR as a treatment for gender dysphoria aligns "with generally accepted standards of medical practice in the United States," and "[a] solid—and growing—body of medical literature." Berli Decl. ¶¶ 26−27. For instance, a review of medical literature conducted to inform WPATH's SOC-8 found that GAFR has a "substantial impact . . . on overall well-being" of transfeminine patients and reduces mental health distress. Gorton Decl. ¶ 18. Additional literature reviews and studies support the same conclusion, demonstrating "statistically and clinically significant improvements in the Quality of Life (QoL) for transgender

patients undergoing GAFR with very low surgical risks." Gorton Decl. ¶¶ 19−26; *see also* Berli Decl. ¶¶ 16, 20, 34. GAFR also increases the likelihood that others will correctly perceive transfeminine people as women, which "in turn alleviates gender dysphoria by decreasing the occurrence of misgendering and harassment." Berli Decl. ¶ 18; *see also* Gorton Decl. ¶¶ 27-34.

GAFR is often a medically necessary treatment for gender dysphoria for transfeminine patients. Gorton Decl. ¶ 36; *see also* Berli Decl. ¶¶ 23−25. GAFR is not undertaken for aesthetic reasons. Berli Decl. ¶ 22. Rather, GAFR treats gender dysphoria and "all its psychological, somatic, and social sequalae" by changing the "structure of the face to correct effects of testosterone rather than aesthetic deformities or variations." *Id.* The goals of GAFR are to: "(1) directly diminish the patient's gender dysphoria and (2) allow the individual patient to be perceived as female in everyday society and integrate seamlessly into the community." Gorton Decl. ¶ 10. The second goal "diminishes [gender dysphoria] because transgender people who are misgendered have significantly worse psychological outcomes." *Id.* GAFR effectively serves both of these goals. *See id.* ¶ 36; *see also* Berli Decl. ¶¶ 18−19.

"Excluding GAFR from health coverage would be opposed to the most recent WPATH SOC 8." Berli Decl. ¶¶ 23, 34. The WPATH SOC-8 expressly names GAFR as vital treatment for gender dysphoria; and as such, when medically necessary, insurance should cover GAFR. SOC-8 at S16−17, S12, S18 (listing facial surgical procedures recognized as GAFR treatments for gender dysphoria and asserting that "healthcare systems should provide medically necessary care for transgender and gender diverse people"). Consistent with SOC-8, other national health insurance companies correctly recognize that GAFR is medically necessary to treat gender dysphoria in some transgender patients and provide coverage for GAFR treatments when medically necessary. *See, e.g.*, *Clinical Guidelines and Coverage Criteria for the Treatment of Gender Dysphoria*, Amida

Care, https://perma.cc/9UNC-XN2B (last visited Mar. 3, 2025); *Clinical UM Guideline: Gender-Affirming Surgery (CG-SURG-27)*, Elevance Health, at 4 (Jan. 24, 2023), https://perma.cc/XR44-4REX (last visited Mar. 3, 2025).

Moreover, delays in treatment of gender dysphoria, such as the denial of GAFR, "result in continued daily suffering . . . which can be severe enough to cause suicidal ideations and suicide attempts." Gorton Decl. ¶ 13. Although data on the impact of delaying surgery to treat gender dysphoria is largely unavailable due to the unethical nature of such an experiment, Dr. Gorton personally observed "significant psychological decompensation in a number of [his transgender] patients" whose surgeries were indefinitely delayed during the height of the COVID-19 pandemic. *Id.* Moreover, having a face that is incorrectly perceived as male puts transgender women and other transfeminine people at higher risk for anxiety, depression, and suicide as well as housing and job insecurity. *Id.* ¶¶ 31−34. In his declaration, Dr. Gorton summarizes the immense importance of GAFR for treating gender dysphoria:

> [w]hile Gender Affirming Genital Reconstruction is incredibly important in the treatment of transgender patients, more often than not, transfeminine patients' psychosocial health and wellbeing is improved more impressively with GAFR than any other surgery. It cannot be overstated enough how important this surgery is. Patients who have experienced years of transphobia, misgendering, stares and laughing, and even interpersonal violence because they are not perceived as a woman when others see their face can suddenly live their lives free of this ever-present stigma.

*Id.* ¶ 35.

### *Aetna's Clinical Policy Bulletin 0615*

Aetna is a health insurance company. Aetna designs, markets, sells, supplies, issues, underwrites, and administers health coverage and insurance plans, including processing claims for

fully funded (insured) and self-funded plans. Aetna receives federal financial assistance, including Medicare and Medicaid reimbursements.[3]

Aetna publishes, implements, and enforces clinical policy bulletins ("CPBs") regarding the coverage of various medical services under plans underwritten or administered by Aetna and its affiliates. *See Medical clinical policy bulletins*, Aetna Inc., https://perma.cc/C5QQ-SDQS (last visited March 3, 2025) ("Medical Clinical Policy Bulletins (CPBs) detail the services and procedures we consider medically necessary, cosmetic, or experimental and unproven. They help us decide what we will and will not cover."). Aetna uses CPBs to make individual claims determinations under an Aetna member's plan. *See id*. Drs. Homnick and Herley are members of employer-based plans administered by Aetna.

Aetna's *Gender Affirming Surgery: Clinical Policy Bulletin 0615* ("CPB 0615") governs coverage of surgical treatment for gender transition. *See* Ex. 7 (CPB 0615). CPB 0615 only applies to transgender people seeking to treat gender dysphoria by changing their sex characteristics. *See id.* (requiring "[d]ocumentation of marked and sustained gender dysphoria" for coverage). For transfeminine people, CPB 0615 affords coverage of reconstruction of the breasts and genitals subject to its medical necessity criteria. *See id.* But CPB 0615 categorically excludes "all facial gender affirming procedures" "that may be performed as a component of gender transition" by wrongfully labeling them "cosmetic" and "not medically necessary" in all cases. *See id.*

---

[3] CVS Health Corp., Annual Report (Form 10-K), at 4, 19−20 (Feb. 12, 2025) https://perma.cc/W9RC-7U5W; *see also Welcome U.S. Postal Service Employees and Annuitants!*, Aetna Inc., https://perma.cc/7LQM-B8HJ (last visited Mar. 3, 2025) (acknowledging that Aetna has provided health plans to federal employees since 1959); *Notice of non-discrimination: Discrimination is against the law*, Aetna Inc., https://perma.cc/HA9J-457B (last visited Mar. 3, 2025) (acknowledging that health plans must comply with the ACA's regulations).

Aetna's GAFR Exclusion applies by default to all health plans Aetna administers nationally, except in some plans where state law requires Aetna to cover medically necessary GAFR procedures, and in some individual employer plans where the employers affirmatively guarantee coverage for GAFR. Thus, contrary to CPB 0615's incorrect and blanket characterization of GAFR "as not medically necessary and cosmetic," Aetna assesses individual medical necessity of GAFR and offers coverage in some plans regulated by California, Colorado, Maryland, New York, Oregon, and Washington. *See* Ex. 8 (state-specific addenda to CPB 0615). Moreover, Aetna only applies the GAFR Exclusion to facial surgeries "performed as a component of gender transition." *See* Ex. 7. That is, the GAFR Exclusion only precludes coverage for transgender people seeking to treat gender dysphoria by changing their secondary sex characteristics. *See id.* Non-transgender people may require facial reconstruction, for example, after traumatic injury or to treat an illness or "congenital defect." *See Cosmetic Surgery and Procedures: Clinical Policy Bulletin 0031*, Aetna Inc. (Feb. 19, 2025), https://perma.cc/2FJ9-J64M [hereinafter, "CPB 0031"]; *Septoplasty and Rhinoplasty: Clinical Policy Bulletin 0005*, Aetna Inc. (Feb. 18, 2025), https://perma.cc/WJ6T-JU5E [hereinafter, "CPB 0005"]. Aetna does not subject non-transgender people to the GAFR Exclusion. Indeed, Aetna's CPB on cosmetic surgery allows for coverage of procedures "needed to improve the function of a body part or otherwise medically necessary even if the surgery or procedure also improves or changes the appearance of a portion of the body," including facial surgeries. *See* CPB 0031; *see also* CPB 0005. Thus, Aetna allows coverage of facial reconstruction—even some procedures that comprise GAFR—to treat conditions unrelated to being transgender. *See id.* Accordingly, the GAFR exclusion only bars coverage for transgender people who must change the secondary sex characteristics of their faces to treat gender dysphoria.

Aetna's GAFR Exclusion contradicts "WPATH's recommendations, peer-reviewed literature, and U.S. standards of medical practice." Berli Decl. ¶ 32. Specifically, under SOC-8, "GAFR should be treated no differently than other gender-affirming surgeries deemed medically necessary[.]" *Id.* ¶ 33. In creating the GAFR Exclusion in CPB 0615, "Aetna ignores accepted standards and willfully withholds medically necessary care." *Id.* ¶ 34. In sum, "GAFR is medically necessary and there is no legitimate medical basis to exclude it from Aetna's CPB 0615." *Id.* ¶ 36; *see also* Gorton Decl. ¶ 36 ("In my professional opinion, GAFR is medically necessary treatment for gender dysphoria for transfeminine patients when clinically indicated[.]")

### Dr. Homnick

Dr. Homnick is a 40-year-old transgender woman who resides in Rochester, New York. Ex. 3, Declaration of Jamie Homnick ("Homnick Decl.") ¶ 2. She holds a Ph.D. in Chemistry and works as an engineer at a pharmaceutical manufacturing firm, which offers health benefits to its employees. *Id.* ¶ 3. Dr. Homnick is enrolled in a self-funded Aetna Traditional Choice health care plan through her employer. *Id.* As documented by her treating providers, Dr. Homnick requires GAFR to treat her gender dysphoria. *Id.* ¶¶ 11, 18−19; Ex. 4, Declaration of Amanda Shaw ("Shaw Decl.") (Dr. Homnick's Therapist) ¶¶ 12, 14, 18; Ex 3-A.

Dr. Homnick has suffered from gender dysphoria since she was a child. Homnick Decl. ¶¶ 4−6. At a young age, she recognized that she was a girl. *Id.* ¶ 4. Her feelings of gender dysphoria worsened during puberty when she began developing male secondary sex characteristics. *Id.* ¶ 6. Her facial characteristics, including her forehead, nose, and jaw, caused her profound, daily distress. *Id.* For much of her life, Dr. Homnick felt compelled to hide her true identity because transgender people were rejected in her community. *Id.* ¶ 7. Finally, in 2021, she relocated and felt able to live as a woman; at first privately, then around her family, and finally in public. *Id.* ¶¶ 8−9.

10

Beginning in September 2023, Dr. Homnick began seeing Dr. Amanda Shaw, a therapist, specializing in gender and LGBTQ+ issues. *Id.* ¶ 10. At this time, Dr. Shaw formally diagnosed Dr. Homnick with Gender Dysphoria in Adults (DSM 302.85) (International Classification of Diseases-10 F64.1). *Id.*; Shaw Decl. ¶ 6. Since 2023, Dr. Homnick has continued seeing Dr. Shaw weekly for therapy, and she is also under the care of a Physician Assistant, Bill Schaefer, who prescribes her hormone replacement therapy ("HRT"). Homnick Decl. ¶¶ 10−11; Shaw Decl. ¶ 4.

Dr. Homnick has received other gender-affirming medical treatments and interventions to treat her gender dysphoria and manage her gender transition, including voice therapy and facial hair removal. Homnick Decl. ¶ 10; Shaw Decl. ¶ 9. These procedures helped reduce her gender dysphoria by better aligning her body with her gender identity. Homnick Decl. ¶ 12.

But despite these procedures and treatments, Dr. Homnick continues to suffer from severe gender dysphoria due to her stereotypically masculine facial features. Homnick Decl. ¶¶ 13−16. Every day, she takes several steps to hide her masculine facial features to help alleviate her symptoms of gender dysphoria—she wears a wide headband to cover her forehead and hairline, makeup, feminine eyeglasses, and stereotypically feminine clothing, like skirts with tights, even when it is cold outside. *Id.* ¶ 13. Despite these efforts, Dr. Homnick's severe gender dysphoria persists—exacerbated by the stereotypically male face she sees in the mirror—and triggers distress, anxiety, depression, fearfulness, irritability, hopelessness, interference with relationships, low self-esteem, and feelings of self-loathing. *Id.* ¶¶ 14−16; Shaw Decl. ¶¶ 6−8, 13, 18. These feelings make it difficult for her to leave the house with her friends and family and engage socially as much as she otherwise would for fear that others will see her as a man. Homnick Decl. ¶¶ 14−15. In Dr. Homnick's words, "I think about my gender constantly, and I feel *tired* of thinking about my gender ███████████████████████████████." *Id.* ¶ 16.

Dr. Homnick's medical providers have determined that she is a good candidate for GAFR given the severity of her gender dysphoria related to her facial features and the substantial likelihood that feminizing facial features would both alleviate the main source of this dysphoria and improve her well-being and overall functioning. Homnick Decl. ¶¶ 11, 18; Shaw Decl. ¶¶ 12, 14, 17−18. In August 2024, she had a consultation with Dr. Morrison, a plastic surgeon in New York who specializes in gender-confirming surgeries for transgender individuals. Homnick Decl. ¶ 18. To support the medical necessity of the surgeries, she gave Dr. Morrison a letter of support from Dr. Shaw and Bill Schaefer. Shaw Decl. ¶ 14; Ex. 3-A. In her letter, Dr. Shaw shared that "Dr. Homnick meets the criteria for Gender Dysphoria" and "she has no psychiatric symptoms that impair her ability to make informed medical decisions or impact her gender identity." *Id.* ¶ 14; Ex. 3-A at 4−5; Ex. 4-A. Mr. Schaefer also confirmed that Dr. Homnick "met the [WPATH] clinical and social guidelines" for gender dysphoria. Ex. 3-A at 2−3.

After a lengthy consultation in August 2024, Dr. Morrison also determined that Dr. Homnick met the criteria under the Standards of Care for GAFR. Homnick Decl. ¶ 18. On September 4, 2024, Dr. Morrison submitted a prior authorization to Aetna for these GAFR procedures. *Id.* ¶ 19; Ex. 3-A. He told Dr. Homnick that in his experience, many insurers cover the requested procedures, which gave Dr. Homnick immense hope. *Id.*; *see also* Shaw Decl. ¶ 15. But later in September 2024, the request for prior authorization was denied under the GAFR Exclusion. Homnick Decl. ¶ 19; Ex. 3-B; *see also* Shaw Decl. ¶ 16. Dr. Homnick's anxiety and depression exploded in response to the denial. Homnick Decl. ¶ 20; *see also* Shaw Decl. ¶ 16 ("[H]er hope for reducing the symptoms of gender dysphoria was taken away by Aetna's denial of coverage"). Dr. Morrison appealed the decision, but Aetna rejected the appeal. Homnick Decl. ¶ 19. On

November 12, 2024, Dr. Homnick filed an appeal with Aetna, which Aetna rejected the next day. *Id.*

Without other recourse, Dr. Homnick joined this lawsuit on December 3, 2024. *See* ECF No. 46. On January 31, 2025, Aetna moved to dismiss Dr. Homnick's claims in this suit, contending, in part, that Dr. Homnick's employer revised the terms of her healthcare plan to cover GAFR. *See* Def. Mot. to Dismiss & Mem. in Support, ECF Nos. 52, 52-1 at 18, 25−26, 52-10. Dr. Homnick, shocked by that statement, checked on her plan's online portal, which still reflects CPB 0615 as governing coverage and her claim as denied. Homnick Decl. ¶ 22; Ex. 3-C. She contacted her employer to confirm, and the Senior Human Resources Director responded that "there have been no changes to the coverage in 2025 and no exception made for you." Homnick Decl. ¶ 23; Ex. 3-D.

With the lack of treatment her doctors have prescribed, Dr. Homnick's gender dysphoria has worsened. Homnick Decl. ¶¶ 20, 25; *see also* Shaw Decl. ¶ 18. Without the means to pay for the $130,000 needed for surgery out of pocket, she feels hopeless. Homnick Decl. ¶¶ 17, 20; Shaw Decl. ¶¶ 16−17. She has experienced profound depression and distress because of the denial and her inability to complete her gender transition. Homnick Decl. ¶¶ 12−17, 20, 24, 25; Shaw Decl. ¶¶ 16−18. She has become so desperate for relief from her dysphoria that she has considered taking out a high interest loan, but she has not, out of concern for preserving her family's shared resources. Homnick Decl. ¶ 17.

Dr. Homnick's stress and anxiety have only worsened since President Trump took office again. Homnick Decl. ¶ 26. In Dr. Homnick's own words, "[t]he Trump Administration's immediate steps to try to erase transgender identity and attack the principle that individuals can authentically identify with a gender different than their biological sex has only worsened my

feelings of dread and anxiety." *Id.* She fears for her physical safety and that she will be confronted by anti-trans people in public. *Id.* She also worries that "seeing anti-trans hatred directed at [her] will harm her children and [her] relationship with them." *Id.* These fears have materialized for individuals in Dr. Homnick's network. *Id.* Dr. Homnick knows, and Dr. Shaw corroborates, that Dr. Homnick's mental health will continue to decline, and she will continue to suffer severe symptoms of gender dysphoria without GAFR. *Id.* ¶ 27; Shaw Decl. ¶¶ 17−19. Ultimately, Dr. Homnick wants to enjoy life "without this horrible noise of . . . dysphoria that doesn't go away." Homnick Decl. ¶ 27.

### *Dr. Herley*

Dr. Herley is a 62-year-old transgender woman who resides in Nassau County, New York. Ex. 5, Declaration of Gennifer Herley ("Herley Decl.") ¶ 2. She holds a Ph.D. in Organizational Psychology and is the Founder and Executive Director of TransNewYork, an organization that serves economically marginalized members of the transgender community. *Id.* ¶ 3. Dr. Herley is enrolled in a self-funded Aetna Open Access CPOS II Basic Plan through her wife's former employer, the New York City Metropolitan Transportation Authority. *Id.* As documented by her treating providers, Dr. Herley requires GAFR to treat her gender dysphoria. *Id.* ¶ 22; Ex. 5-A; Ex. 6, Declaration of Janice Stefanacci Seward ("Seward Decl.") (Dr. Herley's Therapist) ¶¶ 14−16.

From a young age, Dr. Herley always knew herself to be female and "wanted to express the femininity" that she felt within herself. Herley Decl. ¶¶ 4−6. But Dr. Herley was raised in a socially conservative community, and she felt compelled to hide herself and her true identity throughout her childhood and adolescence. *Id.* ¶ 7. In the early 1990s, when Dr. Herley was around 30 years old, the feeling of wanting to present as a woman became increasingly pervasive and preoccupied her mind nonstop. *Id.* ¶ 9. Still unsure what this meant, she began attending

conferences in search of a gender diverse community. *Id.* ¶¶ 9–10. At these conferences, Dr. Herley found her community. *Id.* She also met and connected with Dr. Janice Seward, a psychologist with expertise treating individuals experiencing distress related to gender identity and sexuality. *Id.* ¶ 10; Seward Decl. ¶ 3.

In 1995, Dr. Herley started working with Dr. Seward. Herley Decl. ¶ 10; Seward Decl. ¶ 4. Dr. Herley shared with Dr. Seward the intense distress she had always felt arising from the incongruence of her masculine appearing face and gender identity, and her symptoms of depression, anxiety, hypervigilance, suicidal thinking, low self-esteem, an intense desire to avoid social interactions, emotional fatigue, as well as an extreme focus on her appearance. Herley Decl. ¶ 11; Seward Decl. ¶¶ 4, 6. Dr. Seward diagnosed Dr. Herley with gender dysphoria. Herley Decl. ¶ 11; Seward Decl. ¶ 5. After years of therapy, Dr. Herley advised Dr. Seward of her desire to socially and medically transition, and Dr. Seward helped Dr. Herley develop a gender transition plan. Herley Decl. ¶ 12; Seward Decl. ¶¶ 8–10.

In 2017, Dr. Herley began her transition, including making alterations to her appearance and public presentation to better comport with her identity. Herley Decl. ¶ 13. In 2018, Dr. Herley came out to her daughter and ex-wife and later to her siblings. *Id.* ¶ 17. As she transitioned, Dr. Herley felt vulnerable in her job as a plumber—a field primarily comprised of heteronormative cisgender men—and left to create the education and advocacy nonprofit that she now leads. *Id.*

Dr. Herley is currently under the care of Dr. Seward and Dr. Aren Skolnick, her endocrinologist. Herley Decl. ¶ 22. She has received gender-affirming medical treatments and interventions to treat her gender dysphoria, including HRT, breast augmentation, and vaginoplasty. *Id.* ¶¶ 13–14; Seward Decl. ¶¶ 8–9. Before each of these treatments and surgeries, Dr. Herley discussed the procedure in depth with Dr. Seward to decide whether and how they would treat her

gender dysphoria. Herley Decl. ¶ 15; Seward Decl. ¶ 10. These procedures helped reduce her gender dysphoria by better aligning her body with her gender identity. Herley Decl. ¶ 16; Seward Decl. ¶ 11.

But Dr. Herley continues to suffer from severe gender dysphoria due to her stereotypically masculine facial features. Herley Decl. ¶ 16; Seward Decl. ¶¶ 12−14. Every day, she takes steps to help alleviate her symptoms of gender dysphoria by dressing and presenting herself in an overtly feminine manner. Herley Decl. ¶ 18; Seward Decl. ¶ 13. These efforts do not alleviate her daily distress and anxiety resulting from the gender dysphoria she experiences when she sees stereotypically male facial features in the mirror. Herley Decl. ¶ 19; Seward Decl. ¶¶ 14−15. Without GAFR, Dr. Herley also experiences debilitating anxiety of socializing with other people and fears that she will be mistaken for a man or outed in public as transgender. Herley Decl. ¶¶ 11, 21; Seward Decl. ¶¶ 23−25.

Dr. Herley's medical providers have determined that she is a good candidate for GAFR given the severity of her gender dysphoria related to her facial features and the substantial likelihood that feminizing facial features would both alleviate the main sources of this dysphoria and improve her well-being and overall functioning. Herley Decl. ¶ 22; Seward Decl. ¶¶ 14−16, 26. On November 20, 2024, following the advice of her providers, Dr. Herley had a consultation with Dr. Eduardo Rodriguez, a plastic surgeon in New York who specializes in gender-affirming surgeries for transgender people. Herley Decl. ¶ 22. To support the medical necessity of the surgeries, she gave Dr. Rodriguez letters of support from Dr. Seward and Dr. Skolnick. *Id.* In her letter, Dr. Seward confirmed that she had evaluated the medical necessity of GAFR for Dr. Homnick and determined that according to the Standards of Care, GAFR would treat her gender dysphoria. Seward Decl. ¶¶ 14−16; Exs. 5-A & 6-A. Likewise, in Dr. Skolnick's letter, he

recommended "facial feminization surgery for Gennifer Herley in order [for her] to live life successfully both mentally and physically." Ex. 5-A.

Upon review of Dr. Herley's letters of support and independent evaluation, Dr. Rodriguez also determined that GAFR was medically necessary for Dr. Herley under the applicable standards of care. Herley Decl. ¶ 22. In or around late November 2024, Dr. Rodriguez submitted a request for prior authorization to Aetna for these GAFR procedures. *Id.* On December 13, 2024, Aetna denied the request pursuant to its GAFR Exclusion. Herley Decl. ¶ 22; Ex. 5-B.

Since Aetna denied her coverage, Dr. Herley's condition has deteriorated. Her depression and anxiety have spiked, and she has experienced heightened feelings of dysphoria, social isolation, obsessive thoughts, as well as an increased risk of self-harm, feelings of impending danger, panic, or doom, and trouble concentrating or making decisions. Herley Decl. ¶ 23; Seward Decl. ¶¶ 17−20, 23−25. She has also experienced physical symptoms, including panic attacks, dizziness, and a rash of unknown origins that worsens when she experiences distress from her gender dysphoria. Seward Decl. ¶ 22. Without access to GAFR, Dr. Seward believes that Dr. Herley's symptoms will continue to worsen to the point that she will be unable to work altogether and may engage in self-harm. *Id.* ¶¶ 23−25, 27. Dr. Herley wants to receive the medical care she needs and be "free to focus on [her] work and [her] family." Herley Decl. ¶ 23. And with GAFR, Dr. Herley will likely experience a "dramatic reduction in gender dysphoria symptoms right away," allowing her to pursue those goals. Seward Decl. ¶ 26.

## III.    LEGAL STANDARD

To obtain a preliminary injunction, the moving party must prove that: (1) they are "likely to suffer irreparable harm in the absence of preliminary relief'"; (2) they are "likely to succeed on the merits"; (3) the balance of equities weighs in their favor; and (4) "an injunction is in the public

interest." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)).

Drs. Homnick and Herley's motion for preliminary injunction satisfies all four factors considered by the Second Circuit, such that a prohibitory injunction is necessary to immediately halt the ongoing and serious harm to Plaintiffs.[4]

## IV.    ARGUMENT

### A.    Plaintiffs, Drs. Homnick and Herley, Are Suffering Ongoing, Irreparable Harm.

The evidence proffered by Drs. Homnick and Herley demonstrates that actual, ongoing irreparable harm is occurring and likely to continue absent a preliminary injunction. *See Rashid v. Pierce*, No. 23-cv-1235 (VDO), 2024 WL 3495792, at *2 (D. Conn. July 22, 2024) (allegations of irreparable harm must be substantiated with admissible evidence). To obtain a preliminary injunction, Drs. Homnick and Herley need not demonstrate that irreparable injury is inevitable, but only that it "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). Irreparable harm is "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to

---

[4] Plaintiffs seek a prohibitory injunction—that is, they move to enjoin Aetna from applying CPB 0615's discriminatory GAFR Exclusion to Plaintiffs. *See Daileader*, 96 F.4th at 356 (describing a prohibitory injunction as requiring the "non-movant to refrain from taking some action" and a mandatory injunction as requiring "the non-movant to take some action"). Under the requested injunction, without the GAFR Exclusion that incorrectly labels GAFR as "cosmetic" and "not medically necessary" in all cases, Aetna would be required to review claims for GAFR for medical necessity like any other gender-affirming procedure (and as it does in certain states, as described in Ex. 8). But even if the Court determines that the heightened standard for mandatory injunctions applies, as this memorandum shows, Plaintiffs satisfy the mandatory injunction standard as well. Plaintiffs demonstrate: a "strong showing" of irreparable harm; a "clear or substantial likelihood of success on the merits"; and that the balance of equities and the public interest weigh in favor of granting the injunction. *See Daileader*, 96 F.4th at 358; *see also A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

resolve the harm." *Grand River Enter. Six River Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal citations omitted). Irreparable harm is also an "injury. . . that cannot be remedied by an award of monetary damages." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)). Plaintiffs are likely to suffer irreparable harm because, absent an injunction, they will continue to be denied medically necessary care, exacerbating their symptoms and distress associated with their gender dysphoria.

Plaintiffs are suffering actual, ongoing, significant harm to their health and overall well-being, including both psychological and physical injuries, caused by Aetna's GAFR Exclusion. Herley Decl. ¶¶ 18−21, 23−24; Homnick Decl. ¶¶ 12−17, 20, 24−27; Seward Decl. ¶¶ 7, 12−15, 17−20, 22−27; Shaw Decl. ¶¶ 6−8, 11, 13, 16−18. The harm to their health is more than likely; it is certain, already occurring, and will continue if Aetna is allowed to continue delaying or denying this medically necessary care. *See id.* Aetna's assertion in its motion to dismiss that Dr. Homnick's employer has changed its policy, which has been contradicted by Dr. Homnick's employer in its communications to Dr. Homnick, does not change this fact. *See* ECF No. 52 at 11; Ex. 3-D; Homnick Decl. ¶¶ 21−23; *see also Eng v. Smith*, 849 F.2d 80, 83 (2d Cir. 1988) (defendants' assertion they were voluntarily implementing relief sought did not preclude finding of irreparable harm). Neither Dr. Homnick nor Dr. Herley have been able to obtain the surgery they need, and both are suffering and will continue to suffer without it.

This irreparable harm suffered by Plaintiffs cannot be remedied by monetary damages. Monetary damages cannot adequately compensate plaintiffs for injuries they have suffered because of delayed medical care, including treatment for gender dysphoria. *See, e.g., LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004) (imminent threat of foregoing needed

medical care constituted more than "mere monetary harm"); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 946 (W.D. Wis. 2018) ("Ongoing impact on [transgender] plaintiffs' health" could not be sufficiently remedied by monetary awards); *Olson v. Wing*, 281 F. Supp. 2d 476, 486 (E.D.N.Y. 2003) ("The award of retroactive benefits cannot ameliorate the harm suffered if such a recipient should be forced by circumstances to forego treatment or medication."), *aff'd*, 66 F. App'x 275 (2d Cir. 2003); *C. P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-CV-06145-RJB, 2023 WL 8777349, at \*6 (W.D. Wash. Dec. 19, 2023) (transgender plaintiffs' "anxiety and mental anguish" as a result of "the refusal of, or delay in, treatment" cannot be cured by monetary damages), *stay granted pending appeal*, 2024 WL 532400 (W.D. Wash. Jan. 22, 2024), *appeal pending*, No. 23-4331 (9th Cir. Dec. 22, 2023); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at \*9 (W.D. Wash. Dec. 11, 2017) ("[M]onetary damages proposed by Defendants will not . . . cure the medical harms caused by the denial of timely health care."). As described above, Plaintiffs have suffered significant mental and emotional distress attributable to Aetna's denial of GAFR. Monetary damages will not relieve these injuries. Injunctive relief is a necessary intervention so that Plaintiffs can access the GAFR they medically require.

Drs. Homnick and Herley are suffering irreparable harm because they are each experiencing severe gender dysphoria due to the incongruence between their sex and their typically masculine facial features, which for both is exacerbated by their inability to get this care and the adverse consequences, including fear of misgendering or violence in public. Herley Decl. ¶¶ 21, 23−24; Homnick Decl. ¶¶ 14−15, 26−27. Rather than alleviating Plaintiffs' distress by covering medically necessary GAFR, Aetna's denial of coverage for the surgery has increased Plaintiffs' distress due to their gender dysphoria, which has manifested in many ways, as attested to by Plaintiffs and their providers. *See, e.g.*, *LaForest*, 376 F.3d at 55 (reductions in medical coverage

caused irreparable harm); *Bontrager v. Indiana Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 611 (7th Cir. 2012) (determining that denial of "medically necessary care" constitutes irreparable harm); *Pritchard*, 2023 WL 8777349, at *6 ("Loss of access to medically necessary [gender-affirming care for transgender insurance plan members] is a form of irreparable injury.").

Specifically, as recognized by numerous federal courts, denying access to transition-related health care constitutes irreparable injury. *See, e.g.*, *Clark v. Quiros*, No. 3:19-CV-575 (VAB), 2024 WL 3552472, at *21 (D. Conn. July 26, 2024) (transgender plaintiff met standard of irreparable harm by demonstrating that lack of access to medically necessary gender affirming care risks her "health, safety, and life" (internal markings omitted)); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (determining that transgender plaintiff's "persistent distress" caused by her gender dysphoria supports a finding of irreparable harm absent an injunction); *Flack*, 328 F. Supp. 3d at 942−46 (transgender plaintiffs demonstrated irreparable harm where they are "at risk of worsening mental health, exacerbated by gender dysphoria, self-harm and stigma" without access to gender affirming care (citation omitted)); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *9−10 (E.D. Mo. Feb. 9, 2018) (transgender plaintiff met her burden of showing irreparable injury where she asserts she has and will continue to suffer from "depression, anxiety, and intrusive thoughts of self-castration" without medically necessary care). Despite Dr. Homnick's attempts to manage her gender dysphoria without GAFR, Dr. Homnick has experienced an increase in depression and anxiety since Aetna's denial of coverage for her surgery. Homnick Decl. ¶¶ 20, 25−27; Shaw Decl. ¶¶ 16−17. Dr. Herley also attempted to manage her gender dysphoria without GAFR, but since the denial, she has felt a spike in depression and anxiety, increased risk of self-harm, obsessive thoughts, a sense of impending danger, panic, or doom, and difficulty concentrating. Herley Decl. ¶ 23; Seward Decl. ¶¶ 19−20, 24−25, 27; *see*

*Hicklin*, 2018 WL 806764, at *9 (transgender plaintiff suffering from severe emotional distress and risk of self-harm meets burden of irreparable injury); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) (acknowledging that transgender plaintiff's "[e]motional distress, anxiety, depression, and other psychological problems can constitute irreparable injury"), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015). Aetna's continued denial of coverage for Plaintiffs' medically necessary GAFR will continue to cause irreparable physical and psychological harm to Plaintiffs.

Furthermore, for as long as Aetna's GAFR Exclusion in CPB 0615 remains in effect and is enforced against them, Plaintiffs are at risk of their already severe symptoms worsening, intensifying, or new symptoms arising pending a final resolution of this case. Homnick Decl. ¶ 25; Herley Decl. ¶ 24; Shaw Decl. ¶¶ 16−19; Seward Decl. ¶¶ 17−20, 22−27; *see also* Gorton Decl. ¶ 13 (noting that "[d]elays in treatment of [gender dysphoria] result in continued daily suffering for patients"). The danger of Plaintiffs' mental health deteriorating as this case progresses further highlights the importance of preliminary injunctive relief and underscores Plaintiffs' already substantial evidence of irreparable harm. *See, e.g.*, *Flack*, 328 F. Supp. 3d at 941-42 (holding denial of transgender plaintiffs' medically necessary treatment for their gender dysphoria when they are at a "high risk of worsening mental health" met the irreparable harm standard); *Cano v. S.C. Dep't of Corr.*, No. 922-cv-04247-DCCMHC, 2023 WL 10286851, at *20 (D.S.C. July 31, 2023) (finding that transgender plaintiff demonstrated irreparable harm because she "established that she suffers from and will continue to suffer from severe emotional distress as well as a substantial risk of self-harm and that her condition will worsen" without access to gender-affirming care), *report and recommendation adopted as modified*, No. 9:22-CV-04247-DCC, 2024 WL 1005553 (D.S.C. Jan. 30, 2024), *appeal dismissed*, No. 24-6200, 2024 WL 4501805 (4th Cir. Oct. 16, 2024).

Plaintiffs' providers attest to increased hopelessness, *see* Shaw Decl. ¶¶ 16−18, and depression, anxiety, and social distress, *see* Seward Decl. ¶¶ 17−20, 22−27. Dr. Herley worries she will be outed in public and is concerned over her declining mental health. Herley Decl. ¶¶ 19, 21, 24; *see also* Seward Decl. ¶ 20. Dr. Homnick similarly fears she will be targeted in public and that her mental health will decline, ███████████████████████ Homnick Decl. ¶¶ 25−26; *see also* Shaw Decl. ¶¶ 16−18. Without a preliminary injunction, Plaintiffs are at risk of increased distress, anxiety, fear, social distress, and overall worsening of their mental health as this case continues to a final resolution.

As Plaintiffs have established, they are suffering from ongoing severe psychological distress due to Aetna's denial of coverage for their GAFR, and Drs. Homnick and Herley have more than met their burden of showing imminent, actual harm is likely to occur absent injunctive relief. Plaintiffs have thus proffered a strong showing of irreparable harm.

### B.      Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs have a strong likelihood of success on their claim that Aetna's categorical exclusion of GAFR from its coverage plan in most states violates Section 1557 of the Affordable Care Act ("ACA") by discriminating based on sex. Aetna denies Plaintiffs and other transgender women coverage for GAFR explicitly based on their sex—precisely because they need the care by virtue of being transgender. Whereas Aetna's GAFR Exclusion does not bar cisgender members who may receive coverage for facial surgery. Consequently, Plaintiffs claims are substantially likely to succeed on the merits.

#### 1.      Section 1557's nondiscrimination requirement applies to Aetna.

Because Aetna receives federal financial assistance, including Medicare and Medicaid reimbursements, *see supra* note 3, it is covered under Section 1557 as a "health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts

of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title [1] (or amendments)." 42 U.S.C. § 18116(a). As a federal funding recipient, Aetna subjects itself to Section 1557's non-discrimination requirements and enforcement mechanisms. It is a matter of public record that Aetna receives federal funds and offers plans on the ACA marketplace. *See, e.g.*, *ACA Health Insurance Plan Coverage*, Aetna Inc., https://perma.cc/SK5R-5TX5 (last visited Mar. 3, 2025) (acknowledging that Aetna provides plans on the ACA Marketplace). Aetna also publicly acknowledges its compliance with the ACA in a "Notice of non-discrimination," published on its website. *See Notice of non-discrimination: Discrimination is against the law*, Aetna Inc., https://perma.cc/HA9J-457B (last visited Mar. 3, 2025). Aetna's duty to refrain from discriminating under Section 1557 remains even in its function as a third-party administrator. A third-party administrator that receives claims, complaints, and appeals of claim denials for a plaintiff's employer-sponsored health plan is a proper defendant in a plaintiff's ACA discrimination suit. *See Tovar v. Essentia Health*, 857 F.3d 771, 778 (8th Cir. 2017).

2.    The Challenged Exclusion Violates Section 1557's ban on sex discrimination.

Section 1557 bans discrimination "on the basis of sex" in federally funded health programs and activities, incorporating sex-based discrimination by reference to Title IX. 42 U.S.C. § 18116(a); *see also Nat'l Org. for Women-New York City v. U.S. Dep't of Def.*, No. 23-cv-6750, 2024 WL 4635480, at *9 (S.D.N.Y. Oct. 31, 2024) ("A plaintiff states a claim for sex discrimination under Section 1557 by plausibly alleging that he or she was (1) excluded from participation in, denied the benefits of, or subjected to discrimination in the provision of (2) federally funded healthcare services, and (3) that this treatment occurred on the basis of sex."), *appeal filed*, No. 25-71 (2d Cir. Jan. 8, 2025).

"On the basis of sex" means "gender is a motivating factor." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016). When a covered entity facially discriminates on the basis of sex, no more evidence of motivation is required. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (whether a practice involves "disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination"); *Berton v. Aetna Inc.*, No. 23-cv-01849-HSG, 2024 WL 869651, at *4 (N.D. Cal. Feb. 29, 2024) (holding plaintiff stated a Section 1557 claim because Aetna's infertility policy facially discriminated by "impos[ing] an unequal burden on same-sex as compared to opposite-sex couples").

Here, Aetna facially discriminates on the basis of sex by withdrawing coverage for facial surgery when the person is seeking it because they are transgender. And even if the GAFR Exclusion did not constitute facial discrimination, it, combined with Aetna's other actions and policies, would still present overwhelming direct and circumstantial evidence of having acted on the basis of sex.

### 3.    The GAFR Exclusion Facially Discriminates Because of Sex

The GAFR Exclusion, by its own terms, applies only to "gender affirming" facial procedures "performed as a component of gender transition." Ex. 7. There is no way to apply or describe the GAFR Exclusion without referencing or relying on sex. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (when a "policy cannot be stated without referencing sex," it "is inherently based upon a sex-classification"). That alone shows that the GAFR Exclusion discriminates "on the basis of sex."

*See Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) (if one cannot "writ[e] out instructions . . . without using the words man, woman, or sex (or some synonym)" it is based on sex).[5]

Applying the GAFR Exclusion "is impossible—literally cannot be done without inquiring into a patient's sex assigned at birth and comparing it to [her] gender identity." *Kadel v. Folwell*, 100 F.4th 122, 147 (4th Cir. 2024) (en banc) (discussing equal protection claims), *petition for cert. filed* (Nos. 24-99 & 24-90). Sex—at minimum—includes the sex a person was labeled at birth based on physical characteristics. *See Bostock*, 590 U.S. at 655. If Drs. Homnick and Herley were assigned female at birth, identified as women, and sought insurance coverage for medically necessary facial procedures, the GAFR Exclusion would not be an impediment. *Compare* Ex. 7 to CPB 0005. Because they were assigned male at birth, the procedures they seek are considered "gender affirming" and a component of "gender transition," and thus are categorically excluded from coverage, regardless of medical necessity. *See* Ex. 7. Because the GAFR Exclusion bars coverage based on sex, it fails the "simple test" established in *City of Los Angeles, Department of Water & Power v. Manhart* and reaffirmed in *Bostock v. Clayton County. See City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978); *Bostock*, 590 U.S. at 664.

Put another way, the GAFR Exclusion targets people for being transgender, which is always sex discrimination. *See Klaneski v. Bristol Hosp., Inc.*, No. 3:22-CV-1158 (VAB), 2023 WL 4304925, at *3 (D. Conn. June 30, 2023). A transgender person is someone whose gender

---

[5] While *Bostock* is a Title VII case, its logic applies with the same force here. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (recognizing that "courts have interpreted Title IX by looking to the . . . caselaw interpreting Title VII"). It is immaterial that Title VII prohibits discrimination "because of sex" and Title IX prohibits discrimination "on the basis of sex." *Compare* 42 U.S.C. § 2000e–2(a)(1) with 20 U.S.C. § 1681(a). *Bostock* itself uses the phrases "because of sex" and "on the basis of sex" interchangeably. *See, e.g.*, *Bostock*, 590 U.S. at 664–66, 680; *cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 287 (2023) (Gorsuch, J., concurring) (using *Bostock*'s Title VII holding to interpret Title VI, which proscribes discrimination "on the ground of" race, color, and national origin).

identity is different from their sex assigned at birth, and a person with gender dysphoria is a transgender person who experiences significant distress related to the incongruence between their gender identity and assigned sex. Gorton Decl. ¶ 12; Berli Decl. ¶ 11. Thus, a classification based on sex assigned at birth is embedded within a classification based on transgender status or gender dysphoria. *See Bostock*, 590 U.S. at 669. Under Title IX, and thus Section 1557, sex only needs to be one motivating factor for liability. *Columbia Univ.*, 831 F.3d at 53 (citation omitted). Even using but-for causation, sex need only be one but-for cause of the challenged action, not the sole cause. *Bostock*, 590 U.S. at 646 ("[T]he plaintiff's sex need not be the sole or primary cause of the employer's adverse action . . . ."). The GAFR Exclusion bars coverage only for transgender people who need surgery by virtue of being transgender to change their secondary sex characteristics. It cannot be applied without determining whether the patient is transgender or cisgender, which necessarily considers sex.

For this reason, courts have consistently held anti-transgender discrimination to be a form of sex discrimination under federal civil rights statutes; the plain text of Section 1557 compels the same result here. *See, e.g.*, *Bostock*, 590 U.S. at 683 (Title VII); *Kadel*, 100 F.4th at 164 (Section 1557); *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) (Title IX); *Grimm v. Gloucester Cnty. Sch. Bd.*, 973 F.3d 586, 616 (4th Cir. 2020) (Title IX); *Whitaker*, 858 F.3d at 1049−50 (Title IX); *Hammons v. Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 589-91 (D. Md. 2021) (Section 1557); *Flack*, 328 F. Supp. 3d at 952 (Section 1557); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017) (Section 1557); *Klaneski*, 2023 WL 4304925, at *3 (Section 1557).

Further, in singling out plan members when the care they seek is a "component of gender transition," Aetna penalizes them based on sex stereotypes: the stereotype that those who are

assigned male at birth ought not seek facial features that are more typically feminine, even when necessary for their health, and that the facial surgery needs of transfeminine people can and should be dismissed as unimportant and unworthy of coverage. *See* Ex. 7; *see also Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 121 (2d Cir. 2004) (stereotype that motherhood and long work hours are incompatible is actionable under Title VII); *Kadel v. Folwell*, 620 F Supp 3d 339, 376 (M.D.N.C. Aug. 10, 2022) (determining healthcare plan "overtly discriminates against [transgender] members for failing to conform to the sex stereotype propagated by the [p]lan") (internal citation and markings omitted); *Flack*, 328 F. Supp. 3d at 951 ("[T]he Challenged Exclusion feeds into sex stereotypes by requiring all transgender individuals receiving Wisconsin Medicaid to keep genitalia and other prominent sex characteristics consistent with their natal sex no matter how painful and disorienting it may prove for some."); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018) ("Whether because of differential treatment based on natal sex, or because of a form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics, the Exclusion on its face treats transgender individuals differently on the basis of sex, thus triggering the protections of Title VII and the ACA's anti-discrimination provision."). The same conduct that Aetna penalizes for transfeminine people—seeking facial reconstruction when needed to treat a condition—is tolerated in others. *See Bostock*, 590 U.S. at 658 ("an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person . . . .").

Many decisions before and after *Bostock* find that transgender health coverage exclusions akin the GAFR Exclusion are facially unlawful sex discrimination. *See, e.g.*, *Fain v. Crouch*, 618 F. Supp. 3d 313, 327, 330−31 (S.D.W. Va. 2022) (holding state Medicaid program's categorical

exclusion on "transsexual surgery" violated Section 1557 and the Fourteenth Amendment's Equal Protection Clause) *aff'd sub nom. Kadel*, 100 F.4th at 163-64; *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1015, 1019−22 (W.D. Wis. 2019) (holding state provision denying coverage for "medically prescribed" gender-confirming surgery discriminated on the basis of sex); *Boyden*, 341 F. Supp. 3d at 997 (holding that state's exclusion of gender-affirming medical care violated Section 1557); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) (holding that defendants "were on notice that Section 1557's nondiscrimination requirements encompassed gender-identity discrimination"); *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17788148, at *10 (W.D. Wash. Dec. 19, 2022) (holding that insurer's administration of a categorical exclusion on gender-affirming care was discrimination on the basis of sex in violation of Section 1557), *appeal docketed*, No. 23-4331 (9th Cir. Dec. 22, 2023).

State agencies have reached the same conclusion. In April 2020, the Connecticut Commission on Human Rights and Opportunities determined that insurance policies excluding coverage for gender-affirming procedures, including facial feminization surgery, violate Connecticut's anti-discrimination laws. *Declaratory Ruling on Petition for Health Insurers' Categorization of Certain Gender-Affirming Procedures as Cosmetic*, Conn. Comm'n on Human Rights & Opportunities (Apr. 17, 2020), https://perma.cc/84M6-A3PW. The Commission found that such procedures are medically necessary for individuals with gender dysphoria and cannot be dismissed as merely cosmetic. *Id.* The Commission recognized that denying coverage for these procedures specifically for transgender individuals constituted impermissible discrimination on the basis of gender identity and sex. *Id.* It reasoned that insurers' classification of gender-affirming procedures as "cosmetic" was medically and legally unsupportable, as such treatments are

prescribed to alleviate gender dysphoria and are therefore medically necessary rather than aesthetic. *Id.* The Commission emphasized that the exclusion of gender-affirming care while covering similar procedures for non-transgender individuals—such as reconstructive surgery following trauma or congenital conditions—constituted a form of differential treatment that unlawfully targeted transgender individuals. *Id.*

For the above reasons, Aetna's Exclusion of GAFR facially discriminates on the basis of sex, which satisfies the intent requirement of Section 1557. *See Berton*, 2024 WL 869651, at *4.

> a.    *Alternatively, Plaintiffs establish a likelihood of success on the merits through direct and circumstantial evidence of sex discrimination.*

Because the GAFR Exclusion facially discriminates based on sex, no further inquiry into motivation is needed. But even if such an inquiry were needed, there would still be sufficient evidence that gender was a motivating factor to establish a likelihood of success on the merits. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (Title IX claim can be proven based on totality of circumstances, taking into account inconsistencies by the defendant).

The text of the GAFR Exclusion alone serves as such evidence; Aetna could not have adopted an exclusion targeting "gender affirming" facial surgery when it is a "component of gender transition" without relying at least partially on gender. Ex. 7; *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (explaining that making an employment decision based on evaluations that incorporated sex stereotypes is sex discrimination); *see also Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024) (explaining that words or conduct of a decisionmaker that "may be viewed as *directly reflecting* the alleged *discriminatory attitude* constitute the proverbial smoking gun." (emphasis in original) (citation omitted) (internal quotation marks omitted)).

Moreover, Aetna's contention that GAFR is never medically necessary, as stated in CPB 0615, is both plainly medically incorrect and contradicted by Aetna's own state-specific policies

appended to CPB 0615. *See* Ex. 8. GAFR is a crucial standard of care treatment for gender dysphoria. *See generally* Gorton Decl.; Berli Decl. Aetna already acknowledges that GAFR can be medically necessary treatment for gender dysphoria; Aetna does not apply the GAFR Exclusion to some plans in California, Colorado, Maryland, New York, Oregon, and Washington—all jurisdictions that do not tolerate transgender-specific exclusions. *See* Ex. 8. In those states, Aetna can and does review for medical necessity under its stated criteria, which are based on the prevailing Standards of Care. *See id.*

Further, Aetna covers facial reconstructive procedures in some cases when not classified as treating gender dysphoria by changing sex characteristics. *See* CPB 0005 (covering rhinoplasty when certain criteria are met "to correct a nasal deformity," or when needed "due to trauma, disease, or congenital defect" or as part of a septoplasty). This indicates that Aetna acknowledges the procedures can be medically necessary and plan definitions of medical necessity coupled with sex-neutral exclusion of cosmetic care can limit payment to when procedures are medically necessary for the patient. *Id.* The GAFR Exclusion's only function then is to exclude care because it is needed by transgender people.

### C.    The Balance of the Equities Weighs in Favor of the Plaintiffs.

As Drs. Homnick and Herley have demonstrated a substantial showing of irreparable harm and strong likelihood of success on their claims, this Court must weigh the equities to determine whether the injunction should issue. *See Winter*, 555 U.S. at 24. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (citing *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

For Plaintiffs, the value of receiving GAFR is tremendous while the harm they are suffering without it is immense. As described *supra*, the ongoing consequences of Aetna's continued denial

of coverage for Plaintiffs' GAFR are dire. *See, e.g.,* Homnick Decl. ¶¶ 20, 25−27; Herley Decl. ¶¶ 23−24; Shaw Decl. ¶¶ 16−19; Seward Decl. ¶¶ 17−20, 22−27. Conversely, the issuance of an injunction will provide Plaintiffs with access to this vital care, which is likely to alleviate significant suffering and distress due to gender dysphoria. Seward Decl. ¶ 26; Shaw Decl. ¶¶ 18-19; Gorton Decl. ¶¶ 9−11, 35−36; Berli Decl. ¶¶ 16, 18. Given the serious harm to Drs. Homnick and Herley as they continue to be denied access to medically necessary GAFR and the value the GAFR would bring to them, the balance of equities weighs heavily in favor of Plaintiffs.

Any harm to Aetna as a result of issuing an injunction prohibiting enforcement of Aetna's discriminatory policy is far outweighed by the injuries suffered by Drs. Homnick and Herley. Indeed, courts have acknowledged that injunctions that end unlawful practices or demand compliance with legal obligations are not harmful to defendants. *See, e.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (government "cannot suffer harm from an injunction that merely ends an unlawful practice"); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (defendant "cannot suffer any harm from an injunction that terminates an unlawful practice"); *see also Pritchard*, 2023 WL 8777349, at *6 ("Following antidiscrimination laws is not a hardship."). Requiring Aetna to adhere to its obligations under the Section 1557 to cover medically necessary care in a nondiscriminatory manner is not harm sufficient to outweigh Plaintiffs' ongoing injuries.

To the extent a preliminary injunction may increase costs for Aetna, courts have not found this argument compelling where, as here, plaintiffs seek an injunction to access necessary medical care. *See, e.g.*, *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1268 (S.D. Fla. 2011) ("fiscal harm" to defendant "is far outweighed by the harm" to plaintiff if he does not "immediately receive" medically necessary treatment); *Pritchard*, 2023 WL 8777349, at *6 (determining that the damage to Blue Cross resulting from permanent injunction enjoining it from enforcing

exclusions that wholly exclude or limit coverage for gender-affirming care was "inconsequential"); *Bontrager*, 697 F.3d at 611 (recognizing that the state's budgetary concerns should be considered "but do not outweigh the potential harm to [plaintiff and others], especially when the State's position is likely in violation of state and federal law").

Further, Aetna has no more luck claiming substantial injuries due to administrative or practical burdens if ordered to follow Section 1557 by covering Plaintiffs' GAFR. Any administrative or practical burdens on Aetna would be de minimis, given that Aetna already provides coverage for GAFR in several states, making it well-equipped to handle the coverage of GAFR for Plaintiffs. *See* Ex. 8. Accordingly, any administrative or practical burden on Aetna is minimal and far outweighed by the substantial harm suffered by Plaintiffs.

In short, any marginal harm to Aetna by the issuance of a preliminary injunction pales in comparison to the significant harms Drs. Homnick and Herley will continue to suffer without this care. The balance of equities strongly favors issuing the preliminary injunction.

### D.    The Public Interest is Best Served by Issuing a Preliminary Injunction.

Finally, granting a preliminary injunction would serve the public interest for three reasons. First it would ensure that Plaintiffs receive medically necessary care. *See Kadel v. Folwell*, No. 1:19-cv-272, 2022 WL 11166311, at *5 (M.D.N.C. Oct. 19, 2022) (when weighing public interest against staying injunction, the court found "the public interest . . . lies with protecting public health by ensuring that all individuals covered under [the plans] receive medically necessary services for the treatment of gender dysphoria" (internal markings omitted)); *see also Pritchard*, 2023 WL 8777349, at *6. Second, it would prevent Aetna from acting unlawfully in administering its health insurance coverage under Section 1557. *See Lloyd*, 318 F.Supp.3d at 620 ("[T]his Court is hard-pressed to see how setting aside an unlawful practice could be against public interest."); *Pritchard*, 2023 WL 8777349, at *6 (acknowledging a public interest "in ensuring antidiscrimination laws

are enforced"). Third, it would ensure that the judgment of Plaintiffs' health care providers is respected. *See Norsworthy*, 87 F. Supp. 3d at 1194 (finding that evidence "belies [d]efendants' claim that an injunction is not in the public interest" because defendants are asking court to "disregard the reasoned opinion of medical and mental health professionals most familiar with [transgender plaintiff's] care.").

Conversely, there is no benefit to the public if injunctive relief is denied. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145−46 (D. Idaho 2018) (finding an injunction that "promotes the health, well-being, and safety of transgender people without impacting the rights of others" serves the public interest). Thus, the public interest is best served by issuing a preliminary injunction. Plaintiffs have thus satisfied final prong of the test for a preliminary injunction.

E.    **The Bond Requirement Should be Waived.**

A waiver of the Federal Rule of Civil Procedure 65(c)'s bond requirement is appropriate in this matter. "[T]he amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court [], the district court may dispense with the filing of a bond." *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (internal citations omitted); *see also Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (district courts are "vested with wide discretion" when deciding whether to require a bond (citations omitted)). Waiver of the bond requirement is necessary for the relief sought to be effective, given that Plaintiffs cannot afford the surgeries they require. *See Laforest v. Honeywell Intern., Inc.*, No. 03-cv-6248T, 2003 WL 23180220, at *3 (W.D.N.Y. Sep. 19, 2003) (no bond required because potential harm to plaintiffs who had been denied health insurance benefits was greater than potential financial loss to defendant), *aff'd and remanded sub nom. LaForest*, 376 F.3d 48.

Waiving the bond requirement is also appropriate given the high likelihood of Plaintiffs' ultimate success on the merits and minimal harm to Aetna from a preliminary injunction. *See, e.g.*,

*id.* (no bond was required, in part, because the harm to defendant was only financial loss); *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 243−44 (E.D.N.Y. 2024) (finding no bond is required due to plaintiffs' high likelihood of success on the merits and minimal hardship to defendant).

Accordingly, Plaintiffs respectfully request that this court waive the posting of any bond as a condition of entry of a preliminary injunction.

## V.    CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court issue a preliminary injunction enjoining Aetna from enforcing the GAFR Exclusion of CPB 0615 against Plaintiffs, thereby ensuring they may receive the medically necessary, nondiscriminatory care essential to alleviate their gender dysphoria.

DATED: March 3, 2025                    Respectfully submitted,

/s/ *Harini Srinivasan*
Christine E. Webber (admitted *pro hac vice*)
Harini Srinivasan (admitted *pro hac vice*)
Aniko R. Schwarcz (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave, NW, Suite 800
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699
cwebber@cohenmilstein.com
aschwarcz@cohenmilstein.com
hsrinivasan@cohenmilstein.com

Joseph J. Wardenski [ct31674]
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Phone: (347) 913-3311
Fax: (347) 467-7237
joe@wardenskilaw.com

Gabriel Arkles (admitted *pro hac vice*)
Ezra Cukor (admitted *pro hac vice*)
Sydney Duncan (admitted *pro hac vice*)
ADVOCATES FOR TRANS EQUALITY
EDUCATION FUND
520 Eighth Avenue, Suite 2204
New York, NY 10018
Phone:(646) 993-1688
Fax: (646) 993-1686
garkles@transgenderlegal.org
ecukor@transgenderlegal.org
sduncan@transgenderlegal.org

*Attorneys for Plaintiffs*