**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY and S.N., *individually and on behalf of all similarly situated individuals*, | Case No. 3:24-CV-01447-VAB |
| Plaintiffs, | |
| v. | April 11, 2025 |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

**DEFENDANT AETNA'S RESPONSE IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION BY
PLAINTIFFS JAMIE HOMNICK AND GENNIFER HERLEY**

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ............................................................................. 1

II. FACTUAL BACKGROUND ................................................................................. 3

    A.  Plaintiff Jamie Homnick ........................................................................... 3

    B.  Plaintiff Gennifer Herley. ........................................................................ 11

    C.  WPATH and Aetna's CPB 615 ................................................................ 13

III. ARGUMENT AND AUTHORITIES .................................................................. 18

    A.  *Article III Standing:*  The injury Plaintiffs allege is neither traceable to Aetna nor one the Court can redress because the injunction they seek against Aetna alone will not remedy the irreparable harm they allege. ..................................................................... 19

    B.  *Injunction Requirements:* Plaintiffs cannot establish the requirements for a preliminary injunction. ................................................................................................ 28

IV. CONCLUSION.................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Beacon Theatres, Inc. v. Westover*,
   359 U.S. 500 (1959)..........................................................................................30

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*,
   934 F.2d 30 (2d Cir. 1991)...............................................................................29

*Cacchillo v. Insmed, Inc.*,
   638 F.3d 401 (2d Cir. 2011).............................................................................24

*California v. Texas*,
   593 U.S. 659 (2021)..........................................................................................26

*Carter v. Fagin*,
   363 F. Supp. 2d 661 (S.D.N.Y. 2005)..............................................................37

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).....................................................................................25, 28

*Conkright v. Frommert*,
   559 U.S. 506 (2010)..........................................................................................39

*Cretor Constr. Equip. LLC v. Gibson*,
   738 F. Supp. 3d 950 (S.D. Ohio 2024) ............................................................37

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
   96 F.4th 351 (2d Cir. 2024) ...............................................................28, 29, 31, 32

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)..........................................................................................23

*Do No Harm v. Pfizer Inc.*,
   126 F.4th 109 (2d Cir. 2025) ............................................................................24

*Doe v. CVS Pharmacy, Inc.*,
   982 F.3d 1204 (9th Cir. 2020) ..........................................................................36

*Doe v. New York Univ.*,
   442 F. Supp. 522 (S.D.N.Y. 1978) ...................................................................30

*Egelhoff v. Egelhoff ex rel. Breiner*,
   532 U.S. 141 (2001)..........................................................................................20

*Fay v. Oxford Health Plan*,
    287 F.3d 96 (2d Cir. 2002)........................................................................................34

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
    528 U.S. 167 (2000)...............................................................................................24

*Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*,
    335 F.Supp. 278 (S.D.N.Y. 1971) .........................................................................36

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016)...............................................................................................20

*Grasso Enters., LLC v. Express Scripts, Inc.*,
    809 F.3d 1033 (8th Cir. 2016) ...............................................................................30

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)...............................................................................................26

*Heyman v. Ar. Winarick, Inc.*,
    166 F. Supp. 880 (S.D.N.Y. 1958) ........................................................................37

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)...............................................................................................36

*Johnson v. Burge*,
    506 Fed. Appx. 10 (2d Cir. 2012) ..........................................................................29

*JTH Tax, LLC v. Agnant*,
    62 F.4th 658 (2d Cir. 2023) ...................................................................................28

*Kamerling v. Massanari*,
    295 F.3d 206 (2d Cir. 2002)...................................................................................29

*Khesin v. Aetna Life Ins. Co.*,
    615 F. Supp. 3d 142 (D. Conn. 2022) ....................................................................34

*Knowles v. U.S. Coast Guard*,
    924 F. Supp. 593 (S.D.N.Y. 1996) ...................................................................30, 32

*Kocsis v. Standard Ins. Co.*,
    142 F. Supp. 2d 241 (D. Conn. 2001) ....................................................................34

*Liberty Mut. Ins. Co. v. Donegan*,
    746 F.3d 497 (2d Cir. 2014)...................................................................................20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................23, 32

*Murthy v. Missouri,*
603 U.S. 43 (2024)...................................................................20, 24, 26, 27, 28

*New York ex rel. Schneiderman v. Actavis PLC,*
787 F.3d 638 (2d Cir. 2015)...................................................................29

*Religious Sisters of Mercy v. Becerra,*
55 F.4th 583 (8th Cir. 2022) ...................................................................20

*Schmitt v. Kaiser Found. Health Plan of Washington,*
965 F.3d 945 (9th Cir. 2020) ...................................................................23

*Simon v. Eastern Ky. Welfare Rights Org.,*
426 U.S. 26 (1976)...................................................................20

*Sprint Commc'ns Co., L.P. v. APCC Servs.,*
554 U.S. 269 (2008)...................................................................24

*SQP, Inc. v. Sirrom Sales, Inc.,*
130 F. Supp. 2d 364 (N.D.N.Y. 2001)...................................................................36

*State Farm Mutual Auto, Ins. Co. v. Tri-Borough NY Medical Practice P.C.,*
120 F.4th 59 (2d Cir. 2024) ...................................................................29

*State of N.Y. v. U.S. Gen. Servs. Admin.,*
823 F. Supp. 82 (N.D.N.Y. 1993)...................................................................37

*Thomas v. Veterans Admin.,*
467 F. Supp. 458 (D. Conn. 1979)...................................................................30

*Toll Bros., Inc. v. Twp. of Readington,*
555 F.3d 131 (3d Cir. 2009)...................................................................24

*Town of Huntington v. Marsh,*
884 F.2d 648 (2d Cir. 1989)...................................................................30

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)...................................................................23

*Varity Corp. v. Howe,*
516 U.S. 489 (1996)...................................................................39

*WarnerVision Entertainment Inc. v. Empire of Carolina, Inc.,*
101 F.3d 259 (2d Cir. 1996)...................................................................38

*Williby v. Aetna Life Ins. Co.,*
867 F.3d 1129 (9th Cir. 2017) ...................................................................20, 26, 40

**STATUTES**

Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, *et seq*. ..........................4, 30

**OTHER AUTHORITIES**

81 Fed. Reg. 31,375, 31,432 (May 18, 2016) ..............................................................................25

Defendant Aetna Life Insurance Company ("Aetna") respectfully submits this response in opposition to the Motion for Preliminary Injunction filed herein by Plaintiffs Jamie Homnick and Gennifer Herley [Dkt. 61] ("Mot.").

## PRELIMINARY STATEMENT

Plaintiffs seek coverage for facial gender-affirming surgeries under their employee health benefit plans. The plans are sponsored and funded by Plaintiffs' employers, who hired Aetna to handle claims administration. The employers are not parties here, however.

Plaintiffs seek an injunction to have their claims reviewed independently of Aetna, with the ultimate goal of receiving medical coverage under their employers' plans. Mot. at 1, 2. "Absent an injunction," they say, "they will continue to be denied medically necessary care." *Id.* at 1, 2.

Plaintiffs never explain, however, how an injunction against *Aetna alone* would provide the medical care they seek—how an injunction can bind their *employers* or their *plan assets* when their employers are not parties here. Moreover, Plaintiffs ignore the fact their employers' plans already offer an administrative appeal that provides exactly the relief Plaintiffs seek— external review of their claims independent of Aetna—and that, better still, the external review decision would fully bind their employers and their plans while this Court cannot.

Plaintiffs' motion fails, first, because they cannot satisfy the requirements for Article III standing. The injury Plaintiffs allege is not one that is *traceable* solely to Aetna or one the Court can *redress* because the injunction they seek against Aetna alone will not remedy the harm they allege. Absent their employers, who control the benefits under their plans, the Court lacks the power to order the plan coverage and fund the medical care Plaintiffs ultimately seek.

Second, because Plaintiffs seek to alter the status quo, they must meet a heightened burden of proof, which they cannot satisfy.

- Plaintiffs cannot make a *strong showing of irreparable harm* because they already have an administrative remedy—an external review independent of Aetna—that will provide the same relief as the injunction they seek from this Court but with the added benefit that it would bind their employers and plans while this Court cannot. Plaintiffs cannot establish irreparable harm so long as they refuse to pursue an available administrative remedy that could provide relief this Court cannot order.

- Plaintiffs also cannot show a *clear or substantial likelihood that they will succeed on the merits* because (1) current medical and scientific literature is limited and confounded and does not clearly establish that facial surgery is a reliably effective treatment for gender dysphoria, and (2) Aetna administered the plans of Plaintiffs' employers consistent with the employers' directives, and Plaintiffs cannot clearly show that Aetna acted contrary to the terms of their plans or the intentions of their employers. The Court should not resolve hotly contested questions of material fact at the preliminary injunction stage, especially where the injunction would alter the status quo and impact the interests of non-parties before final resolution of the merits of Plaintiffs' claims.

- Plaintiffs finally cannot show that either the balance of the equities or the public interest supports their motion. There simply is no need for the Court to intervene with the extraordinary and drastic remedy of a preliminary injunction when Plaintiffs already have an external review remedy that would be both more efficient and effective than injunctive relief. The Court should defer, for the moment at least, to the administrative process Plaintiffs' employers have offered through their plans.

Plaintiffs' true aim here is to force parties they haven't sued to pay for health plan coverage those parties haven't authorized. That is not a proper use of a preliminary injunction.

## FACTUAL BACKGROUND

Plaintiffs Jamie Homnick and Gennifer Herley are transgender women who seek coverage for "gender-affirming facial reconstruction" surgeries and procedures (or "GAFR")[1] that are not covered under the terms of their employers' self-funded health benefit plans. Second Amended Class Action Complaint [Dkt. 60] (the "Am. Compl.") ¶¶ 1, 2.

### A.    Plaintiff Jamie Homnick

#### 1.    The Bausch & Lomb plan.

Plaintiff Jamie Homnick is covered under a health benefit plan funded and sponsored by her employer, Bausch & Lomb (the "Bausch & Lomb Plan"). Am. Compl. ¶ 23; Declaration of Hannah Goellner ("Goellner Decl.") ¶ 9. The plan booklet for Dr. Homnick's plan states that the plan is self-funded by her employer, which the booklet identifies as Bausch & Lomb, and states that Aetna provides third party administrative services under the plan. Goellner Decl., Ex. A.

Dr. Homnick's employer, Bausch & Lomb, retained Aetna to act as claims administrator under its employee health benefit plans pursuant to a Master Services Agreement effective January 2022 (the "Bausch & Lomb MSA"), the relevant portions of which are attached hereto as Goellner Decl. Exhibit C. The Bausch & Lomb MSA designates Bausch & Lomb as Plan administrator and provides that benefits are funded by Bausch & Lomb. *Id.* at 1–2. The MSA also provides that Bausch & Lomb, as Plan administrator, "retains complete authority and responsibility for the Plan, its operation, and the benefits provided there under." *Id.* at 2. Bausch & Lomb also expressly retained "the final and sole authority regarding the benefits and provisions of the Plan(s), as outlined in

---

[1] "GAFR" is a loose umbrella term used to encompass procedures also sometimes referred to as "facial feminization surgeries," "gender affirming facial surgeries," and "facial gender affirming procedures," among other similar terms. Am. Compl. at 1 n. 2. Aetna's Clinical Policy Bulletin 615, about which Plaintiffs complain here, refers to these procedures as "facial gender affirming procedures" (or "FGAP"). Aetna has separate bulletins that address reconstructive surgeries, but those policies and surgical procedures are not at issue in this litigation.

3

[Bausch & Lomb's] Plan document." *Id.* at 12. Bausch & Lomb also agreed that Aetna's responsibility was to "process claims for Plan benefits. . . in a manner consistent with the terms of the Plan(s)" and that "Aetna shall have no responsibility or liability for the content of any of [Bausch & Lomb's] Plan documents. . ., regardless of the role Aetna may have played in the preparation of such documents." *Id.* at 10, 12.

The Bausch & Lomb Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, *et seq.* ("ERISA") and offers a comprehensive administrative process for the resolution of benefit disputes. First, the Plan offers two levels of appeal to Aetna. Goellner Decl. Ex. A at 48. The Plan also offers an external appeal through an independent External Review Organization, which is wholly independent of Aetna. *Id.* at 50-51. Finally, Bausch & Lomb, as Dr. Homnicks' employer and funding sponsor of the Plan, retains final authority to review and revise Aetna's benefit decision, but the Plan specifically agreed to accept the independent external decision in the absence of conflict of interest, bias or fraud. *Id.* at 50.

## 2.     Homnick's benefit claim.

Dr. Homnick contacted the Bausch & Lomb Human Resources department about facial gender-affirming surgery in a September 22, 2023, email: "It looks like our Aetna health insurance coverage doesn't include facial feminization surgery for gender affirmation health care, and considers it "Not Medically Necessary".... I'm wondering why Aetna restricts coverage for facial feminization surgery when many medical professionals consider this treatment to be a medically necessary aspect of transgender care — and why B+L doesn't use an insurance provider that includes this treatment." Declaration of Sarah Reeves ("Reeves Decl.") Ex. B at 1483. An HR representative responded by email on September 26, 2023: "I have begun the process of inquiring

about cosmetic gender affirming care and possibilities for coverage under our plan. Though I cannot make any guarantees for coverage, I wanted to assure you that we are looking into it." *Id.* at 1482.

In December 2023, Dr. Homnick sent the HR representative a copy of the WPATH guidelines and asked, "I'm wondering if you have any updates on gender-affirming care benefits for 2024." Reeves Decl. Ex. C at 1459. The Bausch & Lomb representative responded in January 2024: "This is definitely on our list for review. The earliest a determination would likely be made is right before Open Enrollment for 2025 benefits (August/September)." *Id.* Dr. Homnick sent another email on September 10, 2024, again asking that her employer include facial gender-affirming surgery in its 2025 Plan: "Being that B+L calls itself a 'progressive' company, I think this is an important benefit to include in our health care benefits package." *Id.* at 1458.

Dr. Homnick testified in her deposition in this matter that she understood at that time that the 2024 Bausch & Lomb Plan did not cover facial gender-affirming surgery but that the company was considering adding the coverage in its 2025 Plan and that she provided the WPATH guidelines for their consideration in drafting their 2025 Plan. Reeves Decl. Ex. A at 33:15-34:21, Ex. C at 1459.

Dr. Homnick sought prior authorization for gender-affirming procedures on September 4, 2024, which Aetna denied under the terms of the Bausch & Lomb Plan on September 9, 2024. Am. Compl. ¶ 88; Homnick Decl. (Dkt. 62-3) ¶ 19. Dr. Homnick appealed Aetna's decision on September 13, 2024, and Aetna denied the appeal, and upheld its previous decision, by letter dated September 19, 2024. Declaration of Susan Powell ("Powell Decl.") Ex. A. In its September 19 letter, Aetna specifically advised Dr. Homnick that, under the terms of her Plan, she could request a second level appeal of Aetna's decision. *Id.* at 4.[2]

---

[2] Dr. Homnick, also on September 13, 2024, filed a discrimination complaint with the New York State Department of Financial Services ("NYSDFS"). Powell Decl. Ex B. On September 19, 2024, the same date Aetna responded to Dr. Homnick's first level appeal under her Plan, NYSDFS sent Dr.

Aetna's letter also advised Dr. Homnick of her right to request an external review, "to have our decision reviewed by people outside of Aetna." *Id.* at 6. The letter explained: "Independent providers with expertise in the medical service or supply at issue conduct the external review. Once a review is complete, we accept the decision of the external reviewer." *Id.* at 7. Aetna also advised that Dr. Homnick's doctor could request an expedited external review. *Id.* The letter stated that Dr. Homnick would not have to pay for either the external review or any filing fees and that: "Your request for an External Review will not affect your rights to any other benefits under the plan. Nor will it affect your right to representation. Your request will not affect the process for selecting the External Review Organization. Nor will it affect the impartiality of the physician reviewer." *Id.*

### 3. Bausch & Lomb denies Homnick's request for coverage.

Throughout this period, Dr. Homnick continued a dialogue with Bausch & Lomb about her request for facial gender-affirming surgery. Am. Compl. ¶ 88. In a September 2024 email, Dr. Homnick stated that her doctor told her that "my procedure was rejected *solely* on the grounds of it not being in our contract." Reeves Decl. Ex C. at 1458 (original emphasis). She continued to advocate that Bausch & Lomb revise its 2025 benefits plan to include coverage for facial gender-affirming surgery. *Id.* She also asked that her employer grant an exception in her case: "If our 2025 benefits package isn't going to include this, is there an exception the company can make for me? Better yet, is there an exception that could be made in 2024 so I can continue on my health care path uninterrupted?" *Id.*

---

Homnick a letter advising that it lacked authority to handle her discrimination complaint because her health plan was self-funded by her employer. Reeves Decl. Ex. H. Notwithstanding this advice from NYSDFS, Dr. Homnick submitted a second discrimination complaint to NYSDFS on October 16, 2024. Powell Decl. Ex. C. NYSDFS forwarded that second discrimination complaint to Aetna on October 17, 2024, and Aetna thereafter corresponded with both NYSDFS and Dr. Homnick regarding that complaint in October and November 2024. *Id.* Dr. Homnick was again advised that her employer's self-funded plan was exempt from New York state insurance law. Am. Compl. ¶ 88

In November 2024, Dr. Homnick met twice with a vice president of Bausch & Lomb's HR department to discuss her requests. She recorded both meetings, certified transcripts of which are attached hereto as Reeves Decl. Exhibits E and F. In the first meeting, which occurred in or about early November, Dr. Homnick repeated her request that Bausch & Lomb either revise its Plan for 2025 to include facial gender-affirming surgery or authorize an exception for her. Reeves Decl. Ex. E at 14:18-24. She also stated that she could pay a $700 premium to purchase an individual insurance policy from Blue Cross she believed would cover facial gender-affirming surgery and asked if Bausch & Lomb would reimburse her for that premium payment.[3] *Id.* at 15:21-17:25. The Bausch & Lomb representative said the company would consider her requests. *Id.* at 18:20-24.

In the second meeting, on November 6, the Bausch & Lomb representative advised Dr. Homnick that senior management of the company had considered her requests and would not change its Plan for 2025 or authorize an exception for her or pay her premiums for a Blue Cross policy. Reeves Decl. Ex. F 3:23-5:19. In an email summarizing the meeting, Dr. Hominick confirms she was again told that Bausch & Lomb would not agree to her request for GAFR coverage: "There was nothing they could do to help me due to either legal reasons (ERISA) or financial reasons (self-funded coverage payments are paid from limited company money)." Reeves Decl. Ex. D at 1449. The HR representative responded to confirm that Dr. Homnick's email accurately stated the company's position. *Id.* at 1448. Dr. Hominick followed up with additional emails asking that her employer to revise its 2025 plan to include GAFR coverage and, in February 2025, the

---

[3] As Plaintiffs note in their complaint, insurance plans regulated by the State of New York were required, as of September 16, 2024, to cover various GAFR procedures under certain circumstances. Am. Compl. at ¶ 147f. Plaintiffs acknowledge, however, that those regulations do not apply to self-funded plans like the Bausch & Lomb and MTA Plans at issue here, where the coverage is designed and funded entirely by the sponsoring employer. *Id.* at ¶ 88.

HR representative again advised: "Jamie — there have been no changes to the coverage in 2025 and no exception made for you." *Id.* at 1440.

### 4. Bausch & Lomb confirms its policy.

Upon receiving Dr. Homnick's request for GAFR coverage in September 2024, Bausch & Lomb first consulted, not Aetna, but rather Willis Towers Watson ("WTW"), a national consulting firm that specializes in employee benefits plan strategy and design and that advised Bausch & Lomb in that capacity. Goellner Decl. Ex. D. Dr. Patricia Toro, MD, MPH, who is a medical director at WTW, advised Bausch & Lomb as follows:

1. The WPATH SOC8 gives clinical guidance to providers who treat the transgender and gender diverse community. It is not, strictly speaking, a recommendation to insurance carriers. As such, in no place throughout the WPATH SOC8 document does it use the phrase "medically necessary," which is really an insurance carrier phrase.

2. The WPATH SOC8 is open to FGAS, in particular on page S129 the document states, "In recent years, facial GAS (FGAS) has received increased attention, and current literature supports its benefits." This means that WPATH SOC8 supports the use of FGAS for appropriate patients, but it does <u>not</u> mean that all transgender females should have FGAS.

- On page S130, the WPATH SOC8 explicitly calls out facial feminization for individuals assigned male at birth (AMAB) as a potential intervention.

- Appendix E calls out facial feminization procedures (page S258)

3. Health insurance carriers look at multiple sources of information beyond WPATH SOC8 to determine coverage and medical necessity. Most insurance carriers do not cover FGAS because their read of the benefit of these procedures/surgeries does not rise to level of medical necessity for the condition of gender dysphoria.

4. These coverage standards are updated at least annually by the health plans, and recently there has been a lot of changes to expand standard coverage. It may be, with additional information/studies, that standard coverage benefits may include FGAS in the future.

It is rare for any single source of information to be used by a health plan to support a medical policy coverage decision. While WPATH SOC8 is certainly an important recommending organization in this space, it is not the only one. Although WPATH SOC8 recommends it as a potential treatment modality, this does not mean that it is medically necessary. *Id.*[4]

Bausch & Lomb also asked Aetna for an explanation of Aetna's GAFR policy, and Aetna provided the following summary:

Aetna standard coverage for gender affirming treatment is aligned with WPATH SOC8 for coverage for BH care, hormones/hormone blockers, gender affirming breast and genital surgery (including reversal of gender affirming surgery) all per "Recommendations" of SOC8 (SOC8 does not list coverage criteria as did SOC7. Our CPB coverage criteria are in the language (words) of the "Recommendations" stated in SOC8.)

We do not cover the SOC8 Recommendation for facial and body contouring surgery due to a lack of evidence-based literature that these procedures improve the gender dysphoria of these individuals – SOC8 provided only one prospective study for facial feminization and commented that the study "results were direct and consistent, but somewhat imprecise because of certain study limitations." For facial masculinization, SOC8 states "While gender-affirming facial surgery for AFAB individuals is an emerging field, current limited data points toward equal benefits in select patients. Future studies are recommended." Accordingly, we "align" with most of WPATH SOC8. Goellner Decl. Ex. F.

On September 18, 2024, Bausch & Lomb advised Aetna: "B&L and will not be granting an exception for this individual so if you have any standard language that you use in this case, that will be helpful as well. It will be important to reinforce this message should the member call in on this issue again."[5]  *Id.*  On October 2, 2024, Bausch & Lomb directed Aetna to

---

[4] In their November 2024 meetings, the Bausch & Lomb HR vice president advised Dr. Homnick that in developing the Bausch & Lomb 2025 Plan: "[W]e use a consultant [Willis] Towers Watson to help us determine benefit plan and designs, things like that.  They did an analysis.  They looked basically and have MDs on their staff as well and others came back and said, here's what we suggest…. And so this was our step in 2025."  Reeves Decl. Ex. E 4:21-5:5.  He reiterated in the second meeting that the leadership of the company "works on developing what are the US benefit programs that we have.  And we work with [Willis] Towers Watson as a consulting firm that works with us to do this."  Reeves Decl. Ex. F at 2:8-13.

[5] Dr. Homnick also stated in one her September emails that "Aetna's medical director agreed with my three health care providers' professional opinions that this is a medically necessary

confirm its position with Dr. Homnick's providers: "B&L wants to ensure that somehow the providers office is notified that this is not considered medically necessary…." *Id.*  On October 9, Aetna provided the policy statement Bausch & Lomb requested:

> Aetna standard coverage for gender affirming treatment is aligned with WPATH SOC8 for coverage for BH care, hormones/hormone blockers, gender affirming breast and genital surgery (including reversal of gender affirming surgery) all per "Recommendations" of SOC8 (SOC8 does not list coverage criteria as did SOC7. Our CPB coverage criteria are in the language (words) of the "Recommendations" stated in SOC8.)  We do not cover the SOC8 Recommendation for facial and body contouring surgery due to a lack of evidence-based literature that these procedures improve the gender dysphoria of these individuals – SOC8 provided only one prospective study for facial feminization and commented that the study "results were direct and consistent, but somewhat imprecise because of certain study limitations." For facial masculinization, SOC8 states "While gender-affirming facial surgery for AFAB individuals is an emerging field, current limited data points toward equal benefits in select patients. Future studies are recommended." Accordingly, we "align" with most of WPATH SOC8.  CPB Link: Gender Affirming Surgery - Medical Clinical Policy Bulletins | Aetna".  *Id.*

**5.    Current status of Homnick's claim.**

Dr. Homnick stipulates in her complaint that she asked her Bausch & Lomb for "an exception to the exclusion in her case" but her employer "declined her request."  Am. Compl. ¶ 88.

Bausch & Lomb did revise its 2025 plan to include coverage for certain additional gender-affirming procedures, including face and neck electrolysis, voice/communication therapy and adult tracheal shave.  Goellner Decl. ¶ 10.  The 2025 plan booklet notes that "some cosmetic procedures" for gender affirming care are covered.  Goellner Decl. Ex. B. at 10.

---

procedure."  Goellner Decl. Ex. D at 7.  The call notes between the Aetna medical director and Homnick's doctors refute that characterization, however.  Goellner Decl. Ex. E.  Bausch & Lomb requested a clarification, and Aetna responded that its medical director "advised that his statement to providers for these types of services is that they are not medically necessary due to lack of clinical evidence, and then he offers to send the Clinical Policy Bulletin for additional review of our policies and information on our reasoning. If the provider accepts the offer, [he] would send a follow-up email to the provider directly. Unfortunately, because he offers that information at the time of the call, he won't make another outreach to the provider."  Goellner Decl. Ex. F at 3.

While Bausch & Lomb is fully aware of her request for GAFR coverage and has thus far declined to provide such coverage under its Plan, Dr. Hominck still has an administrative option available under her Plan to challenge her employer's decision. As noted above, the Bausch & Lomb Plan allows Dr. Homnick to present her claim to an independent External Review Organization (ERO), which would review her case *de novo* and render a second opinion on the medical necessity of the GAFR procedures she seeks. Goellner Decl. Ex. A at 50. Dr. Homnick could submit any materials she wishes, including the same materials she has offered here with her motion, and the ERO review would be wholly independent of both Aetna and her employer. See Declaration of Deborah Rudolph ("Rudolph Decl.") ¶¶ 4-6. And, especially important here, the Plan provides that Bausch & Lomb will abide by the decision of the ERO, even to provide benefits they ordinarily would not cover or that would not be considered medically necessary under Aetna's Clinical Policy Bulletin. Goellner Decl. Ex. A at 50; Rudolph Decl. ¶ 7.

Dr. Homnick, through her counsel, advised Aetna on March 13, 2025, however, that she declines the ERO opportunity the Bausch & Lomb Plan offers.

**B.    Plaintiff Gennifer Herley.**

Plaintiff Gennifer Herley is covered under a health benefit plan sponsored by her wife's employer, the New York Metropolitan Transportation Authority (the "MTA Plan").[6] Am. Compl. ¶ 24. Plaintiff's MTA Plan is self-funded by MTA and Plaintiff's wife's union, TWU Local 100. Declaration of Cheryl Aronson ("Aronson Decl.") ¶ 7.

MTA retained Aetna as claims administrator under its employee health benefit plan pursuant to an Administrative Services Agreement (the "MTA ASA"). Aronson Decl. Ex. B at iii, 9. Under

---

[6] Dr. Herley is covered as a beneficiary under the plan of her wife, who is the employee of MTA. Regardless, the coverage at issue arises under a plan sponsored by MTA in its role as a self-funding employer.

the MTA ASA, the MTA retained "full and final authority and responsibility for the Plan and its operation." *Id.* at 6. Further, MTA has "sole authority over the design of the plan" and "possess[es] ultimate and discretionary authority to decide . . . benefits covered under the plan." *Id.* at 7.

The ASA also provided that MTA "shall have the right to review [Aetna's] adopted procedures and practices for claims approval, claims denial, and other aspects of the administration of the plan." *Id.* In fact, MTA did just that in 2017. On June 15, MTA's Human Resources Department sent a memorandum to its Acting Executive Vice President, Craig Cipriano, requesting approval to cover medical expenses related to treatment for gender dysphoria. Aronson Decl. Ex. D. Mr. Cipriano signed that document recommending approval on June 20, 2017. The following day, Aetna asked for a list of procedures MTA would like covered under this revision, and MTA's Aetna Account Director confirmed that MTA "will follow Aetna's Clinical Policy." Aronson Decl. Ex. C.

The MTA Plan that covers Dr. Herley offers a comprehensive administrative process for the resolution of benefit disputes. First, the Plan offers two levels of appeal to Aetna. Aronson Decl. Ex. A at 40-41. The Plan also offers an external appeal through an independent External Review Organization ("ERO"), which is wholly independent of Aetna. Powell Decl. Ex. D at 11. The ERO is entitled to make a "final decision" on the matter. *Id.*

Dr. Herley sought prior authorization for facial gender-affirming surgery, which Aetna denied under the terms of the MTA Plan in December 2024. Am. Compl. ¶ 100. Dr. Herley neither appealed Aetna's decision nor sought ERO review as authorized by her Plan. Powell Decl. ¶ 8.

At this time, Dr, Herley still has available an external appeal to an independent ERO to challenge Aetna's decision on her request for gender affirming coverage, which will be considered the final decision on her claim. Powell Decl. Ex. D at 11. Dr. Herely, through her counsel, advised Aetna on March 13, 2025, however, that she declines the ERO opportunity the MTA Plan offers.

**C.      WPATH and Aetna's CPB 615.**

There is substantial research and consensus supporting the efficacy of genital and chest surgical procedures for the treatment of gender dysphoria, and Aetna has recognized the medical necessity of these procedures in appropriate patients for years.    Declaration of Robert McDonough, M.D. ("McDonough Decl.") ¶ 12.  The current data regarding facial surgeries, on the other hand, are limited and imprecise, and studies consistently recognize that additional empirical research is necessary in several important areas.  *Id.* at ¶¶ 12, 28.[7]

* Researchers from the International Facial Gender Symposium, who published the first-ever consensus statement specifically focused on the area of facial gender surgery in 2022, found that there currently is no generally accepted standard for the most commonly requested surgeries (forehead, lower jaw, and nose) and that additional studies are needed in areas such as diagnosis, clinical indication, standardization, and effects on patient quality of life.  *Id.* at ¶ 13.  Data on other facial feminization procedures are even more limited and require validation through additional research.  *Id.*  These researchers also concluded that additional research is necessary to establish "better validation of patient-reported metrics [and] objective standards for outcomes evaluation."  *Id*.  They recommended that "[l]arger, multicenter, prospective studies with sufficient sample size are needed to…identify (a) how to predict which patients benefit the most, and (b) identify the individual impact of each procedural type with facial gender surgery."  *Id.*

* Researchers at the University of North Carolina in 2021 similarly found that outcomes data for facial feminization surgeries are limited and concluded "there remains

---

[7] Both parties refer to medical literature in their briefing and declarations.  That literature is publicly available but, should the Court desire, Aetna can provide copies of the literature it references for the Court's convenience.

a lack of good evidence for short- and long-term complication rates" and "[d]ata regarding satisfaction rates and QoL [quality of life] measures are also improving but remain sparse." *Id.* at ¶ 14. Likewise, another 2021 study concluded that "further studies are required to understand the long-term effect of FFS [facial feminization surgery] in gender dysphoria patients with respect to the quality of their social life." *Id.* at ¶ 24.

- Studies also have identified certain types of patients for whom facial gender-affirming procedures may *not* be appropriate. For example, facial feminization surgery has been found to be less successful in patients over 40 years of age and in patients who have not received other, more common gender-affirming treatments. *Id.* at ¶¶ 25-26.

The current WPATH guidelines, which were published in September 2022, cover a wide range of gender affirming treatments, including both surgical and non-surgical interventions, but include only a very brief reference to facial surgery. *Id.* at ¶ 11. WPATH makes no reference to the studies cited above or to the many limitations in the research and data supporting facial gender-affirming procedures that those and other researchers have identified. *Id.* at ¶ 15. But the literature WPATH does cite on the issue of facial procedures actually reinforces the same research limitations identified by other studies but that WPATH itself does not acknowledge. *Id.*

For example, WPATH cites only *one* prospective study on facial gender-affirming procedures. *Id.* at ¶ 16. By comparison, WPATH cites *five* prospective studies on gender affirming chest surgery and *eight* prospective studies on gender affirming genital surgery. *Id.* Prospective studies are essential in evaluating the efficacy of a procedure as a treatment for gender dysphoria because only prospective studies, which follow participants forward in time, allow investigators to observe the intervention and the outcome, to better assess a cause-and-effect relationship. *Id.* There simply is far more research and evidence-based consensus

supporting the efficacy of chest and genital procedures for the treatment of gender dysphoria than exists for facial gender-affirming procedures, a fact even WPATH recognizes. *Id.*

Moreover, the lone prospective study WPATH cites on facial gender-affirming procedures (Morrison et al.) acknowledges significant limitations. *Id.* at ¶ 17. That study, which was published in 2020, acknowledged that "[n]o data exist on the prospective outcomes of facial feminization surgery." *Id.* The authors surveyed patients at one and six months post-operatively and found: "Of note, *no particular area of the face…or number of procedures…was associated with a statistically significant effect on facial feminization surgery outcome score or satisfaction outcomes* in our cohort." *Id.* (emphasis added). Finally, the authors acknowledged that "[l]imitations exist in this study and include response bias of participants, heterogeneity of procedures used in facial feminization surgery, and the use of a quality-of-life instrument that was not initially developed for the transgender or gender-diverse population, although it has been specifically adapted for the transgender population. In addition, gender appearance and general aesthetic outcomes scale used were not validated." *Id.* They also noted that additional studies are needed to develop "a robust patient-reported outcome measure" for facial gender surgical procedures. *Id.*

WPATH discusses none of the limitations the Morrison authors identified, but WPATH instead characterizes the results as "direct and consistent, but somewhat imprecise." *Id.* at ¶ 18.

WPATH references only one other study that attempted to make an evidence-based assessment of the efficacy of facial surgery as a treatment for gender dysphoria. *Id.* at ¶ 19. That study (Ainsworth) found that patients who received facial feminization surgery reported better subjective outcomes on a satisfaction survey than those patients who had not had surgery, but the researchers specifically noted that "[o]ne limitation of the outcomes evaluation is that it has not been validated by prior investigations." *Id.* That same study also found that patients receiving

facial feminization surgery showed "no statistically significant difference in mental health-related quality of life" compared to the general female population. *Id*. WPATH, though citing the study, notes none of these limitations of the study. [8] *Id.*

Based on the available data, the WPATH section discussing facial gender-affirming surgery does not characterize the surgery as "medically necessary," but instead offers the more equivocal, and ambiguous, statement that "current literature supports its benefits." *Id.* at ¶ 22. Overall, the literature cited by WPATH highlights important questions about the efficacy of facial surgery for treatment of gender dysphoria that remain unanswered, including identification of particular facial procedures that may be effective to treat gender dysphoria and development of robust protocols to measure outcomes and validate efficacy. *Id.* at ¶ 23.

Aetna has developed Medical Clinical Policy Bulletins (CPBs) that detail certain services and procedures Aetna considers medically necessary, cosmetic, or experimental and unproven. Aetna's CPBs are based on evidence in the peer-reviewed published medical literature, technology assessments and structured evidence reviews, evidence-based guidelines from nationally recognized professional healthcare organizations and public health agencies—with the overall goal that Aetna's policies will reflect the current medical and scientific consensus. *Id.* at

---

[8] Another study cited by WPATH (Van de Grift) did not address facial surgery separately and simply cross-referenced the Ainsworth study. McDonough Decl. ¶ 20. The study noted: "Overall, the current evidence suggests that postoperative QoL [quality of life] of people surgically treated for gender dysphoria may be influenced by feelings of (minor) regret and dissatisfaction with GAS. Although individuals generally report high satisfaction rates with their GAS, little is known on dissatisfaction/regret and its impact on psychological and QoL outcomes." *Id.* The authors also recommended much longer post-surgical follow up (five years) to better assess overall feelings of well-being—a substantially longer follow up than the six months in the Morrison study. *Id.* Again, WPATH merely cites the Van de Grift study but discusses none of the concerns and limitations those authors reported. *Id.*

The five other papers cited by WPATH simply reported the results of various surgical techniques without any statistical or other evidence-based assessment of impact on gender dysphoria. *Id.* at ¶ 21.

¶ 5.  All CPBs are developed using the same standards to assess the strength of the clinical evidence, regardless of the nature of the procedure or treatment being examined, or which individuals are likely to seek it.  *Id.* at ¶ 6.  Aetna's CPB 615 (Gender Affirming Surgery) states that Aetna considers most facial gender-affirming procedures as not medically necessary and cosmetic, which is consistent with the limited and equivocal data currently available.  *Id.* at ¶ 10.

Moreover, while Aetna CPBs are developed to assist in administering plan benefits, they do not themselves constitute a description of plan benefits.  *Id.* at ¶ 8.  For example, CPB 615 notes, "Some plans may cover gender affirming procedures in addition to the following policy. Please check the specific benefit documents."  *Id*. at ¶ 10.  For Aetna plans that are employer-funded, Aetna defers to the plan sponsor and to the plan terms; self-funded plans are free to make their own coverage decisions irrespective of Aetna's CPBs.  *Id.*[9]

Finally, while CPBs define Aetna's clinical policy, medical necessity determinations in connection with coverage decisions are made on a case-by-case basis.  *Id.* at ¶ 8.  Where a member's coverage request includes services that may or may not be considered "medically necessary" for the condition being treated, each service included in the request is reviewed by a licensed medical practitioner, who makes coverage determinations based on an individualized assessment of the specific request(s), the member's plan language, the member's individual needs and their individual medical history. Declaration of Dorothea Verbrugge, M.D. ("Verbrugge Decl.") ¶ 8.  Although Aetna's medical directors often consult various sources of information (including CPBs), each coverage decision rests on the judgment and discretion of the medical director making the medical necessity determination, subject to Plan coverage restrictions and legal and regulatory requirements, and Aetna's medical directors are responsible

---

[9] Dr. Homnick's plan is a good example of this: Bausch and Lomb revised its 2025 Plan to cover certain cosmetic gender affirming procedures, including electrolysis and tracheal shaving.

for reviewing member and provider requests for coverage regardless of whether a CPB is available for consultation. *Id.* at ¶¶ 11, 14. If Plaintiffs' coverage requests were re-presented for precertification review and Aetna's medical director was unable to consult CPB 0615, the medical director would still make individualized medical necessity determinations based upon the clinical evidence and research available, which would include an evaluation of whether the efficacy of the requested procedure or service is supported by evidence-based medical and scientific research and literature. *Id.* at ¶ 14.

## ARGUMENT AND AUTHORITIES

The scientific question whether facial surgery is an *effective* treatment for gender dysphoria has not been nearly so clearly established as Plaintiffs suggest. Empirical data demonstrating that facial procedures are efficacious in alleviating gender dysphoria are limited and confounded, and even the medical literature cited by WPATH and Plaintiffs' experts concedes that additional research is still needed.

Aetna's CPB 615 appropriately recognizes this current state of the science. So, too, do Plaintiffs' employers who created and fund—and who ultimately control the benefits available under—the health Plans from which Plaintiffs seek coverage. Dr. Homnick specifically asked Bausch & Lomb to approve GAFR coverage for her, but the employer, after consulting its own outside consultant, affirmed that its plan does not cover all of the GAFR treatments Plaintiff wants and denied her request for coverage. MTA, the sponsor of Dr. Herley's Plan, specifically directed Aetna to follow its CPBs in processing requests for gender affirming coverage.

Both Plaintiffs' employers, however, offer an external appeal whereby Plaintiffs can seek a review of their requests by an outside expert, independent of their employers or Aetna and Aetna's CPB. For all practical purposes, the very relief they seek from this Court. Importantly,

moreover, Plaintiffs' Plans also provide that their employers will abide by the external decision, even to provide benefits their plans ordinarily would not cover, and this administrative process thus binds Plaintiffs' employers in a way this Court cannot because they are not parties here. Both Plaintiffs, however, declined to pursue the external review opportunity their Plans offered.

Plaintiffs' motion fails because the preliminary injunction they seek is both ineffectual and unnecessary.  And it asks the Court to resolve prematurely complex disputed questions of medical science that would unjustly impact the rights and interests of Plaintiffs' employers whom Plaintiffs have intentionally excluded from this suit.

A.    *Article III Standing:*  **The injury Plaintiffs allege is neither traceable to Aetna nor one the Court can redress because the injunction they seek against Aetna alone will not remedy the irreparable harm they allege.**

Plaintiffs seek "a preliminary injunction to halt Aetna's enforcement of the GAFR Exclusion in CPB 0615 against them while this case is pending."  Mot. at 1.  Aetna must be enjoined, they say, to "ensure that Plaintiffs receive the medically necessary care they need."  *Id.* at 2.  "Plaintiffs are likely to suffer irreparable harm *because, absent an injunction, they will continue to be denied medically necessary care*, exacerbating their symptoms and distress associated with their gender dysphoria."  *Id.* at 19 (emphasis added).

Plaintiffs never explain, however, how an injunction against *Aetna alone* could compel their *employers* to cover and fund the medical care they seek.  In the terms of Article III, Plaintiffs cannot establish that the injury they allege (denial of facial gender-affirming surgery under their employer-funded and -controlled health plans) is one that is traceable to Aetna alone or that the Court can redress by an injunction against Aetna alone.  Plaintiffs have intentionally structured this litigation to proceed against Aetna only and to exclude the employers who created and funded, and control the benefits offered by, the health plans under which they seek coverage. By doing so, Plaintiffs have deprived the Court of the practical power to order the ultimate relief

19

they seek—namely, coverage for facial gender-affirming coverage under the plans of the absent employers. "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).[10]

**1.    Plaintiffs' employers control and fund the benefits offered by their Plans.**

Aetna is *not* Plaintiffs' *insurer*, nor does Aetna *underwrite* the plans of Plaintiffs' employers. *See* Mot. at 8. Rather, Plaintiffs' health plans are entirely self-funded by their employers, who created the plans and control their benefits, and Aetna serves as claims administrator at the direction of the employers. The Bausch & Lomb Plan covering Dr. Homnick is funded entirely by Bausch & Lomb and governed by ERISA; the MTA Plan covering Dr. Herley is funded by MTA and her wife's union.[11]

The administrative agreements governing the relationship between Aetna and the employer-sponsors of Plaintiffs' plans both confirm that the employers retain ultimate responsibility for the coverage terms and benefits of the plans they created and fund. The MSA for Dr. Homnick's Plan provides that Bausch & Lomb "retains complete authority and responsibility for the Plan, its operation, and the benefits provided there under" and retains "the final

---

[10] Internal citations, quotations and emphasis are omitted from citations unless otherwise noted.

[11] Self-funded health benefit plans are not "insurance" in the conventional sense. When a health plan is self-funded, the sponsoring employer does not purchase a commercial insurance policy to cover its plan obligations; instead, the employer designs its own coverage plan, with benefit claims paid from its own coffers, and retains a third-party administrator ("TPA") to process claims. *Liberty Mut. Ins. Co. v. Donegan,* 746 F.3d 497, 501 (2d Cir. 2014); *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1131 (9th Cir. 2017). The responsibility to fund the benefits remains with the plan sponsor. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 317 (2016). Moreover, the TPA is obligated to administer a self-funded plan according to its terms. "ERISA . . . requires plans to be administered consistent with their terms," *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 591 (8th Cir. 2022), and a TPA has no right to unilaterally alter the benefits offered under the plan. *See, e.g., Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 150 (2001) (recognizing that plans must "be administered, and benefits be paid, in accordance with plan documents").

20

and sole authority regarding the benefits and provisions of the Plan(s), as outlined in [the] Plan document." Goellner Decl. Ex. C at 2. Similarly, the ASA for Dr. Herley's Plan provides that MTA retains "full and final authority and responsibility for the Plan and its operation" and had "sole authority over the design of the plan" and "possess[es] ultimate and discretionary authority to decide…benefits covered under the plan." Aronson Decl. Ex. B at 6-7.

Moreover, both Plaintiffs' employers explicitly exercised their discretionary control here.

- *Bausch & Lomb and Dr. Homnick.* Dr. Homnick first approached Bausch & Lomb and requested coverage for facial feminization surgery as early as September 2023, a year before she submitted a coverage request to Aetna. She was told that Bausch & Lomb would consider her request but "cannot make any guarantees for coverage." Reeves Decl. Ex. C at 1461. She has testified that she understood at that time that the 2024 Bausch & Lomb Plan did not cover facial gender-affirming surgery but that she hoped the company would add the coverage in its 2025 Plan. Reeves Decl. Ex. A at 33:15-34:21.

She sought prior authorization for gender-affirming procedures in September 2024, which Aetna denied under the terms of the Bausch & Lomb Plan. She again contacted Bausch & Lomb and began a dialogue with her employer that extended over the next several weeks. She asked that Bausch & Lomb either revise its 2025 Plan to include coverage for GAFR procedures or grant an exception in her case. Reeves Decl. Ex. C at 1457-1458.

In considering Dr. Homnick's request, Bausch & Lomb sought advice from an outside employee benefits consultant, WTW, whose medical director advised: "It is rare for any single source of information to be used by a health plan to support a medical policy coverage decision. While WPATH SOC8 is certainly an important recommending organization in this

space, it is not the only one. Although WPATH SOC8 recommends it as a potential treatment modality, this does not mean that it is medically necessary." Goellner Decl. Ex. D at 9.

On September 18, 2024, Bausch & Lomb advised Aetna: "B&L and will not be granting an exception for this individual so if you have any standard language that you use in this case, that will be helpful as well. It will be important to reinforce this message should the member call in on this issue again." Goellner Decl. Ex. F at 5. On October 2, 2024, Bausch & Lomb also directed Aetna to confirm its position with Dr. Homnick's providers: "B&L wants to ensure that somehow the providers office is notified that this is not considered medically necessary…." *Id.* at 3.

Bausch & Lomb considered Dr. Homnick's request at the senior management level and advised her, in November 2024, that it would not approve her request for GAFR coverage (as Dr. Homnick summarized in an email) due to "legal reasons (ERISA) or financial reasons (self-funded coverage payments are paid from limited company money)." Reeves Decl. Ex. D at 1449. Bausch & Lomb confirmed its decision again in a February 2025 email to Dr. Homnick. *Id.* at BATES001440. Dr. Homnick stipulates in her amended complaint that she asked her Bausch & Lomb for "an exception to the exclusion in her case" but her employer "declined her request." Am. Compl. ¶ 88.

- *MTA and Dr. Herley.* MTA retained Aetna to administer claims under its Plan but, by contract, expressly retained both "ultimate and discretionary authority to decide…benefits covered under the plan." and "the right to review [Aetna's] adopted procedures and practices for claims approval, claims denial, and other aspects of the administration of the plan." Aronson Decl. Ex. B at 7. Pursuant to that authority, MTA

22

specifically directed Aetna to follow its Clinical Policy Bulletins in processing claims for gender affirming care.  Aronson Decl. Ex. C.

The ACA creates no freestanding right to any health benefits from self-funded plans. The ACA "does not…require covered entities to cover any particular procedure or treatment." *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 958 (9th Cir. 2020).  Rather, the benefits Plaintiffs seek exist, if at all, only to the extent their employers' Plans authorize them.  And Plaintiffs do not allege, much less offer any proof, that Aetna violated the terms of their employers' Plans or administered the Plans any differently than their employers intended. Nor do they offer any authority for the proposition that the ACA required Aetna to provide and pay for a different benefit than Plaintiffs' employers intended.[12]

### 2. Plaintiffs cannot satisfy the traceability or redressability requirements for Article III standing.

Plaintiffs must establish standing for each claim and form of relief sought. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Plaintiffs thus must prove—for *each* claim and for *each* form of relief— that (1) they suffered or are imminently threatened with a concrete and particularized injury-in-fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that is likely to be redressed by the

---

[12] Plaintiff's motion rests on a fundamental misunderstanding of how employer-funded health benefit plans work and the role of Aetna's CPBs.  Enjoining the use of Aetna's CPB 615 will neither create medical consensus on the efficacy of GAFR where none otherwise exists nor guarantee that employers who control and fund their own plans, and who have access to their own sources of medical authority, will authorize coverage and payment for Plaintiffs' GAFR— as Dr. Homnick's appeals to Bausch & Lomb vividly illustrate.

requested relief.  *TransUnion*, 594 U.S. at 423; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992).

"[I]n order to seek injunctive relief, a plaintiff must show the three familiar elements of

standing: injury in fact, causation, and redressability."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401,

404 (2d Cir. 2011).  The second prong of Article III standing, traceability, is often also referred

to the "causation" element and requires a "fairly traceable connection between the alleged injury

in fact and the alleged conduct of the defendant."  *Sprint Commc'ns Co., L.P. v. APCC*

*Servs.*, 554 U.S. 269, 273 (2008).  The third prong, redressability, requires a showing that "it is

likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff

seeks in bringing suit."  *Id.*  The redressability prong of the standing analysis "looks forward" to

determine whether "the injury will be redressed by a favorable decision."  *Toll Bros., Inc. v. Twp.*

*of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw*

*Env't Servs., Inc.*, 528 U.S. 167, 181 (2000)).

And while a plaintiff's allegations are entitled to deference at the pleading stage, "[w]hen

a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be

no less than that required on a motion for summary judgment."  *Cacchillo*, 638 F.3d at 404; *see*

*also Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113-14 (2d Cir. 2025) ("The evidentiary burden

for establishing Article III standing for the purposes of a motion for a preliminary injunction is at

least as onerous as the burden for establishing standing to secure a summary judgement.").  "At

the preliminary injunction stage, then, the plaintiff must make a clear showing that she is likely

to establish each element of standing."  *Murthy v. Missouri*, 603 U.S. at 58.

Plaintiffs cannot satisfy the traceability and the redressability elements of Article III

standing because they can establish neither "any concrete link between their injuries and [Aetna's]

conduct," *Id.* at 76, nor any likelihood that the injury they allege will be remedied by the injunction they seek, *Sprint Commc'ns Co.,* 554 U.S. at 286–87.

*First*, Plaintiffs cannot satisfy the *traceability* requirement because they cannot show that the injury they allege (denial of plan benefits) was caused solely by Aetna's *administration* of their employer's Plans as opposed to the *terms* of the Plans, which Aetna does not control. It is undisputed here that Plaintiffs' employers created, funded, and controlled their Plans and retained sole and final authority, both legally and contractually, over the coverage and benefits provided by their Plans. Indeed, Plaintiffs do not even allege, much less attempt to prove, that Aetna administered their employer's Plans, or decided their requests for facial surgery, any differently than their employers intended. In fact, the evidence shows the opposite—that Aetna administered the gender affirming benefits of both the Bausch & Lomb and MTA Plans pursuant to explicit directives from those employers. "[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n. 5 (2013).[13]

---

[13] Plaintiffs argue only that a third-party administrator, like Aetna here, is a "proper defendant" to a suit under the ACA. Mot. at 24. Plaintiffs cite no authority, however, for the proposition that the ACA required Aetna to provide and pay for a different benefit than Plaintiffs' employers intended. To the contrary, the Department of Health and Human Services Office of Civil Rights' ("OCR") implementing regulations specifically explain how the ACA distinguishes between a self-funding plan sponsor and a third party claims administrator in this very situation. In its 2016 rules, OCR expressly recognized that "third party administrators are generally not responsible for the benefit design of the self-insured plans they administer and that ERISA (and likely the contracts into which third party administrators enter with the plan sponsors) requires plans to be administered consistent with their terms." 81 Fed. Reg. 31,375, 31,432 (May 18, 2016). For that reason, in processing claims of alleged discrimination by self-insured health plans, OCR assesses "whether responsibility for the decision or other action alleged to be discriminatory rests with the employer or the third party administrator." *Id.* Where the alleged discrimination "relates to the *benefit design* of a self-insured plan," as opposed to the administration of that plan, OCR will address the complaint against that employer. *Id.* (emphasis added). Plaintiffs' ability to

*Second*, Plaintiffs also cannot satisfy the *redressability* requirement because they cannot articulate, much less prove, how this Court can redress their injury by issuing an injunction against Aetna alone, which would not bind the absent employers who control and fund the Plans under which Plaintiffs seek benefits. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (injunction preventing federal agencies from enforcing provisions of Indian Child Welfare Act and declaring provisions unconstitutional would not redress plaintiffs' alleged injury because state agencies carry out the provisions and the state officials who implement the ICWA were not parties to the suit and thus not bound by any judgment court might enter). "Redressability requires that the court be able to afford relief *though exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id.* (original emphasis).

It is important to emphasize the unusual relief Plaintiffs seek here, because the redressability requirement turns on "the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 603 U.S. at 73 (citing *California v. Texas*, 593 U.S. 659, 671 (2021)). Plaintiffs characterize the injunction they seek as one requiring only that Aetna refrain from acting (as opposed to one compelling Aetna to take some action). Mot. at 18 n. 4. The prohibition they seek is to "to halt Aetna's enforcement of the GAFR Exclusion in CPB 0615 against them while this case is pending." *Id.* at 1. The injury they allege is that "absent an injunction, they will continue to be denied medically necessary care." *Id.* at 19.

Plaintiffs cannot explain, however, how enjoining *Aetna* from consulting its CPB will compel Plaintiffs' *employers* to cover and fund the medical care they seek. They ignore—and urge the Court to ignore as well—the undisputed fact that the medical benefits they seek arise

---

demonstrate a likelihood of success on the merits is thus further eroded by the legal uncertainty regarding the viability of ACA discrimination claims in the absence of the employers who control and fund Plaintiffs' Plans.

solely under their employee health benefit plans, the terms and funding of which ultimately are controlled by their employers who are not parties here. Moreover, and important here, Bausch & Lomb has repeatedly made clear that its Plan does not cover facial gender-affirming surgery and specifically refused Dr. Homnick's request for coverage, and MTA expressly directed Aetna to apply its CPBs in administering gender-affirming benefits under the MTA Plan.[14]

The recent Supreme Court decision in *Murthy v. Missouri* is dispositive. Plaintiffs there sought to sue federal agencies and officials for alleged censorship by non-party social media platforms. The Court held that plaintiffs failed to satisfy both the traceability and redressability requirements for standing under Article III, principally because the alleged injury arose, in substantial part, from the independent actions of the absent parties. Plaintiffs could not establish traceability because the non-party social media platforms, acting independently and exercising their own judgment, had adopted the challenged policies in consultation, not just with the federal government defendants, but also with their own outside experts. 603 U.S. at 60. Nor could plaintiffs satisfy the redressability requirement because "[t]he [social media] platforms are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Id.* at 73.

Plaintiffs' true aim by their motion is to create a *different Plan benefit* than their employers have authorized. Both employers' Plans provide coverage for some forms of gender affirming

---

[14] While CPBs define Aetna's clinical policy, medical necessity determinations in connection with coverage decisions are made on a case-by-case basis. Although Aetna's medical directors often consult various sources of information (including CPBs), each coverage decision rests on the judgment and discretion of the medical director making the medical necessity determination, subject to Plan coverage restrictions and legal and regulatory requirements. Aetna's medical directors are responsible for reviewing member and provider requests for coverage, and regardless of whether a CPB is available for consultation, this review may include an evaluation of whether the efficacy of the requested procedure or service is supported by evidence-based medical and scientific research and literature. *See* discussion at pp. 16-18, supra.

care, but each employer has decided that the facial procedures requested here are not covered treatments for gender dysphoria. Enjoining Aetna from applying its CPB would not legally bind Plaintiffs' absent employers, change the terms of their Plans, or compel them to pay for the coverage and medical care Plaintiffs demand. Rather, Plaintiffs "can only speculate about the decisions of third parties." *Murthy v. Missouri*, 603 U.S. at 72. The Supreme Court has repeatedly expressed its "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 58; *Clapper*, 568 U.S. at 413.

Plaintiffs intentionally omit from this suit the employers who created, controlled, and funded the Plans under which they seek coverage and who had ultimate discretionary authority over Plaintiffs' particular benefit claims. This Court thus has no power over these absent parties, both of whom are likely not subject to jurisdiction in this district.[15] An injunction against Aetna alone would neither bind the absent employers nor compel the medical care Plaintiffs seek, and, for that reason, the injunctive relief Plaintiffs request would constitute no more than an ineffectual advisory opinion. Plaintiffs lack standing under Article III.

**B.** *Injunction Requirements:* **Plaintiffs cannot establish the requirements for a preliminary injunction.**

To obtain a preliminary injunction, the moving party must prove that: (1) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (2) they are "likely to succeed on the merits"; (3) the balance of equities weighs in their favor; and (4) "an injunction is in the public

---

[15] The parties' contracts confirm that Bausch & Lomb Americas is a Delaware corporation with its address listed as Bridgewater, New Jersey (*see* Goellner Decl. Ex. C at 1) and MTA is a New York entity (*see* Aronson Decl. Ex. B at iii). Aetna has filed a motion to dismiss Plaintiffs' complaint pursuant to Rules 12(b)(7) and 19 because Plaintiffs' employers are necessary and indispensable parties to this action seeking to compel benefits under the Plans they control and fund. *See* Dkt. 78.

interest." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)).

A preliminary injunction, however, "is an is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm Mutual Auto, Ins. Co. v. Tri-Borough NY Medical Practice P.C*., 120 F.4th 59, 79 (2d Cir. 2024); *Johnson v. Burge*, 506 Fed. Appx. 10, 11 (2d Cir. 2012). Moreover, Plaintiffs face a heightened burden here because the injunction they seek would alter the status quo— would "halt Aetna's enforcement of the GAFR Exclusion in CPB 0615 against them while this case is pending" (*see* Mot. at 1). Where an injunction seeks to alter the status quo, rather than maintain the status quo pending resolution of the case, "the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Daileader*, 96 F.4th at 356 (original emphasis).

Plaintiffs satisfy none of the requirements for a preliminary injunction.

**1.     Plaintiffs cannot make a strong showing that they are likely to suffer irreparable harm in the absence of a preliminary injunction.**

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction to be considered." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). *See also Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 934 F.2d 30, 34 (2d Cir. 1991) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of money damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015). Moreover, "a threat of irreparable injury *must be proved, not assumed*." *Knowles v. U.S. Coast Guard*, 924 F. Supp. 593, 603 (S.D.N.Y. 1996) (citing *Town of Huntington v. Marsh*, 884 F.2d 648, 653 (2d Cir. 1989)) (emphasis added).

Of particular importance here, courts hesitate to invoke the extraordinary and drastic remedy of an injunction where "the plaintiff seeks to short-circuit an administrative procedure designed specifically to handle the very sort of issues" plaintiff raises. *Thomas v. Veterans Admin.*, 467 F. Supp. 458, 464 (D. Conn. 1979). *See also Doe v. New York Univ.*, 442 F. Supp. 522, 523 (S.D.N.Y. 1978) (denying preliminary injunction where "administrative remedies exist to handle this plaintiff's complaint" because "it is simply too early to find this specific administrative remedy inadequate."). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1039-40 (8th Cir. 2016) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). There is no need for injunctive relief where the plaintiff has an adequate legal or administrative remedy to address the same alleged injury. *Id.* at 1040 (no need for preliminary injunction under ERISA § 502(a)(3) where plaintiff had legal remedy under ERISA § 502(a)(1)(B)).

Both Plaintiffs' Plans offer a process whereby Plaintiffs can have their claims reviewed by an independent External Review Organization (ERO) that follows the Federal ERO process. Rudolph Decl. ¶ 3. EROs exist specifically for the purpose of reviewing questions of medical necessity and providing a final opinion on claims for health plan benefits like Plaintiffs seek here. *Id.* Plaintiffs' claims would be reviewed by a specialty-matched expert physician

appointed by the ERO, who would review and consider all appropriate medical evidence, including any materials provided by Plaintiffs or their doctors. *Id.* at ¶ 4. ERO review is available at no cost to Plaintiffs and the decision typically is issued within 45 days. *Id.* at ¶ 8.

Importantly, ERO review is conducted entirely independent of Aetna, and the external expert is neither bound by Aetna's decisions or conclusions nor required to consult or follow Aetna's clinical policy bulletins. *Id.* at ¶¶ 5-6. The reviewer can evaluate the medical necessity of Plaintiffs' coverage requests wholly independent of Aetna's CPB 615. *Id.* And, equally important, the ERO decision is fully and finally binding on Plaintiffs' employers—both the Bausch & Lomb and MTA Plans offer the opportunity for independent ERO review *and* provide that the employers will abide by the ERO decision. *Id.* at ¶ 7. In 2024, the federal ERO overturn rate was 24.1%. *Id.* at ¶ 9.

Both Plaintiffs still have available to them the opportunity to seek the independent ERO review their Plans offer. That opportunity is particularly important here in light of the unusual nature of the injunction Plaintiffs seek. Plaintiffs demand, in essence, that their requests for facial gender-affirming coverage be reviewed for medical necessity independent of Aetna's CPB 615, which is exactly what ERO review is designed to accomplish. But even more important, the independent ERO decision would be fully binding on Plaintiffs' employers and Plans, which this Court cannot accomplish through an injunction because the employers are not parties here. In short, the ERO provides Plaintiffs precisely the independent review they seek and, better yet, binds their employers in a way this Court cannot.

Both Plaintiffs, through counsel, have declined to pursue the ERO appeal that would provide exactly the independent, legally binding medical necessity review they say they want. Instead, they have constructed this lawsuit to omit their employers, thus rendering ineffectual

any relief this Court could provide.  Under these peculiar circumstances, Plaintiffs cannot make the "*strong showing* of irreparable harm" necessary to support a preliminary injunction under Second Circuit law.  *See Daileader*, 96 F.4th at 356 (original emphasis).  Indeed, the Supreme Court has cautioned that when "the acts necessary to make the injury happen are at least partly within the plaintiff's own control," a "high degree of immediacy" is required.  *Defenders of Wildlife*, 504 U.S. at 560; *Knowles*, 924 F. Supp. at 603.  Plaintiffs' most immediate—and effective—remedy is the ERO review that awaits only their election to pursue it.

### 2.    Plaintiffs cannot show a clear or substantial likelihood that they will succeed on the merits.

Where an injunction seeks to alter the status quo, as Plaintiffs do here, the movant must "show a *clear or substantial* likelihood of success on the merits."  *Daileader*, 96 F.4th at 356 (original emphasis).  Plaintiffs can make no such showing.

Plaintiffs premise their motion on two arguments:  first, that the WPATH guidelines "expressly name[] GAFR as vital treatment for gender dysphoria" (Mot. at 6), and second, that Aetna covers facial surgery for cisgender members but not for transgender women (*id.* at 23). Plaintiffs misstate both the scientific evidence and Aetna's policy, however.

Plaintiffs rely heavily on the WPATH guidelines and, while their discussion of WPATH is replete with adjectives and superlatives, it notably misstates what WPATH actually says about GAFR.  WPATH, they say, "found that GAFR has a 'substantial impact…on overall well-being' of transfeminine patients and reduces mental health distress" (*id.* at 5) and "expressly names GAFR as vital treatment for gender dysphoria" (*id.* at 6).  A simple Ctrl+F word search of the WPATH guidelines quickly reveals, however, that WPATH actually says no such thing.[16]

---

[16] Indeed, the first statement—that GAFR has been shown to have a "substantial impact on overall well-being [and to] reduce[] mental health distress"—is a prime example of how Plaintiffs and their experts try to put their *own* opinions into the mouth of WPATH.  That

What WPATH actually says about GAFR is far more equivocal: only that "current literature supports its benefits."  McDonough Decl. at ¶ 22. WPATH concedes, moreover, that the *only* prospective study of GAFR produced results that were "direct and consistent, but somewhat imprecise." *Id.* at ¶ 18.  And the authors of that study themselves reported that "no particular area of the face…or number of procedures…was associated with a statistically significant effect on facial feminization surgery outcome score or satisfaction outcomes." *Id.* at ¶ 17 (emphasis added).  The authors also acknowledged that "[l]imitations exist in this study and include [that the] gender appearance and general aesthetic outcomes scale used were not validated," and that additional studies are needed to develop "a robust patient-reported outcome measure" for facial gender surgical procedures.  *Id.*   Another study cited by WPATH similarly found that patients receiving facial feminization surgery showed "no statistically significant difference in mental health-related quality of life" compared to the general female population. *Id*. at ¶ 19.

These two important unanswered questions highlighted by the WPATH literature— identification of particular facial procedures that may be effective to treat gender dysphoria and development of robust protocols to measure outcomes and validate efficacy over time—still remain unresolved. *Id.* at ¶ 28.  Plaintiffs' experts devote much of their reports to this latter issue and while they summarize the results of recent studies that have attempted to develop and validate various outcome measures, they overstate the consistency of those results and the level of consensus on the issue. *See* Mot., Ex. 1 at ¶¶ 16-22, Ex. 2 at ¶¶ 19-26.   Indeed, they ignore a 2023 systematic review of 286 studies, representing 85,395 transgender and nonbinary patients

---

statement comes from one of their experts, Dr. Gorton, who cites as the reference a *2017 publication* from another of Plaintiffs' experts, Dr. Berli.  *See* Mot. at 5; Mot. Ex. 3 at ¶ 18 n.2. Neither expert acknowledges, however, that the lone prospective study that WPATH itself cites, the Morrison study, found *in 2020* that "[n]o data exist on the prospective outcomes of facial feminization surgery."  *See* McDonough Decl. at ¶ 17.

from more than 30 countries, that evaluated the quality of patient-reported outcome measures (PROM) for gender-affirming care generally and concluded that "PROM implementation in gender-affirming care was inconsistent and did not follow evidence-based approaches in implementation science." McDonough Decl. at ¶ 23. Importantly, the researchers also found a lack of replication to validate proposed outcome measures, noting that "[m]ost of the PROMs were also implemented for research purposes, which may explain why most were administered only once…with insufficient follow-up time." *Id.* And like the Morrison authors, they also noted the imprecision of using outcome measures "not validated for gender-affirming care." *Id.*

In the end, Plaintiffs and their experts rely essentially on the simplistic assertion that facial surgery works for gender dysphoria because patients who receive the treatment often report that they feel better about their appearance during the period just after their treatment. But that kind of subjective, short-term linkage is not a substitute for evidence-based outcome validation, which is precisely why researchers around the world continue to strive to develop robust protocols to measure long-term outcomes and validate the efficacy of GAFR—to develop *scientific data* to establish that facial surgery actually *treats* gender dysphoria.[17]

In sum, the current data regarding the efficacy of facial surgery as a treatment for gender dysphoria is not nearly so definitive as Plaintiffs suggest. Indeed, if any consensus has emerged

---

[17] Nor it is dispositive that Plaintiffs' doctors attest that the facial surgery they seek is "medically necessary," especially in the case of Plaintiff Homnick, whose Plan is governed by ERISA. *See, e.g.*, *Khesin v. Aetna Life Ins. Co.*, 615 F. Supp. 3d 142 (D. Conn. 2022) ("[I]t is an ERISA claimant's burden to establish an entitlement to benefits, and administrators may exercise their discretion in determining whether a claimant's evidence is sufficient to support his claim."); *Kocsis v. Standard Ins. Co.*, 142 F. Supp. 2d 241 (D. Conn. 2001) (that ERISA administrator's decision differed from plaintiff's physicians did not render the decision arbitrary and capricious so as to allow reversal by the court); *Fay v. Oxford Health Plan*, 287 F.3d 96, 108 (2d Cir. 2002) (holding that the plaintiff's requested medical care was not medically necessary despite counter-testimony from plaintiff's two physician experts because the "court [could not] find [defendant's] determination of medical necessity 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'").

from current research, it is that more research is needed. Aetna's CPB 615 necessarily and appropriately reflects the evolving state of medical science on these issues and evaluates the evidence using the same evidentiary standards it uses for all clinical policy questions. Indeed, a medical review by an outside consultant retained by Dr. Homnick's employer, Bausch & Lomb, reached the same conclusion *entirely independent of Aetna*: "While WPATH SOC8 is certainly an important recommending organization in this space, it is not the only one. Although WPATH SOC8 recommends it as a potential treatment modality, this does not mean that it is medically necessary." Goellner Decl. Ex. D at 9.

Contrary to Plaintiffs' motion, moreover, Aetna's CPBs do not question the efficacy of facial gender-affirming surgery because the members seeking the treatment are transgender. Rather, as with every other procedure, the concern is that there is insufficient evidence at the present time to demonstrate that these procedures are an *effective* treatment for gender dysphoria, any more than similar facial surgeries have been shown to be *effective* to treat cisgender individuals for depression, social anxiety, body dysmorphia, or other emotional or psychological disorders associated with body image. McDonough Decl. at ¶ 29. Plaintiffs note that Aetna covers facial surgery for treatment of trauma or congenital defect, *see* Mot. at 9, 30, 31, but those treatments, when sought to remediate injuries or birth defects, are well supported by numerous valid studies and available to all patients equally. McDonough Decl. at ¶ 29.

The operative factor is not the status of the member requesting the procedure but, rather, whether there is sufficient, high-quality evidence and medical consensus establishing that the requested procedure is medically necessary as an effective treatment for the member's condition. *Id.* Aetna continues to regularly evaluate the evolving science on these questions and may revise

its policy regarding facial gender-affirming procedures as new data emerges, as it already has done for other, more common and well-established gender-affirming treatments.[18] *Id.*

Plaintiffs likewise cannot show a clear or substantial likelihood that they can carry their legal burden to prevail under the ACA.  Plaintiffs acknowledge that to prevail under ACA Section 1557, they must establish that Aetna's CPB *intentionally* discriminates against transgender persons.  Mot. at 28, 30.  Section 1557 incorporates and follows the legal standards developed under Title IX for claims alleging discrimination on the basis of sex. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020).  Under those standards, to state a claim for discrimination on the basis of sex under Section 1557, Plaintiff must adequately allege that the discrimination at issue was intentional—the statutory prohibition does not reach activities that merely have a disparate impact on a protected group. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (explaining that Title IX prohibits "intentional sex discrimination," and discussing cases elaborating that standard).  Plaintiffs offer no evidence of intent whatsoever.

A court should not resolve disputed questions of fact on a preliminary injunction and on affidavits alone, especially complex questions that require expert testimony or that turn on intent or state of mind. *See, e.g.*, *SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 368 (N.D.N.Y. 2001) ("A disputed question of fact…need not be resolved on an application for a preliminary

---

[18] Plaintiffs note that Aetna covers facial surgery where required by state law or plan terms. Mot. at 9.  That is true.  And Aetna approved coverage for two other Plaintiffs, Binah Gordon and Kay Mayers, at their employers' specific direction, which illustrates that the employers, not Aetna, ultimately control the benefits offered by their plans.  And, in any event, a state or plan directive is not the equivalent of scientific evidence or consensus.

Plaintiffs also cite various court decisions reviewing transgender health coverage provisions they say are "akin" to Aetna's policy regarding facial gender-affirming surgery.  Mot. at 28-29; *see also id.* at 21-22.  Those decisions, however, involved situations where transgender persons were denied access to *all* gender-affirming procedures, including hormone therapy or the more common and well-established surgical procedures that Aetna has long covered. None specifically involved facial feminization surgery or evaluated the state of the medical science on the efficacy of facial surgery for treating gender dysphoria.

injunction…[r]ather, determination of disputed facts should be made at trial."); *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278, 281 (S.D.N.Y. 1971) ("Where sharp issues of fact are presented it is apparent that the case is not a fit one for preliminary relief and the resolution of the disputed facts must await trial.").  This is especially so where the injunction would alter the status quo and thus is subject to the heightened "clear or substantial" evidence standard.  *See, e.g.*, *Carter v. Fagin*, 363 F. Supp. 2d 661, 666 (S.D.N.Y. 2005) (Preliminary injunction denied "[b]ecause the facts concerning plaintiff's condition and the appropriateness of treatment are hotly contested, I cannot say that plaintiff has shown the 'clear right to relief' required for the issuance of a mandatory injunction that would, in essence, give plaintiff all the equitable relief he seeks.").  "Where a case contains complicated technical aspects the court should have the benefit of expert opinion clarified by cross-examination, and should not resolve the technical dispute upon conflicting affidavits submitted in support of a motion for a preliminary injunction."  *Heyman v. Ar. Winarick, Inc.*, 166 F. Supp. 880, 883 (S.D.N.Y. 1958).

### 3.    Plaintiffs cannot show that the balance of the equities weighs in favor of the ineffectual injunction they seek.

Plaintiffs' arguments on the balance of the equities miss the mark.

First, because the Court cannot enter an injunction that would bind the non-party employers who ultimately control the benefits under the Plans at issue, the relief Plaintiffs seek would be wholly ineffectual and a waste of judicial resources.  The balance of the equities decisively disfavors Plaintiffs for that reason alone.

But even assuming the Court could render injunctive relief that would somehow require Plaintiffs' employers to revise their Plans to provide GAFR coverage, any analysis of the balance of the equities must consider the impact on, and interests of, the *absent employers* from whose coffers any benefits would be paid.  Plaintiffs ignore that perspective entirely.  A court is

"obligated to withhold an injunction after balancing the hardships, *including those hardships that would fall upon non-parties*." *State of N.Y. v. U.S. Gen. Servs. Admin.*, 823 F. Supp. 82, 87 (N.D.N.Y. 1993) (emphasis added); *Cretor Constr. Equip. LLC v. Gibson*, 738 F. Supp. 3d 950, 971 (S.D. Ohio 2024) (When a court considers the equitable balance of harms factor, "the [c]ourt must…assess the impact the preliminary injunction might have on relevant third parties.").

This is especially so here, where Plaintiffs seek an injunction that would give them all the relief they seek on the merits. Plaintiffs say they want "a preliminary injunction to halt Aetna's enforcement of the GAFR Exclusion in CPB 0615 against them *while this case is pending*." Mot. at 1 (emphasis added). In the very next breath, however, they say Aetna must be enjoined to "ensure that Plaintiffs receive the medically necessary care they need." *Id.* at 2. Plaintiffs clear purpose is to compel their employers to cover the GAFR they seek *while this case is pending*. But "[t]he purpose of a preliminary injunction is not to give plaintiff the ultimate relief it seeks [and] ought not to be used to give final relief before trial." *WarnerVision Entertainment Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261-62 (2d Cir. 1996). Neither should an injunction "permit one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ," *id.* at 262, especially where the party most impacted is not even before the court.[19]

---

[19] In fact, Bausch & Lomb has expressed to Dr. Homnick a concern that this lawsuit could impact the company's interests. In another telephone call that Dr, Homnick secretly recorded, a Bausch & Lomb HR representative advised that the company was concerned "because of the lawsuit that's been filed against Aetna that has Bausch & Lomb sort of getting included in it." Reeves Decl. Ex. G at 2:12-14. When Dr, Homnick suggested that company was not part of the lawsuit, the representative replied, "Well, it's Aetna and Aetna—and since you are part of it then Bausch & Lomb becomes part of that." *Id.* at 4:6-10. As noted previously, Bausch & Lomb is a New Jersey corporation and thus likely not subject to jurisdiction in this district. But any injunction the Court entered, if it is to be effective at all, would necessarily impact Bausch & Lomb without the company having an opportunity to be heard.

**4.    Plaintiffs cannot show that the public interest is best served by the injunction they seek.**

The injunction Plaintiffs seek will be either an ineffectual advisory opinion (and thus a futile waste of judicial resources) or unjust (as binding employers who are not even here to state their case). Neither outcome serves the public interest.

Plaintiffs do not explain why it is in the public interest for this Court to intervene when their employers already offer an administrative remedy that is more efficient and effective than any this Court can provide—an expert external review that would accomplish exactly what Plaintiffs say they want (an evaluation of the medical necessity of their requests for GAFR independent of Aetna and its CPB) and that, better still, would bind their employers when this Court cannot. Employer-sponsored and -funded health benefit plans exist principally because Congress enacted ERISA to encourage their creation.[20] "Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place. We have therefore recognized that ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Id.* Congress sought to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

---

[20] Plaintiff Homnick's Bausch & Lomb Plan is governed by ERISA. Plaintiff Herley's MTA Plan, which is funded by both her wife's employer and union, is not regulated by ERISA, but the same public policy interests relevant here apply equally to both Plans.

These public policy concerns are not mere abstractions here. Bausch & Lomb, in particular, has repeatedly told Dr. Homnick that its Plan does not cover GAFR and cited both its obligations under ERISA and the impact on its Plan funds. Reeves Decl. Ex. F at 4:13-22. Plaintiffs' employers designed their Plans to offer an external appeal precisely to resolve disputes like this one, and there simply is no need for the Court to intervene with the extraordinary and drastic remedy of a preliminary injunction when Plaintiffs already have available an administrative remedy that is more quick, efficient, and sufficient—and, critically, that would fully bind Plaintiffs' employers in a way this Court cannot.

Plaintiffs say what they want is a review of their benefit requests independent of Aetna. Their employers already offer that. And the public interest would best be served by the Court declining to intervene unless and until Plaintiffs pursue that opportunity.

### 5.    The bond requirement should not be waived.

Plaintiffs' analysis of the bond requirement again misstates the issue.

What Plaintiffs want is for their employers' Plans to immediately cover and pay for GAFR benefits, while this lawsuit is pending and before the case is resolved on the merits. But their employers are not parties here. So, the question whether a bond is necessary thus turns, not on the impact of an injunction on *Aetna* alone, but rather the potential harm to *Plaintiffs' employers* by an injunction that would impact their Plan funds without their having any opportunity to be heard on the matter. Plaintiffs make no attempt to address the potential harm to their absent employers, and they should not be excused from posting the bonds necessary to protect their employers in the event Plaintiffs ultimately do not prevail on the merits in this case.

### CONCLUSION

For the foregoing reasons, Aetna respectfully requests the Court deny Plaintiffs' motion for preliminary injunction.

Dated at Hartford, Connecticut this 11th day of April, 2025.

/s/ Theodore J. Tucci
Theodore J. Tucci (ct05249)
Abby M. Warren (ct30077)
Christopher A. Costain (ct31612)
Robinson & Cole LLP
One State Street
Hartford, CT 06103-3195
Tel.: (860) 275-8200
Fax: (860) 275-8299
ttucci@rc.com
awarren@rc.com
ccostain@rc.com

Sarah Reeves (*pro hac vice*)
Earl B. Austin (*pro hac vice*)
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel.: (212) 408-2649
Fax: (212) 408-2449
sarah.reeves@bakerbotts.com
earl.austin@bakerbotts.com

*Counsel for Defendant*
*Aetna Life Insurance Company*