IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY and S.N., *individually and on behalf of all similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 3:24-cv-1447-VAB |

**DECLARATION OF ROBERT MCDONOUGH, M.D.**

I, Robert McDonough, declare as follows:

1. I am over 18 years old. I have personal knowledge of the following facts. If called as a witness in this action, I could and would testify competently to these facts.

2. I am a medical doctor. I received my medical degree, as well as a master's degree in public policy analysis, from Duke University in 1988. I then completed an internship in internal medicine at Stanford University in 1989. From 1989 to 1995, I served as a senior project manager in the health program at the Congressional Office of Technology Assessment in Washington, D.C., where I managed technology assessment studies and health service research projects commissioned by committees of Congress. A copy of my curriculum vitae is attached.

3. I am currently employed by Aetna Resources LLC, a subsidiary of Defendant Aetna Life Insurance Company ("Aetna"), as Executive Director, Clinical Policy Research and Development. I have been with Aetna since 1995. I oversee Aetna's clinical policy program,

including the Clinical Policy Council and its development of medical Clinical Policy Bulletins for Aetna.

4.  I make this declaration in support of Aetna's Opposition to the Motion for Preliminary Injunction by Plaintiffs Jamie Homnick and Gennifer Herley (the "Motion") in the above-captioned litigation. I have reviewed the Motion, the supporting Memorandum of Law (the "Memorandum") and its exhibits, as well as Plaintiffs' Second Amended Class Action Complaint (the "Complaint"). I particularly reviewed the declarations of Plaintiffs' healthcare providers and experts Jens U. Berli, M.D., R. Nicholas Gorton, M.D., Amanda M. Shaw, Ph.D., and Janice Stefanacci Seaward, Psy.D., as well as the literature references cited in their declarations. I also have reviewed and am familiar with the World Professional Association for Transgender Health ("WPATH") Standards of Care Version 8 generally and as they refer to Facial Gender Affirming Surgery.

5.  Aetna has developed Medical Clinical Policy Bulletins (CPBs) that detail certain services and procedures Aetna considers medically necessary, cosmetic, or experimental and unproven. Aetna's CPBs are based on evidence in the peer-reviewed published medical literature, technology assessments and structured evidence reviews, evidence-based guidelines from nationally recognized professional healthcare organizations and public health agencies— with the overall goal that Aetna's policies will reflect the current medical and scientific consensus. Aetna cannot develop criteria for the diagnosis of a disease or condition or evaluate the clinical safety and efficacy of a procedure or treatment unless and until the broader medical and scientific community has reached an evidence-based consensus on those questions. Aetna cannot itself establish medical or scientific consensus.

6.      Aetna maintains over 100 active Clinical Policy Bulletins which evaluate the efficacy of a wide range of medical interventions as applied to an even-wider array of specific diagnoses. Each CPB is based on evidence in the peer-reviewed published medical literature, technology assessments and structured evidence reviews, and evidence-based guidelines from nationally recognized professional healthcare organizations and public health agencies—with the overall goal that Aetna's policies will broadly reflect the current medical and scientific consensus. To deem a particular medical intervention for a specific diagnosis or condition is medically necessary, the scientific evidence first must permit valid and reliable conclusions concerning the effect of the intervention on the outcome being sought. The evidence should consist of multiple well-designed and well-conducted investigations published in peer-reviewed journals which consistently demonstrate that the intervention in question can alter the specific disease, injury, illness, or condition at issue. Opinions and evaluations by national medical associations, consensus panels, or other technology evaluation bodies are evaluated according to the scientific quality of the supporting evidence and rationale.[1] Put simply, for a CPB to indicate that a particular intervention is medically necessary, the consensus view of the medical evidence must be that the intervention has been proven effective for the purpose presented. Aetna cannot simply deem medical or scientific consensus to have been established.

7.      Aetna's Clinical Policy Council (CPC), which I oversee, reviews each Aetna CPB at least annually and also develops new CPBs as appropriate. I have been personally involved in Aetna's CPC review and CPB development with regard to Gender Affirming Surgery (CPB 615) and Cosmetic Surgery (CPB 31). The standards utilized in developing the medical necessity guidance in these specific CPBs followed the criteria listed in paragraph six, using the same

---

[1] See IOM (Institute of Medicine), 2011. *Clinical Practice Guidelines We Can Trust.* Washington, DC: The National Academies Press.

3

standards and process utilized to assess the clinical efficacy of any other diagnosis/intervention combination.

8.  Aetna explains generally how its CPBs are developed and used to assist the administration of plan benefits on its public website, which states, in pertinent part:

- Aetna Clinical Policy Bulletins (CPBs) are developed to assist in administering plan benefits and do not constitute medical advice. Treating providers are solely responsible for medical advice and treatment of members. Members should discuss any Clinical Policy Bulletin (CPB) related to their coverage or condition with their treating provider.

- While the Clinical Policy Bulletins (CPBs) are developed to assist in administering plan benefits, they do not constitute a description of plan benefits. The Clinical Policy Bulletins (CPBs) express Aetna's determination of whether certain services or supplies are medically necessary, experimental, investigational, unproven, or cosmetic. Aetna has reached these conclusions based upon a review of currently available clinical information (including clinical outcome studies in the peer-reviewed published medical literature, regulatory status of the technology, evidence-based guidelines of public health and health research agencies, evidence-based guidelines and positions of leading national health professional organizations, views of physicians practicing in relevant clinical areas, and other relevant factors).

- Each benefit plan defines which services are covered, which are excluded, and which are subject to dollar caps or other limits. Members and their providers will need to consult the member's benefit plan to determine if there are any exclusions or other benefit limitations applicable to this service or supply. The conclusion that a particular service or supply is medically necessary does not constitute a representation or warranty that this service or supply is covered (i.e., will be paid for by Aetna) for a particular member. The member's benefit plan determines coverage. Some plans exclude coverage for services or supplies that Aetna considers medically necessary. If there is a discrepancy between a Clinical Policy Bulletin (CPB) and a member's plan of benefits, the benefits plan will govern.

- Please note also that Clinical Policy Bulletins (CPBs) are regularly updated and are therefore subject to change.

- Since Clinical Policy Bulletins (CPBs) can be highly technical and are designed to be used by our professional staff in making clinical determinations in connection with coverage decisions, members should review these Bulletins with their providers so they may fully understand our policies. Under certain circumstances, your physician may request a peer to

4

     peer review if they have a question or wish to discuss a medical necessity precertification determination made by our medical director in accordance with Aetna's Clinical Policy Bulletin.

- While Clinical Policy Bulletins (CPBs) define Aetna's clinical policy, medical necessity determinations in connection with coverage decisions are made on a case by case basis. In the event that a member disagrees with a coverage determination, Aetna provides its members with the right to appeal the decision. In addition, a member may have an opportunity for an independent external review of coverage denials based on medical necessity or regarding the experimental and investigational status when the service or supply in question for which the member is financially responsible is $500 or greater. However, applicable state mandates will take precedence with respect to fully insured plans and self-funded non-ERISA (e.g., government, school boards, church) plans.

     9.     One note on terminology is necessary. Plaintiffs refer throughout their submissions to Gender Affirming Facial Reconstruction ("GAFR"). The WPATH guidelines, however, refer to Facial Gender Affirming Surgery ("FGAS"). The medical literature also refers to "facial feminization surgery" or "facial gender surgery." Aetna's CPB 615 refers to Gender Affirming Surgery and Facial Gender Affirming Procedures ("FGAP"), which is consistent with the terminology used in WPATH. It is unclear to me whether Plaintiffs and their experts are using GAFR interchangeably with FGAS/FGAP as used in WPATH and Aetna's CPB 615 or as a more expansive term. GAFR, as the name suggests, includes certain reconstructive procedures not universally considered part of FGAS/FGAP. I will use the terms facial gender affirming procedures or FGAP in this declaration because that is the terminology used by Aetna's CPB, but I would note that the confusion even as to terminology is indicative of the lack of cohesion and consensus in this area.

     10.     Aetna's CPB 615 (Gender Affirming Surgery) states that Aetna considers most facial gender affirming procedures as not medically necessary and cosmetic, which is consistent

5

with the limited and equivocal data currently available.[2] Aetna's CPB 31 (Cosmetic Surgery) provides, however, "Aetna plans exclude coverage of cosmetic surgery and procedures that are not medically necessary, but generally provide coverage when the surgery or procedure is needed to improve the functioning of a body part or otherwise medically necessary even if the surgery or procedure also improves or changes the appearance of a portion of the body.  Additionally, many Aetna plans specify that certain surgeries are not considered to be cosmetic (e.g., surgery to correct the result of injury, post-mastectomy breast reconstruction, breast augmentation to treat gender dysphoria, surgery needed to treat certain congenital defects such as cleft lip or cleft palate).  Please check benefit plan descriptions for details."[3]  In addition, CPB 615 also notes, "Some plans may cover gender affirming procedures in addition to the following policy.  Please check the specific benefit documents."[4]  For Aetna plans that are self-funded by the sponsoring employer, Aetna defers to the plan sponsor and to the plan terms; self-funded plans are free to make their own coverage decisions irrespective of Aetna's Clinical Policy Bulletins.

11. The current WPATH guidelines, Version 8, were published in September 2022.[5] The guidelines cover a wide range of gender affirming treatments, including both surgical and non-surgical interventions, and include a very brief reference to facial surgery.[6]  The reference notes, "In recent years, facial GAS (FGAS) has received increased attention, and current literature supports its benefits," and cites eight publications, only one of which is a prospective

---

[2] Aetna Clinical Policy Bulletin 615 at 4-5.

[3] Aetna Clinical Policy Bulletin 31 at 1.

[4] CPB 615 at 1.

[5] Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S5 (2022) ("WPATH").

[6] *See id.* at 5129-30.

6

cohort study.[7]  The literature cited by WPATH, as well as the references cited by Plaintiffs providers and experts, demonstrate that current data assessing the efficacy of facial surgery for the treatment of gender dysphoria is limited and the conclusions equivocal and lacking in consensus.

12.  By contrast, there is substantial research and consensus supporting the efficacy of genital and chest surgical procedures for the treatment of gender dysphoria, and Aetna's CPB 615 has recognized the medical necessity of these procedures in appropriate patients for years. The research and literature regarding facial surgeries, on the other hand, is far more limited, and reflects a lack of general consensus around the efficacy of such procedures.

13.  In 2022, shortly before the current WPATH guidelines were released, an international group of surgeons, psychologists, and researchers from the International Facial Gender Symposium ("Facial Gender Symposium") published "the first-ever consensus statement…focused on the area of facial gender surgery."[8]  The report noted that the then-current WPATH guidelines "indicate[d] that genital surgery and chest masculinization are medically necessary, whereas facial surgery [was] lumped under 'various procedures' and medical necessity was not clearly determined."[9]  The authors noted further, "More importantly, no criteria were defined [in the WPATH guideline at that time] to assist a provider in establishing the individual need."[10]  They observed that "'[m]edical necessity' is a frequently used term but

---

[7] *Id.* at 5129.

[8] Coon et al., *Facial Gender Surgery: Systematic Review and Evidence-Based Consensus Guidelines from the International Facial Gender Symposium*, 149 J. of Am. Soc'y of Plastic Surgeons: Plastic & Reconstructive Surgery 212-224 (2022) ("Facial Gender Symposium").  Dr. Berli cites this reference in his declaration.

[9] *Id.* at 218.

[10] *Id.*

may be difficult to define, especially in plastic surgery" and that "most recognize the need for more clarity."[11] In reviewing particular facial surgical procedures, the authors noted:

> *Forehead surgery*: "At this time, there is no evidence of a gold standard reconstructive method" and "standardization of the reconstructive process in forehead surgery" is needed.[12]

- *Lower jaw surgery*: "Despite the high demand for this treatment, the literature reviewed does not specifically include key factors related to diagnosis, clinical indication, or techniques" and standardization and prospective studies were needed.[13]

- *Nose surgery*: "Rhinoplasty is the most developed of these three areas in certain aspects, as many tools for traditional rhinoplasty are relevant," but "[h]igh priority areas for research include more in-depth linkage of the changes from rhinoplasty to the resulting effects on patient quality of life."[14]

- *Other facial procedures*: "Additional evidence is necessary to demonstrate the effects of certain other facial surgery procedures. These procedures may have mixed feminizing-aesthetic components and present data are limited because current studies generally include the 'primary procedures' above."[15]

Finally, the authors concluded:

> Research should be performed to provide additional granularity on both patient and procedural subsets, with better validation of patient-reported metrics, objective standards for outcomes evaluation, and definition of optimal time points for measurement. Current data prove that, in cohorts where most patients received "full face" treatment, substantial improvements result. Larger, multicenter, prospective studies with sufficient sample size are needed to advance the science further and identify (a) how to predict which patients benefit the most, and (b) identify the individual impact of each procedural type within facial gender surgery.[16]

14. Another significant study by researchers at the University of North Carolina, published in 2021 shortly before the current WPATH guidelines, also emphasized that "[d]ata

---

[11] *Id.* at 219.

[12] *Id.* at 220-21.

[13] *Id.* at 221.

[14] *Id.*

[15] *Id.* at 222.

[16] *Id.* ay 222-23.

8

regarding facial gender-affirming surgery are limited" and "there are significant gaps in the literature with respect to…facial masculinization and feminization, and patient-reported outcomes."[17] The authors found that "[o]utcomes data for facial feminization are sparse"[18] and concluded that, compared to data supporting the efficacy of gender-affirming top and bottom surgeries, [f]acial feminization and masculinization literature remain sparse" and that "[w]hile smaller studies demonstrate good results, there remains a lack of good evidence for short- and long-term complication rates."[19] Moreover, "[d]ata regarding satisfaction rates and QoL [quality of life] measures are also improving but remain sparse."[20]

15. The current WPATH guidelines make no reference to the Facial Gender Symposium consensus statement or the University of North Carolina study or to the many limitations in the research and data supporting facial gender affirming procedures that those and other researchers have identified. In fact, the scant literature WPATH does cite on the issue of facial gender affirming procedures recognizes some of the same research limitations identified by these previous authors.

16. For example, WPATH cites only one prospective study on facial gender affirming procedures.[21] By comparison, WPATH cites five prospective studies on gender affirming chest surgery (commonly referred to as "top surgery") and eight prospective studies on gender affirming vaginoplasty (commonly referred to as "bottom surgery").[22] Prospective studies are

---

[17] Akhavan et al., *A review of gender affirmation surgery: What we know, and what we need to know*, 170 Surgery 336 (2021).

[18] *Id.* at 338.

[19] *Id.* at 339.

[20] *Id.*

[21] WPATH at 5129.

[22] *Id.*

essential in evaluating the efficacy of a particular procedure in the treatment of gender dysphoria because only prospective studies, which follow participants forward in time, allow investigators to observe the intervention and then the in-vivo outcome of that intervention, making it easier to establish the temporal sequence necessary to suggest a cause-and-effect relationship. There simply is far more research and evidence-based consensus supporting the efficacy of top and bottom surgery for the treatment of gender dysphoria than exists for facial gender affirming procedures, a fact even WPATH recognizes.

17.     Moreover, the lone prospective study WPATH cites on facial gender affirming procedures (the "Morrison study") acknowledges significant limitations.[23] That study, which was published in 2020, acknowledged that "[n]o data exist on the prospective outcomes of facial feminization surgery."[24] The authors surveyed patients at one and six months post-operatively and found that the study patients "had feminine gender appearance and good overall aesthetic outcomes," but that "their gender appearance and general aesthetic outcomes were still not equal to those of cisgender women controls."[25] Significantly, they specifically concluded, consistent with the findings of the Facial Gender Symposium researchers, that:

> Further characterization as to which facial feminization surgery procedures specifically are associated with improved outcomes is warranted, yet will likely prove difficult to assess, as facial feminization surgery is patient-specific and generally requires multiple concomitant procedures. *Of note, no particular area of the face…or number of procedures…was associated with a statistically significant effect on facial feminization surgery outcome score or satisfaction outcomes* in our cohort.[26] (Emphasis added)

---

[23] Morrison et al., *Prospective quality-of-life outcomes after facial feminization surgery: An international multicenter study*. Plastic and Reconstructive Surgery, *145*(6), 1499–1509 (2020) ("Morrison et al.").

[24] *Id.* at 1499.

[25] *Id.* at 1507.

[26] *Id.*

Finally, the authors acknowledged that "[l]imitations exist in this study and include response bias of participants, heterogeneity of procedures used in facial feminization surgery, and the use of a quality-of-life instrument that was not initially developed for the transgender or gender-diverse population, although it has been specifically adapted for the transgender population. In addition, gender appearance and general aesthetic outcomes scale used were not validated."[27] They also noted that additional studies are needed to develop "a robust patient-reported outcome measure" for facial gender surgical procedures.[28]

18. WPATH discusses none of these limitations that the Morrison authors acknowledged, but WPATH instead characterizes the results as "direct and consistent, but somewhat imprecise."[29]

19. WPATH references seven other non-prospective publications in its discussion of facial gender affirming procedures, but only one attempted to make an evidence-based assessment of the efficacy of facial surgery as a treatment for gender dysphoria. That study (Ainsworth et al.) found that patients who received facial feminization surgery reported better subjective outcomes on a satisfaction survey than those patients who had not had surgery, but the researchers specifically noted that "[o]ne limitation of the outcomes evaluation is that it has not been validated by prior investigations."[30] That same study also found that patients receiving facial feminization surgery showed "no statistically significant difference in mental health-

---

[27] *Id.* at 1508.

[28] *Id.*

[29] WPATH at 5130.

[30] Ainsworth et al., *Quality of Life of Individuals with and Without Facial Feminization Surgery or Gender Reassignment Surgery*, 19 Quality of Life Rsch. 1019, 1023 (2010). Dr. Berli cites this reference in his declaration.

11

related quality of life" compared to the general female population.[31] WPATH notes none of these limitations from the Ainsworth study.

20. Another study cited by WPATH (Van de Grift et al.) did not address facial surgery separately and cross-referenced the Ainsworth study.[32] The study noted: "Overall, the current evidence suggests that postoperative QoL [quality of life] of people surgically treated for gender dysphoria may be influenced by feelings of (minor) regret and dissatisfaction with GAS. Although individuals generally report high satisfaction rates with their GAS, little is known on dissatisfaction/regret and its impact on psychological and QoL outcomes."[33] The authors also recommended much longer post-surgical follow up (five years) to better assess overall feelings of well-being – a substantially longer follow up than the six months in the Morrison study.[34] Again, WPATH merely cites the Van de Grift study but discusses none of the concerns and limitations those authors reported.

21. The five other papers cited by WPATH simply reported the results of various surgical techniques without any statistical or other evidence-based assessment of impact on gender dysphoria.[35]

---

[31] *Id.* at 1019, 1021.

[32] Van de Grift et al., *Surgical satisfaction, quality of life, and their association after gender-affirming surgery: A follow-up study*. Journal of Sexual and Marital Therapy, *44*(2), 138–148 (2017).

[33] *Id.* at 139.

[34] *Id.* at 147.

[35] Bellinga, et al., *Technical and clinical considerations for facial feminization surgery with rhinoplasty and related procedures*. JAMA Facial Plastic Surgery, *19*(3), 175–181 (2017); Capitán et al., *Facial feminization surgery: The forehead. Surgical techniques and analysis of results*. Plastic and Reconstructive Surgery, *134*(4), 609–619 (2014); Noureai et al., *The role of nasal feminization rhinoplasty in male-to-female gender reassignment*. Archives of Facial Plastic Surgery, *9*(5), 318–320 (2007); Raffaini et al., *Full facial feminization surgery: Patient satisfaction assessment based on 180 procedures involving 33 consecutive patients*. Plastic and Reconstructive Surgery, *137*(2), 438–448 (2016); Simon et al., *Facial gender confirmation*

22.     Based on the available data, the WPATH section discussing facial gender affirming surgery does not characterize the surgery as "medically necessary," but instead offers the more equivocal, and ambiguous, statement that "current literature supports its benefits."[36]

23.     The WPATH literature highlights important questions about the efficacy of facial gender affirming surgery for treatment of gender dysphoria that remain unanswered, including identification of particular facial procedures that may be effective to treat gender dysphoria and development of robust protocols to measure outcomes and validate efficacy.  The latter issue is especially important, because even prospective studies cannot provide reliable data without robust outcome measures, and as Plaintiffs' experts note in their reports, recent studies have attempted to develop and validate various outcome measures.  But that effort is not complete, and no current consensus exists on the question.  For example, a 2023 systematic review of 286 studies, representing 85,395 transgender and nonbinary patients from more than 30 countries, evaluated the quality of patient-reported outcome measures (PROM) for gender-affirming care generally and concluded that "PROM implementation in gender-affirming care was inconsistent and did not follow evidence-based approaches in implementation science."[37]  The researchers also found a lack of replication to validate proposed outcome measures, noting that "[m]ost of the PROMs were also implemented for research purposes, which may explain why most were administered only once…with insufficient follow-up time."[38]  Like the Morrison authors, they

---

*surgery: The lower jaw. Description of surgical techniques and presentation of results*. Plastic and Reconstructive Surgery, *149*(4), 755e–766e (2022).

[36] WPATH at 5129.

[37] Kamran et al., *Implementation of Patient-Reported Outcome Measures for Gender-Affirming Care Worldwide: A Systematic Review*, JAMA Network Open, 6/25, 6(4):e236425 (2023).

[38] *Id.*

also noted the imprecision of using outcome measures "not validated for gender-affirming care."[39]

24. Other recent studies echo the limitations of current data on the efficacy of facial surgery to treat gender dysphoria and the need for additional evidence-based research. Researchers in a 2021 study (Li et al.), for example, concluded that "further studies are required to understand the long-term effect of FFS [facial feminization surgery] in gender dysphoria patients with respect to the quality of their social life."[40]

25. Studies also have identified certain types of patients for whom facial gender affirming procedures may *not* be appropriate. For example, in discussing "[f]actors that were associated with less favorable outcomes in our cohort," the Morrison authors observed that "increased age [] was negatively associated with facial feminization outcome score and patient satisfaction."[41] The Facial Gender Symposium researchers made a similar finding: "It is clear that bony reduction procedures in some patients (especially those older than 40 years) fail to result in equivalent contracture of the soft-tissue envelope. The result is not only unaesthetic, but more importantly the feminized facial skeleton often cannot be seen—negating the possibility of the surgery having the desired effect on patient self-image or treatment by others."[42] Those authors also identified the need for the "[c]reation of evidence-based criteria" for the types and combination of procedures that may be efficacious for patients over 40.[43]

---

[39] *Id.*

[40] Li et al., *Necessity of facial contouring in feminization surgery for Chinese transgender females*, 9 Annals Translational Med. 1, 8 (2021). Dr. Berli cites this reference in his declaration.

[41] Morrison et al. at 1507.

[42] Facial Gender Symposium at 219.

[43] *Id.*

26. As noted previously, Aetna's CPB 615 recognizes the medical necessity of many core surgical and non-surgical treatments for gender dysphoria, and research suggests that facial gender affirming procedures in the absence of other treatments may be less effective. The Morrison study, for example, noted: "Facial feminization surgery alone is likely insufficient to achieve complete gender affirmation for many patients…. Moreover, facial femininity is just one of many cues that transgender women can use to affirm their gender to themselves and others, in combination with physical characteristics such as body habitus, breast size, clothing and hairstyle, and nonphysical characteristics such as voice quality and communication style."[44]

27. It must be noted, too, that the WPATH guidelines have been criticized as generally lacking evidence-based support for many of its recommendations. For example, British researchers conducted a systematic review of WPATH using a validated quality appraisal instrument and criticized version 7 of the WPATH guidelines (the version prior to the current version) for "inconsistent use of systematic reviews in generating recommendations" and concluded that "WPATH SOCv7 cannot be considered 'gold standard'."[45] The same British journal also questioned the current WPATH guidelines after evidence emerged suggesting that WPATH attempted to influence the findings of studies it cited in its guidelines and "meddl[ed] with its own guideline development."[46] A recent report commissioned by NHS England likewise found that WPATH "overstates the strength of the evidence" in making some of its recommendations,"[47] and another recent study assessing the quality of available treatment

---

[44] Morrison at 1507.

[45] Dahlen et al., *International clinical practice guidelines for gender minority/trans people: systematic review and quality assessment*, BMJ Open, 11:e048943, 1, 8 (2021).

[46] BMJ Investigation, *BMJ*, 387:q2227, 1, 2 (2024).

[47] Cass, H. (2024). *Independent review of gender identity services for children and young people: Final report*, 131-32. https://cass.independent-review.uk/home/publications/final-report/

guidelines for gender-affirming case criticized WPATH guidance as "lack[ing] developmental rigor and transparency."[48]

28. In sum, while other gender affirming procedures are supported by more robust clinical research, no such evidence-based data or generally accepted consensus currently exists for facial gender affirming procedures. There is a paucity of data, particularly reliable prospective data based on validated outcome measures, establishing the efficacy of facial surgery for the treatment of gender dysphoria, and the limited data currently available on facial gender surgery demonstrate a lack of consensus regarding which particular surgical procedures may be effective to treat gender dysphoria in particular patients and reliable protocols to measure outcomes and validate efficacy. Current data also suggests that facial surgery may not be appropriate for patients over 40 or patients who have not had other gender affirming treatments. Finally, while the WPATH guidelines are one available reference, their methodology and lack of developmental rigor has been subject to criticism, and they fail even to acknowledge other contemporaneous consensus statements and research that recognize serious limitations in existing data. And the WPATH findings and conclusions regarding facial gender affirming procedures are ambiguous and equivocal at best.

29. Aetna's CPBs 615 and 31 necessarily and appropriately reflect the evolving state of medical science on these issues. Aetna's CPBs do not raise questions about the efficacy of facial gender affirming surgery because the members seeking the treatment are transgender. Rather, as with every other procedure reviewed by Aetna's Clinical Policy Council, the concern is that there is insufficient evidence at the present time to demonstrate that these procedures are

---

[48] Taylor et al., *Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: a systematic review of guideline quality (part 1)*, Arch. Dis. Child, 109:s65, s71 (2024).

an *effective* treatment for gender dysphoria, any more than similar facial surgeries have been shown to be *effective* to treat cisgender individuals for depression, social anxiety, body dysmorphia, or other emotional or psychological disorders associated with body image. Aetna's CPBs allow coverage for facial surgery for treatment of trauma or congenital defect, but those same treatments to remediate injuries or birth defects are well supported by numerous valid studies and available to all patients equally. The operative factor is not the status of the member requesting the procedure but, rather, whether there is sufficient high-quality evidence and medical consensus establishing that the requested procedure is medically necessary as an effective treatment for the member's condition. Aetna continues to regularly evaluate the evolving science on these questions and may revise its policy regarding facial gender affirming procedures as new data emerges, as it already has done for other, more common and well-established gender-affirming treatments.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 11th day of April, 2025 in Hartford, Connecticut.

*[signature]*

_____
Robert McDonough, M.D.

**Robert S. McDonough, M.D.**

**PROFESSIONAL HISTORY**

*Employment*

- **Aetna Inc.,** Hartford, CT
    August 1995 to present. Current position: Executive Director of Clinical Policy Research & Development, Medical Affairs

Responsible for conducting technology assessments and developing clinical policies that apply to all of Aetna's products (indemnity, PPO, POS, and HMO plans).   Responsible for providing consultations to medical directors on clinical policy issues.  Chairman of Aetna's National Pharmacy and Therapeutics Committee (through 2019).

- **Congress of the United States, Office of Technology Assessment,** Washington, DC
    *Senior Analyst (Project Director),* Health Program, August 1989 to August 1995

Provided committees of Congress with critical analyses of technical and policy issues related to health care.  Duties included conducting research, directing projects, preparing memos and reports, managing staff, overseeing contracts, and responding to the needs of Congressional committees.

*Education*

Medical Internship, Department of Internal Medicine, Stanford University School of
    Medicine, Stanford, CA, July 1989
J.D. (with honors), Duke University School of Law, Durham, NC, May 1988
M.D., Duke University School of Medicine, Durham, NC, May 1988
M.P.P.S. (Policy Sciences), Sanford Institute of Public Policy, Duke University, Durham,
    NC, May 1988
B.S., Zoology (*Summa Cum Laude*), University of Texas at Austin, May 1982
B.A., Plan II, Interdisciplinary Honors Program (*Summa Cum Laude* and Special
    Honors), University of Texas at Austin, May 1982
Additional health services research coursework completed at Johns Hopkins University School of Hygiene and Public Health and University of Connecticut School of Medicine.

**Robert McDonough**
Page 2 of 2

*Professional Licensure and Certification*

Bar of the District of Columbia Court of Appeals
District of Columbia License to Practice Medicine and Surgery
Drug Enforcement Administration Controlled Substances Registration
Fellow, American College of Legal Medicine
New York State License to Practice Medicine and Surgery
Registered to Practice Patent Cases before the U.S. Patent and Trademark Office
Virginia State Bar

*Memberships*

EXCITE International (Chairman, Payer Advisory Committee)
American College of Legal Medicine
Stanford Medical Alumni Association
Duke Graduate School, Law School, and Medical School Alumni Associations
Medicare Evidence Development and Coverage Advisory Committee (MedCAC) (2005 to 2016)

**GRADUATE AND PROFESSIONAL SCHOOL**

*Graduate and Professional School Extracurricular Activities*

President, Duke Graduate and Professional Student Council
Member, Board of Directors, Duke Alumni Association
Cofounder, Duke Medical-Legal Society
Note and Comment Editor, *Duke Law Journal*
Editorial Board Member, *Duke Law Journal*
Research Assistant for Clark Havighurst, J.D., William Neal Reynolds Professor of Law
Research Assistant for Wendell Rosse, M.D., Chief, Hematology-Oncology
Member, Council on Legislation, American Medical Association
Member, Advisory Council, Medical Student Section, American Medical Association

*Graduate and Professional School Honors and Awards*

Duke University Law School Merit Scholarship
*Duke Law Journal* Note Award
Collins Endowment Medical Scholarship
National Health Lawyers Association Scholarship
Outstanding Young Men of America
Sanford Fellowship, Sanford Institute of Public Policy