# EXHIBIT B

# METROPOLITAN TRANSPORTATION AUTHORITY

## REQUEST FOR PROPOSAL

## Contract No. 15118-0100

## Attachment A, Exhibit C

# GENERAL CONTRACT PROVISIONS

# Proposed Contract

The Authority has generated two proposed forms of Contracts, one for administrative services only (ASO) and one for HMO insured benefits and services, both of which are attached to this Schedule.

During its Medical RFP, the Authority intends to evaluate each Proposer's willingness to execute the applicable attached proposed Contract(s), as drafted. Accordingly, each Proposer must review the attached Contract(s) carefully before submitting its RFP Response, and note in its RFP Response all "exceptions" to the Contract(s) that the Proposer will ask be made, prior to executing the Contract(s). The Authority will review each Proposer's identified contract "exceptions" to enable the Authority to determine which Proposers are most willing to provide a Contract similar – or identical – to that sought by the Authority. The Authority will review "exceptions" on a case by case basis and may choose, in its discretion, to negotiate certain terms and conditions.

Instructions for noting "exceptions" to the Authority's Section IV proposed Contract(s) follow.

**Instructions:**

1.      Each Proposer must identify any terms in the applicable proposed Contract(s) that the Proposer will be unwilling to accept, as well as any Contract changes the Proposer will accept with modifications. Accordingly, "exceptions" is defined to include: all additions to, modifications of, or deletions of, Contract terms.

2.      Each Proposer shall indicate its Contract "exceptions" by submitting a redlined, contract markup of the attached Contract(s), at the time all RFP Responses are due. Proposers without exceptions shall submit a statement indicating that all terms are accepted.

3.      Any Proposer that does not indicate Contract "exceptions" in submitting its RFP Response, but subsequently asks for "exceptions" during the RFP process, may be eliminated from further consideration.

# ADMINISTRATIVE SERVICES AGREEMENT

## CONTRACT NO. __285593/ 285612_____

# Table of Contents

Article 1.    Definitions.................................................................................................. 3
Article 2.    Appointment ............................................................................................ 6
Article 3.    Obligation and Duties of The Authority ................................................ 6
3.1    Obligations and Duties of The Authority.................................................. 6
3.2    Payment of Fees ........................................................................................ 6
3.3    Eligibility Data .......................................................................................... 7
3.4    Plan Design; Arbiter of Eligibility for Participation and Benefits ........... 7
3.5    Payment of Benefits .................................................................................. 8
3.6    Disputed Claims ........................................................................................ 8
Article 4.    Obligation and Duties of Contractor ..................................................... 8
4.1    Obligations and Duties of Contractor........................................................ 8
4.2    Claims Processing ..................................................................................... 9
4.3    Denied Claims .......................................................................................... 10
4.4    Disputed Claims ....................................................................................... 10
4.5    Correction of Errors ................................................................................ 10
4.6    Discounts, Adjustments and Credits ........................................................ 10
4.7    Pursuit of Overpayments and Subrogation.............................................. 11
4.8    Coordination of Benefits .......................................................................... 11
4.9    Changes in Claims Administration Processes........................................... 12
4.10    Participant Services ............................................................................... 12
4.11    Cooperation with Other Plan Vendors/Contractors............................... 12
4.12    Identification Cards and Network Directories ....................................... 12
4.13    Utilization Management Services .......................................................... 13
4.14    Provider Network Management.............................................................. 13
4.15    Contractor's Compensation ................................................................... 14
4.16    Provider Credentialing........................................................................... 15
4.17    Material Changes in Composition of Network Providers ...................... 15
4.18    NCQA Accreditation .............................................................................. 15
4.19    Performance Standards and Service Levels............................................ 15
4.20    Reports and Accounting by Contractor ................................................. 16
4.21    Account Management Team ................................................................... 16
4.22    Certificates of Creditable Coverage. ..................................................... 16
4.23    Reporting and Disclosure ...................................................................... 16
4.24    Hold Harmless ....................................................................................... 16
4.25    Quarterly and Annual Reconciliations .................................................. 17
4.26    Fraud Detection and Prevention. ........................................................... 17
4.27    Responsible Reporting Party ................................................................. 17
4.28    Unclaimed fund ..................................................................................... 17
Article 5.    Records ................................................................................................. 17
5.1    Maintenance of Records.......................................................................... 17
5.2    Confidentiality of Information and Data Security.................................... 18
5.3    Right to Audit........................................................................................... 19
5.4    Audits by Regulatory Agencies............................................................... 20

| | | |
|---|---|---|
| 5.5 | SAS 70 Audits | 20 |
| 5.6 | Ownership of Data. | 20 |
| Article 6. | Indemnification | 20 |
| Article 7. | Defense of Lawsuits | 21 |
| Article 8. | Term and Termination of the Agreement | 21 |
| 8.1 | Term of the Agreement | 21 |
| 8.2 | Termination. | 22 |
| 8.3 | Provision for Temporary Services | 23 |
| 8.4 | Provision of Claims Run-Out Services Upon Termination or Expiration | 23 |
| 8.5 | Plan Data | 23 |
| Article 9. | General Provisions | 24 |
| 9.1 | No Obligation to Continue Plan | 24 |
| 9.2 | Non-Exclusivity | 24 |
| 9.3 | Article Headings. | 24 |
| 9.4 | Counterparts | 24 |
| 9.5 | Force Majeure | 24 |
| 9.6 | Waiver of Provisions | 25 |
| 9.7 | Notices. | 25 |
| 9.8 | Relationship of the Parties | 26 |
| 9.9 | Subcontracting. | 26 |
| 9.10 | Proprietary Information | 26 |
| 9.11 | Insurance | 27 |
| 9.12 | Identification | 31 |
| 9.13 | Assignment | 31 |
| 9.14 | Compliance with Laws | 31 |
| 9.15 | No Third Party Rights | 31 |
| 9.16 | Invalid Provisions | 31 |
| 9.17 | Survival of Obligations | 31 |
| 9.18 | Offshore Services | 32 |
| 9.19 | Nondiscrimination | 32 |
| 9.20 | Modifications | 32 |
| 9.21 | Remedies Cumulative. Specific Performance | 32 |
| 9.22 | Governing Law and Forum. | 32 |
| 9.23 | Minority and Women-Owned Business Enterprise | 32 |
| 9.24 | Exhibits | 33 |
| 9.24 | Entire Agreement. | 33 |
| 9.25 | Mutuality of Drafting. | 33 |
| 9.26 | Statute of Limitations on Right to Sue the Authority/No Claim against Authority Officers, Agents or Employees | 33 |
| Article 10. | Conflict of Interest | 34 |
| Article 11. | Disputes. | 35 |
| Article 12. | General Representations and Warranties | 36 |
| 12.1 | Existence; Compliance with Law | 36 |
| 12.2 | Authority. | 36 |
| 12.3 | No Legal Bar | 36 |
| 12.4 | No Litigation. | 36 |

12.5    No Default ........................................................................................ 37
12.6    No Inducement or Gratuities .......................................................... 37
12.7    Conflict of Interest ........................................................................ 38
12.8    No Conviction or Indictment .......................................................... 38

THIS AGREEMENT ("Agreement" or "Contract") dated and effective as of January 1, 2017 ("Effective Date"), is entered into by and between Aetna Life Insurance Company ("Contractor") and The Metropolitan Transportation Authority, a New York State Public Benefit Corporation, on behalf of the New York City Transit Authority (NYCTA), Manhattan and Bronx Surface Transit (MaBSTOA), Metropolitan Transit Authority Bus Company (MTA Bus), and Staten Island Railway Transit Authority (SIRTOA) (collectively, the "Authority").

# W I T N E S S E T H

**WHEREAS,** the Authority has established and sponsors the Plan, as defined herein, to provide group health benefits to certain of its eligible employees, retirees and their dependents;

**WHEREAS,** Contractor has established and maintains administrative and clinical resources and claims administration systems necessary to fully support the administration of benefits for employee benefit plans offering group health benefits;

**WHEREAS,** Contractor has established and maintains network(s) of health care providers;

**WHEREAS,** the Authority desires to retain Contractor to provide the services set forth in this Agreement; and

**WHEREAS,** Contractor desires to provide such services in accordance with the terms of this Agreement,

**NOW, THEREFORE,** in consideration for the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Authority and Contractor agree as follows:

## Article 1.    Definitions

For purposes of this Agreement, and any amendments, attachments, or Exhibits to this Agreement, the following words and terms have the following meanings unless otherwise expressly provided herein:

1.1    "**Agreement**" or "**Contract**" shall mean the General Contract Provisions, Scope of Work, Price Schedule, Performance Guarantees, Attachments, Exhibits, Schedules, Request for Proposal, all Addenda, and Contractor's Proposal to the extent accepted by the Authority.

1.2    **"Authority"** shall mean the Metropolitan Transportation Authority, a New York State public benefit corporation, acting for and on behalf of New York City Transit Authority (NYCTA), Manhattan and Bronx Surface Transit (MaBSTOA), Metropolitan Transit Authority Bus Company (MTA Bus), and Staten Island Railway Transit Authority (SIRTOA).

1.3    **"Benefits"** means the health care expenses that are payable under the Plan.

1.4    **"City"** shall mean the City of New York, according to its boundaries at the date of this Agreement.

1.5    **"Claim"** means any written or electronic request for Benefits made by or on behalf of a Participant in a form acceptable to Contractor, and submitted to Contractor for adjudication.

1.6    **"Claims Run-Out Services"** means the Claims processing and recovery services Contractor provides during the Run-Out Period.

1.7    **"Confidential Participant Information"** means information about a Participant, including, but not limited to, medical records, name, address, telephone number, Social Security number, date of birth, and protected health information as defined under HIPAA ("Protected Health Information").

1.8    **"Contractor Affiliate"** means an entity controlling, under common control with or controlled by the Contractor.

1.9    **"Days"** shall mean calendar days.

1.10    **"Dependent"** means the spouse or other eligible dependent, as each term is defined under the Plan, of an Employee or Retiree who is eligible for coverage under the Plan by virtue of such person's relationship to the Employee/Retiree.

1.11    **"Disputes Resolution Officer"** or **"DRO"** shall mean the Chief Procurement office MTA/BSC Procurement.

1.12    **"Employee"** means the full-time and part-time active employees of the Authority, and any other employee of the Authority that the Authority designates as eligible to participate in the Plan.

1.13    **"EOB"** means an explanation of benefits form provided by Contractor to the Participant setting forth, to the extent applicable, the amount of any Benefits payable from or provided under the Plan and the reason for denial of any Claim.

1.14    **"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations issued thereunder.

1.15    **"MTA"** shall mean the Metropolitan Transportation Authority or any other board, body, official or officials to which or to whom the powers now belonging to the MTA in respect to the planning, financing, location, construction, equipment, maintenance and operation of mass transportation facilities or the purchase of Rapid Transit cars under the provisions of Article 5, Title 11 of the Public Authorities Law of the State of New York.

1.16    **"Network"** means the network of Providers the Contractor offers under this Agreement.

1.17    **"Network Provider"** means a Provider who has agreed to provide health care services to Participants pursuant to a written arrangement with Contractor.

1.18    **"Overpayments"** means payments that exceed the amount payable under the Plan and this Agreement. An Overpayment may occur for reasons including, but not limited to, a Provider billing error, retroactive or inaccurate eligibility information, an error in the administration of coordination of benefits, a Medicare dispute, or missing information.

1.19    **"Participant"** means an Employee or Retiree who elects to participate in the Plan administered by Contractor. The term Participant also includes, for purposes of this Agreement, a Dependent who participates in the Plan because of his or her relationship to a Participant.

1.20    **"Plan"** means the health benefits to which employees and retirees of the Authority are entitled under certain collective bargaining agreements with the Transport Workers Union Local 100, ATU Local 1056, ATU Local 726, SSSA, TSO Local 106, SIRTOA Unions TCU, UTU, ATD, MTA Bus Unions, ATU L1179, and ATU L1181 to be administered by Contractor under this Agreement.

1.21    **"Plan Documents"** means the summary plan description(s) and any other documents that are specifically incorporated by reference in the summary plan description(s). The summary plan descriptions shall include summaries of the Benefits and other information as determined by the Authority.

1.22    **"Provider"** means a duly licensed physician, dentist, health professional, hospital, health care facility, laboratory, person or entity duly licensed to render health care services to a Participant or any other provider of medical services, products, or supplies which are Benefits subject to any definitions or provisions of the plan regarding "provider" or medical professionals whose services are covered under a Plan.

1.23    **"Proprietary Information"** means information that belongs to a party, including, but not limited to, pricing, methods, processes, financial data, Provider or customer lists, statistics, software, systems or equipment, programs, research, development, strategic plans, operating data, operating manuals,

certain symbols, trademarks, service marks, designs, data, processes, plans, procedures and information, or related information of each of the parties and/or their affiliated entities, clients and suppliers, concerning past, present, or future activities of said entities. A party's Proprietary Information shall include all such information that a party disclosed to the other party before this Agreement was executed.

**1.24** **"Records"** means records with respect to Contractor's processing, payment, and denial of Claims and all other services Contractor provides under this Agreement.

**1.25** **"Renewal Term"** means any additional calendar year term after the initial Term of this Agreement.

**1.26** **"Retiree"** means the former Employees of the Authority who are eligible to participate in the Plan.

**1.27** **"Run-Out Period"** means the twelve (12) month period after the date this Agreement terminates or expires during which Contractor shall continue to process and pay Claims, as set forth in Section 8.4.

**1.28** **"Term"** means the time period beginning on the Effective Date and continuing until December 31, 2019 or, if terminated earlier, the date this Agreement is terminated as provided in Article 8. At the Authority's option, the Authority may extend the Agreement for two successive one-year periods measured from January 1, 2020

## Article 2.    Appointment

The Authority hereby retains and appoints Contractor to provide services hereinafter described in connection with administration of the Plan.

## Article 3.    Obligation and Duties of The Authority

**3.1** **Obligations and Duties of The Authority.** The Authority shall assume the obligations and perform the duties set forth in this Article 3. Unless otherwise specifically provided under the terms of this Agreement, the Authority retains full and final authority and responsibility for the Plan and its operation. Contractor is empowered to act on behalf of the Authority, but only as expressly stated in this Agreement or as mutually agreed upon in writing by the parties.

**3.2** **Payment of Fees.** The Authority shall pay the fees as set forth in Exhibit A (Fees) on a monthly basis, subject to submission of all supporting documentation required by the Contractor. Fees set forth in Exhibit A shall be fixed for the Term of this Agreement. If improper fees are paid due to

administrative error or updates to eligibility, the Authority shall be able to retroactively rectify any such fee payment error under the Term of this Contract. If the Authority terminates certain services under this Agreement pursuant to Section 8.2, the administrative fees shall be reduced (i) as specified in Exhibit A if the fees for the terminated services are shown in Exhibit A or (ii) consistent with the changed scope of services. If the number of Employees and/or Retirees covered by this Agreement increases or decreases by twenty percent (20%) or more, the parties agree to negotiate an equitable adjustment to the fees. If improper fees are paid due to administrative error or updates to eligibility, the Authority shall be able to retroactively rectify any such eligibility (and related fee payment error). Except as expressly set forth herein, the Authority shall have no obligation to pay any additional fees with respect to any services described in this Agreement. The Authority will calculate the monthly fees on a self-billing basis and will provide supporting documentation to Contractor that illustrates by billing arrangement total lives paid equaling total payment made. The Authority will allow Contractor to Audit such bills. Fees are due on the first day of the month, i.e. January's fees are due January 1st. The Authority will have a 31 day grace period to remit payment.

3.3    **Eligibility Data.** The Authority has and retains sole and discretionary authority to determine the criteria for eligibility to participate in the Plan and to amend those criteria at any time. The Authority shall furnish, or cause its designee to furnish; to Contractor full populations file of Participants before the Effective Date of this Agreement and semi-monthly thereafter. Upon receipt of eligibility information from the Authority or its designee, Contractor shall promptly review all eligibility information received for data integrity, validity, reasonableness, and accuracy and identify errors within two (2) business days of receipt. Where no errors have been identified, Contractor must load the files within two (2) business days of receipt. Where identified errors require the Authority or its designee to provide a new file, Contractor shall load the revised file within two (2) business days of receipt of the new file. If eligibility provided by the Authority or its designee is not properly coded due to administrative error or updates to eligibility, the Authority shall be able to retroactively rectify any such eligibility error and Contractor shall promptly correct its files.

3.4    **Plan Design; Arbiter of Eligibility for Participation and Benefits**. The Authority shall have sole authority over the design of the Plan, including any modification or termination of the Plan. The Authority shall possess the ultimate and discretionary authority to decide in the Authority's sole discretion all questions regarding Participant eligibility and benefits covered under the Plan. The Authority shall have the right to review Contractor's adopted procedures and practices for claims approval, claims denial, and other aspects of the administration of the Plan. All general correspondence and print materials sent by Contractor to Participants must be reviewed in advance and approved by the Authority prior to transmission. All general correspondence

and print materials sent by Contractor to Providers must be reviewed in advance and approved by the Authority prior to transmission if such correspondence or print materials refer to the Authority or Plan.

The Authority shall furnish Contractor with a complete copy of the Plan before the Effective Date and, thereafter, with copies of all applicable amendments to the Plan and the relevant effective dates within a reasonable period of time following the adoption of such amendments, and Contractor shall administer such amendments. If such amendments would impose any significant additional obligations upon Contractor, then in such event there may be an adjustment to the Contractor's fees to reflect the additional obligations, provided that this fee adjustment shall not become effective unless the parties agree to the fee adjustment in writing.

3.5    **Payment of Benefits and Claim Wire Billing.** The Authority shall pay or fund Claims and claim wire billing items in accordance with the banking arrangements and procedures, including the submission by Contractor of all supporting documentation required by the Authority, as further described in Exhibit B (Funding of Benefits and Claim Wire Billing). The parties acknowledge that, from time to time, a Claims adjustment may be necessary as a result of coordination of benefits, subrogation, workers' compensation, other third party recoveries, payment errors and the like, and that the adjustment will take the form of a debit (for an additional amount paid by Contractor) or a credit (for an amount refunded to the Plan). Funds to cover claims and the claim wire billing items are due within 24 hours of the request from Contractor. Contractor shall have the right to suspend processing of Claims if the Authority fails to fund the Benefits pursuant to the terms of this Agreement, provided that (i) Contractor has given the Authority written notice of the Authority's failure to fund the Benefits and Contractor's intent to suspend processing of Claims and (ii) the Authority fails to fund the Benefits within ten (10) days of receipt of Contractor's notice of the Authority's failure to fund the Benefits.

3.6    **Disputed Claims.** The Authority will, within sixty (60) days of receipt of a Claims listing from Contractor reflecting Claim payments, notify Contractor in writing with appropriate documentation of any disputed Claims and will, upon request, execute any documents required for collection of amounts that third parties owe.

## Article 4.    Obligation and Duties of Contractor

4.1    **Obligations and Duties of Contractor**. In consideration of the obligations to be assumed and the duties to be performed by the Authority under this Agreement, Contractor shall assume the obligations and perform the duties set forth herein. Contractor acknowledges and agrees that this Agreement shall not limit the Authority in the event the Authority chooses, in its sole discretion, to utilize other service providers to the Plan to offer any of the services Contractor

provides or other services under the Plan in any geographic area. In the exercise of its duties under this Agreement, Contractor shall use that degree of care and reasonable diligence that an experienced and prudent plan administrator familiar with such matters would use acting in like circumstances, and consistent with industry standards.

4.2    Claims for Out of Network Providers

Contractor shall require  that in-network providers notify participants in writing when referrals are to out-of-network providers. Both the Authority  and the participants shall be held harmless for the extra cost of out-of network claims in excess of the in-network charge if the participant was not notified in writing that the referral was to an out-of-network provider. Contractor will be responsible for costs above a similar situated in-network charge for the service provided by the out-of-network provider.

Contractor shall hold harmless both the Authority and Participants who are seeking services in an In-Network facility from balance billing for charges by an out-of-nework provider who has not disclosed in writing to the participant that they are not an in-network provider.

**4.3**    **Claims Processing**. Contractor shall process Claims incurred during the Term of this Agreement and provide customer service in a prudent and expert manner ( and consistent with the Performance Standards described in Section 4.19), including investigating and reviewing such Claims to determine what amount, if any, is due and payable according to the terms and conditions of the Plan documents and this Agreement. In processing Claims, Contractor shall use its own medical policies and medical policy exception processes, precertification and/or preauthorization policies that the Authority shall make consistent with the terms of the Plan. Contractor shall disburse to the applicable individuals or entities (including Providers) Claim payments that it determines to be due according to the provisions of the Plan documents and applicable law. Contractor shall process claims within the time periods and in the manner required in this Agreement and the Plan. However, the Authority shall not be charged or responsible for any claims that Providers or participants submit twelve (12) months after the date of service. Following termination of a Participant's eligibility, Contractor shall process and pay Claims related to services that the Participant incurred while the Participant's eligibility was still effective. The Authority delegates to Contractor discretionary authority under the Plan for purposes of (i) making initial Claims payments and denials under the Plan; (ii) performing the fair and impartial review(s) of all appeals of denied Claims; and (iii) issuing any required notices to Plan participants. In connection with those duties, Contractor shall have discretionary authority to determine what Benefits are payable under the Plan, subject to the eligibility and

enrollment information the Authority gives to Contractor, and to construe the terms of the Plan. Contractor shall be deemed to have properly exercised such authority unless it has abused its discretion by acting arbitrarily or capriciously. Contractor is a fiduciary of the Plan to the extent necessary to perform its obligations and duties as expressed in this Agreement and to the extent that its performance of such actions constitutes fiduciary action. Contractor shall not act as the plan administrator for the Plan in performing its obligations under this Agreement.

4.4     **Denied Claims**. In the event Contractor wholly or partially denies a Claim, Contractor shall provide an EOB that describes in detail the amount of Benefits payable or Benefits denied and how that determination has been made in accordance with the provisions of the Plan, and shall include a notice to Participant of the Participant's right to file with Contractor a written request for review of the denied Claim. This notice shall include (i) all information required by the Plan and applicable laws, and (ii) the appropriate name and address for Participants to mail to Contractor requests for review of Claims or denied appeals. Contractor shall provide the notice within the time periods required by the Plan and applicable laws.

4.5     **Disputed Claims.** Contractor shall investigate and, within a reasonable time, respond to such disputed Claims. Additionally, Contractor shall, following the recovery of an amount from a third party, or following Contractor's determination that any other disputed amount is not the Authority's liability, or that an amount shown on a claims listing and invoice is incorrect, credit the recovered or corrected amount on the next subsequent invoice.

4.6     **Correction of Errors.** Contractor shall promptly correct any errors identified in Claim payments and processing within thirty (30) days of discovery of each such error, whether identified by Contractor, Participants, Providers, auditors (internal and external), or the Authority . Such errors include, but are not limited to, payments for benefits not covered under the Plan and payments for benefits received by persons not covered under the Plan. If a common overpayment error affects a large number of Participants or a geographically concentrated number of Participants, Contractor shall promptly notify the Authority of the error. The Authority will assist and cooperate with Contractor in recovering errors in benefit payments made to Participants, but Contractor shall be ultimately responsible for such errors in Claim payments and shall refund the Plan in accordance with Section 4.7, except to the extent the error is due solely to the Authority's negligence.

4.7     **Discounts, Adjustments and Credits**. Contractor represents, warrants, and covenants that the Participant or the Plan, as appropriate, will be charged the lower of Contractor's discounted or negotiated rate with a Provider and the Provider's billed charge. Contractor represents, warrants, and covenants that, in determining the amount of any payment to a Participant or amount billed to the

Plan, the Participant or the Plan, as appropriate, shall receive one hundred percent (100%) of any discounted or negotiated rates or payment arrangements; any price adjustments, rebates, or refunds; and any retroactive or supplemental payments or credits negotiated by Contractor or its affiliates, agents, or subcontractors. Contractor shall not accrue any portion of Provider charges in any manner or at any time. No separate arrangement that returns fees or otherwise compensates Contractor based upon the volume of Participants and/or services rendered to Participants or based upon any other factor shall be permissible, except as mutually agreed otherwise by the parties. Without limiting the scope of the foregoing, Contractor agrees that, where a negotiated discount applies to a Claim, all copayments/coinsurance a Participant owes shall be calculated as a portion of the discounted amount rather than any greater billed amount.

4.8    **Pursuit of Overpayments and Subrogation**. With respect to any Overpayment of any Claim made to a Participant, Contractor shall pursue recovery of such Overpayment in accordance with industry standards (currently $15) and, upon recovery, repay the amount of such Overpayment to the Plan. With respect to any Overpayment of any Claim made to a Network Provider, Contractor shall withhold such Overpayment from any subsequent Claim for the Network Provider and, upon recovery shall repay such amount to the Plan. With respect to any Overpayment of any Claim made to a Provider who is not a Network Provider, Contractor shall use its best efforts to obtain recovery of such Overpayment and, upon recovery, repay the amount of such Overpayment to the Plan. Notwithstanding the foregoing, Contractor shall be liable for all un-recovered Overpayments due to Contractor's breach of this Agreement (including, without limitation, Contractor's failure to meet the standard of care, i.e., Contractor fails to use the degree of care and reasonable diligence that an experienced and prudent plan administrator familiar with such matters would use acting in like circumstances, and consistent with industry standards), negligence, willful malfeasance, or violation of applicable law. After termination of this Agreement, Contractor shall continue to identify Overpayments, and pursue recovery on Claims paid during the Term of this Agreement and the Run-Out Period. Contractor shall provide subrogation services in accordance with the terms of the Plan and shall retain a percentage of any such recovery as set forth in Exhibit A (Fees).

4.9    **Coordination of Benefits**. Contractor shall identify and pursue Claims under the Plan that may be subject to coordination of benefits rules under the Plan. Contractor shall make payments to the Centers for Medicare and Medicaid Services ("CMS") to the extent CMS determines that the Plan should have been the primary payer for services rendered by a Provider. Contractor shall make payments to any state Medicaid agencies to the extent such agencies determine that the Plan should have been the primary payer for services rendered by a Provider

**4.10**    **Changes in Claims Administration Processes.** Before implementing any material change or modification to the system, protocols and procedures, location, or personnel that Contractor utilizes for Claims adjudication or Claims processing, Contractor shall notify the Authority in writing of the change or modification within a reasonable amount of time (commensurate with the nature and effect of the change or modification) if the change or modification: (i) would affect Contractor's ability to perform one or more of its obligations under this Agreement; (ii) would be visible to the Authority or Participants; or (iii) might have the effect of putting Contractor or the Plan in noncompliance with the provisions or substantive intent of the Plan; or (iv) would reduce the Benefits payable or services provided to Participants; provided that any such change will not become effective until agreed to by the Authority in writing. This provision shall not be construed to preclude the Authority from exercising any other rights under the Agreement, including default.

**4.11**    **Participant Services.** Contractor shall support its Claims administration services to the Plan by providing a dedicated Participant services unit (with a dedicated toll-free telephone line and a TTY telephone line) that shall operate during Contractor's usual and customary hours of operation, but not less than Monday to Friday from 8 am to 6 pm Eastern Standard Time. Contractor shall staff such unit with staff members familiar with the terms and provisions of the Plan, including, without limitation, Benefits payable under the Plan, applicable copayments, coinsurance, out-of-pocket maximums, benefit maximums, instructions for completing a Claims form and determining the status of Claims. Contractor shall provide Participants with direct access to their Claims information, including the ability to electronically view and check the status of Claims through the Internet.

**4.12**    **Cooperation with Other Plan Vendors/Contractors**. At the Authority's direction, Contractor shall provide Plan data in its possession, including, but not limited to, Records, directly to the Authority or any of its designees. Upon receipt of Plan data from the Authority or its designee, Contractor shall take all actions necessary to preserve and maintain the confidentiality of such Plan data and to use such Plan data only for the purposes of administering the Plan and in accordance with Section 5.2 of this Agreement.

**4.13**    **Identification Cards and Network Directories.** For Participants who are eligible for the Plan on the Effective Date, Contractor shall issue identification cards to such Participants within five (5) business days of receiving the initial eligibility file from the Authority or its designee as provided in Section 3.3. For Participants who become eligible for the Plan after the Effective Date, Contractor shall issue identification cards to such Participants within five (5) business days of receiving notification from the Authority or its designee that such Participants are eligible. Contractor shall provide Participants access to an electronic version of its directory of Network Providers and shall provide written directories of Network Providers to Participants upon request, at no

charge. Written directories shall be updated monthly and electronic directories shall be updated at least weekly.

**4.14** **Utilization Management Services.** Contractor shall maintain a utilization management function that prospectively and concurrently manages patient care in accordance with Plan requirements. Contractor shall implement Plan's notification requirements and shall ensure Network Provider compliance. Contractor's electronic utilization management system shall contain complete (i.e., sufficient to accurately portray the events of the prospective and concurrent review during an independent medical audit of the utilization management record) documentation of the review process by capturing data elements as well as clinical notes.

Contractor shall use protocols that are diagnosis/procedure specific, consistent with efficient medical practices, and that provide registered nurse reviewers with guidelines regarding the type of care that is indicated during each day of treatment. Physician reviewers shall be actively involved in the review process in accordance with industry standards.

Contractor shall maintain a comprehensive internal audit program for utilization management services. During these random, internal audits, Contractor shall include a review of the quality of care Participants receive. All cases identified as involving a potential quality-of-care problem shall be referred to Contractor's quality assurance department.

**4.15** **Provider Network Management.** Contractor shall maintain a Network of Providers throughout the term of this Agreement adequate to meet the health care needs of Participants in all geographic areas covered by this Agreement as set forth in Exhibit G. Contractor agrees to use its best efforts to maintain a level of Network participation sufficient to meet Participant's Provider access needs. Contractor agrees to use its best efforts to maintain the following access standards: (i) Urban - at least one hospital within 10 miles, one freestanding ambulatory surgical center within 5 miles, two primary care physicians within 5 miles, and two specialists within a 5-mile radius for each of the provider types as follows: allergist/immunologist, anesthesiologist, cardiologist, chiropractor, dermatologist, ear/nose/throat, endocrinologist, gastroenterologist, oncologist, neonatologist, neurologist, OB/GYN. orthopedist, physical therapist, psychiatrist, psychologist, social worker, urologist (Urban areas are defined as those with more than 3,000 people per square mile); (ii) Suburban - at least one hospital within 10 miles, one freestanding ambulatory surgical center within 8 miles, two primary care physicians within 8 miles, and two specialists for each of the provider types listed in (i) within an 8 mile radius (Suburban areas are defined as those with between 1,000 and 3,000 people per square mile and (iii) Rural - at least one hospital within 20 miles, one freestanding ambulatory surgical center within 10 miles, two primary care physicians within 10 miles, and two specialists for each of the provider types listed in (i) within a 10 mile

radius (Rural areas are defined as less than 1,000 people per square mile.) In the event that Contractor is unable to maintain the target access levels as set forth above, Contractor shall provide written notice to the Authority within five (5) business days of failure to maintain such levels. The Authority understands and agrees that Contractor shall be afforded a minimum of ninety (90) days after written notice of deficiency is provided to the Authority to achieve the stated target access levels. If Contractor is not able to achieve the stated target access levels within the 90-day period, administrative fees shall be reduced by5% for each succeeding 30 day period in which Contractor fails to meet the stated access standards for up to three such 30-day periods and thereafter by 10% for each succeeding 30 day period in which Contractor fails to meet the stated access standards. Contractor shall ensure Participants' timely access to Network Providers by establishing and monitoring scheduling standards for Network physicians. Standards shall not be less than:

- Regular and routine appointments
  - Preventive routine care within 8 weeks
  - Symptomatic/non-urgent acute care within 3 days
  - Routine care within 7 days
- Urgent care: same day or within 24 hours
- After hours care: physicians must have a reliable 24/7 answering service or a machine with a beeper or paging system

The choice of a Provider is solely the Participant's choice and Contractor shall not interfere with the Participant's relationship with any Provider. Each Provider provides services only to Participants and does not provide any services to the Authority or the Plan.

Contractor shall make good faith efforts to recruit and contract providers being utilized by current members who are in network with Empire and UHC, when such providers are not yet in Contractor's network. This effort to recruit and contract providers shall be extended only to those providers being utilized by members as of the time in which Contractor starts its obligations under this Agreement and should not extend for more than three (3) months from the effective date under this Agreement.

4.16    **Contractor's Compensation.** Contractor represents and warrants that all of the compensation, direct or indirect (from any persons other than the Authority), paid to Contractor, its affiliates, agents, or subcontractors in connection with, or as a result of, this Agreement is set forth in this Agreement and fully disclosed to the Authority. Contractor warrants that it (including any of its affiliates, agents or subcontractors) will not receive any other consideration in connection with, or as a result of, this Agreement (including, without limitation, "float") other than amounts disclosed to and approved by the Authority in this Agreement.

**4.17**    **Provider Credentialing**. Contractor shall be solely responsible for the selection, monitoring, and retention of its Network Providers. Contractor represents and warrants that: (i) Contractor has exercised and shall exercise due diligence in the selection and retention of Network Providers with regard to professional credentials, liability coverage, and record of malpractice or professional sanction consistent with the Contractor's credentialing standards and procedures developed that shall be provided to the Authority prior to the execution of this Agreement and during the Term of this Agreement upon the Authority's request (including any periodic updates in such standards); and (ii) Contractor's written agreements with Providers are in full compliance with all applicable federal, state and local laws, rules, and regulations. Contractor shall ensure that all Network Providers meet Contractor's credentialing criteria before being made available to Participants. Contractor shall maintain during the term of this Agreement, quality improvement committees and medical directors to monitor the quality of medical care Network Providers furnish, as well as the quality of services Contractor maintains, and direct action as appropriate to correct deficiencies. Contractor shall maintain during the Term of this Agreement, programs to promulgate Provider best practices.

**4.18**    **Material Changes in Composition of Network Providers.** Contractor shall notify the Authority in writing of any material change in the Network Providers offered through the Network ninety (90) days before the effective date of such change. Material changes include, without limitation:

a.      A five percent (5%) or more loss of primary care physicians or a five percent (5%) or more drop in any category of specialist physicians or any other class of Providers or suppliers in a service area; or

b.      Any change in the facility Network Providers or restriction imposed by a facility Network Provider on the number of Participants that the facility Network Provider is willing to accept as patients.

Upon the Authority's request, Contractor shall notify all Participants in writing of such change not later than thirty (30) days before the effective date of such change.

**4.19**    **NCQA Accreditation**. Contractor shall use its best efforts to maintain, throughout the Term of this Agreement, the same level of accreditation by the National Committee for Quality Assurance ("NCQA") that Contractor has for each service area which has NCQA accreditation as of the Effective Date. Upon the Authority's request, Contractor shall report to the Authority the status of such accreditation(s).

**4.20**    **Performance Standards and Service Levels.** Contractor shall comply with the performance standards described in Exhibit C and the Authority may, in its sole discretion, independently monitor adherence to each performance standard. If

Contractor fails to satisfy the performance standards in Exhibit C, Contractor's fees shall be adjusted as described in Exhibit C. Contractor shall report measurements related to the performance standards described in Exhibit C within thirty (30) days of the applicable reporting period. Performance for the purpose of fee adjustment shall be measured on a quarterly basis and Contractor shall remit any payments due within thirty (30) days of the Authority's request. Any adjustment to Contractor's service fees under Exhibit A is in addition to, and not in lieu of, any other remedies provided under this Agreement or by applicable law.

4.21   **Reports and Accounting by Contractor.** Contractor shall furnish to the Authority the reports set forth in Exhibit D at the times described therein. Contractor's costs for providing these reports are included in the administrative fee.

4.22   **Account Management Team.** Contractor shall appoint an account management team that shall be responsible for technical liaison with Plan representatives and for maintaining a business liaison with the Authority. Contractor shall inform the Authority of the name of the account executive Contractor appoints within thirty (30) calendar days before the signing of this Agreement. Contractor shall meet with the Authority upon request to review Claims experience, Plan progress, and service-related issues.

4.23   **Certificates of Creditable Coverage.** Contractor shall provide certificates of creditable coverage as required by HIPAA with respect to Participants' participation in the Plan, and respond to any requests for such certificates and related inquiries. The Plan agrees to promptly provide Contractor with any information as may be necessary for Contractor to provide the certificates of creditable coverage.

4.24   **Reporting and Disclosure.** Contractor shall provide the Authority with such information and assistance necessary for preparation of the Plan's information returns and forms required by federal or state laws. Contractor shall prepare and mail all IRS Forms 1099, any other similar forms that are given to Providers, and any Forms W-2 that are generated for the purposes of disclosing income imputed to Participants. Notwithstanding the Contractor's representation in Section 4.15, Contractor shall timely provide the Authority with all information, including, without limitation, information regarding compensation and conflicts of interest, required to be disclosed under regulations issued by the U.S. Department of Labor or other governmental body.

4.25   **Hold Harmless.** Contractor shall cause its agreements with Providers to require that upon providing a Participant any of the Benefits or services that such Participant is or may be eligible for under the Plan, Providers shall be required to collect from the Participant the amount of any applicable deductible, copayment, or coinsurance. Additionally, Providers shall hold harmless and not

recover any amounts other than the copayment or coinsurance from such Participants, but are instead required to recover any unpaid balances for eligible benefits from the Plan or Contractor only.

**4.26**    **Quarterly and Annual Reconciliations**. Each quarter and at year-end, Contractor shall present to the Authority a reconciliation report in a form satisfactory to the Authority concerning administrative fees, Claims payments, and any other amounts paid or to be paid under the Agreement.

**4.27**    **Fraud Detection and Prevention.** The Contractor shall administer a fraud prevention and detection program, including system edits and other procedures to critically examine charges for all services that appear abusive, excessive or fraudulent, and cooperate with the Authority's efforts to eliminate and prosecute health care fraud.

**4.28**    **Responsible Reporting Party**. Contractor shall be the responsible reporting entity ("RRE") for the Plan as that term is defined pursuant to Section 111 of the Medicare, Medicaid, and SCRIP Extension Act of 2007. The Authority shall cooperate with Contractor and timely respond to requests for information made by Contractor applicable to its RRE obligation.

**4.29**    **Unclaimed fund**s. Contractor shall provide the Authority with access to reports of unclaimed checks for Benefits written on Contractor's account that have not been cashed.

## Article 5.    Records

**5.1**    **Maintenance of Records.** Contractor shall maintain complete and accurate Records, and retain them for seven (7) years after the end of the calendar year in which the transaction occurred, or longer as required by applicable law. Contractor shall retain such Records in either an electronic or hard copy format. Maintenance of Records shall include the obligation to store backup computer files at an off-site storage location. Contractor shall establish and implement a disaster recovery plan for the Records. Contractor will test the disaster recovery plan at least once per year. Contractor agrees to execute recovery of essential operations within forty-eight (48) hours of a disaster. Contractor will ensure all system data, including, but not limited to, databases, applications, application programs, and system software, is backed up on a daily basis.

All Records in Contractor's possession, excluding Contractor's Proprietary Information, are and shall remain the property of the Plan upon termination of this Agreement. Upon the termination or expiration of this Agreement, Contractor shall return all Records of the Plan. At the end of Contractor's seven (7) year retention of Records as stated in this Section 5.1, Contractor may destroy any Records not returned previously to the Authority, provided that Contractor gives the Authority one hundred and twenty (120) days prior written

notice of Contractor's intention to destroy such Records to allow the Authority the opportunity to take possession of such records if the Authority so chooses.

**5.2**    **Confidentiality of Information and Data Security**. Contractor agrees to comply with all the terms and conditions of the Business Associate Agreement, as set forth in Exhibit E. In addition, Contractor agrees not to conduct any customer satisfaction surveys of Participants without the Authority's prior written permission. Further, Contractor shall not use "protected health information," as defined in 45 C.F.R. § 164.501, except as permitted under the Business Associate Agreement set forth in Exhibit E; provided, however, that Contractor shall not sell or receive direct or indirect remuneration for the use or disclosure of protected health information.

Contractor shall establish and maintain safeguards consistent with industry best practice standards and applicable law existing and as evolving against the destruction, loss, alteration of, or unauthorized physical or electronic access to Confidential Member Information. Such safeguards shall include: (i) host and network-based intrusion detection systems, with penetration tests conducted by an independent third party; (ii) controls against unauthorized physical or electronic access including viruses and malicious software, and unauthorized physical entry to facilities and equipment; (iii) encryption of all Confidential Member Information that is transmitted over any external network or is stored, processed or managed on portable equipment or devices or in the case of smartphone  devices, alternate controls which offer the same degree of protection of encryption; and (iv) appropriate controls and access standards relating to safeguarding and limiting access to Confidential Member Information by Contractor personnel.

In the event of a theft, loss, or unauthorized access to any Personal Information or Confidential Member Information in Contractor's possession or control, promptly after learning of such matter (in no event more than five (5) business days after learning of the matter), Contractor shall notify the Authority and shall communicate to the affected current or former Members the legally required information applicable to Contractor and the Authority about such loss or disclosure and the applicable remedies. The notice to the Authority shall include a description of the matter that is sufficient to understand what has happened, and a statement as to what Contractor has done or plans to do to investigate the matter and to report the matter to and request the assistance of public authorities. The Authority shall cooperate as reasonably necessary and appropriate for Contractor to provide such notice. Contractor shall defend and indemnify the Authority and current or former Members with respect to any damages incurred or claims asserted by persons or entities as a result of any such loss, theft, or unauthorized access to or disclosure of Confidential Member Information, including providing, at Contractor's cost, credit monitoring services. The Authority may independently or in coordination with Contractor,

undertake or cause to be undertaken an investigation and report to and request the assistance of public authorities, including the MTA Police Department.

The relevant provisions of the New York Personal Privacy Protection Law (Article 6-A of the Public Authorities Law, the "PPPL") shall apply to this Agreement as if Contractor were an agency of the State of New York as defined therein. If, in connection with the performance of this Agreement, Contractor receives or otherwise has possession or control of information which, because of any name, number, symbol, mark or other identifier, can be used to identify a person ("Personal Information"), such Personal Information shall be received, maintained and used by Contractor solely for the purpose of performing this Agreement and for no other purpose, except as permitted or required by law. If Contractor receives a request for disclosure of Personal Information to any person or entity not expressly authorized under this Agreement, Contractor shall not comply with the request and shall instead promptly notify the Authority. If Contractor is required by law to comply with the request, to the extent lawful, Contractor shall delay complying with the request until Contractor notifies the Authority's General Counsel in the most expeditious manner possible (e.g., telephone, email, fax) and affords the Authority with the opportunity to lawfully oppose such request.

The provisions of Section 9.10 regarding Proprietary Information shall apply equally to Confidential Participant Information under this Section 5.2.

**5.3**    **Right to Audit.** The Authority shall have the right to conduct at any time during the Term of this Agreement, and within two (2) years after the termination or expiration of this Agreement, whether directly or through the appointment of a third party designated by the Authority, at its sole expense, examinations of all records regarding third party recoveries, enrollment, customer service telephone calls, Claims and Claim payments made under this Agreement, during Contractor's normal business hours. The Authority must provide Contractor with thirty (30) days, or in the case of Contractor fraud or misconduct twenty-four (24) hours, prior written notice of the Authority's intent to audit Contractor's Records. The Authority's audit rights shall not be restricted as to the amount of time or number of Claims included in any audit. Audits of Claims may include a review of contracts and pricing initiatives between Contractor and Providers with whom it, or any of its affiliates, agents, or subcontractors has a contract. Such audits will be designed to confirm payments have been made in accordance with this Agreement, the Plan, and Provider contracts. Any third party auditor shall be required to sign the Confidentiality of Healthcare Information Agreement, attached hereto as Exhibit F. The Authority shall conduct routine audits no more frequently than annually, unless material errors are found during the course of such audit; provided, however, that audits of the performance standards and audits undertaken to investigate fraud, criminal misconduct, or willful negligence shall not be counted toward this annual limit.

The Authority will provide Contractor with prior written notice (i) that the audit is requested; (ii) of the time period covered by the audit; and (iii) how the data is to be provided for the audit. In general, audits are designed to ensure (1) contract compliance, (2) that the interface system is working properly, (3) proper payment of claims where the Participant should have coverage or (4) proper rejection of claims where the Participant's coverage has terminated, and and (5) efficient and effective medical management. Contractor shall select and supply the auditor with the Records the auditor requests in the manner the auditor requests within fourteen (14) days of such request. Contractor will be liable for time or other costs Contractor incurs in association with an audit, including, but not limited to, the costs associated with providing personnel, systems access, or office space.

Contractor shall make the necessary modifications to its Claims administration processes in order to correct any specific deficient performance under this Agreement identified in the audits and to satisfy the Authority as to the implementation of such modifications.

5.4     **Audits by Regulatory Agencies**. The parties acknowledge that representatives of a regulatory, government, or accreditation agency may also inspect and audit Contractor's and the Authority's books and records.

The Authority and Contractor shall fully cooperate with representatives of each other, with independent accountants and consultants retained by the Authority, and with representatives of any regulatory, government, or accreditation agency, to conduct any inspection or audit.

5.5     **SSAE16 SOC Audits.** At least annually, Contractor shall conduct a SSAE16 SOC Type II audit and shall provide the results to the Authority no later than thirty (30) days after Contractor's receipt of the audit report, at no cost to the Authority. Contractor shall provide a copy of its current SSAE16 SOC Type II audit to the Authority prior to the Effective Date. Contractor represents and warrants that it shall promptly correct any specific deficiencies identified in any SSAE16 SOC audit.

5.6     **Ownership of Data.** All business documents and Records relating to Benefits under the Plan, including, but not limited to, all historical data, books of account,
enrollment records, general administrative records, patient records, and Benefits payment
information, are the sole property of the Plan.

## Article 6.     Indemnification

Contractor shall indemnify and hold harmless the Authority and the Plan, their agents, directors, officers, employees acting in the course of their employment, and their

respective successors and assigns from and against any losses, claims, fines and
penalties, damages, suits, liabilities, judgments or expenses (including reasonable
attorneys' fees) that arise directly or indirectly out of or result from any negligent,
willful misconduct, acts or inactions of Contractor or its directors, officers, employees,
affiliates, or contractors with respect to the terms of this Agreement and/or the services
being provided hereunder.

## Article 7.    Defense of Lawsuits

If a Participant commences any litigation, arbitration, or mediation, seeking recovery of
Benefits and/or other related damages against the Authority, the Plan, or Contractor, or
a combination thereof, ("Litigation") the following shall apply:

a.    If the suit is brought against Contractor, Contractor shall promptly notify the
      Authority of the pendency of such suit and shall defend the suit.

b.    If the suit is brought against Contractor and the Authority or the Plan,
      Contractor shall arrange for the defense of the suit so long as there are no
      conflicts of interest among the parties.

c.    If the suit is brought against the Authority and/or the Plan and Contractor is not
      a party, Contractor shall review the complaint with the Authority and the parties
      shall jointly determine how to proceed.

d.    Contractor shall be responsible for the legal costs and expense of any suit in
      which it has been named a party.

e.    In the event Contractor wishes to settle any suit when in its judgment it appears
      appropriate to do so, Contractor shall first consult with the Authority and obtain
      the Authority's prior written consent to any such settlement. Any suit settled by
      Contractor without the Authority's prior written consent shall be at Contractor's
      cost and expense.

f.    The Plan shall be liable for the full amount of any Claims payable under the
      Plan as the result of a judgment rendered by a court of competent jurisdiction
      pursuant to Litigation; provided, however, that in no event will the Authority,
      the Plan, or Contractor be liable for any indirect, special, incidental,
      consequential, exemplary, punitive, or other extraordinary damages resulting
      from or arising out of such Litigation. Contractor shall not be liable for any
      Claims payable under the Plan except as provided in sub-paragraph (e) of this
      Section 7.1.

## Article 8.    Term and Termination of the Agreement

**8.1    Term of the Agreement**. This Agreement shall continue in full force and effect
      for the duration of the Term unless terminated earlier as provided herein. At the

Authority's option, the Authority may extend the Agreement for two successive one-year periods measured from January 1, 2020. The option to extend the Agreement shall be exercised by written notice by the Authority to Contractor at least thirty (30) days prior to the expiration of the Agreement.

8.2    **Termination.** The Authority may terminate this Agreement, in whole or in part, at any time without penalty upon ninety (90) days prior written notice to Contractor. The Agreement shall automatically terminate if the Plan is terminated. In addition, the Agreement may be terminated during the Term in the manner set forth below:

a.    The Authority may terminate the Agreement by providing a written notice to the other party, which termination shall be effective immediately or at such later date set forth in the written notice, if the Contractor needs and has lost, has had suspended or has not secured a license, governmental approval, or exemption in accordance with applicable laws or regulations in order to enter into or perform this Agreement;

b.    The Authority may terminate the Agreement by providing a written notice to Contractor, which termination shall be effective immediately or at such later date set forth in the written notice, if the Contractor materially breaches this Agreement in any manner, including but not limited to a failure to meet, in a material respect, performance standards set forth in Exhibit C for more than two (2) consecutive calendar quarters, where such material breach continues for a period of thirty (30) days after written notice is given to the breaching party, specifying the nature of the breach and requesting that it be cured;

c.    The Authority may terminate the Agreement on ten (10) days written notice to Contractor in the event (i) Contractor shall apply for or consent to the appointment of a receiver, trustee, or liquidator for all or a substantial part of its assets; (ii) Contractor shall file a voluntary petition in bankruptcy; (iii) Contractor shall make a general assignment for the benefit of creditors; (iv) Contractor shall file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law; (v) or a court of competent jurisdiction enters an order, judgment, or decree, upon the application of a creditor, adjudicating Contractor bankrupt or insolvent or approving a petition seeking reorganization of Contractor, of all or a substantial part of its assets, and such order, judgment, or decree shall continue unstayed and in effect for a period of sixty (60) consecutive days.

d.    The Authority may terminate the Agreement effective immediately upon Contractor's material breach of its HIPAA Responsibilities as described in Exhibit E.

**8.3**  **Provision for Temporary Services.** If this Agreement is terminated or expires, the Authority shall have the option, by giving written notice to Contractor, to have Contractor continue to provide services hereunder and pursuant to the terms hereof for a period not to exceed one hundred and eighty (180) days. The fees for such 180-day period shall be the fees in effect at the time the option is exercised. Such notice shall specify the duration of the period of temporary services.

**8.4**  **Provision of Claims Run-Out Services Upon Termination or Expiration.** If requested by the Authority, upon termination or expiration of this Agreement, including termination following any period during which Contractor is performing temporary services pursuant to Section 8.3 (Provision for Temporary Services), Contractor shall continue to process and pay all Claims for the Run-Out Period incurred before the date of such termination or expiration, whether or not Claims for such services have been submitted before the date of termination or expiration or Contractor has made Claim payments for such services as of the date of such termination or expiration. The terms and conditions of this Agreement shall continue to apply to all services performed by Contractor during the Run-Out Period. Contractor shall also continue to administer all Benefits and apply all negotiated Network Provider rates for individuals who are hospitalized on the date of termination or expiration. Contractor's responsibilities to administer Benefits shall continue until (i) the date when the hospitalized individual becomes covered under another group health plan for the expenses associated with the hospital confinement, or (ii) the date the individual is discharged from the hospital, whichever occurs first. A final reconciliation concerning Claims payments, administrative fees, and any other amounts (including, but not limited to, credits for performance standards) shall be made within thirty (30) days after the last day of the Claims Run-Out Services. If the final settlement indicates that one party owes money to the other party, such amounts shall be paid within thirty (30) days of the completion of the final reconciliation.

**8.5**  **Plan Data.** Upon termination, in whole or in part, or expiration of this Agreement, Contractor shall transfer all appropriate and relevant Claim data, Records, books, and files to enable a successor entity to perform its functions, including, but not limited to, eligibility, paid Claims, authorizations and other information, in a frequency and format to be mutually agreed upon by Contractor and the Authority. Contractor shall fully cooperate in the orderly transfer of Plan documents and services and provide for transition of care support to include data reports of cases under management at the time of transition and telephonic review/transfer of select high risk cases. Contractor shall provide a process for referral and warm transfer of Participants (i.e., person-to-person transfers) between programs and vendors with associated tracking and reporting capabilities.

## Article 9.    General Provisions

9.1    **No Obligation to Continue Plan.** Nothing in this Agreement shall constitute an obligation on the part of the Authority to continue to offer Benefits to Participants, and the Authority retains the right to terminate or amend the Plan at any time, consistent with the terms of any other order or agreement that the Authority may be subject to.

9.2    **Non-Exclusivity.** Nothing in this Agreement shall be construed to be an exclusive arrangement for services, nor shall this Agreement prevent the Authority from entering into similar agreements or contracts with other entities during any term of this Agreement. The Contractor acknowledges and agrees that (i) Participants covered under this Agreement may be changed at any time at the sole discretion of the Authority, (ii) Participants may cease to be covered under this Agreement by voluntarily choosing other benefit plan options, vendors or programs, or as a result of a decision by the Authority to migrate portions of the Participants, based on geographic location or any other reason, to a different service provider, (iii) any such change in the Participants shall not affect the full enforcement of this Agreement for the remaining Participants, and (iv) the Authority does not guarantee a minimum number of Participants to be covered under this Agreement.

9.3    **Article Headings.** Headings of articles and sections in this Agreement are inserted for purposes of reference only and shall not limit or affect the meaning of any provisions hereof.

9.4    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but together they shall constitute one and the same instrument.

9.5    **Force Majeure.** Neither party shall be liable to the other in the event the operations of such party's facilities or any substantial portion thereof, are interrupted by war, fire, explosion, insurrection, riots, government requirement, civil or military authority, flood, the elements, earthquakes, acts of God, or other similar causes beyond its control ("Force Majeure Condition"), and the provisions of this Agreement (or such portions hereof as such party is thereby rendered incapable of performing) shall be suspended for the duration of such interruption. If any Force Majeure Condition occurs, the party delayed or unable to perform shall give immediate notice to the other party, stating the nature of the Force Majeure Condition and any action being taken to avoid or minimize its effect, and the party(ies) affected by the non-performing party's delay or inability to perform may elect to (i) suspend this Agreement for the duration of the Force Majeure Condition and (a) buy, sell, obtain or furnish elsewhere services to be bought, sold, obtained or furnished under this Agreement and (b) once the Force Majeure Condition ceases, resume performance under this Agreement and/or (ii) when the delay or non-

performance continues for a period of at least fifteen (15) days, terminate, at no charge, effective upon fifteen (15) days' prior written notice this Agreement relating to services not already performed. Each party will exercise its best efforts to mitigate the extent of any delay or failure and their adverse consequences caused by a Force Majeure Condition.

**9.6    Waiver of Provisions.** No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or waiver of any other breach or default.

**9.7    Notices.** Unless otherwise provided in this Agreement, any notice required or permitted under this Agreement shall be (i) delivered or mailed, Certified or Registered Mail, or sent for overnight delivery by use of a nationally recognized courier, to the other addressed as follows:

1.    If directed to the Authority's Representative:

**Angel Barbosa**

**Chief Procurement Officer**

**Metropolitan Transportation Authority**

**333 West 34th Street**

**New York, NY 10001**

2.    If directed to Contractor's Representative:

**Michael S. Copeck**

**Assistant Vice President and Actuary**

**Aetna Life Insurance Company**

**151 Farmington Ave**

**Hartford, CT 06516**

Such notice or demand shall be deemed effective on the date of receipt. The above addresses may be changed at any time by giving prior written notice as above provided.

**9.8**   **Relationship of the Parties.** Contractor is an independent contractor with respect to the Authority.

**9.9**   **Subcontracting.** Contractor shall not contract with other entities for the performance of any material services to be performed by Contractor hereunder without the Authority's prior written approval. For the purposes of this Agreement services that are material in nature to the services to be performed or the items to be delivered shall include: answering customer service inquiries, data entry, Claims adjudication, Overpayment recovery services, utilization management and case management. Contractor shall remain fully responsible and liable for performance of any such services to be performed by Contractor hereunder but subcontracted to other entities. Contractor represents and warrants that it and all of its affiliates, agents, and subcontractors will comply with all applicable laws, the terms of the Plan, and the terms of this Agreement in connection with the provision of services hereunder. Network Providers are not subcontractors under this Agreement.

**9.10**   **Proprietary Information.** The parties agree that each party may have access to the other party's Proprietary Information.

Except as otherwise provided in this Agreement, the parties agree that Proprietary Information of the other party will be maintained in strict confidence; will be used only for purposes of this Agreement; and will not be disclosed by the recipient party, its agents, or employees without the prior written consent of the other party. Each party agrees to take all reasonable precautions to prevent the disclosure of the other party's Proprietary Information.

Nothing contained in this Agreement may be construed as prohibiting either party's disclosure of Proprietary Information (other than to known actual competitors of the other party) to (i) its employees or employees of its parent company and subsidiaries and affiliates on a need-to-know basis; (ii) employees, agents, or representatives of the other party; or (iii) other persons (including consultants) in need of access to such information for purposes specifically related to either party's responsibilities under this Agreement.

The parties agree that upon the request of the party having proprietary rights to Proprietary Information, and subject to any statutory or regulatory record-keeping requirements, the party in possession of such information will promptly return it (including any copies, extracts, and summaries) to the requesting party or, with the other party's written consent, will promptly destroy it (including any copies, extracts, and summaries) and will provide the other party with written certification of same.

This Section 9.10 shall not apply to any information that either party can demonstrate (i) at the time of disclosure was either already known to the

receiving party (and not subject to a pre-existing confidentiality agreement) or publicly known; (ii) after the time of disclosure became publicly known through no fault of the receiving party; (iii) after the time of disclosure was received from a third party who did not indicate that the information was confidential; or (iv) the receiving party independently developed the knowledge without the use of the other party's Proprietary Information. In addition, a party will not be considered to have breached its obligations under this Section 9.10 for disclosing the other party's Proprietary Information to the extent required to satisfy any valid subpoena, court order, litigation, or regulatory request, any other legal requirement of a competent governmental authority or any request pursuant to New York State Freedom of Information Law, provided that following receipt of any such request, or making a determination that disclosure is legally required, and to the extent that it may legally do so, such party advises the other party before making such disclosure so that the other party may object to such disclosure, take action to ensure confidential treatment of the Proprietary Information, or take such other action as it considers appropriate to protect the Proprietary Information.

9.11    **Insurance.** Except as otherwise provided in this Agreement, Contractor shall procure, at its sole cost and expense, and shall maintain in force at all times during the term of this Agreement, through the final completion of contract, including the Warranty Period, if applicable, policies of insurance as herein below set forth, written by companies with an A.M. Best Company rating of A-/"VII" or better, and approved by the MTA and shall deliver evidence of such policies. These policies must: (i) be written in accordance with the requirements of the paragraphs below, as applicable; (ii) include a provision that the policy will not be canceled, materially changed, or not renewed unless at least thirty (30) days' prior written notice is provided to the MTA, c/o MTA Risk and Insurance Management Department - Standards, Enforcement & Claims Unit, 2 Broadway – 21st floor, New York, NY 10004; and (iii) state or be endorsed to provide that the coverage afforded under Contractor's policies shall apply on a primary and not on an excess or contributing basis with any policies which may be available to the MTA, and also that Contractor's policies, primary and excess, must be exhausted before implicating any MTA policy available. (iv) In addition, Contractor's policies shall state or be endorsed to provide that, if a subcontractor's policy contains any provision that may adversely affect whether Contractor's policies are primary and must be exhausted before implicating any MTA policy available, Contractor's and subcontractor's policies shall nevertheless be primary and must be exhausted before implicating any MTA policy available. Except for Professional Liability, policies written on a claims made basis are not acceptable. At least two (2) weeks prior to the expiration of the policies, Contractor shall endeavor to provide evidence of renewal or replacement policies of insurance, with terms and limits no less favorable than the expiring policies. Except as otherwise indicated in the detailed coverage paragraphs below, self-insured retentions and policy deductibles shall not exceed $100,000, unless such increased deductible or retention is approved by

the MTA. Contractor shall be responsible for all claim expense and loss payments within the deductible or self-insured retention on the same basis as would be the case if commercial insurance was available for the loss. The insurance monetary limits required herein may be met through the combined use of the insured's primary and umbrella/excess policies.

A.    **Workers' Compensation Insurance** (including Employer's Liability Insurance with limits of not less than $2,000,000, which limit may be met by a combination of primary and excess insurance) meeting the statutory limits of the laws of the state in which the work is to be performed.

B.    **Commercial General Liability Insurance** (I.S.O. 2001 Form or equivalent approved by the MTA) in Contractor's name with limits of liability in the amount of at least $3,000,000 each occurrence/$3,000,000 General Aggregate Limit (other than products-completed operations)/$3,000,000 Products/Completed Operations Aggregate Limit on a combined single limit basis for injuries to persons (including death) and damage to property. The limits may be provided in the form of a primary policy or combination of primary and umbrella/excess policy. When the minimum contract amounts can only be met when applying the umbrella/excess policy, the umbrella/excess policy must follow form of the underlying policy and be extended to "drop down" to become primary in the event primary limits are reduced or aggregate limits are exhausted. Such insurance shall be primary and non-contributory to any other valid and collectible insurance and must be exhausted before implicating any MTA policy available.

Such policy should be written on an occurrence form, and shall include:

- Contractual coverage for liability assumed by Contractor under this Agreement;
- Personal and Advertising Injury Coverage;
- Products-Completed Operations;
- Independent Contractors Coverage;
- Additional Insured Endorsement (I.S.O. Form CG 20 10 1185 version or equivalent approved by the MTA) naming The Metropolitan Transportation Authority including its subsidiaries and affiliates as additional insureds.

C.    **Professional Liability Insurance** covering actual or alleged acts, errors or omissions committed by Contractor, its agents or employees, arising out of the performance of this Agreement. The policy coverage shall also extend to include personal injury, bodily injury and property damage, alleged statutory violations, and negligent, intentional, fraudulent or criminal acts of Contractor, its agents or employees arising

from the performance of professional services and/or arising out of the Work. Professional Liability coverage shall extend to the following:

1) **Network Security and Privacy Liability.** The policy shall cover actual or alleged acts, errors, or omissions committed by Contractor, its agents or employees. The policy shall also extend to include the intentional, fraudulent or criminal acts of the Contractor, its agents or employees. The above policy(ies) shall expressly provide, but not be limited to, coverage for the following perils:

   - Unauthorized use/access of a computer system or database.
   - Defense of any regulatory action involving a breach of privacy or similar right.
   - Failure to protect from disclosure information that is deemed confidential by law or agreement (including both personal and commercial information).
   - Notification and remedial action costs in the event of an actual or perceived computer security or privacy breach, whether or not required by statute.
   - Network Business Interruption for reimbursement of loss of income and / or extra expense resulting from an interruption or suspension of computer system due to a failure of network security.
   - Data Asset Protection shall cover the costs to recollect, restore, or recreate electronic data, software or other applications that have been altered, corrupted, destroyed, deleted, or damaged by a computer attack.
   - Network Security Liability shall cover liability to a third party as a result of a failure of network security to prevent or mitigate a computer attack, whether that attack originated internally or externally.

2) **General Provisions, Professional Liability Coverages.** Each policy shall have limits of liability of at least $10,000,000 per claim. If said policy(ies) is subject to an aggregate limit, replacement insurance will be required if it is likely such aggregate will be exhausted. Defense costs must be in addition to the limit of liability.

The policy(ies) may contain a deductible / self-insured retention clause of a maximum of $250,000 which is the sole responsibility of Contractor. If the deductible/self-insured retention exceeds the maximum allowed, prior approval by the MTA is required. Such insurance shall be subject to the terms and conditions and exclusions

that are usual and customary for this type of insurance. Contractor shall be responsible for all claim expenses and loss payments.

If this insurance is provided on a claims-made basis, Contractor shall maintain continuous insurance coverage during the term of this Agreement, and in addition to the coverage requirements above, such policy(ies) shall provide that:

- Policy retroactive date coincides with or precedes the insured's initial services under the Agreement and shall continue until the termination of the Agreement (including subsequent policies purchased as renewals or replacements);
- Policy allows for reporting of circumstances or incidents that might give rise to future claims; and
- An extended Reporting Period of at least one year will be available and must be purchased in the event ongoing coverage is not maintained.

Contractor shall furnish evidence of all policies before any work is started to the MTA:

> c/o MTA Risk & Insurance Management
> Standards Enforcement & Claims Unit
> 2 Broadway – 21st Floor
> New York, NY 10004

Certificates of Insurance may be supplied as evidence of such aforementioned policies, unless otherwise noted herein. However, if requested by the MTA, Contractor shall deliver to the Agency within forty-five (45) days of the request a copy of such policies, certified by the insurance carrier as being true and complete. If a Certificate of Insurance is submitted it must: (1) be provided on the MTA Certificate of Insurance Form for Joint Agency Agreements; (2) be signed by an authorized representative of the insurance carrier or producer and notarized; (3) disclose any deductible, sub-limit, self-insured retention, aggregate limit or any exclusions to the policy that materially change the coverage; (4) indicate the Additional Insureds as required herein. Contractor must provide a *physical copy* of the Additional Insured Endorsement ( I.S.O. Form CG 20 10 1185 version or equivalent), as applicable and the endorsement(s) must include policy number(s); (5) reference the Agreement by number on the face of the certificate; and (6) expressly reference the inclusion of all required endorsements.

Nothing herein contained shall be deemed to limit Contractor's liability to the limits of liability, or coverage of Policies above, their renewals, or replacement.

If, at any time during the period of this Agreement, insurance as required is not in effect, or proof thereof is not provided to the MTA, the MTA shall have the option to: (i) direct Contractor to suspend work or operation with no additional cost or extension of time due on account thereof; or (ii) treat such failure as an Event of Default.

9.12    **Identification.** No identification of or references to the Authority or the Plan shall be used in any of Contractor's announcements, release of information, advertising or promotional efforts in reference to activities undertaken by Contractor under this Agreement without prior written permission from the Authority.

9.13    **Assignment.** No party may assign this Agreement or any of its rights or obligations whether by operation of law or other without the prior written consent of the other party, which the other party may grant or withhold in its sole discretion. In the event of a permitted assignment by a party, this Agreement will inure to the benefit of such party, its successors and assigns; otherwise, any other assignment or purported assignment by such party will be null and void.

9.14    **Compliance with Laws.** In performing the services set forth in this Agreement, Contractor shall comply with all applicable state, federal, and local laws, rules, and regulations, including, but not limited to, procurement of required permits, certificates, licenses, and insurance. Contractor shall have the responsibility for and bear the cost of non-compliance with any federal, state, or local rules, laws, or regulations as may apply to Contractor in connection with performance of its obligations under this Agreement.

9.15    **No Third Party Rights.** This Agreement is intended for the sole benefit of the Authority, the Plan and the Contractor. This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action, or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement.

9.16    **Invalid Provisions.** If any provision or portion of this Agreement is determined to be invalid, illegal or unenforceable, only such provision or portion thereof, and only to the extent determined to be invalid, shall be deemed omitted from this Agreement.

9.17    **Survival of Obligations.** The obligations of each party to the other under this Agreement, which by their nature would continue beyond the termination or expiration of this Agreement in whole or in part, shall survive termination or expiration of this Agreement.

**9.18**  **Offshore Services.** Contractor will not perform or contract with another entity to perform services under this Agreement outside of the United States without the Authority's prior written consent.

**9.19**  **Nondiscrimination.** In carrying out this Agreement, Contractor shall not discriminate in any manner against any Participant because of age, race, religion, color, sex, sexual orientation, national origin, disability, or health-related status.

**9.20**  **Modifications.** Any changes to this Agreement, or the Exhibits attached hereto, must be made in writing and signed by the parties hereto.

**9.21**  **Remedies Cumulative. Specific Performance**. Subject to the provisions of Article 11 (Disputes), the rights and remedies of the parties hereto shall be cumulative (and not alternative). The parties to this Agreement agree that to the extent permitted by applicable law, in the event of any breach or threatened breach by any party to this Agreement of any covenant, obligation or other provision set forth in this Agreement for the benefit of the other party to this Agreement, such other party shall be entitled (in addition to any other remedy that may be available to it) to: (i) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision; and (ii) an injunction restraining such breach or threatened breach. Neither party shall be required to provide any bond or other security in connection with any such decree, order or injunction or in connection with any related action or legal proceeding.

**9.22**  **Governing Law and Forum.** This Agreement shall be governed by the laws of the State of New York to the extent not preempted by federal law, without reference to any applicable conflict of laws or choice of laws provisions thereof. The parties agree that any and all claims asserted by or against the Authority arising hereunder or related hereto shall be heard and determined either in the courts of the United States located in New York City ("Federal Courts") or in the courts of the State of New York ("New York State Courts") located in New York County.

**9.23**  **Minority and Women-Owned Business Enterprise**. Contractor agrees to comply with the provisions of the MBE/WBE Business Enterprise program as attached as Exhibit H and to meet the established goal of awarding 0.0% percent (__%) of the total amount obligated under the Agreement to minority-owned and controlled firms and 0.0% percent (0.0%%) of the total amount obligated under the Agreement to women-owned and controlled firms (collectively, MBE/WBEs).

The parties agree that for this particular Agreement and RFP there is no specific requirement for MBE/WBEs contracts and relationships. The Parties agree that there is no need for Exhibit H which will stay named and included but without

any content. Both Parties agree that if there are any opportunities to contract with MBE/WBEs the Parties will assess the opportunity and engage if beneficial for the program in general.

**9.24** **Exhibits.** The following exhibits are an integral part of this Agreement and are incorporated herein by reference:

Exhibit A. Fees
Exhibit B. Funding of Benefits
Exhibit C. Performance Standards
Exhibit D. Reports
Exhibit E. Business Associate Agreement
Exhibit F. Confidentiality of Healthcare Information Agreement
Exhibit G. Geographic Service Areas
Exhibit H. MBE/WBE Business Enterprise Program-N/A
Exhibit I: Procurement Lobbying Disclosure
Exhibit J: Certification of Compliance with the Lobbying Law
Exhibit K: Employment Eligibility Verification
Exhibit L: New York State Comptroller Review Approval

**9.24** **Entire Agreement.** This Agreement along with all attachments constitutes the entire understanding and agreement of the parties regarding matters contained herein and supersedes any prior agreements and understandings, oral or written, between the parties. If there is any conflict between the terms and conditions of the Plan and the other terms and conditions of this Agreement, the Plan shall control.

**9.25** **Mutuality of Drafting.** This Agreement is the mutual product of Contractor and the Authority. Each provision of this Agreement has been subject to mutual consultation, negotiation, and drafting, and the language of this Agreement shall therefore be interpreted without regard to which party prepared this Agreement or any portion of this Agreement.

**9.26** **Statute of Limitations on Right to Sue the Authority/No Claim against Authority Officers, Agents or Employees**. No action shall lie or be maintained by the Contractor against the Authority upon any claim arising out of or based upon this Contract or by reason of any act or omission or requirement of the Authority or its agents, unless such action shall be commenced within six (6) months after the completion of the termination of the Contract. No additional time shall be allowed to begin anew any other action if an action commenced within the time herein limited be dismissed or discontinued, notwithstanding any provision in the New York Civil Practice Law and Rules ("CPLR") to the contrary. Nothing herein shall extend the time, as provided in the CPLR, to commence a lawsuit.

## Article 10.   Conflict of Interest

The Contractor represents that:

**10.1.**    No officer, director, employee, agent, or other contractor of the Metropolitan Transportation Authority, or its respective subsidiaries and affiliates (collectively the "Authorities") or a member of the immediate family or household of any of the aforesaid has directly or indirectly received or been promised any form of benefit, payment or compensation, whether tangible or intangible or in connection with the grant of this Agreement.

**10.2**    There are no undisclosed persons or entities interested with the Contractor in this Agreement. This Agreement is entered into by the Contractor without any connection with any other entity or person making a proposal for the same purpose, and without collusion, fraud or conflict of interest. No elected or appointed officer or official, director, employee, agent or other contractor of the Authorities, or of the City or State of New York (including elected and appointed members of the legislative and executive branches of government), or a member of the immediate family or household of any of the aforesaid:

   a.    is interested on behalf of or through the Contractor directly or indirectly in any manner whatsoever in the execution or the performance of this Agreement, or in the Services, supplies or work, to which this Agreement relates or in any portion of the revenues; or

   b.    is an employee, agent, advisor, or consultant to the Contractor or to the best of Contractor's knowledge any subcontractor or supplier to Contractor.

   As an exception to the above, the Authorities, in their sole discretion, may consent in writing to waive this provision with respect to an individual or entity if the Contractor provides the Authorities with a written request for such waiver, in advance, which identifies all of the individuals and entities involved and sets forth in detail the nature of the relationship and why it would not constitute a conflict of interest.

**10.3.**    Neither the Contractor nor any officer, director, employee, agency, parent, subsidiary, or affiliate of the Contractor shall have an interest which is in conflict with the Contractor's faithful performance of Contractor's obligations under this Agreement; provided that the Authorities, in their sole discretions, may consent in writing to such a relationship, provided Contractor provides the Authorities with a written notice, in advance, which identifies all the individuals and entities involved and sets forth in detail the nature of the relationship and why it is in the Authorities best interest to consent to such relationship.

**10.4**    The provisions of this Article are supplemental to, not in lieu of, all applicable laws with respect to conflict of interest or professional standard. In the event there is a difference between the standards applicable under this Agreement and those provided by statute or professional standard, the stricter standard shall apply.

**10.5**    In the event the Contractor has no prior knowledge of a conflict of interest as set forth above and acquires information which may indicate that there may be an actual or apparent violation of any of the above, the Contractor shall promptly bring such information to the attention of the Authorities. The Contractor shall thereafter cooperate with the Authorities' review and investigation of such information, and comply with the instructions Contractor receives from the Authorities in regard to remedying the situation.

## Article 11.  Disputes

**11.1**    In the event the Contractor and the Authority are unable to resolve any disputes arising under this Agreement, the Contractor may attempt to resolve the dispute in accordance with the procedure set forth in this Article. Exhaustion of these dispute resolution procedures shall be a precondition to any lawsuit by Contractor permitted hereunder.

**11.2**    The parties to this Agreement authorize the Disputes Resolution Officer ("DRO"), to be named later, acting personally, to decide all questions of any nature whatsoever arising out of, under or in connection with, or in any way related to or on account of, this Agreement (including claims in the nature of breach of the Agreement or fraud or misrepresentation before or subsequent to Agreement award) and the DRO's decision shall be conclusive, final and binding on the parties. The DRO's decision may be based on such assistance as s/he may find desirable, including advice of Contractor auditors or other experts. The effect of the DRO's decision shall not be impaired or waived by any negotiations or settlement offers in connection therewith, or by any prior decision of others, which prior decisions shall be deemed subject to review, by any termination or cancellation of this Agreement. All such disputes shall be submitted in writing by either party to the DRO, acting personally, for its decision, together with all evidence and other pertinent information in regard to such questions, in order that a fair and impartial decision may be made. The DRO shall render their decision in writing and deliver a copy of same to the parties.

**11.3**    If the Contractor protests the determination of the DRO, the Contractor may commence a lawsuit in Supreme Court, New York County under Article 78 of the New York Civil Practice Law and Rules, it being understood the review of the Court shall be limited to the question of whether or not the DRO's determination is arbitrary, capricious or so grossly erroneous as to evidence bad faith. No evidence or information shall be introduced or relied upon in such an

action or proceeding that has not been presented to the DRO personally prior to the DRO making their decision.

**11.4**    Neither the requirements of this Article nor the time necessary for compliance therewith, however, shall affect the time to have accrued for purpose of any statute controlling actions/proceedings against the Authority and the time of such accrual shall be determined without reference to this Article.

## Article 12.    General Representations and Warranties

In order to induce the Authority to enter into and perform this Agreement, Contractor represents and warrants to the Authority that:

**12.1**    **Existence; Compliance with Law**. The Contractor (i) if it is a corporation is duly incorporated, organized, validly existing and in good standing as a corporation under the laws of the jurisdiction of its incorporation; (ii) if it is a partnership, non-profit organization, individual or sole proprietorship is duly organized and validly existing under the laws of the jurisdiction in which it was organized; (iii) is duly qualified and in good standing under the laws of each jurisdiction where its existing ownership, lease, or operation of property in the conduct of its business requires, and (iv) has the power and authority and the legal right to conduct the business in which it is currently engaged and to enter into this Agreement.

**12.2**    **Authority**. The Contractor has full power, authority and legal right to execute, deliver and perform this Agreement. The Contractor has taken all necessary action to authorize the execution, delivery and performance of this Agreement.

**12.3**    **No Legal Bar**. The execution, delivery and performance of the Agreement do not and will not violate any provision of any existing law, regulation, or of any order, judgment, award or decree of any court or government applicable to the Contractor or the charter or by-laws of the Contractor or any mortgage, indenture, lease, contract, or other agreement or undertaking to which the Contractor is a party or by which the Contractor or any of its properties or assets may be bound, and will not result in the creation or imposition of any lien on any of its respective properties or assets pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement or undertaking.

**12.4**    **No Litigation**. Except as specifically disclosed to the Authority in writing prior to the date hereof, no claim, litigation, investigation or proceeding of or before any court, arbitrator or governmental authority is currently pending nor, to the knowledge of the Contractor, is any claim, litigation or proceeding threatening against the Contractor or against its properties or revenues (i) which involves the services provided under this Agreement or (ii) which, if adversely determined, would have an adverse effect on the business, operations, property

or financial or other condition of the Contractor. For purposes of this paragraph, a claim, litigation, investigation or proceeding may be deemed disclosed to the Authority if the Authority has received, prior to the date hereof, detailed written information concerning the nature of the matter involved, the relief requested, and a description of the intention of the Contractor to controvert or respond to such matter.

12.5    **No Default**. The Contractor is not in default in any respect in the payment or performance of any of its obligations or in the performance of any mortgage, indenture, lease, contract or other agreement or undertaking to which it is a party or by which it or any of its properties or assets may be bound, and no such default or Event of Default (as defined in any such mortgage, indenture, lease, contract, or other agreement or undertaking) has occurred and is continuing or would occur solely as a result of the execution and performance of this Agreement. The Contractor is not in default under any order, award, or decree of any court, arbitrator, or government binding upon or affecting it or by which any of its properties or assets may be bound or affected, and no such order, award or decree would affect the ability of the Contractor to carry on its business as presently conducted or the ability of the Contractor to perform its obligations under this Agreement or any of the other financing to which it is a party.

12.6    **No Inducement or Gratuities**.

    a.    Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon any agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by Contractor for the purpose of securing business.

    b.    Additionally, Contractor warrants that no gratuities or other inducements have been offered or given or will be offered or given (in the form of entertainment, gifts, offers of employment, or any other thing of value) to any official or employee of the Authority. The Contractor further warrants that during the term of the Agreement it shall not make any offers of employment to any Authority employee, or solicit or interview therefore, without obtaining the written approval of the employee's Department Head.

    c.    For breach or violation of the foregoing warranties, the Authority shall have the right to cancel the Agreement without liability or, at its discretion, to deduct from the fees or otherwise to recover the full amount of such commission, percentage, brokerage or contingent fee, or gratuities, and to include the occurrence of such a breach or violation in assessments of the Contractor's responsibility in future bids.

**12.7**    **Conflict of Interest**. Contractor covenants that neither it, nor any officer of the corporation or partner of the partnership, as the case may be if Contractor be a corporation or partnership, has any interest, nor shall it acquire any interest, either directly or indirectly, which would conflict in any manner or degree with the performance of the services hereunder. It further covenants that, in the performance hereof, no person having such interest shall be employed by it. It is expressly understood that breach of any of the covenants contained in this paragraph is a material breach hereof and shall entitle the Authority to recover damages immediately, as well as all monies paid hereunder.

**12.8**    **No Conviction or Indictment**. Contractor hereby represents that to the best of its knowledge neither it, nor any of its personnel or shareholders has been the subject of any investigation nor has any of them been convicted or indicted for commission of any crime involving misconduct, corruption, bribery, or fraud in connection with any public contract in the State of New York or any other jurisdiction, except as has been specifically disclosed in writing to the Authority, and that, should any such conviction or indictment be obtained or any such investigation commenced prior to the expiration of the term hereof, regardless of the date of the occurrence giving rise to the subject matter of such conviction, indictment or investigation, it will be disclosed in writing to the Authority.

****

It is agreed that each of the persons signing this Agreement represents and warrants that that person is a duly authorized officer, director or agent of the party on whose behalf the person is signing and further represents and warrants that the person signing has the power and authority to bind the party and that the party has the legal power to enter into this Agreement.

In Witness Whereof, this Agreement has been executed by the authorized representatives of the Authority and Contractor. This Agreement has been executed as of the dates written below.

**The Metropolitan Transportation Authority on behalf of itself and the New York City Transit Authority (NYCTA), Manhattan and Bronx Surface Transit (MaBSTOA), Metropolitan Transit Authority Bus Company (MTA Bus) and Staten Island Railway Transit Authority (SIRTOA), and the Plan**

By: _Angel Barb_

Print Name: _Angel Barbose_

Title: _Chief Procurement Officer_

Date: _12/21/16_

**[INSERT NAME OF CONTRACTOR]**

By: Aetna Life Insurance Company

Print Name: Michael L. Cooper

Title: ___Assistant Vice President and Actuary___

Date: ___December 20, 2016___

# Exhibit A
## Fees, Assumptions and Allowances

### I. Fees and Assumptions
#### A. Fees Self-Funded Medical Service and Fee Schedule
January 1, 2017 through December 31, 2017

| Administrative Fees Per Employee Per Month | Choice POS II | Open Access Aetna Select | Medicare Direct PPO |
|---|---|---|---|
| Assumed Enrollment | 27,401 | 17,524 | 13,686 |
| **Total Per Employee Per Month** | **$40.43** | **$42.89** | **$24.66** |

The fees above include expenses associated with processing runoff claims for one year following cancellation.

Aetna fees are based on the total number of employees enrolled in Aetna medical products.

**Split families fees:**

   a) When at least one Participant in the family is in a Medicare Advantage (MA) Plan, the Authority only pays an MA Premium for each Participant enrolled in an MA Plan and does not pay ASO fees for other family members.
   b) When the split family coverage involves only Non-MA Plans the Authority only pays one ASO Fee for the family which is the greatest ASO Fee based on the Plans in which Participants are enrolled. For example, if the Retiree Participant is in Medicare Direct PPO with an ASO of $24.66 and the Dependent Participant is in Aetna Select with an ASO Fee of $42.89, the Authority pays a total of $42.89 for the family.
   c) Split Family does not apply when Participant is Active because entire family is in the same active plan and only that plan's ASO fee is payable.

We guarantee that the second-year fees will increase over the first-year mature fees by no more than 3 percent. We also guarantee that the third-year fees will increase over the second-year fees by no more than 3 percent. We also guarantee that the fourth-year fees will increase over the third-year fees by no more than 3 percent and the fifth-year fees will increase no more than 3 percent over the fourth-year fees.

Customer has ability to market check annually.

| Included Services / Programs in Above Administrative Fees | Choice POS II | Open Access Aetna Select | Medicare Direct PPO |
|---|---|---|---|
| *Implementation & Communications* | | | |
| Designated Implementation Manager | Included | Included | Included |
| Open Enrollment Marketing Material (non-customized) | Included | Included | Included |
| Onsite Open Enrollment Meeting Preparation | Included | Included | Included |
| Standard ID Cards | Included | Included | Included |
| *General Administration* | | | |
| Experienced Account Management Team | Included | Included | Included |
| Designated billing, eligibility, plan set up, underwriting and drafting services | Included | Included | Included |
| Review or draft plan documents | Included | Included | Included |
| Summary of Benefits and Coverage (SBCs) | Included | Included | Included |

| | | | |
|---|---|---|---|
| Aetna Full Claim Fiduciary - Option 1 | Included | Included | Included |
| Aetna provides External Review | Included | Included | Included |
| ***Member and Claim Services*** | | | |
| Claim Administration | Included | Included | Included |
| Member Services | Included | Included | Included |
| Custom Out of Network Benefit Processing | Included | NA | Included |
| Aetna Voice Advantage | Included | Included | Included |
| Dedicated toll-free number | Included | Included | Included |
| Designated Service Center | Included | Included | Included |
| Plan Sponsor Liaison | Included | Included | Included |
| Special Investigations / Zero Tolerance Fraud Unit | Included | Included | NA |
| Aetna Concierge | Included | Included | NA |
| ***Network*** | | | |
| Network Access / Full National Reciprocity | Included | Included | NA |
| ***Care Management*** | | | |
| Utilization Management Inpatient Precertification | Included | Included | NA |
| Utilization Management Outpatient Precertification | Included | Included | NA |
| Utilization Management Concurrent Review | Included | Included | NA |
| Utilization Management Discharge Planning | Included | Included | NA |
| Utilization Management Retrospective Review | Included | Included | NA |
| Aetna Custom Case Management - Dedicated | Included | Included | NA |
| 1/2 Resource Social Worker | Included | Included | NA |
| Embedded Coach- Clinical Nurse | Included | Included | NA |
| Aetna Compassionate Care[SM] Program (ACCP) | Included | Included | Included |
| Infertility Case Management | Included | Included | N/A |
| Institutes of Quality Program (IOQ) (same benefits) | Included | Included | N/A |
| National Medical Excellence[®] | Included | Included | Included |
| Aetna Health Connections[SM] Disease Management | Included | Included | NA |
| Aetna Health Connections[SM] Disease Management (Designated Unit) | Included | Included | NA |
| MedQuery® | Included | Included | Included |
| MedQuery® with Physician Messaging | Included | Included | Included |
| Online Programs | Included | Included | Included |
| Personal Health Record | Included | Included | Included |
| Preventive Care Considerations (Electronic) | Included | Included | Included |
| Beginning Right[SM] Maternity Program | Included | Included | NA |
| Informed Health[®] Line - 24-hour Nurseline 1-800 # | Included | Included | Included |
| Simple Steps To A Healthier Life [®]- Health Assessment | Included | Included | Included |
| Aetna Healthy Actions (Incentive Reporting) | Included | Included | Included |
| ***Behavioral Health*** | | | |
| Managed Behavioral Health | Included | Included | NA |
| Aetna Behavioral Health Basic Conditions Management Program | Included | Included | NA |
| ***Web Tools*** | | | |
| DocFind[®] (online provider directory) | Included | Included | N/A |
| Aetna Navigator[®] - Member Self Service Web | Included | Included | Included |
| Web-Chat Technology - Virtual Assistant Ann | Included | Included | Included |
| Customized Website (via CCG) | Included | Included | Included |
| Health Decision Support – Basic | Included | Included | Included |
| ***Reporting*** | | | |
| 50 Hours of Ad Hoc Reports, Annual Restoration | Included | Included | Included |

| | | | |
|---|---|---|---|
| 1/2 AetInfo Resource Reporting | Included | Included | NA |
| Aetna Health Information Advantage™ | Included | Included | Included |
| e.Plan Sponsor Monitor™ - Level B Reporting (Standard Quarterly Utilization Reports) | Included | Included | Included |
| Monthly Financial Claim Detail Reports | Included | Included | Included |
| Monthly Banking Reports | Included | Included | Included |
| **Data Integration Services** | | | |
| Weekly Eligibility Feed to (1) External Vendor | Included | Included | Included |
| Integrating 3rd-party Pharmacy data to support repoting requirements | Included | Included | Included |
| Importing 3rd-party Pharmacy data to support care management programs | Included | Included | Included |
| **Aetna Discount Program** at home products, books, fitness, hearing, national products and services, oral health care, vision and weight management | Included | Included | Included |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## Exhibit A —Continued:

### B. Fee Assumptions

**Fee Guarantee Period**

The first-year fees for the period January 01, 2017 through December 31, 2017 are guaranteed as shown within the financial exhibits. Service fees in years 2 and 3 will increase annually by no more than 3 percent over the prior year mature fees. We guarantee that the fourth-year fees will increase over the third-year mature fees by no more than 3 percent. We also guarantee that the fifth-year fees will increase over the fourth-year fees by no more than 3 percent. Performance Guarantees are included.

**Underwriting Caveats**

If any of the changes outlined below occur, we reserve the right to recalculate your guaranteed fees, using the Guarantee Period formulas.

During the Guarantee Period we may recalculate:

1.  If, for any product:

    a.  There is a 20 percent increase/decrease in the number of enrolled employees in aggregate from our enrollment assumptions or from any subsequently reset enrollment assumptions.

    b.  The member-to-employee ratio increases/decreases by more than 15 percent. We have assumed a member-to-employee ratio of:
        -   2.65 for Aetna Choice POS II I(CPOS II)
        -   2.76 for Aetna Select – Open Access (AS-OA)
        -   1.48 for Medicare Direct Program

2.  Maximum account structure exceeds 750 units per product. Account structure determines the reporting format. During the installation process, we will work with you to finalize the account structure and determine which report formats will be most meaningful. Maximum total account structure includes Experience Rating Groups (ERGs), controls, suffixes, billing and claim accounts.

3.  A material change in the plan of benefits is initiated by MTA-New York City Transit Authority or by legislative or regulatory action.

4.  A material change in the claim payment requirements or procedures, claim fiduciary option, account structure or any other change materially affecting the manner or cost of paying benefits initiated by MTA-New York City Transit Authority or by legislative or regulatory action.

5.  There are any changes to the Aetna programs and services offered to MTA-New York City Transit Authority.

6.  MTA-New York City Transit Authority terminates any of our other products not addressed within this financial package including, but not limited to, fully-insured Medical products, and Voluntary Products and/or Pharmacy products.

7.  MTA-New York City Transit Authority places the products and services included in this multi-year fee guarantee out to bid, this guarantee is nullified.

8.  Legislation, regulation or requests of government authorities result in material changes to plan benefits, we reserve the right to collect any material fees, costs, assessments, or taxes due to changes in the law even if no benefit or plan changes are mandated.

If one or more of the circumstances identified above occurs, then the additional financial guarantees between us including, but not limited to, claim-based performance guarantees may also be modified or terminated in accordance with the financial conditions contained in those documents.

**Late Payment**

If the Authority fails to pay fees on a timely basis as provided in such Agreement, Contractor will assess a late payment charge. The current charges are:

—  late payments on service fees after 31 day grace period:  12.0 percent annual rate

Contractor reserves the right to collect any incurred late payment charges. These charges will be documented on the annual accounting.

**Contractor will notify the Authority of any change to late payment interest rates. The late payment charges described in this section are without limitation to any other rights or remedies available to Aetna under the Agreement or at law or in equity for failure to pay.**

## II. Allowances

- **Pre-Implementation/Implementation Allowance** – We have included a pre/post implementation audit allowance of up to a max of $300,000. This is in accordance with the revised specification request allocating of $75,000 per plan up to a max of 4 plans.  Allowance may be used towards reasonable pre / post implementation-audit related and enrollment services incurred during the first Guarantee period. These funds will be available as of the effective date of the period. We will pay implementation related expenses directly to the vendor once you send us the invoice(s) outlining the expenses you have incurred. Just submit your invoices within 60 days following the close of the policy period; otherwise you forfeit the funds.

We will pay any implementation allowance in accordance with applicable law. You should consult with your legal counsel and other advisors to determine if the implementation allowance, or other payments from us that offset or reimburse expenses, must be credited to plan assets, and accounting for reporting of such payments.

- **Claims Audit Allowance** – We are including a Claim audit allowance of up to a max of $200,000. This is in accordance with the revised specification request of allocating $50,000 per plan up to a max of 4 plans.  Allowance may be used towards reasonable claim-audit related services incurred during the first Guarantee period. These funds will be available as of the effective date of the period. We will pay claim audit related expenses directly to the vendor once you send us the invoice(s) outlining the expenses you have incurred. Just submit your invoices within 60 days following the close of the policy period; otherwise you forfeit the funds.

We will pay any claim audit allowance in accordance with applicable law. You should consult with your legal counsel and other advisors to determine if the Claim Audit allowance, or other payments from us that offset or reimburse expenses, must be credited to plan assets, and accounting for reporting of such payments.

A claim audit allowance of up to $200,000 is available in both the second and third Guarantee periods. The allowance is forfeited at the end of each year if not fully utilized (it is not rolled over for a cumulative amount).

- **Clinical Audit Allowance** – We are including a Clinical audit allowance of up to a max of $120,000. This is in accordance with the revised specification request of allocating $40,000 per plan up to a max of 3 plans.  Allowance may be used towards reasonable clinical-audit related services incurred during the first Guarantee period. These funds will be available as of the effective date of the period. We will pay clinical audit related expenses directly to the vendor once you send us the invoice(s) outlining the expenses you have incurred. Just submit your invoices within 60 days following the close of the policy period; otherwise you forfeit the funds.

We will pay any clinical audit allowance in accordance with applicable law. You should consult with your legal counsel and other advisors to determine if the clinical audit allowance, or other payments from us that offset or reimburse expenses, must be credited to plan assets, and accounting for reporting of such payments.

A clinical audit allowance of up to $120,000 is available in both the second and third Guarantee periods. The allowance is forfeited at the end of each year if not fully utilized (it is not rolled over for a cumulative amount).

- **General Fund and Wellness Allowance** – We are including a General Fund and Wellness allowance of up to a max of $600,000. This is in accordance with the revised specification request of allocating $200,000 per plan up to a max of 3 plans.  Allowance may be used towards reasonable wellness related services incurred during the first Guarantee period. These funds will be available as of the effective date of the period. We will pay wellness related expenses directly to the vendor once you send us the invoice(s) outlining the expenses you have incurred. Just submit your invoices within 60 days following the close of the policy period; otherwise you forfeit the funds.

We will pay any General fund/wellness allowance in accordance with applicable law. You should consult with your legal counsel and other advisors to determine if the general fund/wellness allowance, or other payments from us that offset or reimburse expenses, must be credited to plan assets, and accounting for reporting of such payments.

A general fund and wellness allowance of up to $600,000 is available in both the second and third Guarantee periods. Please note, the allowance of up to $600,000 is available for each year and is forfeited at the end of each year if not fully utilized (it does not get rolled over for a cumulative amount).

Any expense beyond the wellness allowance are the responsibility of the customer. Any amounts ("Wellness allowance") paid by Aetna to a plan sponsor to offset or reimburse such plan sponsor for any expense or cost incurred as a result of contracting with Aetna for benefits plan administration services, shall be paid in accordance with applicable law. You are advised to determine appropriate accounting for these payments with your own counsel or accountant. Any plan sponsor receiving a wellness allowance or other payments from us that offset or reimburse expenses that would otherwise be paid from plan assets, should consult with their ERISA counsel to determine if such allowance must be credited to plan assets, and for additional counsel regarding the accounting for reporting of such payments. We assume the funding of any wellness allowance is either at the request of your plan administrator acting in their fiduciary capacity to your plan or for the exclusive benefit of your plan.

**Underwriting Assumptions**

- Our quotation assumes our standard Agreement provisions and claim settlement practices apply unless otherwise stated.

- **Pricing and Underwriting Basis** – We have assumed that the proposed plan of benefits will be extended to the employee group(s) included on the census file that was submitted with the request for proposal. Our enrollment assumptions are shown on the attached financial exhibits. Our proposal assumes coverage will not be extended to additional employee groups without review of supplemental census information and other underwriting information for appropriate financial review.

- **Participation Requirement** – There is a minimum requirement of 500 enrolled employees for administration of the proposed products and services on a self-funded plan basis. However, any performance guarantee is contingent upon the total number of covered lives (i.e., the total number of MTA-New York City Transit Authority employees enrolled for coverage) outlined in our proposal.

- **Plan Design** – These products are offered subject to the terms of our Benefit Review Document.

- **Claim Fiduciary** – Our proposal assumes we have been delegated claim fiduciary responsibilities. As claim fiduciary, we will be responsible for final claim determination and the legal defense of disputed benefit payments. Our appeal administrative services are automatically included when we assume

claim fiduciary responsibility. The fee included for this service assumes a member-to-employee ratio range of 2.61+.

- **External Review** – We have included external review in our proposal. External review uses outside vendors who coordinate a medical review through their network of outside physician reviewers.

- **Non-ERISA** – For a non-ERISA plan, the risks and responsibilities are different from those under ERISA plans, since the ERISA preemption and ERISA standard of performance do not apply. Our charge for non-ERISA plans must take into account the additional liability risk as compared to known risks under an ERISA plan. An additional $0.35 per-employee, per-month is charged for non-ERISA plans and has been included in our fees as shown on the financial exhibits.

- **Eligibility Transmission** –we will receive eligibility information two times a month, from the Authorityand/or by your designated vendor.

- **Third-Party Audits** – We do not typically charge to recoup internal costs associated with a third-party audit. We reserve the right to recover these expenses if significant time and materials are required.

- **Mental Health/Substance Abuse Benefits** – Our quotation assumes that mental health/substance abuse benefits are included

- **Prescription Drug Benefits** – Our quotation assumes that prescription drug benefits are excluded. We have included pharmacy data integration from your third-party pharmacy vendor.

- **Medicare Direct** – We have assumed that Medicare eligible retirees will be enrolled in the Medicare Direct program. If this program is not offered to those eligible, an additional administration charge will apply to the monthly PEPM fees. Patient Management programs are excluded for Medicare eligible retirees. If you would like us to market this program directly to your retirees, an additional charge will apply.

**Additional Products and Services** – Costs for special services rendered that are not included or assumed in the pricing guarantee will be billed through the claim wire, on a single claim account, when applicable, to separately identify charges. Additional charges that are not collected through the claim wire during the year will either be direct-billed or reconciled in conjunction with the year-end accounting and may result in an adjustment to the final administration charge. For example, you will be subject to additional charges for customized communication materials, as well as costs associated with custom reporting, booklet and SPD

printing, etc. The costs for these types of services will depend upon the actual services performed and will be determined at the time the service is requested.

**Billing Information**

- **Advance Notification of Fee Change** – We will notify you of any fee change within 31 days of the fee change.

- **Claim Wire Billing Fees** – Claim wire billing fees refers to the portion of the total administrative expenses that will be charged through the claim wire as the services are rendered, and are subject to any future fee increases. These programs/services are excluded from the administrative fees as illustrated on the financial exhibit(s) and will not appear as part of the monthly billing statement.

**Claim and Member Services**

- **Policies and Claim Settlement Practices** – Our quotation assumes that our standard contract provisions and claim settlement practices will apply. If a material change is initiated by MTA-New York City Transit Authority or by legislative or regulatory action in the claim payment requirements or procedures, account structure, or any changes materially affecting the manner or cost of paying benefits, we reserve the right to adjust our proposal accordingly

- **Run-In Claim Processing** – Our proposal excludes run-in claim processing from the prior carrier (claims incurred before the effective date of the plan).

- **Run-Off Claims Processing** – The expenses associated with processing runoff claims following cancellation are covered for one year.

- **Medical EOB Suppression** – Unless required by state law, we do not produce EOBs for Aetna Choice® POS II, Open Access™ Aetna Select℠, and PPO claims when there is no member liability. Our claim system automatically suppresses an EOB where benefits are assigned and the member's liability is either zero or consists of a copayment only. Additionally, EOBs are always available electronically through Aetna Navigator.

- **Medical Service Center** – We have assumed that claim administration and member services for the quoted plans will be managed centrally by the Allentown, PA Service Center. Members will be able to reach the Member Service representatives Monday through Friday, from 8 a.m. to 8 p.m.

- **Patient Management Center** – Patient Management services for MTA-New York City is administered by the dedicated Care Advocate Team Service Center.

- **Alternate Office Processing (AOP)** – You have asked that we adjudicate all of your claims within the United States, and the additional cost for such on-shore adjudication is included in your fees. "Adjudication" may not include such ancillary services as pre-certification, imaging, the handling of provider inquiries and our internal application development and technical support, which is consistent with our standard claim determination and payment procedures. If you would like to modify this service, please contact your Aetna Account Executive. Additional financial detail and information is available on request.

- **Claims Subrogation** – We have entered into an agreement with Rawlings & Associates to provide comprehensive subrogation services. A contingency fee of 30 percent is retained upon recovery for self-funded customers.

- **Contracted Services** – A contingency fee up to 30 percent is paid to a vendor upon recovery of self-funded customers' claims for certain claim overpayment programs such as the following:

  – Coordination of benefits
  – Retroactive termination
  – Audits (Hospital, DRG, High Cost Drugs, etc.)
  – Duplicate Bills
  – Contract Compliance

- **Specialty Pharmaceutical Rebates** – We will retain (as compensation for our efforts in administering the Preferred Specialty Pharmaceutical Program) all specialty pharmaceutical rebates earned on drug claims that we administer and pay through the medical benefit rather than the pharmacy benefit.

**Institutes of Excellence™ Transplant Network** – As part of our National Transplant Program, a registered nurse is assigned to each member to assist with every phase of the transplant process, from evaluation through post-transplant recovery. The nurse coordinates care and assists your employees in accessing covered treatment through our contracted Institutes of Excellence (IOE) transplant network. The program also features dedicated claims and member services staff for special handling of patient claims and benefits issues. The IOE transplant network is our national network of facilities for transplants and transplant related services. Hospitals that are selected to participate in our IOE transplant network have met enhanced quality thresholds for volumes and outcomes. The charge is on a per transplant basis, whether or not an IOE facility is used. The charge is based on

your specific utilization. Billing is through the claim wire process at the rate of $2,500 when a member is wait-listed for a transplant and $7,500 when a member's transplant procedure is complete. We will waive this fee if your medical enrollment with us exceeds 10,000 employees.

**Legislative & Regulatory Requirements**

We believe this proposal to be compliant with all applicable state and federal laws, including health care reform.

- **Employer Reporting Requirements** – Under Internal Revenue Code (IRC) Section 6055 health insurance issuers, certain employers, government agencies and other entities that provide Minimum Essential Coverage (MEC) to individuals must report to the IRS information about the type and period of coverage and furnish related statements to covered individuals. This information is used by the IRS to administer the individual shared responsibility provision and by individuals to show compliance with the individual shared responsibility provision.

IRC Section 6056 requires large employers (those having employed an average of 50 or more full-time employees during the preceding calendar year) to report to the IRS information about the health care coverage they have offered and also furnish applicable statements to employees. The purpose is to allow the IRS to enforce the employer responsibility provisions.

Self-funded employers will be responsible for collecting and reporting the information to their employees. For the collection, they may use a combined form for their 6055 and 6056 reporting. Entities must file their 6055 and 6056 requirements to the IRS by no later than February 28 of the year following coverage (if filing on paper) or March 31 if filing electronically. A statement must be filed to the individuals by January 31 of the year succeeding the calendar year to which the return relates (i.e., January 31, 2016 for the 2015 plan calendar year).

- **Support for SBC Draft Documents** – At Metropolitan Transit Authority's request, Aetna will provide assistance in connection with the preparation of draft Summaries of Benefits and Coverage (SBCs) subject to the direction, review and final approval of MTA-New York City Transit Authority. The development of draft SBCs by Aetna will be based on the benefits information MTA-New York City Transit Authority has provided and existing plan information from our benefit source system. Aetna will include plan design information in the draft SBC relating to products or services administered under the Services Agreement by Aetna as well as any additional pharmacy or

behavioral health carve out information provided by MTA-New York City Transit Authority or its delegate. SBCs are not required for "retiree-only plans" as defined by the ACA and Aetna will not be supporting generation of SBCs for "retiree-only plans."

MTA-New York City Transit Authority has the responsibility to review and approve any SBCs and revisions thereto and to consult with MTA-New York City Transit Authority's legal counsel, at its discretion, in connection with said review and approval, as well as to disseminate the final SBC to Plan participants. Aetna has no responsibility or liability for the content or distribution of any of MTA-New York City Transit Authority's SBCs, regardless of the role Aetna may have played in the preparation of the documents. The production of SBCs will not be subject to Service or Performance Guarantees.

Aetna does not provide legal or tax advice, and recommends that plan sponsors consult with their own legal and tax counselors when making MEC and MV determinations. Aetna has no responsibility or liability regarding the minimum value or minimum essential coverage evaluation, regardless of the role we may have played in reviewing/producing the SBC documents.

- **Retiree Only Plan Status Certification** – Guidance issued by the Internal Revenue Service (IRS), and the U.S. Department of Labor (DOL), and Department of Health and Human Services (HHS) has indicated that "retiree only" plans are exempt from the benefit mandates under the ACA (Retiree only plans are subject to certain ACA fees and assessments). In order to demonstrate the establishment of a retiree only plan, a plan should maintain, separately from the plan for current (i.e., active) employees, a separate plan document and Summary Plan Description (SPD) and file a separate Form 5500. If you have a retiree only plan, and want to be considered exempt, please submit a retiree only certification form and required documentation to Aetna.

The benefits and fees within this proposal are subject to change pending any required approvals or future guidance from state or federal regulatory agencies. If you have questions, please contact your Sales/Account Executive. Aetna reserves the right to modify its products, services, rates and fees, in response to legislation, regulation or requests of government authorities resulting in changes to plan benefits and to recoup any material fees, costs, assessments, or taxes due to changes in the law even if no benefit or plan changes are mandated.

- **Waiting Period Requirement** – Under the ACA, when group health plans renew on or after January 1, 2014, they cannot apply a waiting period that exceeds 90 days. That means otherwise eligible plan participants and beneficiaries (employees and their dependents) must be able to elect coverage that becomes effective on a date that does not exceed 90 days.

  When renewing its plan(s) with Aetna, the plan sponsor represents the following:

– The plan sponsor will give us effective dates for its employees and dependents that take into account all state and federal eligibility conditions and waiting period requirements, including a reasonable and bona fide orientation period.

– If this information changes, the plan sponsor will inform us immediately.

  We will use this effective date information to enroll eligible employees and dependents into the group plan.

- **Orientation Period** – Under the ACA, when group health plans renew on or after January 1, 2014, a reasonable and bona fide orientation period can be imposed as a condition for eligibility for coverage under a plan before the waiting period begins (see Waiting Period Requirement information below). The final rule states the maximum length of the orientation period is one month.

  One month is generally determined by adding one calendar month and then subtracting one calendar day from an employee's start date in a position that is otherwise eligible for coverage.

  The orientation period is determined and administered by the plan sponsor prior to the start of the benefit waiting period, and is not tracked in Aetna systems.

# Exhibit B
# Funding of Benefits

The Authority will provide funds through a pushed Fed wire transfer for drafts clearing the bank under the self-funded arrangement as well as Claim Wire Billing items.

**Claim Wire Billing**

**Claim wire billing fees refers to the portion of the total administrative expenses that are charged through the claim wire as the services are rendered, and are subject to any future fee increases. Expenses that are charged through the claim wire include those described below as well as those fees that the parties may subsequently agree to add to the claim wire from time to time. Programs/services that are charged through the claim wire are excluded from the monthly PEPM Administrative Fees as illustrated above and will not appear on the monthly billing statement for PEPM Administrative Fees, but will appear in other monthly reports provided to the customer. Contractor will itemize each item with documentation satisfactory to the Authority.**

| Item<br>*Not included in the PEPM fees/services above.* | *Claim Wire Billing* |
|---|---|
| Subrogation | 30% of recovered amount will be retained |
| Coordination of Benefits, Retro Terminations, Medical Bill and Hospital Bill Audits, Workers Compensation, DRG and Implant Audits | 30% of recovered amount will be retained |
| National Advantage™ Program[1] | 50% of savings will be retained |
| Standard Facility Charge Review[1] | 50% of savings will be retained |
| NYCRA, ACO Fees, State Assessments/Taxes | |
| *Claim Wire Billing - Charged through the claim wire. Not included in the PEPM fees above.* | *Optional Services -Claim Wire Billing* |
| Aetna Oncology Solutions[SM] | $150 per month of active treatment |

[1]NAP is offered on CPOS II High, and CPOS II Basic Pre- Medicare, and CPOS II Plus.

When paid claims (cleared) have accumulated to more than $20,000, a request will be sent to The Authority requesting funds for the total paid claims from the previous day(s). In addition, there will be a month end close out request on the first banking day of each subsequent month which could be less than the $20,000 paid and cleared claim threshold.

The following banking reports will be provided to the Authority:

Claim Time of Wire Report
Monthly Claim Detail Report
Monthly Fund Summary Report

# Exhibit C
# Performance Standards

I.    **Aetna  Performance Guarantees – Medical**

<u>General Performance Guarantee Provisions</u>

Aetna Life Insurance Company, on behalf of itself and its affiliates ("Aetna", "our" or "we") provides health benefits administration and other services (set forth in this document) for the self-funded Medical plan(s) operated on behalf of The Metropolitan Transit Authority (also "you" or "your").

**Guarantee Period**

The guarantees described herein will be effective for the 12-month period from January 1, 2017 through December 31, 2017 (hereinafter "guarantee period").

The performance guarantees below will apply to the following self-funded medical plans serviced under the Administrative Services Only arrangement (through a 'Services Agreement' or 'Master Services Agreement', as the case may be, but each from this point on referred to as "Agreement").

- Aetna Choice POS II (CPOS II): High Option, Basic Options, and Plus Option
- Open Access Aetna Select

These guarantees **do not** apply to non-Aetna benefits or non-Aetna networks.

If we process runoff claims upon termination of the Agreement, the Turnaround Time, Financial Accuracy, and Total Claim Accuracy performance guarantees will not apply to runoff claims.

Full replacement and a minimum enrollment of 40,000 subscribers enrolled in an Aetna plan, this assumes the active population enrolled in the CPOS II Options and Open Access Aetna Select program and does not pertain to those enrolled in the Self-funded Medicare Direct program.

**Medical Service Guarantee Maximum**

The maximum medical service performance guarantee penalty adjustment will be equal to **56.0 percent** of actual collected administrative service fees.  Administrative service fees at risk exclude:

- Program fees at risk in the Demonstrating Value Scorecard
- Implementation/Communication/Wellness/Audit/Clinical/General fund Allowance(s)
- Charges for services performed which are not included on the monthly administrative service fee bill

**Aggregate Guarantee Maximum**

In no event will total collected administrative service fees be adjusted by more than **50.0** percent due to the results of this guarantee and all other guarantees combined. "Collected fees" means those fees collected for the guarantee period as of the time of the final reconciliation of the guarantee.

**Termination Provisions**

Termination of the guarantee obligations shall become effective upon written notice by Aetna in the event of one of the following occurrences:

i.    A material change in the plan initiated by The Metropolitan Transit Authority or by legislative action that impacts the claim adjudication process, member service functions or network management

ii.   Failure of The Metropolitan Transit Authority to meet its obligations to remit administrative service fees or fund claim payment wires under the Agreement

iii.  Failure of The Metropolitan Transit Authority to meet their administrative responsibilities (for example, a submission of incorrect or incomplete eligibility information)

These guarantees will not apply if you terminate your Aetna medical plan in whole or in part (defined as a 50 percent or greater membership reduction from the membership we assumed in this proposal) prior to the end of the guarantee period (December 31, 2017).

**Refund Process**

> We will provide you with final results for the performance guarantees when reporting is available after the end of the respective guarantee period. If necessary, we will provide a "lump sum" refund for any penalties incurred.

iv.

**Performance Objectives**

We believe that measuring the activities described below is an important indicator of how well we service your account. We're confident that the Claim Administration and Member Services provided to you will meet your high standards of performance. To reinforce your confidence in our ability to administer your program, we are offering guarantees in the following areas:

| Performance Category | Minimum Standard | Maximum Fees at Risk |
|---|---|---|
| **Implementation** | | |
| • Account Management Implementation Satisfaction | Average evaluation score of 3.0 or higher | 12.0% |
| • Accurate Implementation | 100% | 6.0% |
| • Enrollment Support | Standard information and marketing materials provided upon request | 1.0% |
| • ID Card Production & Distribution | 97% of ID cards mailed within 15 business days of receiving eligibility file | 1.0% |
| • Overall Implementation Satisfaction | Average evaluation score of 3.0 or higher | 1.5% |
| **Plan Sponsor Services** | | |
| • Eligibility Updates | 97.0% within 2 business days 100% within 5 business days | 1.0% |
| **Account Management** | | |
| • Overall Account Management | Average evaluation score of 3.0 or higher | 6.0% |
| • Management Reports | Paid claim reports within 45 days; Incurred claim reports within 90 days | 3.0% |
| **Claim Administration** | | |
| • Turnaround Time | 90.0% of claims processed within 14 *calendar* days | 1.5% |
| • Financial Accuracy | 99.0% | 1.5% |

| Performance Category | Minimum Standard | Maximum Fees at Risk |
|---|---|---|
| • Total Claim Accuracy | 95.0% | 1.5% |

| Member Services | | |
|---|---|---|
| • Member Appeals Resolution Turnaround Time | 95% | 2.0% |
| • First Call Resolution | 85.0% | 2.0% |
| • Telephone Service Factor | 80.0% within 30 seconds | 2.0% |
| • Abandonment Rate | 3.0% | 2.0% |
| Member Satisfaction | Positive response rate of 80% or higher | 2.0% |
| Network Management | | |
| • Network Communications | Will notify within 30 days | 5.0% |
| Navigator | | |
| • Activity Reports | Provide quarterly reports | 4.0% |
| • Online Availability | 99.0% | 1.0% |
| Total | | 56% |

## Implementation

Account Management Implementation Satisfaction Guarantee

**Guarantee:** We guarantee that the services (i.e., financial, eligibility, drafting, benefit administration and customer support) provided by the Field Office Account Management Staff during the implementation period will be satisfactory to you.

**Penalty and Measurement Criteria:** Via responses to Account Management survey , you agree to make us aware of possible sources of dissatisfaction throughout the implementation period. Your responses to the survey  will evaluate account management services in the following categories:

- technical knowledge
- professionalism
- proactive management
- accessibility
- responsiveness of personnel

Each category will be given a rating of 1 - 5 with 1 = lowest, 5 = highest. We will tally the results from the report card(s) when received. The results of the survey(s) are used to facilitate a discussion between you and your Account Executive regarding the results achieved and opportunities for improvement.

If the report card is not completed and returned within 15 days after the end of the implementation period, it is assumed that the service provided to you is satisfactory and the guarantee is deemed met. If the score on the report card average a 3.0 or higher, no credit is due. Satisfactory service would equal a score of 3.0 and would be based on the total average of 24 questions with a rating scale of 1 to 5. Should the score from the average report card fall below a 3.0 (meaning that service levels have not improved), we will make a mutually agreed upon reduction in compensation. The maximum reduction will be 12.0 percent of the guarantee period administrative service fees.

**Accurate Implementation Guarantee**

**Guarantee:** Aetna will guarantee 100% accuracy of medical set-up, testing, implementation of structure and benefit designs upon receipt of timely, accurate, complete and final benefit and/or structure information from The Metropolitan Transit Authority.

**Definition:** Timely, accurate, complete and final benefit and structure information is defined as the following:

1.   Updates will be received by Aetna plan set-up at least 90 days in advance of the effective date.
2.   Accurate, complete and final information submitted to Aetna plan set-up by The Metropolitan Transit Authority and the field Account Manager will be used as the source documentation.
3.   Systems will be coded in accordance with the documentation which is deemed to be final and submitted for processing. Updates coded in accordance with that documentation will be considered 100% accurate.
4.   If additional updates are received after the documentation that is deemed to be final, the performance guarantee is null and void for those additional updates.

**Penalty and Measurement Criteria:** We will reduce our compensation by 1.2 percent of the guarantee period administrative service fees for each full 1.0 percent that implementation accuracy drop below 100%. The maximum reduction will be 6.0 percent of the guarantee period administrative service fees. Our results will be used to determine whether the terms of the guarantee have been met.

**Enrollment Support**

**Guarantee:** We guarantee that we will provide standard web-based information that you can place on your intranet site and/or printed marketing materials in bulk shipment to you during Open Enrollment when requested.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for each full day that we fail to share web-based information and/or bulk mail marketing materials to you during Open Enrollment. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. The Account Executive in our servicing field office will keep track of the information shared and mailed to you during Open Enrollment.

**ID Card Production and Distribution**

**Guarantee:** We guarantee that 97 percent of ID cards will be produced and mailed within 15 business days following the receipt of complete, accurate, & viable electronic enrollment files to members.

**Penalty and Measurement Criteria:** We will reduce our compensation by 1.0 percent of the guarantee period administrative service fees if we fail to produce and mail ID cards to your members within 15 business days of receiving the enrollment eligibility file. Our implementation team records are used to determine whether ID cards were produced and mailed within the specified time frame.

**Overall Implementation Guarantee**

**Guarantee:** We utilize the implementation team concept to carefully coordinate all aspects of the implementation. An Implementation Manager is assigned to assemble your implementation team and develop an Implementation Management Plan for the conversion to the new plan of benefits. The Implementation Management Plan will outline the tasks and target dates for their completion.

Working with your team, the Implementation Manager will help determine the implementation priorities. As new information becomes available and priorities change, the Implementation Management Plan is updated. However, for the implementation to progress in a timely manner, you will be responsible for providing key information to the Implementation Manager as close to the target dates as possible (e.g., finalized account structure, finalized plan of benefits, accurate eligibility files, signed legal agreements).

This guarantee is effective for the implementation period in the first guarantee period. The implementation period begins at the initial implementation meeting and runs through the implementation sign-off.

**Penalty and Measurement Criteria:** Via timely responses to the attached Implementation Evaluation Tool (provided at the end of this guarantee section), you agree to make us aware of possible sources of dissatisfaction throughout the implementation period. Each question is given a rating of 1 - 5 with 1 = lowest, 5 = highest. We will tally the results from the evaluation tool when received. Your responses to the attached evaluation tool are used to facilitate a discussion between you, your Implementation Manager and your Account Executive regarding the results achieved. If the Implementation Evaluation Tool is not completed and returned within 30 days of receipt, it is assumed that the service provided to you is satisfactory and the guarantee is deemed met. If, at the end of the implementation process, the score of the final evaluation falls below a 3.0, (meaning that service levels have not improved) we will make a mutually agreed upon reduction in compensation. The maximum reduction will be 1.5 percent of the guarantee period administrative service fees.

**Plan Sponsor Services**

**Eligibility Updates**

**Guarantee:** We guarantee that 97.0 percent of non-Open Enrollment eligibility updates (defined as the number of electronic eligibility files updated) are processed within 2 business days of receipt of complete and accurate data. We also guarantee that 100.0 percent of non-Open Enrollment eligibility updates will be processed within 5 business days of receipt of complete, accurate and viable data (if a file requires adjustments the customer will be notified by e-mail as soon as the need is identified).

**Definition:** Complete enrollment/eligibility data is defined as employee name, address, provider selection, DOB, SSN, and covered dependent information (if applicable) as well as mutually agreed upon eligibility specifications. This guarantee is contingent upon the file being transmitted successfully to us (files received after noon ET will be considered as having been received on the next business day). Any eligibility file received which must be adjusted by us using a file fix will not be included in the reconciliation. The Electronic Report (ELR) is used to determine the completeness of the data provided by you.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.2 percent of the guarantee period administrative service fees for each full 1.0

percent that eligibility updates drop below 97.0 percent within 2 business days and 100.0 percent within 5 business days. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees. Our results will be used to determine whether the terms of the guarantee have been met.

**Account Management**

**Overall Account Management Guarantee**

**Guarantee:** We guarantee that the services (i.e., on-going financial, eligibility, drafting, benefit administration and continued customer support) provided by the Field Office Account Management Staff during the guarantee period will be satisfactory to you.

**Penalty and Measurement Criteria:** Via quarterly responses to the Account Management Evaluation, you agree to make us aware of possible sources of dissatisfaction throughout the guarantee period. Your responses to the evaluation tool will evaluate account management services in the following categories:

- technical knowledge
- professionalism
- proactive management
- accessibility
- responsiveness of personnel

Each category will be given a rating of 1 - 5 with 1 = lowest, 5 = highest. We will tally the results from the report card(s) when received. The results of the survey(s) are used to facilitate a discussion between you and your Account Executive regarding the results achieved and opportunities for improvement.

If all report cards based on the frequency of the guarantee are not completed and returned within 15 days after the end of the quarter, it is assumed that the service provided to you is satisfactory and the guarantee is deemed met. If the score on the first report card and the report card(s) for the subsequent survey(s) average a 3.0 or higher, no credit is due. Satisfactory service would equal a score of 3.0 and would be based on the total average of 24 questions with a rating scale of 1 to 5. Should the score from the first report card and the average of the remaining report card(s) fall below a 3.0 (meaning that service levels have not improved), we will make a mutually agreed upon reduction in compensation. The maximum reduction will be 6.0 percent of the guarantee period administrative service fees.
**Management Reports**

**Guarantee:** We guarantee that the quarterly Aetna Informatics (Aetna Health Information AdvantageTM ("AHIA")) reports will be available on the website within 45 days after the end of the reporting period. Incurred claims reports will be available on the website within 90 days after the end of the reporting period.

**Penalty and Measurement Criteria:** If we do not make the management reports available via the website during the guaranteed time frames, we will reduce our compensation. The maximum reduction will be 3.0 percent of the guarantee period administrative service fees. Our records are used to determine if the terms of this guarantee have been met.

**Claim Administration**

**Turnaround Time (TAT)**

**Guarantee:** We guarantee that the claim TAT during the guarantee period will not exceed 14 calendar days for 90.0 percent of the processed claims on a cumulative basis each year.

**Definition:** We measure TAT from the claimant's viewpoint; that is, from the date the claim is received in the service center to the date that it is processed (paid, denied or pended). Weekends and holidays are included in turnaround time. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** If the cumulative year TAT exceeds the day guarantee as stated above, we will reduce our compensation by an amount equal to 0.3 percent of the guarantee period administrative service fees for each full day that the TAT exceeds 12 calendar days for 90.0 percent of all processed claims. The maximum reduction will be 1.5 percent of the guarantee period administrative service fees.

If you have more than 3,000 enrolled members, a computer generated TAT report for your specific claims will be provided on a quarterly basis. If you have less than 3,000 enrolled members, results will be reported at the site level.

**Financial Accuracy**

**Guarantee:** We guarantee that the financial accuracy will be 99.0 percent or higher.

**Definition:** Financial accuracy is measured using industry accepted stratified audit methodology. The results are determined by calculating the financial accuracy for a subset of claims (a stratum) and then extrapolating the results based on the size of the population and combining with the extrapolated results of the other strata. Each overpayment and underpayment is considered an error; they do not offset each other. Financial accuracy includes both manual and auto adjudicated claims.

Dollars Paid Correctly
Total Dollars Paid

We then extrapolate the results based on the size of the population and combine them with the extrapolated results of the other strata.

**Penalty and Measurement Criteria:** We will reduce our compensation by an amount equal to 0.3 percent of the guarantee period administrative service fees for each full 1.0 percent that financial accuracy drops below 99.0 percent. The maximum reduction will be 1.5 percent of the guarantee period administrative service fees.

Our audit results for the unit(s) processing your claims are used. Those results include our performance in processing ALL customers' claims handled by the unit(s) in question during the guarantee period, not just your plan's claims. The results for this guarantee are calculated using industry accepted stratified audit methodologies.

**Total (Overall) Claim Accuracy**

**Guarantee:** We guarantee that the total (overall) claim accuracy will be 95.0 percent or higher.

**Definition:** Overall accuracy is measured using industry accepted stratified audit methodology. Accuracy in each stratum (a subset of the claim population) is calculated by:

Number of claims processed correctly
Total number of claims audited

We then extrapolate the results based on the size of the population and combine them with the extrapolated results of the other strata.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.3 percent of the guarantee period administrative service fees for each full 1.0 percent that total claim accuracy drops below 95.0 percent. The maximum reduction will be 1.5 percent of the guarantee period administrative service fees.

Our audit results for the unit(s) processing your claims are used. Those results include our performance in processing ALL customers' claims handled by the unit(s) in question during the Guarantee period, not just your plan's claims. The results for this guarantee are calculated using industry accepted stratified audit methodologies.

## Member Services

Member Appeals Resolution Turn Around Time

**Guarantee:** We will comply with Department of Labor appeal resolution time frames specified in the regulations. We guarantee that we will achieve 95 percent compliance on the Department of Labor appeals/grievances resolution time frames.

**Definition:** Percent of member appeals that we resolve within the specified Department of Labor (DOL) turn around times. TAT begins when the initial appeal is received at the designated appeal post office box and ends when the appeal decision upholding or denying the appeal is communicated to the member. This excludes provider appeals and appeals that are the responsibility of the plan sponsor or a vendor.

For plans offering 2 levels of appeal, the DOL turn around times for each category of appeal are shown below. (For plans offering only one level of appeal TATs are doubled.)
    Pre-Service Claim - 15 Calendar Days
    Urgent Care - 36 Hours
    Post Service Claims - 30 Calendar Days

In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers.  This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** We will reduce its compensation by 0.4 percent of the guarantee period administrative service fees for each 1.0 percent that compliance with DOL resolution time frames drop below 95 percent. There will be a maximum reduction of 2.0 percent of the guarantee period administrative service fees. Aetna's results will be used to determine whether the terms of the guarantee have been met.

**First Call Resolution Rate – Outbound Call Survey**

**Guarantee:** We guarantee that the first call resolution rate will be 85.0 percent or higher.

**Definition:** We will share the first call resolution results with you annually from the accountable unit that services you. We define the first call resolution rate as the percentage of member calls resolved on the first call as reported by the member during the outbound call survey. The rate is calculated based upon first calls where the issue was within our control to resolve.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.4 percent of the guarantee period administrative service fees for each 1.0 percent that the first call resolution rate falls below 85.0 percent. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees. Results of the Outward Bound Survey are used.

**Telephone Service Factor (TSF)**

**Guarantee:** We guarantee that the TSF for the phone skill(s) providing your customer service will not fall below 80.0 percent of all calls responded to within 30 seconds.

**Definition:** TSF measures the speed in which calls are answered by a Customer Service Professional (CSP) after being placed in queue by the auto attendant. This does not include the time the caller spent navigating through any auto attendant menus. TSF includes total calls (answered and abandoned) that are offered to CSPs. Interactive Voice Response (IVR) system calls are not included in the measurement of TSF. The TSF measure is a percentage of calls answered within 30 seconds. In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.4 percent of the guarantee period administrative service fees for each full percentage point that the cumulative TSF falls below 80.0 percent for calls to be answered within 30 seconds. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees. The phone skill(s) providing your customer service are used.

## Abandonment Rate

**Guarantee:** We guarantee that the average rate of telephone abandonment for the phone skill(s) providing your customer service will not exceed 3.0 percent.

**Definition:** The result is calculated as follows:

$$\frac{\text{Total number of calls abandoned}}{\text{Number of calls accepted into the skill}}$$

In the event there is an outage or when experiencing peak volumes, calls may be transferred to other Aetna call centers. This guarantee may not apply and a penalty may not be paid, if results are not achieved due to severe weather events which directly or indirectly impact performance during the guarantee period.

**Penalty and Measurement Criteria:** We will reduce our compensation by 0.4 percent of the guarantee period administrative service fees for each 1.0 percent that the average abandonment rate exceeds 3.0 percent. The maximum reduction will be 2.0 percent of the guarantee period administrative service fees. The phone skill(s) providing your customer service are used.

## Member Satisfaction

**Definition:** We guarantee a positive response rate of 80.0 percent better on the standard Aetna Performance Tracking Process. The survey is based on a randomly selected sample of actively enrolled Aetna Book of Business members aged 18-64. Interviews are conducted on a continuous basis throughout the year.

**Penalty and Measurement Criteria:** We will reduce our compensation by 2.0 percent of the guarantee period administrative service fees if we fail to meet a positive response rate of 80.0 percent or better. Results of the Aetna Performance Tracking Process are used as the measurement criteria. These surveys are performed based on statistically valid samples of members, by product, across all customers.

**Network Management**

**Network Communications:**

**Guarantee:** We will notify you in a timely manner regarding significant network changes in Aetna networks resulting from physician group and/or hospital terminations that impact 100 or more members within 30 days of effective date.

**Definition:** "Timely manner" means we will notify you at least 30 days prior to the effective date of the significant network changes. The guarantee is only for those network changes that are communicated to the Account Management Team within the 30-day timeframe. When circumstances surrounding the change make prior notification unreasonable (i.e. Aetna needs to be sensitive to Network Management's negotiation strategy with terminating facility/physician group), the Account Manager will notify you of the termination as soon as possible. "Significant change" means an expansion of a service area, addition of a hospital, or addition of a physician group which results in a 10% or greater increase in physician headcounts in a quarter; or any reconfiguration including termination of a hospital product withdrawal or physician group resulting in a 10% or greater loss of providers in a quarter.

**Penalty and Measurement Criteria:** Aetna will reduce its compensation by 5.0 percent (Scenario 1) of the annualized administrative service fees for failure to meet the terms of this guarantee. Aetna's Account Executive will use the Network Update tool to determine if the required notification was provided. Results are measured on a cumulative basis for the guarantee period. This applies to Aetna Select and Aetna Choice POS II networks with 100 or more Metropolitan Transit Authority members.

**Navigator**

**Navigator Activity Reports**

**Guarantee:** We will provide quarterly reports on the number of members who register and total logon counts for the Aetna Navigator® web site.

**Penalty and Measurement Criteria:** We will reduce our compensation by 4.0 percent of the guarantee period administrative service fees if we fail to provide quarterly reports. The data is shared at the customer specific level.

**Navigator Online Availability**

**Guarantee:** We guarantee that the Aetna Navigator® availability rate will be 99.0 percent or higher. Our Aetna Navigator website typically experiences approximately 360 minutes of downtime per quarter, or up to approximately 120 minutes of downtime per month. This is due to scheduled maintenance (typically performed one Sunday a month between 6 am and 7 am ET and does not include database maintenance.) Book-of-business measurements are used.

Penalty and Measurement Criteria: We will reduce our compensation by 0.2 percent of the guarantee administrative service fees for each 1.0 percent that Aetna Navigator is not available at least 99.0 percent of the total operational time. The maximum reduction will be 1.0 percent of the guarantee period administrative service fees.

## II.    *Medical Claim Target Guarantee*

We guarantee MTA – New York City Transit Authority's Net Effective Trend for each of the first three 12-month guarantee periods from January 01, 2017 through December 31, 2019. Outlined below is an illustration of the calculation for the guarantee period. *Dollar amounts are shown for illustrative purposes only.*

We guarantee your net effective trend for each of the first three 12-month guarantee periods from January 1, 2017 through December 31, 2019. Your active and pre-65 retirees employees are included in this guarantee. You'll find an example of the calculation for the guarantee period below. Dollar amounts are shown for clarifying purposes only.

Year 1 (January 1, 2017 through December 31, 2017)

| | | Total Replacement |
|---|---|---|
| **Proposed Product** - Total Replacement CPII/AS-OA | | |
| **Proposed Aetna Enrollment** of employees/ members | | 44,909 / 120,864 |
| Projection for the Guarantee Period (2017) | | **Factor** |
| Base Year Medical Incurred Claim (per member per year) | | $5,395 |
| Unit Cost Relativities | X | 0.9418 |
| Other | X | 1.0000 |
| Medical Management and Integration Savings Factor | X | 0.9668 |
| Trend factor | X | 1.0940 |
| 2017 Projected Claim Target (per member per year) | = | $5,374 |
| Net effective trend | | -0.39% |

Year 2 (January 1, 2018 through December 31, 2018)

| | | Total Replacement |
|---|---|---|
| **Proposed Product** - Total Replcement CPII/AS-OA | | |
| **Proposed Aetna Enrollment** of employees/ members | | 44,909 / 120,864 |
| Projection for the Guarantee Period (2018) | | **Factor** |
| Base Year Medical Incurred Claim (per member per year) | | $5,363 |
| Target Claim Trend[2] | X | 1.1040 |
| 2018 Projected Claim Target (per member per year) | = | $5,921 |
| Illustrative Net effective Trend (2018) | | 10.4% |

[2]Trend is illustrative and will be guaranteed at renewal

Year 3 (January 1, 2019 through December 31, 2019)

| | | Total Replacement |
|---|---|---|
| **Proposed Product** - Total Replacement CPII/AS-OA | | |
| **Proposed Aetna Enrollment** of employees/ members | | 44,909 / 120,864 |
| Projection for the Guarantee Period (2019) | | **Factor** |
| Base Year Medical Incurred Claim (per member per year) | | $5,921 |
| Target Claim Trend[2] | X | 1.1040 |
| 2019 Projected Claim Target (per member per year) | = | $6,537 |
| Illistrative Net Effective trend (2019) | | 10.4% |

[2]Trend is illustrative and will be guaranteed at renewal

Outlined below are the definitions of the items in the table(s) above.

**Base year medical incurred claim**

The base year medical incurred claims for Year 1 are for the January 1, 2016 through December 31, 2016 and paid through June 30, 2017. We will finalize your base year medical incurred claims using the data provided to us by your prior carriers. Please refer to the Addendum for the data needed.

For Year 2, the base year medical incurred claims will be set based on the Year One actual incurred claims PMPY with run-out.

For Year 3, the base year medical incurred claims will be set based on the Year Two actual incurred claims PMPY with run-out.

To ensure that we are comparing the base year and the projection year on the same basis, we adjust base year claims for:

- Differences in member to employee ratios from the baseline period to the projection period

- Changes in plan design from baseline period to projection period

- Changes in demographics and geography

- The increase in medical costs that comes with increases in your pre-65 retiree enrollment.

## Unit cost relativities

The unit cost relativities refer to the differential between Aetna's and the incumbent carrier's discounts (1-Aetna Discount %) / (1 – Incumbent Carrier Discount %). We guarantee the unit cost relativities at the time of quotation.

## Medical management and integration savings factor

The medical management and integration savings factor accounts for the decrease in medical costs due to:

Integration of our medical, pharmacy, radiology, behavioral health, dental and disability programs for you, as well as the savings opportunity for pharmacy integration with your Pharmacy Benefits Manager (PBM)

Our clinical and cost management programs (relative to your current vendors and programs)

## Net Effective Trend /Trend factor (Year 1)

Your trend factor is guaranteed at the time of quotation for year one as stated above. Trend for years 2 and 3 will be established no later than 90 days prior to the renewal date.

**Penalty reconciliation**

We compare the guaranteed net effective trend to the actual trend result to determine whether we meet the performance guarantee. Based on that outcome, we make any fee adjustments based on the table below.

| Actual Claims PMPY vs. Projected Claims PMPY | Fee Adjustment | Maximum Guarantee Period Adjustment |
|---|---|---|
| > 103% | 2.0% fee reduction to the per-employee, per-month fee for each full 1.0% of difference of actual claims above target claims plus the corridor | 25% |
| <= 103% | No Adjustment | N/A |

The Risk Fee Corridor is 1%

The maximum guarantee for this Medical Claim Target Guarantee is 25 percent of actual collected administrative service fees for the applicable guarantee period. Administrative service fees exclude program fees at risk in the Aetna Demonstrating Value Scorecard, Implementation/Communication/Wellness/Audit/Clinical/General fund allowances and any charges for services performed which are not included on the monthly administrative service fee bill. You need to let us know which guarantee you have chosen before the effective date.

**Aggregate Maximum**

**Total Replacement:** In no event will total collected administrative service fees be adjusted by more than **50.0** percent due to the results of this guarantee and all other guarantees combined. "Collected fees" means those fees collected for the guarantee period as of the time of the final reconciliation of the guarantee.

**Conditions for the guarantee**

We reserve the right to revise or remove the guarantee if any of the following conditions are not met.

- Accurate Information: We rely on information from you and your representatives in creating and reconciling the terms of this guarantee. If any of this information is inaccurate, it may have an impact on the net effective trend.

- Plan Options: We provided a total solution option replacing Empire and United it was assumed that we will receive pharmacy data on a bi-weekly format for analysis.

- Minimum Enrollment: You enroll a minimum of 40,000 employees in the quoted Aetna self-funded medical products.

- Group Size Variation: The enrolled group does not vary in size by more than 20 percent from the assumption. Our assumption is as stated in the above scenarios active and pre-65 retiree employees will enroll in our medical plans. COBRA, post-65 retirees and disabled employees are not included in this guarantee.

- Group Size Variation: The combined enrolled pre-65 retirees does not vary in size by more than two percent or comprise more than fifteen percent of the total Aetna covered group.

- Cost Factor Variation: The change in the projected cost factors related to the combination of geography, age, and gender in any site with at least 100 employees enrolled is less than 5 percent.

- Minimum Contribution Percentage: You contribute at least 50% of the total cost at each tier rate and your contribution percentage does not decline by more than 5 percentage points from the 2017 plan year by product.

- Minimum Plan Participation: At least 75% of eligible employees must participate in your plan or at least 50% when excluding those providing proof of enrollment in a spouse's plan.

- Large Claims: Claims per member per year paid in excess of $100,000 are excluded from the total incurred claims of both the base year and the guarantee period.

- <u>Benefit Plan Changes</u>: There are no changes to the products, programs, current or proposed benefit plans, and there is no change in government laws or regulations that have a material impact on claim costs.

- <u>Network Changes</u>: There are no substantial changes in the CPOS II,and AS network that services the (Metro NY) area, which could potentially affect the net effective trend. This includes, but is not limited to, the addition of a new participating hospital and/or termination of a participating hospital.

- <u>Group Composition</u>: You do not have any acquisitions or divestitures.

- <u>Involuntary Terminations</u>: We do not include employees whose continuation in Aetna's benefit options stems from an involuntary termination occurring after the effective date in this guarantee.

- <u>In-Network Utilization</u>: Your Aetna medical plans maintain a minimum in-network claim dollar utilization of 90% during the guarantee period.

- <u>Out of network reimbursement</u>: The National Advantage Plan will be included for the guarantee period.

- <u>Pharmacy Claims</u>: Pharmacy and Specialty Pharmacy claims are excluded.

- <u>Subrogation</u>: Our subrogation services through a third-party vendor are included.

- <u>Data Requirements</u>: The Medical Claim Target Guarantee is considered met if we do not receive all of the necessary information by December 15, 2017.

- <u>Coverage Termination</u>: The Medical Claim Target Guarantee is considered met if Aetna medical coverage is terminated by you prior toDecember 31, 2017.

- Assessment charges such as NY HCR charges are excluded from this guarantee.

**Benefit plan conditions for the guarantee**

We reserve the right to revise or remove the guarantee if any of the following benefit plan conditions are not met.

You include the following Medical Management Programs:

- Aetna Concierge
- Aetna Health Connections℠ disease management
- MedQuery®
- Online Disease Management
- Personal Health Record

**Addendum**

1.  To ensure effective execution of our medical management programs beginning on the effective date of January 1, 2017 we will need twenty-four months of prior carrier medical and pharmacy claim history. This would be a detailed claim history file by member.

    The first file should contain claims incurred and paid January 1, 2015 through October 31, 2016. (Note a second detailed claim file will be required as noted in #4 below.)

2.  Accurate member eligibility file(s) has been submitted to us and in our eligibility system 45 days prior to the effective date. This information is required to match a member's prior carrier medical and pharmacy information with members continuing on the Aetna plan.

3.  Summary of Benefits and Coverage (SBC) for each of the plans offered prior to moving to Aetna and any mid-year plan changes (if applicable).

You will need to send us the following information **after the effective date with dates noted** for each.

4.  The second detailed claim history file should contain claims incurred January 1, 2015 through December 31, 2016and paid through February 28, 2017. The data should be sent to us by March 15, 2017. There should be no gaps in data. As noted in #1 above, this detailed claim history file is to ensure effective execution of our medical management programs.

5.  Summarized Claim information –Two submissions of claim summary information as outlined in the following grid. The first submission of information is for a preliminary analysis of the data. It is also to make sure that the data given is based on the parameters set forth in this document. The second submission of information is for the actual reconciliation of the guarantee. The files should cover the following timeframes:

|  | Incurred time period | Paid time period | Date due to Aetna |
|---|---|---|---|
| **Initial request** | January 1, 2016 through December 31, 2016 | January 1, 2016 through December 31, 2016 | March 1, 2017 |
| **Second request** | January 1,2016 through December 31, 2016 | January 1, 2016 through June 30, 2017 | August 1, 2017 |

If we find that we need to more closely monitor the experience based on the first summary claim file, we may request an interim claim summary update prior to the final update used for the guarantee reconciliation.

- **Additional claim information details**

– We've attached an excel workbook with two sample formats (you only need to submit one) on how we would prefer to obtain the claim data. Data would be provided in a summary format, preferably in excel, and would include, by incurred month: paid medical claims, paid capitations (if applicable), employees and members. Claim summaries should be provided separately for each plan design and prior carrier. Pharmacy and specialty pharmacy claims should not be included.
– Claims should only represent active and pre-65 retirees members as post 65 retirees, COBRA, disabled members and employees on severance or leave of absence are excluded from the guarantee.
– We require information on large claims by plan for claims paid in excess of $100,000 per member. You should provide this information on medical claims only and on the same basis as the claim information in the initial and final extracts.

6. Membership information (in excel), by month (for the base year for the period: January 1, 2016 through December 31, 2016), that includes a listing of members showing gender, date of birth, zip code, plan design, COBRA indicator. In addition:

- Membership needs to represent all members regardless of whether they incurred a claim or not for the specific period.
- The plan design indicator for each member represents the plan design (i.e. basic, buy up, HMO, POS, PPO, etc.) and prior carrier.
  An indicator that allows us to exclude post-65 retirees, disabled members, COBRA and employees on severance or leaves of absence. The claim target only applies to active and pre-65 retiree members.

Prior_Carrier_Claim_
&_Member_Sample.xl

### III.    Aetna Custom Care Demonstrating Value Scorecard

**General Performance Guarantee Provisions**

Aetna Life Insurance Company, on behalf of itself and its affiliates ("Aetna", "our" or "we") provides health benefits administration and other services (set forth in this document) for the self-funded Aetna medical plans operated on behalf of The Metropolitan Transportation Authority (also "you" or "your").

**Performance Objectives**

We believe that measuring the activities described below is an important indicator of how well we service your account. To reinforce your confidence in our ability to administer your program, we have outlined below our guarantees for you Care Management Programs, which include:

- Aetna Health Connections℠ - Disease Management
- Financial Performance
- Member Satisfaction Surveys
- Custom Case Management - Dedicated
- Beginning Right℠ Maternity Program
- Case Management and Utilization
- Population-based Health

You may receive reporting throughout the year relative to utilization or operational data. The data contained in those reports may differ from the actual performance guarantee results due to the timing of the reports and/or auditing of performance guarantee results.

We have provided a program assuming full replacement with a minimum enrollment of 44,000 active subscribers enrolled in an Aetna plan.

|  | Minimum Standard | PEPM @ risk | | Total @ risk |
|---|---|---|---|---|
| **AHC-DM** | | | | |
| ▪ Opt Out Rate | less than 5% | $ | 0.10 pepm | $ 53,891 |
| ▪ Nurse Engagement Rate | 50% | $ | 0.10 pepm | $ 53,891 |
| ▪ Sustained Nurse Engagement | 60% | $ | 0.10 pepm | $ 53,891 |
| ▪ Depression Screening | 90% | $ | 0.10 pepm | $ 53,891 |
| **Clinical Outcome Improvement Rates** | | | | |
| ▪ Diabetic HbA1c testing | 75% | $ | 0.10 pepm | $ 53,891 |
| ▪ Asthma-controller medications | 80% | $ | 0.10 pepm | $ 53,891 |
| **Financial Performance** | | | | |
| ▪ Care Management ROI | 2:1 | $ | 8.83 pepm | $ 4,758,558 |
| **Case Management/Utilization Management** | | | | |
| ▪ Utilization Management Touch Rate | 85% | $ | 0.10 pepm | $ 53,891 |
| ▪ Depression Screening | 90% | $ | 0.10 pepm | $ 53,891 |
| **Member Satisfaction Surveys** | | | | |
| ▪ AHCDM; Beginning Right; CAT, IHL; CM | 90% | $ | 0.20 pepm | $ 107,782 |
| **Population-based Health** | | | | |
| ▪ Population Risk Improvement | 30% | $ | 0.20 pepm | $ 107,782 |
| ▪ Population Chronic Care - CAD | 55% | $ | 0.10 pepm | $ 53,891 |
| ▪ Population Readmission | 8.5% | $ | 0.20 pepm | $ 107,782 |
| **Care Advocate Team - Dedicated** | | | | |
| ▪ Discharge Planning | 95% | $ | 0.10 pepm | $ 53,891 |
| ▪ Case Management Plan | 95% | $ | 0.10 pepm | $ 53,891 |
| ▪ Preadmission Outbound Call | 95% | $ | 0.10 pepm | $ 53,891 |
| ▪ Post Discharge Outbound Call | 97% | $ | 0.05 pepm | $ 26,945 |
| ▪ Post Discharge Outreach Success | 40% | $ | 0.05 pepm | $ 26,945 |
| ▪ Case Management Pulse Screening Rate | 95% | $ | 0.10 pepm | $ 53,891 |
| ▪ Case Management High Claimant Screening | 97% | $ | 0.10 pepm | $ 53,891 |
| ▪ Annual Case Management Engagement | 1.5% | $ | 0.05 pepm | $ 26,945 |
| ▪ Engaged of Reach Rate | 93% | $ | 0.05 pepm | $ 26,945 |
| **Beginning Right Maternity** | | | | |
| ▪ Participation Rate | 90% | $ | 0.25 pepm | $ 134,727 |
| ▪ Engagement Rate | 85% | $ | 0.20 pepm | $ 107,782 |
| ▪ Post-partum Depression screening | 85% | $ | 0.20 pepm | $ 107,782 |
| **Total** | | $ | 11.68 pepm | |

Employees in above programs: 44,909

**Guarantee Period**

The guarantee period shall be represented as a one-year guarantee for the implementation of the programs and the year immediately following the implementation such as January 1, 2017 through December 31, 2017 and then shall be on an annual basis thereafter, upon the mutual agreement of the parties (hereinafter "guarantee period").

The performance guarantees shown below will apply to the incremental costs for each of the programs administered under the Administrative Services Only arrangement (through a 'Services Agreement' or 'Master Services Agreement', as the case may be, but each hereinafter referred to as 'Agreement'). The incremental costs for each of the programs are represented in the "amount at risk" column on the scorecard on page 2. These guarantees do not apply to non-Aetna benefits or networks.

Performance guarantees described herein will not apply if Agreement termination occurs prior to the end of the guarantee period. Performance guarantees are subject to enrollment requirements outlined below.

**Changes in Clinical Practice Guidelines**

Medical knowledge is dynamic and as research progresses the recommendations for evidence-based clinical guidelines change. Such changes may involve:

- A test, service or medication is no longer recommended
- A change in the frequency or intensity of a test or service, or dosage of a medication
- A change in the clinical goal or target
- A change in the specifications for the denominator population

When a recognized national organization changes clinical practice guidelines that impact performance guarantees, we reserve the right to amend or eliminate the performance guarantees. This is necessary because physicians will start to manage their patients in accordance with the revised guidelines. If a test, service or medication is no longer recommended, then the performance guarantee must be eliminated since we cannot recommend to physicians and patients to have a test done or take a medication that is no longer recommended. When the service continues to be recommended but at a different frequency or with a new target, Aetna must modify the associated metric accordingly.

We will notify you when such changes are being made. It may be necessary to recalculate performance for the baseline year to reflect changes in clinical target or specifications for denominator population. This is required to accurately calculate improvement from baseline.

**Population Risk Improvement Guarantee Period**

We mutually agree to a timeline in which an initial action period and a secondary action period will be established. During the first and second action periods, eligible members enrolled in the Aetna medical plan will be asked to participate in completing a Health Risk Assessment (HRA) and biometric screening. The timeline will have:

- Action periods of 2 or 3 month

- A first action period that is completed no later than 3 months after the plan's effective start date.

- A second action period that occurs 12 months after the first action period (the start and end dates of the second period will occur 12 months after the start and end dates of the first action period).

The guarantee period will begin at the start of the first action period during which members participate in taking the initial HRA and biometric screening, and will end at the close of the second action period during which members participate in taking the follow-up HRA and biometric screening.

**Population Chronic Care and Readmission Guarantee Periods**

The guarantee period for the Population Chronic Care and Readmission Guarantees shall be represented as a two-year guarantee for January 01, 2017 through December 31, 2018 and shall be on an annual basis thereafter, upon mutual agreement of the parties. The period January 01, 2017 through December 31, 2017 hereinafter shall be referred to as "year 1". The period January 01, 2018 through December 31, 2018 hereinafter shall be referred to as "year 2".

The guarantee(s) described herein will not apply if Agreement termination occurs prior to the end of the guarantee period. The guarantee(s) are subject to requirements outlined in the sections below including the Guarantee Parameters section.

**Demonstrating Value Scorecard Guarantee Maximum**

We agree to place at risk up to **$11.68 PEPM** of the collected Care Management programs guarantee period administrative service fees. The Care Management guarantee period administrative service fees will be calculated at the end of the respective guarantee period and will be based on the total number of your employees enrolled in the underlying medical plans that also offer the services of the programs for each guarantee period.

**Aggregate Guarantee Maximum**

In no event will the total collected administrative service fees be adjusted by more than **50.0%** of actual collected fees due to the results of this guarantee and all other guarantees combined. "Collected fees" means those fees collected for the guarantee period as of the time of the final reconciliation of the guarantee.

**Financial Conditions**

- If actual enrollment increases or decreases by 15%, Aetna retains the right to revise the performance guarantees.

- MedQuery® is an essential component of the disease management and must be included.

- This guarantee assumes that Aetna will receive, at a minimum, bi-weekly pharmacy data feeds.

- If you utilize an external vendor for onsite biometric screenings or other wellness programs, this guarantee assumes we will receive those external feeds, when data being collected by the external vendor has a material impact on the results of the performance guarantees outlined in this agreement.

- Members enrolled in the medical plans are also enrolled in the Aetna Health Connections Disease Management Program.

- This guarantee assumes that your under age 65 population is structured separately from the over age 65 population for accounting/reporting purposes with Aetna, as this guarantee excludes populations that are over age 65 with Medicare primary. If the two populations are not separate, we retain the right to revise the performance guarantees.

- This guarantee assumes the average member age of your enrolled Aetna medical plan participants is greater than 34.

- This guarantee assumes that your member/employee ratio is at least 2:1.

- This guarantee assumes a minimum of 44,000 Active subscribers enrolled in the Aetna plan.

- Member eligibility (complete, accurate and viable enrollment data; including member phone numbers) is fully loaded in Aetna's eligibility system 35 days prior to effective date.

- This guarantee assumes that we currently have or will receive a minimum of 24 months of prior carrier medical and pharmacy experience.

- For Aetna Health Connections Disease Management and/or MedQuery, medical claim and pharmacy history must be received by us in our stated acceptable format for data feeds within 45 days of the program effective date. If we do not receive acceptable file feeds within 45 days of the programs effective date, then the basis of the guarantee will be book-of-business results for the guarantee period. If an external Rx vendor is being utilized, ongoing bi-weekly feeds must be received by specified dates.

**Refund Process**

We will provide you with final results for the scorecard when reporting is available after the end of the respective guarantee period. Reporting that outlines associated savings for the contract period is estimated to be available at the end of the third quarter following the close of the respective guarantee period.  If the guarantees have not been met, at The Metropolitan Transportation Authority's sole discretion, Aetna shall (1) provide a cash payment to The Metropolitan Transportation Authority for the amount due as a result of Aetna's non-compliance within thirty (30) days of The Metropolitan Transportation Authority's receipt of such results or (2) reduce the following month(s)'s administrative fee payment by the amount due by The Metropolitan Transportation Authority. In no event will more than 100% of collected Care Management fees be refunded.

**Termination Provisions**

Termination of the guarantee obligations shall become effective upon written notice by us in the event of the one of the following occurrences:

i.    A material change in the plan initiated by The Metropolitan Transportation Authority or by legislative action that impacts the claims adjudication process, member services functions, medical management or network management

ii.   Failure of The Metropolitan Transportation Authority to meet its obligations to pay administrative services fees or fund claim payment wires under the Services Agreement

iii.  Failure of The Metropolitan Transportation Authority to meet its administrative responsibilities (for example, a submission of incorrect or incomplete eligibility information).

**These guarantees will not apply if you:**

- Terminate your Aetna Custom Care Management Solutions: Aetna Custom Case Management – Dedicated program prior to the end of the guarantee period.

- Terminate your Aetna medical plan in whole or in part (defined as a 50 percent or greater membership reduction from the membership we assumed in this proposal) prior to the end of the guarantee period, December 31, 2017.

**Aetna Health Connections** [SM] **– Disease Management Program (AHC – DM)**

**AHC-DM Opt Out Rate**

**Guarantee**:  We will guarantee an opt-out rate of no more than 5 percent in our AHC-DM program. Opt out is defined as:

$$\frac{\text{Members who opt out during a telephone call}}{\text{Total number of members identified for the DM Program}}$$

The Aetna Health Connections Disease Management Activity reports will be used to reconcile this guarantee annually. Results are calculated on a customer-specific basis. This guarantee assumes that you will have a minimum of 5,000 medical employees and 30 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- > 10 percent - We return 100 percent of the fee allocated to this component
- <10 percent, but > 5 percent – We return 50 percent of the fee allocated to this component

**AHC-DM Nurse Engagement Rate**

**Guarantee:  We will guarantee an engagement rate of 50 percent or better in its AHC-DM program. Engagement is defined** as:

<u>Cumulative RN engaged YTD *</u>
All members with outreach completed minus UTR **

* Includes unique cumulative members who participated in the highest level of intervention (nurse engagement) during the year
** Includes all unique cumulative members reached. (Calculation: enrolled w/RN engagement + supportive engagement)

The metric does not include unable-to-reach (UTR) members. Appropriate performance guarantee reports will be used to reconcile this guarantee annually. Results are calculated on a customer-specific basis. This guarantee assumes that you will have a minimum of 5,000 medical employees and 30 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 40 percent - We return 100 percent of the fee allocated to this component
- 40 percent, but < 50 percent - We return 50 percent of the fee allocated to this component

**AHC-DM Sustained Nurse Engagement**

**Guarantee:** A minimum of 60 percent nurse-engaged participants will complete a minimum of 3 nursing calls. This excludes members moved to the quarterly call program and those members that were identified in the last quarter.  Results are calculated on a customer-specific basis. This guarantee assumes that you will have a minimum of 5,000 medical employees and 30 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 50 percent - We return 100 percent of the fee allocated to this component
- 50 percent, but < 60 percent - We return 50 percent of the fee allocated to this component

**AHC-DM Depression Screening**

**Guarantee:**  We will guarantee that 90 percent of members 18 years or older enrolled that agree to engage in the DM Program will be screened for depression. Results are calculated on a customer-specific basis. This guarantee assumes that you will have a minimum of 5,000 medical employees and 30 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 85 percent - We return 100 percent of the fee allocated to this component
- 85 percent, but < 90 percent - We return 50 percent of the fee allocated to this component

**Clinical Performance**

**Guarantee:**  We will guarantee to maintain and/or improve the compliance levels of clinical outcomes for members identified with certain conditions. The clinical guarantees assume that we receives 24 months of prior carrier medical and pharmacy data to set a baseline for the guarantees. This medical and pharmacy data will be loaded into Aetna systems and the Care Engine.  Member claim data must be present for 10 months in the prior carrier data to be considered for the clinical guarantee metrics. The guaranteed targets for 2017 are as follows:
- Diabetic members –Diabetic members receiving an HbA1c test in the past 12 months.
    - **All diabetic members participating in the AHC-DM Program for a minimum of 6 months during the current guarantee period will achieve a minimum 5 percent improvement in the difference between the baseline compliance rate and the target compliance rate, up to 75 percent target compliance level, at which point the guarantee will be to maintain the target compliance**.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this guarantee as follows:

- If we achieve the target compliance level of 75%, we return none of the fee.
- If we do not achieve the target compliance level of 75% but do achieve a minimum five percent improvement between the baseline rate and the target rate, we return none of the fee.

- If neither of these conditions is met, we will return $0.10 per employee, per month.

- Asthmatic members —Asthmatic members using appropriate controller medications in the past 12 months.
  - **All persistent asthmatic members participating in the AHC DM program for a minimum of 11 months during the current guarantee period and identified as a persistent asthmatic for at least 6 months will achieve a minimum 5 percent improvement in the difference between the baseline compliance rate and the target compliance rate, up to an 80 percent target compliance level, at which point the guarantee will be to maintain the target compliance.**

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this guarantee as follows:

- If we achieve the target compliance level of 80%, we return none of the fee.
- If we do not achieve the target compliance level of 80% but do achieve a minimum five percent improvement between the baseline rate and the target rate, we return none of the fee.
- If neither of these conditions is met, we will return $0.10 per employee, per month

**Reconciliation example:**

If your baseline compliance rate is 50 percent and the target compliance rate for the metric is 70 percent, the guarantee will be to improve the rate from the current 50 percent to 51 percent in the following year [(70 percent-50 percent) * 5 percent].

In order to reconcile clinical outcome guarantees using customer-specific results, the customer must have at least 3,000 employees enrolled in the Aetna medical plan. Additionally, for any individual clinical outcome, there must be a minimum of 30 members participating to reconcile the outcome using customer-specific results. For customers with fewer than 3,000 employees or for an individual outcome for which there are less than 30 members participating, the Aetna book-of-business results will be used to reconcile the guarantee. All clinical outcome improvement guarantees will be reconciled annually using the Aetna Health Connections Disease Management Clinical Outcomes Report.

## Financial Performance

**Care Management ROI**

**Guarantee:** We will guarantee that the savings associated with the Care Management Program will be equal to two times the guarantee period administrative service fee of $9.33 per-employee, per-month (PEPM) to a maximum of the total fee. The guarantee fee includes:

- Concurrent review
- Precertification
- Aetna Custom Care Management Solutions: Aetna Custom Case Management - Dedicated
- MedQuery
- Disease Management (including MedQuery)
- Personal Health Record (PHR)

The guarantee will be reconciled annually using the Aetna Health Disease Management CC and HEM Report and the Program Savings Report. Customer-specific results will be used.

**Penalty and Measurement Criteria**: We will place $8.83 per employee, per month of the guarantee period administrative service fees at risk for this metric.

## Case Management and Utilization Management

**Utilization Management Touch Rate**

**Guarantee:** We will guarantee that 85 percent of all inpatient stays, excluding non-high-risk maternity stays, will be touched by at least one Utilization Management (UM) program. Customer-specific results will be used to reconcile the guarantee annually using the appropriate performance guarantee report. This guarantee assumes that you will have a minimum of 5,000 medical employees and 30 members available to measure for this metric or the guarantee will revert to book-of-business results.

Note: We offer several utilization management programs for members who have been (or will be) admitted to a hospital. A patient may have any, all or none of the programs extended based on a variety of criteria. Despite the possibility of having more than one program administered for a single inpatient stay, the utilization management touch rate only reflects a single program or "touch" by our nurses. For

example, if member 1 had concurrent review, member 2 had concurrent review and discharge planning, and member 3 had no programs, then the touch rate would be 2 touched members divided by 3 inpatient stays, or 66.7 percent.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for our Utilization Management Touch Rate guarantee as follows:

- < 75 percent - We return 100 percent of the fee allocated to this component
- 75 percent, but < 80 percent - We return 50 percent of the fee allocated to this component
- 80 percent, but < 85 percent - We return 20 percent of the fee allocated to this component

**Depression Screening**

**Guarantee:** We will guarantee that 90 percent or more of members 18 years or older that agree to engage in the Case Management program will be screened for depression. Customer-specific results for Case Management will be used to reconcile the depression screening guarantee annually using the appropriate performance guarantee report. This guarantee assumes that you will have a minimum of 5,000 medical employees and 30 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 85 percent - We return 100 percent of the fee allocated to this component
- 85 percent, but < 90 percent - We return 50 percent of the fee allocated to this component

**Member Satisfaction Surveys**

**We will guarantee an overall positive response rate of 90 percent or better on medical management program surveys administered during the guarantee period.** Member satisfaction surveys will be administered for each individual program and then averaged equally across the surveys to derive one overall member satisfaction survey result for 2017 (for instance, for a customer offering 3 surveys, each result would be blended equally 33.3%). The surveys will be administered on a book-of-business basis. Results are available on a calendar year basis only. Customer-specific surveys are available for an additional charge. A minimum of 500 survey respondents are required to use customer-specific results.

A minimum of 2 member satisfaction surveys must be administered. The survey results must be blended together to derive one member satisfaction rate that will apply to all surveys administered. For example: the AHC-DM survey generates a 92 percent satisfaction level and the Informed Health Line survey generates an 88 percent satisfaction level. The guarantee would be considered "met," as the blended average is 90 percent.

**Penalty and Measurement Criteria (for all member satisfaction surveys combined):** Member satisfaction surveys will be administered for each individual program and then averaged equally across the surveys to derive one overall member satisfaction survey result for 2017. If the combined result is less than 90%, we will pay $0.20 per employee, per month of the guarantee period administrative service fees back to the customer.

**Aetna Health Connections – Disease Management Program Participant Satisfaction**

**Guarantee:** We will guarantee a blended positive response rate of 90 percent or better on the program surveys administered during the guarantee period. The survey is based on a statistically valid, randomly selected sample size of AHC-DM participants ages 18 to 64.

**Beginning Right$^{SM}$ Maternity Management Program Participant Satisfaction**

**Guarantee:** We will guarantee a blended positive response rate of 90 percent or better on the program surveys administered during the guarantee period. The survey is based on a statistically valid, randomly selected sample size of maternity management participants ages 18 to 64.

**Informed Health$^\circ$ Line Program Participant Satisfaction**

**Guarantee:** We will guarantee a blended positive response rate of 90 percent or better on the program surveys administered during the guarantee period. The survey is based on a statistically valid, randomly selected sample size of Informed Health Line participants ages 18 to 64.

**CAT Program Participant Satisfaction**

**Guarantee:** We will guarantee a blended positive response rate of 90 percent or better on the customer-specific program surveys administered during the guarantee period. The survey assumes a 5 point scale with the top 3 responses viewed as positive. The survey is based on a statistically valid, randomly selected sample size of CAT participants ages 18 to 64.

## Population-based Health

**Population Risk Improvement**

We will guarantee a risk improvement for your members who complete an initial and secondary Health Risk Assessment (HRA) and biometric screening. Biometric screenings must include all the required biometric measures (BMI, blood pressure, blood sugar, LDL and triglyceride). Members showing risk improvement are those members identified as a high or medium risk at the time of their initial HRA and biometric screening who improve to a lower risk at the time of their second HRA and biometric screening.

A member's risk status is defined as follows:

Low risk = 0 – 3 modifiable risk factors identified in the HRA/biometric screening, Medium risk = 4 – 5 modifiable risk factors identified in the HRA/biometric screening, High risk = 6 or more modifiable risk factors identified in the HRA/biometric screening.

We guarantee a minimum percent of members ("target levels") will improve their risk status as follows from the first HRA/biometric screening completion to the second HRA/biometric screening completion:

| Completion rate[1]: Percentage of members who complete the HRA/biometric screenings | Target levels: Guaranteed minimum percentage of members who will improve from a high or medium risk to a lower risk |
|---|---|
| 0% to 49.99% | Not applicable |
| 50% to 69.99% | 20% |
| 70% to 89.99% | 25% |
| 90% to 100% | 30% |

[1]Completion rate = <u>Members who complete the HRA/biometric screening in both the 1st and 2nd action periods</u>
Total members eligible to participate in the HRA/biometric screening

The numerator and denominator will include only those members:

- Continuously enrolled in the Aetna medical plan from the first action period through the second action period

- Eligible to take the HRA and biometric screening

**Penalty and Measurement Criteria**: We will place $0.20 per employee, per month of the guarantee period administrative service fees at risk for this metric.

**Population Chronic Care**

For the measures itemized in the table below, we guarantee achieving in year 2: (1) the target, if the measure in year 1 is at the minimum target or higher (or at the maximum target or lower), or (2) a minimum 5 percent improvement in the measure from year 1 to year 2, relative to the target, if the measure in year 1 is below the minimum target (or above the maximum target). The minimum improvement from year 1 to year 2 is calculated as 5 percent of the difference between the target and the measure in year 1. Reconciliation examples are provided in the next section.

The members counted in this measure are those members: (1) identified as having the chronic condition for at least 6 months, and (2) enrolled for at least 11 months in each period reported.

| Guarantee measure | Minimum Target |
|---|---|
| • CAD members using statins | 55% |

**Reconciliation example for measures with minimum targets**

If the measure in year 1 is 81 percent and the minimum target is 80 percent, the guarantee will be to maintain the measure in year 2 at 80 percent or greater.

If the measure in year 1 is 60 percent and the minimum target is 80 percent, the guarantee will be to improve the measure from 60 percent in year 1 to 61 percent or greater in year 2:

$$61 \text{ percent} = 60 \text{ percent} + (80 \text{ percent} - 60 \text{ percent}) \times 5 \text{ percent}.$$

**Reconciliation of guarantee(s)**

Year 1 will be a guarantee report period only. The guaranteed measure(s) will be reconciled after the end of year 2.

Customer-specific results will be used to reconcile the guarantee.

In order to reconcile the chronic care guarantees, you must have at least 3,000 employees enrolled in the Aetna medical plan. Additionally, there must be a minimum of 30 members identified as having the applicable condition in both year 1 and year 2.

We retain the right to revise or void the guarantee(s) if the guarantee requirements or parameters are not met.

**Penalty and Measurement Criteria**: We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for this metric.

**Population Readmission**

We guarantee achieving in year 2: (1) the 8.5 percent target readmission rate, if the readmission rate in year 1 is at 8.5 percent or lower, or (2) a minimum 25 percent improvement (reduction) in the readmission rate from year 1 to year 2, relative to the 8.5 percent target rate, if the readmission rate in year 1 is above 8.5 percent. The minimum improvement (reduction) from year 1 to year 2 is calculated as 25 percent of the difference between the rate in year 1 and the 8.5 percent target rate. Reconciliation examples are provided in the next section.

**Reconciliation example**

If the readmission rate in year 1 is 8.4 percent, the guarantee will be to maintain the rate in year 2 at a minimum of the 8.5 percent target rate.

If the readmission rate in year 1 is 9.5 percent, the guarantee will be to improve (reduce) the rate from 9.5 percent in year 1 to 9.25 percent in year 2:

$$9.25 \text{ percent} = 9.5 \text{ percent} - (9.5 \text{ percent} - 8.5 \text{ percent}) \times 25 \text{ percent}.$$

**Reconciliation of guarantee**

Readmission cases counted in each year are acute inpatient hospital readmissions which occur within a 30 day period of the initial admission for all causes other than maternity, chemotherapy, trauma, and planned readmissions. The members counted for the guarantee are those members who, during the year being evaluated, are those members ages 18 to 64 who are enrolled for at least 11 months. Both the initial admission and the readmission must occur during the year being evaluated.

Year 1 will be a guarantee report period only. The guarantees will be reconciled after the end of year 2. The average member age of your enrolled Aetna medical plan participants is less than 43. In addition, there must be a minimum of 150 acute inpatient admissions in both year 1 and year 2.

If the guarantee parameters are satisfied, customer-specific results will be used to reconcile the guarantee. Otherwise a book-of-business result will be used in place of your results to reconcile the guarantee.

**Penalty and Measurement Criteria**: We will place $0.20 per employee, per month of the guarantee period administrative service fees at risk for this metric.

<u>Aetna Custom Care Management Solutions: Aetna Custom Case Management - Dedicated</u>

**Discharge Planning**

**Guarantee:** We will guarantee that 95 percent of cases targeted for discharge planning will have activity documented in Aetna Total Clinical View (ATV), for instances where an inpatient length of stay is greater than 3 days. Members managed by other clinical areas (for example, Beginning Right maternity) are not included in this guarantee. Customer-specific results will be used to reconcile the guarantees annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for our Discharge Planning guarantee as follows:

- < 80 percent – We return 100 percent of the fee allocated to this component
- 80 percent, but < 90 percent - We return 50 percent of the fee allocated to this component
- 90 percent, but < 95 percent - We return 20 percent of the fee allocated to this component

**Case Management Plan**

**Guarantee:** We will guarantee that 95 percent of cases accepted for case management will have a documented case management plan within 7 business days of the start of the event. Members managed by other clinical areas (for example, Beginning Right maternity) would be managed separately and not included in this guarantee. Customer-specific results will be used to reconcile the guarantees annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for our Case Management Plan guarantee as follows:

- < 80 percent - We return 100 percent of the fee allocated to this component
- 80 percent, but < 90 percent – We return 50 percent of the fee allocated to this component
- 90 percent, but < 95 percent – We return 20 percent of the fee allocated to this component

**Preadmission Outbound Call**

**Guarantee:** We will guarantee 2 outreach attempts and an unable to reach letter to 95 percent of members targeted for a preadmission call. This applies to all elective admissions when notified 5 business days prior to a scheduled elective inpatient event. This guarantee excludes maternity, newborns, behavioral health, coordination of benefits (COB), Medicare, skilled nursing facility (SNF), transplants (NME) and rehabilitation admissions. Customer-specific results will be used to reconcile the guarantees annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for our Preadmission Outreach Call Rate guarantee as follows:

- < 80 percent - We return 100 percent of the fee allocated to this component
- 80 percent, but < 90 percent - We return 50 percent of the fee allocated to this component
- 90 percent, but < 95 percent - We return 20 percent of the fee allocated to this component

**Post Discharge Outbound Call**

**Guarantee:** We will guarantee 2 outreach attempts and an unable to reach letter to 97 percent of members within 5 business days. This guarantee excludes maternity, newborns, behavioral health, coordination of benefits (COB), Medicare, skilled nursing facility (SNF), transplants (NME) and rehabilitation admissions. This assumes timeliness of notification of a discharge by a facility provider (defined as notification of discharge within 48 hours or first business day, whichever is sooner). Customer Specific results will be used to reconcile the guarantees annually using the appropriate plan sponsor reporting templates.

**Penalty and Measurement Criteria:** We will place $0.05 per employee, per month of the guarantee period administrative service fees at risk for our Post Discharge Outbound Call Rate guarantee as follows:

- < 82 percent - We return 100 percent of the fee allocated to this component
- 82 percent, but < 92 percent - We return 50 percent of the fee allocated to this component
- 92 percent, but < 97 percent - We return 20 percent of the fee allocated to this component

**Post Discharge Outreach Success**

**Guarantee:** We will guarantee to engage 40% of members discharged. Customer Specific results will be used to reconcile the guarantees annually using the appropriate plan sponsor reporting templates.

**Penalty and Measurement Criteria:** We will place $0.05 per employee, per month of the guarantee period administrative service fees at risk for our Post Discharge Outreach Success Rate guarantee as follows:

- < 30 percent - We return 100 percent of the fee allocated to this component
- 30 percent, but < 35 percent - We return 50 percent of the fee allocated to this component
- 35 percent, but < 40 percent - We return 20 percent of the fee allocated to this component

**Case Management Pulse Screening**

**Guarantee:** We will guarantee a 95 percent screening rate with a PULSE score of 10 or more. Customer- Specific results will be used to reconcile the guarantees annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for our Case Management Screening Rate guarantee as follows:

- < 80 percent - We return 100 percent of the fee allocated to this component
- 80 percent, but < 90 percent - We return 50 percent of the fee allocated to this component
- 90 percent, but < 95 percent - We return 20 percent of the fee allocated to this component

**Case Management High Claimant Screening**

**Guarantee:** We will guarantee that 97 percent of members with claims in excess of $50,000 will be screened for case management. Customer Specific results will be used to reconcile the guarantee annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria:** We will place $0.10 per employee, per month of the guarantee period administrative service fees at risk for our High Claimant Screening Rate guarantee as follows:

- < 82 percent - We return 100 percent of the fee allocated to this component
- 82 percent, but < 92 percent - We return 50 percent of the fee allocated to this component
- 92 percent, but < 97percent - We return 20 percent of the fee allocated to this component

**Annual Case Management Engagement**

**Guarantee**: We will guarantee that at least 1.5% of your population will be engaged in our case management programs at some point during the plan year. Customer Specific results will be used to reconcile this guarantee annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria**: We will place $0.20 per employee, per month of the guarantee period administrative service fees at risk for this metric.

**Engaged of Reached Rate**

**Guarantee:** We will guarantee an engagement rate of 93 percent or better of those we are successful in reaching in the Care Advocate Team (CAT) Case Management Program. Engagement is defined as:

<u>Cumulative nurse engaged year-to-date*</u>
All members with outreach minus the unable-to-reach**

\* The numerator is calculated as nurse engaged (member or provider) participation level
\*\* The denominator is calculated as all members targeted for nurse engagement and reached; excludes unable to reach.

Customer Specific results will be used to reconcile this guarantee annually using the appropriate performance guarantee report.

**Penalty and Measurement Criteria**: We will place $0.05 per employee, per month of the guarantee period administrative service fees at risk for our Case Management Engagement of Reached Rate guarantee as follows:

- < 78 percent - We return 100 percent of the fee allocated to this component
- 78 percent, but < 88 percent - We return 50 percent of the fee allocated to this component
- 88 percent, but < 93 percent - We return 20 percent of the fee allocated to this component

**Beginning Right<sup>SM</sup> Maternity Program**

**Participation Rate**

**Guarantee:** We will guarantee a participation rate of 90 percent or better in our Beginning Right Maternity Program. Participation is defined as:

Participating members *

All members identified and confirmed as pregnant

 * Cumulative unique members who are participating in the program. (Includes members
 enrolled in any level of the program: case managed, fulfillment only and unable to reach.)

The numerator includes those members who are unable to be reached via phone, as they will continue to receive program materials. The denominator includes all members who are confirmed as being pregnant. Customer-specific results will be used to reconcile the guarantee annually using the appropriate performance guarantee report. This guarantee assumes that you will have a minimum of 5,000 medical employees and 10 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.25 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 85 percent - We return 100 percent of the fee allocated to this component
- 85 percent, but < 90 percent - We return 50 percent of the fee allocated to this component

**Engagement Rate**

**Guarantee:** We will guarantee an engagement rate of 85 percent or better in its Beginning Right Maternity Program. Engagement is defined as:

Engaged members *

All members stratified for appropriate risk levels **

 * The numerator includes all cumulative unique members who are actively working with a case
 manager for the following stratification levels: 1. High Risk, 2. At Risk, and 3. Supportive.
 ** The denominator includes all members who have completed the enrollment process for the
 following stratification levels: 1. High Risk, 2. At Risk, and 3. Supportive.

The metric does not include unable-to-reach members. Customer-specific results will be used to reconcile the guarantee annually using the appropriate performance guarantee report. This

guarantee assumes that you will have a minimum of 5,000 medical employees and 10 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.20 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 80 percent - We return 100 percent of the fee allocated to this component
- 80 percent, but < 85 percent - We return 50 percent of the fee allocated to this component

**Postpartum Depression Screening**

**Guarantee:** We will guarantee that 85 percent of cases managed in the Beginning Right Maternity Program where participants meet criteria for postpartum outreach will have an outbound member call (success or attempt) completed for postpartum depression following the member's delivery date. Customer-specific results will be used to reconcile the guarantee annually using the appropriate performance guarantee report. This guarantee assumes that you will have a minimum of 5,000 medical employees and 10 members available to measure for this metric or the guarantee will revert to book-of-business results.

**Penalty and Measurement Criteria**: We will place $0.20 per employee, per month of the guarantee period administrative service fees at risk for this metric as follows:

- < 75 percent - We return 100 percent of the fee allocated to this component
- 75 percent, but < 85 percent - We return 50 percent of the fee allocated to this component

# Exhibit D
# Reports

**Banking**
Claim time of wire:  Daily
Claim Detail: monthly
Fund Summary: monthly

**Eligibility**
Census monthly

**Utilization: Aetna Informatics[SM] Reporting and Consulting**
Quarterly standard reports
Ad Hoc, as necessary

**Data Integration (Set-up)** : one historical medical and one historical pharmacy data integration feed. For an additional fee, historical medical and pharmacy data integration feeds may be added.

**Claims History Transfer (set up)** – These files are used to administer deductible and internal maximums. There is no cost associated with receiving claim history files electronically from the prior carrier for initial implementation. There will be a charge for files received in a format other than electronically; costs are based on the complexity and format of the data.

**States' All payer Claims database (APCD) reporting** – State all payer claims database regulations require insurance carriers and third party administrators (TPAs) for self-funded plans to supply data to that state's all payer claims database (APCD). As a TPA for your self-funded plan, we are required to submit health care claims data to states with APCDs. However, in some states, the law indicates that providing the data for self-funded plans is voluntary. We will provide your self-funded plan data to these states unless you inform us in writing that you do not wish us to do so.

# Exhibit E
## Business Associate Agreement

This Exhibit ("Exhibit") sets forth the terms and conditions on which the Contractor ("Business Associate") will provide services, as defined herein, on behalf of the Plan. The Authority is the Sponsor of the Plan.

Terms appearing with initial upper case letters shall have the respective meanings assigned to them in this introductory paragraph or in Article 1 of this Exhibit, as applicable. The parties acknowledge and agree that in providing Services to or on behalf of the Covered Entity, Business Associate will create, receive, use, maintain access, transmit, or disclose Protected Health Information. The parties intend to address the requirements of HIPAA, HITECH, the Privacy Rule, and the Security Rule as they apply to "business associates", including the establishment of permitted and required uses and disclosures (and appropriate limitations and conditions on such uses and disclosures) of Protected Health Information by Business Associate that is created, received, used, maintained, accessed, transmitted, or disclosed in the course of performing Services on behalf of the Plan.

**Article 1.    Definitions**

1.01    **General Definitions**. All terms appearing in this Exhibit with initial upper case letters that are not otherwise defined in this Exhibit shall have the same meaning as that provided for in the attached Agreement, or as provided under 45 C.F.R. §§ 160.103, 160.202, 160.401, 164.103, 164.304, 164.402, and 164.501, whichever is applicable. To the extent that there are any conflicts between the meanings assigned to the respective terms in this Exhibit or the Agreement and HIPAA, the HIPAA meanings shall control for purposes of this Exhibit.

1.02    **Specific Definitions**. For purposes of this Exhibit, the following terms shall have the indicated meanings whenever the term appears with initial upper case letters in this Exhibit:

a.    "**Business Associate**" shall have the same meaning as the term "business associate" at 45 C.F.R. § 160.103, and in reference to the party to this Exhibit, shall mean Contractor.

b.    "**Breach**" means the acquisition, access, use, or disclosure of Protected Health Information in a manner not permitted by HIPAA which compromises the security or privacy of the Protected Health Information unless such acquisition, access, use, or disclosure is otherwise excluded under 45 C.F.R. § 164.402. For purposes of this Exhibit, an acquisition, access, use or disclosure of Protected Health Information in a manner not permitted by HIPAA is presumed to be a breach unless the Business Associate demonstrates to the satisfaction of the Covered Entity that there is a low probability that the Protected Health Information has been compromised based on the Business Associate's risk assessment of at least

the following factors: (i) the nature and extent of the Protected Health Information involved, including the types of identifiers and the likelihood of re-identification; (ii) the unauthorized person who used the Protected Health Information or to whom the disclosure was made; (iii) whether the Protected Health Information was actually acquired or viewed; and (iv) the extent to which the risk to the Protected Health Information has been mitigated.

c.     **"Covered Entity"** means the Plan.

d.     **"Data Aggregation"** shall mean, with respect to Protected Health Information created or received by the Business Associate in its capacity as the Business Associate of the Covered Entity, the combining of such Protected Health Information by the Business Associate with the Protected Health Information received by the Business Associate in its capacity as business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective entities and is within the meaning of 45 C.F.R. § 164.501.

e.     **"Designated Record Set"** shall mean a group of records maintained by or for the Authority and/or the Covered Entity within the meaning of 45 C.F.R. § 164.501 that consists of: (i) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (ii) records that are used, in whole or in part, by or for the Authority and/or the Covered Entity to make decisions about Individuals.

For purposes of this Section 1.02(e), the term "record" means any item, collection or grouping of information that includes Protected Health Information and is maintained, collected, used or disseminated by or for the Covered Entity.

f.     **"HHS-Approved Technology"** shall mean, with respect to data in motion, the encryption guidelines in Federal Information Processing Standard 140-2. For data at rest, HHS-Approved Technology shall mean the encryption guidelines in National Institutes of Standards and Technology (NIST) Special Publication 800-111. With respect to the destruction of data containing Protected Health Information, an HHS-Approved Technology requires the destruction of the media on which the Protected Health Information is stored such that, for paper, film or other hard copy media, destruction requires shredding or otherwise destroying the media so that Protected Health Information cannot be read or reconstructed; for electronic media, destruction requires that the data be cleared, purged or destroyed consistent with NIST Special Publication 800-88 such that the information cannot be retrieved. HHS-Approved Technology may be updated from time to time based on guidance from the Secretary of HHS.

g.   **"HIPAA"** shall mean the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191.

h.   **"HITECH"** shall mean the Health Information Technology for Economic and Clinical Health Act, Pub. L. 111-5.

i.   **"Individual"** shall have the same meaning as the term "individual" in 45 C.F.R. § 160.103, and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

j.   **"Privacy Rule"** shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E.

k.   **"Protected Health Information"** shall mean Individually Identifiable Health Information that is transmitted by Electronic Media (within the meaning of 45 C.F.R. § 160.103), maintained in Electronic Media, or maintained, stored or transmitted in any form or medium including, without limitation, all information (including demographic, medical, and financial information), data, documentation, and materials that are created or received by Business Associate from or on behalf of the Covered Entity in connection with the performance of Services, and relates to:

(A)   The past, present or future physical or mental health or condition of an individual;

(B)   The provision of health care to an individual; or

(C)   The past, present or future payment for the provision of health care to an individual;

and that identifies or could reasonably be used to identify an individual and shall otherwise have the meaning given to such term under the Privacy Rule including, but not limited to, 45 C.F.R. § 160.103. Protected Health Information does not include health information that has been de-identified in accordance with the standards for de-identification provided for in the Privacy Rule including, but not limited to, 45 C.F.R. § 164.514, or Individually Identifiable Health Information: (i) in education records covered by the Family Educational Rights and Privacy Act, as amended, 20 U.S.C. 1232g; (ii) in records described at 20 U.S.C. 1232g(a)(4)(B)(iv); (iii) in employment records held by a Covered Entity in its role as employer; and (iv) regarding a person who has been deceased for more than 50 years.

l.   **"Required By Law"** shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

m.  **"Secretary"** shall mean the Secretary of the United States Department of Health and Human Services ("HHS") or his designee.

n.  **"Secured Protected Health Information"** shall mean Protected Health Information to the extent that the information is protected by using an HHS-Approved Technology identified by HHS for rendering Protected Health Information unusable, unreadable or indecipherable to unauthorized individuals.

o   **"Security Rule"** shall mean the Security Standards at 45 C.F.R. Part 160, Part 162, and Part 164.

p.  **"Services"** shall mean the functions, activities or services to be provided to the Authority and/or the Covered Entity under the terms of the Agreement.

q.  **"Unsecured Protected Health Information"** shall mean Protected Health Information that is not rendered unusable, unreadable or indecipherable to unauthorized individuals through the use of an HHS-Approved Technology.

**Article 2.**   **Obligations and Activities of Business Associate**

**2.01**   **Non-Disclosure of Protected Health Information**. Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by this Exhibit or as Required By Law.

**2.02**   **Safeguards**. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of Protected Health Information other than as provided for by this Exhibit or the Privacy Rule. Business Associate agrees to implement administrative, physical, and technical safeguards that satisfy the Standards set forth in the Security Rule at 45 C.F.R. §§ 164.308, 164.310, and 164.312, along with corresponding policies and procedures, as required by 45 C.F.R. § 164.316, that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic Protected Health Information that it creates, receives, maintains, accesses or transmits on behalf of the Covered Entity. Business Associate agrees to adopt and apply such safeguards, policies, and procedures to the electronic Protected Health Information to the same extent that such electronic Protected Health Information would have to be safeguarded if created, received, maintained, accessed, or transmitted by the Covered Entity. Business Associate shall also utilize Secured Protected Health Information in connection with the performance of Services under this Agreement.

**2.03**   **Mitigation**. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate relating to a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Exhibit.

**2.04**    **Reporting of Violations**. Subject to Section 2.05, Business Associate agrees to report to the Authority and the Covered Entity any use or disclosure of Protected Health Information not provided for by this Exhibit within twenty four (24) hours of such disclosure or Business Associate's knowledge of such disclosure. Business Associate agrees to report to the Authority and the Covered Entity any Security Incident (within the meaning of 45 C.F.R. § 164.304) of which Business Associate becomes aware.

**2.05**    **Breach of Unsecured Protected Health Information**. To the extent that the Business Associate knows or has reason to know (within the meaning of 45 C.F.R. § 164.410(a)(2)) that there has been a Breach or suspected Breach of Unsecured Protected Health Information, the Business Associate is required to identify the Individual whose Unsecured Protected Health Information has been acquired, accessed, used or disclosed and to notify the Covered Entity of such Breach without unreasonable delay, but no later than twenty four (24) hours after discovery of the Breach. Upon discovering the Breach, the Business Associate is required to identify and communicate to the Covered Entity (a) the nature and extent of the Protected Health Information involved, including the types of identifiers and the likelihood of re-identification; (b) the unauthorized person who used the Protected Health Information or to whom the disclosure was made; (c) whether the Protected Health Information was actually acquired or viewed; and (d) the extent to which the risk to the Protected Health Information has been mitigated.

**2.06**    **Notice of a Breach of Unsecured Protected Health Information**. In the event of a Breach involving Unsecured Protected Health Information, the Business Associate, with the prior written approval of the Covered Entity, will notify the affected Individuals without unreasonable delay, but no later than sixty (60) days after discovery of the Breach ("notice date"). The notice will include (a) a brief description of the incident, (b) the date the Breach occurred, (c) the date the Breach was discovered, (d) the type of Protected Health Information involved, (e) steps the Individual should take to protect him/herself from potential harm resulting from the Breach, (f) a brief description of steps the Covered Entity has taken to investigate, mitigate losses and protect against further Breaches, and (g) contact information for Individuals to ask questions, including a toll-free number, e-mail address, website or postal address. To the extent that the Breach involves more than 500 residents of a single state or jurisdiction, the Business Associate shall provide to Covered Entity, no later than fifteen (15) days prior to the notice date, the information necessary for the Covered Entity to prepare the notice to media outlets as set forth in 45 C.F.R. § 164.406. To the extent that the Breach involves 500 or more Individuals, the Business Associate shall provide to the Covered Entity, no later than fifteen (15) days prior to the notice date, the information necessary for the Covered Entity to prepare the notice to the Secretary of HHS, as set forth in 45 C.F.R. § 164.408. To the extent that the Breach involves less than 500 Individuals, the Business Associate shall maintain a log of such Breaches and provide such log to the Covered Entity on an annual basis, not later than forty-five (45) days after the end of the calendar year. Upon

the written request of the Covered Entity (including faxed and e-mailed requests), Business Associate shall provide such Breach log to the Secretary of HHS, in accordance with the requirements set forth in 45 C.F.R. § 164.408.

2.07.   **Audits**. Business Associate shall permit the Authority and the Covered Entity to audit Business Associate's compliance with the Privacy Rule, Security Rule and this Exhibit upon reasonable prior notice and in a reasonable manner. The Authority and/or the Covered Entity shall pay for any such audits.

2.08   **Agents and Contractors**. Business Associate agrees to ensure that any Business Associate agent, including a Subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of the Authority and/or the Covered Entity agrees, by way of written contract or other written arrangement, to the same restrictions and conditions that apply through this Exhibit to Business Associate with respect to such information.

In accordance with 45 C.F.R. §§ 164.308(b)(2) and 164.502(e)(1)(ii), if applicable, Business Associate also agrees to ensure that any Business Associate employee or agent, including any Subcontractor to whom it provides Protected Health Information received from, created, received, accessed or transmitted or otherwise maintained by Business Associate on behalf of the Authority and/or the Covered Entity agrees to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such Protected Health information under this Exhibit. Business Associate, the Authority, and the Covered Entity agree that the Business Associate and any Subcontractor of the Business Associate are not the agents of the Covered Entity or the Authority at any time under this Exhibit.

2.09   **Sanctions**. Business Associate agrees to apply appropriate sanctions against any Business Associate employee or agent, including a Subcontractor, with access to Individuals' Protected Health Information who fails to comply with the Authority's, the Covered Entity's, and the Business Associate's health information privacy policies and procedures.

2.10   **Amendment of Protected Health Information**. Business Associate agrees to make appropriate amendments to Protected Health Information in a Designated Record Set that an Individual requests pursuant to procedures established under 45 C.F.R. § 164.526. To the extent Business Associate is requested by an Individual to amend his or her Protected Health Information, Business Associate shall communicate its approval or denial of such request to the Individual pursuant to procedures to be mutually agreed upon in advance by the Parties.

2.11   **Disclosure of Internal Practices, Books, and Records**. Business Associate agrees to make internal practices, books, and records (including policies and procedures) relating to the use and disclosure of Protected Health Information received from, or created, received or maintained by Business Associate, or that can be otherwise accessed and transmitted by Business Associate on behalf of the

Authority or the Covered Entity, available to the Covered Entity or, at the request of the Covered Entity, to the Secretary, in a time and manner mutually agreed to by the Parties or designated by the Secretary, for purposes of the Secretary determining the Covered Entity's compliance with the Privacy Rule.

2.12    **Access to Protected Health Information**. To the extent that either the Covered Entity or an Individual requests to inspect or obtain a copy of Protected Health Information (as provided for in 45 C.F.R. § 164.524) that may be in the possession or control of the Business Associate or its agents or Subcontractors in a Designated Record Set, Business Associate shall respond within thirty (30) days of its receipt of the request by Business Associate, provided that compliance with the request would not result in a violation of HIPAA or the Privacy Rule. Notwithstanding the foregoing, the Business Associate must provide the Individual with access to Protected Health Information in the form and format requested by the Individual, if it is readily producible in such form and format; or, if not, in a readable hard copy form or such other form and format as agreed to by the Covered Entity and the Individual, provided, however, that if the Protected Health Information that is the subject of a request for access is maintained in one or more Designated Record Sets electronically and if the individual requests an electronic copy of such information, the Business Associate must provide the Individual with access to the Protected Health Information in the electronic form and format requested by the Individual, if it is readily producible in such form and format; or, if not, in a readable electronic form and format as agreed to by the Covered Entity and the Individual.

2.13    **Documentation of Disclosures**. Business Associate agrees to document disclosures of Protected Health Information and information related to such disclosures as would be required for a Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528. At a minimum, such documentation shall include: (i) the date of each disclosure; (ii) the name of the entity or person who received Protected Health Information and, if known, the address of the entity or person; (iii) a brief description of the Protected Health Information disclosed; (iv) the disclosures of Protected Health Information that occurred during the six-year period prior to the date of the request for an accounting (or any other shorter period of time requested by the individual) and that are otherwise subject to the accounting requirements in 45 C.F.R. § 164.528; (v) a brief statement of the purpose of the disclosure that reasonably informs the Individual of the basis for the disclosure or, if applicable, in lieu of such a statement, a copy of the Individual's authorization; and a copy of the written request for disclosure; and (vi) the form and format (electronic or paper) of such disclosure.

2.14    **Accounting for Disclosures**. Business Associate agrees to provide to the Covered Entity or an Individual, in a time and manner mutually determined by the Parties, information collected in accordance with Section 2.13 of this Exhibit so as to permit the Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with

45 C.F.R. § 164.528, provided, however, that to the extent that the Business Associate uses or maintains an electronic health record (within the meaning of 42 U.S.C. § 17921) with respect to Protected Health Information, Business Associate shall provide such accounting to the Individual (or, upon the request of the Covered Entity, to the Covered Entity for delivery to the Individual) of the disclosures required for the three-year period immediately preceding the date on which the accounting is requested. The accounting of disclosures through electronic health records shall not be required earlier than the earliest applicable date established by the Secretary of HHS.

**2.15**    **Facilitate the Exercise of Privacy Rights**. Business Associate agrees to establish procedures that allow Individuals to exercise their rights under the Privacy Rule, including the right to (i) inspect and obtain copies of records and documents within the possession or control of the Business Associate that contain the Individual's Protected Health Information; (ii) request amendments to their Protected Health Information; (iii) receive an accounting of disclosures of their Protected Health Information by Business Associate; (iv) request restrictions on the use or disclosure of Protected Health Information; and (v) receive communications regarding Protected Health Information at alternative locations or by alternative means.

**2.16**    **No Waiver of Rights**. Business Associate agrees to not require Individuals to waive their health information privacy rights as a condition for treatment, payment or enrollment in the Covered Entity, or eligibility for its benefits.

**2.17**    **Responses to Subpoenas**. In the event that Business Associate receives a subpoena, discovery request or other lawful process, with or without an order from a court or administrative tribunal, arising out of or in connection with the Covered Entity or this Exhibit including, but not limited to, any use or disclosure of Protected Health Information or any failure in Business Associate's health data security measures, Business Associate shall fully comply with the notice and protective action obligations set forth in 45 C.F.R. § 164.512(e) in accordance with Business Associate's standard policy and procedures regarding subpoenas, discovery requests, and other lawful processes which shall be communicated to the Covered Entity upon request.

**2.18**    **Electronic Transactions**. To the extent required under HIPAA (including the Standards for Electronic Transactions at 45 C.F.R. Parts 160 and 162), Business Associate agrees to use or conduct, in whole or part, standard transactions and utilize code sets or identifiers under the Privacy Rule for or on behalf of the Authority or the Covered Entity as detailed under the Privacy Rule or HIPAA (including the Standards for Electronic Transactions at 45 C.F.R. Parts 160 and 162). Business Associate shall also require any Subcontractor or agent to also comply with such electronic transaction requirements under HIPAA (including the Standards for Electronic Transactions at 45 C.F.R. Parts 160 and 162).

**2.19**    **Security Standards**. Business Associate acknowledges that it may need to issue and change procedures from time to time to improve electronic data and file security, and agrees that such measures shall be at least as stringent as may be required by the Privacy Rule or the Security Rule, as applicable. Notwithstanding the foregoing, Business Associate agrees and acknowledges that it shall at all times use an HHS-Approved Technology for all Protected Health Information that is in motion, stored or to be destroyed, and to use appropriate safeguards including, but not limited to, complying with Subpart C of 45 C.F.R. Part 164 with respect to electronic Protected Health Information so as to prevent access, use or disclosure of Protected Health Information other than as provided for by this Exhibit.

**2.20**    **Disclosures to Designated Plan Sponsor Representatives**. The Authority shall identify for Business Associate, in writing, certain Authority employees who are authorized to discuss Protected Health Information with Business Associate in connection with an Individual's claim for benefits from the Covered Entity. To the extent that Business Associate is contacted by any such designated Authority representative in connection with an Individual's claim for benefits from the Covered Entity, Business Associate shall treat such inquiry as relating to "treatment, payment or healthcare operations" within the meaning of the Privacy Rule and shall provide the information permitted under such Privacy Rule.

**2.21**    **Notice of Privacy Practices**. Covered Entity shall prepare and distribute a notice of privacy practices as required by the Privacy Rule. If Business Associate maintains a web site on behalf of the Authority or the Covered Entity that provides information about the Covered Entity's participant services or benefits, Business Associate shall make the notice of privacy practices available electronically through the web site and shall make certain that the notice of privacy practices is prominently posted on the web site. Notwithstanding the foregoing, following the Covered Entity's revision to such Notice of Privacy Practices, the Business Associate shall prominently post the change or the revised Notice on its web site by the effective date of any material change to the Notice. At the request of the Covered Entity, the Business Associate shall provide the revised Notice or information about the material change and how to obtain the revised Notice, in its next annual mailing to Individuals then covered by the Covered Entity.

**Article 3**    **Permitted Uses and Disclosures By Business Associate**

**3.01**    **General Uses and Disclosures**. Except as otherwise limited by this Exhibit, Business Associate agrees to create, receive, maintain, access, use or disclose Protected Health Information only in a manner that is consistent with this Exhibit the Privacy Rule or Security Rule, and only in connection with providing Services to the Authority and/or the Covered Entity, provided that such creation, receipt, maintenance, use, access or disclosure would not violate the Privacy Rule or Security Rule if done by the Covered Entity, or the minimum necessary policies and procedures of the Covered Entity. Covered Entity shall limit its disclosures of

Protected Health Information to Business Associate to the minimum necessary to accomplish the Services, and Business Associate shall limit its access, use and disclosures of Protected Health Information to any Subcontractor or other third party to the minimum necessary to accomplish the Services.

3.02    **Use and Disclosure for Treatment, Payment and Health Care Operations**. In providing Services, Business Associate shall be permitted to use and disclose Protected Health Information for purposes of "treatment, payment and health care operations" in accordance with the Privacy Rule, including, but not limited to, using or disclosing Protected Health Information (i) to investigate, pay, audit and otherwise administer and facilitate the payment of health plan claims; (ii) to enroll or disenroll participants and beneficiaries in and/or confirm or deny participant and beneficiary eligibility for participation in the Covered Entity; and (iii) to coordinate the payment of benefits from the Covered Entity when a participant or beneficiary is enrolled in another health plan which provides similar benefits, provided, however, that any communication by Business Associate that is about a product or service and that encourages recipients of the communication to purchase or use the product or service shall not be considered a health care operation for purposes of 45 C.F.R. Part 164, subpart E, unless the communication is made in accordance with 45 C.F.R. § 164.501 and is approved in writing by Covered Entity.

3.03    **Use and Disclosure for Public Health, Health Oversight and Law Enforcement Purposes**. In providing Services, Business Associate shall be permitted to use and disclose Protected Health Information, in accordance with the Privacy Rule, (i) to provide needed information to government agencies engaged in public health, health oversight, law enforcement, and otherwise as Required by Law; and (ii) to report violations of law to appropriate Federal and State authorities, consistent with 45 C.F.R. § 164.502(j)(1).

3.04    **Use for Management and Administration of Business Associate**. Except as otherwise limited in this Exhibit, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate (defined as those uses arising in the ordinary course of its business and as is customary in its industry) or to carry out the legal responsibilities of the Business Associate. Any such use shall be in accordance with the uses and disclosures permitted by the Privacy Rule.

3.05    **Disclosure for Management and Administration of Business Associate**. Except as otherwise limited in this Exhibit, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate provided that the disclosures are Required by Law, or Business Associate (i) obtains the prior written approval of the Covered Entity for such use or disclosure, and (ii) obtains reasonable assurances from the person to whom the information is to be disclosed that (A) the information shall remain confidential, (B) the information shall be accessed, used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person,

and (C) the person shall notify the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

**3.06**   **Use for Data Aggregation Services**. Except as otherwise limited in this Exhibit, Business Associate may use Protected Health Information to provide Data Aggregation services relating to the health care operations of the Covered Entity as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

**3.07**   **Prohibition on Marketing or Sale of Electronic Health Records or Protected Health Information**. Except as provided in this Exhibit or otherwise excepted under HIPAA, Business Associate shall not directly or indirectly receive remuneration from or on behalf of the recipient of the Protected Health Information in exchange for the marketing (within the meaning of 45 C.F.R. § 164.501) or sale (within the meaning of 45 C.F.R. § 164.501) of any Protected Health Information of an Individual unless the Covered Entity has (i) provided its written consent to such marketing or sale, and (ii) received a valid authorization (within the meaning of 45 C.F.R. § 164.508(a)(4)) from the Individual that includes a statement that the disclosure will result in remuneration to the Covered Entity or Business Associate.

**Article 4**   **Obligations of the Covered Entity**

**4.01**   **Obligations to Notify Business Associate**.

  a.   Limitations in Notice of Privacy Practices. Covered Entity shall notify Business Associate of any limitations in the Covered Entity's Notice of Privacy Practices provided in accordance with the requirements of 45 C.F.R. § 164.520, to the extent such limitations may affect Business Associate's use or disclosure of Protected Health Information.

  b.   Changes in Permission by Individual for Use of Disclosure. Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by an Individual to use or disclose Protected Health Information, if and to the extent that such changes affect Business Associate's use or disclosure of Protected Health Information.

  c.   Agreements to Restrict Use or Disclosure. Covered Entity shall notify Business Associate of any restrictions on the use or disclosure of Protected Health Information or a request for confidential communication that the Covered Entity has agreed to pursuant to and in accordance with the requirements of 45 C.F.R. § 164.522, or shall direct Individuals to make any such request directly to Business Associate if and to the extent that such restriction or request may affect Business Associate's use or disclosure of Protected Health Information.

**4.02**   **Permissible Requests by Covered Entity**. Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule or Security Rule if done by

the Covered Entity, except that the Covered Entity may request that Business Associate perform Data Aggregation services pursuant to the provisions of Section 3.06 of this Exhibit.

**Article 5.    Term and Termination**

**5.01    Protected Health Information Following Termination of Agreement**. This Exhibit shall survive the termination of the Agreement and shall terminate only when all of the Protected Health Information received from Covered Entity, or created, maintained, or received by Business Associate on behalf of Covered Entity that the Business Associate still maintains in any form is destroyed or returned to the Covered Entity or, if it is infeasible to return or destroy Protected Health Information, protections shall be extended to such information, in accordance with the termination provisions in this Article 5.

**5.02    Effect of Termination**.

**a.    Return or Destruction of Protected Health Information**. Except as provided in Section 5.02(b) of this Exhibit, upon termination of the Agreement for any reason, Business Associate shall return or destroy (in accordance with the HHS-Approved Technology) all Protected Health Information received from the Covered Entity, created, received or maintained by Business Associate on behalf of the Covered Entity, and shall discontinue and terminate access to all Protected Health Information on behalf of the Covered Entity. This provision shall also apply to Protected Health Information that is in the possession of Subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

**b.    Extension of Protections for Retained Protected Health Information**. In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to the Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Exhibit to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information, and for as long as the Business Associates can access Protected Health Information. The obligations of the Business Associate under this Exhibit shall survive termination of the Agreement with respect to that Protected Health Information that Business Associate is unable to return or destroy, or Protected Health Information that the Business Associate may continue to access.

**Article 6.**      **Miscellaneous**

6.01    **Regulatory References**. A reference in this Exhibit to a section in the Privacy Rule or the Security Rule means the section in the respective regulations, as amended and in effect at the relevant time.

6.02    **Amendment**. The Parties agree to take such action as is necessary to amend this Exhibit from time to time in order for the Covered Entity to comply with the requirements of the Privacy Rule, the Security Rule, and HIPAA. All references to "C.F.R." are to the Code of Federal Regulations as amended and in effect at the relevant time.

6.03    **Interpretation**.

a.      **Ambiguity**. Any ambiguity in this Exhibit shall be resolved in favor of a meaning that permits the Covered Entity to comply with the Privacy Rule or the Security Rule, as applicable.

b.      **Inconsistency**. In the event of an inconsistency between the provisions of this Exhibit and the Privacy Rule or the Security Rule, as may be amended from time to time, as a result of interpretations by HHS, a court or another regulatory agency with authority over the Parties, the interpretation of HHS, such other court or regulatory agency shall prevail.

c.      **Non-Mandatory Provisions**. In the event provisions of this Exhibit are not the same as those mandated by the Privacy Rule or the Security Rule, but are nonetheless permitted by the Privacy Rule or the Security Rule, the provisions of this Exhibit shall control

## Exhibit F
## Confidentiality of Health Care Information

_____ ("Contractor") has entered into a contractual agreement ("Service Agreement") with the Metropolitan Transportation Authority on behalf of itself and the New York City Transit Authority (NYCTA), Manhattan and Bronx Surface Transit (MaBSTOA), Metropolitan Transit Authority Bus Company (MTA Bus) and Staten Island Railway Transit Authority (SIRTOA) (collectively, "the Authority") as more fully set forth in the Service Agreement. The Service Agreement gives the Authority or their authorized representatives the right to review certain records and other information (collectively, "Data") held by Contractor in connection with the Plan. The Data includes, but is not limited to, Claim history for covered employees, retirees and their dependents. The Data also includes Contractor's arrangements with health care providers.

The Data that the Contractor provides to the Authority pursuant to the Service Agreement includes records and information that the Authority shall keep as confidential. The Authority has requested that Contractor release the Data to (YYY). (YYY) understands and agrees t that the Data shall be handled, stored, maintained, used and destroyed in a manner that shall preserve the confidentiality of the Data. (YYY) further agrees that the Data shall not be used for any purpose other than the administration, evaluation, analysis and management of the Plan.

(YYY) agrees to hold harmless, release and indemnify the Authority and Contractor and its directors, officers and employees, against any and all claims, damages, losses, lawsuits, settlements, judgments, costs, penalties and expenses (including reasonable attorneys' fees) resulting from and arising out of or in connection with (YYY)'s breach of this Confidentiality of Health Care Information Agreement.

Unauthorized use of Data or Contractor's proprietary information is a material breach of this Agreement which may result in irreparable harm to the Authority and/or Contractor for which the payment of money damages is inadequate. YYY agrees that the Authority or Contractor, upon adequate proof of unauthorized use, may immediately obtain injunctive relief in any court of competent jurisdiction enjoining any continuing or further breaches and may obtain entry of judgment for injunctive relief. Nothing herein shall be construed to limit the Authority's or Contractor's remedies at law of equity in the event of a breach.

The provisions of this Confidentiality of Health Care Information Agreement shall apply to all functions performed by (YYY) on behalf of the Authority in connection with the Plan's Data. It is agreed that termination of the Service Agreement shall not affect (YYY)'s obligations to hold Contractor, the Authority harmless as set forth in this Confidentiality of Health Care Information Agreement.

ACCEPTED and AGREED:
**(YYY) Company**

By: _____

Print Name: _____

Title: _____

Date: _____

**The Metropolitan Transportation Authority on behalf of itself
and the New York City Transit Authority (NYCTA),
Manhattan and Bronx Surface Transit (MaBSTOA),
Metropolitan Transit Authority Bus Company (MTA Bus)
and Staten Island Railway Transit Authority (SIRTOA),
and the Plan**

By: _____

Print Name: _____

Title: _____

Date: _____

**[INSERT NAME OF CONTRACTOR]**

By: Aetna Life Insurance Company

Print Name: _Michael L. Cooper_

Title: __Assistant Vice President and Actuary__

Date: __December 20, 2016__

## Exhibit G
## Geographic Service Areas

**Contractor agrees to maintain a Provider Network in the three digit zip codes were the Authority has at least 50 actives and/or retirees.**

**Exhibit H**
**MBE/WBE Business Enterprise Program**

**This RFP has no requirement for MBE**/WBE

**Exhibit I**
**Procurement Lobbying Disclosure**

This Agreement is subject to the provisions of New York State Finance Law, Sections 139-j and 139-k (the "Lobbying Law"), which became effective on January 1, 2006. The Lobbying Law, which is designed to restrict lobbying by Offerors and lobbyists on governmental procurements, is summarized in Attachment F to the Request for Proposals that resulted in the award of this Agreement. Among other things, the Lobbying Law imposes fines and penalties against persons and organizations that engage in impermissible contracts about a governmental procurement and provides for the debarment of repeat violators. Contractor agrees to the following:

A.    The affirmation, certifications and disclosure of prior non-responsibility determinations submitted with the Contractor's Proposal are incorporated herein by reference.

B.    If applicable for certain modifications that may be made in future to this Agreement, Contractor will be required to submit new disclosure and certification forms **(Disclosure of Prior Non-responsibility Determinations and the "Affirmation and Certification")** with its proposal for the contract modification. Contractor would be required to disclose findings of non-responsibility due to intentional provision of false or incomplete information to a covered agency or authority within the past four years with respect to the Lobbying Law.

C.    Contractor may be in default in the event it is found that Contractor's "Affirmation and Certification" form and its "Disclosure of Prior Non-responsibility Determinations" form submitted with its proposal were intentionally false or intentionally incomplete. Upon such finding, the Authority may exercise its termination right by providing written notification to Contractor in accordance with the terms of this Agreement.

**Exhibit J**
**Certification of Compliance with the Lobbying Law**

By signing this Agreement, Contractor also certifies that all information provided to the Authority with respect to New York State Finance Law, Sections 139-j and 139-k (the "Lobbying Law") is complete, true and accurate.

## Exhibit K
## Employment Eligibility Verification

Contractor is responsible for complying in all respects with the Immigration Reform and Control Act of 1986, as amended ("IRCA"), with respect to all persons performing Services on its behalf in connection with this Agreement, including employees and agents of Contractor and any subcontractor. Specifically, for each such employee/agent, including a person who is a United States citizen, Contractor is responsible for completing and retaining and causing any subcontractor to complete and retain, an Employment Eligibility Verification Form (Form I-9), in accordance with the applicable laws and regulations. Contractor will assume any and all liability, including the defense thereof, that may result from a claim or finding that Contractor or any subcontractor violated the IRCA with respect to any person performing Services on its behalf in connection with this Agreement.

## Exhibit L
## New York State Comptroller Review Approval

In accordance with Public Authorities Law §2879-a, this contract may be subject to review and/or approval of the Office of the State Comptroller (OSC), and shall not be valid, effective or binding until it has been approved by the OSC, if such review and/or approval is required.