## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| BINAH GORDON *et al.*, | |
| Plaintiffs, | |
| v. | No. 3:24-cv-01447-VAB |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

## REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION BY PLAINTIFFS JAMIE HOMNICK AND GENNIFER HERLEY

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ......................................................................................................... 3

   I. PLAINTIFFS HAVE STANDING TO CHALLENGE AETNA'S POLICY ........................ 3

     A. Plaintiffs' Injuries Are Fairly Traceable to CPB 0615. ........................... 3

     B. The Requested Injunction Would Redress Plaintiffs' Injuries. ................. 5

  II. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION. ........................... 10

     A. Plaintiffs Have Shown Sufficient Irreparable Harm to Justify an Injunction. ............ 10

        1. *Plaintiffs have suffered and will continue to suffer irreparable harm without medically necessary GAFR.* ............................................ 10

        2. *The availability of the external review process does not undermine Plaintiffs' showing of harm.* ................................................. 11

     B. Aetna Has Failed to Rebut Plaintiffs' Strong Showing of Likelihood of Success on the Merits. ................................................... 14

        1. *Aetna has not cited a single Section 1557 case to contest Plaintiffs' arguments that the GAFR Exclusion is facially discriminatory on the basis of sex.* ................................................ 14

        2. *Plaintiffs have provided sufficient evidence to demonstrate that GAFR is generally accepted as medically necessary to treat gender dysphoria.* ............... 15

     C. The Balance of Equities and Public Interest Favors Plaintiffs. ................. 18

        1. *The severe harms to Plaintiffs far outweighs any de minimus burden on Aetna.* ...................................................... 18

        2. *The public interest strongly supports the requested injunction.* ........... 19

     D. The Bond Requirement Should Be Waived. ......................................... 20

CONCLUSION ..................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*,
  88 F.4th 344 (2d Cir. 2023) ..................................................................................................3

*Berton v. Aetna Inc.*,
  No. 23-cv-1849, 2024 WL 869651 (N.D. Cal. Feb. 29, 2024) ...................................................9

*Bontrager v. Indiana Ind. Family & Soc. Servs. Admin.*,
  697 F.3d 604 (7th Cir. 2012) ................................................................................................18

*Boyden v. Conlin*,
  341 F. Supp. 3d 979 (W.D. Wis. 2018) ..................................................................................15

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield*,
  No. 20-cv-6145, 2023 WL 8777349 (W.D. Wash. Dec. 19, 2023) ...................................18, 19

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011).....................................................................................................5

*Cano v. S.C. Dep't of Corr.*,
  No. 9:22-cv-4247, 2023 WL 10286851 (D.S.C. July 31, 2023), *report &
  recommendation adopted as modified*, 2024 WL 1005553 (D.S.C. Jan. 30, 2024) .......... 10-11

*Carter v. HealthPort Techs. LLC*,
  822 F.3d 47 (2d Cir. 2016).......................................................................................................4

*Daileader v. Certain Underwriters at Lloyd's*,
  96 F.4th 351 (2d Cir. 2024) ...................................................................................................10

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999)................................................................................................................15

*Doe v. N.Y. Univ.*,
  442 F. Supp. 522 (S.D.N.Y. 1978) .........................................................................................14

*Fain v. Crouch*,
  618 F. Supp. 3d 313 (S.D. W. Va. 2022), *aff'd sub nom. Kadel v. Folwell*, 100 F.4th
  122 (4th Cir. 2024)..................................................................................................................14

*Flack v. Wis. Dep't of Health Servs.*,
  328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................................................18

*Flack v. Wis. Dep't of Health Servs.*,
  395 F. Supp. 3d 1001 (W.D. Wis. 2019) ................................................................................15

*Grasso Enters., LLC v. Express Scripts, Inc.*,
   809 F.3d 1033 (8th Cir. 2016) ....................................................................... 13-14

*Hicklin v. Precynthe*,
   No. 4:16-cv-1357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ................................10

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005).............................................................................................15

*K.G. ex rel. Garrido v. Dudek*,
   839 F. Supp. 2d 1254 (S.D. Fla. 2011) ..................................................................19

*Kadel v. Folwell*,
   No. 19-cv-272, 2022 WL 11166311 (M.D.N.C. Oct. 19, 2022)............................19

*Koss v. Norwood*,
   No. 17-cv-2762, 2018 WL 2926581 (N.D. Ill. Mar. 29, 2018) ............................19

*Kulwicki v. Aetna Life Ins. Co.*,
   720 F. Supp. 3d 108 (D. Conn. 2024)..................................................................4, 9

*L.B. v. Premera Blue Cross*,
   No. 23-cv-953, 2025 WL 1149630 (W.D. Wash. Apr. 18, 2025) ...........................14

*L.V.M. v. Lloyd*,
   318 F. Supp. 3d 601 (S.D.N.Y. 2018) ...................................................................18

*LaForest v. Former Clean Air Holding Co.*,
   376 F.3d 48 (2d Cir. 2004).............................................................................14, 18

*Langer v. Hartland Bd. of Educ.*,
   No. 3:22-cv-1459, 2023 WL 6140792 (D. Conn. Sept. 20, 2023).......................3, 5

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...............................................................................................3

*M.G. ex rel. Garcia v. Scrase*,
   No. 1:22-cv-325, 2023 WL 3686751 (D.N.M. May 26, 2023), *aff'd sub nom. M.G. ex
   rel. Garcia v. Armijo*, 117 F.4th 1230 (10th Cir. 2024)............................................10

*Murthy v. Missouri*,
   603 U.S. 43 (2024)............................................................................................8, 9

*Nokia Corp. v. InterDigital, Inc.*,
   645 F.3d 553 (2d Cir. 2011)..................................................................................20

*Paykina ex rel. E.L. v. Lewin*,
   387 F. Supp. 3d 225 (N.D.N.Y. 2019) ....................................................................10

*Rodriguez v. Robbins*,
　　715 F.3d 1127 (9th Cir. 2013) ........................................................................18

*Rothstein v. UBS AG*,
　　708 F.3d 82 (2d Cir. 2013).............................................................................3

*Schiebel v. Schoharie Cent. Sch. Dist.*,
　　120 F.4th 1082 (2d Cir. 2024) ......................................................................15

*Schmitt v. Kaiser Foundation Health Plan of Washington*,
　　965 F.3d 945 (9th Cir. 2020) ........................................................................15

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
　　554 U.S. 269 (2008)........................................................................................5

*Tay v. Dennison*,
　　457 F. Supp. 3d 657 (S.D. Ill. 2020)............................................................19

*Thomas v. Veterans Admin.*,
　　467 F. Supp. 458 (D. Conn. 1979) ...............................................................14

*Tovar v. Essentia Health*,
　　857 F.3d 771 (8th Cir. 2017) .......................................................................4, 9

*Tovar v. Essentia Health*,
　　342 F. Supp. 3d 947 (D. Minn. 2018)........................................................15, 19

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
　　549 F.3d 100 (2d Cir. 2008)...........................................................................3

## STATUTES AND REGULATIONS

42 U.S.C. § 18116.............................................................................................6, 14

29 U.S.C. 1001 *et seq.*.........................................................................................18

45 C.F.R. § 147.136(d) .......................................................................................5, 13

## OTHER AUTHORITIES

Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse
　　People, Version 8*, Int'l J. of Transgender Health S1 (2022)....................................16

## INTRODUCTION

Defendant Aetna Life Insurance Company ("Aetna") seeks to evade liability for categorically denying coverage for medically necessary gender-affirming facial reconstruction ("GAFR") surgeries to Plaintiffs Jamie Homnick and Gennifer Herley by: (1) understating its central role in its administration of Plaintiffs' health benefits and in the development of the challenged categorical exclusion for insurance coverage of GAFR as "not medically necessary" in all instances; and (2) misconstruing the relief Plaintiffs seek through the present motion for preliminary injunction as outside the ambit of Aetna.

In its Opposition Brief, ECF No. 81, Aetna misleadingly suggests that it is merely a passive player in administering healthcare. That contention is contradicted in multiple ways by the preliminary record. First, neither of Plaintiffs' plans contain *any* mention of GAFR, let alone a categorical exclusion of it. Instead, both plans generally cover medically necessary care and delegate to Aetna the primary responsibility for determining medical necessity and making coverage determinations within the bounds of the law. Thus, both plans require and expect Aetna to determine whether gender-affirming surgeries sought by their members are medically necessary.

But when it comes to GAFR, it is again Aetna that short-circuits the medical necessity review process by relying on a categorical exclusion in its *own* national coverage policy, the Clinical Policy Bulletin on Gender Affirming Surgery ("CPB 0615"), to treat GAFR as "not medically necessary" and therefore not covered. The coverage denials that Plaintiffs received from Aetna expressly cite *Aetna's* exclusion on GAFR in CPB 0615 (hereinafter, the "GAFR Exclusion") as the *sole* criteria used for those denials. There is no evidence to suggest that Aetna considered any other source when it denied Plaintiffs individualized medical necessity review.

Second, when its hand is forced, Aetna does review GAFR claims for individualized medical necessity. For Aetna-administered plans regulated by seven states that mandate it, Aetna *routinely* applies medical necessity criteria to make individualized coverage determinations for GAFR. Aetna's claim that GAFR is not well-accepted as care to treat gender dysphoria therefore falls flat. Both Plaintiffs, whose treating providers have documented the medical necessity of GAFR to treat their gender dysphoria related to their gender incongruent facial features, would easily meet the medical necessity criteria Aetna uses in those state-regulated plans.

Plaintiffs face significant and ongoing irreparable harm from Aetna's refusal to cover their care based on the GAFR Exclusion. The relief this Court can grant now—enjoining Aetna from applying the GAFR Exclusion to the two Plaintiffs—is the most meaningful route to redress their injuries. Without the exclusion, Aetna would be required to conduct individualized medical necessity reviews, as required by Plaintiffs' plans, based on the same clinical criteria Aetna utilizes for other forms of gender-affirming surgery. Plaintiffs are not asking for a "different plan benefit" or for "coverage [their plan sponsors] haven't authorized." ECF No. 81 at 2, 33 (emphasis omitted).[1] Since Plaintiffs' plan sponsors are contractually obligated to pay for all non-excluded services Aetna deems medically necessary, if Plaintiffs meet the medical necessity criteria for GAFR in the absence of an exclusion, the plan sponsors would cover the cost for these services, just like any other medically necessary care.

Since Plaintiffs have standing and satisfy the requirements for a preliminary injunction, the Court should grant the requested injunction.

---

[1] Citations to ECF filings refer to the page numbers generated by the headers, not the internal page numbers.

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO CHALLENGE AETNA'S POLICY.

Contrary to Aetna's assertions, Plaintiffs have standing to seek an injunction against Aetna's enforcement of the GAFR Exclusion. Aetna misstates the applicable causation and redressability requirements by contending that Plaintiffs' injuries are not "traceable solely to Aetna" or redressable by Aetna alone. ECF No. 81 at 1 (emphasis omitted); *see id*. at 19-20. Properly construed, the facts in the record—including Aetna's own admissions in its briefing and supporting materials—plainly establish that Aetna is the core obstruction to the relief Plaintiffs require to redress their enduring harm without proper treatment for their gender dysphoria.

### A.    Plaintiffs' Injuries Are Fairly Traceable to CPB 0615.

For Article III standing, a plaintiff must show "causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)), *cert denied*, 556 U.S. 1184 (2009). "The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (internal citation omitted). As the Second Circuit has explained, the Article III causation requirement "does not create an onerous standard" for plaintiffs. *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352-53 (2d Cir. 2023). "It requires no more than *de facto* causality, a standard that is, of course, lower than for proximate causation." *Id.* at 353 (citations omitted). Ultimately, "a plaintiff 'need not show that a particular defendant is the *only* cause of their injury.'" *Langer v. Hartland Bd. of Educ.*, No. 3:22-cv-1459, 2023 WL 6140792, at *10 (D. Conn. Sept. 20, 2023) (citations omitted), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

Aetna's position that Plaintiffs must show that their injuries are traceable only to Aetna, *see* ECF No. 81 at 25, runs directly afoul of these principles. Indeed, the Second Circuit has held that a plaintiff can establish causality even if a third party plays some role in causing the injuries. *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016). Other courts, including in this District, have rejected nearly identical causation arguments raised by Aetna and other insurers. *See, e.g.*, *Tovar v. Essentia Health*, 857 F.3d 771, 778 (8th Cir. 2017) (plaintiff's injuries could be traceable to defendant third-party administrator even where employer adopted and controlled terms of plaintiff's health plan); *Kulwicki v. Aetna Life Ins. Co.*, 720 F. Supp. 3d 108, 114 (D. Conn. 2024) (plaintiff's injuries arising from a denial of coverage for in vitro fertilization "may be traceable to [Aetna] because it allegedly designed . . . and administered claims under" plaintiff's self-funded employer health plan).

Aetna's assertion that it is merely implementing exclusions in Plaintiffs' plan sponsors' plans is false. *See* ECF No. 81 at 31 n.13. Neither plan mentions, let alone excludes, GAFR.[2] In a section captioned "Gender affirming treatment," Dr. Homnick's Bausch & Lomb plan document states that "[c]overed services include certain services and supplies for gender affirming treatment," and then links to the homepage of Aetna's Clinical Policy Bulletins "for detailed information about this benefit, including eligibility and medical necessity requirements." Decl. of Hannah Goellner Ex. A, at 5, ECF No. 86-1. Dr. Herley's MTA plan document does not reference gender-affirming care at all. *See* Decl. of Cheryl Aronson Ex. A, ECF No. 87-1. Aetna and MTA have both acknowledged that Aetna follows CPB 0615 in administering the MTA plan's gender

---

[2] Aetna makes much of the different terms used in CPB 0615 (facial gender affirming procedures), World Professional Association of Transgender Health Standards of Care 8 ("WPATH SOC 8") (gender-affirming facial surgery or facial gender-affirming surgery), and this suit (GAFR). *See* ECF No. 81 at 9 n.1; Decl. of Robert McDonough ¶ 9, ECF No. 83. These terms are all synonymous. And, for present purposes, they are immaterial because Defendant treated each surgical procedure Drs. Homnick and Herley sought as covered by CPB 0615. *See* Decl. of Jamie Homnick Attach. B at 19-30, ECF No. 62-3; Decl. of Susan Powell Ex. D, ECF No. 88-4.

dysphoria benefit. *See* Aronson Decl. Ex. C, at 2, ECF No. 87-3.[3] In short, both plans defer entirely

to the eligibility criteria created and maintained by Aetna.[4] Aetna—not the plan sponsors—

enforces CPB 0615 under its delegated authority to administer Plaintiffs' plans, and its denial of

GAFR coverage is the direct cause of Plaintiffs' injuries. Plaintiffs' injuries—being denied

coverage for GAFR—are thus fairly traceable to Aetna.

### B.    The Requested Injunction Would Redress Plaintiffs' Injuries.

Plaintiffs' injuries are redressable by the requested injunction. Neither of Plaintiffs' plans

expressly exclude GAFR from coverage; rather the plans are silent on whether GAFR is covered

and defer entirely to Aetna on how to make coverage decisions.

A plaintiff's claims are redressable if "it is 'likely' and not 'merely speculative' that the

plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit.'" *Cacchillo v.

Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Sprint Comm'ns Co. v. APCC Servs.,

Inc.*, 554 U.S. 269, 273-74 (2008)). As Aetna admits, its denials of Plaintiffs' coverage for GAFR

were based on Aetna's determination that the services were not medically necessary. *See* Decl. of

Dorothea Verbrugge ¶ 13, ECF No. 84. Where an Aetna-administered plan has a written exclusion

on a particular service, Aetna states that it may not approve coverage for those services "regardless

of medical necessity." *Id.* ¶ 9. But where, as here, a plan contains no exclusion of a particular

service, Aetna's job is to determine whether the service is medically necessary when making

coverage decisions, based on its own clinical coverage policies and other sources. *Id.* ¶¶ 8, 10.

---

[3] Aetna's assertion that Plaintiffs should seek external review, *see infra* at Sec. II.A.2, also contradicts its argument that Plaintiffs' plans exclude GAFR. *See* ECF No. 81 at 36-38. External review is generally not available for denials based on a plan exclusion. Rather it is available for denials "that involve[] medical judgment," including denials of care covered by the plan for lack of medical necessity. *See* 45 C.F.R. § 147.136(d)(1)(i)(A).

[4] But even if it were true that Aetna was implementing an exclusion rooted in the Plaintiffs' plans—which it is not— Plaintiffs' injuries would still be traceable to Aetna. *See Langer*, 2023 WL 6140792, at *10 (where a school board fired a teacher for failing to comply with state COVID-19 mandate, rejecting argument that teacher's injuries were not traceable to the board since the board's *implementation* of the mandate was the "most immediate cause" of the termination).

Aetna spills pages of ink on its employees' email exchanges with Bausch & Lomb about Dr. Homnick's coverage, inferring that the employer's consideration of its employee's healthcare coverage is tantamount to the employer steering the terms of the policy. ECF No. 81 at 10-16, 32-33. But it is the plan document—not emails—that control the terms of the plan. While Bausch & Lomb, like any employer, could seek to *affirmatively* cover GAFR in its plan, which would override CPB 0615, or create an exception for an individual, its decision to do so is wholly separate from Aetna's authority to enforce the GAFR Exclusion.

Here, both plan sponsors' plans expressly delegate to Aetna the primary responsibility for making coverage determinations and making medical necessity assessments, all within the bounds of the law. Under the master services agreement between Bausch & Lomb and Aetna, "Aetna shall process claims for Plan benefits . . . using Aetna's normal claim determination, payment and audit procedures and applicable cost control standards in a manner consistent with the terms of the Plan(s)" and perform this function in compliance with the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and all other applicable laws. Goellner Decl. Ex. C, at 11, ECF No. 86-3. Similarly, under MTA's contract with Aetna, Aetna "shall have discretionary authority to determine what Benefits are payable under the Plan, subject to the eligibility and enrollment information [MTA] gives to [Aetna], and to construe the terms of the Plan." Aronson Decl. Ex. B, at 13-14, ECF No. 87-2. That discretionary authority is broad: Aetna "shall be deemed to have properly exercised such authority unless it has abused its discretion by acting arbitrarily or capriciously." *Id.* at 14. Further, under the MTA contract, Aetna "shall comply with all applicable state, federal, and local laws, rules, and regulations" and "shall have the responsibility for and bear the cost of non-compliance with [such laws] as may apply to [Aetna] in connection with performance of its obligations under this Agreement," and, "[i]n carrying out this Agreement,

[Aetna] shall not discriminate in any manner against any Participant because of . . . sex" or other factors. *Id.* at 35-36.

Currently, Aetna bypasses individualized medical necessity assessments and categorically denies GAFR coverage in all instances to Plaintiffs and others based on the GAFR Exclusion. Even though Aetna claims to conduct individualized reviews in every case, *see* Verbrugge Decl. ¶¶ 8, 13-14, it has offered no evidence that it did anything other than mechanically apply the exclusion to deny Plaintiffs' claims. In fact, Aetna swiftly denied Plaintiffs' claims after they were submitted and the denials explicitly cited CPB 0615 as the basis for the Aetna's "determination" that the GAFR services sought by Plaintiffs were "not medically necessary." Decl. of Gennifer Herley Attach. B, at 11-23, ECF No. 62-5; Decl. of Jamie Homnick Attach. B, at 19-31, ECF No. 62-3. Furthermore, the record shows that Aetna's medical necessity "determinations" for Plaintiffs' requested GAFR services were based entirely on the GAFR Exclusion and not Plaintiffs' individual circumstances.[5]

If this Court enjoins enforcement of the GAFR Exclusion, Aetna will be required to conduct individualized medical necessity determinations without the blanket policy that GAFR is "not medically necessary" in all cases, just as it does for other surgeries. For example, for genital, gonad and breast surgeries to treat gender dysphoria, Aetna applies the following criteria (with immaterial wording differences for procedures for transfeminine or transmasculine people):[6]

- Signed letter from a qualified mental health professional . . . assessing the transgender/gender diverse individual's readiness for physical treatments; *and*
- Documentation of marked and sustained gender dysphoria . . . ; *and*

---

[5] Although Aetna implies that its medical directors may ignore categorical coverage exclusions in the company's clinical policy bulletins, including the GAFR Exclusion, *see* ECF No. 81 at 23-24, Aetna fails to explain how an Aetna medical director could ignore the company's blanket characterization of GAFR as "not medically necessary" (except where Aetna is required by state regulators to review GAFR requests for medical necessity), or whether any of its medical directors have ever substituted their own judgment to approve coverage for GAFR.

[6] Aetna also requires cancer screening or risk assessment for some services. Opening Br. Ex. 7, at 5, ECF No. 62-7.

- Other possible causes of apparent gender incongruence have been excluded; *and*
- Mental and physical health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed; *and*
- Capacity to consent for the specific physical treatment; *and*
- Six months of continuous hormone therapy as appropriate to the member's gender goals (12 months for adolescents less than 18 years of age), unless hormone therapy is not desired or medically contraindicated.

ECF No. 62-7 at 4. These criteria are also apt for GAFR. Ex. 1, Reb. Decl. of R. Nicholas Gorton ¶ 61 ("Gorton Reb."). These are essentially the same criteria Aetna uses to determine medical necessity for GAFR in state-regulated plans that override the GAFR Exclusion. *See* Opening Br. Ex. 8, ECF No. 62-8 (New York, Colorado, Maryland, and Washington).[7]

If Aetna were to update or modify those criteria—as it does routinely—both of Plaintiffs' plans contemplate that the clinical criteria in place at any point would control Aetna's coverage decisions. *See* ECF No. 87-3; ECF No. 86-1. Aetna has routinely revised or updated CPB 0615 during both Bausch & Lomb's and MTA's contract periods—including five times in 2024 alone and once (so far) in 2025[8]—and there is no evidence that Aetna requires plan sponsors' sign-off every time Aetna makes such revisions or updates. If Aetna were to amend CPB 0615 to remove the GAFR Exclusion (whether on its own or under court order), both plan sponsors would be obligated to pay for GAFR services Aetna deems medically necessary based on an individualized medical necessity review; Aetna has offered nothing to suggest otherwise.

Moreover, Aetna is wrong that the Supreme Court's recent decision in *Murthy v. Missouri*, 603 U.S. 43 (2024) compels a different result. *See* ECF No. 81 at 33. *Murthy* restates a well-

---

[7] The New York criteria are identical to Aetna's criteria for other gender-affirming surgeries. The other states also require a photo showing gender incongruent features. *See* ECF No. 62-8 at 2-6.

[8] The history of Aetna's revisions and updates to CPB 0615 is available at https://www.aetna.com/cpb/medical/data/disclaimer/history/600_699/0615.html (last visited Apr. 27, 2025).

trodden principle that a plaintiff's prospective future injury is not redressable by the relief requested in the injunction because the harm is inflicted *entirely* by the independent third parties. *Murthy*, 603 U.S. at 57. Here, by contrast, Plaintiffs have demonstrated Aetna's direct role in making Plaintiffs' benefits determinations. It is Aetna's decision-making, not the plan sponsors', that has been and will continue to cause Plaintiffs' injuries. This Court need not engage in "conjecture" about Aetna's future decision-making, *Murthy*, 603 U.S. at 46 (citation omitted), because Aetna *solely* controls the content and application of its clinical coverage policies, including CPB 0615 and its GAFR Exclusion, and will continue to apply the GAFR Exclusion without an injunction. Because no independent actor stands between Aetna's policy and the denial of benefits, Plaintiffs' injuries are redressable by an injunction against Aetna and, thus, Plaintiffs have standing to seek the requested injunction.

Aetna and other insurers have advanced a substantially similar defense in other Section 1557 challenges to discriminatory categorical coverage exclusions—namely, that plaintiffs' claims against the insurer must be dismissed for failure to name their employer plan sponsors as defendants—which have failed every single time. *See Tovar*, 857 F.3d at 778 (reversing district court's dismissal of plan administrator of a self-funded plan for lack of traceability or redressability because plaintiff plausibly alleged that the discriminatory terms originated with the plan administrator and so plaintiff's injuries were redressable by suit against the plan administrator); *Kulwicki*, 720 F. Supp. 3d at 113 (rejecting Defendant Aetna's argument that plaintiff's injury was not traceable to nor redressable by Aetna in a self-funded plan because Aetna had an "independent duty to refrain from discriminating under Section 1557 of the ACA"); *Berton v. Aetna Inc.*, No. 23-cv-1849, 2024 WL 869651, at *4-5 (N.D. Cal. Feb. 29, 2024) (rejecting Aetna's argument that self-funded plan sponsor was a necessary party in challenge to Aetna's infertility coverage policy

for same-sex couples). Aetna has provided no justification for this Court to take a contrary view.

For these reasons, Plaintiffs satisfy the redressability requirement.

## II.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.

For the reasons explained in Plaintiffs' opening brief, Plaintiffs have satisfied every requirement for a preliminary injunction: they are likely to succeed on the merits, will be irreparable harmed, and the equities tip squarely in their favor. ECF No. 62 at 8 ("Opening Br."). Aetna characterizes the requested injunction as mandatory, not prohibitory, and argue that Plaintiffs fail to clear the higher bar required for mandatory relief. ECF No. 81 at 42-43. But Plaintiffs have satisfied that burden: they made a "*strong showing* of irreparable harm" and have demonstrated a "*clear or substantial* likelihood" of success on the merits, *Daileader v. Certain Underwriters at Lloyd's*, 96 F.4th 351, 356 (2d Cir. 2024) (citation omitted), and are therefore entitled to the requested injunction.

### A.    Plaintiffs Have Shown Sufficient Irreparable Harm to Justify an Injunction.

#### 1.    *Plaintiffs have suffered and will continue to suffer irreparable harm without medically necessary GAFR.*

Plaintiffs have met their burden of making a strong showing of ongoing irreparable harm—severe distress, untreated gender dysphoria, and related harms—that can be prevented by the requested injunction. *See M.G. ex rel. Garcia v. Scrase*, No. 22-cv-325, 2023 WL 3686751, at *7 (D.N.M. May 26, 2023) (plaintiffs made "an incredibly strong showing of irreparable harm" because they demonstrated possibility of immediate medical harm without injunctive relief), *aff'd sub nom. M.G. ex rel. Garcia v. Armijo*, 117 F.4th 1230 (10th Cir. 2024); *Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 240-41 (N.D.N.Y. 2019) (plaintiff child's evidence of future psychological injuries satisfied showing of irreparable harm); *see also Hicklin v. Precynthe*, No. 16-cv-1357, 2018 WL 806764, at *9-10 (E.D. Mo. Feb. 9, 2018); *Cano v. S.C. Dep't of Corr.*, No.

22-cv-4247, 2023 WL 10286851, at *20 (D.S.C. July 31, 2023), *report & recommendation adopted as modified*, 2024 WL 1005553 (D.S.C. Jan. 30, 2024).

Without an injunction, Drs. Homnick and Herley will not receive medically necessary care, which will exacerbate their symptoms associated with severe gender dysphoria. *See* ECF No. 62 at 18-23. Dr. Homnick's facial traits cause her profound, daily distress. *See* Homnick Decl. ¶ 6, ECF No. 62-3. She experiences anxiety, depression, fear, low self-esteem, increased irritability, interpersonal conflict, and self-loathing, which impact her ability to leave her house and interact with her friends and family. *Id.* ¶¶ 14−16; Decl. of Amanda M. Shaw ¶¶ 6−8, 13, 18, ECF No. 62-4. Her mental health will continue to decline if she is unable to access medically necessary GAFR. Homnick Decl. ¶¶ 16, 25, 27; Shaw Decl. ¶¶ 11, 17−18.

Dr. Herley also experiences daily distress from her facial characteristics—her symptoms include depression, anxiety, suicidal ideation, and low self-esteem. Herley Decl. ¶ 11, ECF No. 62-5. The incongruence between her facial features and her gender also causes her debilitating anxiety of socializing with other people because she fears she will be mistaken for a man or outed in public as transgender. *Id.* ¶¶ 11, 21; Decl. of Janice Stefanacci Seward ¶¶ 23−25, ECF No. 62-6. As stated by her therapist Dr. Janice Seward, if Dr. Herley does not receive GAFR, her symptoms will continue to worsen to the point where she may not be able to work and might engage in self-harm. *See* Seward Decl. ¶¶ 23−25, 27. Plaintiffs require GAFR to treat their gender dysphoria.

2.    *The availability of the external review process does not undermine Plaintiffs' showing of harm.*

Drs. Homnick and Herley saw the writing on the wall from their first denial letters from Aetna: CPB 0615's GAFR Exclusion stands as an impediment to coverage, despite their well-documented evidence that GAFR will treat their gender dysphoria. Herley Decl. Attach. B, at 11-

23, ECF No. 62-5; Homnick Decl. Attach. B, at 19-31, ECF No. 62-3. In its brief, Aetna attempts to evade responsibility for the repercussions of its policy by pointing its finger to the external review process available pursuant to the ACA, just as it attempts to do with the plan sponsors. *See* ECF No. 81 at 37-38. But the buck stops with Aetna: enjoining Aetna's GAFR Exclusion is the most straightforward relief to the irreparable harm Plaintiffs have experienced.

First, to suggest that Plaintiffs must engage in an external review—functionally another round of an already onerous appeals process that will likely be poisoned by the same discriminatory GAFR Exclusion—disregards the harm and suffering Plaintiffs have already experienced from receiving adverse benefits determinations from Defendant. *See* Homnick Decl. ¶ 20 (stating that after receiving Defendant's denial of her claims for GAFR her "depression and anxiety exploded"); Shaw Decl. ¶¶ 11, 16-17 (stating she has observed that Dr. Homnick's gender dysphoria, and particularly her feelings of hopelessness and depression, increase when medical care is restricted or threatened and Aetna's denial caused Dr. Homnick to lose hope); Herley Decl. ¶ 23 (stating that she was "devastated" by Defendant's denial and her "depression and anxiety spiked"); Seward Decl. ¶¶ 17-20 (describing Dr. Herley's increased feelings of despair and heightened symptoms of dysphoria following Defendant's denial, including obsessive thoughts, a sense of impending danger, trouble concentrating or making decisions, increased risk of self-harm, and several physical symptoms). This is especially so where, if Aetna employee Deborah Rudolph's claim is taken at face value, Plaintiffs have less than a 25% chance of a different benefits decision than the ones they have already received. *See* Decl. of Deborah Rudolph ¶ 9, ECF No. 82. Ms. Rudolph contends that the Independent Review Organization ("IRO") that would conduct the external review process is not required to consider CPB 0615 in its decision. *Id.* ¶ 6. Yet, Ms. Rudolph fails to mention that federal regulations for the external review process explicitly mandate

that the IRO review "[a]ny applicable clinical review criteria developed and used by the plan or issuer" to the extent the IRO considers them appropriate.[9] 45 C.F.R. § 147.136(d)(2)(iii)(B)(5)(vi). In other words, Aetna's assertion that external review provides independent relief rings hollow; any external reviewer is likely to defer to the very discriminatory policy Plaintiffs challenge here.

Second, this avenue is moot or extremely onerous. Aetna provides no evidence that the external review process is even still *available* to Plaintiffs, without starting anew on their claims. Dr. Homnick had 123 days from the date she received Aetna's second-level appeal decision to request an external review. *See* Goellner Decl. Ex. B, at 8, ECF No. 86-2. Based on the terms of her plan, the time has elapsed: Dr. Homnick and her providers would likely need to submit new claims, including updated supporting documentation demonstrating the medical necessity of GAFR, and pursue time-consuming, emotionally taxing, and ultimately futile internal appeals before even being able to access the ERO process. *See* ECF No. 86-1 at 6; Homnick Decl. ¶ 19 (filed her second level appeal in November 2024). Dr. Herley would have to file *two* internal appeals before accessing the external review process. *See* Aronson Decl. Ex. A, at 8-9, ECF No. 87-1; 45 C.F.R. § 147.136(d)(2)(ii)(3). Again, Plaintiffs had, and continue to have, no reason to believe these processes are effective so long as the GAFR Exclusion remains in effect.[10]

The three cases that Aetna cites to support its assertion that the ERO process is equivalent to injunctive relief are inapposite. There, the plaintiffs brought claims under statutes the courts found required administrative exhaustion before seeking judicial review. *See Grasso Enters., LLC*

---

[9] Plaintiffs' plans both follow the federal external review process. Rudolph Decl. ¶ 3, ECF No. 82.

[10] Plaintiff Homnick would be remiss not to note that this is not the first time Aetna has claimed a pathway to coverage was available to her only for her to arrive at a dead end. In support of its original motion to dismiss, Aetna's employee and declarant stated that Dr. Homnick's plan had been updated to include coverage for GAFR. Decl. of Hannah Goellner ¶ 6, ECF No. 52-10. Dr. Homnick spent weeks poring through her plan, talking with HR, as well as counsel, only to discover that no such change had been made to her plan. Aetna has never explained why it made that baseless assertion to the Court.

*v. Express Scripts, Inc*., 809 F.3d 1033, 1039-40 (8th Cir. 2016); *Thomas v. Veterans Admin*., 467 F. Supp. 458, 464 (D. Conn. 1979); *Doe v. N.Y. Univ*., 442 F. Supp. 522, 523 (S.D.N.Y. 1978). No administrative exhaustion requirement exists for Section 1557 sex discrimination claims, *see* 42 U.S.C. § 18116; *see also L.B. v. Premera Blue Cross*, No. 23-cv-953, 2025 WL 1149630, at *11 (W.D. Wash. Apr. 18, 2025). Nor do these cases support its argument that the mere availability of an alternative mechanism to cover denied claims bars plaintiffs from seeking preliminary relief in court. *See, e.g.*, *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) (rejecting defendants' argument that because plaintiffs could seek healthcare coverage by other means, plaintiffs could not demonstrate irreparable harm).

For these reasons, Plaintiffs have made a strong showing of irreparable harm.

### B. Aetna Has Failed to Rebut Plaintiffs' Strong Showing of Likelihood of Success on the Merits.

#### 1. *Aetna has not cited a single Section 1557 case to contest Plaintiffs' arguments that the GAFR Exclusion is facially discriminatory on the basis of sex.*

Defendant has not cited a single Section 1557 case to challenge Plaintiffs' arguments that the GAFR Exclusion is facially discriminatory on the basis of sex. ECF No. 81 at 42-43. By contrast, Plaintiffs, with the support of Section 1557 and other civil rights caselaw, have demonstrated that the GAFR Exclusion is inherently sex-based, with no way to apply or describe the GAFR Exclusion without referencing or relying on sex. *See* ECF No. 62 at 31-37. The GAFR Exclusion is only an impediment to Plaintiffs because they are transgender women—if they were assigned female at birth, identified as women, and sought insurance coverage for medically necessary facial surgeries, the GAFR Exclusion would not apply.

Courts have consistently found that categorical coverage exclusions of gender-affirming care are unlawful sex discrimination. *See, e.g.*, *Fain v. Crouch*, 618 F. Supp. 3d 313, 327, 330-31 (S.D. W. Va. 2022) (holding state Medicaid program's categorical exclusion on "transsexual

surgery" violated Section 1557 and the Equal Protection Clause), *aff'd sub nom. Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024); *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1015, 1019-22 (W.D. Wis. 2019) (holding state Medicaid program's categorical exclusion on gender-affirming surgery violated Section 1557 and the Equal Protection Clause); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018) (holding that state employee benefits plan's exclusion on gender-affirming medical care violates Title VII and Section 1557); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 954 (D. Minn. 2018) (holding that plan administrator could be held liable under Section 1557 for enforcing plan's exclusion on "gender reassignment surgery").

Aetna misstates the relevant intent standard for Section 1557 claims. Under Section 1557, the relevant inquiry is not, as Aetna argues, whether "Aetna's CPB *intentionally* discriminates against transgender persons." ECF No. 81 at 42. Rather, the inquiry under Section 1557 (incorporating Title IX standards), it is whether Aetna engaged in "intentional conduct that violates the clear terms of the statute." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005); *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1093 (2d Cir. 2024). Thus, Aetna is liable for its intentional conduct that denied Plaintiffs benefits under their plans "on the basis of sex." Because the GAFR Exclusion is facially discriminatory—that is, Aetna has "designed its plan benefits in a discriminatory way," *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 954 (9th Cir. 2020)—Aetna's conduct is inherently intentional. *See* ECF No. 62 at 30-37.

### 2. Plaintiffs have provided sufficient evidence to demonstrate that GAFR is generally accepted as medically necessary to treat gender dysphoria.

In the absence of any case law to support its position, Aetna contends that its GAFR Exclusion is consistent with the "evolving state of medical science," ECF No. 81 at 40-41, citing the declaration of an Aetna employee who does not claim any expertise in gender-affirming care

and has not treated *any* patients since 1989. *See* McDonough Decl. ¶ 2; *id.* at 18. But, as one of Plaintiffs' experts explains, Aetna's employee misapplied the relevant standards and practices for evidence-based medicine and failed to note the key conclusions and information from relevant studies that support Plaintiffs. *See* Gorton Reb. ¶¶ 44-57. Aetna's position is contradicted by the wealth of evidence Plaintiffs have offered to show that GAFR is widely recognized as a safe, effective, and medically necessary treatment for gender dysphoria. *See* ECF No. 62 at 10-13.

WPATH SOC 8 classifies GAFR as medically necessary treatment for gender dysphoria. SOC 8 says the "literature supports [the] benefits" of GAFR and describes some of that literature, as Aetna concedes. *See* ECF No. 81 at 39 (quoting McDonough Decl. ¶ 22 (quoting Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S129 (2022))). Aetna ignores that SOC 8 expressly lists GAFR among recognized, medically necessary surgeries to treat gender dysphoria. Gorton Reb. ¶¶ 8-9; Decl. of Jens U. Berli ¶¶ 19, 26, ECF No. 62-1. Aetna's arguments to the contrary are baseless. It notes that SOC 8 cites more studies about genital surgery than GAFR. *See* ECF No. 81 at 19-21. But the relative number of studies says nothing about GAFR's efficacy and necessity as treatment for gender dysphoria. Gorton Reb. ¶ 11. By that logic, acetaminophen would not effectively treat headaches because non-steroidal anti-inflammatory drugs are more studied. *Id.* It is immaterial that SOC 8 neither cites every study about GAFR nor contains exhaustive discussion of the literature it references. SOC8 is based on systematic reviews of the literature, clinical experience, and consensus-based expert opinions. Gorton Reb. ¶ 5; Berli Decl. ¶¶ 12, 26. Aetna points to the Institute of Medicine ("IOM") as setting the standard for clinical practice guidelines. *See* McDonough Decl. ¶ 6 n.1. And SOC 8 meets the IOM standards for high quality guidelines. Gorton Reb. ¶ 5; *see* Berli Decl. ¶¶ 12, 26.

Aetna argues that there is insufficient medical literature to consider GAFR medically necessary, but the sources it cites does not support its argument. *See* ECF No. 81 at 19-22. In fact, every study Aetna cites finds GAFR effective in treating gender dysphoria. Gorton Reb. ¶¶ 37-57. Although Aetna cherry-picks quotes from these scholars' discussions of the limitations of existing research and questions for future research, Aetna ignores these scholars' conclusions that, considering these limitations, the weight of medical literature, scientific research, and clinical practice support the conclusion that GAFR is an effective treatment for gender dysphoria. *Id.*; Berli Decl. ¶¶ 18-22, 27; Decl. of R. Nicholas Gorton ¶¶ 11-36, ECF No. 62-2.

Defendant's discussion of a study conducted by Tiffany A. Ainsworth et al. is perplexing. *See* ECF No. 81 at 21-22. Ainsworth compared transgender women who had received GAFR to those who had not and to cisgender women in the general population, using a well validated outcome measure. Gorton Reb. ¶¶ 47-49. Ainsworth found that transgender women who had not had surgery had lower mental health related quality of life than the general population of women but that transgender women who had GAFR attained mental health quality of life indistinguishable from other women in the general population. *Id.* ¶ 49. What Defendant calls a limitation, *see* ECF No. 81 at 22, is actually powerful evidence illustrating GAFR's efficacy, *see* Gorton Reb. ¶ 49. The medical literature, including the studies Defendant cites overwhelmingly supports the conclusion that GAFR is safe, effective, and necessary for some patients with gender dysphoria. Gorton Reb. ¶¶ 37-57; Berli Decl. ¶¶ 18-22, 27; Gorton Decl. ¶¶ 11-36.

Consistent with the medical consensus, Plaintiffs' own providers have applied these standards to determine that GAFR is medically necessary to treat their gender dysphoria. Plaintiffs provide overwhelming evidence, not only that GAFR clinically indicated for them, but it is

medically necessary as defined by the medical community and Aetna itself. In short, but for the GAFR Exclusion, Plaintiffs' GAFR would be covered.[11]

### C.     The Balance of Equities and Public Interest Favors Plaintiffs.

*1.   The severe harms to Plaintiffs far outweighs any de minimus burden on Aetna.*

The undisputed record shows that Drs. Homnick and Herley face worsening gender dysphoria, depression, and anxiety, as well as an elevated risk of self-harm, every day that coverage is denied. Their treating providers detail the "dire" psychological and physical consequences of continued delay and attest that GAFR is medically necessary to arrest that decline. *See supra* at 10-11. Delayed or denied medically necessary care is irreparable harm. *See LaForest*, 376 F.3d at 55-56 (threat of foregoing needed care is "more than 'mere monetary harm'"); *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 611 (7th Cir. 2012) ("deni[al of] medically necessary care" is irreparable); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 942-44 (W.D. Wis. 2018) (holding that transgender "plaintiffs [] advanced more than enough evidence to establish that they face a possibility of irreparable harm" because they were denied coverage for medically necessary gender-affirming surgeries).

By contrast, a defendant "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, No. 20-cv-6145, 2023 WL 8777349, at *6 (W.D. Wash. Dec. 19, 2023) ("Following antidiscrimination laws is not a hardship."); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) ("setting aside an unlawful practice" never harms the

---

[11] Aetna argues that this Court should disregard the fact that Plaintiffs' healthcare providers determined they need GAFR to treat gender dysphoria. ECF No. 81. at 40 n.17. The Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 *et seq.*, cases Aetna cite for this proposition have no bearing on Plaintiffs' Section 1557 claims. *See id.* Moreover, Plaintiffs' providers' unanimous, independent determinations that GAFR is medically necessary for them is strong evidence rebutting CPB 0615's faulty premise: that GAFR is never medically necessary.

defendant). Where a defendant's injury is limited to potential compliance costs, the equities favor the plaintiff. *See K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1268 (S.D. Fla. 2011).

Here, the injunction would impose only a minimal obligation on Aetna: to conduct an individualized medical necessity review for two members using the exact same medical necessity criteria it uses for other types of gender-affirming surgeries *and* for GAFR under Aetna's state-specific policies. *See supra* at 7-8. Aetna itself will not pay the claims—the plan sponsors will, just as they have agreed to under their Aetna contracts for all other medically necessary treatments approved by Aetna. Any administrative effort Aetna cites is *de minimis* given that it already covers GAFR for policyholders in several states and could easily do the same for Plaintiffs here.

2. *The public interest strongly supports the requested injunction.*

Judicial enforcement of Section 1557's nondiscrimination mandate clearly serves the public interest. *See Kadel v. Folwell*, No. 19-cv-272, 2022 WL 11166311, at *5 (M.D.N.C. Oct. 19, 2022) ("[T]he public interest . . . lies with protecting public health by ensuring that all individuals . . . receive 'medically necessary services for the treatment of gender dysphoria.'" (citation omitted)); *C.P.*, 2023 WL 8777349, at *6 (emphasizing "[t]he public has a strong interest in ensuring that antidiscrimination laws are enforced"). An injunction would also promote public health by preventing a documented risk of self-harm and facilitating Plaintiffs' ability to work and participate fully in society—all in the public interest. *See Koss v. Norwood*, 305 F. Supp. 3d 897 (N.D. Ill. 2018); *Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020). Conversely, denying relief would leave discriminatory barriers to care in place and frustrate the compelling public policy favoring equal access to health care. *See Koss*, 305 F. Supp. 3d at 924. Lastly, Aetna cites an interest in complying with ERISA. ECF No. 81 at 26 n.11. But a plan administrator's compliance with Section 1557 does not conflict with or violate ERISA. *See Tovar*, 342 F. Supp. 3d at 954.

19

Because Plaintiffs face grave, ongoing harm, with no apparent hardship to Aetna from an injunction, the balance of equities and the public interest tip decisively in Plaintiffs' favor.

### D.    The Bond Requirement Should Be Waived.

Aetna appears to argue that it is entitled to a bond because the plan sponsors would be required to pay claims, just as they do for any other covered procedures, when Aetna no longer denies GAFR to Plaintiffs based on the GAFR Exclusion. ECF No. 81 at 46. Aetna advances that Plaintiffs "should not be excused from posting the bonds necessary to protect their employers in the event Plaintiffs ultimately do not prevail on the merits in this case." *Id.* Aetna–the party–would suffer no financial loss and is not entitled to a security bond on behalf of the plan sponsors. *See Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011) (noting that the bond is contemplated for *the enjoined party*). Therefore, the bond requirement should be waived.

## CONCLUSION

For the reasons explained above, this Court should grant a preliminary injunction barring Aetna from enforcing the GAFR Exclusion in CPB 0615 and requiring it to review Plaintiffs' claims for medical necessity based on the same clinical criteria it already applies to other gender-affirming surgeries and to GAFR in states that require such individualized review.

DATED: April 29, 2025

Respectfully submitted,

/s/ Joseph J. Wardenski
Joseph J. Wardenski [ct31674]
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Phone: (347) 913-3311
Fax: (347) 467-7237
joe@wardenskilaw.com

Christine E. Webber (admitted *pro hac vice*)
Harini Srinivasan (admitted *pro hac vice*)
Aniko R. Schwarcz (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave, NW, Suite 800
Washington, DC 20005
Phone: (202) 408-4600
Fax: (202) 408-4699
cwebber@cohenmilstein.com
aschwarcz@cohenmilstein.com
hsrinivasan@cohenmilstein.com

Gabriel Arkles (admitted *pro hac vice*)
Ezra Cukor (admitted *pro hac vice*)
Sydney Duncan (admitted *pro hac vice*)
Kelly Parry-Johnson (admitted *pro hac vice*)
Seran Gee (admitted *pro hac vice*)
ADVOCATES FOR TRANS EQUALITY
EDUCATION FUND
520 Eighth Avenue, Suite 2204
New York, NY 10018
Phone:(646) 993-1688
Fax: (646) 993-1686
garkles@transequality.org
ecukor@transequality.org
sduncan@transequality.org
kparry-johnson@transequality.org

*Attorneys for Plaintiffs*