# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BINAH GORDON *et al*., | |
| Plaintiffs, | |
| v. | No. 3:24-cv-01447-VAB |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

## REBUTTAL DECLARATION OF R. NICHOLAS GORTON, M.D.

I, R. Nicholas Gorton, declare as follows:

1.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I submit this declaration in response to the declaration of Aetna employee, Robert McDonough, M.D. *See* Dkt. No. 83 ("McDonough Dec.").

2.      My background, qualifications, and the basis for my opinions are set forth in my initial declaration.

3.      I reserve the right to revise and supplement the opinions expressed in this declaration and my initial declaration or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## I.      The WPATH SOC 8[1]

---

[1] A true and complete copy of the World Professional Association for Transgender Health ("WPATH") Standards of Care Version 8 ("SOC 8") is attached as Attachment A.

4.    Dr. McDonough says opinions of medical associations, consensus panels, or other technology associations should be evaluated "according to the scientific quality of their supporting evidence and rationale." McDonough Dec. ¶ 6. For this point he cites the IOM (2011), *Clinical Practice Guidelines We Can Trust.* Washington, DC: The National Academies Press.

5.    Dr. McDonough neglects to mention that the SOC 8 follows those very IOM recommendations for reliable/high quality clinical practice guidelines. The SOC 8's development process is transparent, rigorous, and methodologically sound.[2] WPATH's methodology for the SOC 8 is on par with the normal development of clinical guidelines for every large medical association in the US. The SOC 8 is based on systematic reviews of the literature, expert opinion, and clinical experience.

6.    Within medicine, there are structured ways of looking at evidence and using this evidence to make recommendations both for clinical guidelines and ultimately individual patients. The most commonly used system is the GRADE system (Grading of Recommendations, Assessment, Development, and Evaluation), which is used by the World Health Organization, the US Agency for Healthcare Research and Quality, Cochrane, and also WPATH in its development of the SOC 8. In short, the process is that research is systematically reviewed for the quality of the individual publications, which is used as one of four determinants to make recommendations for patient care that are generally either described as strong or weak. In addition to the 1) quality of evidence, the other three determinants are: 2) balance of benefits and harms, 3) patients' values and preferences and how much variance there is in the patient population, and 4) resource/cost considerations.

---

[2] SOC 8 at S247 et seq.

7.      As discussed in more detail below, it is important to remember that the "quality" of a study, as the term is used in medical literature, has a technical meaning different from the informal uses of the word. Moreover, the quality of the research is only one of the considerations, and it is very possible to have low quality evidence produce a strong recommendation in a clinical guideline. As a simple example, the quality of evidence for the benefits of screening for diabetes by checking blood sugar levels in patients without symptoms is low but based on the balance of the above four factors, the American Diabetes Association strongly recommends screening for all adults over 35 at least every 3 years regardless of risk factors or symptoms.

8.      Dr. McDonough's description of what the SOC 8 says about gender affirming facial surgery ("GAFR") is distorted at best. Dr. McDonough characterizes the reference to facial surgery as a "very brief reference," indicative of a lack of consensus. McDonough Dec. ¶ 11. However, the SOC 8 has much more to say (and includes more citations from the literature) about GAFR than he acknowledges.

9.      Dr. McDonough repeatedly says or implies that WPATH does not consider GAFR medically necessary. *See, e.g.* McDonough Dec. ¶ 22. This is simply untrue. Multiple parts of the SOC 8 expressly name facial surgeries—which comprise GAFR—as among medically necessary surgeries recommended to treat gender dysphoria. For example (emphasis mine): "Medically necessary gender-affirming interventions are discussed in SOC 8. These include but are not limited to . . . gender-affirming facial surgery and body contouring; voice therapy and/or surgery."[3] And: "In general, most medically necessary surgeries can be thought of as involving three regions: the face, chest/breasts, and genitalia (internal and external). Additional medically

---

[3] SOC 8 at S18.

necessary procedures include body contouring and voice surgery."[4] These examples and the SOC 8 as a whole validate GAFR as medically necessary treatment for gender dysphoria.

10.     Dr. McDonough's observations about WPATH's engagement with the literature do not support his arguments that WPATH does not or should not consider GAFR medically necessary.  For example, he complains that only one study cited by the SOC 8 is prospective. McDonough Dec. ¶16. That criticism makes no sense. For starters, as discussed below, other longstanding medical procedures came into use because of retrospective research. An example is that traditional open appendectomy is almost exclusively supported by retrospective data. Also, there are multiple prospective studies reaching the same conclusion; that WPATH did not cite them—as they occurred after WPATH's literature search concluded—does not diminish the evidence.

11.     Dr. McDonough seems to criticize the number of studies about GAFR cited by WPATH. His observation that there is more research "supporting the efficacy of top and bottom surgery for the treatment of gender dysphoria than exists for facial gender affirming procedures, a fact even WPATH recognizes," is pointless. McDonough Dec. ¶16. It is common in medicine that multiple treatments for the same condition are supported by different amounts of research. The existence of more medical evidence for one treatment does not at all imply that there is inadequate evidence for the others. There is far more evidence, for example, that non-steroidal anti-inflammatory drugs (NSAIDs), such as Ibuprofen, are effective for pain relief than there is that acetaminophen (Tylenol) is effective for pain relief. But there is adequate evidence to support the use of both, and, indeed, it is important that patients have access to different

---

[4] SOC 8 at S125.

treatment options for the same issue—whether so that a pregnant person can have access to safe pain relief (which sometimes excludes NSAIDs) or a patient suffering a high fever can alternate between both drugs.

12.     Dr. McDonough also appears to criticize the SOC 8 based on which and how many studies are cited in its discussion of GAFR. First, he appears to ignore at least some of the literature cited in the SOC 8.[5] Second, the SOC 8 need not cite or discuss all of the studies in its explanatory text—the SOC 8 itself is not meant to be a comprehensive literature review or a meta-analysis. It is a clinical practice guideline based on GRADE methodology.

13.     Dr. McDonough's criticism of the SOC 8 for not including what he calls the University of North Carolina ("UNC") study is meritless. McDonough Dec. ¶ 15. Given that all of the outcomes research for GAFR described in the UNC study was also cited in the SOC 8 (and in fact the SOC 8 cited far more research than the UNC study), mention of the UNC study was unnecessary. Moreover, the UNC study lumps facial masculinization surgery (a more recent development for which there is less outcomes data) with facial feminization surgery (which has been performed for far longer and for which there is a larger body of evidence).

14.     McDonough also criticizes the SOC 8 for not citing Coon et al., which he refers to as the Facial Gender Symposium Consensus. McDonough Dec. ¶ 15.  The criticism makes no sense: three of Coon et al.'s co-authors were also authors of the SOC 8 and the SOC 8's

---

[5] *See, e.g.*, Colebunders, B., Brondeel, S., D'Arpa, S., Hoebeke, P., & Monstrey, S. (2017). *An update on the surgical treatment for transgender patients*. *Sexual medicine reviews*, *5*(1), 103-109; Van Boerumet al. M. S., Salibian, A. A., Bluebond-Langner, R., & Agarwal, C. (2019). *Chest and facial surgery for the transgender patient. Translational Andrology and Urology*,8(3), 219–227.; Altman, K. (2012). *Facial feminization surgery: Current state of the art. International Journal of Oral and Maxillofacial Surgery*, 41(8), 885–894. https://doi.org/10.21037/tau.2019.06.18; Altman, K. (2012). *Facial feminization surgery: Current state of the art. International Journal of Oral and Maxillofacial Surgery*, 41(8), 885–894. https://doi.org/10.1016/j.ijom.2012.04.024.

recommendations are in line with Coon et al.'s recommendation that GAFR be among the treatments that the SOC 8 recognize as being medically necessary.

15.     In the same vein, Dr. McDonough complains that the SOC 8 cites groups of studies on GAFR without describing their limitations. That is not at all unusual for clinical practice guidelines. An example is the American Heart Association's most recent update of the Advanced Cardiac Life Support guidance, which cites a group of studies supporting its recommendations for invasive angiography without reference to the studies' extensive discussion of their own limitations.[6] The SOC 8's discussion of the research is in line with what it is—a clinical practice guideline.

16.     Dr. McDonough's criticism of the SOC 8's discussion of the literature on outcomes measures is equally flawed. The paper he cites in support of his argument does not say there is bad or insufficient evidence of patient reported outcomes measures, but instead that the data produced by studies could better account for what patients feel is a good outcomes measure. McDonough Dec. ¶ 23.  In the end, the fact that the medical and scientific community is working to refine and improve outcomes measures does not mean that there is not enough information to show that GAFR alleviates gender dysphoria. It is simply a reflection of the normal course of medical and scientific research.

17.     Dr. McDonough states that there are some articles critiquing WPATH. McDonough Dec. ¶ 27. I will refrain from exhaustive discussion of the many shortcomings and biases of those articles here. None of those articles are relevant to the SOC 8's utility as a clinical practice guideline for medically necessary surgery such as GAFR.

---

[6] Perman, Sarah, et al. (2023). *2023 American Heart Association Focused Update on Adult Advanced Cardiovascular Life Support: An Update to the American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care.* https://www.ahajournals.org/doi/pdf/10.1161/CIR.0000000000001194

II.    **Evidence-Based Medicine**

18.    Dr. McDonough presents a misleading view of evidence-based medicine ("EBM").

19.    As a physician who has practiced in both the emergency department and in a primary care clinic for over two decades and who strives to provide EBM care to his patients, I am well acquainted with the uses and limitations of the medical literature (especially that regarding treatment of transgender patients).

20.    The medical and scientific community relies on EBM to treat health conditions.

21.    Dr. McDonough says that Aetna's Clinical Policy Bulletins ("CPBs") accept care as medically necessary when the consensus view of the medical evidence is that care is effective "for the purpose presented." McDonough Dec. ¶ 6.

22.    As detailed in my initial declaration and discussed below, the consensus view of the relevant medical and scientific community is that GAFR is medically necessary to treat gender dysphoria, which is a view based on multiple prospective and retrospective studies. To characterize the evidence for GAFR as lacking, McDonough resorts to vague, undefined standards, such as "well-designed," and oversimplifies and distorts EBM. McDonough Dec. ¶ 6.

23.    Dr. McDonough's reference to "sufficient high-quality evidence" implies that evidence must meet the definition of high quality to be adequate. McDonough Dec. ¶ 29. The medical literature does not provide high quality evidence to support a significant proportion of the treatments that are routinely provided to patients and compensated by insurance.

24.    High quality, as it is defined in the medical literature, has a technical meaning is different from day-to-day use of the words "high quality."  High quality evidence is generally

either a single large, double-blind if possible, randomized, controlled, prospective clinical trial, or a meta-analysis of multiple medium quality trials showing significant benefits. This level of evidence is simply not available for a wide array of medical interventions nor is it required for a physician to recommend a treatment.

25.    A landmark paper discussing EBM and its utility for making clinical decisions for patients was published in the BMJ in 1996, and to this day is regularly cited and is one of the most cited papers ever written in the medical literature.[7] Sackett et al. described it thusly: "Evidence based medicine is not restricted to randomised trials and meta-analyses. It involves tracking down the best external evidence with which to answer our clinical questions."[8]

26.    There are also no bright line rules about how many studies or what kind of studies are required to determine what treatment, based on the evidence, is necessary, safe, and effective to treat a particular condition. If there is a single high quality study with clear and significant results, that can be sufficient. If high quality evidence is not available but multiple studies of lower quality all have consistent results, that can be sufficient. Even a single low or very low quality study—or multiple case reports—may support an intervention as necessary in some situations, such as to treat a very rare, deadly condition.

27.    EBM does *not* mean refusing to provide or cover care unless it is supported by studies that are graded high quality. Dr. McDonough's insinuation otherwise is wrong. *See, e.g.*, McDonough Dec. ¶ 29. The evidence for the vast majority of medical treatments falls well below this level.

---

[7] Sackett, D. L., Rosenberg, W. M., Gray, J. M., Haynes, R. B., & Richardson, W. S. (1996). Evidence based medicine: what it is and what it isn't. *bmj*, *312*(7023), 71-72.
[8] *Id.*

28.    There are numerous examples of common treatments that many providers perform and insurers, including in my experience Aetna, pay for, that lack the level of supporting medical evidence that McDonough seems to say Aetna demands for GAFR. For example, the quality of evidence for efficacy of surgery to treat carpal tunnel syndrome is not high, but this surgery is still performed and covered. Similarly, there is no high quality evidence supporting endarterectomy to remove a blockage in the carotid artery in an asymptomatic patient, but it is typically performed and covered for significant blockages found on ultrasound. A traditional, open appendix removal is an intervention almost exclusively supported by retrospective data. While better evidence supports laparoscopic removal being preferred to open technique, if laparoscopic equipment were not available, refusing to perform an open appendectomy due to lack of prospective studies could lead to needless complications or even endanger the patient's life.

29.    Sometimes high quality evidence is not available because such studies would not only run afoul of medical ethics standards (by denying sometimes lifesaving care to patients), or would be impossible to perform, as cleverly illustrated in another BMJ article "Parachute use to prevent death and major trauma when jumping from aircraft: randomized controlled trial."[9] While this study concluded that "Parachute use did not reduce death or major traumatic injury when jumping from aircraft," it was due to the fact that those who were willing to jump without a parachute were only open to doing so while the plane was on the ground. Similarly, sufficiently large acute acetaminophen overdose was almost always fatal before the use of N-acetylcysteine ("NAC") as an antidote, and almost always survivable after the use of NAC. While the quality of the evidence supporting NAC remains very low for acute acetaminophen

---

[9] Yeh, R. W., Valsdottir, L. R., Yeh, M. W., Shen, C., Kramer, D. B., Strom, J. B., ... & Nallamothu, B. K. (2018). Parachute use to prevent death and major trauma when jumping from aircraft: randomized controlled trial. *bmj*, *363*.

overdose, it would be unethical to withhold lifesaving treatment in the interest of obtaining higher quality evidence.

30.     Dr. McDonough also seems to suggest that, before there would be "sufficient" evidence of medical necessity and in turn support for coverage, studies would also have to show that isolated procedures completely resolve the condition in question, and that studies ought not be relied on if they acknowledge limitations or identify avenues of further research. McDonough Dec. ¶ 26. Such a position is completely unfounded. I disagree with Dr. McDonough's characterization of the effectiveness of GAFR as a sole form of treatment, as explained in my initial declaration and below. But regardless, just because one treatment isn't effective in isolation does not mean it lacks evidence that it is medically necessary. For example, in a patient with a severe asthma attack in the ER, using nebulized albuterol alone is not going to work. Similarly, corticosteroids alone are not going to work. The same is true for supplemental oxygen. But together these three treatments are lifesaving. If you neglect any one of them in a patient with a severe asthma attack, the patient could suffer severe consequences including death. To suggest that because albuterol alone does not adequately treat a severe asthma attack, it is not medically necessary and can legitimately be denied by insurers is nonsensical. The same is true when it comes to gender dysphoria.

31.     Dr. McDonough also critiques studies for naming their limitations. *See, e.g.*, McDonough Dec. ¶¶ 13-20. All studies have limitations. It is not only customary but required for publication of research in peer-reviewed journals for authors to include in their discussion section the limitations of their study. Were acknowledgment of limitations an indication that the intervention studied was not supported by medical research, there would be no EBM for any treatment provided by modern medicine.

32.    Similarly, the statement that "more research is needed" does not indicate that there is not enough research supporting a treatment, but simply that the author is doing what the vast majority of other researchers do when publishing their studies—acknowledging that there are always further questions and avenues of inquiry. *See, e.g.*, McDonough Dec. ¶¶ 13-20

33.    Additional questions and limitations instead are to be read together with the whole article to understand the risks and benefits of treatments and how much insight the study gives providers for their particular patients' situation. They also inform researchers' subsequent studies. As such, they advance both clinical practice and scientific research.

34.    Dr. McDonough states that "Aetna cannot simply deem medical or scientific consensus to have been established," but he fails to acknowledge that Aetna ought not ignore medical and scientific consensus when it actually exists, simply because one could imagine an even more robust body of evidence supporting the same conclusion. In fact, Sackett et al. presciently described precisely what Aetna is attempting to do in this case: "Some fear that evidence based medicine will be hijacked by purchasers and managers to cut the costs of health care. This would not only be a misuse of evidence based medicine but suggests a fundamental misunderstanding of its financial consequences."[10]

35.    If the medical community abruptly decided to stop providing care unless it was supported by the quality of evidence that Aetna demands of GAFR, a significant proportion of the treatments that improve and even save the lives of countless patients would be simply off the table.

## III.    Dr. McDonough's Discussion of the Medical Literature

---

[10] Sackett, D. L., Rosenberg, W. M., Gray, J. M., Haynes, R. B., & Richardson, W. S. (1996). Evidence based medicine: what it is and what it isn't. *bmj, 312*(7023), 72.

36.     As detailed in my initial declaration, the literature shows that GAFR is medically necessary treatment that diminishes gender dysphoria. Gorton Dec. ¶¶ 8-26.

37.     Dr. McDonough did not point to a single study finding there was no positive effect on gender dysphoria for people who had GAFR. That is because studies have consistently shown that it is effective. Nor did he point to any studies indicating that the risk of treatment would outweigh the risk of nontreatment. The complication rate for GAFR is consistently low. I am unaware of any medical associations or consensus panels of researchers and clinicians who treat transgender patients that have concluded GAFR is not medically necessary to treat gender dysphoria in some patients. Dr. McDonough does not identify any either. That is because the only evidence-based conclusion one can draw from the peer-reviewed literature is that GAFR is adequately safe and significantly effective enough to recommend this as medically necessary treatment for some patients with gender dysphoria.

38.     Dr. McDonough also asserts that use of different terminology to describe GAFR is "confusion even as to terminology" and "indicative of the lack of cohesion and consensus in this area." McDonough Dec. ¶ 9. Would he similarly suggest that, since gynecologists use the terms total hysterectomy, radical hysterectomy, TAHBSO, TLHSBO, Wertheim's hysterectomy, total uterine and ovarian extirpation, and panhysterectomy to generally mean the removal of the uterus and both ovaries, the gynecologic literature about this procedure has a "lack of cohesion and consensus?" Medicine is one of the fields that is well known for having numerous terms for a single concept and the suggestion that because transgender medicine follows this pattern, it therefore lacks consensus, is illogical.

39.     Dr. McDonough also repeatedly selectively quotes and misconstrues the medical literature to insinuate that there is insufficient literature on GAFR to consider it medically

necessary. *See, e.g.*, McDonough Dec. ¶¶ 10, 12, 22, 28. The studies he cites, however, support rather than undermine that GAFR is medically necessary treatment for gender dysphoria. These studies also do not support his argument there is a lack of consensus on this point.

40.    I will discuss Dr. McDonough's treatment of three examples: Coon et al., Ainsworth et al., and Morrison et al. below.

*A. Coon et al.*[11]

41.    In discussing Coon et al.,[12] Dr. McDonough selectively quotes from the article to imply that the Evidence-Based Consensus Guidelines from the International Facial Gender Symposium concluded that GAFR was not medically necessary and that even the term medical necessity is ill defined in their specialty, plastic surgery. McDonough Dec. ¶ 13, 25. Far from it.

42.    Dr. McDonough neglects to include the paper's first and foremost conclusion: "The evidence demonstrates that core facial gender operations are not cosmetic, are medically necessary, and should be covered by insurance like other gender operations. WPATH SOC 8 should reflect the similarities between facial and other gender operations. In particular, the following procedures address the most common concerns and are shown to (a) make the face more feminine to observers and may decrease misgendering; (b) improve patient-reported facial perception and quality of life; and (c) cannot be dismissed as "cosmetic," as they arise solely from either the effect of testosterone on facial development or iatrogenic sequelae."[13]

43.    Dr. McDonough quotes excerpts from Coon et al.'s discussion of surgical techniques and the seventh of seven points of their conclusion. McDonough Dec. ¶ 13. To the extent McDonough implies this seventh conclusion means existing evidence does not justify

---

[11] A true and complete copy of this article is attached as Attachment B.
[12] Coon, D., et al. (2021). Facial gender surgery: systematic review and evidence-based consensus guidelines from the international facial gender symposium. *Plastic and reconstructive surgery*, *149*(1), 212-224.
[13] *Id.* at 222.

GAFR, that is flat wrong. The seventh point of conclusion is valid in that while there is an adequate evidence base to support the efficacy and safety of GAFR, more granular data would be beneficial to help inform decisions about what types of GAFR procedures are most likely to ameliorate the patient's gender dysphoria.

44.     Dr. McDonough's conclusion that the call for more research implies that there is inadequate evidence of GAFR's benefits is baseless. As discussed above, literature often identifies additional avenues for research. The phrase "more research is needed" is so cliche that BMJ banned the use of this phrase unless the authors provided more details and justifications why such research is needed (which Coon et al. actually did).[14] Dr. McDonough's repeated reliance on this phrase—in his discussion of Coon et al. and other studies—only shows that his assertion that there is insufficient literature on GAFR is weak and not otherwise supported by the literature he cites.

45.     Dr. McDonough cites Coon et al. to argue that GAFR may not be effective for patients over the age of forty. That is misleading. The paper explains that *without a face tightening procedure* (also called a face lift), the changes in the facial skeleton produced by GAFR may not be as apparent in patients over 40 years old, so performing a face tightening procedure may be medically necessary as an *additional* procedure in such patients.

46.     Dr. McDonough cites Coon et al. to imply that there is a lack of consensus or that it concluded GAFR is not medically necessary, when the opposite is true. The paper is a result of a symposium that brought together researchers and clinicians from all over the world who came

---

[14] Fiona Godlee, editor, BMJ. More research is needed—but what type? *BMJ* 2010;341:c4662, doi: https://doi.org/10.1136/bmj.c4662 (BMJ editor explains "no article was allowed to end with the redundant claim that more research is needed. We wanted something more informative—exactly what types of research are needed, addressing what specific questions?")

to a consensus statement that GAFR is medically necessary and supported by the medical literature.

B. *Ainsworth et al.*[15]

47.    In discussing Ainsworth et al.,[16] Dr. McDonough again omits critical information about the study and provides a misleading picture of the study as a whole. McDonough Dec. ¶ 19. As discussed in my initial declaration, Ainsworth et al. supports that GAFR is medically necessary.

48.    In the study, there were *two* instruments used to measure outcomes. Dr. McDonough only mentions one of these instruments—the "FFS Outcomes Evaluation"—but Ainsworth et al. also used a well validated measure of quality of life: the San Francisco short 36-question health questionnaire ("SF36v2"). The SF36v2 uses a norm-based scoring system with standard results obtained from a National Survey of Functional Health Status, so it gives a benchmark for the population at large to which groups of patients with mental health diagnoses can be compared.  Since, at the time of Ainsworth et al.'s publication fifteen years ago, there were no validated outcome measures for GAFR, the author adapted previously published and validated measures in facial plastic surgery for GAFR.[17] When publishing a new proposed outcome measure, it is common to also use a previously well validated measure to provide context to the research (and to ensure that a well validated measure is available to judge outcomes). This is a common way that new, unvalidated outcome measures are developed.[18]

---

[15] A true and complete copy of this article is attached as Attachment C.

[16] Ainsworth, T. A., & Spiegel, J. H. (2010). Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery. *Quality of Life Research*, *19*, 1019-1024.

[17] Alsarraf, R. (2002). Outcomes instruments in facial plastic surgery. *Facial plastic surgery*, *18*(02), 77-86.

[18] The FFSOE first published by Ainsworth has subsequently been used in research (including studies that Dr McDonough cites like Raffini et al., and Morrison et al. on GAFR and has been validated: Soledade, V. S., Sena, L. S., & Patrocínio, L. G. (2024). Validation of the Brazilian Portuguese language version of the facial feminization surgery outcomes evaluation the Brazilian Portuguese language version of the FFSOE. *Brazilian Journal of Otorhinolaryngology*, *90*(6), 101483.

15

49.    Referring to Ainsworth et al., Dr. McDonough also states: "That same study also found that patients receiving facial feminization surgery showed 'no statistically significant difference in mental health related quality of life' compared to the general female population. WPATH notes none of these limitations from the Ainsworth study." McDonough Dec. ¶ 19. I believe that Dr. McDonough may have misunderstood. Far from a limitation, his statement highlights a notable positive outcome of the study. Ainsworth et al. compared patients who had undergone GAFR to *two* populations: transgender women who had not undergone surgery and the general normative population of United States women. While transgender women who had not undergone surgery scored significantly lower than the normal range for women in the SF36v2, not only did the transgender women who had undergone GAFR score higher, their function had improved so much that they were *statistically indistinguishable* from the SF36v2 community women's sample. Dr. McDonough seems to believe this remarkable result is a negative outcome, perhaps due to misunderstanding either the study design or how the SF36v2 measure is utilized.

C.  *Morrison et al.*[19]

50.    Dr. McDonough quotes parts of Morrison et al. that appear to support his arguments but ignores others—including critical discussion and conclusions. As a result, his declaration paints an incomplete and misleading picture of study. *See, e.g.*, McDonough Dec. ¶¶ 17-18, 25. Morrison et al. does not support Dr. McDonough's argument that the literature is insufficient to demonstrate GAFR is medically necessary. As discussed in my initial declaration, Morrison et al. supports that GAFR is medically necessary.

---

[19]Shane D. Morrison et al., *Prospective Quality-of-Life Outcomes after Facial Feminization Surgery: An International Multicenter Study*, 145 J. of Am. Society of Plastic Surgeons: Plastic & Reconstructive Surgery 1499, 1499-1509 (2020). A true and complete copy of this article is attached as Attachment D.

16

51.     Dr. McDonough ignores Morrison et al.'s discussion that their data supports that "facial surgery clearly targets gender dysphoria to achieve improved quality of life."[20] He also ignores the conclusion that GAFR achieved positive outcomes for patients.[21]

52.     Instead, Dr. McDonough's discussion of Morrison et al. focuses almost exclusively on the study's discussion of its own limitations and identification of unknowns or suggestions for further research. But even his observations about these parts of the study often present an incomplete picture or miss the point.

53.     Dr. McDonough states that Morrison et al. surveyed patients at one and six months post-operatively and found that the study patients "'had feminine gender appearance and good overall aesthetic outcomes,' but that 'their gender appearance and general aesthetic outcomes were still not equal to those of cisgender women controls.'" McDonough Dec. ¶ 17. Dr. McDonough seems to make the clinical error of presuming that partial improvement in a patient's symptoms does not represent therapeutic success, even if complete resolution is not achieved.[22] Treatment effectiveness exists on a spectrum rather than a binary and it is important in medicine not to let "perfect be the enemy of good." Morrison et al. does note that although transgender women who underwent GAFR did not have facial features that were rated precisely as feminine as cisgender women, they had significantly improved facial femininity. Therefore, contrary to Dr. McDonough's opinion, the finding supports that GAFR is effective.

54.     Dr. McDonough also ignores other pertinent outcomes of the study. Morrison et al. used the (now validated) FFS Outcomes Score from Ainsworth et al. and demonstrated that patients had a persistent, statistically significant, and clinically significant improvement in their

---

[20] Morrison et al. at 1508.
[21] *Id* at 1505-1508.
[22] Anyone who has ever taken a pain medicine that significantly reduced but did not completely eliminate their pain can attest to the fact that while not perfect, "good" is far better than no treatment at all.

scores at one month and six months post-operatively. The FFS Outcome Score range is 0-100. The pre-operative score mean was 47.2, the one month post-operative score mean was 75, and at six months post-operative, the score mean was 80.6.

55.    Dr. McDonough also misrepresents Morrison et al.'s conclusions. He states: "Significantly, they specifically concluded, consistent with the findings of the Facial Gender Symposium researchers, that: Further characterization as to which facial feminization surgery procedures specifically are associated with improved outcomes is warranted, yet will likely prove difficult to assess, as facial feminization surgery is patient-specific and generally requires multiple concomitant procedures. Of note, no particular area of the face…or number of procedures…was associated with a statistically significant effect on facial feminization surgery outcome score or satisfaction outcomes in our cohort." McDonough Dec. ¶ 19. Morrison et al. is certainly making the *de rigueur* statement that "more research is required." However, the meaning of this statement in context was that since GAFR is most often a combination of several procedures on different parts of the face done at the same surgical event (in this study the average was 3.8 per patient, and the range was one through seven), it will remain difficult to determine what specific procedures are the most beneficial. This is because it would be unethical to do a study where patients are given serial individual procedures, since this would expose patients to increased risks (for example, an average of 3.8 separate episodes of anesthesia instead of one). This is an example of how some studies, while they might give more granular and detailed evidence, would never be allowed by an Institutional Review Board because of ethical and safety concerns.[23]

---
[23] Morrison et al. at 1507.

56.     Dr. McDonough continues to quote from Morrison et al.'s discussion of
limitations and questions for further study, including as to outcomes measures. McDonough Dec.
¶ 17. He is correct that the article notes its own limitations. None of these observations detract,
however, from the reality that there is sufficient literature to support that GAFR medically
necessary to treat gender dysphoria when clinically indicated.

****

57.     Using what are typical parts of a research publication to diminish the significance
of a study while failing to fairly describe the actual findings of the study as Dr. McDonough does
with Coon et al., Ainsworth et al., and Morrison et al. is not a fair scientific assessment of the
literature.  It is only by approaching the medical literature with an unbiased desire to (as
described by Sackett et al.) "[track] down the best external evidence with which to answer our
clinical questions" that clinicians can determine the best EBM care for our patients.[24]

### D.  Additional More Recent Literature

58.     Dr. McDonough claims Aetna CPBs are updated at least annually and reflect
current literature. McDonough Dec. ¶¶ 6-8.  But Dr. McDonough seems to have stopped his
review of more recent medical evidence published in the literature at 2022. Had Dr. McDonough
done such a review, I would have expected him to include the following articles—many cited in
my initial declaration—that provide additional evidence with regards to improvement in
psychosocial outcomes:

- Caprini, R. M., Oberoi, M. K., Dejam, D., Chan, C. H., Potemra, H. I. M., Morgan, K. B., ... & Lee, J. C. (2023). Effect of gender-affirming facial feminization surgery on psychosocial outcomes. *Annals of surgery*, *277*(5), e1184-e1190.

---

[24] Sackett, D. L., Rosenberg, W. M., Gray, J. M., Haynes, R. B., & Richardson, W. S. (1996). Evidence based medicine: what it is and what it isn't. *bmj*, *312*(7023), 72.

- Chou, D. W., Bruss, D., Tejani, N., Brandstetter, K., Kleinberger, A., & Shih, C. (2022). Quality of life outcomes after facial feminization surgery. *Facial plastic surgery & aesthetic medicine*, *24*(S2), S-44.
- Alper, D. P., Almeida, M. N., Hu, K. G., De Baun, H. M., Hosseini, H., Williams, M. C., ... & Alperovich, M. (2023). Quantifying facial feminization surgery's impact: focus on patient facial satisfaction. *Plastic and Reconstructive Surgery–Global Open*, *11*(11), e5366.
- Almeida, M. N., Long, A. S., Junn, A. H., Rivera, J. C., Hauc, S. C., Alper, D. P., ... & Alperovich, M. (2024). FACE-Q satisfaction ratings are higher after facial feminization surgery than hormone replacement therapy alone. *Transgender Health*, *9*(5), 436-443.
- Schmidt, M., Ramelli, E., Atlan, M., & Cristofari, S. (2023). FACE-Q satisfaction following upper third facial gender-affirming surgery using custom bone-section guides. *International Journal of Oral and Maxillofacial Surgery*, *52*(6), 696-702.

## IV.    What Criteria Aetna Could Use Instead

59.    Finally, Dr. McDonough suggests that there is not enough evidence to identify transfeminine people for whom GAFR is medically necessary. There is.

60.    As detailed in my initial declaration, I have twenty years of clinical experience serving as a primary care physician for transgender patients at a practice in California. In my experience, many patients are able to get GAFR covered by their health plans—including Medicaid and private insurance—when it is clinically indicated.

61.    After reviewing Aetna's CPB 0615 I would like to suggest appropriate criteria for assessing the medical necessity of GAFR:

1. Documentation of marked and sustained gender dysphoria; *and*

2. Other possible causes of apparent gender incongruence have been excluded; *and*

3. Mental and physical health conditions that could negatively impact the outcome of gender-affirming medical treatments are assessed, with risks and benefits discussed; *and*

4. Capacity to consent for the specific physical treatment; *and*

5.  Completion of six months of gender confirming hormone replacement therapy, unless hormone therapy is not desired or medically contraindicated.

These criteria are generally in line with the SOC 8's assessment criteria for gender-affirming surgery in adults. As a result, they are grounded in a combination of medical literature, evidence from clinical practice, and expert consensus.[25] These criteria are also akin to the criteria Aetna's CPB 0615 uses to assess the medical necessity of gender-affirming chest and genital surgeries.

**I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.**

Dated:  4/28/2025 | 3:57 PM PDT           Signed:  _Signed by:_

_R. Nicholas Gorton, M.D._

D1804439FF54464...

R. Nicholas Gorton, M.D.

---

[25] *See, e.g.*, SOC 8 at S31, S256.