# EXHIBIT B

152 F.4th 1245

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

United States Court of Appeals, Eleventh Circuit.

Anna LANGE, Plaintiff-Appellee,

v.

HOUSTON COUNTY, GEORGIA,

Houston County Sheriff Cullen Talton, in his official capacity, Defendants-Appellants,

Houston County Board of Commissioners, et al., Defendant.

No. 22-13626

|

Filed: 09/09/2025

**Synopsis**

**Background:** Transgender employee brought action against county and sheriff's office alleging that county health insurance plan's denial of coverage for gender-affirming care violated Title VII. The United States District Court for the Middle District of Georgia, No. 5:19-cv-00392-MTT, Marc T. Treadwell, J., 608 F.Supp.3d 1340, entered summary judgment in employee's favor, and county appealed. The Court of Appeals, 101 F.4th 793, affirmed. Rehearing en banc was granted.

**Holdings:** The Court of Appeals, Brasher, Circuit Judge, held that:

[1] plan's denial of coverage for gender-affirming care did not discriminate on basis of sex;

[2] plan did not discriminate on basis of transgender status;

[3] plan did not discriminate on basis of sex stereotypes; and

[4] plan did not facially violate Title VII by penalizing covered employees for transitioning.

Reversed, vacated, and remanded.

Newsom, Circuit Judge, concurred and filed opinion.

Rosenbaum, Circuit Judge, concurred in judgment and filed opinion.

Jill Pryor, Circuit Judge, dissented and filed opinion in which Jordan, Abudu, Kidd, and Wilson, Circuit Judges, joined.

Abudu, Circuit Judge, dissented and filed opinion.

Wilson, Circuit Judge, dissented and filed opinion in which Abudu and Kidd, Circuit Judges, joined.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (9)

**[1]    Federal Courts** 🔑 **Summary judgment**

**Federal Courts** 🔑 **Summary judgment**

Court of Appeals reviews district court's grant of summary judgment de novo, viewing all evidence, and drawing all reasonable factual inferences, in nonmoving party's favor.

**[2]    Civil Rights** 🔑 **Compensation and benefits**

Employer-provided health insurance is "privilege of employment" for purposes of Title VII, so if employer provides health insurance, its policy cannot discriminate based on protected characteristic. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

**[3]    Civil Rights** 🔑 **Disparate treatment**

Unlike other Title VII claims, disparate treatment claim based on facially discriminatory policy does not depend on why defendant discriminates, but rather on explicit terms of discrimination. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

**[4]    Civil Rights** 🔑 **Practices prohibited or required in general; elements**

Privilege of employment discriminates on basis of sex, in violation of Title VII, if changing

employee's sex would have yielded different choice by employer. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

1 Case that cites this headnote

**[5]**    **Civil Rights** 🔑 **Particular cases**

County health insurance plan's denial of coverage for natal male employee's gender-affirming care did not discriminate on basis of sex, in violation of Title VII; if natal male employee were instead natal woman who wanted female-to-male transition, insurance policy would not pay for it, and if employee were natal woman who sought coverage for same male-to-female transition that employee sought —perhaps for male dependent—county's policy would deny coverage. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

**[6]**    **Civil Rights** 🔑 **Particular cases**

County health insurance plan's denial of coverage for gender-affirming care did not discriminate on basis of transgender status, in violation of Title VII, even if transgender status was separately protected under Title VII; policy was classification based on medical use, and would cover procedures that made up transition for other purposes, whether or not employee who needed those procedures was transgender. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

1 Case that cites this headnote

**[7]**    **Civil Rights** 🔑 **Practices prohibited or required in general; elements**

Title VII forbids treating employees differently because of sex-based stereotypes about men or women. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

**[8]**    **Civil Rights** 🔑 **Discrimination by Reason of Sexual Orientation or Identity**

County health insurance plan's denial of coverage for gender-affirming care did not

discriminate on basis of sex stereotypes, in violation of Title VII; plan excluded coverage for suite of medical procedures that changed appearance of person's sex organs—regardless of whether goal was to differ from, or align with, natal sex. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

**[9]**    **Civil Rights** 🔑 **Particular cases**

County health insurance plan's denial of coverage for gender-affirming care did not facially violate Title VII by penalizing covered employees for transitioning; plan did not penalize employees who had undergone transition, but instead declined to extend coverage for transition operations. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1).

Appeal from the United States District Court for the Middle District of Georgia, D.C. Docket No. 5:19-cv-00392-MTT

**Attorneys and Law Firms**

Z. Gabriel Arkles, Ezra Ungrich Cukor, Seran Gee, Shayna Medley, Advocates for Trans Equality Education Fund, New York, NY, Kevin M. Barry, Quinnipiac University, Hamden, CT, Kenneth E. Barton, III, Michael Devlin Cooper, Cooper Barton & Cooper, LLP, Macon, GA, Catherine Fata, Jill Kaden Grant, Amanda Marie Payne, Wesley R. Powell, Willkie Farr & Gallagher LLP, New York, NY, for Plaintiff-Appellee.

Sharon P. Morgan, William Drummond Deveney, Richard Read Gignilliat, Patrick Lail, Fisher & Phillips LLP, Atlanta, GA, Defendants-Appellants.

Anna Marks Baldwin, Campaign Legal Center, Washington, DC, Tovah Calderon, U.S. Department of Justice, Washington, DC, for Amicus Curiae United States of America.

Jason Lee, Sydney Foster, DOJ-Crt, Washington, DC, for Amicus Curiae United States of America

Michelle Bone, Allen Overy Shearman Sterling US LLP, Washington, DC, Jon M. Greenbaum, Justice Legal Strategies, PLLC, Washington, DC, Katherine P. Kieckhafer,

Goldman Ismaelli Tomaselli Brennan & Baum LLP, Chicago, IL, Nicholas Mitrokostas, Allen Overy Shearman Sterling US LLP, Boston, MA, Dariely Rodriguez, Kathryn Youker, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Amicus Curiae Lawyers' Committee for Civil Rights Under Law.

Jon M. Greenbaum, Justice Legal Strategies, PLLC, Washington, DC, Katherine P. Kieckhafer, Goldman Ismaelli Tomaselli Brennan & Baum LLP, Chicago, IL, for Amici Curiae Equal Rights Advocates, the National Health Law Program, Anti-Defamation League.

Jon M. Greenbaum, Justice Legal Strategies, PLLC, Washington, DC, Dariely Rodriguez, Kathryn Youker, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Amici Curiae National Employment Law Project and LatinoJustice PRLDEF.

Joshua A. Block, American Civil Liberties Union Foundation, New York, NY, Jon M. Greenbaum, Justice Legal Strategies, PLLC, Washington, DC, Anya Anton Marino, National Women's Law Center, Washington, DC, Caroline Andrews McNamara, Daniel Boaz Tilley, ACLU Foundation of Florida, Inc., MIAMI, FL, Katherine P. Kieckhafer, Goldman Ismaelli Tomaselli Brennan & Baum LLP, Chicago, IL, Amicus Curiae National Women's Law Center, AFL-CIO, American Civil Liberties Union, Pride At Work.

Edmund Gerard LaCour, Jr., Alexander Barrett Bowdre, Office of The Attorney General, Montgomery, AL, for Amici Curiae State of Alabama, State of Florida, State of Georgia, State of North Dakota, State of Tennessee.

Joshua Divine, Missouri Attorney General's Office, Jefferson City, MO, Edmund Gerard LaCour, Jr., Alexander Barrett Bowdre, Office of The Attorney General, Montgomery, AL, for Amici Curiae State of Alaska, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Ohio, State of South Carolina, State of South Dakota, State of Texas, State of West Virginia.

Dan Morenoff, The American Civil Rights Project, Dallas, TX, for Amicus Curiae American Civil Rights Project.

Andrew L. Schlafly, Law Offices of Andrew L. Schlafly, Far Hills, NJ, for Amicus Curiae Association of American Physicians and Surgeons.

Joshua Kerry Payne, Campbell Miller Payne, PLLC, Dallas, TX, for Amicus Curiae Billy Burleigh, Kathygrace Duncan, Jane Smith.

Christopher Ernest Mills, Spero Law, LLC, Charleston, SC, for Amicus Curiae Christian Employers Alliance.

Eric Nieuwenhuis Kniffin, Kniffin Law PLLC, Colorado Springs, CO, for Amicus Curiae Ethics and Public Policy Center.

Joshua Divine, Missouri Attorney General's Office, Jefferson City, MO, for Amicus Curiae State of Wyoming.

Daniel Boaz Tilley, ACLU Foundation of Florida, Inc., MIAMI, FL, American Civil Liberties Union of Florida.

Joshua A. Rosenthal, Asian Law Caucus, San Francisco, CA, for Amici Curiae City of Cincinnati, City of Cleveland, City of Cuyahogo County, City of Iowa City, Iowa, City of Toledo.

Caroline Andrews McNamara, ACLU Foundation of Florida, Inc., Miami, FL, Joshua A. Rosenthal, Asian Law Caucus, San Francisco, CA, for Amicus Curiae City of Columbus.

Before William Pryor, Chief Judge, and Jordan, Rosenbaum, Jill Pryor, Newsom, Branch, Grant, Luck, Lagoa, Brasher, Abudu, Kidd, and Wilson, [*] Circuit Judges.

## Opinion

Brasher, Circuit Judge, delivered the opinion of the Court, in which William Pryor, Chief Judge, and Newsom, Branch, Grant, Luck, and Lagoa, Circuit Judges, joined.

Newsom, Circuit Judge, filed a concurring opinion.

Rosenbaum, Circuit Judge, filed an opinion concurring in the judgment.

JILL PRYOR, Circuit Judge, filed a dissenting opinion, in which Jordan, Abudu, Kidd, and Wilson, Circuit Judges, joined.

Abudu, Circuit Judge, filed a dissenting opinion.

Wilson, Circuit Judge, filed a dissenting opinion, in which Abudu and Kidd, Circuit Judges, joined.

Brasher, Circuit Judge:

**\*1248** Anna Lange, a transgender woman and deputy at the Houston County Sheriff's Office, sought a male-to-female sex change surgery [1] and requested that the County's employer-provided health insurance pay for it. But because the County's insurance policy excludes "[d]rugs for sex change surgery" and "[s]ervices and supplies for a sex change and/or the reversal of a sex change," the insurer denied Lange's request. **\*1249** Doc. 205 at 3–4. Lange then sued the County for disparate treatment because of sex under Title VII of the Civil Rights Act of 1964, and the district court held, among other things, that the plan's exclusion facially discriminates because of sex as a matter of law.

We took this appeal en banc to answer whether the insurance policy facially violates Title VII. We conclude that it does not. Many of Lange's arguments have been rejected by the Supreme Court. *See United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025). Although the plan does not cover sex change surgeries, it does not treat anyone differently based on a protected characteristic. Because the exclusion is not facially discriminatory under Title VII, we reverse the district court's judgment, vacate the permanent injunction, and remand for further proceedings consistent with this opinion.

## I.

Anna Lange, a natal male, has been a deputy with the Houston County Sheriff's Office since 2006. In 2017, Lange was diagnosed with gender dysphoria and began to openly identify as a woman. According to one of Lange's expert witnesses, gender dysphoria is a "serious medical condition" that creates "an intense and persistent discomfort" with one's biological anatomy. Doc. 132-3 at 6–7. Most transgender individuals seek some level of medical services in connection with their diagnoses. Those services range from mental health services, to counseling, to hormone therapy, to sex change surgeries.

A sex change surgery is a suite of medical procedures that can vary in purpose, cost, and complexity. It may include "[c]hest reconstruction surgery"; "[g]enital reconstruction surgeries" such as a "penectomy (removal of the penis), orchiectomy (removal of the testes), vaginoplasty, clitoroplasty, and/or vulvoplasty"; and other surgeries such as "facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation ..., and hair reconstruction, among others." *Id.* at 9.

As a deputy at the Houston County Sheriff's Office, Lange participates in the County's health insurance plan. Doc. 205 at 3. That plan, in total, excludes coverage for 68 medical categories and 29 pharmaceutical categories. Among the excluded medical categories are dental and vision care, elective abortions, contraceptives, hearing aids, fertility treatment, and oral surgeries. The plan excludes all coverage for "[s]ervices or supplies for male or female sexual problems," "[d]rugs to treat sexual or erectile problems," and treatments and drugs for "[i]nfertility." *Id.* 70, 72, 74. The plan also excludes coverage for cosmetic surgeries. And, since at least 1998, the plan has excluded "[d]rugs", "[s]ervices[,] and supplies for a sex change and/or the reversal of a sex change." *Id.* at 72, 74.

Because the plan does not exclude coverage for all treatments related to gender dysphoria, Lange took advantage of the plan to pay for hormones, endocrinologist visits, and psychologist visits. Lange testified to that effect, explaining that mental health services and "medication"—which Lange clarified includes hormones—were covered, and that insurance paid "the bulk of the charge" for Lange's endocrinology visits. Doc. 137-3 at 49–50; Doc. 150-18, Ex. 36, at 11–12.

As additional treatment for gender dysphoria, Lange sought a sex change surgery to alter Lange's male genitals to appear more like female genitals. Under this procedure, "the testicles will be removed, the urethra will be shortened, and the penile and scrotal skin will be used to line the **\*1250** neovagina, the space between the rectum and the prostate and the bladder." Doc. 144-1 at 7. After the procedure, the patient must undergo an "extensive regimen of post-surgery dilatation to prevent the closure of the neovagina." *Id.* Because no surgeon who could perform this procedure was available where Lange lived, Lange sought this care in New York from a specialist in sex change surgery. *See* Doc. 144-1 at 8 ("there's no one who does bottom surgery in [Lange's] community"); 179-3 at 44–45.

Citing the County's exclusion, the insurer that administers the County's plan denied coverage for Lange's sex change surgery. Lange then sued the County under Title VII for discrimination because of sex. The parties disputed why the County adopted the exclusion, and the district court held that the dispute was genuine. *See* Doc. 205 at 21 n.11 ("Because there is a genuine dispute of material fact as to whether the adoption and maintenance of the Exclusion was done with discriminatory intent, the Court does not reach the question of whether the Exclusion would subsequently

survive intermediate scrutiny."). But the district court held that the County's reasons for the policy did not matter under Title VII. *See id.* at 27 n.15 ("Although the parties debate whether the County's professed desire to save money is relevant to disprove discriminatory intent or to provide a legitimate nondiscriminatory reason appropriate in a *McDonnell Douglas* analysis, that debate has no place here."). The district court concluded that the County's insurance policy violated Title VII on its face, granted summary judgment for Lange, and permanently enjoined the exclusion of sex change surgery from the County's insurance policy.

The County appealed. After a divided three-judge panel of this Court affirmed the district court, *Lange v. Houston County*, 101 F.4th 793, 798–99 (11th Cir.), *reh'g en banc granted, opinion vacated*, 110 F.4th 1254 (11th Cir. 2024), we voted to take the case en banc and asked the parties to brief one question: whether the insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for Lange's sex change surgery, facially violates Title VII.

## II.

**[1]** "We review a district court's grant of summary judgment *de novo*, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the nonmoving party." *Baxter v. Santiago-Miranda*, 121 F.4th 873, 883 (11th Cir. 2024) (quotation omitted).

## III.

Health insurance is a heavily regulated industry. Congress has enacted statutes that bar insurance companies from denying coverage to individuals with preexisting conditions. 42 U.S.C. §§ 300gg–1(a), 300gg–3(a), 300gg–4(a). Other statutes prohibit insurers from charging higher rates to individuals based on their medical history. *Id.* §§ 300gg, 300gg–4(b). And yet more statutes require insurers to cover specific conditions, treatments, and periods of hospitalization. *Id.* § 18022(b); 29 U.S.C. §§ 1185–1185a.

**[2]** Title VII, however, does not directly regulate insurance policies. Instead, Title VII makes it unlawful for a covered employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Employer-provided health insurance is a "privilege of employment." *See* **\*1251** *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). So, if an employer provides health insurance, its policy cannot discriminate based on a protected characteristic.

**[3]** Lange has brought a disparate treatment claim against the County under Title VII. The Supreme Court has held that Title VII prohibits employers "from firing employees on the basis of homosexuality or transgender status" when "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex." *Bostock v. Clayton County.*, 590 U.S. 644, 669, 680, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). Lange argues that the sex change exclusion in the County's insurance policy violates Title VII because it reflects a "formal, facially discriminatory policy requiring adverse treatment of" transgender employees based on sex. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Unlike other Title VII claims, a disparate treatment claim based on a facially discriminatory policy "does not depend on why the [defendant] discriminates but rather on the explicit terms of the discrimination." *Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991).

The question for us is whether the County's insurance plan facially discriminates based on a protected characteristic. Lange makes four arguments that it does. None works. We will address each argument in turn.

**[4]** First, Lange argues that the policy discriminates on the basis of sex. Under *Bostock*, we apply a "simple test" for sex discrimination—"change one thing at a time and see if the outcome changes." 590 U.S. at 656, 671, 140 S.Ct. 1731. "[I]f changing the employee's sex would have yielded a different choice by the employer," then the employer has discriminated based on sex. *Id.* at 659–60, 140 S.Ct. 1731. Citing *Bostock*, Lange argues that the plan discriminates based on sex because it would have covered the requested surgery if Lange were born a female and denied coverage only because Lange was born a male. We disagree.

The Supreme Court recently rejected Lange's interpretation of *Bostock* in *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025). There, the plaintiffs argued that a Tennessee law discriminated based on sex

when it disallowed certain treatments for gender dysphoria in children but allowed those treatments for other medical conditions. The plaintiffs "urge[d]" the Court "to apply *Bostock*'s reasoning" to their equal protection claim. *Id.* at 1834. The Court assumed the plaintiffs were correct that *Bostock*'s reasoning applied outside the Title VII context. But it held that, "[u]nder the reasoning of *Bostock*, neither [the plaintiff's] sex nor his transgender status is the but-for cause of his inability to obtain testosterone." *Id.* at 1834.

More specifically, the Court reasoned that the law did not classify based on sex because "the law does not prohibit conduct for one sex that it permits for the other." *Id.* at 1831. Instead, the Court explained that the challenged law "divides minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to treat other conditions." *Id.* at 1833. Thus, "[i]f a transgender boy seeks testosterone to treat his gender dysphoria, [the law] prevents a healthcare provider from administering it to him"—and "[i]f you change his biological sex from female to male, [the law] would still not permit him the hormones he seeks." *Id.* at 1834. But, if the same hypothetical child seeks testosterone **\*1252** for a qualifying diagnosis, that child could obtain the testosterone regardless of his sex. *Id.*

 **[5]** The Supreme Court's reasoning in *Skrmetti* applies equally here. The County's policy does not pay for a sex change operation for anyone regardless of their biological sex. *See id.* at 1831 ("*[N]o* minor may be administered [the prohibited drugs] to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of *any* sex may be administered puberty blockers or hormones for other purposes"). Lange is a natal man. If Lange were instead a natal woman who wanted a female-to-male sex change, the insurance policy would not pay for it. Or if Lange were a natal woman who sought coverage for the same male-to-female sex change that Lange received (perhaps for a male dependent), the County's policy would operate in the same way—it would deny coverage. Nothing about the policy exclusion turns on whether the County's employee is a man or woman.

The same is true when we consider the specific procedures that were part of Lange's sex change surgery. Lange's sex change surgery involved the removal of the testicles, the shortening of the urethra, and the creation of a neovagina. Let's change "one thing" and assume Lange were a natal woman instead of a natal man: would the insurance policy have covered any of those procedures as part of a sex change?

Again, the answer is no. Some of those procedures would be impossible for a person with a female anatomy to undergo. *See, e.g.*, *id.* at 1830 (explaining that when "a transgender boy (whose biological sex is female) takes puberty blockers to treat his gender incongruence, he receives a different medical treatment than a boy whose biological sex is male who takes puberty blockers to treat his precocious puberty"). And others would be denied to both natal men and natal women as part of a sex change. For example, if a natal woman needed a neovagina as part of a sex change surgery—perhaps as a reversal of a previous female-to-male sex change—the plan would deny coverage for that procedure just as it denied coverage for Lange as a natal man. On the other hand, these procedures would be covered when required because of medical conditions, such as cancer or injuries from a car accident, for an employee of either sex (subject to the policy's other exclusions). "Under the logic of *Bostock*, then, sex is simply not a but-for cause." *Id.* at 1835.

Second, even if the exclusion does not discriminate based on sex, Lange says that the County's plan discriminates based on transgender status because it does not cover treatments for gender dysphoria to the same extent that it covers treatments for other conditions. Neither the Supreme Court nor this Court has held that transgender status is separately protected under Title VII apart from sex. And *Bostock* did not add transgender status, as a category, to the list of classes protected by Title VII. To the contrary, the Court expressly denied that it was answering any question other than "whether an employer who fires someone simply for being ... transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex' " within the meaning of Title VII's plain terms. *Bostock,* 590 U.S. at 681, 140 S.Ct. 1731 (quoting 42 U.S.C. § 2000e-2(a)(1)).

 **[6]** But, even if this theory were viable under Title VII, the County's plan does not facially discriminate based on transgender status. Again, the Supreme Court rejected a very similar argument in *Skrmetti*. There, the plaintiffs argued that the Tennessee law discriminated based on transgender status because it prohibited healthcare providers from administering **\*1253** puberty blockers or hormones to treat gender dysphoria, although it allowed them to be prescribed for other conditions. The Court, however, held that the law did not "classify on the basis of transgender status." *Skrmetti,* 145 S. Ct. at 1833. The Court recognized that "a key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address." *Id.* at 1830. Applying that insight to the discrimination question, the Court held

that the state law did not discriminate based on transgender status because it did "not exclude any individual from medical treatments on the basis of transgender status but rather remove[d] one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 1833.

Although the plaintiffs' claim in *Skrmetti* arose under the Equal Protection Clause, the Court expressly held that the state statute at issue did not discriminate based on transgender status under the same Title VII precedents that we must apply here. This was so, the Court explained, because "changing a minor's sex or transgender status does not alter the application" of the challenged statute. *Id.* at 1834. The Court reasoned that, because a "transgender boy" could "obtain the [treatment] regardless of his sex or transgender status" if he had a "permissible diagnos[is]," *id.,* the challenged law did not discriminate based on transgender status. *Id.* The Court said point blank: "Under the reasoning of *Bostock,* neither [the plaintiff's] sex *nor his transgender status* is the but-for cause of his inability to obtain" the prohibited treatment. *Id.* (emphasis added).

For all the same reasons, we likewise conclude that the County's plan does not facially discriminate based on transgender status. Like the law at issue in *Skrmetti,* the County's policy is a "classification based on medical use." *Id.* at 1833. The plan does not say, for example, that transgender employees must pay more than nontransgender employees or that transgender employees or their dependents receive reduced benefits. *See, e.g., Newport News,* 462 U.S. at 684, 103 S.Ct. 2622 ("[T]he husbands of female employees receive[d] a specified level of hospitalization coverage for all conditions," but "the wives of male employees receive[d] such coverage except for pregnancy-related conditions"); *L.A. Dep't of Water & Power v. Manhart,* 435 U.S. 702, 705, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (policy "required female employees to make monthly contributions to the fund which were 14.84% higher than the contributions required of comparable male employees"). Instead, as we have already explained, the County's plan would cover the procedures that make up a sex change for other purposes, such as treatment for cancer or reconstructive surgery following a car accident, whether or not the employee who needed those procedures was transgender. *See Skrmetti,* 145 S. Ct. at 1834 ("[I]f he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status.").

Our dissenting colleagues say that the Supreme Court's extensive discussion of *Bostock* in *Skrmetti* is either distinguishable or dicta or both. We disagree. In *Skrmetti,* the plaintiffs argued that, under the reasoning of *Bostock,* they had been discriminated against based on sex and transgender status. *Id.* at 1834. *See also id.* at 1874-78 (Sotomayor, J., dissenting) (making the same argument). The Supreme Court's analysis of *Bostock* is why the Court rejected that argument. The Court assumed without deciding that *Bostock* applied to the plaintiffs' equal protection claim and concluded that their argument failed because, "[f]or reasons we **\*1254** have already explained, changing the minor's sex or transgender status does not alter the application of" the challenged state law. *Id.* at 1834. It expressly held that, "[u]nder the reasoning of *Bostock*" and "[u]nder the logic of *Bostock,*" there was no discrimination based on sex or transgender status for reasons that (as we have already explained) apply equally here. *Id.* at 1834–35.

It is passing strange that our dissenting colleagues rely extensively on *Bostock,* and, at the same time, reject the Supreme Court's own explanation of what *Bostock* means. [2] We have said many times that "[t]he holding of a case comprises both the result of the case and those portions of the opinion necessary to that result." *E.g., United States v. Gillis,* 938 F.3d 1181, 1198 (11th Cir. 2019) (quotation marks omitted). Under that standard, *Skrmetti*'s holding about the meaning of *Bostock* is binding on us unless and until the Supreme Court says otherwise. As lower court judges, we cannot shut our ears when the Supreme Court tells us how to apply its precedents.

[7] [8] Third, Lange argues that the plan facially discriminates based on sex stereotypes. Title VII forbids treating employees differently because of sex-based stereotypes about men or women. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). But this exclusion is not based on stereotypes. *Cf. Skrmetti,* 145 S. Ct. at 1832 ("the plaintiffs' allegations of sex stereotyping are misplaced"). If the plan discriminated against participants because of gender stereotypes, it would presumably cover procedures to *align* a participant's physical characteristics with those of his or her biological sex. But it does not do that. On the contrary, the plan excludes coverage for a suite of medical procedures that change the appearance of a person's sex organs—regardless whether the goal is to differ from, or align with, natal sex.

**[9]** Fourth, Lange argues that the plan's exclusion facially violates Title VII because it penalizes a person for transitioning. But this argument is simply a mischaracterization of the plan's function. The fact that the plan excludes coverage for one treatment for gender dysphoria is not a penalty in any sense of the word. The plan does not, for example, impose a surcharge on employees who have undergone a sex change. Instead, the plan declines to extend a benefit—namely, coverage for a sex change operation. And that benefit is declined to everyone.

Finally, although Lange implies that the County's policy lacks a legitimate justification, that question is well outside the scope of this appeal. The question here is about alleged discrimination *on the face of the policy*. The district court expressly held that the County's reason for the policy was a matter of genuine dispute and could not be resolved at summary judgment. *See* Doc. 205 at 21 n.11 (holding that "a genuine dispute of material fact" exists as to "whether the adoption and maintenance of the Exclusion was done with discriminatory **\*1255** intent"). Lange did not challenge the district court's conclusion on appeal. The panel, of course, did not reach the issue. *See Lange v. Houston County*, 101 F.4th 793, 799 (11th Cir. 2024) (holding that the policy is "facially discriminatory" and going no further), *reh'g en banc granted, opinion vacated*, 110 F.4th 1254 (11th Cir. 2024). And we did not ask the parties to brief that issue en banc—telling the parties instead to address whether the policy "facially violates Title VII" no matter its justification.

In short, the County's plan does not facially violate Title VII. The County's plan draws a line between certain treatments, which it covers, and other treatments, which it does not. That line may or may not be appropriate as a matter of health care policy, but it is not facial discrimination based on protected status.

## IV.

Because we conclude that the plan is not facially discriminatory under Title VII, we **REVERSE** the district court's judgment, **VACATE** the permanent injunction, and **REMAND** for further proceedings consistent with this opinion.

Newsom, Circuit Judge, concurring:

I concur. Lange's Title VII challenge is foreclosed by the portion of the Supreme Court's recent opinion in *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025), that addresses and explains its earlier decision in *Bostock v. Clayton County*, 590 U.S. 644, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). I write separately simply to emphasize that I don't take either *Skrmetti* or today's en banc opinion to collapse the separate analyses that apply to claims under Title VII and the Fourteenth Amendment's Equal Protection Clause. For reasons I'll try to explain briefly, I don't think there would be any valid justification for doing so.

Title VII and the Equal Protection Clause have certain commonalities, to be sure. They share some of the same conceptual "space" and, as relevant here, both prohibit sex discrimination in certain circumstances. But they're also different in some very significant ways.

Most importantly by far, there's the issue of text: The two provisions use different *words*. The Equal Protection Clause says that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Title VII states that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A court's most fundamental job is to interpret the words and phrases used in written documents —in particular, words and phrases authored by others, be they the Framers, legislators, regulators, or private parties. Ideally, the court will do so by giving those words and phrases the meanings "they conveyed to reasonable people at the time they were written." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 16 (2012). Because the Equal Protection Clause and Title VII were adopted at different times—indeed, nearly a full century apart—and employ different terms, their respective interpretations can't simply be merged into an undifferentiated whole.

The textual differences, while paramount, are just the tip of the iceberg—the distinctions run deep and wide:

- To start with the most obvious, the Equal Protection Clause and Title VII have different sources: The former **\*1256** is constitutional; the latter is statutory.

- The two also have different fields of operation: The Equal Protection Clause applies to all manner of discriminatory actions, but only those taken by government entities,

*see, e.g.*, *NCAA v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988); Title VII reaches only employment-related discrimination, but applies to private entities as well as public, *see, e.g.*, *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 304 n.7, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

- Another difference, noted by the most (in a good way) "notorious" sex-equality advocate of her generation: "The Equal Protection Clause ... prohibits only intentional discrimination," while "Title VII ... aims to eliminate all forms of employment discrimination, unintentional as well as deliberate." *Ricci v. DeStefano*, 557 U.S. 557, 627, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (Ginsburg, J., dissenting).

- Yet another: At least as implemented by the Supreme Court, the provisions operate on different objects, so to speak: The Equal Protection Clause focuses on classifications (race, sex, etc.) and groups (black people, white people, men, women, etc.), *see, e.g.*, *Skrmetti*, 145 S. Ct. at 1828–29, whereas in a Title VII case, the court's "focus should be on individuals, not groups," *Bostock*, 590 U.S. at 658, 140 S.Ct. 1731; *see also L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 709, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (observing that Title VII "requires that [courts] focus on fairness to individuals rather than fairness to classes").

- One more: At least under current law, the two provisions entail different doctrinal frameworks. If a court applying the Equal Protection Clause concludes, for instance, that a state statute or policy classifies on the basis of sex, it must then march through a multi-part heightened-scrutiny analysis in order to determine whether a violation has occurred. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 531–34, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Title VII, by contrast, is effectively a toggle: If a court concludes that an employer's action discriminates on the basis of sex, it is verboten per se. *See, e.g.*, *Bostock*, 590 U.S. at 659, 140 S.Ct. 1731.

So, the Court is quite right to reject Lange's Title VII claim—the portion of *Skrmetti* that explains *Bostock* requires as much. But to be clear, at least as I see things, the analyses that govern challenges brought under Title VII and the Equal Protection Clause remain separate—as they must, for both textual and doctrinal reasons. [1]

**Rosenbaum**, Circuit Judge, concurring in the judgment:

**\*1257** I concur in the judgment because I agree that *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025), binds us in this case. *Skrmetti* held that a Tennessee law prohibiting prescribing puberty blockers to minors for gender-affirming purposes does not violate the Equal Protection Clause. *Skrmetti* reached this conclusion because it determined the law neither discriminated based on sex, nor discriminated based on transgender status since, the Court said, the law does not classify by sex or transgender status. [1]

To be sure, Lange brings a sex-discrimination claim under Title VII, not the Equal Protection Clause. And *Skrmetti* is an Equal Protection Clause case. But the first step in both Title VII and Equal Protection Clause cases requires us to determine whether the law or program at issue classifies on the basis of a protected status. Though Title VII and Equal Protection Clause analyses don't always use the same understandings of discriminatory classifications to determine the answer to that first step, *Skrmetti* says it applied both understandings of discriminatory classifications and arrived at the same answer: the law in *Skrmetti* did not use a discriminatory classification.

In particular, the Court held that a law that prohibited healthcare providers from prescribing puberty blockers and hormones to minors—but only for a diagnosis of gender dysphoria—did not classify by sex or transgender status. And because a party argued that Title VII's methodology requires the conclusion that the law classified by sex, *Skrmetti* had to consider whether it did. *Skrmetti* determined that Title VII demands no such conclusion. That binds us.

As I explain later in this opinion, I haven't found a meaningful way to distinguish Houston County's healthcare plan—which excludes from coverage certain surgeries, but only if they involve (in the words of the plan) a "sex change" (a procedure one would have only to address gender dysphoria)—from the law at issue in *Skrmetti*. So *Skrmetti* requires me to conclude that the plan doesn't classify by sex.

I say this with deep regret for three reasons. First, as Judge Wilson explains, *see* Wilson Op. at 1290-91 n.2, the record compellingly reveals that Houston County precludes sex-affirming surgeries for discriminatory reasons. Despite this, our decision today leaves Lange with no remedy for her disparate-treatment claim. Second, most respectfully,

*Skrmetti*'s conclusion that the law there didn't discriminate by sex or transgender status, even under Title VII's understanding of discriminatory classifications, conflicts with decades of Title VII jurisprudence culminating in *Bostock v. Clayton County*, 590 U.S. 644, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020), the opinion on which it relies. In my view, *Skrmetti* incorrectly applies *Bostock*'s test, so it wrongly determines that the *Skrmetti* **\*1258** law did not classify by sex. And third, *Skrmetti*'s determination that the law there didn't discriminate by sex or transgender status, even under Title VII's understanding of discriminatory classifications, effectively imports the reasoning of *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), into Title VII jurisprudence. But Congress expressly amended Title VII to reject the holding and reasoning of *Geduldig*, overriding the Supreme Court's extension of the reasoning of that case to the statute. The Supreme Court itself recognized this in *Newport News Shipbuilding & Dry Dock Co. v. Equal Employment Opportunity Commission*, 462 U.S. 669, 678, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (acknowledging that "[w]hen Congress amended Title VII in 1978, it unambiguously expressed its disapproval of *both the holding and the reasoning* of the Court in the [*General Electric Co. v.*] *Gilbert* [ 2 ] decision," which had applied *Geduldig*'s understanding of discriminatory classifications to the Title VII context (emphasis added)).

*Geduldig* is a fifty-one-year-old *opinio non grata* that the Court had essentially exiled—even in the Equal Protection Clause context—until just recently. For good reason. Most respectfully, *Geduldig*'s reasoning is illogical and cannot peacefully coexist with the Supreme Court's discrimination jurisprudence—or even with the concept of discrimination.

But *Geduldig*'s doctrinal shortcomings shouldn't surprise us. After all, the Supreme Court issued it in 1974—two years *before* the Court first articulated its modern-day framework for how courts analyze sex-discrimination claims under the Equal Protection Clause. *See Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). [3] So the Court couldn't have designed *Geduldig* to be consistent with the body of antidiscrimination law that came after it. [4]

I write separately to explain how *Skrmetti* incorrectly imports *Geduldig*'s reasoning into Title VII and to respectfully add my voice to the chorus of those urging the Court to reconsider *Geduldig*'s reasoning and *Skrmetti*. [5]

**\*1259** This concurrence proceeds in three parts. First, I summarize how discrimination jurisprudence generally works. Then, I explain why *Geduldig* clashes with that framework, is illogical even on its own terms, and should be overturned. And last, I show how *Skrmetti* wrongly applied *Bostock* and, in the process, imported *Geduldig*'s reasoning when it determined that the law there did not classify by sex or transgender status, even under Title VII's methodology for determining discriminatory classes.

## I. The Equal Protection Clause's Two-Step Approach to Discrimination Law

To explain why *Geduldig* was wrongly reasoned, we must think about how discrimination jurisprudence generally works.

But first, a remark on terminology: I use the phrase "discrimination jurisprudence" throughout this concurrence as a shorthand. Of course, the right to be free from discrimination has many sources in American law. These include the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, and more specific employment-related statutes—like the Equal Pay Act of 1963, the Age Discrimination in Employment Act of 1967, the Pregnancy Discrimination Act of 1978, and the Americans with Disabilities Act of 1990, among others. So of course, the analysis of discrimination claims isn't identical across statutes, [6] or between Title VII and the Equal Protection Clause.

Equal Protection Clause discrimination jurisprudence uses a two-step analysis to determine whether a violation has occurred. At the first step, we ask "whether a law 'differentiate[s] on the basis of [a suspect classification, like sex, race, national origin, or religion].'s " *Skrmetti*, 145 S. Ct. at 1875 & n.9 (Sotomayor, J., dissenting) (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 58, 137 S.Ct. 1678, 198 L.Ed.2d 150 (2017)). If so, we proceed to the second step. At step two, we consider whether the state has met its "demanding" "burden" of showing that a law that differentiates on the basis of a suspect classification on its face has an "exceedingly persuasive" justification. *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

Similarly, for a facial challenge like Lange's, Title VII precedents like *Bostock* "ask[ ] the very same question our equal protection precedents do" at step one of the analysis

—namely, "whether a law 'differentiate[s] on the basis of gender.' " *Skrmetti*, 145 S. Ct. at 1875 & n.9 (Sotomayor, J., dissenting) (quoting *Sessions*, 582 U.S. at 58, 137 S.Ct. 1678). If so, that's pretty much the end of the Title VII inquiry because "Title VII offers employers no similar opportunity [to step two of the Equal Protection Clause framework] justify discrimination ...." *Id.* at 1875 n.9.

Importantly, both Title VII and the Equal Protection Clause ask whether a law **\*1260** classifies by a protected class at the level of the individual. *See Bostock*, 590 U.S. at 658, 140 S.Ct. 1731 (stating that in analyzing Title VII claims, "our focus should be on individuals, not groups"); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("[T]he ... Fourteenth Amendment[ ] to the Constitution protect[s] *persons,* not *groups.*" (emphases in original)). But while the Court's "cases discussing constitutional principles [in the Equal Protection context] *can* provide helpful guidance in th[e] statutory context" of Title VII, the analyses aren't entirely coextensive. *See Ricci v. DeStefano*, 557 U.S. 557, 582, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (emphasis added).

In particular, at step one of the analysis, they differ when it comes to how each line of precedent treats *Geduldig*—which undergirded the Supreme Court's decision in *Skrmetti*.

This is significant. It means the analysis can differ in how we answer the question whether a given law classifies on the basis of sex. I explain this further in the next section. In *Skrmetti*'s Equal Protection context, the Court embraced *Geduldig*'s logic. *See* 145 S. Ct. at 1833–34. But in the context of Title VII, the Court—and Congress, for that matter—have expressly rejected that reasoning. [7] *See* J. Pryor Dissenting Op. at 1276-77; *see also Newport News*, 462 U.S. at 678, 103 S.Ct. 2622.

So to be sure, the analyses under the Equal Protection Clause and Title VII aren't identical. And this concurrence isn't, of course, a treatise on nondiscrimination law, nor does it intend to serve as a comprehensive primer on all the nuanced distinctions among different species of discrimination claims. Rather, what matters, for our purposes, is discussing the high-level two-step analysis that generally applies to disparate-treatment discrimination claims under (as relevant here) the Equal Protection Clause and how the first step of that analysis differs under Title VII, even though we ask the same question about whether a law classifies on a suspect (or protected, in Title VII cases) classification basis in both frameworks.

With that background in mind, I zoom in on the Equal Protection framework.

As I've mentioned, Equal Protection Clause discrimination jurisprudence generally employs a two-step analysis. *See, e.g.*, Russell W. Galloway, Jr., *Basic Equal Protection Analysis*, 29 SANTA CLARA L. REV. 121, 123–24 (1989). At the first step, we consider whether the challenged program classifies on the basis of a suspect classification—that is, a classification like sex, race, national origin, or religion. *See id.*

**\*1261** We call them "suspect" classifications because legislatures have historically unjustly discriminated against those groups, simply because their members are born into them. *See, e.g., id.* at 133–36, 145 n.111 ("Intensified scrutiny is appropriate because, historically, [protected-class members] have been the victims of discrimination."); *Sessions*, 582 U.S. at 62–64, 137 S.Ct. 1678. But the Constitution considers all Americans to be born equal. *See, e.g.*, U.S. CONST. amend. XIV, § 1; AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 380–85 (2005). So when a law classifies on the basis of a suspect classification, we must conduct a methodical, searching inquiry into it to ensure that the law doesn't violate the Constitution. *See* Galloway, *supra*, at 123–24.

That's why the answer to the first question of Equal Protection Clause discrimination analysis—whether the law classifies by a suspect classification—determines what we do at the second step of the analysis. If the program doesn't classify on the basis of a suspect classification, we apply rational-basis scrutiny to the law or program. And rational-basis scrutiny means the program will usually survive constitutional review because we need only hypothesize a rational reason for the program to uphold it. [8] We generally trust the legislature has a good reason for classifying on these bases. *See id.*

But if the program classifies on the basis of a suspect classification, we apply heightened scrutiny in reviewing it. Depending on the suspect classification, that level of scrutiny can be intermediate or strict. But either way, it is far harder for a program to survive heightened scrutiny than rational-basis review. That is, we look with a skeptical eye towards these classifications because of legislatures' historical practice of unjustly discriminating on these bases. We need to make sure that the real purpose behind the challenged law is not to treat a group of people unequally, as can often be the case with these classifications. *See id.*

Because whether a program classifies on the basis of a suspect classification often determines whether it can survive the second step of the Equal Protection Clause discrimination-jurisprudence framework, it is critical to get the first step of discrimination analysis right. But *Geduldig* didn't. And in the process, it illogically distorted and hopelessly confused the definition of "classification." As a result, *Geduldig* subjects laws that we should be skeptical of, in light of our country's history of sex discrimination, to the deference of rational-basis review. And in fact, as I explain in the next section, *Geduldig* itself does just that.

## II. *Geduldig*'s Illogical Misapplication of Discrimination Law

In *Geduldig*, the Court analyzed whether California's disability insurance plan violated the Equal Protection Clause. All workers—both male and female—had to pay 1% of their wages into the insurance plan. But the state defined "disability" to exclude coverage for "certain disabilities resulting from pregnancy." 417 U.S. at 486, 94 S.Ct. 2485.

Even though only women can get pregnant and the program didn't exclude coverage **\*1262** for any male-exclusive conditions, *see id.* at 489, 94 S.Ct. 2485, the Court determined that the program didn't classify by sex, *id.* at 494–97, 94 S.Ct. 2485. The Court reasoned that the program "divided potential recipients into two groups: 'pregnant women and non-pregnant persons,' " and "women fell into both groups[.]" *Skrmetti*, 145 S. Ct. at 1833 (quoting *Geduldig*, 417 U.S. at 496 n.20, 94 S.Ct. 2485). So, the Court concluded, "the program did not discriminate against women as a class." *Id.* Rather, the Court characterized the program as doing no more than "remov[ing] one physical condition—pregnancy—from the list of compensable disabilities." *Geduldig*, 417 U.S. at 496 n.20, 94 S.Ct. 2485. And in determining that the program didn't classify by sex, the Court also considered that the cost of the program would increase if it covered pregnancy-related disabilities. *See id.* at 493–94, 94 S.Ct. 2485.

*Geduldig*'s classification determination is wrong for at least four reasons.

First, it is factually incorrect to say that the program, which excluded coverage for pregnancy-related conditions, which only females can experience, while covering male-only medical conditions, did not classify by sex.[9] Indeed, in its most classic formulation, a classification is based on sex

when an individual assigned female at birth is disadvantaged relative to a comparable individual assigned male at birth (or vice versa), because of that person's sex.[10] That's exactly what occurs when females who have sex-linked medical conditions receive no protection while males with sex-linked medical conditions do.

Second, *Geduldig*'s logic embraces historic sex stereotyping, which flouts the purpose of antidiscrimination law. At step one, we must decide whether a law differentiates on the basis of a suspect classification because laws that do *may* have been driven by sex stereotyping or other forms of discriminatory animus. And ironically, the line *Geduldig* draws—on pregnancy—buys into the exact kind of historic sex stereotyping that our antidiscrimination jurisprudence is designed to root out.

Third, *Geduldig* effectively applies a special and unwarranted exception for suspect classifications that also involve medical conditions. But discrimination on the basis of medical conditions is often a proxy for discrimination on the basis of suspect classifications. So excusing discrimination on the basis of a suspect class merely because it also involves medical conditions allows laws that discriminate on the basis of a suspected classification to avoid the heightened scrutiny they deserve.

And fourth, *Geduldig*'s logic improperly invites courts to consider, at step one, whether a law is justified when they should be assessing only whether a law classifies on the basis of a suspect classification. That undermines the courts' ability to engage in meaningful scrutiny at step two.

I explain each problem below.

### *A. Geduldig is illogically reasoned under our discrimination jurisprudence.*

*First*, despite *Geduldig*'s holding, it's common sense that a program that excludes coverage for female-only medical conditions, but not any male-only ones, **\*1263** commits sex discrimination. That remains true even if that program discriminates on the basis of a condition not all females endure.

Many of our classic antidiscrimination cases bear this out. For example, not all women wished or tried to attend the prestigious Virginia Military Institute ("VMI") when just

347 women inquired into attending in 1988 and 1989. *See Virginia*, 518 U.S. at 523, 116 S.Ct. 2264. Yet even in the Equal Protection Clause context, the Supreme Court understood and held that VMI's program discriminated against women because the school refused to consider women for admission because they were women. *See generally id.* It made no difference that not every woman wanted or had the physical fitness to attend VMI. For purposes of finding a sex classification under the Equal Protection Clause, it was enough that VMI refused to consider the women who did wish to attend and were fit enough to do so, simply because they were women.

But under *Geduldig*'s logic, women fall into the categories of those who wish to attend VMI and those who don't. So *Geduldig* would incorrectly conclude that VMI did not discriminate against women under the Equal Protection Clause.

Or consider an example Justice Sotomayor raised in *Skrmetti*. As she explained, "*Geduldig*'s reasoning may well suggest that a law depriving all individuals who 'have ever, or may someday,' menstruate' of access to health insurance would be sex neutral merely because not all women menstruate." 145 S. Ct. at 1880 (Sotomayor, J., dissenting). Indeed, *Geduldig*'s logic does demand that conclusion. Menstruation, like pregnancy, is a condition that not all females experience.

But obviously, a classification on the basis of menstruation classifies by sex. It discriminates against women because only females have ever, or may someday, menstruate. So though such a law doesn't mention females expressly, it excludes most females—and no males—from healthcare coverage. That is a sex classification, whether or not the law expressly refers to men and women. After all, a discriminatory law can't skirt antidiscrimination law simply by clever drafting that avoids employing express prohibited-class classification in its description. *See id.* at 1831 (majority opinion) ("Of course, a State may not circumvent the Equal Protection Clause by writing in abstract terms.").

Nor does it matter that not all women have ever menstruated or will menstruate. That is, it makes no difference that, as in *Geduldig*, women fall on both sides of the line that the challenged law draws. The law still classifies by sex. *Cf. Loving v. Virginia*, 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("The mere fact of equal application does not mean that our analysis of these statutes should follow the approach we have taken in cases involving no

racial discrimination ...."). The same is true even though the hypothetical law classifies by a physical condition. When a law classifies by a characteristic or condition that is inherently, solely, and overwhelmingly experienced by or connected with only one sex, the law classifies by sex just as surely as if it employed the term "women" or "men."

The rest of antidiscrimination law requires this conclusion. Indeed, if nothing counted as discrimination unless it happened to every member of a protected class, we couldn't have facial discrimination claims. That some members of a protected group don't suffer under a facially discriminatory policy doesn't mean the policy's not facially discriminatory; it means only that the policy hasn't yet been applied against that person.

**\*1264** Consider a government employer that has a "Dress Code and Appearance" policy. This hypothetical policy requires employees to maintain a "professional" appearance at all times. Let's say the policy prohibits employees from wearing ashes on their foreheads or donning yarmulkes, but it doesn't prohibit the wearing of turbans.

Now imagine an employee comes into work on Ash Wednesday with ashes on her forehead in the sign of the cross. And another employee wears a yarmulke to the office. The employer writes them up. Has the employer's policy discriminated against these workers because they're Catholic and Jewish, respectively?

On *Geduldig*'s reasoning, the answer is no. Not all Catholics attend mass on Ash Wednesday and receive ashes on their foreheads, and not all Jews wear yarmulkes—just as not all women are pregnant or have menstruated. No matter that everybody (for the most part) who receives ashes on their forehead is Catholic, who wears a yarmulke is Jewish, and who is pregnant or menstruates was assigned female at birth.

*Geduldig*'s logic draws lines by requiring every member of a protected class to actually participate in the prohibited conduct or endure the targeted condition for the challenged program. But that's not how antidiscrimination law works—even under non*Geduldig* Equal Protection Clause jurisprudence. As I've noted, in *United States v. Virginia*, not every woman wanted or was otherwise eligible to attend VMI. VMI's admission policy had no effect on the majority of women's lives. But the fact that the overwhelming percentage of women (far more than who become pregnant) didn't suffer

any harm from VMI's policy didn't make the policy any less of a classification by sex or discriminatory against women.

Similarly, the law at issue in *Loving v. Virginia* violated the Equal Protection Clause because it banned interracial marriages—even though not every member of any given racial group was in (or sought out) an interracial marriage. *See* 388 U.S. at 11, 87 S.Ct. 1817. It didn't matter that people of any particular racial group existed on both sides of the line, with some of them in interracial relationships and some not. [11]

So just because every Catholic doesn't wear ashes on Ash Wednesday doesn't mean a policy targeting ash-wearers doesn't classify by Catholicism. Nor does the fact that not every Jew wears a yarmulke mean a policy targeting yarmulke-wearers doesn't discriminate against Jews. Similarly, not every woman gets pregnant or menstruates; but that doesn't mean that laws targeting those conditions wouldn't classify by sex and discriminate against women. Policies that target a protected class in this way— harming *only* people in that class, though not harming *all* people in that class—can still be discriminatory.

In short, *Geduldig*'s reasoning is at war with our antidiscrimination law. Indeed, Congress has recognized *Geduldig*'s logic conflicts with antidiscrimination law. Two years after the Court issued *Geduldig*, the Court relied on *Geduldig* to conclude in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that an employer's disability-insurance program that paid nonoccupational benefits but didn't cover pregnancy-related disabilities **\*1265** didn't violate Title VII. *Id.* at 128, 97 S.Ct. 401. The Court explained its decision by assuming "that the Fourteenth Amendment standard of discrimination is coterminous with that applicable to Title VII," *id.* at 154 n.6 97 S.Ct. 401 (J. Brennan, dissenting); *see also id.* at 412–13, and then applying *Geduldig*. Two years later, Congress passed the Pregnancy Discrimination Act of 1978 [12] and amended Title VII.

The Supreme Court told us what this meant for *Geduldig*— at least, as applied to the Title VII context—in *Newport News*. To the point, the Court explained that, with the 1978 amendments, Congress adopted the dissenters' position in *Geduldig*. *See* 462 U.S. at 683–84, 103 S.Ct. 2622. So a program need not cover one group as a whole, and *not* cover another group as a whole, to count as discriminatory. *See id.* at 683, 103 S.Ct. 2622. Differences in coverage

of a smaller "magnitude" can violate Title VII. [13] *Id.* As a result, the Court found that the health plan at issue in *Newport News* discriminated on the basis of sex because it "unlawfully [gave] married male employees a benefit package for their dependents that is less inclusive than the dependency coverage provided to married female employees." *Id.* at 684, 103 S.Ct. 2622.

Not only that, but the Court noted that, through its amendments to Title VII, Congress had "made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* In other words, classifying on the basis of a physical or medical condition that is unique to one sex is the same thing as classifying on the basis of sex.

*Newport News*'s reasoning seemingly inflicts a death blow on *Geduldig*'s logic for two reasons. First, *Geduldig*'s logic effectively requires that a program burden *all* members of a protected class to "classify" on a protected basis. The health plan in *Newport News*, of course, didn't. And second, *Geduldig*'s logic excuses classification on the basis of sex if it can be recharacterized on the basis of a physical or medical condition—even if only one sex experiences that condition.

We don't have to wonder whether the *Newport News* Court knew what it was doing when it flatly rejected *Geduldig*'s reasoning. Rather, the Court told us that Congress "unambiguously" rejected "both the holding *and the reasoning*" of *Geduldig* when it passed the Pregnancy Discrimination Act of 1978. *Id.* at 678, 103 S.Ct. 2622 (emphasis added). In fact, the Court emphasized, it understood that Congress did not "limit[ ] the scope of the act to the specific problem that motivated its enactment." *Id.* at 679, 103 S.Ct. 2622. Put simply, *Geduldig* no more for Title VII jurisprudence.

And it's not just *Newport News*. The Supreme Court has taken the same tack in several of its other post-*Geduldig* Title VII decisions, too. For example, the Supreme Court found that a policy was facially discriminatory when it barred all fertile women (but not infertile women) from jobs involving lead exposure in **\*1266** *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 190–91, 198–98, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). In neither *Johnson Controls* nor *Newport News* did it matter that people within the suspect class stood on both sides of the line. *See also Connecticut v. Teal*, 457 U.S. 440, 455, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) ("It is clear that Congress [in Title VII] never intended to give an employer

license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.... Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired.").

At bottom, it's simply factually incorrect to say that a law or a program that targets the conditions or characteristics of only members of a protected class does not classify by protected class, even if it doesn't affect each and every member of that protected class. Congress has already rejected that reasoning, and until recently, the Supreme Court had, too.

*B. Geduldig's logic embraces, rather than rectifies, historical sex-stereotyping discrimination.*

*Second*, *Geduldig*'s logic effectively embraces a historic sex-discrimination rationale: that the fact that women can become pregnant somehow justifies treating them less favorably. We see this in the example of *Geduldig* itself.

Shortly after the Court issued its opinion, Professor Katharine T. Bartlett recognized this irony: "That women may and do become pregnant is the most significant single factor used to justify the countless laws and practices that have disadvantaged women for centuries." Katharine T. Bartlett, *Comment, Pregnancy and the Constitution: The Uniqueness Trap*, 62 CALIF. L. REV. 1532, 1532 (1974). Justice Ginsburg recognized this as well, as our anti-discrimination jurisprudence continued to develop. *See Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 56, 132 S.Ct. 1327, 182 L.Ed.2d 296 (2012) (Ginsburg, J., dissenting) (stating that because "pregnancy provided a *central justification* for ... historic discrimination against women," *Geduldig* "was egregiously wrong to declare that discrimination on the basis of pregnancy is not discrimination on the basis of sex" (emphasis added)).

Pregnancy has long been leveraged as a means of differentiating between men and women in employment, disability benefits, and more.[14] Indeed, employers have weaponized pregnancy as an excuse to discriminate against women for years—and employers' views on pregnancy have been "inextricably intertwined with [their] 'stereotypical views about women's commitment to work and their value as employees.' " *Id.* (citation omitted). In finding that California's disability-insurance program wasn't sex-based, the *Geduldig* Court ignored this history and, in effect,

endorsed the United States's historically ingrained practice of discriminating against women on the basis of pregnancy.

*C. Geduldig illogically endorses laws that classify on the basis of a suspect classification just because they also classify by medical condition.*

*Third*, *Geduldig*'s reasoning is illogical because it gives a free pass to laws that **\*1267** discriminate on the basis of suspect classifications, if they also involve medical classifications. For instance, in *Skrmetti*, the Court described *Geduldig* as standing for the proposition that a law doesn't classify by sex "by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination." *See* 145 S. Ct. at 1833. But that approach conflates the first and second steps of antidiscrimination analysis. First, we have to ask *whether* the law classifies by sex. Only then can we ask, at step two, *why* the law classifies by sex—whether for a legitimate reason or a discriminatory (invidious) one.

The regulation's justification doesn't affect whether the law classifies by sex in the first place, though. A law justified on grounds having to do with "medical classifications" can still classify on the basis of sex, too, as I'll get to shortly.

The *Skrmetti* Court also distinguished Justice Sotomayor's hypothetical law that classifies on the basis of menstruation from *Geduldig* by saying that the hypothetical law "does not regulate a class of *treatments* or conditions. Rather, it regulates a class of *persons* identified on the basis of a specified characteristic." *Id.* at 1834 n.3.

Yet the fact that a law regulates medical treatments or conditions doesn't necessarily insulate it logically or factually from also classifying by sex. Imagine, for instance, that besides excluding coverage for pregnancy-related disabilities, the California disability insurance plan at issue in *Geduldig* also excluded coverage for disabilities relating to uterine cancer, polycystic ovary syndrome, uterine fibroids, ovarian cancer, endometriosis, cervical cancer, and Turner syndrome —all medical conditions that affect only females. But at the same time, the law provided coverage for disabilities arising from all other medical conditions, including prostate issues, erectile dysfunction, testicular cancer, and other conditions that only males can get. So the law denied coverage for several (and only) disabilities arising from medical conditions that only females can suffer, while males enjoyed coverage for

disabilities arising from any medical conditions they might have, including those that only males can present with. That's a classification on the basis of sex, even if the law also classifies on the basis of medical condition. [15]

Or take another example. Imagine a healthcare plan that precludes treatment for or relating to circumcised penises. Circumcision is a medical condition. It also happens to be a medical condition that is religiously mandated for many in Judaism and Is-lam, so it is widely shared by Jews and Muslims in comparison to members of other religions (or no religion). But just because the plan classifies by medical condition doesn't mean that it doesn't also classify by religion.

For all the reasons I've already discussed in this opinion, laws like these certainly classify by suspect classification, even though they also classify by medical condition. *Cf. Bostock, 590 U.S. at 667, 140 S.Ct. 1731* ("Sex wasn't the only factor, or maybe even the main factor, but it was one but-for cause—and that was enough."). And *Geduldig*'s failure to recognize this fact caused it to incorrectly conclude that **\*1268** the law there didn't classify on a suspect-classification basis.

> *D. Geduldig improperly collapses the discrete inquiries under the first and second steps of the discrimination analysis, which results in applying the wrong level of scrutiny at step two.*

And that brings me to the *fourth* reason *Geduldig* is illogical: *Geduldig* allowed the second part of the discrimination analysis—review of the law's reasons and its tailoring—to leach into and determine the first part—whether the law classifies by protected class. In particular, the Court reasoned that because covering disabilities related to pregnancy would increase the cost of California's program, the program regulated only by medical condition and not by sex. But consideration of the cost—that is, the reason why California decided to write its disability-insurance program the way that it did—tells us nothing about whether the law classifies by sex. Rather, that consideration goes to only the second part of the discrimination analysis: whether the state had a legitimate reason for using a sex-based classification and whether the law is appropriately tailored under the circumstances.

By importing the reason for the state's classification decision into the determination of whether the classification classifies on a protected basis, *Geduldig* collapses the discrimination analysis. And that means that *Geduldig* allows laws that

classify on a protected-class basis—that is, laws that classify in a way that the Constitution considers especially suspect—to escape application of the correct (and more exacting) level of scrutiny at the second step of the discrimination analysis. As a result, laws that are unconstitutional wrongly survive review.

### III. *Skrmetti* misguidedly applied *Geduldig*'s reasoning when it interpreted *Bostock*, which defines Title VII's methodology for determining whether a law discriminates on the basis of a protected class.

This section explains why *Skrmetti* binds us to uphold Houston County's healthcare plan. I conclude *Skrmetti* requires this result, even though Lange challenges the plan under Title VII, not the Equal Protection Clause, which *Skrmetti* was based on. *Skrmetti* does so because it imports *Geduldig*'s reasoning into Title VII analysis in cases like this one, even though both Congress and the Supreme Court previously have told us that Title VII rejects *Geduldig*'s reasoning. Still, because the Court chose that path, I'm obligated to follow it today.

> *A. Skrmetti requires us to uphold Houston County's healthcare plan.*

I begin by explaining why *Skrmetti* requires us to uphold Houston County's healthcare plan. As a reminder, the law at issue in *Skrmetti* prohibited the administration of gender-affirming drugs to minors whose birth-assigned sex did not match their gender identity. *See 145 S. Ct. at 1826–27*. The Court concluded that the law didn't classify on the basis of sex or transgender status. *Id. at 1829–34*.

In reaching that conclusion, the Court anchored its analysis in *Geduldig*'s reasoning. *See id. at 1833*. It said that the law there "divide[d] minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to treat other conditions." *Id.* But, the Court continued, transgender individuals fall into both groups. *Id.* Then the Court compared its analysis of the law **\*1269** to *Geduldig*'s analysis of the insurance plan at issue there. It reasoned, "[A]lthough only transgender individuals seek treatment for gender dysphoria, gender identity disorder, and gender incongruence—just as only biological women can become pregnant—there is a 'lack of identity' between transgender status and the excluded medical diagnoses." *Id.*

After applying *Geduldig* to conclude that the *Skrmetti* law didn't classify on a suspect-classification basis, the Court devoted a separate section of its opinion to responding to arguments that *Bostock*, a Title VII case, required a different answer. *See id.* at 1834–35. The Court concluded *Bostock* did not. *Id.* It began by assuming without deciding that *Bostock*'s analysis could apply in the Equal Protection Clause context. *Id.* at 1834. Next, the Court said it was applying *Bostock*. *See id.*

The Court noted that *Bostock* "reasoned that Title VII's 'because of' test incorporates the traditional but-for causation standard, which 'directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.' " *Id.* (quoting *Bostock*, 590 U.S. at 656, 140 S.Ct. 1731). To apply this test, the Court used the example of a transgender boy who seeks testosterone to treat his gender dysphoria—something the law prohibited a healthcare provider from administering to him. *Id.* The Court observed that changing his biological sex from female to male "would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone ...." *Id.* Yet "if he had such a diagnosis," the Court went on, "he could obtain the testosterone regardless of his sex or transgender status." *Id.* Based on this discussion, the Court concluded that, "[u]nder the reasoning of *Bostock*, neither [the transgender boy's] sex nor his transgender status is the but-for cause of his inability to obtain testosterone." *Id.*

As for the possibility that sex or transgender status might be one of multiple but-for causes, the Court ruled that out. *See id.* at 1835. To do so, the Court used an example of a "girl with unwanted facial hair inconsistent with her sex," and a diagnosis of hirsutism (male-pattern hair growth). *Id.* The Court explained that a healthcare provider could prescribe her puberty blockers or hormones to make her appearance more consistent with her birth-assigned gender if she had a diagnosis of male-pattern hair growth. *Id.* But if she were a boy, the Court said, that would "not automatically change the operation of [the *Skrmetti* law]." *Id.* To show why, the Court pointed to two different medical diagnoses: gender dysphoria and precocious puberty. *Id.* Under the law, a boy couldn't get puberty blockers if his diagnosis was gender dysphoria instead of hirsutism, but he could if it was precocious puberty. *Id.* So, the Court concluded, "sex is simply not a but-for cause of [the *Skrmetti* law's] operation." *Id.*

Under *Skrmetti*'s version of *Bostock*'s reasoning, we could consider the example of a birth-assigned male with undesired enlarged breast tissue inconsistent with their sex, who was diagnosed with gynecomastia. That person could receive a breast reduction or mastectomy under Houston County's healthcare plan. But if they were a birth-assigned female with unwanted breast tissue inconsistent with their gender identity, that would "not automatically change the operation of [the healthcare plan]." *Skrmetti*, 145 S. Ct. at 1835. Rather, that birth-assigned female could get a mastectomy if they had breast cancer that warranted it. But they couldn't if they wanted the mastectomy to confirm their gender identity.

**\*1270** I just don't see a way to distinguish *Skrmetti*'s application of *Bostock* from the healthcare plan at issue here. And because the Court had to undertake its *Bostock* analysis to respond to arguments that *Bostock* required a different outcome than the Court reached under *Geduldig*, I think we are bound by the Court's *Bostock* application in *Skrmetti*. In fact, had the Court determined in *Skrmetti* that *Bostock* required a different answer than *Geduldig* did, the Court would have had to either strike down the *Skrmetti* law, unless it also concluded that *Bostock*'s analysis didn't govern Equal Protection Clause cases. But of course, *Bostock*'s analysis does control Title VII cases.

To be sure, *Skrmetti*'s conclusion that *Bostock* demands the same answer as *Geduldig* seems to conflict with *Newport News*'s treatment of *Geduldig*'s logic in the Title VII context. But because of *Skrmetti*, a conflict in Title VII law now exists between *Newport News*'s reasoning and *Bostock*'s, when it comes to the specific area of transgender individuals and medical diagnoses. When, as here, two binding precedents that are relevant to a dispute before us conflict, we must follow the one that "has direct application" to the case. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.' " (citation omitted and emphasis added)).

I don't think I can say *Newport News* "has direct application" to this case, compared to *Bostock*. *Newport News* involved pregnancy-related discrimination, and the Court considered it under the Pregnancy Discrimination Act. *Bostock*, in contrast, *does* directly apply here: it specifically involved and analyzed claims of sex-discrimination on the basis of transgender

status. And the Court in *Skrmetti* changed how we do the *Bostock* test, at least in the specific context of analyzing laws involving transgender individuals and medical diagnoses. Though I think this was misguided, it also binds us in this case.

*B. Skrmetti incorrectly construed Bostock.*

Most respectfully, it seems to me that *Skrmetti* departed from what *Bostock* demands because *Skrmetti* relied on *Geduldig*. *Skrmetti* inadvertently imported *Geduldig*'s reasoning—at least when it comes to challenges that an employer discriminated on the basis of gender-dysphoria treatments—into the Title VII context.

To explain, we must zoom in on *Bostock*. *Bostock*'s foundational principle teaches that to discern sex discrimination under Title VII, "our focus should be on individuals, not groups." *Bostock*, 590 U.S. at 658, 140 S.Ct. 1731. And that principle drove the outcome in *Bostock*.

There, the Court considered, among other things, whether an individual gay man suffers sex discrimination when his employer discriminates against him because he's attracted to males. *See Bostock*, 590 U.S. at 653, 140 S.Ct. 1731. When we change the employee's sex, they become a female attracted to males, and their employer takes no issue. So *Bostock* recognizes that the employer's change in action happens "because of" the employee's sex. And under *Bostock*, our individual male suffered sex discrimination. *See id.* at 660, 140 S.Ct. 1731.

But something else happens when we apply this test; of necessity, "[a]long the way, we change his sexual orientation too (from homosexual to heterosexual)." **\*1271** *Id.* at 671, 140 S.Ct. 1731. The gay "man" is now not only not a "man" but also no longer "gay." Rather, this hypothetical person is now a "heterosexual woman" because this person is a woman attracted to men. We previously labeled this individual a gay man. But when we change his sex, a new label definitionally applies—heterosexual woman. We *can't* change the gay man's sex without changing the more general corresponding label that describes him—"homosexuality" is not an accurate descriptor anymore, for the hypothetical attracted-to-men female comparator.

To put it simply, when we describe this prospective plaintiff at the individual level, we'd say he is (1) a man, who is (2)

attracted to men, *and therefore* (3) he's also gay. *Bostock* counsels us to change just one thing, so all we change is his sex—*and therefore* that makes the hypothetical comparator (now a woman attracted to men) straight. So the *Bostock* test changes a male attracted to males into a female attracted to males, even though doing so makes it no longer accurate to call our individual "gay."

The Court could have fashioned a different test in *Bostock*. It could have instructed us that to change the sex of a gay male, keeping all else constant, we change him into a gay female. That way, the general demographic description of the person would stay constant. But the Court expressly rejected that approach. *See id.*

Why? Because a gay female is *not* the female version of the gay *individual* man. Besides being female, the gay female has a second trait the gay male doesn't: she's attracted to females, but he's attracted to males. So her experience doesn't describe our prospective plaintiff as an *individual* nor inform whether he has been discriminated against as an *individual*. All it does is preserve the correct general, group-level descriptor—calling the comparator "gay." The more general "gay" label takes into account two more specific things, of course—that our plaintiff is a man, and that he's attracted to men. So if we tried to define the comparator on the basis of retaining this higher-level characteristic of homosexuality, we'd effectively take away what makes our prospective plaintiff who he is, as an individual—someone attracted to men. Put differently, we'd be changing *two* things about him as an individual, just to fit him into this bigger "group" of same-sex-attracted people.

But Title VII doesn't care about group experience—it cares that no individual bears the brunt of sex discrimination in their unique experience. In trying to grow a forest, the test *Bostock* rejected misses the individual trees. But the *Bostock* test doesn't; it instructs us that when we change the sex of our person experiencing sex discrimination, we need to describe him with sufficient *specificity* to capture his individualistic experience—changing only one thing at a time. We can't just change a generic gay male into a gay female. We need to describe the gay male specifically—as a man who's attracted to men—and *then* change his sex.

To summarize, *Bostock* creates its own new three-step test. First, we describe the person alleging discrimination at the correct level of specificity. At step one, we swap out the label "gay" from a gay male and describe him in greater detail—he's a male attracted to males. Then, at step two, we identify

his comparator by changing his sex, so he becomes a female attracted to males. Now, at step three, we can redescribe the comparator with any general labels that might help us understand who this new person is. And it turns out, our new person's not a gay female but a heterosexual female. We've found the person of the opposite sex whose experience most closely mirrors him as an individual.

**\*1272** The level of generality at which we describe the person facing discrimination (i.e., the more *general* descriptor, "a gay man," or the more *specific* one, "a male attracted to males"), changes how we do the analysis. And we need to adopt the level of specificity that *Bostock* itself did.

Faithfully applying *Bostock*'s test to *Skrmetti*'s facts yields an answer opposite to the one that *Skrmetti* reached. Let's consider *Skrmetti*'s example of a male who has unwanted facial hair. Zooming out to a higher level of generality, we give him the general label of a male seeking gender-dysphoria treatment. But we can't jump to step two and change his sex, without doing step one where we first describe him with sufficient specificity. A male seeking gender-dysphoria treatment doesn't become a female seeking gender-dysphoria treatment. A female seeking gender-dysphoria treatment is a person who needs treatment to develop more masculine features. She isn't the female version of the male seeking gender-dysphoria treatment, who needs to develop more feminine features.

So at step one, we exchange our individual male's general label of a male seeking gender-dysphoria treatment and instead describe him more specifically—he's a male with unwanted facial hair. Then, at step two, we identify his comparator by changing his sex, so he becomes a female with unwanted facial hair. Now, at step three, we can redescribe this comparator using any general labels that might help us understand who this new person is. And it turns out that our new person's a female with hirsutism, not gender *dysphoria*. We've found the person of the opposite sex whose experience most closely mirrors our male as an individual.

As under *Bostock*, the level of generality at which we describe the person facing discrimination (i.e., the more *general* descriptor, "a male with gender *dysphoria*," or the more *specific* one, "a male with unwanted facial hair") changes the outcome of the analysis. And *Bostock* requires us to adopt that more specific level of generality.

Under *Bostock*, it doesn't matter that if our individual male's diagnosis had been precocious puberty, he could've received treatment as a male. *But see Skrmetti*, 145 S. Ct. at 1835 (reasoning the opposite). Our hypothetical *individual* experiencing gender dysphoria doesn't have "precocious puberty." That condition describes a separate individual who is irrelevant to the analysis of *this* individual with gender dysphoria. The fact that another male doesn't experience discrimination and can get the treatment our individual seeks doesn't change that *our individual* has experienced unlawful discrimination.

That's what *Bostock* teaches us. Imagine an employer who fires an individual gay male only because that male is married to another male, but the employer would not have fired the male if he remained unmarried. Under *Bostock*, that employer violates Title VII just as much as if it fired all gay males because it would have tolerated a female's marriage to a male. It doesn't matter that the employer doesn't fire all gay males because the employer discriminated against *our individual* male on the basis of sex. *Cf. Bostock*, 590 U.S. at 659, 140 S.Ct. 1731 ("It's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall. The employer is liable for treating *this* woman worse in part because of her sex." (emphasis in original)).

In the same way, an employer can't deny employment opportunities to pregnant women just because it treats non-pregnant women fairly, despite the principles of *Geduldig*. *See Newport News*, 462 U.S. at 678, 103 S.Ct. 2622.

**\*1273** Nor, when we do *Bostock*'s three steps correctly, will we find the female version of our hypothetical male is a female with facial hair who somehow lacks any medical diagnosis. *But see Skrmetti*, 145 S. Ct. at 1834 (reasoning that the comparator "would lack a qualifying diagnosis"). That misapplies step three. At step one, we recognize a male seeking gender-dysphoria treatment is a male with male-pattern facial hair he seeks to remove to make his face more feminine. We then do step two, and he becomes a female with male-pattern facial hair she seeks to remove to make her face more feminine. And *now*, we do step three and redescribe her at the general level. She's not a person with no medical diagnosis, for which she needs treatment. The person we have described *specifically* would be described more *generally* at step three as a woman with hirsutism. That's the diagnosis she'd walk out of the doctor's office with. But

that's not something that *we've* changed; that's a descriptor that's inherently *had* to change, when we change just her sex and nothing else. *Cf. Bostock*, 590 U.S. at 671, 140 S.Ct. 1731 ("Along the way, we change his sexual orientation too (from homosexual to heterosexual)."). And her employer covers treatment for her condition of hirsutism. So the employer denied treatment to our original individual male only because he was male.

*Bostock* demands we drop the more general labels (i.e., someone who meets the definition of "gay," or whose condition means the definition of "gender dysphoria") at step one, so that we can capture the *individual* experience (i.e., attending to the specifically applicable component parts of those definitions). And when we find, as here, that the female parallel to the individual male with gender dysphoria would have access to the treatment the original male wants, that individual male has experienced sex discrimination. [16] The **\*1274** employer's actions towards any person other than the exact parallel female individual with hirsutism are irrelevant. No ifs, ands, or buts: if an employer treats an individual differently than it would if his sex were different, it has violated Title VII.

*C. Skrmetti incorrectly imports Geduldig's reasoning into Title VII cases involving transgender individuals seeking medical treatment.*

That was the law until *Skrmetti*. But in *Skrmetti*, the Court determined that a male with gender dysphoria exacerbated by their facial hair growth can be denied care when a female with hirsutism is not because males with "precocious puberty" also receive treatment. *See Skrmetti*, 145 S. Ct. at 1835. That is—sex discrimination against an individual with gender dysphoria is permissible because other males don't experience gender dysphoria. [17] *Skrmetti* justifies discrimination against an individual because other members of the group he is a part of are spared. That's exactly counter to the principles of *Bostock*.

Indeed, if *Bostock* were decided under *Skrmetti's* interpretation of *Bostock*, *Bostock* would have come out differently. The Court would have compared the male and female counterpart at the more general level of the "gay" label descriptor (instead of the individual level of "attracted to men") and found that the employer treated both the male and female employees the same way, so it didn't discriminate on the basis of sex. *See Bostock*, 590 U.S. at 660, 140 S.Ct. 1731.

"Why are *these*" cases involving gender-dysphoria treatment "different from all the rest? Title VII's text can offer no answer." *Id.* at 673, 140 S.Ct. 1731.

*Geduldig* gave the Court the answer. It teaches that medical-related claims are different. And discrimination against individuals on the basis of sex can be justified for certain individuals with a medical condition. With *Geduldig* as its scalpel, *Skrmetti* performed surgery on *Bostock* and incorrectly carved out bans on treatment for gender dysphoria from Title VII's protections.

As I've explained, though, Congress rejected *Geduldig's* reasoning for Title VII. **\*1275** That is, Congress amended Title VII to ban *Geduldig's* logic. So if I weren't bound by *Skrmetti*, I'd follow my pre-*Skrmetti* understanding of *Bostock* and what I take to be the lessons of Congress's amendment of Title VII. So I'd recognize that a policy that bars gender-dysphoria treatment is a sex-based classification. But I am an inferior-court judge duty bound to follow what I understand Supreme Court precedent to require. And on my reading, the Court went the opposite way in *Skrmetti*. That constricts me here.

**IV. Conclusion**

In 1976, the Supreme Court in *Craig* expressly articulated, for the first time, the intermediate-scrutiny framework for sex-based discrimination claims under the Equal Protection Clause. *See* 429 U.S. at 197, 97 S.Ct. 451. Indeed, *Craig* represented a "compromise on the standard of review to be used in sex discrimination cases," *see* Kenneth L. Karst, *The Supreme Court, 1976 Term—Foreword: Equal Citizenship Under the Fourteenth Amendment*, 91 HARV. L. REV. 1, 54 (1977), following earlier debates on the Court, *see, e.g.*, *Geduldig*, 417 U.S. at 498, 94 S.Ct. 2485 (Brennan, J., dissenting). [18]

Two years before any of that happened, the Court issued *Geduldig*. Given that the Court hadn't yet developed its modern framework for analyzing sex-discrimination claims at that time, it's especially curious to rely on *Geduldig* today. Indeed, *Geduldig* conflicts with modern Equal Protection jurisprudence because the Supreme Court issued *Geduldig* before it developed that jurisprudence. And the Supreme Court itself has previously recognized that Congress amended Title VII because it rejected *Geduldig's* reasoning.

That history may be part of why the Supreme Court itself hasn't relied on *Geduldig* much over the last half-century. *See, e.g., Coleman,* 566 U.S. at 60 n.6, 132 S.Ct. 1327 (Ginsburg, J., dissenting) (noting that "the plurality d[id] not cite or discuss *Geduldig v. Aiello,* perhaps embarrassed by that opinion's widely criticized conclusion that discrimination based on pregnancy does not involve 'discrimination based upon gender as such' " (internal citations omitted)). [19]

In sum, it's understandable why the Supreme Court didn't rely on *Geduldig* for many years. *Geduldig*'s reasoning is illogical and fatally flawed. So the Court was right to banish it. Because *Skrmetti* is based on *Geduldig,* whose application both Congress and the Court have emphatically rejected in the Title VII context (and, until *Skrmetti,* seemingly altogether), I respectfully urge the Supreme Court to reconsider its continued reliance on *Geduldig*'s reasoning.

*Jill Pryor,* Circuit Judge, joined by *Jordan, Abudu, Kidd,* and *Wilson,* Circuit Judges, dissenting:

The Houston County employee health insurance plan we consider here excludes **\*1276** coverage for "[d]rugs for sex change surgery" and "[s]ervices and supplies for a sex change and/or the reversal of a sex change." Doc. 155-1 at 72, 74.[1] Relying on equal protection precedent, the majority opinion holds that these exclusions do not discriminate based on sex or transgender status under Title VII because the plan merely "draws a line between certain treatments, which it covers, and other treatments, which it does not." Majority Op. at 1255. But the Supreme Court definitively held more than four decades ago that such line drawing is impermissible in Title VII cases when the dividing line is a medical condition that impacts employees differently based on sex. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 678, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). The law has been settled on that score ever since. Yet today the majority opinion makes the same mistake in its Title VII analysis that was addressed and corrected long ago by Congress and then by the Supreme Court—it imports equal protection reasoning into a Title VII case. Because that reasoning has no place in the case before us, I dissent.

The line the majority draws here relies on reasoning from equal protection cases. In *Geduldig v. Aiello,* the Supreme Court held that a state disability insurance program that excluded coverage for disabilities caused by pregnancy did not amount to sex-based discrimination under the Equal

Protection Clause of the Fourteenth Amendment. 417 U.S. 484, 486–87, 494–95, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). The Supreme Court reasoned that "[t]he California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition —pregnancy—from the list of compensable disabilities." *Id.* at 496 n.20, 94 S.Ct. 2485. Despite recognizing that this exclusion only impacted women, the Court explained that "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.* "The lack of identity between the excluded disability and gender" meant that the program did not classify based on sex. *Id.* Instead, "[t]he program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes." *Id.* Therefore, the Court concluded that the program classified based on a medical condition rather than sex. *Id.*

But in Title VII cases, this reasoning has been rejected, first by Congress and then by the Supreme Court. After *Geduldig,* the Supreme Court applied its equal protection reasoning in a Title VII case, holding that exclusion of pregnancy from an employer health insurance plan did not discriminate based on sex because "[t]he [p]lan ... is nothing more than an insurance package, which covers some risks, but excludes others." *Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 138, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (citing *Geduldig,* 417 U.S. at 494, 496–97, 94 S.Ct. 2485). Congress responded by amending Title VII. It passed the Pregnancy Discrimination Act of 1978, including "pregnancy, childbirth, or related medical conditions" in the definition of discrimination "because of sex." 42 U.S.C. § 2000e(k). When a Title VII case challenging an employer health insurance plan that excluded coverage for pregnancy next reached the Supreme Court, the Court recognized that with this amendment Congress "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News,* 462 U.S. at 678, 103 S.Ct. 2622. The plan at issue covered pregnancy-related **\*1277** conditions for employees but not for spouses of employees. *Id.* at 683– 84, 103 S.Ct. 2622. The Supreme Court explained that by providing full medical coverage for the spouses of female employees and medical coverage except for pregnancy-related conditions for the spouses of male employees, the plan discriminated based on sex because it "unlawfully [gave] married male employees a benefit package for their dependents that [was] less inclusive than the dependency

coverage provided to married female employees." *Id.* at 684, 103 S.Ct. 2622.

Importantly, the Supreme Court did not limit its disapproval of *Geduldig*'s reasoning to pregnancy. It reasoned that in relying on *Geduldig Gilbert* misinterpreted Title VII, which "protect[s] *all* individuals from sex discrimination in employment—including but not limited to pregnant women workers." *Id.* at 681, 103 S.Ct. 2622 (emphasis in original). Since *Newport News*, an employer insurance plan that excludes coverage of a condition based on sex violates Title VII.

After en banc oral argument in this case, the Supreme Court decided *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025). The Court considered an equal protection challenge to a Tennessee law that prohibited medical treatments to minors for conditions that impact only transgender individuals. *Id.* at 1826–27, 1830–31, 1833. Tennessee prohibited treatments administered for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. § 68-33-103(a)(1). The Supreme Court held that this restriction did not discriminate based on sex because it, instead, "restricts which ... medical treatments are available to minors ... to treat gender dysphoria, gender identity disorder, or gender incongruence." *Skrmetti*, 145 S. Ct. at 1830–31.

It further held that the restriction of these treatments did not discriminate based on transgender status. *Id.* at 1833. Relying on *Geduldig*, the Court concluded that the Tennessee law did "not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* The Supreme Court explained that the pregnancy exclusion in *Geduldig* did not discriminate based on sex because it divided the employees into two groups, " ' pregnant women and nonpregnant persons,' " and "[b]ecause women fell into both groups, the program did not discriminate against women as a class." *Id.* (quoting *Geduldig,* 417 U.S. at 496 n.20, 94 S.Ct. 2485). It reasoned that the Tennessee law created a similar nondiscriminatory distinction. "Because only transgender individuals seek puberty blockers and hormones for the excluded diagnoses, the first group includes only transgender individuals; the second group, in contrast, encompasses both transgender and

non-transgender individuals." *Id.* The Supreme Court thus held that the law prohibiting medical care to treat conditions that impact transgender individuals only did not classify based on transgender status under the Equal Protection Clause. *Id.* at 1833–34.

Today, by importing *Skrmetti*'s equal protection reasoning into a Title VII case, the majority commits the same error the Supreme Court did in *Gilbert*. The majority opinion concludes that the County health plan's exclusion of medical care related to a "sex change" does not discriminate based on sex or transgender status because it merely "draws a line between **\*1278** certain treatments, which it covers, and other treatments, which it does not." Majority Op. at 1255. This is the exact same reasoning that both Congress and the Supreme Court rejected for Title VII claims. *See Gilbert,* 429 U.S. at 138, 97 S.Ct. 401 ("The [p]lan ... is nothing more than an insurance package, which covers some risks, but excludes others."); *see also Newport News,* 462 U.S. at 684, 103 S.Ct. 2622 ("Although *Gilbert* concluded that an otherwise inclusive plan that singled out pregnancy-related benefits for exclusion was nondiscriminatory on its face, because only women can become pregnant, Congress was unequivocally rejected that reasoning."). And yet the majority opinion revives that very reasoning to conclude that an employer insurance plan excluding coverage for medical care that only transgender individuals need does not discriminate based on transgender status or on sex.

The majority does so in the face of binding Supreme Court precedent holding that under Title VII the fact that only women can get pregnant makes a pregnancy-based exclusion sex-based and therefore facially discriminatory. *See Newport News,* 462 U.S. at 684, 103 S.Ct. 2622. Likewise, the fact that only transgender individuals can require "sex changes" renders the County's exclusion transgender-based. Under Title VII "it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.,* 590 U.S. 644, 660, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). And Title VII "protect[s] *all* individuals from sex discrimination." *Newport News,* 462 U.S. at 681, 103 S.Ct. 2622. So Supreme Court precedent dictates that excluding from coverage healthcare that only transgender individuals can require constitutes sex-based discrimination in violation of Title VII. The fact that the exclusion here applies equally to individuals the majority calls "natal men" who are transgender and to "natal women" who are transgender does not make the exclusion neutral under *Newport News.*

In *Skrmetti*, the majority said, "[w]e have not yet considered whether Bostock's reasoning reaches beyond the Title VII context, and we need not do so here." 145 S. Ct. at 1834. Despite expressly stating that it was not considering or deciding whether Bostock's reasoning applied to equal protection claims, the majority nonetheless observed that *Bostock* "does not alter our analysis." *Id.* But *Skrmetti*'s discussion of *Bostock* is utterly devoid of references to *Geduldig* and its equal protection progeny. *See id.* Because *Skrmetti*'s analysis of *Bostock* implicitly relied on since-rejected reasoning from *Geduldig* and *Gilbert,* the Supreme Court has created a tension that only it can resolve.

The *Skrmetti* majority's discussion of *Bostock* does not bind us. No Title VII claim was before the Supreme Court. *Skrmetti* therefore did not and could not decide whether an employer's insurance plan that bases coverage of medical treatments on sex or transgender status violates Title VII. Nor did *Skrmetti* address the use of equal protection precedent in the Title VII context in commenting on *Bostock*. Finally, *Skrmetti* did not acknowledge or discuss *Newport News*. Although we do not take lightly Supreme Court dicta, we simply are not free to follow it in the face of binding Supreme Court authority to the contrary. After all, "[t]he Supreme Court has told us, over and over again, to follow any of its decisions that directly applies in a case, even if the reasoning of that decision appears to have been rejected in later decisions and leave to that Court 'the prerogative of overruling its own decisions.' " *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012) (quoting **\*1279** *Tenet v. Doe*, 544 U.S. 1, 10–11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005)); *see also United States v. Davis*, 785 F.3d 498, 521 (11th Cir. 2015) (en banc) (William Pryor, J., concurring) ("As judges of an inferior court, we have no business in anticipating future decisions of the Supreme Court). I believe we are bound by *Newport News*'s holding that an employer insurance plan that excludes coverage of a condition based on sex violates Title VII, *see* 462 U.S. at 684, 103 S.Ct. 2622, and *Bostock*'s unequivocal statement that for Title VII purposes "discrimination based on ... transgender status necessarily entails discrimination based on sex." 590 U.S. at 669, 140 S.Ct. 1731.

Because the majority relies on analysis that both Congress and the Supreme Court—interpreting Congress's action—have rejected for Title VII claims, I respectfully dissent.

Abudu, Circuit Judge, Dissenting:

I dissent from the majority opinion because the holding is contrary to Title VII's plain language, reasonable interpretation, and clear mandate to eradicate sex-based discrimination, in all its forms, in the workplace. *See Bostock v. Clayton Cnty.,* 590 U.S. 644, 674, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."). For the reasons stated in Judge Wilson's and Judge Jill Pryor's dissents, Houston County's decision to exclude from its employee health insurance plan coverage related to "*sex* change surgery" is a *sex*-based form of discrimination and, thus, clearly violates Title VII. As my dissenting colleagues discuss, the Supreme Court's recent decision in an Equal Protection Clause case, *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025), does not alter that legal conclusion. [1]

I write separately to acknowledge the ongoing cultural war in which this Court, like courts before us, has had to participate. Our role is to ensure that, regardless of religious, political, or other ideologies, the law applies equally to all. The majority's decision, unfortunately, undermines that goal and sets us up for yet another episode in our Circuit's legal history where the majority just gets the outcome wrong, and the short- and long-term implications of its flawed decision cannot be ignored.

**I. The Majority Opinion Directly Conflicts with *Bostock***

For Deputy Anna Lange and millions of transgender people, [2] gender is not binary. After serving on the Houston County police force for nearly twelve years, Deputy Lange took the extremely brave step of **\*1280** disclosing she is transgender and sought support from her colleagues in making the public announcement and private transition. Instead of support, when she came out to the Sheriff, he asked, "[w]hat the hell is he [Deputy Lange] talking about[,]" exclaimed he "thought it was a joke," and said, "I don't believe in sex changes." The Sheriff then called a group meeting to discuss "a sensitive and a serious subject," where he proclaimed, "I don't believe in all this," and that what Deputy Lange did "takes big balls." Nevertheless, Deputy Lange pushed through in seeking the medical services necessary for her gender dysphoria that, but for her transgender status, she would have been able to receive through the Houston County's health insurance coverage policy.

Today, the majority upholds Houston County's policy and practice of denying medically necessary healthcare to an employee simply based on their sex. *See Bostock,* 590 U.S. at 660, 140 S.Ct. 1731 ("An individual's homosexuality or transgender status is not relevant to employment decisions ... because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). "Transgender" is a term used to describe a person whose gender identity —a person's inner sense of their gender or lack thereof— differs from the sex they were assigned at birth. [3] Gender [dysphoria](), a medical condition recognized by every major medical association and leading world health authority, [4] refers to the "psychological distress that results from an incongruence between one's sex assigned at birth and one's gender identity." [5] Left untreated, gender [dysphoria]() can cause debilitating anxiety and depression, self-harm, and increased risk of suicide. [6] Treatment for gender [dysphoria]() includes social transitioning, hormone therapy, and surgical procedures to align a person's sex characteristics with the person's gender identity. [7]

When, as here, an employer intentionally treats a person worse by limiting access to certain health insurance benefits because they are transgender, the employer has discriminated against that person in violation of Title VII. *See Bostock,* 590 U.S. at 658, 140 S.Ct. 1731; *[Newport News Shipbuilding & Dry Dock Co. v. EEOC]()*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). Houston County did not challenge Deputy Lange's medical diagnosis or that such surgery was part of a transgender person's transition, and it allowed Deputy Lange to follow the "female dress policy." However, using a binary **\*1281** gender construct, the majority engages in intellectual gymnastics to delay the inevitable—that transgender people are in the workplace, and they need access to medical procedures that are not uniquely performed on them, but for which transgender people are denied.

The Supreme Court's decision reversing our panel opinion in *Bostock* is directly on point to the issue here. The employee in *Bostock* brought a discrimination suit under Title VII alleging his employer fired him because of his sexual orientation. Although the panel acknowledged Title VII prohibits sex-based discrimination against employees, it held Title VII protections did not encompass sexual-orientation discrimination based on binding circuit precedent from *[Blum v. Gulf Oil Corp.]()*, 597 F.2d 936, 938 (5th Cir. 1979) (per curiam). *[Bostock v. Clayton Cnty. Bd. of Comm'rs]()*, 723 F. App'x 964, 964–65 (11th Cir. 2018) (unpublished) (per curiam) ("*Bostock Panel*"), *rev'd,* 590 U.S. 644, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). In *Blum,* an employee filed a Title VII suit alleging he was discharged because of his sexual orientation and ethnicity/religion, but the court held, *inter alia,* "[d]is-charge for homosexuality is not prohibited by Title VII ...." 597 F.2d at 938. The *Bostock* panel also relied on *[Evans v. Georgia Regional Hospital]()*, 850 F.3d 1248, 1256 (11th Cir. 2017), as confirmation that *Blum* remained binding circuit precedent. *Bostock Panel,* 723 F. Appx at 964– 65. In *Evans,* despite post-*Blum* Supreme Court decisions that interpreted Title VII to include discrimination based on the expression of nonconforming gender characteristics [8] and same-sex sexual harassment, [9] we held the employee's Title VII wrongful termination claim based on her sexual orientation was foreclosed by *Blum.* 850 F.3d at 1256.

The *Bostock* panel concluded the post-*Blum* decisions did not clearly apply to discrimination based on sexual orientation and held it could not overrule *Blum,* "regardless of whether [they thought] it was wrong," unless intervening controlling precedent was issued. *Bostock Panel,* 723 F. Appx at 965. In repudiating the *Bostock* panel opinion, *Blum,* and *Evans,* the Supreme Court gave us just that and then some—clear precedent and a straightforward test that applies not only to sexual orientation, but also to transgender status. *See Bostock,* 590 U.S. at 660, 140 S.Ct. 1731. The Court relied on the "express terms" of Title VII and rebuked the employer's assertion that " 'no one in 1964" when Title VII was passed would have anticipated the results of its holding, explaining "[n]ot long after the law's passage, gay and transgender employees began filing Title VII complaints, so at least *some* people foresaw this potential application." *Id.* at 653, 676, 140 S.Ct. 1731 (citing *[Smith v. Liberty Mut. Ins. Co.]()*, 395 F. Supp. 1098, 1099 (N.D. Ga. 1975) (addressing gender non-conforming claim from 1969), *aff'd,* 569 F.2d 325 (5th Cir. 1978); *[Holloway v. Arthur Andersen & Co.]()*, 566 F.2d 659, 661 (9th Cir. 1977) (addressing transgender discrimination claim from 1974)).

**\*1282** In this case, there is no erroneous prior precedent tying our hands. To the contrary, we have a clear rule directly on point with the case before us. Yet, despite *Bostock*'s unambiguous directive, the majority goes through a strained analysis to avoid the plain truth that Houston County's policy violates Title VII on its face. Like the panel in *Bostock,* the majority ignores or, at best, severely dilutes, Title VII's express terms. Therefore, the district court's grant of summary judgment should be affirmed, and the

case should be remanded for further proceedings to address Deputy Lange's request for declaratory and injunctive relief, monetary damages, and attorney's fees.

## II. The Majority Opinion Serves as Fodder for Those Who Oppose Legal Rights for Transgender People

The majority reaches its conclusion without acknowledging the elephant in the room—transgender rights have come to the forefront of debate in recent years, shining a necessary light on areas of society still rife with discrimination. Since the start of 2025, at least 981 state and federal bills are under consideration and 121 have been passed that address the rights and restrictions placed on transgender individuals in areas such as education, healthcare, access to public facilities, artistic expression, incarceration, and the military. [10] Many of these bills also address transgender persons and employment issues. [11] While no comment can be made regarding the legality of these legislative efforts, Title VII is broad, inclusive, and clearly prohibits sex-based discrimination against transgender persons in the workplace, just as it prohibits such discrimination against cisgender men and women. *See Bostock*, 590 U.S. at 683, 140 S.Ct. 1731 (explaining "[i]n Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when" taking an adverse employment action).

The record is clear that the same surgeries, medications, and mental health treatments that may be covered for some employees also fall under those "certain treatments" not covered for others, and the policy draws the line unequivocally based on transgender status and, therefore, sex. [12] Still, the majority concludes that "[n]othing about the policy exclusion turns on whether the County's employee is a man or woman," and "the County's plan does not facially discriminate based on transgender status,"—essentially concluding that the Exclusion applies equally to all people. Maj. Op. at 1252, 1253. Yet, the argument that a law or policy is valid because it "applies equally to those whom it is applicable" has long been rejected as a basis to justify illegal discrimination. *See McLaughlin v. Florida*, 379 U.S. 184, 188–90, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (rejecting this principle in striking down a ban on the cohabitation of interracial couples); *Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (same in the context of interracial marriage).

Instead of exercising our limited role in statutory interpretation by "applying the law's demands as faithfully as we can," the majority provides more traction for "extratextual **\*1283** considerations" and "overlook[s] plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Bostock*, 590 U.S. at 673–74, 681, 683, 140 S.Ct. 1731. [13] We need not look hard to find extratextual considerations from groups opposed to transgender equality, as the amicus briefs filed in support of Houston County reveal plenty. The guise of legal analysis soon parts to reveal opposition groups' true perspective: "[a]ll this is nonsense .... Slicing off a male's genitals is not the same procedure as correcting a female's congenital absence of a vagina," and "a mastectomy 'for cancer' treatment' is not the same procedure as removing a woman's healthy breasts 'for sex change.' " Brief for Christian Employers Alliance Amicus Curiae in Support of Appellants at 14–15, *Lange v. Houston County*, Docket No. 22-12028 (11th Cir. 2024). [14] The disdain is palpable. However, one's personal beliefs that promote "transgenderism" [15] do not change the language of Title VII or *Bostock*'s holding and guidance. "Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 590 U.S. at 653, 140 S.Ct. 1731.

Access to appropriate medical care is especially important in protecting one's bodily autonomy. Lange was denied coverage, and thus access, to medically necessary treatment by a healthcare coverage exclusion that limits an adult's control over their own body. The importance of bodily autonomy crosses political and religious lines [16] and has been illustrated by, for **\*1284** example, the recent challenges to mandatory COVID-19 vaccines. [17] As Justice Cardozo famously proclaimed, "[e]very human being of adult years and sound mind has a right to determine what shall be done with [their] own body[.]" *Schloendorff v. Soc'y of N.Y. Hosp.*, 211 N.Y. 125, 105 N.E. 92, 93 (1914), *abrogated on other grounds by Bing v. Thunig*, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957); *see also Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278–79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (recognizing the constitutional right to bodily autonomy which allows competent persons to refuse unwanted medical treatment). Our Constitution does not permit courts to pick and choose which people warrant protection under the law based on the personal views of a subset of the population. [18]

## III. The Majority Opinion Effectively Sanctions Employment Discrimination Against Transgender People

Deputy Lange's life journey has not unfolded in the neat binary way in which the majority opinion treats her experience and the denial of her employment benefits. As society's concepts around gender, sex, sexual orientation, and bodily autonomy evolve through time, our Court is expected to help dismantle *de jure* and *de facto* forms of discrimination based on these characteristics. In the area of sex and gender discrimination, social movements have focused on lifting cisgender women out of second- and third-class citizenship. However, instead of extending this progress to all sex- and gender-based classifications, our Court instead is imposing that lower-class citizenship to a new category—transgender people.

Despite persistent attempts to portray the advancement of transgender rights as tantamount to the degradation of the rights of cisgender women [19]—in the same way propaganda encouraged men to believe that rights for women meant a diminishing **\*1285** of their own [20]—the rights of these two groups are not and have never been mutually exclusive. [21] Title VII's protections against "an employer who intentionally treats a person worse because of sex," *Bostock*, 590 U.S. at 658, 140 S.Ct. 1731, apply equally to all genders—even those whose very existence remains a point of contention. [22] Therefore, recognizing legal protections for Deputy Lange and other transgender individuals in the employment context tracks the reality that transgender individuals often come into the fullness of their identity while they are working adults, and if the workplace is going to be a law-abiding environment, it must abide by those legal protections for all of its employees.

"[T]he position of women in this country at its inception is reflected in the view expressed by Thomas Jefferson that women should be neither seen nor heard in society's decisionmaking councils." *Frontiero v. Richardson*, 411 U.S. 677, 684 n.13, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (citing MARTIN GRUBERG, WOMEN IN AMERICAN POLITICS 4 (1968) and ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA (Reeves trans. 1948)). Even after women were granted the right to vote, "for a half century thereafter, it remained the prevailing doctrine that government ... could withhold from women opportunities accorded men so long as any 'basis in reason' could be conceived for the discrimination." *United States v. Virginia*,

518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (Ginsburg, J., majority opinion) (citations omitted).

However, as the role of women in society and the concept of gender evolved, so did the law, exemplified by Title VII of the landmark Civil Rights Act of 1964 at issue here that, *inter alia*, prohibited employment discrimination based on sex. 42 U.S.C. §§ 2000e–2000e-17. In 1971, the Supreme Court in *Phillips v. Martin Marietta Corp.* played its part and held Title VII "requires that persons of like qualifications be given employment opportunities irrespective of their sex," and concluded it **\*1286** may not permit different hiring policies for women and men based on each having preschool aged children. 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). That said, the *Phillips* Court maintained the presumption that conflicting family obligations were a women-specific concern, and "if demonstrably more relevant to job performance for a woman than for a man, could arguably be a basis" for a gender-based distinction in the law. *Id.* Justice Marshall, concerned with this surviving presumption, explained: "I fear that in this case ... the Court has fallen into the trap of assuming that the Act permits ancient canards about the proper role of women to be a basis for discrimination. Congress, however, sought just the opposite result." *Id.* at 545, 91 S.Ct. 496 (Marshall, J. concurring). That same year, over a hundred years after the ratification of the Fourteenth Amendment, the Court held for the first time that a law that discriminated against women was unconstitutional under the Fourteenth Amendment. U.S. CONST. amend. XIV (ratified on July 9, 1868); *Reed v. Reed*, 404 U.S. 71, 76–77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (striking a state statute that mandated preference of men over "equally entitled" women).

Thereafter, the Court continued to dismantle our nation's "long and unfortunate history of sex discrimination," that was traditionally "rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage." *Frontiero*, 411 U.S. at 684, 93 S.Ct. 1764. In *Frontiero*, the Court recognized that although the position of women had improved, "it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena." *Id.* at 686, 93 S.Ct. 1764 (footnotes omitted). Untangling this seemingly subtle discrimination meant severing our outdated and disproven concept of gender roles and capacity, and so the Court began striking

discriminatory state and federal laws which had been based on archaic and overbroad generalizations about gender, particularly rejecting the notion that women were "destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." *Stanton v. Stanton*, 421 U.S. 7, 14–15, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) (citation omitted).

No longer was the presumption that a woman was dependent on a husband, less valuable in the workplace, or less likely to work a viable basis for gender-based distinctions in employment law, property rights, and access to entitlements and benefits.[23] Acknowledging "[w]omen's activities and responsibilities [were] increasing and expanding," the Court recognized that "[t]he presence of women in business, in the professions, in government and, indeed, **\*1287** in all walks of life where education is a desirable, if not always a necessary, antecedent is apparent and a proper subject of judicial notice." *Id. at* 15, 95 S.Ct. 1373. As late as 1996, the Court struck down the Virginia Military Institute's categorical exclusion of women and reiterated that precedent does not allow for "a law or official policy [that] denies to women, simply because they are women, full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *United States v. Virginia*, 518 U.S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (citations omitted).[24]

Unfortunately, the traditional and stereotypical concepts around sex and gender are still so entrenched in our society's institutions that to advance sex and gender equality means challenging more than just the laws that make explicit, facial sex- and gender-based criteria. For example, the Court began striking down laws that made distinctions based on pregnancy. *See, e.g.*, *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 645–46, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (rejecting the "conclusive presumption" that being pregnant made one unfit to work in a challenge to a policy that required teachers to take unpaid maternity leave after the first trimester of pregnancy); *Nashville Gas Co. v. Satty*, 434 U.S. 136, 146, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (striking down policy that denied accumulated seniority to employees returning from pregnancy under Title VII). In interpreting the Pregnancy Discrimination Act of 1978 ("PDA"), which extended Title VII protections by prohibiting discrimination based on pregnancy or pregnancy-related medical conditions, the Court held discrimination based on pregnancy was discrimination based on sex and applied the PDA broadly to include an employee's spouse in the context of employment

benefits. *Newport News*, 462 U.S. at 684–85, 103 S.Ct. 2622; *see* 42 U.S.C. § 2000e(k).

This gradual dismantling of archaic gender concepts goes beyond just their effect on women. In *Mississippi University for Women v. Hogan*, for example, the Court struck down a nursing school's categorical exclusion of men and concluded the policy "tends to perpetuate the stereotyped view of nursing as an exclusively woman's job." 458 U.S. 718, 729, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). In *Oncale v. Sundowner Offshore Services, Inc.*, the Court held that Title VII prohibits same-sex sexual harassment even when both parties are heterosexual men, concluding the "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Recently, and at issue here, courts have been grappling with our evolving concepts around gender within the context of sexual orientation and gender identity. For instance, the belief that a heterosexual couple is the only proper foundation for marital and familial relationships and, thus, the only family construct entitled to legal protections, has shifted.[25] In the landmark **\*1288** case *Obergefell v. Hodges*, the Supreme Court held same-sex marriage is a constitutional right and that "[t]he limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest." 576 U.S. 644, 670–71, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). Further, as the concept of the "gender binary" continues to develop,[26] courts also must continue to develop an effective legal framework to address discrimination in all its forms.[27]

Nevertheless, the Supreme Court already has begun to address discrimination against transgender persons, some of our most vulnerable citizens,[28] by extending anti-discrimination frameworks to new contexts. Thus, we arrive back at *Bostock*, where the Court applied the existing, straightforward "but-for cause" test to hold that under Title VII, "[a]n employer who fires an individual merely for being gay or transgender defies the law." 590 U.S. at 683, 140 S.Ct. 1731. Again, the Court recognized that "homosexuality and transgender status are distinct concepts from sex," but concluded that "sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees." *Id.* at 661, 669, 140 S.Ct. 1731.

In Deputy Lange's case, we are not tasked with untangling hundreds of years of evolving concepts around gender and sex and their effect on transgender individuals in every conceivable context. Rather, like the early work of eliminating explicit sex- and gender-based distinctions in the law, we only are tasked with reading Houston County's healthcare exclusions to decide whether they, on their face, treat Deputy Lange worse because she is transgender, *i.e.*, that her sex was the "but-for cause" of Houston County's decision to deny her medical coverage. The healthcare exclusions do just that. Consequently, the majority opinion traps transgender persons in the category of lower-class citizenship, **\*1289** outside of the protections afforded to cisgender individuals. However, just as "[a] prime part of the history of our Constitution ... is the story of the extension of constitutional rights and protections to people once ignored or excluded," *Virginia*, 518 U.S. at 557, 116 S.Ct. 2264, so is our history of requiring all to comply with federal laws that guarantee those protections.

The international community is also extending legal protections to transgender persons. The United Nations Commission on Human Rights has clarified that provisions of the Universal Declaration of Human Rights, which states "all human beings are born free and equal in dignity and rights," include transgender persons. [29] The UN Report is not an aspirational assertion but a recognition that specific, treaty-based international human rights laws include transgender rights. [30] For example, the Report reiterates that flowing from the International Covenant on Economic, Social and Cultural Rights [31] is the prohibition of "any discrimination in access to health care and the underlying determinants of health, as well as to means and entitlements for their procurement, on the grounds of sexual orientation and gender identity." [32] Similarly, an international group of legal experts developed the Yogyakarta Principles on the Application of International Human Rights Law in Relation to Sexual Orientation and Gender Identity, which provide an "expert exposition of international human rights law as it currently applies to the grounds of sexual orientation, gender identity, gender expression and sex characteristics." [33] The Yogyakarta Principles suggest that to protect transgender persons from discrimination in healthcare settings, states should ensure "gender affirming healthcare ... costs are covered or reimbursable under private and public health insurance **\*1290** schemes." [34] Since it was published in 2006 and supplemented in 2017, the Yogyakarta Principles

have had widespread influence on international and state protections of transgender rights. [35]

\* \* \*

Instead of embracing a legal tradition (and mandate) of upholding the law to ensure all people are treated equally, or that any treatment is not rooted in a discriminatory purpose or practice, the majority opinion temporarily moves the needle back in the ongoing struggle for basic human dignity. Accordingly, I respectfully dissent.

Wilson, Circuit Judge, joined by Abudu and Kidd, Circuit Judges, Dissenting:

But for her transgender status, Sergeant Anna Lange's medically necessary [1] surgery would have been covered by her employer's health insurance plan. Due to facially discriminatory coverage exclusions, it was not. Because discrimination against transgender people is outlawed by Title VII, I dissent.

## I.

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against "any individual" with respect to his or her "compensation, terms, conditions, or privileges of employment, because of ... sex." 42 U.S.C. § 2000e-2(a)(1). Health insurance benefits are " 'compensation, terms, conditions, or privileges of employment.' " *E.g.*, *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (quoting 42 U.S.C. § 2000e-2(a)).

Title VII's "because of" language incorporates the "but-for" causation standard. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). This test for impermissible discrimination is a "sweeping" one—if an employer relies, even in part, on an employee's sex when deciding to take an adverse employment action, "a statutory violation has occurred." *Id.* at 656, 659–60, 140 S.Ct. 1731. The "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* at 656, 140 S.Ct. 1731.

A few facts [2] illustrate how Houston County's decision to exclude gender confirming **\*1291** care from its

insurance plan violates *Bostock*'s but-for test. The health plan covers "medically necessary" services, including "office visits and doctor services," "diagnostic laboratory" services, "prescription drugs," "surgical supplies," "inpatient hospital care," and "inpatient professional services" included in "surgery" and "general anesthesia." The plan also has sixty-eight medical exclusions and twenty-nine pharmacy exclusions. Of the exclusions, two specifically carve out gender transition care [3] from coverage: one excludes coverage for "[s]ervices and supplies for a sex change and/or the reversal of a sex change" (Exclusion 57) and the other "[d]rugs for sex change surgery" (Exclusion 26) (together, the Exclusions). Houston County does not dispute that the Exclusions deny coverage to transgender people seeking treatment for gender dysphoria, even when it is medically necessary, and even when the plan would cover the same treatment for a cisgender person [4]:

LANGE'S COUNSEL: Would exclusion 57 exclude a mastectomy sought for cancer treatment?

HOUSTON COUNTY REPRESENTATIVE: **No.**

LANGE'S COUNSEL: But would exclusion 57 prevent coverage of a mastectomy if it was used to treat gender dysphoria?

HOUSTON COUNTY REPRESENTATIVE: **Yes.**

LANGE'S COUNSEL: Exclusion 26 would not exclude hormone replacement therapy to treat menopause?

HOUSTON COUNTY REPRESENTATIVE: **No**, not as I understand it.

LANGE'S COUNSEL: But would exclusion 26 prevent hormone replacement therapy if used to treat gender dysphoria?

HOUSTON COUNTY REPRESENTATIVE: As I understand it, **yes.**

LANGE'S COUNSEL: Is mental healthcare generally covered under the plan?

HOUSTON COUNTY REPRESENTATIVE: **Yes.**

LANGE'S COUNSEL: So it becomes not covered when it's related to transgender treatment?

HOUSTON COUNTY REPRESENTATIVE: ... to answer your question, **yes.**

Lange sought and was denied a medically necessary vaginoplasty. If Lange had **\*1292** been assigned female sex at birth, [5] her medically necessary vaginoplasty would have been covered by the health plan. Because she was not, it was not.

The *Bostock* but-for test reveals that Lange's sex "play[ed] an unmistakable and impermissible role" in the coverage decision. 590 U.S. at 660, 140 S.Ct. 1731. Lange (1) is a woman, (2) was assigned male sex at birth, and (3) is seeking a medically necessary vaginoplasty. Houston County excludes this care from its health plan. [6] Changing "one thing," *id.* at 656, 140 S.Ct. 1731, imagine someone that (1) is a woman, (2) was assigned female sex at birth, and (3) is seeking a medically necessary vaginoplasty. This care would be covered. Therefore, Houston County's health plan "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock*, 590 U.S. at 660, 140 S.Ct. 1731. Because the individual's sex is a but-for cause of the denial of coverage, the plan violates Title VII.

While Title VII's "because of" language, operationalized through *Bostock's* "but-for" test, is a "sweeping" discrimination standard designed to ensure that Title VII's protected characteristics play no role in employment decisions, the test is still subject to different formulations. *Bostock*, 590 U.S. at 656, 140 S.Ct. 1731. For example, take the majority's but-for analysis. First, it presents Lange, a "natal man," who sought a male-to-female sex change. The majority then hypothesizes "a natal woman who wanted a female-to-male sex change." In this hypothetical the majority changes two things, both the person's sex assigned at birth and the treatment they are seeking. This is contrary to *Bostock*'s mandate **\*1293** that we "change one thing." *Bostock*, 590 U.S. at 656, 140 S.Ct. 1731.

The majority then tries another formulation of *Bostock*'s "simple test." It hypothesizes "a natal woman who sought coverage for the same male-to-female sex change that Lange received." For starters, someone assigned female sex at birth would not seek a male-to-female sex change unless they had previously transitioned. This scenario would entail changing multiple variables at one time, again violating *Bostock*'s mandate.

The majority's test then, seems to depend on the idea that the Exclusions are made nondiscriminatory by a cisgender

person who would have to pay out of pocket for their transgender dependent's surgery. This argument defies logic. The Exclusions discriminate based on sex, regardless of whether the person being discriminated against is an employee or the dependent of an employee.

The majority's claim that "[n]othing about the policy exclusion turns on whether the County's employee is a man or woman" ignores that the Exclusions themselves are impermissibly "bound up with sex." *Bostock*, 590 U.S. at 661, 140 S.Ct. 1731. So "[a]n employer musters no better defense by responding that it is equally happy to [exclude] male and female employees" from this coverage. *Id.* at 662, 140 S.Ct. 1731.

Indeed, to apply the Exclusions, the plan administrator would have to know the purpose of the procedure—if for a "sex change" or a "sex change reversal," it is excluded, but if for something else, it is covered. To determine whether the care is for a "sex change," "sex change reversal," or something else, the administrator must look at a person's sex—their sex assigned at birth, what it is now, and what they intend it to be in the future. Then, and only then, can the administrator decide whether the care is covered or not covered. So, inquiring into the purpose of the care necessarily entails inquiring into, and denying benefits based on, sex. "There is no way" to determine whether coverage will be provided "without considering [an employee's] sex" assigned at birth and then excluding coverage based on that finding. *Bostock*, 590 U.S. at 668, 140 S.Ct. 1731.

The fact that Bostock's "but-for" test is subject to manipulation is no indication that the Exclusions are facially nondiscriminatory. Discrimination has been reframed in neutral terms in the past.[7] For **\*1294** example, in *Loving v. Virginia*, the Court confronted the argument that anti-miscegenation laws were permissible because they "punish[ed] equally" both the Black and white participants in an interracial marriage. 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). But the Court "reject[ed] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations." *Id.* We are not the first to make this point. *See United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 1877, 222 L.Ed.2d 136 (2025) (Sotomayor, J., dissenting). But it is particularly apt here, where the majority recasts sex discrimination as a neutral policy excluding "sex change operation[s] for anyone regardless of their biological

sex." Just as the illegality of a marriage under the statutes in *Loving* hinged on a person's race, so too here do the Exclusions hinge on a person's sex.

Courts have time and again pointed to a purported nondiscriminatory reason rather than grapple with the discriminatory terms of a statute or policy. Ignoring that the Exclusions hinge on sex is antithetical to Title VII's "momentous" message that "[a]n individual employee's sex is not relevant to the selection, evaluation, or compensation of employees." *Id.* at 660, 140 S.Ct. 1731 (internal quotation marks omitted).

## II.

The majority opinion relies heavily on *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025). But this reliance is misplaced. Although the Court conducted an analysis under *Bostock*,[8] the Court declined to address "whether *Bostock*'s reasoning reaches beyond the Title VII context." *Id.* at 1834–35. And *Skrmetti* arose under the Equal Protection Clause, where our conception of discrimination is quite different from that under Title VII.[9] The differences begin with the text.

**\*1295** The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV § 1. It does not contain the phrase "because of" or any similar phrase that adopts a test of but-for causation.

Our equal protection jurisprudence has developed to "coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). The Court has never taken a but-for approach to equal protection classifications. The contrast between the stringency of the but-for test's operation and the flexibility of the Court's equal protection classifications is nowhere clearer than it is in the Court's sexual orientation discrimination cases.

The Court has never treated sexual orientation as a form of sex discrimination, requiring heightened scrutiny, under the Equal Protection Clause. Even in decisions recognizing constitutional protections for the LGBTQ community, such

as in *Romer v. Evans*,[10] *Lawrence v. Texas*,[11] *United States v. Windsor*,[12] and *Obergefell v. Hodges*,[13] the Court has consistently avoided the question of whether sexual orientation should be deemed a suspect or quasi-suspect class. Most recently, in *Skrmetti*, it avoided deciding whether laws classifying based on transgender status are subject to heightened scrutiny as sex discrimination. 145 S. Ct. at 1832–33.

Not so under Title VII, which "requires that we focus on fairness to individuals rather than fairness to classes." *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 709, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). Title VII's stricter "but-for" test is ' 'simple but momentous': An individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.' " *Bostock*, 590 U.S. at 660, 140 S.Ct. 1731 (quoting **\*1296** *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). And "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660–62, 140 S.Ct. 1731.

The majority opinion's argument that ' 'the law does not prohibit conduct for one sex that it permits for the other,' " is a group level discrimination argument that is no good under Title VII. It is no "defense for an employer to say it discriminates against both men and women because of sex. This statute works to protect individuals of both sexes from discrimination, and does so equally." *Bostock*, 590 U.S. at 659, 140 S.Ct. 1731.

Perhaps most telling of the differences in how we conceive of discrimination under the Equal Protection Clause and Title VII is the evolution of the Court's treatment of another form of sex discrimination—pregnancy discrimination. In 1974, the Court considered whether an insurance program that excluded from coverage certain disabilities resulting from pregnancy discriminated on the basis of sex. *Geduldig v. Aiello*, 417 U.S. 484, 486, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). The Court reasoned that there was a "lack of identity" between sex and pregnancy because the plan divided participants into two groups—"pregnant women and nonpregnant persons." *Id.* at 496 n.20, 94 S.Ct. 2485. Because women could belong to either group, there was no discrimination based on sex as such. *Id. Gilbert* followed next, and the Supreme Court upheld a disability plan that excluded disabilities arising from pregnancy, relying largely on *Geduldig*'s reasoning. *General*

*Elec. Co. v. Gilbert*, 429 U.S. 125, 132–34, 97 S.Ct. 401, 50 L.Ed.2d 343 (1979).

Today, this kind of reasoning lives on in the equal protection context. *See, e.g., Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). The Court in *Skrmetti* found that excluding medical treatments for gender dysphoria does not discriminate on the basis of transgender status because "although only transgender individuals seek treatment for gender dysphoria ... —just as only biological women can become pregnant—there is a 'lack of identity' between transgender status" and the exclusion of gender dysphoria treatment. 145 S. Ct. at 1833. Instead, the law at issue divided people into two groups: those that seek puberty blockers and hormones to treat gender dysphoria, which only includes transgender individuals, and those who might seek puberty blockers or hormones to treat other conditions. *Id.* The latter group encompasses both transgender and non-transgender individuals, so the Court concluded the law did not "exclude any individuals on the basis of transgender status." *Id.* at 1833–34. Here, the majority opinion uses this reasoning to decide that the "County's plan does not facially discriminate based on transgender status" but rather "draws a line between certain treatments, which it covers, and other treatments, which it does not."

But this reasoning is particularly inappropriate in Title VII cases. Congress amended Title VII in response to *Gilbert* and "unambiguously expressed its disapproval" of this reasoning. *Newport News*, 462 U.S. at 678, 103 S.Ct. 2622. The House and Senate Reports expressed that the *Gilbert*'s dissenters "correctly interpreted the Act." *Id.* (quotation mark omitted). The dissenters argued that it "was inaccurate to describe the program as dividing potential recipients into two groups, pregnant women and non-pregnant persons, because insurance programs 'deal with future *risks* rather than historic facts.' Rather, the appropriate classification **\*1297** was 'between persons who face a risk of pregnancy and those who do not.' " *Id.* (quoting *Gilbert*, 429 U.S. 161–62, 97 S.Ct. 401 (Stevens, J., dissenting)).

Applying the correct discrimination standard from the *Gilbert* dissenters, transgender individuals are the only ones that face the "risk" of needing a "sex-change" or "sex-change reversal." By excluding medically necessary care if it is classified as a "sex-change" or "sex-change reversal" the health plan provides less complete coverage for people based on their transgender status, and therefore also based on their

sex. *See Bostock*, 590 U.S. at 660–62, 140 S.Ct. 1731. This violates Title VII.

**III.**

Because the majority manipulates *Bostock*'s but-for test to obfuscate the discrimination apparent on the face of the plan, I dissent.

**All Citations**

152 F.4th 1245, 31 Fla. L. Weekly Fed. C 414

---

## Footnotes

\*  Senior Circuit Judge Wilson elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

1  The Supreme Court has held that "sex ... is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). We nevertheless refer to this surgical procedure as a "sex change" because that is the terminology used by the policy and the parties.

2  Our dissenting colleague, Judge Jill Pryor, also criticizes the Supreme Court's discussion of *Bostock* in *Skrmetti* as "implicitly rel[ying] on since-rejected reasoning from *Geduldig* [*v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974)] and [*General Electric Co. v.*] *Gilbert* [429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976)]." Of course, those cases were about pregnancy discrimination (which is not an issue in this case), not alleged transgender discrimination (which is the issue in this case, was the issue in *Bostock*, and was the issue in *Skrmetti*). And it's not clear how a lower court judge's idiosyncratic interpretation of a Supreme Court decision from four decades ago could trump the plain language of a Supreme Court decision from four months ago. In any event, our opinion in this case says nothing about *Geduldig*, *Gilbert*, or the Pregnancy Discrimination Act.

1  In his dissent, Judge Wilson seems to agree that Title VII and equal-protection challenges should be adjudged according to their own respective standards and that reviewing courts shouldn't conflate the two. *See* Wilson Dissenting Op. at 1294 *et seq.* The problem for Judge Wilson is that, as he acknowledges, in *Skrmetti*—a case that arose under the Equal Protection Clause—the Supreme Court "conducted an analysis under *Bostock*." *Id.* at 1294. And it doesn't matter that the Court "declined to address 'whether *Bostock*'s reasoning reaches beyond the Title VII context,' " *id.* (quoting *Skrmetti*, 145 S. Ct. at 1834–35)—because the case before us arises squarely *within* "the Title VII context." So whether or not it was strictly necessary, or even wise, for the *Skrmetti* Court to address *Bostock* in the course of deciding an equal-protection case, the fact is it did so. And we can't ignore what it said and did. *See, e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]here is dicta, and then there is dicta, and then there is Supreme Court dicta.").

1  More precisely, *Skrmetti* addressed the constitutionality of a law that "prohibit[ed] a healthcare provider from '[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being,' or '[p]re-scribing, administering, or dispensing any puberty blocker or hormone,' for the purpose of (1) '[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex,' or (2) '[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity.' " 145 S.Ct. at 1826 (internal citations omitted).

2  429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

3    In stating the standard, *Craig* held that "[t]o withstand constitutional challenge, ... classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." 429 U.S. at 197, 97 S.Ct. 451. In other words, under our modern Equal Protection framework, "sex-based classifications warrant heightened scrutiny." *Skrmetti*, 145 S. Ct. at 1828.

4    *See* Leah Litman, *The Archaic Sex-Discrimination Case the Supreme Court Is Reviving*, THE ATLANTIC (June 24, 2025), https://www.theatlantic.com/ideas/archive/2025/06/supreme-court-sex-discrimination-skrmetti/683296/ [https://perma.cc/XK4B-G6T7] (observing that "heightened judicial scrutiny" didn't apply "[a]t the time *Geduldig* was decided").

5    *See, e.g.*, *Skrmetti*, 145 S.Ct. at 1880 (Sotomayor, J., dissenting) ("*Geduldig* was 'egregiously wrong' when it was decided ...." (quoting *Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 56–57, 132 S.Ct. 1327, 182 L.Ed.2d 296 (2012) (Ginsburg, J., dissenting))); *AT&T Corp. v. Hulteen*, 556 U.S. 701, 728 n.17, 129 S.Ct. 1962, 173 L.Ed.2d 898 (2009) (Ginsburg, J., dissenting) (collecting sources critiquing *Geduldig's* reasoning); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 327, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (Stevens, J., dissenting); Sylvia A. Law, *Rethinking Sex and the Constitution*, 132 U. PA. L. REV. 955, 983–84 (1984) ("Criticizing *Geduldig* has since become a cottage industry. Over two dozen law review articles have condemned both the Court's approach and the result.... Even the principal scholarly defense of *Geduldig* admits that the Court was wrong in refusing to recognize that the classification was sex-based ...."); ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 779 (4th ed. 2011) ("It is hard to imagine a clearer sex-based distinction [than the one in *Geduldig*].").

6    That said, Congress passed many of the employment-discrimination laws that postdate Title VII to expand some of Title VII's protections to other groups. *See* Abigail C. Modjeska, 1 EMPLOYMENT DISCRIMINATION LAW § 1:1 (3rd ed.). "Because of this historical development, the early Title VII cases gave rise to many of the substantive doctrines that are now applied in all employment discrimination cases." *Id.*; *see also, e.g.*, *Lewis v. City of Union City*, 918 F.3d 1213, 1221 n.7 (11th Cir. 2019) (en banc) ("*McDonnell Douglas's* burden-shifting framework applies to claims arising under a host of federal antidiscrimination laws.").

7    Perhaps it may seem unusual that the same question may generate two different answers in two different contexts. But sometimes that's what the law requires. Here, we are considering a constitutional provision (the Equal Protection Clause of the Fourteenth Amendment) and a statutory one (Title VII). The Supreme Court gets to interpret the Constitution. *See generally Marbury v. Madison*, 5 U.S. 1 Cranch 137, 2 L.Ed. 60 (1803). But Congress can pass laws telling the Court when it's erred in construing Congress's legislation—through a congressional override. *See, e.g.*, Deborah Widiss, *Undermining Congressional Overrides: The Hydra Problem in Statutory Interpretation*, 90 TEX. L. REV. 859, 875 (2012) (explaining that congressional overrides are "a crucial mechanism of maintaining legislative supremacy in the statutory realm"). That's exactly what Congress did when it amended Title VII and enacted the Pregnancy Discrimination Act: it overrode the Supreme Court's *Geduldig* reasoning as applied to the Title VII context. *See Newport News*, 462 U.S. at 678, 103 S.Ct. 2622.

8    That is not to say that rational-basis review never invalidates a law. If a law classifies by a class that is not protected "not to further a proper legislative end but to make them unequal to everyone else," it will not pass rational-basis scrutiny. *Romer v. Evans*, 517 U.S. 620, 625, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). After all, "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Id.* (citations and quotation marks omitted).

9    We know that the insurance plan in *Geduldig* covered male-only medical conditions because it covered prostatectomies, among other "disabilities ... that affect only or primarily [the male] sex." *See id.* at 501, 94 S.Ct. 2485 (Brennan, J., dissenting).

10     For ease of reading, for the remainder of this opinion, I refer to those assigned female at birth as "females" and those assigned male at birth as "males."

11     True, as *Skrmetti* noted, Virginia's antimiscegenation law included an express "race-based classification," anyway. *See* 145 S. Ct. at 1831. But again, antidiscrimination law does not turn on magic words or express classifications because, "[o]f course, a State may not circumvent the Equal Protection Clause by writing in abstract terms." *See id.*

12     Pub. L. No. 95-555, § 1, 92 Stat. 2076, 2076 (codified at 42 U.S.C. § 2000e(k) (2012)).

13     For example, the Court explained, "a plan that provided complete hospitalization coverage for the spouses of female employees but did not cover spouses of male employees when they had broken bones would violate Title VII by discriminating against male employees." *Id.* That's so even though *some* "diagnoses" of male employees' spouses (namely, those that don't involve broken bones) remain covered. The point was that this plan discriminated in part on the basis of sex. *See id.*

14     *See, e.g.*, Reva B. Siegel, *Employment Equality Under the Pregnancy Discrimination Act of 1978*, 94 YALE L.J. 929, 942 & n.63 (1985) (observing that pregnancy is "traditionally believed to render women unfit for employment" and collecting sources); *Maya Manian, Commentary on* Geduldig v. Aiello, *in* FEMINIST JUDGMENTS: REWRITTEN OPINIONS OF THE UNITED STATES SUPREME COURT 185, 187 (Kathryn M. Stanchi, Linda L. Berger & Bridget J. Crawford eds., 2016) (arguing that the *Geduldig* majority ignored "the long history of women's subordination based on their capacity for pregnancy").

15     As we'll get to soon enough, *Bostock* tells us that we must ask whether the challenged program or policy classifies on the basis of sex at the level of the individual. And so we must do that analysis at the appropriate level of generality. Of course, a program that discriminates against an individual female can *also*, in practice, discriminate at a higher level of generalization—that is to say, against all or most women, as these examples show.

16     The fact that the plan at issue here prohibits coverage for "sex-change reversals" doesn't show that an individual male seeking a sex-change operation hasn't suffered sex discrimination. We need to be careful to accurately conduct *Bostock's* three steps. Our individual male seeking a sex-change operation is a male seeking the construction of a vagina. This person has no history of having undergone a procedure to medically construct a penis. So the female version of this individual male, found at step two, also doesn't have this history of having medically constructed a penis. Rather, the comparator is a female seeking the construction of a vagina with no history of having a medically constructed penis. Otherwise, the comparator is not the female version of the prospective plaintiff. So at step three, it would be inaccurate to describe the comparator as a female seeking a "sex-change reversal." The comparator's sex has never been changed. A female seeking a "sex-change reversal" describes a wholly different person from the female parallel to our individual male. And that female's experience is irrelevant to whether our *individual* has experienced sex discrimination.

An eagle-eyed reader might point out that at step one, we could describe our individual male as a male *with a penis* seeking the construction of a vagina. Then at step two, we change that person to a female *with a penis* seeking the construction of a vagina. And at step three, this new person seems like a female seeking a "sex-change reversal." But that's the result of two subtle errors at steps two and three.

First, at step two, when we change our individual male to a female, we have to actually *change* this person into a female—change their birth-assigned sex. That means we can't retain the genitalia this person had at birth. So the female comparator doesn't have a penis from birth. Otherwise, for example in *Bostock* itself, the court should have described a "gay man" as a male with a penis with which he has sexual relations with males, who, at step two becomes a female with a penis with which she has sexual relations with males. And at step

three, we would be left with a comparator who is not female but intersex. (Though *Bostock*'s implications for intersex individuals are outside the scope of this opinion, others have thoughtfully considered the issue. *See, e.g.*, Sam Parry, *Sex Trait Discrimination: Intersex People and Title VII After* Bostock v. Clayton County, 97 WASH. L. Rev. 1149, 1150 (2022) (observing that "[b]ecause current Title VII jurisprudence assumes there are only two sexes, the legal status of intersex people remains in limbo")).

And even if we could carry over our individual male's penis in step two, it would be inaccurate, at step three, to describe this new female with a penis as a female seeking a "sex-change reversal." That's because this seemingly intersex person would have had their penis at birth as our original individual male did—it would not be the result of medical construction. So at step three, we could not describe this person as seeking a "sex-change reversal." This individual seeks no "reversal" of anything. At bottom, a female seeking a "sex-change reversal" is just not a relevant comparator for a male seeking a "sex-change" operation.

17 It's irrelevant under *Bostock*, that if we take a female with hirsutism, and turn that person into a male, they might be a male with either "gender dysphoria" or "precocious puberty." *But see Skrmetti*, 145 S. Ct. at 1835. That might inform an analysis of whether an individual with hirsutism experiences sex discrimination. But it says nothing, under the *Bostock* test, about whether a *different individual* male with gender dysphoria (due to excessive facial hair) experiences sex discrimination. To figure out whether *that person* experienced sex discrimination, we change *that person's* sex, not the sex of the female with hirsutism. And when we change the sex of our male with excessive facial hair, who therefore has gender dysphoria, we always end up with a female with excessive facial hair, who therefore has hirsutism.

18 Though "[t]he 'modern' era [in considering sex-discrimination claims] began with *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)," *Craig* represented the "compromise" describing the Court's modern intermediate standard for these kinds of claims. *See* Karst, *supra* at 54 & n.297. For more on the history of the Court's then-developing standard for sex-discrimination claims brought under the Equal Protection Clause, see Gerald Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a New Equal Protection*, 86 HARV. L. REV. 1, 29–30 (1972); *see also* Law, *supra*, at 987–88.

19 In fact, before *Skrmetti*, the Court had expressly resurrected *Geduldig*'s reasoning only twice. *See Bray*, 506 U.S. at 271, 113 S.Ct. 753; *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 216, 142 S.Ct. 2228, 213 L.Ed.2d 545 (2022).

1 "Doc." numbers refer to the district court's docket entries.

1 Justice Thomas saw "no reason to import *Bostock*'s Title VII analysis into the Equal Protection Clause." 145 S. Ct. at 1838 (Thomas, J., concurring). The *Bostock* Court's analysis relied on specific terms found "within the context of Title VII," and the Equal Protection Clause "include[d] none of th[at] language." *Id.* "That such differently worded provisions should mean the same thing is implausible on its face." *Id.* (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) (Gorsuch, J., concurring)). Accordingly, he noted that "[e]xtending the *Bostock* framework [to *Skrmetti*] would depart dramatically from this Court's Equal Protection Clause jurisprudence." *Id.* Similarly, we should not extend *Skrmetti*'s Equal Protection Clause analysis to this Title VII context and stray from established Title VII jurisprudence.

2 *What Percentage of the US Population is Transgender?*, USAFACTS, https://usafacts.org/articles/what-percentage-of-the-us-population-is-transgender (updated Feb. 12, 2025) [https://perma.cc/67RE-HKBQ].

3    *Understanding Transgender People, Gender Identity and Gender Expression*, AM. PSYCH. ASS'N, https://www.apa.org/topics/lgbtq/transgender-people-gender-identity-gender-expression (last updated July 8, 2024) [https://perma.cc/JPG8-HURU].

4    *Medical Association Statements in Support of Health Care for Transgender People and Youth*, GLAAD, https://glaad.org/medical-association-statements-supporting-trans-youth-healthcare-and-against-discriminatory (last updated June 26, 2024) (providing a comprehensive list of domestic and international health organizations' recognition of gender dysphoria) [https://perma.cc/28JKGK8R].

5    *Understanding Transgender People, Gender Identity and Gender Expression*, *supra* note 3; *What is Gender Dysphoria*, AM. PSYCH. ASS'N, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (last visited Apr. 8, 2025) [https://perma.cc/EN7A-B94K].

6    AM. PSYCH. ASS'N, *supra* note 5; *Gender dysphoria*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/gender-dysphoria/symptoms-causes/syc-20475255 (last visited Sept. 5, 2025) [https://perma.cc/N385-RVY4].

7    AM. PSYCH. ASS'N, *supra* note 5.

8    *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235, 250–51, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (holding discrimination based on failure to conform to a gender stereotype is sex-based discrimination), *superseded on other grounds by statute*, Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1075, *as recognized in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020).

9    *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding "sex discrimination consisting of same-sex sexual harassment is actionable under Title VII" and "[t]he prohibition of harassment on the basis of sex requires neither asexuality nor androgyny").

10   *2025 Anti-Trans Bills Tracker*, TRANS LEGIS. TRACKER, https://translegislation.com (last visited Sept. 4, 2025) [https://perma.cc/C4Z5-G9D8].

11   *Id.*

12   For example, Houston County admitted that a mastectomy for cancer treatment, hormone replacement therapy to treat menopause, and mental healthcare generally are all covered under the policy, but the exclusion would bar coverage of each to treat a transgender employee for gender dysphoria.

13   To illustrate, at Oral Argument, an inference was made that perhaps Deputy Lange's bottom surgery was so specialized that she had to travel to New York to find a surgeon that could perform it, supporting the Appellant's assertion that the policy did not draw a line based on transgender status, but rather on the type of procedure. However, transgender rights and protections vary throughout the country, and these geographic disparities, particularly in access to gender affirming care, may well force transgender people like Deputy Lange to travel out-of-state to obtain medically necessary care. *See Map: Attacks on Gender Affirming Care by State*, HUM. RTS. CAMPAIGN (Dec. 4, 2024), https://www.hrc.org/resources/attacks-on-gender-affirming-care-by-state-map [https://perma.cc/6W5X-RJ4G]; Jaclyn M. White Hughto et al., *Geographic and Individual Differences in Healthcare Access for U.S. Transgender Adults: A Multilevel Analysis*, 3 LGBT HEALTH 424, 431 (2016) ("Our findings uniquely demonstrate that, in addition to individual-level demographic and behavioral factors, the social climate of a state as measured through partisan voting practices is a strong indicator of experiencing care refusal among U.S. transgender individuals.").

14   Amicus Christian Employers Alliance does not hide its goal to stop "gender-transition mandates" that it claims "coerce ... employers and healthcare providers to either pay or perform gender-

transition surgeries, procedures, counseling, or other treatments—all of which are in direct violation of their deeply-held religious beliefs." *Christian Employers Alliance Praises Temporary Injunction to Stay Two Biden Administration Gender-Transition Mandates*, CHRISTIAN EMPS. ALL. (May 17, 2022), https://christianemployersalliance.org/wp-content/uploads/2022/12/5.17.22-CEA-v-EEOC-PR-FINAL.pdf [https://perma.cc/XN3B-5L5J]. Of course, our own precedent recognizes religious exemptions in certain contexts, but Title VII makes no allowance for such extratextual considerations given its express terms prohibit discrimination based on an employee's transgender status.

15    "Transgenderism" is a term opponents of transgender equality use to imply that being transgender is an ideology (often political) or a concept, rather than a term that describes a person's identity. *Online Anti-LGBTQ Hate Terms Defined: "Transgenderism"*, GLAAD, https://glaad.org/transgenderism-definition-meaning-anti-lgbt-online-hate (last visited Apr. 9, 2025) [https://perma.cc/Z5GY-EAET].

16    "If you own yourself, then you have the freedom to make [ ] personal intimate decisions. Otherwise you are not truly free to exercise any of your other rights." Christina Sandefur, *Bodily Autonomy and Individual Rights*, THE FEDERALIST SOCIETY (Dec. 21, 2021), https://fedsoc.org/commentary/fedsocblog/bodily-autonomy-and-individual-rights-subtitle-showcase-panel-iv-law-science-and-public-policy [https://perma.cc/C7SR-YHE4].

17    Katie Mettler et al., *Anti-vaccine activists march in D.C. — a city that mandates coronavirus vaccination — to protest mandates*, WASH. POST (Jan. 24, 2022), https://www.washingtonpost.com/dc-md-va/2022/01/23/dc-anti-vaccine-rally-mandates-protest [https://perma.cc/Q8QZ-RUSG].

18    Justice Barrett, in her concurrence in *Skrmetti*, proclaimed that transgender individuals should not be considered a part of a suspect class because such status is not marked by some "obvious, immutable, or distinguishing characteristic[ ]," like race or sex. *United States v. Skrmetti*, 605 U.S. 495, 145 S. Ct. 1816, 1851, 222 L.Ed.2d 136 (2025) (Barrett, J., concurring). Specifically, she contended that individuals experience gender dysphoria at varying ages, and the term " 'transgender' can describe a huge variety of gender identities and expressions." *Id.* at 1852 (internal quotation and citation omitted). Interestingly, Justice Barrett's arguments raise the question of whether our caselaw has properly addressed questions around "whiteness" as an immutable characteristic. Our nation's history shows that not everyone considered "white" today was always viewed that way. Moreover, the phenomenon of mixed-raced people "passing" as white is well-documented, thus supporting the view that "whiteness" is a social construct. To push Justice Barrett's point further, perhaps more exploration is necessary to determine what steps should be taken to authenticate one's purported "white" racial category. *See generally* Martha R. Mahoney, *Segregation, Whiteness, and Transformation*, 143 U. PA. L. REV. 1659, 1660 (1995).

19    *See, e.g.*, Brief for The American Civil Rights Project Amicus Curiae in Support of Appellants at 8–9, *Lange v. Houston County*, Docket No. 22-12028 (11th Cir. 2024) ("Across agencies, the [Biden] Administration maintains that, post*Bostock*, statutes prohibiting sex discrimination must be read to cover gender-identity, *even at the expense of real women and their spaces* that such statutes were explicitly intended to protect." (emphasis added)); Chan Tov McNamarah, *Cis-Woman-Protective Arguments*, 123 COLUM. L. REV. 845, 864–68 (2023).

20    *See, e.g.*, *Fairchild v. Hughes*, 258 U.S. 126, 128, 42 S.Ct. 274, 66 L.Ed. 499 (1922) (plaintiffs arguing that if women were allowed to vote, men "would be deprived of their right to have such elections duly held, the effectiveness of their votes would be diminished, and election expenses would be nearly doubled. Thus irremediable mischief would result."); *Pamphlets Printed and Distributed by Women's Anti-Suffrage Association of the Third Judicial District of the State of New York (1905)*, LIBR. OF CONG., https://www.loc.gov/item/06004652 (last visited Apr. 17, 2025) [https://perma.cc/ERH5-3JUX]; *Pamphlet Distributed by the National Association Opposed to Woman Suffrage*, JEWISH WOMEN'S ARCHIVE, https://jwa.org/media/pamphlet-distributed-by-national-association-opposed-to-woman-suffrage (last visited Apr. 17, 2025)

[https://perma.cc/FDY8-9CJ5]; *Some Reasons Why We Oppose Votes for Women ... National Association Opposed to Woman Suffrage. New York City [1894]*, LIBR. OF CONG., https://www.loc.gov/resource/rbpe.1300130c?st=image (last visited Apr. 22, 2025) [https://perma.cc/67Y6-26UD].

21    *See generally* McNamarah, *supra* note 19.

22    "For members of the [Christian Employers Alliance] specifically, covering experimental gender-transition procedures offends religious convictions 'that male and female are immutable realities defined by biological sex and that gender reassignment is contrary to' their Christian values." Brief for Christian Employers Alliance Amicus Curiae in Support of Appellants at 16–17, *Lange*, Docket No. 22-12028. Further, the American Civil Rights Project, describes gender affirming care as "psychologically-driven surgical treatments for body dysmorphia." Brief for The American Civil Rights Project Amicus Curiae in Support of Appellants at iv, *Lange*, Docket No. 22-12028.

23    *See, e.g.*, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 643, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (rejecting " 'archaic and overbroad' generalization[s]" that men financially support their families while women do not); *Califano v. Goldfarb*, 430 U.S. 199, 206–07, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (similar in the context of social security survivor benefits); *Califano v. Westcott*, 443 U.S. 76, 91–92, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (rejecting the presumption that fathers are the primary breadwinners while mothers are homemakers); *Stanton*, 421 U.S. at 14, 95 S.Ct. 1373 (rejecting the presumptions that its more important for men to seek higher education and women tend to marry earlier than men); *Kirchberg v. Feenstra*, 450 U.S. 455, 456, 461, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981) (rejecting the presumption that, as "head and master" of jointly owned property, a husband possessed a unilateral right to dispose of such property without his wife's consent).

24    *See generally* PAULA A. MONOPOLI, CONSTITUTIONAL ORPHAN: GENDER EQUALITY AND THE NINETEENTH AMENDMENT (Oxford Univ. Press 2020) (detailing history behind the Nineteenth Amendment's passage and the litigation efforts toward women's enfranchisement).

25    *See* I. Bennett Capers, *Sex(ual Orientation) and Title VII*, 91 COLUM. L. REV. 1158, 1163–64 (1991) (discussing heterosexism as "us[ing] the notion of opposite genders to promulgate marital and familial relationships"); *see generally* Michael J. Rosenfeld, *Moving a Mountain: The Extraordinary Trajectory of Same-Sex Marriage Approval in the United States*, 3 SOCIUS: SOCIO. RSCH. FOR A DYNAMIC WORLD 1 (2017) [https://doi.org/10.1177/2378023117727658].

26    *See* Chassitty N. Fiani & Heather J. Han, *Navigating Identity: Experiences of Binary and Non-Binary Transgender and Gender Non-Conforming (TGNC) Adults*, 20 INT'L J. TRANSGENDERISM 181, 181–94 (2019) [https://doi.org/10.1080/15532739.2018.1426074].

27    *See* Francisco Valdes, *Queers, Sissies, Dykes, and Tomboys: Deconstructing the Conflation of "Sex," "Gender," and "Sexual Orientation" in Euro-American Law and Society*, 83 CALIF. L. REV. 1, 23–33 (1995).

28    Poverty rates among the transgender community soar above the national average. Around 29% of transgender people live in poverty, with even higher rates for the Black transgender population (39%) and the Hispanic transgender population (48%). M. V. LEE BADGETT ET AL., LGBT POVERTY IN THE UNITED STATES: A STUDY OF DIFFERENCES BETWEEN SEXUAL ORIENTATION AND GENDER IDENTITY GROUPS 2, 14 (2019), https://williamsinstitute.law.ucla.edu/wp-content/uploads/National-LGBT-Poverty-Oct-2019.pdf [https://perma.cc/AL9V-SZRB]. Attempted suicide rates in the transgender community are as high as 41% compared to 1.6% of the general population, and transgender children grades K-12 have reported alarming rates of harassment (78%), physical assault (35%), and sexual violence (12%). JAMIE M. GRANT ET AL., NAT'L CTR. FOR TRANSGENDER EQUAL. & NAT'L GAY & LESBIAN TASK FORCE, INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION

SURVEY 2–3 (2011) ("INJUSTICE AT EVERY TURN") [https://perma.cc/8WC3-D62N]; *see also* Nicolas A. Suarez et al., *Disparities in Behaviors and Experiences Among Transgender and Cisgender High School Students—18 U.S. States, 2021*, 94 ANNALS OF EPIDEMIOLOGY 113, 113–19 (2024) [https://doi.org/10.1016/j.annepidem.2024.05.004]. The unemployment rate in the transgender community is at least double that of the general population, up to four times that for transgender people of color, and one-fifth of transgender people become homeless at some point because of their transgender status. GRANT, INJUSTICE AT EVERY TURN at 4, 51.

29    Rep. of the U.N. High Comm'r for Hum. Rts., ¶ 5, U.N. Doc. A/HRC/19/41 (2011) (quoting G.A. Res. 217 (III) A, Universal Declaration of Human Rights art. 1 (Dec. 10, 1948)) (reporting to the Human Rights Council the results of the study on discriminatory laws and practices against individuals based on their sexual orientation and gender identity) ("The UN Report").

30    *Id.* ¶¶ 8–19.

31    International Covenant on Economic, Social and Cultural Rights, *opened for signature* Dec. 16, 1966, 993 U.N.T.S. 3 (signed but not ratified by the United States). Even though a State is not bound by a treaty until ratification, Article 18 of the Vienna Convention on the Law of Treaties provides that, upon signing a treaty, a State "is obliged to refrain from acts which would defeat the object and purpose" of the treaty. Vienna Convention on the Law of Treaties, art. 18(a), May 23, 1969, 1155 U.N.T.S. 331. The United States is also not a party to the Vienna Convention on the Law "but has recognized many of its provisions reflect customary international law." Kristen E. Eichensehr & Oona A. Hathaway, *Major Questions About International Agreements*, 172 U. PENN. L. REV. 1845, 1876 n.136 (2024); *see also* Curtis A. Bradley, *Unratified Treaties, Domestic Politics, and the U.S. Constitution*, 48 HARV. INT'L L. J. 307, 307–08 (2007) ("Article 18 reflects customary international law that is binding on nations that have not joined the Convention, a claim that the United States has not denied.").

32    The UN Report, *supra* note 29, at ¶ 54.

33    THE INT'L COMM'N FOR JURISTS & THE INT'L SERV. FOR HUM. RTS., THE YOGYAKARTA PRINCIPLES PLUS 10: ADDITIONAL PRINCIPLES ON THE APPLICATION OF INTERNATIONAL HUMAN RIGHTS LAW IN RELATION TO SEXUAL ORIENTATION, GENDER IDENTITY, GENDER EXPRESSION AND SEX CHARACTERISTICS TO COMPLEMENT THE YOGYAKARTA PRINCIPLES 20 (2017) [hereinafter "YOGYAKARTA PRINCIPLES PLUS 10"] [https://perma.cc/P7SUBM4A]; *see also* THE INT'L COMM'N OF JURISTS & THE INT'L SERV. FOR HUM. RTS, YOGYAKARTA PRINCIPLES ON THE APPLICATION OF INTERNATIONAL HUMAN RIGHTS LAW IN RELATION TO SEXUAL ORIENTATION AND GENDER IDENTITY 6–9 (2007) [https://perma.cc/K44E-SAJW].

34    YOGYAKARTA PRINCIPLES PLUS 10, *supra* note 33, at 20 (Principle 17(L)).

35    *See* Aoife M. O'Connor et al., *Transcending the Gender Binary Under International Law: Advancing Health-Related Human Rights for Trans\* Populations*, 50 J.L. MED. & ETHICS 409, 414 (2022) [https://doi.org/10.1017/jme.2022.84]; David Brown, *Making Room for Sexual Orientation and Gender Identity in International Human Rights Law: An Introduction to The Yogyakarta Principles*, 31 MICH. J. INT'L L. 821, 868–74 (2010).

1    Lange's doctors determined that a vaginoplasty is medically necessary for Lange's gender dysphoria under Anthem's clinical guidelines. Major health professional associations—including the American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American College of Physicians, the American Osteopathic Association, and the American College of Obstetrics and Gynecology—endorse insurance coverage for gender confirming surgeries.

2    A few additional facts help illuminate the motives behind Houston County's decision to exclude gender affirming care. During its annual renewal, Anthem, the health plan administrator, notified the County that "the exclusion for gender identity disorders and sex change surgery will be removed from [Anthem's 2017] plans" as part of its nondiscrimination mandate, required by the Affordable Care Act, 42 U.S.C. § 18116; *see* 42 C.F.R. pt. 92. Although "the County generally follows the recommendation of its third-party administrators as to exclusions for the plan," Houston County opted out of this nondiscrimination mandate. Anthem notified the County that they would "be responsible for any penalties that result if the plan is determined to be noncompliant."

Later, when Lange met with Sheriff Talton and Houston County Director of Personnel Kenneth Carter to discuss that she is transgender and wanted to live openly as a woman, the Sheriff asked Carter, "What the hell is he talking about?" and commented, "I don't believe in sex changes." After the meeting, Carter emailed the County's insurance broker, informing her that they were "good with nothing being covered."

3    Today, when used for transgender people, these treatments tend to be referred to as gender transition, gender-affirming, gender confirmation, transgender healthcare, or treatment for gender dysphoria. Appellee Br. at 4. Because the Exclusions refer to this care as for a "sex change," we use that language at times here.

4    The majority highlights that some of Lange's other treatments for gender dysphoria were covered. But they were not supposed to be. The diagnosis for gender dysphoria was "not covered" under the plan. Although Lange initially received treatments because they were not coded for gender dysphoria, the plan withdrew coverage once it discovered the treatments were used to "help someone transition."

These questions and answers come from the Director of Personnel for Houston County's deposition. Similar responses were given by the Group Account Manager at McNeal Agency, the liaison between Houston County and Blue Cross/Blue Shield, and by the Director of Administration for Houston County as the County's designated representative.

5    The majority opinion relies on *Frontiero v. Richardson* for the proposition that "sex ... is an immutable characteristic determined solely by the accident of birth." 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Even putting aside the contradiction of asserting that biological sex is an "immutable" characteristic in a case about someone trying to change it, the Supreme Court's Title VII jurisprudence and medical evidence caution against accepting this as settled fact or law. First, the *Frontiero* Court was not referring to individuals who *are* attempting to change their biological sex to match their gender identity. It made that observation while explaining that laws that classify based on sex are inherently suspect under the Equal Protection Clause because sex, like race and national origin, "bears no relation to ability to perform or contribute to society," and sex-based laws relegate "the entire class of females to inferior legal status without regard to the actual capabilities of its individual members." *Id.* at 686–87, 93 S.Ct. 1764.

Similarly, in Title VII, "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). But rather than treat sex as "immutable," *Bostock* only proceeded on the assumption that " 'sex' ... refer[s] only to biological distinctions between male and female." *Id.* at 660–61, 140 S.Ct. 1731.

The "presumption that biological sex is accurately determinable at birth and that it is a static or permanent biological determination" is "medically and scientifically flawed." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 821–22 (11th Cir. 2022) (en banc) (Wilson, J., dissenting). I therefore take issue with the majority's assertion that sex is an immutable characteristic based on a flawed and unnuanced reading of *Frontiero*.

6     Both parties agree that cost was not a factor in the County's decision to opt out of the nondiscrimination mandate. Lange's surgery was estimated to cost $25,600, and she is the only employee under the County's health plan to seek this treatment. The almost $1.2 million that Houston County has spent on this litigation would have covered approximately forty-six of the procedures Lange requested and equates to almost three times the County's annual physical and mental health budget. Aliyya Swaby & Lucas Waldron, *This Georgia County Spent $1 Million to Avoid Paying for One Employee's Gender-Affirming Care*, ProPublica (Mar. 19, 2023), https://perma.cc/56FU-94C6.

7     *See Plessy v. Ferguson*, 163 U.S. 537, 548, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (finding that "enforced separation" of Black and white persons did not violate the Equal Protection clause), *overruled by Brown v. Board of Ed.*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Separate educational facilities are inherently unequal."); *Pace v. Alabama*, 106 U.S. 583, 585, 1 S.Ct. 637, 27 L.Ed. 207 (1883) (upholding a law under the Equal Protection Clause that punished "fornication" between people of different races more severely than "fornication" between people of the same race because both races received increased punishment for interracial "fornication"), *overruled by McLaughlin v. Florida*, 379 U.S. 184, 188–190, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) ("This narrow view of the Equal Protection Clause was soon swept away."); *General Elec. Co. v. Gilbert*, 429 U.S. 125, 138–39, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (holding that the exclusion of pregnancy-related disabilities from the insurance plan did not violate Title VII even though the exclusion impacted one gender more than the other), *superseded by statute as stated in Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 678, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (Congress "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision."); *Korematsu v. United States*, 323 U.S. 214, 223–24, 65 S.Ct. 193, 89 L.Ed. 194 (1944) ("To cast this case into outlines of racial prejudice, without reference to the real military dangers which were presented, merely confuses the issue. Korematsu was not excluded from the Military Area because of hostility to him or his race. He was excluded because we are at war with the Japanese Empire ....") *overruled by Trump v. Hawaii*, 585 U.S. 667, 710, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) ("The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority. But it is wholly inapt to liken that morally repugnant order to a facially neutral policy denying certain foreign nationals the privilege of admission."); *but see Trump*, 585 U.S. at 754, 138 S.Ct. 2392 (Sotomayor, J., dissenting) ("By blindly accepting the Government's misguided invitation to sanction a discriminatory policy motivated by animosity toward a disfavored group, all in the name of a superficial claim of national security, the Court redeploys the same dangerous logic underlying *Korematsu* and merely replaces one 'gravely wrong' decision with another.").

8     The but-for analysis was not necessary to deciding the case and is therefore dicta. *See United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017).

9     Recently, Justice Gorsuch pointed to the differences between Title VI (whose language is "materially identical" to Title VII) and the Equal Protection Clause in his concurrence in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 302, 308–09, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) (Gorsuch, J., concurring). Justice Gorsuch explained:

>Consider just some of the obvious differences. The Equal Protection Clause operates on States. It does not purport to regulate the conduct of private parties. By contrast, Title VI applies to recipients of federal funds—covering not just many state actors, but many private actors too. In this way, Title VI reaches entities and organizations that the Equal Protection Clause does not. In other respects, however, the relative scope of the two provisions is inverted. The Equal Protection Clause addresses all manner of distinctions between persons and this Court has held that it implies different degrees of judicial scrutiny for different kinds of classifications.... By contrast, Title VI targets only certain classifications—those based on race, color, or national origin. And that law does not direct courts to subject these classifications to one degree of scrutiny

or another. Instead, as we have seen, its rule is as uncomplicated as it is momentous. Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin.

*Id.* (internal citations omitted).

10    517 U.S. 620, 624, 632–34, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating a Colorado statute under the Equal Protection Clause that prohibited the enactment of laws that would allow gay people to "claim any minority status, quota preferences, protected status or claim of discrimination" because it failed rational basis review).

11    539 U.S. 558, 562, 575, 578–79, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (declining to hold a Texas statute that made "it a crime for two persons of the same sex to engage in certain intimate sexual conduct" invalid under the Equal Protection Clause instead finding that it violated the Due Process Clauses of the Fifth and Fourteenth Amendments).

12    570 U.S. 744, 775, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (invalidating Section 3 of the Defense of Marriage Act, which provided a federal definition of marriage to mean "only a legal union between one man and one woman," 1 U.S.C. § 7, because it failed rational basis review).

13    576 U.S. 644, 675, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015) (holding laws that prohibit same-sex marriages are unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment but not applying heightened scrutiny).

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.