# EXHIBIT E

149 F.4th 1107
United States Court of Appeals, Tenth Circuit.

Peter POE, BY AND THROUGH his parents and next friends, Paula POE and Patrick Poe; Paula Poe; Patrick Poe; Daphne Doe, by and through her guardian and next friend, Donna Doe; Donna Doe; Brandon Boe, by and through his parents and next friends, Bethany Boe and Benjamin Boe; Bethany Boe; Benjamin Boe; Lydia Loe, by and through her parent and next friend, Lauren Loe; Lauren Loe; Ryan Roe, by and through his parents and next friends, Rachel Roe and Richard Roe; Rachel Roe; Richard Roe, Plaintiffs - Appellants, Dr. Shauna Lawlis, on behalf of her patients, Plaintiff.

v.

Gentner DRUMMOND, in his official capacity as Attorney General of the State of Oklahoma; Steven Katsis, M.D., in his official capacity as President of the Oklahoma State Board of Medical Licensure and Supervision; Trevor Nutt, in his official capacity as Vice-President of the Oklahoma State Board of Medical Licensure and Supervision; Clayton Bullard, in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Susan Chambers, M.D., in her official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Louis Cox, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Mark Fixley, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Jeremy Hall, in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; TImothy Holder, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Robert Howard, in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Ross Vanhooser, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Don Wilber, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision; Katherine O'dell, D.N.P., R.N., in her official capacity as President of the Oklahoma Board of Nursing; Kyle Leemaster, M.B.A., R.N., in his official capacity as Vice-President of the Oklahoma Board of Nursing; Shawn Stachovic, L.P.N., in her official capacity as Secretary of the Oklahoma Board of Nursing; Shelly Swalley, M.S., R.N., in her official capacity as a member of the Oklahoma Board of Nursing; Lindsay Potts, L.P.N., in her official capacity as a member of the

|
FILED August 6, 2025

**Synopsis**

**Background:** Transgender minors, their parents, and healthcare provider brought § 1983 action against state university healthcare system and state officials, challenging Oklahoma law prohibiting certain gender transition procedures for minors as violating the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The United States District Court for the Northern District of Oklahoma, John F. Heil, III, J., 697 F.Supp.3d 1238, denied plaintiffs' motion for preliminary injunction. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Carson, Circuit Judge, held that:

[1] law's classification based on age did not violate Equal Protection Clause;

[2] law's classification based on medical procedure or use did not violate Equal Protection Clause;

[3] law did not discriminate based on transgender status;

[4] legislature did not enact law because of its adverse effects upon transgender persons;

[5] parents' liberty interest implicated by law was whether parents had the right to access certain gender transition procedures for their children;

[6] parents' right to access gender transition procedures for their children was not fundamental; and

[7] law did not violate Due Process Clause.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (61)

**[1]    Constitutional Law** 🔸 Levels of Scrutiny

State statutes that do not discriminate on basis of protected class receive deferential review under Constitution's Equal Protection Clause. U.S. Const. Amend. 14.

**[2]    Constitutional Law** 🔸 Protections Provided and Deprivations Prohibited in General

Court of Appeals reviews statutes deferentially if they do not implicate fundamental right under Due Process Clause. U.S. Const. Amend. 14.

**[3]    Federal Courts** 🔸 Preliminary injunction; temporary restraining order

Court of Appeals reviews district court's denial of preliminary injunction for abuse of discretion.

**[4]    Federal Courts** 🔸 Preliminary injunction; temporary restraining order

District court "abuses its discretion" in denying a preliminary injunction when it bases its decision on erroneous conclusion of law or there is no rational evidentiary basis for its ruling.

**[5]    Federal Courts** 🔸 Questions of Law in General

**Federal Courts** 🔸 "Clearly erroneous" standard of review in general

Court of Appeals reviews district court's factual findings for clear error and its legal conclusions de novo.

**[6]    Injunction** 🔸 Grounds in general; multiple factors

To obtain preliminary injunction, plaintiffs must demonstrate: (1) likelihood of success on merits; (2) likelihood that movant will suffer irreparable harm in absence of preliminary relief; (3) that balance of equities tips in movant's favor; and (4) that injunction is in public interest.

**[7]**    **Injunction**    Extraordinary or unusual nature of remedy

**Injunction**    Entitlement to Relief

Preliminary injunctions are extraordinary remedies, so right to relief must be clear and unequivocal.

**[8]**    **Constitutional Law**    Similarly situated persons; like circumstances

In essence, under the Equal Protection Clause, states must treat all persons similarly situated alike. U.S. Const. Amend. 14.

**[9]**    **Constitutional Law**    Equality of results

**Constitutional Law**    Similarly situated persons; like circumstances

Equal protection does not guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations. U.S. Const. Amend. 14.

**[10]**    **Civil Rights**    Weight and Sufficiency of Evidence

**Constitutional Law**    Intentional or purposeful action requirement

To establish equal protection claim, under § 1983, plaintiff must show discriminatory intent either facially or through circumstantial proof. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[11]**    **Constitutional Law**    Equal protection

In the context of an equal protection claim, under § 1983, when the face of state law distinguishes between groups of persons, courts presume an intent to discriminate, and no further examination of legislative purpose is required. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[12]**    **Constitutional Law**    Equal protection

**Constitutional Law**    Statutes and other written regulations and rules

In the context of an equal protection claim, under § 1983, when the state law is neutral and applies to all persons, no presumption of discriminatory intent exists and proof is required. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[13]**    **Constitutional Law**    Intentional or purposeful action requirement

In the context of an equal protection claim, under § 1983, proof of discriminatory intent requires more than the plain results or awareness of the consequences. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[14]**    **Constitutional Law**    Intentional or purposeful action requirement

In the context of an equal protection claim, under § 1983, to prove discriminatory intent, the states must have selected a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[15]**    **Constitutional Law**    Intentional or purposeful action requirement

A state action may cause a discriminatory effect against a group and the effect may even be a foreseen (or known) consequence of state action; but the discriminatory effect does not violate the Equal Protection Clause unless the state intended the consequence. U.S. Const. Amend. 14.

**[16]**    **Constitutional Law**    Levels of Scrutiny

In the context of an equal protection claim, under § 1983, if court determines that state actor possessed discriminatory intent against specific group, court reviews state law under appropriate level of scrutiny. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[17]    Constitutional Law** 🔑 **Statutes and other written regulations and rules**

To comply with the Equal Protection Clause rational basis review, statutory classifications must be rationally related to legitimate governmental purpose. U.S. Const. Amend. 14.

**[18]    Constitutional Law** 🔑 **Strict scrutiny and compelling interest in general**

Under the Equal Protection Clause, more stringent judicial scrutiny attaches to classifications based on certain suspect characteristics. U.S. Const. Amend. 14.

**[19]    Civil Rights** 🔑 **Practices prohibited or required in general; elements**

Under *Bostock v. Clayton County*, 140 S.Ct. 1731, courts use the traditional but-for causation standard, which directs courts to change one thing at a time and see if the outcome changes to determine whether an employer has violated Title VII's prohibition on discharging individuals because of their sex. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.

**[20]    Civil Rights** 🔑 **Practices prohibited or required in general; elements**

Using logic in *Bostock v. Clayton County*, 140 S.Ct. 1731, an employer offends Title VII when it has penalized a member of one sex for a trait or action that it tolerates in members of the other. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.

**[21]    Constitutional Law** 🔑 **Families and Children**

Oklahoma law prohibiting certain gender transition procedures for minors discriminated on the bases of age, and thus was subject to rational basis review, under the Equal Protection Clause, where law facially discriminated based on age because it prohibited certain gender transition procedures for all persons under the age of 18. U.S. Const. Amend. 14; 63 Okla. Stat.

Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[22]    Constitutional Law** 🔑 **Families and Children**
**Health** 🔑 **Validity**

Oklahoma had a rational basis for classification based on age, in law prohibiting certain gender transition procedures for minors, and thus classification did not violate the Equal Protection Clause, where, in continuing and evolving area of medicine, Oklahoma had a legitimate interest in the health and welfare of its children and using age to determine the accessibility of gender transition procedures rationally related to that legitimate interest. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[23]    Constitutional Law** 🔑 **Age**

Age does not trigger heightened scrutiny under the Equal Protection Clause. U.S. Const. Amend. 14.

**[24]    Constitutional Law** 🔑 **Statutes and other written regulations and rules**

Under rational basis review, court must uphold law, under the Equal Protection Clause, if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. U.S. Const. Amend. 14.

**[25]    Constitutional Law** 🔑 **Age**

For purposes of assessing whether law violates equal protection, under rational basis review, the states have a strong and legitimate interest in the welfare of their young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely. U.S. Const. Amend. 14.

**[26]    Constitutional Law** 🔑 **Families and Children**
**Health** 🔑 **Validity**

Oklahoma law prohibiting certain gender transition procedures for minors discriminated on the basis of medical procedure or use, subjecting it to rational basis review under the Equal Protection Clause; whether healthcare providers in Oklahoma could administer listed procedures depended on the minor's medical condition, as statutes barred procedures to affirm the minor's perception of his or her gender or biological sex, if that perception was inconsistent with the minor's biological sex, but allowed performance of such procedures if used to treat listed conditions such as presence of ambiguous genitalia, incomplete genitalia, both male or female anatomy, or biochemically verifiable disorder of sex development. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a), 2607.1(A)(2)(b)(4, 6), 2607.1(B).

**[27]**  **Constitutional Law** 🔑 **Families and Children**
**Health** 🔑 **Validity**

Oklahoma had a rational basis for classification based on medical procedure or use, in law prohibiting certain gender transition procedures for minors, and thus classification did not violate the Equal Protection Clause; there was no consensus in the medical field about the extent of the risk or benefits of the treatment protocols to address a minor's gender dysphoria, and thus, in light of the ongoing debates among medical professionals, Oklahoma's decision to enact law rationally related to its concerns about the safety and efficacy of treating gender dysphoria with gender transitioning procedures. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a), 2607.1(A)(2)(b)(4, 6), 2607.1(B).

**[28]**  **Constitutional Law** 🔑 **Particular Rights**

Classifications that turn on medical use are subject to only rational basis review, under the Equal Protection Clause. U.S. Const. Amend. 14.

**[29]**  **Constitutional Law** 🔑 **Particular Rights**

Relatively relaxed standard of rational basis review, under the Equal Protection Clause, for classifications that turn on medical use reflects awareness that the drawing of lines, particularly in the medical context where certain risk accompany treatments, is peculiarly a legislative task and an unavoidable one. U.S. Const. Amend. 14.

**[30]**  **Constitutional Law** 🔑 **Families and Children**
**Constitutional Law** 🔑 **Families and Children**

Oklahoma law prohibiting certain gender transition procedures for minors did not discriminate based on transgender status, and thus law did not make sex-based classification that would trigger heightened scrutiny under Equal Protection Clause; both group that might seek listed procedures to treat the excluded diagnoses and group that might seek procedures to treat other conditions included transgender minors, so there existed a lack of identity between transgender status and the medical diagnoses excluded under law, and a minor's ability to receive medical treatment under law did not turn on the minor's transgender status, but rather, it turned on the minor's medical diagnosis. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[31]**  **Constitutional Law** 🔑 **Families and Children**

Contemporary statements of lawmakers and broader context of several non-enacted bills targeting transgender persons did not establish that intent of enacting Oklahoma law prohibiting certain gender transition procedures for minors was to discriminate against transgender persons, and thus heightened scrutiny was not triggered under the Equal Protection Clause on that basis; contemporary statements from a few legislators was not persuasive of discriminatory intent, other legislators' and the Governor's statements indicated that intent for enacting law was to protect health and safety of children, and legislature's inability to enact other legislation suggested that legislature and the governor did not agree with it. U.S. Const. Amend. 14;

63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[32]**    **Constitutional Law** 🔗 Sex or gender

Where law's classifications are neither covertly nor overtly based on sex, Court of Appeals does not subject law to heightened review, under the Equal Protection Clause, unless it was motivated by invidious discriminatory purpose. U.S. Const. Amend. 14.

**[33]**    **Constitutional Law** 🔗 Heightened Levels of Scrutiny

In determining whether discriminatory intent is present, triggering heightened scrutiny under the Equal Protection Clause, what motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it. U.S. Const. Amend. 14.

**[34]**    **Constitutional Law** 🔗 Families and Children

Fact that Oklahoma enacted other laws, including law appropriating funds to the University Hospitals Authority on condition that University Hospitals Authority not use funds to perform gender reassignment medical treatments on patients under age of 18, did not prove that legislature acted with discriminatory intent when it enacted law prohibiting certain gender transition procedures for minors, and thus heightened scrutiny was not triggered under the Equal Protection Clause on that basis; appropriation law did not target transgender persons, but incentivized medical providers not to perform gender reassignment medical treatments on minors, and legislature would have enacted each separate law for different intents and purposes, not necessarily or even remotely related to law at issue. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[35]**    **Constitutional Law** 🔗 Heightened Levels of Scrutiny

In determining whether discriminatory intent is present, triggering heightened scrutiny under the Equal Protection Clause, the ultimate question remains whether a discriminatory intent has been proven in given case; more distant instances of official discrimination in other cases are of limited help in resolving that question. U.S. Const. Amend. 14.

**[36]**    **Constitutional Law** 🔗 Families and Children

Text of Oklahoma law prohibiting certain gender transition procedures for minors demonstrated that legislature did not enact law in part because of, not merely in spite of, its adverse effects upon transgender persons, and thus heightened scrutiny was not triggered under the Equal Protection Clause; if the law truly sought to discriminate against transgender persons, the prohibition would not distinguish based on age, instead, legislature enacted law not because of the effects on transgender persons, but to prohibit medical procedures that may have permanent effects on children, and opposition to gender transition procedures for minors could not be considered an irrational surrogate to target transgender persons because there were common and respectable reasons for opposing it. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[37]**    **Constitutional Law** 🔗 Sexual orientation

Whether one agrees or disagrees with goal of preventing gender transition procedures for children, that goal in itself does not qualify as invidiously discriminatory animus, and thus does not give rise to heightened scrutiny under the Equal Protection Clause. U.S. Const. Amend. 14.

**[38]**    **Constitutional Law** 🔗 Levels of scrutiny; strict or heightened scrutiny

Substantive rights under the Due Process Clause forbid the government from infringing on a fundamental liberty interest unless the infringement is narrowly tailored to serve a

compelling state interest. U.S. Const. Amend. 14.

**[39]**   **Constitutional Law** ⚖ Reasonableness, rationality, and relationship to object

If government burdens some lesser right, to comply with due process, infringement is merely required to bear rational relation to legitimate government interest. U.S. Const. Amend. 14.

**[40]**   **Constitutional Law** ⚖ Rights and interests protected; fundamental rights

To determine whether the legislative action violates an individual's right to substantive due process, Court of Appeals must, first, provide a careful description of the asserted fundamental liberty interest; second, Court must determine whether the liberty interest counts as a fundamental right, partaking in a careful analysis of the history of the right at issue to determine whether it is so deeply rooted in nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed; third, Court asks whether the government has infringed on the right through direct or substantial interference; and finally, Court provides the appropriate standard of review. U.S. Const. Amend. 14.

**[41]**   **Constitutional Law** ⚖ Privacy and Sexual Matters

**Health** ⚖ Validity

**Parent and Child** ⚖ Care, Custody, and Control of Child; Child Raising

Liberty interest implicated by Oklahoma law prohibiting certain gender transition procedures for minors was not the right asserted by parents, of having a fundamental right to decide their children's medical care, but rather was parents' right to access certain gender transition procedures for their children, for purposes of § 1983 action brought by parents of transgender minors, challenging law as violating the Due Process Clause; because parents had no absolute

right to determine their child's medical care, parents' asserted right suffered from a high level of generality, and law did not prohibit parents from deciding all medical care for their children, but rather prohibited parents only from accessing certain gender transition procedures for their children. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[42]**   **Constitutional Law** ⚖ Parent and Child Relationship

Parents have the right, under the Due Process Clause, to make decisions concerning the care, custody, and control of their children, which includes to some extent a more specific right to make decisions about the child's medical care. U.S. Const. Amend. 14.

**[43]**   **Constitutional Law** ⚖ Protection of Children; Child Abuse, Neglect, and Dependency

When parents' decisions endanger a child's life or health, a state may intervene without violating the parents' constitutional due process rights. U.S. Const. Amend. 14.

**[44]**   **Constitutional Law** ⚖ Privacy and Sexual Matters

A state's prohibition on gender transition procedures for minors does not infringe on parents' right, under the Due Process Clause, to direct their children's medical care because children and parents do not have a right to affirmative access of medical care that the government reasonably prohibited. U.S. Const. Amend. 14.

**[45]**   **Constitutional Law** ⚖ Privacy and Sexual Matters

There was no deeply rooted tradition in parents' right to access gender transition procedures for their children, and thus right was not fundamental and Oklahoma law prohibiting

certain gender transition procedures for minors was not subject to heightened scrutiny under the Due Process Clause; regardless of parent-child relationship, nation did not have deeply rooted history of affirmative access to medical treatment the government reasonably prohibited, and recent development in the medical field regarding gender transition procedures for minors showed that nation did not have a deeply rooted tradition in providing gender transition procedures to minors. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[46]    Constitutional Law** ⬅ Due process

Health and welfare laws have a strong presumption of validity, under the Due Process Clause. U.S. Const. Amend. 14.

**[47]    Constitutional Law** ⬅ Drugs and medical devices

Government has authority to limit patient's choice of medication, whether patient is adult or child, without violating the Due Process Clause. U.S. Const. Amend. 14.

**[48]    Constitutional Law** ⬅ Parent and Child Relationship

Although, under the Due Process Clause, parents have authority over their children's medical care, no case law supports the extension of this right to a right of parents to demand that the State make available a particular form of treatment. U.S. Const. Amend. 14.

**[49]    Constitutional Law** ⬅ Protection of Children; Child Abuse, Neglect, and Dependency

The state's interest in a child's health may constrain a parent's liberty interest, under the Due Process Clause, in the custody, care, and management of her children. U.S. Const. Amend. 14.

**[50]    Constitutional Law** ⬅ Reasonableness, rationality, and relationship to object

Without a fundamental right, courts apply rational basis review to determining whether law violates the Due Process Clause. U.S. Const. Amend. 14.

**[51]    Constitutional Law** ⬅ Reasonableness, rationality, and relationship to object

A law withstands rational basis review, under the Due Process Clause, if the law's means and goals rationally relate to a legitimate state interest. U.S. Const. Amend. 14.

**[52]    Constitutional Law** ⬅ Reasonableness, rationality, and relationship to object

Rational basis review, under the Due Process Clause, demands no more than a reasonable fit between governmental purpose and the means chosen to advance that purpose. U.S. Const. Amend. 14.

**[53]    Constitutional Law** ⬅ Due process

**Constitutional Law** ⬅ Reasonableness, rationality, and relationship to object

Rational basis review, under the Due Process Clause, is highly deferential toward the government's actions, and the § 1983 plaintiff has the burden to show the governmental act complained of does not further a legitimate state purpose by rational means. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[54]    Constitutional Law** ⬅ Children and minors in general

For purposes of rational basis review, under the Due Process Clause, state governments have a particular interest in the health of minors, and a compelling interest in safeguarding the physical and psychological well-being of a minor. U.S. Const. Amend. 14.

**[55]**  **Constitutional Law** 🔑 Children and minors in general

For purposes of rational basis review, under the Due Process Clause, the state has a duty of the highest order to protect the interest of minor children, because a democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens. U.S. Const. Amend. 14.

**[56]**  **Constitutional Law** 🔑 Privacy and Sexual Matters

**Health** 🔑 Validity

The potential health risks related to gender transition procedures provided rational basis for Oklahoma's decision to enact law prohibiting certain gender transition procedures for minors, and thus law did not violate Due Process Clause, where gender transition procedures for minors could result in permanent health risks to children including impaired brain development, poor educational development, impact to bone density, underdeveloped genitalia, and infertility, medical community offered no consensus about the extent of risk and benefits of gender transition procedures for minors, and disagreement with legislature's assessment of such procedures' risks did not invalidate a democratically enacted law on rational-basis grounds. U.S. Const. Amend. 14; 63 Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

**[57]**  **Federal Courts** 🔑 Environment and health

The Court of Appeals would defer to district court's factual findings regarding potential health risks to children from gender transition procedures, in § 1983 action brought by transgender minors, their parents, and healthcare provider against state officials, challenging Oklahoma law prohibiting certain gender transition procedures for minors as violating the Due Process Clause; factual findings did not constitute dicta because they necessarily involved the determination of whether law was

rationally related to a legitimate purpose, as required for review under the Due Process Clause, district court properly considered plaintiffs' evidence and referenced plaintiffs' evidence within its decision, and record supported district court's factual findings, so they were not clearly erroneous. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; Okla. Stat. Ann. §§ 2607.1(A)(2)(a)(1, 2), 2607.1(A)(2)(b)(1-6), 2607.1(B).

More cases on this issue

**[58]**  **Constitutional Law** 🔑 Privacy and Sexual Matters

Under rational basis review, under the Due Process Clause, a court will not usurp the legislature's judgment when it engages in earnest and profound debate about the morality, legality, and practicality of gender transition procedures for minors. U.S. Const. Amend. 14.

**[59]**  **Constitutional Law** 🔑 Reasonableness, rationality, and relationship to object

Under rational basis review, under the Due Process Clause, respect for a legislature's judgment applies even when the laws at issue concern matters of great social significance and moral substance. U.S. Const. Amend. 14.

**[60]**  **Federal Courts** 🔑 Definite and firm conviction of mistake

A factual finding is "clearly erroneous" when it lacks factual support in the record or if, after reviewing all the evidence, the Court of Appeals is left with a definite and firm conviction that a mistake has been made.

**[61]**  **Federal Courts** 🔑 Conflicting or undisputed evidence

Where two permissible views of evidence exist, fact finder's choice between them cannot be "clearly erroneous."

Appeal from the United States District Court for the Northern District of Oklahoma (D.C. No. 4:23-CV-00177-JFH-SH)

**Attorneys and Law Firms**

Omar Gonzalez-Pagan, Lambda Legal Defense and Education Fund, Inc., New York, NY (Laura J. Edelstein, Jenner & Block, LLP, San Francisco, CA, Megan Lambert, American Civil Liberties Union of Oklahoma Foundation, Oklahoma City, OK, Harper S. Seldin, and Chase Strangio, American Civil Liberties Union, New York, NY with him on the briefs), for Plaintiffs-Appellants.

Garry Gaskins, Solicitor General (Zach West, Director of Special Litigation, Audrey A. Weaver and Will Flanagan, Assistant Solicitors General, with him on the brief), Office of the Attorney General, State of Oklahoma, Oklahoma City, OK, for Defendants-Appellees.

J. Craig Buchan, McAFee & Taft, A Professional Corporation, Tulsa, OK; Ronald T. Shinn, Jr., and Jennie Mook, McAfee & Taft, A Professional Corporation, Oklahoma City, OK, on the brief for Defendants-Appellees OU Medicine, Inc., and Dr. Richard Lofgren.

Rob Bonta, Attorney General of California, Renu R. George, Senior Attorney General, Kathleen Boergers, Supervising Deputy Attorney General, Stephanie T. Yu, Nimrod Pitsker Ellias, Lily G. Weaver, Natalie Torres, and Sean C. McGuire, Deputy Attorney General, State of California, Oakland, CA, for the State of California; Philip J. Weiser, Attorney General of Colorado, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Brian L. Schwalb, Attorney General of District of Columbia, Anne E. Lopez, Attorney General of Hawaii, Kwame Raoul, Attorney General of Illinois, Aaron M. Frey, Attorney General of Maine, Anthony G. Brown, Attorney General of Maryland, Andrea Joy Campbell, Attorney General of Massachusetts, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Matthew J. Platkin, Attorney General of New Jersey, Raul Torrez, Attorney General of New Mexico, Ellen F. Rosenblum, Attorney General of Oregon, Letitia James, Attorney General of New York, Peter F. Neronha, Attorney General of Rhode Island, Michelle A. Henry, Attorney General of Pennsylvania, Robert W. Ferguson, Attorney General of Washington, Charity R. Clark, Attorney

General of Vermont, filed an amicus curiae brief for the State of California and 20 Other States, in support of Plaintiffs-Appellants.

Katelyn Kang, Cooley LLP, New York, NY, Elizabeth F. Reinhardt, Cooley LLP, Washington, DC, Kathleen Hartnett, Julie Veroff, and Zoe Helstrom, Cooley LLP, San Francisco, CA, filed an amicus curiae brief for BioMedical Ethics and Public Health Scholars, on behalf of Plaintiffs-Appellants.

Andrew Rhys Davies, Charles C. Bridge, Emily Brody-Bizar, Anna Mizzi, Duy Nguyen, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, filed an amicus curiae brief for Foreign Non-Profit Organizations Advocating for the Rights of Transgender People, on behalf of Plaintiffs-Appellants.

Kristen Clarke, Assistant Attorney General, Bonnie I. Robin-Vergeer, and Elizabeth Parr Hecker, Department of Justice, Washington, DC, filed an amicus curiae brief for the United States, on behalf of Plaintiffs-Appellants.

Cortlin H. Lannin, Covington & Burling LLP, San Francisco, CA and D. Jean Veta, William Isasi, and Emily A. Vernon, Covington & Burling LLP, Washington, DC, filed an amicus curiae brief for American Academy of Pediatrics and Additional Medical and Mental Health Organizations, on behalf of Plaintiffs-Appellants.

Jordan D. Hershman, Nathaniel P. Bruhn, Dana N. Bach, and L. Felipe Escobedo, Morgan, Lewis & Bockius LLP, Boston, MA, filed an amicus curiae brief for GLBTQ Legal Advocates & Defenders, Freedom Oklahoma, Prism Project, and National Center for Lesbian Rights, on behalf of Plaintiffs-Appellants.

Brian T. Burgess, Goodwin Procter LLP, Washington, DC, filed an amicus curiae brief for Conservative Legislators, Former Legislators, and Activists, on behalf of Plaintiffs-Appellants.

Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton LLP, New York, NY, and Sydney Duncan, Transgender Legal Defense & Education Fund, Inc, New York, NY, filed an amicus curiae brief for Elliot Page and Fifty-Six Other Individuals, on behalf of Plaintiffs-Appellants.

Christopher Mills, Spero Law LLC, Charleston, SC, filed an amicus curiae brief for Family Research Council filed an amicus curiae brief on behalf of Defendants-Appellees.

Jacob P. Warner, Alliance Defending Freedom, Scottsdale, AZ, and John J. Bursch and James A. Campbell, Alliance

Defending Freedom, Washington, DC, filed an amicus curiae brief for Alliance Defending Freedom, on behalf of Defendants-Appellees.

Ryan Haynie, Oklahoma Council of Public Affairs, Oklahoma City, OK, and David H. Thompson, Peter A. Patterson, Brian W. Barnes, John D. Ramer, Cooper & Kirk, PLLC, Washington, DC, filed an amicus curiae brief for Do No Harm and Oklahoma Council of Public Affairs, on behalf of Defendants-Appellees.

Steve Marshall, Attorney General of Alabama, Edmund G. LaCour Jr., Solicitor General, and A. Barrett Bowdre, Principal Deputy Solicitor General, State of Alabama, Montgomery, AL; Tim Griffin, Attorney General of Arkansas, Nicholas J. Bronni, Solicitor General, and Dylan L. Jacobs, Deputy Solicitor General, State of Arkansas, Little Rock, AR, Jonathan Skrmetti, Attorney General & Reporter of Tennessee, and Whitney D. Hermandorfer, Director of Strategic Litigation Unit & Assistant Solicitor General, State of Tennessee, Nashville, TN; Andrew Bailey, Attorney General of Missouri, and Joshua M. Divine, Solicitor General, State of Missouri, Jefferson City, MO; Treg Taylor, Attorney General of Alaska, Ashley Moody, Attorney General of Florida, Chris Carr, Attorney General of Georgia, Raul R. Labrador, Attorney General of Idaho, Theodore E. Rokita, Attorney General of Indiana, Brenna Bird, Attorney General of Iowa, Jeff Landry, Attorney General of Louisiana, Kris W. Kobach, Attorney General of Kansas, Daniel Cameron, Attorney General of Kentucky, Lynn Fitch, Attorney General of Mississippi, Austin Knudsen, Attorney General of Montana, Michael T. Hilgers, Attorney General of Nebraska, Drew Wrigley, Attorney General of North Dakota, Alan Wilson, Attorney General of South Carolina, Marty Jackley, Attorney General of South Dakota, Ken Paxton, Attorney General of Texas, Sean Reyes, Attorney General of Utah, Jason Miyares, Attorney General of Virginia, Patrick Morrisey, Attorney General of West Virginia, filed an amicus brief for Alabama, Arkansas, Missouri, Tennessee, and 19 Other States, on behalf of Defendants-Appellees. [1]

Before HARTZ, PHILLIPS, and CARSON, Circuit Judges.

**Opinion**

CARSON, Circuit Judge.

 **\*1118 [1]** **[2]** State statutes that do not discriminate on the basis of a protected class **\*1119** receive a deferential review under the Constitution's Equal Protection Clause. We

also review statutes deferentially if they do not implicate a fundamental right under the Due Process Clause.

This case requires us to consider the constitutionality of Oklahoma Senate Bill 613 ("SB 613"), which prohibits certain gender transition procedures for minors. Plaintiffs Peter Poe, Daphne Doe, Brandon Boe, Lydia Loe, and Ryan Roe ("Minor Plaintiffs"), their parents ("Parent Plaintiffs"), and Dr. Shauna Lawlis began this lawsuit, claiming that SB 613 violates their rights under the Constitution. [2] Plaintiffs moved for a preliminary injunction, which the district court denied. We abated Plaintiffs' appeal pending the Supreme Court's United States v. Skrmetti decision. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1) and relying on Skrmetti, we affirm the district court's preliminary injunction denial.

I.

On May 1, 2023, Oklahoma enacted SB 613, which prohibits healthcare providers from "provid[ing] gender transition procedures" to anyone under eighteen years old. Okla. Stat. Ann. tit. 63, § 2607.1 (B). SB 613 defines gender transition procedures as:

> medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex:
>
> (1) surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex, or
>
> (2) puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex.

§ 2607.1 (A)(2)(a)(1)–(2). But SB 613 does not prohibit mental health counseling; medication to treat depression, anxiety, precocious puberty, or delayed puberty; services provided for those born with ambiguous or incomplete genitalia, or both male and female anatomy; treatments of any infection caused by the performance of gender transition procedures; and treatments for any injury or illness that would place the individual in imminent danger of death. § 2607.1 (A)(2)(b)(1)– (6).

Minor Plaintiffs are transgender persons, diagnosed with gender dysphoria— "a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex." United States v. Skrmetti, 605 U.S. 495, 145 S. Ct. 1816, 1824, 222 L.Ed.2d 136 (2025). To treat Minor Plaintiffs' gender dysphoria, healthcare providers prescribed puberty blockers and cross-sex hormones. [3]

Minor Plaintiffs' prescribed medication of puberty blockers and cross-sex hormones fits within SB 613's definition of gender transition procedures. Plaintiffs contend that SB 613 violates their rights under the Equal Protection Clause of the Fourteenth Amendment, and Parent Plaintiffs assert that SB 613 violates their rights under the Due Process Clause of the Fourteenth Amendment. Plaintiffs sought a preliminary injunction to enjoin **\*1120** enforcement of SB 613. The district court denied it, finding that Plaintiffs had not shown a likelihood of success on the merits. For the reasons that follow, we affirm.

## II.

 **[3]**    **[4]**    **[5]** "We review a district court's denial of a preliminary injunction for abuse of discretion." Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1065 (10th Cir. 2001) (citing A.C.L.U. v. Johnson, 194 F.3d 1149, 1155 (10th Cir. 1999)). A district court abuses its discretion when it bases its decision on an erroneous conclusion of law or there is no rational evidentiary basis for its ruling. Id. (quoting Hawkins v. City & Cnty. of Denver, 170 F.3d 1281, 1292 (10th Cir. 1999)). We review a district court's factual findings for clear error and its legal conclusions de novo. Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1249 (10th Cir. 2024) (citing Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003)).

 **[6]**    **[7]** To obtain a preliminary injunction, Plaintiffs "must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." Little v. Jones, 607 F.3d 1245, 1251 (10th Cir. 2010) (quoting Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)). Preliminary injunctions are extraordinary remedies, so "the right to relief must be clear and unequivocal." Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting

Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).

## III.

The district court denied Plaintiffs' request for a preliminary injunction at step one of the preliminary injunction analysis because Plaintiffs failed to demonstrate a likelihood of success on the merits. Plaintiffs contest this holding, arguing that SB 613 violates the Fourteenth Amendment's Equal Protection and Due Process Clauses. We address these constitutional issues in turn.

### A.

 **[8]**    **[9]** The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In essence, states must treat "all persons similarly situated" alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). But equal protection "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations." SECSYS, LLC v. Vigil, 666 F.3d 678, 685 (10th Cir. 2012) (citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 271–73, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).

 **[10]**    **[11]**    **[12]** To establish an Equal Protection claim, the plaintiff must show discriminatory intent either facially or through circumstantial proof. Ashaheed v. Currington, 7 F.4th 1236, 1250 (10th Cir. 2021) (citing SECSYS, 666 F.3d at 686). When the face of state law distinguishes between groups of persons, we presume an intent to discriminate, "and no further examination of legislative purpose is required." SECSYS, 666 F.3d at 685 (citing Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944); Shaw v. Reno, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)). But when the state law is neutral and applies to all persons, no presumption exists and "proof is required." Id.

 **\*1121**    **[13]**    **[14]**    **[15]** Proof of discriminatory intent requires more than the plain results or awareness of the consequences. Feeney, 442 U.S. at 279, 99 S.Ct. 2282 (citing United Jewish Orgs. v. Carey, 430 U.S. 144, 179, 97 S.Ct. 996,

51 L.Ed.2d 229 (1977) (Stewart, J., concurring)). The states must have selected "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. So a state action may cause a discriminatory effect against a group and the effect "may even be a foreseen (or known) consequence of state action." SECSYS, 666 F.3d at 685 (first citing Feeney, 442 U.S. at 279, 99 S.Ct. 2282; then citing Vill. of Arlington Heights v. Metro. Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). But the discriminatory effect does not violate the Equal Protection Clause unless the state intended the consequence. Id. (citing Feeney, 442 U.S. at 279, 99 S.Ct. 2282).

 [16]  [17]  [18] If we determine the actor possessed discriminatory intent against a specific group, we review the state law under the appropriate level of scrutiny. Id. at 686. Statutory classifications must be "rationally related to a legitimate governmental purpose." Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). "[M]ore stringent judicial scrutiny attaches to classifications based on certain 'suspect' characteristics." Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d 792, 799 (10th Cir. 2019) (citing City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249).

Plaintiffs assert that SB 613 triggers intermediate scrutiny because it (1) discriminates based on sex and (2) discriminates based on transgender status. Defendants disagree and argue that SB 613 only discriminates based on age and medical procedure, so rational basis review applies.

### 1.

In United States v. Skrmetti, the Supreme Court considered the constitutionality of Tennessee's SB1—a law substantially similar in form to SB 613—which prohibited healthcare providers from administering sex transitioning treatments to minors to treat certain conditions. 145 S. Ct. at 1828. Specifically, SB1 barred providers from "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being," or "[p]rescribing, administering, or dispensing any puberty blocker hormone" to those under eighteen for the purpose of (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or (2) "[t]reating purported discomfort or distress from a discordance between the minor's

sex and asserted identity." Id. at 1826 (first quoting Tenn. Code Ann. § 68–33–102(5); then quoting § 68–33–103(a)(1)).

The Supreme Court subjected Tennessee's SB1 to rational basis review after holding the law denied these gender transition procedures on the basis of age and medical use. Id. at 1835–37. It "reject[ed] the argument that the application of SB1 turns on sex," because SB1 "prohibits healthcare providers from administering puberty blockers or hormones to *minors* for certain *medical uses*, regardless of a minor's sex." Id. at 1829–30. It also declined to find that SB1 discriminated on the basis of transgender status because it "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence— from the range of treatable conditions." Id. at 1833. The Court concluded that Tennessee had a rational basis for SB1's classifications considering the "ongoing debate among medical experts regarding **\*1122** the risks and benefit associated with administering puberty blockers and hormones to treat gender dysphoria" and that "SB1's ban on such treatments responds directly to that uncertainty." Id. at 1836 (first citing City of Cleburne, 473 U.S. at 448, 105 S.Ct. 3249; and then citing Romer v. Evans, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)).

 [19]  [20] The Court also clarified that it had not yet considered whether its reasoning in Bostock v. Clayton County, 590 U.S. 644, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020), applied beyond the Title VII context and declined to do so in Skrmetti because "sex is simply not a but-for cause of SB1's operation." Id. at 1835. Under Bostock, we use the "traditional but-for causation standard, which 'directs us to change one thing at a time and see if the outcome changes' " to determine whether an employer has violated Title VII's prohibition on discharging individuals "because of" their sex. Id. at 1834 (quoting Bostock, 590 U.S. at 656, 140 S.Ct. 1731). Using Bostock's logic, an employer offends Title VII when it "has penalized a member of one sex for a trait or action that it tolerates in members of the other." Id. (citing Bostock, 590 U.S. at 662, 140 S.Ct. 1731). A "key distinction between the operation of SB1 and the logic of Bostock," the Court reasoned, is that under SB1, "changing a minor's sex or transgender status does not alter the application of SB1." Id. at 1834–35. The Court concluded that Bostock's logic was inapplicable to its constitutional analysis of SB1.

**[21]** **[22]** **[23]** **[24]** **[25]** Like Tennessee's Oklahoma's SB 613's applicability turns on the same two factors: age and medical use. SB 613 facially discriminates based on age because it prohibits certain gender transition procedures for all persons under the age of eighteen. Okla. Stat. Ann. tit. 63, § 2607.1 (B). Age does not trigger heightened scrutiny, Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 83, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (first citing Gregory v. Ashcroft, 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); then citing Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); and then citing Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam)), so we subject SB 613 to a rational basis review. Under rational basis review, we must uphold SB 613 "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (first citing Sullivan v. Stroop, 496 U.S. 478, 485, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); then citing Bowen v. Gilliard, 483 U.S. 587, 600–603, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987); then citing U.S. R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 174–79, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); and then citing Dandridge v. Williams, 397 U.S. 471, 484–85, 90, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)). The states have "a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely." Hodgson v. Minnesota, 497 U.S. 417, 444, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (first citing Bellotti v. Baird, 443 U.S. 622, 634–39, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); then citing Prince v. Massachusetts, 321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944)). In this continuing and evolving area of medicine, Oklahoma has a legitimate interest in the health and welfare of its children and using age to determine the accessibility of gender transition procedures rationally relates to that legitimate interest. Kimel, 528 U.S. at 88, 120 S.Ct. 631 ("[T]he Equal Protection Clause does not require States to match age distinction and the legitimate interest they serve with razorlike precision.").

***1123** **[26]** SB 613 also discriminates on the basis of medical procedure or use. Whether healthcare providers in Oklahoma may administer procedures to "alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex," or administer "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features

consistent with the opposite biological sex" depends on the minor's medical condition. Okla. Stat. Ann. tit. 63, § 2607.1 (A)(2)(a)(1)–(2). Under SB 613, these procedures fall outside the ambit of prohibited gender transitioning services if used to treat: infections "caused by the performance of gender transition procedures"; "injur[ies] or illness[es] that would ... place the individual in imminent danger of death"; or the presence of "ambiguous genitalia, incomplete genitalia, or both male or female anatomy, or biochemically verifiable disorder of sex development." § 2607.1 (A)(2)(a)(4), (6). The statute makes clear, however, that providers may not administer these procedures to "affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." § 2607.1 (A)(2)(a). Thus, whether a provider may administer these procedures turns on the condition to be treated.

**[27]** **[28]** **[29]** Like classifications based on age, "[c]lassifications that turn on [ ] medical use are subject to only rational basis review." Skrmetti, 145 S. Ct. at 1829 (first citing Murgia, 427 U.S. at 312–314, 96 S.Ct. 2562; and then citing Vacco v. Quill, 521 U.S. 793, 799–808, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997)). This "relatively relaxed standard reflect[s] the Court's awareness that the drawing of lines," particularly in the medical context where certain risk accompany treatments, "is peculiarly a legislative task and an unavoidable one." Id. at 1835 (quoting Murgia, 427 U.S. at 314, 96 S.Ct. 2562). Here, the district court found that "that there is no consensus in the medical field about the extent of the risk or benefits of the Treatment Protocols" to address a minor's gender dysphoria. Thus, in light of the ongoing debates among medical professionals, Oklahoma's decision to enact SB 613 rationally relates to its concerns about the safety and efficacy of treating gender dysphoria with these gender transitioning procedures. See Skrmetti, 145 S. Ct. at 1835. So although SB 613 discriminates based on age and medical purpose or use, it does not do so unconstitutionally.

In short, like the law at issue in Skrmetti, SB 613 prohibits healthcare providers from providing gender transition procedures to anyone under eighteen years old "to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," or in other words, to treat the minor's gender dysphoria. Okla. Stat. Ann. tit. 63, § 2607.1 (A)(2)(a). The statute's classifications are thus based on age and medical use which requires us to employ a rational basis inquiry. We conclude that Oklahoma's enactment of SB 613 rationally relates to Oklahoma's interest in safeguarding the

physical and psychological well-being of minors in light of the debate among medical experts about the risks and benefits associated with treating a minor's gender dysphoria with gender transitioning procedures. We thus affirm the district court's ruling as to Plaintiffs' Equal Protection claim.

2.

[30]  Plaintiffs also assert that SB 613 classifies based on a person's transgender status, which they argue, is a sex-based classification under Bostock v. Clayton County, 590 U.S. 644, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). Plaintiffs maintain that the statute's prohibition turns on a person's transgender status, and that transgender *1124 status necessarily is a sex designation because a "transgender person, by definition, is someone whose sex designated at birth is different from their gender identity."

The Supreme Court's Skrmetti decision forecloses Plaintiffs' argument that SB 613 turns on transgender status. In Skrmetti, the Court analogized SB1's classifications to the those found in Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), where it held that "a California insurance program that excluded from coverage certain disabilities resulting from pregnancy did not discriminate on the basis of sex." Skrmetti, 145 S. Ct. at 1833 (citing Geduldig, 417 U.S. at 486, 94 S.Ct. 2485). In Geduldig, the Court divided potential coverage recipients into two groups, pregnant women and nonpregnant persons, and noted the "lack of identity between sex and the excluded pregnancy-related disabilities" because women fell into both groups. Id. (quoting Geduldig, 417 U.S. at 496 n.20, 94 S.Ct. 2485). Even though the Court concluded that though only biological women can become pregnant, it also stated that "not every legislative classification concerning pregnancy is a sex-based classification" that triggers heightened scrutiny. Id. (quoting Geduldig, 417 U.S. at 496 n.20, 94 S.Ct. 2485). The program "did not exclude any individual from benefit eligibility because of the individual's sex but rather 'remove[d] one physical condition—pregnancy—from the list of compensable disabilities.'" Id. (quoting Geduldig, 417 U.S. at 496 n.20, 94 S.Ct. 2485).

The Skrmetti Court likewise concluded that Tennessee's SB1 also "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range

of treatable conditions." Id. "SB1 divides minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to treat other conditions." Id. (quoting Tenn. Code Ann. § 68–33–103). Because "[o]nly transgender minors seek puberty blockers and hormones for the excluded diagnoses, the first group includes only transgender individuals," but the "second group, in contrast, encompasses both transgender and nontransgender individuals." Id. So, the Court concluded, that "although only transgender individuals seek treatment for gender dysphoria, gender identity disorder, and gender incongruence— just as only biological women can become pregnant—there is a 'lack of identity' between transgender status and the excluded medical diagnoses." Id.

Because Tennessee's SB1 and Oklahoma's SB 613 are functionally indistinguishable, Skrmetti controls. Here, like in Skrmetti, both groups include transgender minors, so there exists a "lack of identity" between transgender status and the medical diagnosis excluded under SB 613. And like Tennessee's SB1, under SB 613, a minor's ability to receive medical treatment under SB 613 does not turn on the minor's transgender status—it turns on the minor's medical diagnosis. We thus conclude that SB 613's prohibitions do not discriminate on the basis of transgender status. And because SB 613 does not discriminate based on transgender status, we, like the Supreme Court, conclude that Plaintiffs' Bostock arguments do not alter our Equal Protection analysis. [4]

*1125  3.

[31]  Plaintiffs also allege that Oklahoma adopted the law as pretext to purposefully discriminate against transgender persons. Plaintiffs argue that lawmakers' contemporary statements reveal an impermissible legislative purpose and that the legislature adopted the law within a broader context of several non-enacted bills targeting transgender persons. Because the legislature enacted SB 613 with "intent to treat transgender minors differently," Plaintiffs argue, we must review it with heightened scrutiny.

[32]  "[W]here a law's classifications are neither covertly nor overtly based on sex ... we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose." Skrmetti, 145 S. Ct. at 1832 (first citing Feeney, 442 U.S. at 271–74, 99 S.Ct. 2282; then citing Arlington Heights, 429 U.S. at 264–66, 97 S.Ct. 555).

[33] First, contemporary statements from a few legislators do not persuade us of discriminatory intent. [5] "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." United States v. O'Brien, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature.") (citing Greater Birmingham Ministries v. Sec'y of State for the State of Ala., 992 F.3d 1299, 1321 (11th Cir. 2021)). Similarly, legislation not enacted into law does not show discriminatory intent because the legislature's inability to enact that legislation suggests that the legislature and the governor did not agree with it.

[34] [35] Plaintiffs also argue that Senate Bill 3 ("SB 3") and other laws passed in Oklahoma prove that the legislature enacted SB 613 with discriminatory intent. But pointing to other enacted laws does not establish Plaintiffs' burden. SB 3, enacted during the 58th Oklahoma Legislature, appropriates funds to the University Hospitals Authority on the condition that University Hospitals Authority not use the funds to perform gender reassignment medical treatments on patients under the age of 18. S.B. 3, 58th Leg., 2nd Ex. Sess. (Okla. 2022). SB 3 does not target transgender persons but incentivizes medical providers not to perform gender reassignment medical treatments on minors. Id. **1126 SB 3 does not show that the 59th Oklahoma Legislature enacted SB 613 with the intent to discriminate against transgender persons. S.B. 613, 59th Leg., 1st Sess. (Okla. 2023). Plaintiffs fail to cite the other laws they wish us to consider, and we decline to search the Oklahoma's legislative record on Plaintiffs' behalf when they fail to meet their burden. But we also have doubts that textually different legislation unrelated to SB 613, especially legislation enacted during prior legislatures, shows discriminatory intent because the legislature would have enacted each separate law for different intents and purposes, not necessarily or even remotely related to SB 613. See Abbott v. Perez, 585 U.S. 579, 604, 138 S.Ct. 2305, 201 L.Ed.2d 714 (2018) (discussing how the 2011 Texas Legislature discriminatory intent does not transfer to the 2013 Texas Legislature even if the enacted law had only small changes from the prior version of the law); see also N.C. State Conf. of the NAACP v. Raymond, 981 F.3d 295, 298 (4th Cir. 2020) ("A legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith.") (citing Abbott, 585 U.S. at 603, 138 S.Ct. 2305);

Arlington Heights, 429 U.S. at 266–68, 97 S.Ct. 555 (omitting contemporary legislation when explaining how legislative history may provide evidence of discriminatory intent). "The ultimate question remains whether a discriminatory intent has been prove[n] in [this] given case." City of Mobile v. Bolden, 446 U.S. 55, 74, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (emphasis added). "More distant instances of official discrimination in other cases are of limited help in resolving that question." Id.

[36] [37] Plaintiffs failed to prove that the legislature enacted SB 613 for invidious discriminatory purpose. The statute's text demonstrates that legislature did not enact SB 613 "in part 'because of,' not merely 'in spite of,'" its adverse effects upon" transgender persons. Feeney, 442 U.S. at 279, 99 S.Ct. 2282. SB 613 prohibits gender transition procedures for any person under the age of eighteen. If the law truly sought to discriminate against transgender persons, the prohibition would not distinguish based on age. Instead, the purpose becomes clear: children's welfare. These novel treatments only recently became available to children, so understandably, "limited data" exist on "the long-term physical, psychological, and neurodevelopmental outcomes in youth." Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. of Transgender Health S1, S65 (2022). The legislature passed SB 613, not because of the effects on transgender persons, but to prohibit medical procedures that may have permanent effects on children. Opposition to gender transition procedures for minors cannot be considered an irrational surrogate to target transgender persons because "it cannot be denied that there are common and respectable reasons for opposing it." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (citing Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 850, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). "Whether one agrees or disagrees with the goal of preventing [gender transition procedures for children], that goal in itself" does not qualify invidiously discriminatory animus. Id. at 274, 113 S.Ct. 753.

4.

In sum, SB 613 does not violate the Equal Protection Clause of the Fourteenth Amendment because it discriminates based on age and medical purpose and satisfies rational basis review. We also need not subject SB 613 to heightened scrutiny based on impermissible legislative purpose because

no evidence exists that Oklahoma legislature enacted it as a pretext to invidiously discriminate against transgender minors. Plaintiffs have thus failed to show a **\*1127** likelihood of success on the merits, and we affirm the district court's preliminary injunction denial as to Plaintiffs' Equal Protection claim.

B.

[38]  [39]  Parent Plaintiffs assert a substantive Due Process claim arguing that SB 613 impinges on their fundamental right to make medical decisions for their minor children. The Due Process Clause of the Fourteenth Amendment provides, "no State shall ... deprive any person of life, liberty, or property, without due process of the law." U.S. Const. amend. XIV, § 1. Substantive rights under the Due Process Clause forbids the government from infringing on a fundamental liberty interest unless the infringement is narrowly tailored to serve a compelling state interest. Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citing Reno v. Flores, 507 U.S. 292, 301–302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)); see also Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018) ("[W]e apply the fundamental-rights approach when the plaintiff challenges legislative action.") (first citing Browder v. City of Albuquerque, 787 F.3d 1076, 1079 (10th Cir. 2015); then citing Dias v. City & Cty. of Denver, 567 F.3d 1169, 1182 (10th Cir. 2009); and then citing Dawson v. Bd. of Cnty. Comm'rs, 732 F. App'x 624, 635–37 (10th Cir. 2018) (Tymkovich, J., concurring)). But if the government "burdens some lesser right, the infringement is merely required to bear a rational relation to a legitimate government interest." Dias, 567 F.3d at 1181 (first citing Glucksberg, 521 U.S. at 728, 117 S.Ct. 2258; then citing Flores, 507 U.S. at 305, 113 S.Ct. 1439).

[40]  The Supreme Court has always been hesitant to expand constitutional protections to an asserted right or liberty interest because to do so "place[s] the matter outside the area of public debate and legislative action." Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258. To determine whether the legislative action violates an individual's right to substantive due process, we must, first, provide a " 'careful description' of the asserted fundamental liberty interest." Id. at 721, 117 S.Ct. 2258 (quoting first Flores, 507 U.S. at 302, 113 S.Ct. 1439; then citing Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); and then citing Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261, 277–78,

110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)). Second, we must determine whether the liberty interest as a fundamental right, partaking in "a careful analysis of the history of the right at issue," Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 238, 142 S.Ct. 2228, 213 L.Ed.2d 545 (2022), to determine whether it is so " 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,' " Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258 (first quoting Moore v. City of E. Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); and then citing Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934); and then quoting Palko v. Connecticut, 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (internal quotations removed)). Third, we ask whether the government has infringed on the right through direct or substantial interference. Browder, 787 F.3d at 1078 (quoting Zablocki v. Redhail, 434 U.S. 374, 387, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)). Finally, we provide the appropriate standard of review. Id. at 1078–79.

1.

[41]  [42]  [43]  Parent Plaintiffs' proffered fundamental right does not provide the careful description needed for our analysis. Parent Plaintiffs define the asserted right **\*1128** as parents having a fundamental right to decide their children's medical care. Parents have the right "to make decisions concerning the care, custody, and control of their children," Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (collecting cases), which includes "to *some extent,* a more specific right to make decisions about the child's medical care," PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197 (10th Cir. 2010) (citing Dubbs v. Head Start, Inc., 336 F.3d 1194, 1203 (10th Cir. 2003) (emphasis added) (holding that a parent's right to direct a child's medical care is not clearly established when the state took away the child because parents failed to follow seven doctors' diagnosis of the child life-threatening cancer and recommendation of chemotherapy)). But we and the Supreme Court have held that parents do not have an absolute "right to direct a child's medical care." Id. at 1198 (first citing Prince, 321 U.S. at 166, 64 S.Ct. 438; and then citing Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)); see also Parham, 442 U.S. at 603, 99 S.Ct. 2493 ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children in dealing with children when their physical or mental health is jeopardized.") (first

citing Wisconsin v. Yoder, 406 U.S. 205, 213, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); then citing Prince, 321 U.S. at 166, 64 S.Ct. 438)). For example, when parents' decisions endanger a child's life or health, "a state may intervene without violating the parents' constitutional rights." Wagner, 603 F.3d at 1198 (citing Parham, 442 U.S. at 603, 99 S.Ct. 2493); see also Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 702 (10th Cir. 1998) (holding that parents do not have the right "to dictate that their children will attend public school for only part of the school day"). Because parents have no absolute right to determine their child's medical care, Parent Plaintiffs' asserted right suffers from a high level of generality. [6] Chavez v. Martinez, 538 U.S. 760, 776, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (quoting Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258) (holding that vague generalities will not suffice).

[44] In fact, Parent Plaintiffs' proffered right broadly exceeds the liberty interest before us. See Glucksberg, 521 U.S. at 724, 117 S.Ct. 2258 (holding that the careful description of the liberty interest is the "right to commit suicide with another's assistance" not the "right to die" because the statute prohibited "aiding another person to attempt suicide"); Flores, 507 U.S. at 302, 113 S.Ct. 1439 (holding that the liberty interest is not "freedom from physical restraint" but whether a child with no available parents, close relative, or legal guardian, and for whom the government is responsible has the right to be placed in the custody of a private custodian). SB 613 does not prohibit parents from deciding all medical care for their children. The law prohibits parents only from accessing certain **\*1129** gender transition procedures for their children. So the careful description of the liberty interest at stake is whether parents have the right to access certain gender transition procedures for their children. [7]

2.

[45] We next determine whether the liberty interest— parents' right to access gender transition procedures for their children—is so deeply rooted in our Nation's history to establish a fundamental right. After conducting "a careful analysis of the history of the right at issue," Dobbs, 597 U.S. at 238, 142 S.Ct. 2228, we conclude there is no deeply rooted tradition in parents' right to access gender transition procedures for their children.

[46] [47] State and federal governments have long played a critical role in regulating health and welfare, and for this reason, health and welfare laws have a "strong presumption of validity." Dobbs, 597 U.S. at 301, 142 S.Ct. 2228 (quoting Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). We also have consistently held that individuals do not have an affirmative right to specific medical treatments the government reasonably prohibits. Abigail All. for Better Access to Dev. Drugs v. von Eschenbach, 495 F.3d 695, 710 n.18 (D.C. Cir. 2007) (collecting cases); see also Watson v. Maryland, 218 U.S. 173, 176, 30 S.Ct. 644, 54 L.Ed. 987 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). We have held that although patients have a fundamental right to refuse treatment, the "selection of a particular treatment ... is within the area of governmental interest in **\*1130** protecting public health." Rutherford v. United States, 616 F.2d 455, 457 (10th Cir. 1980); see also Glucksberg, 521 U.S. at 725, 117 S.Ct. 2258 (discussing how patients have a right to refuse medication but not a right to physician assisted suicide). Thus, the government has the "authority to limit the patient's choice of medication," whether the patient is an adult or a child. Rutherford, 616 F.2d at 457; Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) ("[T]he State has somewhat broader authority to regulate the activities of children than of adults.") (citing Prince, 321 U.S. at 170, 64 S.Ct. 438; Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)).

[48] [49] The parent-child relationship does not change our reasoning, and to conclude otherwise would allow parents to "veto legislative and regulatory polices about drugs and surgeries permitted for children." L.W. ex rel. Williams v. Skrmetti, 83 F.4th 460, 475 (6th Cir.), aff'd sub nom. United States v. Skrmetti, 605 U.S. 495, 145 S. Ct. 1816, 222 L.Ed.2d 136 (2025). Although parents have authority over their children's medical care, no case law "support[s] the extension of this right to a right of parents to demand that the State make available a particular form of treatment." Doe ex rel. Doe v. New Jersey, 783 F.3d 150, 156 (3d Cir. 2015); see also Cruzan, 497 U.S. 261, 286, 110 S.Ct. 2841 (1990) (holding that states have no constitutional requirement to rely on parents' decision-making). In fact, the state's interest in a child's health may "constrain[ ] a parent's liberty interest in the custody, care, and management of her children." Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997). So our Nation does not have a deeply

rooted history of affirmative access to medical treatment the government reasonably prohibited, regardless of the parent-child relationship.

As for gender transition procedures specifically, healthcare providers only recently began providing gender transition procedures for minors. The medical community traditionally limited gender transition treatments to adults. See Skrmetti, 145 S. Ct. at 1825 (citing P. Walker et al., Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons (1st ed. 1979), reprinted in 14 Archives of Sexual Behavior 79 (1985)). In 1979, the World Professional Association for Transgender Health ("WPATH") published the first standard of care ("Standard") for treating gender dysphoria and recommended that healthcare providers only administer hormone and surgical procedures on legal adults. See Walker, Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons § 4.14.4. In 1998, WPATH revised their Standard to include puberty blockers and hormones to those older than 16 if the patient met certain criteria but still recommended that "the administration of hormones to adolescents younger than age 18 should rarely be done." Skrmetti, 145 S. Ct. at 1825 (citing S. Levine et al., The Standards of Care for Gender Identity Disorders (5th ed. 1998), reprinted in 11 J. Psychology & Human Sexuality 1, 20 (1999)).

Not until 2001 did WPATH revise their Standard to allow for puberty blockers as soon as pubertal changes began but still recommended that hormone therapy not occur until the age of 16. W. Meyer et al., Standard of Care for Gender Identity Disorders 10 (6th Ed. 2001). In 2012, WPATH revised their Standards to permit puberty blockers and hormonal therapy from the early stages of puberty. World Pro. Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People 19–20 (7th ed. 2012). This recent development in the medical field regarding gender transition procedures for minors **\*1131** shows that our Nation does not have a deeply rooted tradition in providing gender transition procedures to minors. The right for parents to access gender transition procedure for their children is not a fundamental one, and Oklahoma's prohibition on gender transition procedures for minors infringes on a lesser right.

3.

**[50]    [51]    [52]    [53]** Without a fundamental right, we apply rational basis review. Flores, 507 U.S. at 305, 113 S.Ct. 1439. A law withstands rational basis review if the law's means and goals rationally relate to a legitimate state interest. Dobbs, 597 U.S. at 301, 142 S.Ct. 2228 (first citing Heller, 509 U.S. at 320, 113 S.Ct. 2637; then citing Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); then citing New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam); and then citing Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563 (1955)). The impairment demands "no more than a 'reasonable fit' between governmental purpose ... and the means chosen to advance that purpose." Flores, 507 U.S. at 305, 113 S.Ct. 1439. "Our rational basis review is highly deferential toward the government's actions," and the plaintiff has the burden "to show the governmental act complained of does not further a legitimate state purpose by rational means." Seegmiller v. LaVerkin City, 528 F.3d 762, 772 (10th Cir. 2008) (citing Powers v. Harris, 379 F.3d 1208, 1215 (10th Cir. 2004)).

**[54]    [55]** Oklahoma has a legitimate state interest in the health and welfare of its minor citizens. State governments have a particular interest in the health of minors, Aid for Women v. Foulston, 441 F.3d 1101, 1119 (10th Cir. 2006) (citing Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)), and a compelling interest in "safeguarding the physical and psychological well-being of a minor," New York v. Ferber, 458 U.S. 747, 756–57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (quoting Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)). Indeed, the state "has a duty of the highest order to protect the interest of minor children," Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), because "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." Prince, 321 U.S. at 168, 64 S.Ct. 438.

**[56]    [57]    [58]    [59]    [60]    [61]** The potential health risks related to gender transition procedures provides a rational basis for Oklahoma's decision to enact SB 613. The district court found gender transition procedures for minors may result in permanent health risks to children including impaired brain development, poor educational development, impact to bone density, underdeveloped genitalia, and infertility.[8] Medical and scientific **\*1132** uncertainty also support that Oklahoma has "wide discretion to pass legislation" in this area of healthcare. Skrmetti, 145 S. Ct.

at 1836 (quoting Gonzales v. Carhart, 550 U.S. 124, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007)). The district court found the medical community offers no consensus about the extent of the risk and benefits of gender transition procedures for minors. We recognize the importance of this issue to all involved. But this remains a novel issue with disagreement on how to assure children's health and welfare. We will not usurp the legislature's judgment when it engages in "earnest and profound debate about the morality, legality, and practicality" of gender transition procedures for minors. Glucksberg, 521 U.S. at 735, 117 S.Ct. 2258. "That respect for a legislature's judgment applies even when the laws at issue concern matters of great social significance and moral substance." Dobbs, 597 U.S. at 300, 142 S.Ct. 2228 (collecting cases). While we respect that Plaintiffs disagree with the legislature assessment of such procedures' risks, that alone does not invalidate a democratically enacted law on rational-basis grounds. See Skrmetti, 145 S. Ct. at 1828 ("We generally afford such laws 'wide latitude' under this rational basis review, acknowledging that 'the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.' ") (quoting City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249). Parent Plaintiffs have thus failed to show a likelihood of success on the merits, and we affirm the district court's preliminary injunction denial as to Plaintiffs' Due Process Claim.

C.

For these reasons, Plaintiffs failed to show a likelihood of success on the merits. Because Plaintiffs lack a "clear showing" that they will succeed on the merits, Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)), we decline to consider the remaining factors for a preliminary injunction, Colorado v. U.S. Env't Prot. Agency, 989 F.3d 874, 890 (10th Cir. 2021) (citing N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior, 854 F.3d 1236, 1255 (10th Cir. 2017)). We hold that the district court did not abuse its discretion when denying Plaintiffs' motion for a preliminary injunction.

AFFIRMED.

**All Citations**

149 F.4th 1107

---

### Footnotes

1    The attorneys and amici identified above are those whose names appear on the briefs.

2    SB 613 prohibits only minors from receiving gender transition procedures, so this suit is moot for Minor Plaintiffs who are eighteen-years old or older at the time we issue this opinion and their Parents.

3    Healthcare providers prescribed Boe cross-sex hormones, Doe puberty blockers and cross-sex hormones, Loe cross-sex hormones, Poe puberty blockers, and Roe puberty blockers.

4    Using Bostock's reasoning in Fowler v. Stitt, 104 F.4th 770, 784 (10th Cir. 2024), we concluded that an Oklahoma policy prohibiting birth certificate sex designation changes discriminated based on transgender status and, by extension, also discriminated on the basis of sex. On June 30, 2025, the Supreme Court vacated Fowler and remanded the case for further consideration in light of Skrmetti. Stitt v. Fowler, —— U.S. ——, 145 S.Ct. 2840, —— L.Ed.2d —— (U.S. June 30, 2025) (mem). Because SB 613 discriminates only on the basis of age and medical use, we need not discuss Skrmetti's effect on Fowler and whether discrimination on the basis of transgender status in an Equal Protection context equates to sex discrimination thus triggering heightened scrutiny under Bostock.

5    We also remain unpersuaded after considering the legislators' statements in the context of other legislators' and the Governor's statements about the purpose of SB 613. Representative Kevin West discussed during

the floor debate that state lawmakers have important duties to protect their citizens health and safety, "[a]nd that duty is even more important when it comes to protecting children." Statement of Representative Kevin West, House First Regular Floor Session, Day 47 Afternoon Session, Apr. 26, 2023, 6:21:58–6:22:11 PM. Governor Kevin Stitt stated that "I am thrilled to sign [SB 613] into law today and protect our kids." Press Release, Governor Stitt Bans Gender Transition Surgeries and Hormone Therapies for Minors in Oklahoma, Governor Kevin Stitt (May 1, 2023), https://oklahoma.gov/governor/newsroom/newsroom/2023/may2023/governor-stitt-bans-gender-transition-surgeries-and-hormone-ther.html.

6    Our decision does not conflict with Parham, 442 U.S. at 584, 99 S.Ct. 2493. In Parham, the Supreme Court balanced the competing interests of parents and children to determine whether the procedures for the voluntary commitment of minors to a mental hospital violated the Due Process Clause. Id. at 588, 602, 99 S.Ct. 2493. First, the Supreme Court resolved the matter on procedural, not substantive, due process grounds. Id. at 599–600, 620, 99 S.Ct. 2493. Second, although the Supreme Court discussed parents' " 'high duty' to recognize symptoms of illness and to seek and follow medical advice," id. at 602, 99 S.Ct. 2493, it also held "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized," id. at 603, 99 S.Ct. 2493. Thus, Parham embraces what we have confirmed: parents have no absolute right to make decisions directing their children's medical care. Parent Plaintiffs' proffered fundamental right suffers from the fatal flaw of generality.

7    Parent Plaintiffs argue that we should not define the fundamental right "microscopically." For comparison, Parent Plaintiffs assert that in Turner v. Safley, 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), Zablocki, 434 U.S. at 388, 98 S.Ct. 673, and Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the Supreme Court defined the fundamental right as a "right to marry in its comprehensive sense," not as a narrow definition of marriage. But unlike Turner, where the Supreme Court discussed how the right to marry in prison exists within the fundamental right of marriage, Parent Plaintiffs have not shown, and have offered no reasoning or argument, on how the liberty interest at issue—parents' right to have gender transition procedures for their children—falls within the broader sphere of the right for parents to direct their children's medical care. Compare Dubbs, 336 F.3d at 1203 (discussing how the right for a parent to refuse a medical exam for their children fits within the protected liberty of a competent person right to refuse unwanted medical treatments and the interest of parents in the care, custody, and control of their children); Turner, 482 U.S. at 95, 107 S.Ct. 2254 (holding that the important attributes of marriage still exist within the prison, so inmates retain the constitutional right to marry); Griswold v. Connecticut, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (discussing how the right for a married person to have contraceptives fits within the fundamental right to privacy because a husband and wife's marital relations are private intimate affairs of the home in which the state cannot enter) with Dobbs, 597 U.S. at 255–56, 142 S.Ct. 2228 (discussing how the right to abortion does not fit within the broader right to autonomy because abortion involves critical moral question about potential life). Additionally, a state's prohibition on gender transition procedures for minors does not infringe on parents' right to direct their children's medical care because children and parents do not have a right to affirmative access of medical care that the government reasonably prohibited. Rutherford v. United States, 616 F.2d 455, 457 (10th Cir. 1980); see also Abdi v. Wray, 942 F.3d 1019, 1030–31 (10th Cir. 2019) (discussing how placement on the Selectee List would not infringe the plaintiff's right to travel); Zablocki, 434 U.S. at 386, 98 S.Ct. 673 (discussing whether a statute prohibiting fathers with unpaid child support duties from marriage significantly interferes with the right to marry).

8    Plaintiffs argue that we should not defer to the district court's factual findings because it constitutes dicta, the district court failed to consider Plaintiffs' evidence, and the district court's findings are clearly erroneous. We disagree. We review a district court's "factual findings for clear error." Fish v. Kobach, 840 F.3d 710, 723 (2016) (citing Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003)). A factual finding is clearly erroneous when it lacks "factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. Craig, 808 F.3d 1249, 1255

(10th Cir. 2015) (quoting United States v. Mullins, 613 F.3d 1273, 1292 (10th Cir. 2010)). The district court's factual findings do not constitute dicta because the factual findings necessarily involved the determination of whether SB 613 is rationally related to a legitimate purpose. See, e.g., Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1184 (10th Cir. 1995). The district court also properly considered Plaintiffs' evidence and referenced Plaintiffs' evidence within its decision. Finally, the record supports the district court's factual findings, so the factual findings are not clearly erroneous. Plaintiffs request us to reweigh the validity of expert testimonies, but to do so would turn appellate review on its head. Where two permissible views of the evidence exist, "the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (first citing United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949); and then citing Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    22