### UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

------------------------------------------------------------x

GORDON, ET AL                                    : CASE NO.

v.                                               : 24CV1447

AETNA LIFE INSURANCE COMPANY                     : JANUARY 8, 2026

------------------------------------------------------------x

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE VICTOR A. BOLDEN, U.S.D.J., NEW HAVEN, CT.

### APPEARANCES

FOR THE PLAINTIFF:      HARINI SRINIVASAN, ESQ.
                        **Cohen Milstein Sellers & Toll, PLLC**
                        1100 New York Ave NW
                        Suite 800
                        Washington, DC 20005
                        202-408-4600
                        Hsrinivasan@cohenmilstein.com

                        Joseph Wardenski, ESQ.
                        **Wardenski, PC**
                        134 West 29th Street
                        Suite 709
                        New York, NY 10001
                        347-913-3311
                        347-467-7237 (fax)
                        Joe@wardenskilaw.com

                        ELIZABETH MCCARTHY MCDERMOTT, ESQ.
                        **Cohen Milstein Sellers & Toll, PLLC**
                        1100 New York Avenue NW
                        Suite 800
                        Washington, DC 20005
                        202-408-3682
                        Emcdermott@cohenmilstein.com

**APPEARANCES CONTINUED:**

KELLY PARRY-JOHNSON, ESQ.
**Advocates for Trans Equality Education Fund**
305 Seventh Ave., 15th Fl
New York, NY 10001
646-993-1691
Kparry-johnson@transequality.org

FOR THE DEFENDANT:   EARL B. AUSTIN, III, ESQ.
**Baker Botts, LLP**
2001 Ross Avenue
Suite 900
Dallas, TX 75201-2980
214-953-6542
214-661-4542 (fax)
earl.austin@bakerbotts.com

SARAH REEVES, ESQ.
**Baker Botts, LLP**
30 Rockefeller Plaza
New York, NY 10112
212-408-2649
sarah.reeves@bakerbotts.com

FOR THE DEFENDANT:   THEODORE J. TUCCI, ESQ.
CHRISTOPHER A. COSTAIN, ESQ.
**Robinson & Cole, LLP**
One State Street
Hartford, CT 06103
860-275-8200
860-275-8299 (fax)
ttucci@rc.com
ccostain@rc.com

Heather A. Ireland, Official Court Reporter, RPR, CRR

(10:00 a.m.)

THE CLERK:    All rise.  The Honorable United States District Court for the District of Connecticut is now open.  All persons having cause or action pending, or who have been bound or summoned to appear herein will take due notice hereof and give attention according to law.  The Honorable Victor A. Bolden presiding.

THE COURT:    Good morning, everyone, please be seated.  We are here in Binah Gordon -- I'm sure I'm pronouncing the name wrong -- et al. v. Aetna Life Insurance.

Will counsel please state their appearances for the record?

MS. SRINIVASAN:    Good morning, Your Honor.  This is Harini Srinivasan on behalf of the plaintiffs.

THE COURT:    All right.  Good morning.

MR. WARDENSKI:    Joseph Wardenski for the plaintiffs.

THE COURT:    All right.  Good morning.

MS. PARRY-JOHNSON:    Good morning.  Kelly Parry-Johnson on behalf of the plaintiffs, and we also have three of our plaintiffs here today in the front row.  We have Dr. Jamie Homnick, Alma Avelle, and Dr. Jennifer Herley.

THE COURT:    Great.  Welcome.

MS. McDERMOTT:    Elizabeth McDermott on behalf of the plaintiffs as well.

THE COURT:    All right.  Great.  Good morning.

MR. TUCCI:    Good morning, Your Honor.  Ted Tucci from Robinson & Cole on behalf of the defendant, Aetna Life Insurance Company, and

I'm joined by my colleague, Christopher Costain.  And I would also like to introduce to the Court Earl Austin from the Baker Botts firm and his colleague, Sarah Reeves.

THE COURT:    All right.  Good morning to everyone.  All right. We are here on arguments regarding the pending motion for preliminary injunction.  I assume the plaintiffs will go -- I think there are, obviously, a couple things sort of up in the air.  And I know there are some filings close to the holiday period.  I think what is going to be most constructive for me is I want to, first, if you all could from the plaintiffs' side, first discuss sort of the standing argument and then go from there to your substantive points.

I don't have a strong -- well, I know at some point we are going to have to deal with the impact or not of the Supreme Court's ruling from last June, but because I didn't ask for additional briefing now, I'm -- I will discuss that to the extent the plaintiffs are comfortable, but my intention, to be quite frank, is to provide you the opportunity to file any additional briefing you would because, I mean, I have no doubt that everyone here will be brilliant and be able to explain things to me orally, but whether or not I will be able to retain it without having -- retain it sufficiently without having something in writing, I think would probably be -- I think everyone is best served that way.  All right.  So with that, I think I have done enough preliminaries, why don't we go ahead and begin.  You are up first?

MS. SRINIVASAN:    Your Honor, if it is permissible to the Court,

Mr. Wardenski and I would like to share the argument?

THE COURT:    Sure, yeah, whatever you all wish to do is fine with me.

MS. SRINIVASAN:    All right.  So I will present on the standing issues, and then Mr. Wardenski will be talking about the other aspects of the preliminary injunction.

THE COURT:    Great.  You are doing standing, and you are standing?  (Indicating)

MS. SRINIVASAN:    Would you prefer the podium?

THE COURT:    Wherever you are most comfortable, if you want the podium, that is fine.  If you are comfortable there, I don't have stringent rules on that.  Don't tell the Judges' Union, but that is just --

MS. SRINIVASAN:    We will keep that part off the record.

THE COURT:    Thank you.  I appreciate it.  Whenever you are ready.

MS. SRINIVASAN:    Absolutely.  So, Your Honor, with respect to Aetna's position on standing in particular, the arguments that Aetna has raised is that plaintiffs must show that their injuries are traceable only to Aetna, and that runs directly afoul of the standing principles that are -- that the 2nd Circuit has bound this Court to.  So the 2nd Circuit has held that a plaintiff can establish causality even if a third party plays some role in causing the injuries.  That was accomplished in *Carter v. HealthPort Technologies*.

So other courts, including within this district, have rejected

nearly identical causation arguments that Aetna has raised here, and by other insurers as well, including in *Tovar v. Essentia Health*, which is an 8th Circuit case where plaintiffs' injuries could be traceable to defendant third-party administrators, even where the employer adopted and controlled terms of the plaintiffs' health plan.

And then in *Kulwicki v. Aetna Life Insurance* before Judge Oliver in this Court, he held that plaintiffs' injuries arising from a denial of coverage for in vitro fertilization in that case may be traceable to Aetna because it allegedly designed and administered claims under the plaintiffs' self-funded insurance plan. We acknowledge Aetna raised standing claims to the motion to dismiss as well, but that the standard under *Do No Harm v. Pfizer* in the 5th Circuit is higher on a preliminary injunction. However, the standard -- the prongs for proving standing are exactly the same in both situations.

So here Aetna's assertion, that it is merely implementing exclusions in plaintiffs' plan -- sponsor's plans, is false. Neither plan mentions, let alone excludes the coverage that we are talking about today, which is gender affirming facial reconstruction.

So the two plaintiffs who are moving for relief here, Dr. Jamie Homnick and Dr. Jennifer Herley, both of their plans are silent on the specific terms of coverage for GAFR. So in a section captioned "Gender-Affirming Treatment," Dr. Homnick's Bausch & Lomb plan states "Covered Services," and I'm quoting here from the plan document, it says "Covered services include certain services and supplies for gender-affirming treatment." That's it. And then it links to the

home page of Aetna's clinical policy bulletins for more detailed information about this benefit, including eligibility and medical necessity requirements, and Aetna has appended that document in its opposition.

Dr. Herley's plan from the MTA does not reference gender-affirming care at all. We know from subsequent documentation that Aetna has provided that Aetna and MTA have both acknowledged that Aetna follows CPB's 0615, the clinical policy bulletin at issue in this case, in administering the MTA plan's gender dysphoria benefit.

In short, both plans defer entirely to the eligibility criteria created and maintained by Aetna, which makes sense. Here these employers have contracted with Aetna to provide it with a service, which is plan administration. It has said that there is a specific agreement between these two parties about what Aetna's role will be and what the employer's role will be, and the entire construct of this case is around the aspects that are entirely within the control of Aetna, which is on plan design and administration. So it is Aetna, not the plan sponsors, that are enforcing CPB 0615 under its delegated authority by the plan sponsors to administer plaintiffs' plans, and its denial of GAFR coverage is the direct cause of plaintiffs' injuries. The injuries here, being denied coverage for GAFR, are thus fairly traceable to Aetna.

In terms of redressability, plaintiffs' injuries are redressable by the requested injunction, and my colleague, Mr. Wardenski, will speak more about the particular contours of the injunction, but what I

can say on the standing component is, again, because neither of the plans expressly exclude GAFR from coverage, but are instead silent on whether GAFR is covered, the result of an injunction, in enjoining Aetna from enforcing CPB 0615 is that, functionally, nothing in the plans will change.  Nothing in the agreement between the plan sponsors and Aetna will change.

So a plaintiffs' claims are redressable if it is likely and not merely speculative that the plaintiffs' injuries will be remedied by the relief plaintiff seeks in bringing suit.  And as Aetna admits, its denials of plaintiffs' coverage for GAFR were based on Aetna's determination that the services were not medically necessary.

So where an Aetna administrated plan has a written exclusion on a particular service, that's where Aetna states that it may not approve coverage for those services, regardless of medical necessity. Fair enough.  Both sides acknowledge that.  But that is -- but here, where a plan contains no exclusion of a particular service, it is then Aetna's job to determine whether the service is medically necessary when making coverage decisions based on its own clinical coverage policies and other sources.

In its papers and response to plaintiffs' preliminary injunction motion, Aetna spends a lot of time on some email exchanges between Bausch & Lomb and itself about Dr. Homnick's coverage, inferring that the employer's consideration of its employees' health care coverage is tantamount to the employer steering the policy, and that is not correct.  It is the plan documents, not emails, that control the terms

of the plan.

While Bausch & Lomb, like any employer or any plan sponsor could seek to affirmatively cover GAFR in its plan, which would override CPB 0615, it has not chosen to do that, or it could create an exception for an individual, but both of those decisions are wholly separate from Aetna's authority to enforce the GAFR exclusion.

So, Your Honor, the relationship that we are talking about and the control that we are talking about in this case, across both motions, is that there is the insured, and then there is Aetna. And when the insured has a claim for GAFR, requires GAFR as a medically necessary procedure to treat their gender dysphoria, they file the claim with Aetna. And it is then Aetna, with the delegated authority it has from the plan sponsors, that makes the determination in the first instance of whether or not it is -- the plan covers that procedure. And in this case it is using 0615's categorical exclusion of GAFR to deny coverage.

Now, there is a whole moras of things going on, on this end, right, after that denial. Yes, Aetna's correct, a very tenacious person who is undergoing some of the worst gender dysphoria of their life could pursue an individualized exception with their employer. They could try and encourage their employer to make a different choice and change the terms of their plan. They could seek futile appeals that all are subject or imbued with 0615, but that is not where a challenge under 1557 arises. It arises right here when the person files the claim for coverage and Aetna denies it categorically using

the exclusion in 0615, which is exactly what has occurred for both of these plaintiffs for all the plaintiffs in this case and for the putative class.

THE COURT: If I may, I think I understand, at the risk of grossly oversimplifying what you are saying --

MS. SRINIVASAN: Please.

THE COURT: Part of what you are suggesting is that, rather a standing and it being sort of a third-party issue, the most direct way to deal with the particular issue or exclusion you are trying to address is by having the plaintiffs sue Aetna directly?

MS. SRINIVASAN: Correct. That's right.

THE COURT: Okay.

MS. SRINIVASAN: And so --

THE COURT: And just to be clear, when I say "okay," it doesn't mean I agree or disagree, it is that I understand that point.

MS. SRINIVASAN: Understood. You are more pithily summarizing my point.

THE COURT: I don't know it is pithily.

MS. SRINIVASAN: The only other issue I wanted to make on the standing on this point is we understand with this higher burden for a PI motion, it is important to look at what the plan sponsors have really done in this situation, and so we -- we emphasize that the plan sponsors plans have really delegated this authority to Aetna, which has been affirmed over again in cases against Aetna itself, as a third-party administrator in self-funded plans, but it also makes good

sense, right?  These employers do not want to be wading into the individualized medical need of its employees for specific types of medical care.  It has deferred that to Aetna, and Aetna is one of the largest insurance companies in the country and is well equipped to do that.  In fact, it sells these plans on the marketplace for small and mid-size employers to buy in this self-funded regime, right?

So here the plan specifically state that -- and the contracts between the plan sponsors and Aetna state that Aetna -- and I'm quoting from Dr. Herley's employer, her plan sponsor, the MTA's contract, it says, "Aetna shall have discretionary authority to determine what benefits are payable under the plan, subject to the eligibility and enrollment information given to Aetna and to construe the terms of the plan."

This is a very broad discretionary authority that is given to Aetna.  And, again, that is the -- that is the decision-making authority that is being challenged here, and it is also the decision-making authority that can redress the harms of the plaintiffs by removing the categorical exclusion in CPB 0615 to coverage GAFR. The plaintiffs in this case can then seek individualized medical necessity review, which is what they were coming to Aetna with in the first instance but were discriminatorily denied.

THE COURT:    Thank you.

MS. SRINIVASAN:    Thank you.

MR. WARDENSKI:    Good morning, Your Honor.

THE COURT:    Good morning again.

MR. WARDENSKI:    So I will focus on the merits-based arguments on plaintiffs' preliminary injunction motion, and I want to echo my colleague, Ms. Srinivasan, in terms of what the injunction we are seeking is, because I feel like Aetna muddies those waters a bit.

We are seeking to remove the discriminatory roadblock to getting individualized medical necessity determinations that are afforded to everyone else seeking reconstructive surgeries, everyone else seeking other forms of gender-affirming surgeries, indeed, anyone who is in one of seven states where plans are regulated to require gender-affirming facial reconstruction surgery.  Aetna knows that GAFR can be medically necessary in individual circumstances.  They know how to apply clinical criteria to make that determination and they are choosing not to under the broad and overbroad generalization that these procedures are in the language of CPB never medically necessary and cosmetic.

Plaintiffs' meet all the criteria to satisfy a preliminary injunction.  First, without a PI, both Drs. Homnick and Herley are being profoundly harmed by their inability to obtain this essential gender-affirming care to treat their gender dysphoria.  Their ongoing and, indeed, worsening mental health and overall functioning and well being, which their provider's declarations have testified will persist and worsen the longer they are unable to obtain these treatments, are irreparable harms with no adequate remedy at law.  Indeed, Aetna does not even meaningfully contest these harms in its briefing.  Instead, it spends much time on the availability of an external review process

that they assert plaintiffs should seek, rather than on the actual concrete medical harms that both women are facing in the absence of being able to obtain these treatments in a timely way.

Second, plaintiffs are likely to succeed on the merits of their claims under section 1557 of the Affordable Care Act.  For section 1557, which borrows the liability standards from Title IX, with regard to sex discrimination claims, the controlling standard from 2nd Circuit case law that binds this Court is that liability can be established by showing that sex was a motivating factor in a challenge policy or action that denies an individual the benefits of, or otherwise discriminates against them in a covered health program.

The motivating factor standard that applies to Title IX and by extension section 1557 has been reiterated by the 2nd Circuit in numerous opinions over the years, including in the *Schiebel v. Schoharie School District* case in 2024.

Third, Aetna will face minimal, in any, burden if complying with an injunction here.  All we are asking is that they cease enforcing this exclusion and afford individualized medical necessity review in the same manner that they do to anyone else seeking gender-affirming care, other forms of gender-affirming care, and to those in the seven state-regulated plans where they indeed apply those criteria to GAFR as well.

The equities tip squarely in plaintiffs' favor, and for similar reasons the public interest would be served by an injunction.  Aetna, as a major health insurance company, has no interest in violating

federal civil rights laws.  Indeed, the public interest is served by removing discriminatory barriers to care.  That is, indeed, what the ACA and section 1557 were all about.

So I can walk through the factors in a little bit more depth, with respect to irreparable harm, Dr. Homnick and Dr. Herley and their mental health providers have all submitted declarations describing their need for gender-affirming facial reconstruction surgery as part of their gender transitions and as part of their treatment for gender dysphoria.  Each of them has suffered debilitating depression, anxiety, social isolation, self-loathing, and in one case, suicidality.  This harm is not remote or speculative.  It has already occurred.  It is occurring.  It will continue to occur, and as both of their mental health providers have testified, it will get worse if they are unable to complete their gender transitions.  I think it is helpful to explain why.

As plaintiffs' expert, Dr. Gorton explains in his declarations, in addition to our expert Dr. Berli, for many transgender women and trans feminine people, the face and the male facial characteristics that are the product of the effects of testosterone during an endogenous male puberty are a primary or significant source of gender dysphoria, even more so in many cases than the appearance of the chest or genitalia, and that makes sense, particularly in today's climate with rampant transphobia coming from the highest levels of our federal government, these women, in their own lives, have a fear, and continue to fear for their safety in public, by being misidentified as men or

being perceived to be transgender, when facial reconstruction surgery that would correct the effects of testosterone on their facial characteristics, not to make them prettier, not to make them, you know, beautify them, not for aesthetic reasons, but to give them the facial characteristics that they would have had had they gone through a normal female puberty, would make them feel more comfortable going out in public. It would make them feel more comfortable at work and make them feel safer in their everyday lives. And these are the benefits of GAFR, which is just one form of gender-affirming surgery that Aetna has arbitrarily excluded here from coverage in all cases, and that is why it is important here.

It is well established that delayed and denied medically necessary health care is an irreparable injury that can't be compensated by monetary damages. The *Laforest v. Former Clean Air Holding Company Case* from the 2nd Circuit case in 2004 hold as much as do cases involving transition-related healthcare in other courts around the country such as the *Flack v. Wisconsin Department of Health Services* case from 2018 and 2019.

Aetna repeatedly claims plaintiffs are not irreparably injured because they could have, with respect to the claims that are already submitted, go through an external review process where Aetna would be bound to follow the decision of an external reviewer about whether these procedures are medically necessary. There are a couple of points with that argument where Aetna's arguments actually favor plaintiffs. First, they say that without any explanation in support

or detail that, at least recently, the majority of external reviewers have, in fact, reversed Aetna's coverage determinations and found that GAFR in other cases has been medically necessary. That undermines the incorrect notion as contained in CPB 0615 that this care is always cosmetic and not medically necessary when, in fact, third-party reviewers have the chance to override Aetna they often do so.

More to the point, both womens' claims were submitted some time ago, and as we have briefed, the availability of the external review process for their past claims is -- has likely lapsed and is untimely. Aetna has not addressed that argument, despite the fact we raised it several times in our briefing. The practical reality is both of them, should they -- would need to start from square one. They would need to go back to their providers, get letters, updated letters of support, have their surgeon submit new prior authorizations to Aetna. And there is no dispute that Aetna in the first instance would apply CPB 0615 and deny it, triggering an internal appeal process of one or two rounds of appeal, that as past experience shows would be upheld with reference to 0615, as plaintiffs' own appeal paperwork shows, and that they would then, months or a year from now, undergo an external review process that may or may not result in anything different. An external review process where external reviewers may, and often do look at the clinical coverage criteria of the insurance company that made the claim in the first instance, so even the external review process is infected by this categorical blanket exclusion in CPB 0615.

What an injunction would do here is allow them to resubmit

claims now and require Aetna to conduct an individualized medical necessity review using the same clinical criteria it uses for their gender-affirming surgeries and not force them to go through multiple rounds of likely futile appeals and an uncertain external review process a year into the future or more.

With regard to the likelihood of success, the existing briefing focuses primarily on the standing arguments, which my colleague has addressed.  As Your Honor has acknowledged, the Supreme Court's June, 2025 decision in *Skrmetti* may have an impact here, and we would welcome the opportunity to brief that in further depth.  I will give some high-level points though for why we think *Skrmetti* is distinguishable and, in any event, not dispositive of our claims under section 1557.

First, it involves constitutional claims against a state government where the exclusion -- where the law at issue is banning gender-affirming procedures across the board for minors, and the Court held that under the 14th amendment the class -- the relevant classifications at issue were age and diagnosis, not sex, and that, therefore, apply rationale basis review and upheld the policy.

The Court had a lengthy discussion of the *Bostock* decision and how this analysis might apply in the Title VII context.  That discussion must be treated as dicta.  This was not a Title VII case. There were no Title VII claims before the Court.  The analysis is different under statutory claims, and then it is under the Constitution, and so while it may preview what, you know, at least

some members of the court may think in the Title VII context that, again, is not dispositive, because the relevant burden of proof under Title VII is different than it is under section 1557.

Under Title VII, as the Supreme Court articulated, sex must be a but/for cause for the discrimination at issue. As I have already said, under the 2nd Circuit's controlling case law, including in the *Schiebel* decision that was decided four years after Bostock, the motivating factor -- the motivating factor standard still applies for claims under Title IX and by extension section 1557 and Aetna's categorical exclusion, its policy that treats gender affirming facial surgeries for all transgender women and trans feminine people in all cases as quote, unquote, cosmetic and, therefore, not medically necessary, is discriminatory on its face.

This policy can't be understood without reference to sex, the natal sex of the individual seeking it, the sex that in which they live, their gender identity, the fact that they are undergoing a gender transition and, in meaningful part, the policy does not distinguish based upon diagnosis, it says that these exclusions apply to these particular surgeries when sought as part of a gender transition. It is focusing on the fact someone is undergoing a transition more than on the relevant diagnoses.

THE COURT:    Let me just have one question. I want to understand if I got it right. What you were saying about some of the distinctions between *Bostock* and *Skrmetti* and the 2nd Circuit standard. Are you suggesting that while there was a presumption about

but/for causation in the 2nd Circuit, we should really be looking at motivating factor, and that will be another reason to distinguish between *Bostock* and *Skrmetti*?  Am I getting that wrong?

MR. WARDENSKI:    So all that *Bostock* discussed was Title VII and but/for causation and the, you know, the Skrmetti riffed on the but/for causation standard and what is called the simple test of switching out one sex for another.  That is a way of establishing liability, but it is not the only way.  Neither one of those discussions mentioned *Pricewaterhouse v. Hopkins*, in the 1989 case that established the sex stereotyping is a way in which one can accomplish sex discrimination claims, which has carried over into Title IX and the Section 1557 cases.

*Pricewaterhouse* remains good law, and whatever this Supreme Court has to say about discrimination against transgender people, per se, this policy is also motivated by pernicious stereotypes and overbroad generalizations about transgender women.  By making a blanket assumption that any time a transgender woman is seeking facial reconstruction surgery it is cosmetic in ways that, if you look at Aetna's separate CPB 1 on cosmetic surgery, just wouldn't square, which is why this additional added burden of this additional exclusion appears to be necessary on Aetna's part, that they are making an assumption, an incorrect assumption, that trans women are seeking these services for cosmetic reasons, for aesthetic reasons, to look prettier or more beautiful when, in fact, it is reconstructive in nature, because it is used to treat a medical condition, a serious

one, gender dysphoria, and because it is intended to align one's facial characteristics with one's sex and gender identity, not even if, as Aetna acknowledges is true, in all faces of facial reconstruction surgery there may be ancillary effects on one's appearance, positive or otherwise, when the primary purpose of a procedure and these -- which is the purpose of these procedures, is to treat a medical condition, they are by definition not cosmetic and inherently reconstructive in nature.

THE COURT:   And just to sort of make sure I'm clear on this, is it your contention, in addition to all the things you are saying, and maybe it is implicit in what you are saying is part of the way to think of *Skrmetti* as dicta is because -- well, let me scratch that and ask the question differently.

Is it your contention there is something fundamentally different in the operation of Aetna's policy as opposed, vis-a-vis the operation of SB1's policy that would also suggest that one shouldn't sort of -- whatever one thinks about whatever language was discussed in the majority opinion in *Skrmetti*, one should not leap to think that somehow binds how one should look at what has happened with *Bostock*?

MR. WARDENSKI:   I think that is right.  One key difference is that the Tennessee law at issue in *Skrmetti* was a categorical exclusion on all coverage, but it was also landed, you know, by an age group for minors.  Here, Aetna does recognize that there are services for gender-affirming treatment that are medically necessary but/for reasons that are inconsistent with its own practices and, you know,

plans regulated by seven states in, you know, countless plans where employers actually do affirmatively provide this coverage in the text of their plan documents, that they have chosen to exclude this category of services, gender-affirming facial reconstruction, by labeling it cosmetic and making assumptions about transgender women and their medical needs that is, itself, a form of sex discrimination and that, you know, in addition, there may be other motivations, but under the motivating standard, you can't understand this policy without at least some reference to sex and gender and, in fact, I think it is laden with it, and in that way, and I'm happy to brief this in further depth, we think it is distinguishable from *Skrmetti*.

THE COURT:    I'm not asking you to go further.  I do want the briefing, and I said I wanted it, but I -- well, while I have you here, I'm trying to make sure I understand some of these distinctions as I start wrestling with this.  Now, is -- are you also suggesting -- well, you have not said it, but let me ask you this, since -- the 11th Circuit's decision in *Lang* and the policy at issue there, which was municipal policy, is it -- is the notion that that was more of a categorical exclusion vis-a-vis what we are talking about in Aetna, or are there -- are there greater similarities between --

MR. WARDENSKI:    I think that is part of it.  Also in *Lang*, although there were 1557 claims brought originally, the only claims that were up on appeal were the Title VII claims.  And so, to the extent that the, you know, but/for standard applies to Title VII claims, it does not compel the same result when the motivating factor

standard is applied, regardless of whether we think that the 11th Circuit decision was correct.

I do think that the *Lang* decision suffered from analytical flaws including characterizing, you know, things as holdings throughout that were, in fact, dicta from the various decisions, etc, be that as it may.

THE COURT:    As the judges themselves are batting in their various opinions, but go ahead.

MR. WARDENSKI:    Be that as it may, you know, Title VII, assuming that there is a different standard there, that is not the one that applies here, I think that a different result is compelled.

THE COURT:    Okay.

MR. WARDENSKI:    Just to close the loop, even if we think that it is clear that the policy is facially discriminatory based on, you know, all the language in the policy itself, but even if not, there is significant circumstantial evidence that itself could give rise to liability under section 1557 to show that sex and gender were motivating factors in the development of this policy.  You have to look no further than the fact that Aetna, on one hand, is saying it is always cosmetic and never medically necessary; on the other, in its own policy bulletins and its briefing, even in its own declarant testimony, recognizing that it may be medically necessary in some circumstances, and so a court can look to see if there is something else going on here that, in fact, is what the 9th Circuit recently said in the *Pritchard* decision that further inquiry might be necessary

to determine whether there is discriminatory intent.

With regard to the last two factors, again, the only harm Aetna will suffer here is having to process claims in a more rigorous way, applying the standard that they already apply to lots of other people. It is not an onerous burden and certainly won't cost them very much. The fact that the plan sponsors for Drs. Homnick and Herley may need to pay for these procedures if Aetna approves them is no different than Aetna's approval of any other procedure or service that deems to be medically necessary.  Neither the plan sponsors nor Aetna should have any expectation in being able to violate the law in order not to provide services.  And, again, the public interest is served by vigorous enforcement of the health care protections in the section 1557.

For that same reason, and I will close, we think that the bond requirement should be waived because any financial harm to Aetna will be negligible, if any at all, and the bond wouldn't -- it is just not appropriate in this circumstance.

THE COURT:    Well, one last question, and this may be best left for briefing, but I do want to sort of flag it out there, is one of the things that goes through my mind, which is that, you know, obviously, the Court has to deal with a couple things in the context of thinking about this motion and, obviously, the likelihood of the success of the merits is a critical piece of it.  And, obviously, the Court -- the Court has to also make a decision about the applicability of *Skrmetti* and what does *Bostick* mean and other 2nd Circuit cases

mean, how should that -- for lack of a better word for now, the complexity of thinking through that, how should the Court -- how should I be factoring that in as I think about likelihood of the success of the merits?

You know, is it enough to say gosh, maybe I could do X and Y, but is that really subject the likelihood of the merits?  Again, I'm not suggesting you should respond to that now, but something that should be noodled through in writing.

MR. WARDENSKI:   Understood.  I think our answer is the likelihood of success of merit should be evaluated in the terms of the current law and not what it might be.  At one point, with regard to *Skrmetti* that I think is important to acknowledge is the Supreme Court itself did not purport to have *Skrmetti* apply outside the constitutional context.  In fact, it has taken other cases since on questions that may be on issues that may be more pertinent to the questions before the Court here, nevertheless, current precedent is what it is, and absent a change in controlling law, we would ask that this Court apply these precedent to our request.

THE COURT:   Great.  Thank you very much.

MR. WARDENSKI:   Thank you so much.

THE COURT:   Good morning.

MR. ALSTON:   Good morning, Your Honor, we briefed this extensively, and we do appreciate the questions, because my primary goal is to be helpful to the Court.  I think, to sort of go with what we were just discussing, the question is not whether the plaintiffs

ultimately have a meritorious case, but whether they can win the heightened standard to win today, and they just -- they don't get there, we believe.

THE COURT:    Well, to be clear, as I said at the outset, I don't think anyone will win or lose today.

MR. ALSTON:    No, the point being the injunction, I think it is first important to talk about what their injunction is really asking for.  And they say we must be enjoined from applying Aetna's CPB 0615, and they say the injunction would merely put the absent parties in the position of paying what they always owed as a benefit under the plan.  And the absent party, of course, are the employers.  Just basic points, Aetna is not the insurer here.  It is not Aetna's not underwriting these plans.  It is not Aetna's money.  Ultimately, it is the decision of the employer on what they want to cover and, ultimately, it is they, the employers, that will pay the bill.  And they, the plaintiffs acknowledge that.

One critical distinction between this case and the statutory cases that have been going through the courts is Aetna -- the statutory cases make the requested provisions or the requested procedures illegal.  We don't control whether they can get the surgery.  We don't -- Aetna doesn't perform the surgery.  Their employers don't perform the surgery.  It is simply a matter of money and coverage as it stands under their insurance policy.  They can have the surgery.  The question is who is going to pay for it, and one question we have to think about is if the Court were to grant the

injunction to have the surgery and ultimately lose, are they going to get coverage? Are they going to pay the money back? Because at the end of the day this is about money, is what this is about. And they acknowledge it in their briefing when they say that the ultimate goal is to put the absent parties, namely, their employers in the position of paying what they should have paid. It is, at the end of the day, this is about insurance coverage, and the coverage comes from the employer. The payment comes from the employer. It doesn't come from Aetna.

So we can't -- I just don't think that ultimately we can remove this from a payment question, because at the end of the day, that is what they are after. I would say, too, we can't stray from the plans, and they opened, I think correctly, that one has to look at the plans, but the problem is, they only want to look at part of the plans. They want to sort of pick the parts that they like about the plans. They say that the plan -- that the Bausch & Lomb plan, for example, has no expressed exclusion on gender-affirming care, but it actually does address gender-affirming care, and it says some things are covered and see Aetna's policy. It expressly adopts Aetna's policy as part of the plan like contracts do all the time. There is nothing unusual about that. They expressly adopt it in its policy, and as subsequent events showed when Dr. Homnick's claim went to Bausch & Lomb. Bausch & Lomb looked at it, retained their own outside consultant to look at the question of medical necessary, and then directed Aetna not to cover the claim. So they want to talk about the plan, but they want to sort

of ignore what the plan says and the plan expressly incorporates Aetna's policy.

I will get to it in a little bit more detail, but the plan also provides remedies, one of which is being an external review, and I will put one issue to rest right now; the external review is available. All that -- they don't have to go through any more appeals. All they have to do is go through that. I confirmed that yesterday to reassure -- I will not stand before the Court and file pleadings to say to them they can do this and then request to it because it is too late. It is not too late. All they have to do is ask for it.

THE COURT:    Walk me through the external review process and which I presume is sort of administratively distinct from what you suggested a moment ago, which was that Bausch & Lomb got an expert to look at it and said no, it doesn't cover it. So, go ahead.

MR. WARDENSKI:    Under Bausch & Lomb's plan and --

MR. ALSTON:    The ERO commits the employer will be bound by the result, so even though we have had the history with Dr. Homnick and Bausch & Lomb said we don't want to cover that, in their plan they say if you go to the ERO and the ERO said to cover it, we will cover it.

So it really provides the relief plaintiffs are seeking here, which is a review independent of Aetna's CPB that will be binding on the employers. It is -- it is better, really, than the injunction the Court could enter because the employers have agreed to be bound by it, and the Court doesn't have jurisdiction over the employers here. They

are not parties.  The Court can't enter an injunction that requires Bausch & Lomb to do anything because they are not here.

THE COURT:   Let me ask you this:  Outside the context of this case, what is your understanding of when this external review process is used?

MR. ALSTON:   It is used -- it is available any time there is a medical necessity denial, and so when the question -- they are right, Aetna has discretion, and reasonable minds can differ at times on what is medically necessary and what is not.  And the purpose of the external review is to have -- allow an independent party, and their organizations are to set up to do this, that step in and provide their own judgment on what is -- on the medical necessity issue, and it is independent of Aetna.  It is independent of Aetna's CPB, and they render their own opinion, and the employers have agreed to be bound by it.

THE COURT:   And what is your understanding of how they engage in that review; do you know?

MR. ALSTON:   I don't know the mechanics of it.  I know they will assign -- there are organizations that do this, and they have doctors like for similar to Aetna's medical directors, and they will assign someone with a specialty and review it and approve it.  And as our records have shown, it is pretty frequently that it will be -- the coverage will be provided.

THE COURT:   Yeah, and leaving aside the administrative difference between the external review and the review you suggested

had been done by the claim that Bausch & Lomb had been asked, what is your understanding of what that review entailed, the Bausch & Lomb review, that said that the claim here shouldn't be covered?

MR. ALSTON:    Dr. Homnick, in the course of dealing with Aetna, went to her HR department and said I think this should be covered and I think you should change your policy.  And they have had robust discussion, not only just about her individual claim, but about Dr. Homnick's view on what their policy should be generally, that they were at a time when Bausch & Lomb was actually meeting to draft its plan for the next year.  So they had a long discussion, not just about her claim, but about the whole issue of gender-affirming care, facial feminization surgery, whether it is medically necessary or not.

And Bausch & Lomb went to Dr. Toro, who is a member of a consultant that they used, Bausch & Lomb uses, independent of Aetna to create their plans, and Dr. Toro looked at it and said, look, medical necessity, he looked at WPATH and said, you know, WPATH doesn't expressly say it is medically necessary.  And there is more.  It is not the only source out there, and that Dr. Toro did not come through and say that he thought that was medically necessary.

Bausch & Lomb then relied on that.  In fairness, of course they relied on Aetna's CPB.  They have consultants right.  One was Dr. Toro, one was Aetna, but they made ultimately their own decision, and it was not only with respect to Dr. Homnick's individual claim but what are they going to do next year, and there was a whole discussion about we are just not prepared to change our plan.  Although, I should

note they did change their plan slightly. They did change the plan to cover I think one of the procedures that Dr. Homnick requested, but it is, again, it is Bausch & Lomb doing what they wanted to do under their plan.

And so I think we have to look at the plans holistically. It is not just they adopted the Aetna CPB expressly. There is every indication that they actually knew what they meant when they did it because they talked about it in connection with her claim and in connection with what do they do going forward. This was not done in ignorance. They knew exactly what they were doing when they adopted it. And when they discussed it, her claim, they specifically directed Aetna not to cover the claim.

But the other part of the promise that the employer made to -- that the employer made to its employee is, you can have this independent review through an external reviewer, and if they disagree with us and disagree with Aetna, then we will be bound by it. That is part of the offer that is part of the contract that the employer had with its employee.

Yes, Aetna will look at your claim. We want Aetna to use its CPB, but you have this opportunity to have someone independent look at it, and we will be bound by it. In effect, what they are asking here, you have the right to have your claim reviewed, independent of Aetna and Aetna's CPB, and we -- the employer, will be bound by it, which of course the employer is not here today, but they are -- they have agreed to be bound there.

So it really resolves and provides the relief that the plaintiff seeks here. The core of our standing argument as to the -- we have standing arguments as to some of the other individual plaintiffs on the damages side, but as to these two particular plaintiffs, the core of our standing argument, they want to draw a straight line between enjoining Aetna and get paid to -- and get reimbursed for their surgeries. That is the straight line that they want to draw, and it just doesn't work.

The Court cannot provide that relief for several reasons. First, enjoining Aetna's CPB, it won't change the medical literature. We had it on argument here that didn't even mention WPATH, which is what they were relying on. I think we need to take a step back. This case is different from some of the cases that have been winding through the courts for a whole lot of reasons. As I said, it is not a blanket denial on all gender-affirming care. Aetna covers gender-affirming care in the more conventional areas where there is robust medical literature. WPATH, I think, cites five respective studies on breast and genital surgery, and Aetna covers those.

This is not a policy that, unlike the statutes and unlike -- and this is important, too, the Blue Cross policy in the *Pritchard* case in the 9th Circuit, which is a 1557 case there, Blue Cross didn't cover any gender-affirming care of any kind. This is not that case. There is no inference that can be drawn because Aetna doesn't cover certain procedures that it is -- it has an overall motivated animus against transgender individuals. That is not an inference that can be made

here. But, in any event, it is not an inference the Court can make at this point in the preliminary injunction stage.

So, to have success on the merits, they really have to show two things, first, that the surgery that they -- that these particular procedures really are medically necessary, because that is the distinction that Aetna makes. Aetna covers other -- a wide range of gender-affirming procedures where there is evidence that they are medically necessary to treat gender dysphoria, and that is where -- that is the rub when it comes to the facial feminization procedures. There is -- I think any fair reading of the literature is that there is a debate whether altering the appearance, external appearance actually treats gender dysphoria.

And another point, a distinction we need to make here, Aetna classifies these procedures generally as cosmetic for everyone. A rhinoplasty, you know, a breast augmentation, any sort of aesthetic procedure is generally classified as cosmetic for anyone, regardless of the circumstances. One can imagine a variety of circumstances where someone might have anxiety, depression, body dysmorphia and believe -- and a doctor can tell them that it can be remedied by facial surgery, but there is no evidence in the medical literature that the aesthetic result will treat the underlying anxiety, depression, body dysmorphia. That is the issue with the facial feminization surgery. There is -- yes, it can provide a cosmetic result that can be considered preferable, but that is not the same thing as saying that it treats the underlying condition of gender

dysphoria.  And there is -- and the literature is rife with that distinction.  If it were as simple as, well, the patient is happy with the outcome, there wouldn't be researchers trying to develop outcome determinations and trying to develop ways to measure its impact on gender dysphoria, because that is the separate issue.  That is a mental health issue.  That is a medical issue, and I think any objective reading of the literature is that that issue is still an open question.

And as Aetna has done with the other gender-affirming procedures, if the medical literature gets to the point that there is a consensus -- and keep in mind, there is not even a consensus about what the procedures even should be, which of the procedures are the ones that would be effective.  There is no, for example, there is not even any, you know, it is unfortunate -- it is not unfortunate, but the way it has to work, that these things all work in terms of codes and the doctors have to, you know, submit codes.  There is not even any codes recognized by Medicare or the AMA for facial feminization procedures.

One of the issues we have with having discovery is trying to figure out how do we define what procedures we are looking at, and how do we distinguish the individual's who are getting this for gender dysphoria as opposed to people who are requesting, you know, it is rhinoplasty but a nose job every day for cosmetic reasons.  So this is still an issue the medical community is wrestling with.  What are the procedures that would even be -- that they are in a bucket we should

be looking at?  What are the outcomes that we are looking for, and how can we measure whether this aesthetic outcome is actually treating gender dysphoria, that issue, I think any fair reading of the literature shows that issue is still, the jury -- the medical and scientific jury is still out on that.

I guess, for purposes of today, and for this particular motion, I don't think they can make the height showing that is required on affidavits alone that would allow the Court to resolve that to resolve the issue for them and say, yes, the record here makes a strong showing that these procedures are, in fact, medically necessary.

So we have briefed that pretty thoroughly in the brief, and I will certainly be happy to go in more detail if the Court would like, but the distinction here is not these are transgender individuals, it is that the procedures they are requesting are cosmetic for everyone, generally, and the question is:  Have they demonstrated, or does the medical literature demonstrate that these procedures actually -- that there is a reason to carve out an exception to the fact that these are generally cosmetic on the basis that they would -- are medically necessary to treat gender dysphoria.

And the literature, WPATH, does not say that they treat gender dysphoria.  They cite one article, and the article says we need more work on this.  In fact, they are -- the article that WPATH cites the author says there is no prospective data on the impact of these procedures on the long-term gender dysphoria, and we cited multiple other articles all the way up through 2024 that are saying same thing.

That is what -- and I, look, we should say, too, a lot of this research is going on over in Europe where they have nationalized health care systems, so they have systems that are set up to look at can we link what is being treated with the disease?  And I should point out, too, that every one of these plans has a definition of medical necessity that includes that it has to be -- it is medically necessary if it is -- if it reasonably treats the illness at issue, and the illness here that is being alleged is gender dysphoria, and that just hasn't been resolved, Judge, certainly not to the point that the Court, I think, could enter an injunction on the issue.

The second half of success on the merits is that this discrimination question, and that is -- and I think we will need briefing on that, and I certainly can go into some of the cases, but I think the gist of *Skrmetti* and particularly *Pritchard*, which is a 1557 case from the 9th Circuit, and the -- and the other cases, is that a distinction based on a medical condition or a medical diagnosis is not discriminatory.  The distinction that Aetna's plan -- Aetna's policy makes is not that the members are transgender.  If they are transgender and they are seeking other forms of gender-affirming care, it is covered, because there is evidence of medical necessity that supports that request.

For these particular procedures, which are cosmetic for everyone, we don't believe that there is a basis for saying that there can be -- that they are medically necessary.  That is not a discriminatory distinction.  That is not based on sex.  It is based on

the state of the medical science.  Aetna's policy does not allow facial surgery for men or women who are transitioning in either direction.  It is -- this is not a sex-based distinction, and *Pritchard* -- the plaintiffs in *Pritchard* which is, again, a 1557 case, worked really hard to try to distinguish *Skrmetti* and *Pritchard* does a good job of explaining that simply because a policy references sex or references gender-affirming care does not make it turn on sex.

If it turns on a medical condition, if it turns on a medical diagnoses.  If it turns particularly on a debate in the scientific community about what the procedures should be and whether it works, those are the same distinctions Aetna makes every day, regardless of sex, regardless of gender.  The question is:  Does it work?  That is a legitimate distinction for Aetna and for the employers to make in fashioning their plans.

THE COURT:    I may have gotten it wrong in *Pritchard*.  I know there was a lot of discussion but, ultimately, they sort of remand back to the District Court to sort of flesh out things a little bit better.

MR. ALSTON:    They did.

THE COURT:    I'm not saying you are wrong, that there was a lot of discussion and concurrence, that maybe there was too much discussion, but I understand your point.

MR. ALSTON:    They did, but they did foreclose a lot of issues.  The District Court made the arguments that the plaintiffs effectively make here, which is, by definition, gender-affirming care by

definition relates to sex because it treats gender dysphoria. That is the -- that was the straight line that the District Court drew and that the plaintiffs attempt to draw here, by definition, gender-affirming care relates to gender dysphoria, therefore, it relates to sex. That was the -- that was the decision of the District Court, and the 9th Circuit said *Skrmetti* forecloses that straight-line analysis. You can't simply say that because of its treatment of gender dysphoria, it is -- it relates to sex. That is what -- and *Pritchard*, there is a good discussion of *Pritchard* on that. That is why they remand it back to the District Court, because that straight line linkage is not there.

And the other -- *Pritchard* also did an analysis of the history of Title VII. Title VII originally didn't, for example, reference pregnancy and childbirth, and Congress specifically went back and said no, you can't discriminate on the basis of treatment for pregnancy and childbirth, that violates Title VII. They have not done that for gender dysphoria, and the *Pritchard* just specifically says, under section 1557, it bars discrimination for treatment of pregnancy and childbirth, but it does not bar discrimination of treatment of gender-affirming care or gender dysphoria. *Pritchard* holds that in sending the case back to the District Court.

So a lot of these questions that were a little bit, were up in the air when Aetna filed its original motion to dismiss are becoming much clearer now and we have. *Pritchard*, I think, is the only case that really directly addresses in connection with 1557, certainly post

*Skrmetti*, but that is a hurdle the plaintiffs will have to clear, and I think we will have to, have to address it. And candidly, we have to address it even beyond this injunction hearing, because it relates to all the plaintiffs' claims. And it might make some sense to think about how we would go about setting up a way to do that, whether it is through a motion to dismiss or amended motion for the pleadings or something, because the law is rounding out, and I think the most constructive thing to do is probably just put this issue out and let's deal with it, because it -- it affects the claims across the board.

I mean, our position is that a distinction that is based on a medical diagnosis, that in particular where it is based on a dispute in the medical science about what the procedure is, what it does, what its outcome should be, that is not discriminatory. That sort of -- that sort of distinction is made every day in insurance coverage and by employers of self-funded plans when they are not sure what the science really shows, and I think, you know, I would say Aetna could -- reasonable minds can differ on the science.

Aetna could be -- someone could disagree with Aetna on the science and Aetna still not be discriminatory because it is a reasonable -- it is a reasonable debate which, again, goes back to the ERO. That is a whole point of the ERO, is to have another reasonable mind look at it, and it will bind the employers in a way that this Court can't, because they are not here. I think that covers it.

THE COURT: All right. Thank you very much. I appreciate it. All right. Yes, so your motion -- I will give you the last word.

MR. WARDENSKI:    Thank you.  We just wanted to respond to a couple points counsel just made.  With regard to *Pritchard*, the 9th Circuit applied Title VII in the but/for standard which, for the reasons we explained before, is inconsistent with controlling 2nd Circuit case law here where the motivating factor standard is appropriate.  They didn't discuss what the analysis would be under motivating factor.  I don't know why, but in that regard, we disagree with the decision and find it not persuasive on this Court that has to apply the 2nd Circuit's motivating factor standard.  And as Your Honor mentioned, the Court did identify at least several avenues by which *Skrmetti* was not dispositive and remand for further consideration based on that.

I disagree with Mr. Austin's statement that Aetna considers all facial surgeries cosmetic by default.  That is false.  In fact, I'm just going to read the language from CPB 0031, which is its clinical policy bulletin on cosmetic surgery and procedures.  The language reads, "Aetna plans exclude coverage of cosmetic surgery and procedures that are not medically necessary but generally provide coverage when the surgery or procedure is needed to improve the functioning of a body part or otherwise medically necessary, even if the surgery or procedure also improves or changes the appearance of a portion of the body."

Without the CPB 0615 exclusion Aetna would still have its definition of cosmetic surgery.  It would also have the criteria that it applies for every other form of gender-affirming surgery under the

remaining parts of 0615. It does not make the presumption that, when procedures are needed for anything other than a gender transition, that a patient is not entitled to the individualized medical necessity review. They only -- by applying exclusion to services only when they are sought in the context of a gender transition, add this additional burden that others do not face when seeking these types of surgeries. Everyone else gets the individualized review.

I believe Mr. Austin said that there is no animus here. That is not necessary to find liability under section 1557. The standard is whether the recipient here, Aetna, engaged in intentional conduct, i.e., adopting a policy that violated the plain terms of the statute, i.e., took sex into account when adopting the policy at issue in a way that denied the benefits of, or subjected someone to discrimination under their health administration, health benefits administration.

And, finally, with respect to -- well, not finally, I have two more points. With respect to Dr. Homnick, by the time she was going to Bausch & Lomb and marking entries to change their policy, make an exception for her or otherwise, she had already suffered the discrimination because of Aetna. They had already denied her claim. She had gone through the appeals. It is true that Bausch & Lomb could have overridden that denial. They chose not to. Perhaps they are separately subject to discrimination under Title VII in a separate action, but that is not dispositive of Aetna's own liability in denying claims and setting her on that path of appeals and potential external review.

It is indeed true that the plan incorporates this CPB, but as we mention in our briefing Aetna updates and revises its CPB, including 0615 all the time.  I believe in 2024 it updated it four or five times, since then two more times.  Employers understand that by incorporating language but not mirroring the language in the text of their own plans that Aetna retains the discretion to update its clinical policy bulletins and the employers or plan sponsors are bound to follow Aetna's determinations, except in the cases of extreme of arbitrary or capricious decision making, none of which is true here.

Finally, we reject the notion that there is no evidence to support the effectiveness of gender-affirming facial reconstruction. We brief this extensively, and our experts Dr. Berli and Dr. Gorton, discuss this at length.  There is certainly significant evidence in the research supporting the effectiveness of GAFR, and to rebut this Aetna only submitted the declaration of Dr. Robert McDonough, who has been employed for 31 years by Aetna, and is involved in setting and adopting these very clinical coverage policies.  He is not a practicing physician, as far as I can tell from his resume.  He did one internship after medical school and has been in research and administration ever since.  He has no specialization in gender dysphoria, nor does he claim it.  And, on top of that, there were internal errors that really called the reliability of his opinions into question, and I will, you know, point the Court to the discussion of the Ainsworth study, which both parties mentioned in their briefing.

The Ainsworth study found that transgender women who have received gender-affirming facial reconstruction report quality of life measures that are on par with cisgender women, and he took that as a bad thing. We think that is, in fact, evidence that these procedures work, because the quality of life measures for transgender women who have not had gender-affirming surgeries, including GAFR, are significantly worse than your average cisgender woman, and Dr. McDonough failed to appreciate that even after we mentioned that in our reply brief.

So, with that, unless the Court has any other questions, I will wrap up.

THE COURT:    Just one question. On the question about the external review, I guess I want to make sure I understand the -- because I think this -- well, the defendants are arguing that the external review, to some extent, sort of undercuts sort of the potential for harm in some ways, so talk to me about the notion of why external review isn't some avenue that either provide relief or undercuts relief you are seeking?

MR. WARDENSKI:    It may provide relief, but it also may not, but the harm here and the injuries here, both past and ongoing, are the inability to get Aetna to conduct an individualized medical assessment using objective criteria, the same criteria that it uses for everything else and, therefore, the discrimination is requiring someone else to potentially make a different decision but, you know, Aetna -- Aetna enrollees including, you know, Drs. Homnick and Berli

should not have to go through a multistep internal appeal process and ultimately an external review process for care that could be and should be subject to an individualized medical necessity determination by Aetna in the first instance.

THE COURT:    And on that point, sort of -- because there is a lot of discussion about whether or notes whatever the -- the Court entered an injunction, what effect it would have, the -- I just want to make sure I understood in drilling down on the notion of what you are saying the impact of this individualized medical determination, the determination of medical necessity, how precisely that differs from now.  I just want to make sure I'm clear on that.

MR. WARDENSKI:    Now they are, it appears, despite one of their declarants saying we conducted an individualized medical necessity determination that they apply -- that that review consisted entirely of referring to 0615 and closing the book, and the evidence of that is the language on the claim denials, on the appeal denials, all of which reference one thing and one thing only, the exclusion in 0615.  And to the extent they have other language, it is paraphrasing what 0615 says, there is no evidence that in any case, let alone in these two plaintiffs' situations, that Aetna or its medical directors looked, you know, anywhere beyond 0615.  That is not an individualized review as we see it.  What we see is, in the ordinary course, they would be looking at the medical record.  They would be looking at whether it is -- actually whether it is medically necessary.  They would be applying the same criteria that they to for breast surgery and genital

surgery and other forms of gender-affirming surgery.  There is a letter of support from a mental health professional, etc.

THE COURT:   And I guess the question is, even if I was to order that, then how would one know whether or not it is still isn't -- what you are saying is the individualized medical review would be looking at medical records, perhaps soliciting maybe, I guess, additional medical advice or support, and then how is a determination made?  I guess the question is, how would -- how do we know -- if I issue the injunction, how I will I know whether it had been complied with?

MR. WARDENSKI:   I mean, I think that is a question of fact what that process looks like, but I think one immediate way we can tell is whether they were referencing 0615 or actually giving individualized explanations, and the reason why the default should be the medical necessity criteria they apply to other forms of gender-affirming surgery as well as to the ones they apply in the seven states' plans that require it, is that those are all the same.  Those are the objective criteria; that you have a signed letter from a qualified mental health professional; that you have a documentation of marked and sustained gender dysphoria; that other possible causes of apparent gender congruence have been excluded; that mental and physical health conditions that can negatively affect the outcome of gender-affirming medical treatments are assessed with risks and benefits discussed, and that the patient has the capacity to consent to specific physical treatment.

We think under a fair application under the criteria, which

Aetna applies itself in other cases, and there is no suggestion it denies GAFR in the plans regulated by the seven states where they do apply these criteria, that a fair application of these should, or at least gives the possibility of a determination that Drs. Homnick and Herley qualify for this care, that it is medically necessary for them.

THE COURT:    And because part of the point -- and it is Mr. Alston, right?  Mr. Alston?  Your last name is Alston?

MR. ALSTON:    Yes, Alston.

THE COURT:    I want to make sure I got it right.  Part of what Mr. Alston, I think his argument is, even if you do that, is there a "there" there.  You are saying there is a "there" there, and the "there" there is it past WPATH, or are there -- what is the "there" there, if they got to that individual medical determination?

MR. WARDENSKI:    You would apply these five criteria, which are all basically the same for these other types of surgery, and we will look at, you know, there is marked and sustained evidence of -- marked and sustained gender dysphoria?  Our clients meet that.  Other causes of gender incongruence have been excluded?  Our clients meet that. That any other medical and physical health conditions that can affect the outcome of medical treatments would be assessed.  Aetna has not done it.  They would do that on an individual basis not a categorical one.

You know, to answer Your Honor's question, it may be that Aetna denies it in the first instance based on the criteria or otherwise, but even then, plaintiffs will be better off then they are now because

the appeal process -- the Aetna appeal process also references CPB 0615, and the external reviewers, even though they are not bound to follow the insurer's clinical criteria, often do, and they are aware of what the clinical criteria applied were.  And so the exclusion in 0615 is infecting the whole process, and we think that, you know, requiring Aetna to look at these individual women as individuals and not subjecting them to a discriminatory categorical policy that does not take their individual circumstances into account is itself reliving part of their injury, if not all of it.

THE COURT:    Okay.  Thank you.  Actually, while I have you, Mr. Alston, you can stand there as long as you will talk into the microphone.  I want to make sure I understand, and your -- I guess I understand, having drilled down with him, your point is that, you know, two points, it seems to me, is that one is -- you are not sure, at least from Aetna's perspective, not sure there is a "there" there if they have to get there, and the second issue is who pays for that? Is that a fair summary, or am I missing something?

MR. ALSTON:    I think so.  First, simply removing Aetna CPB, there is no indication that will change the outcome, because the concern about the medical literature is still there, and there has not been any discovery on exactly what was done in each of the plaintiffs' individual cases.  There are assumptions it was not individualized, but there has been no evidence -- there is no evidence one way or the other on that.  I don't have the burden of proof.

And then, at the end of the day, we are still talking about

payment, because Aetna can't do the surgery.  The employers can't do the surgery.  At the end of the day, they want to have the surgery now and have it paid for now, and then how do we unscramble that egg later on after I have a trial on the merits, which is exactly why the ERO is there.  And it is ERO that could have been done months ago.  It is not a lengthy process.  It can be done in a week.

THE COURT:    All right.

MR. ALSTON:    Ten days.  All they have to do is ask for it.

THE COURT:    Thank you.

Anything further?

MR. WARDENSKI:    No, thank you.

THE COURT:    Thank you so much.  The one further question I have is how much time you need to do -- to sort of do supplemental briefing on sort of post *Skrmetti* or *Skrmetti* and post *Skrmetti* filings to sort of help the Court?

MR. ALSTON:    Could I ask one question?

THE COURT:    Yes, please.

MR. ALSTON:    How broadly, because I think this post *Skrmetti* issue, which wasn't there at the time we filed the motion to dismiss, is now there, and it really highlights the entire case.  I would suggest we set up a process which we can just, efficiently, but thoroughly, deal with that issue as it cuts across the entire case, whether I need to file another motion to dismiss, or whether we file a judgment on the plea or call it a post *Skrmetti* motion, I don't care what we call it, I think we obviously need to get to the bottom of the

issue.

THE COURT:    Fair enough.

MR. WARDENSKI:    We don't think it is necessary, nor is the request warranted at this point. *Skrmetti* was decided in mid June. Aetna let it sit for six months before raising it as an issue in this case.  We think a single supplemental brief submitted by both parties of perhaps 10 pages would provide enough argument on these issues for the Court to decide and --

THE COURT:    I will give you more than ten pages, so I think what you are suggesting is do simultaneous briefing, and I can allow for simultaneous replies, and we will just call it supplemental briefing. And I think that --

MR. ALSTON:    We will both file at the same time?

THE COURT:    And each side, then I will give you reply time.  How much time?  What is your -- are we talking two weeks?  Three weeks?

MR. WARDENSKI:    I think two weeks is fine.

MR. ALSTON:    Two weeks will be fine.

THE COURT:    So since I have this affinity for Friday deadlines, so two weeks from tomorrow, is that the 30th?  Am I doing math right?  No, I'm not doing it right, the 23rd.  So the 23rd, and then I will let you all do any replies by the 30th.  Does that work for everyone?

MR. WARDENSKI:    Yes, it does.

THE COURT:    Anything further from the plaintiffs?

MR. WARDENSKI:    No, thank you.

THE COURT:    Thank you for your time, and I appreciate your time. Happy new year.

THE CLERK:    All rise.  The Court stands in recess.

(A recess was taken)

(11:23 a.m.)

# C. E. R. T. I. F. I. C. A. T. E.

24cv1447

GORDON, ET AL  v. AETNA LIFE INSURANCE COMPANY

I, HEATHER A. IRELAND, CSR, CRR, RPR, do hereby certify that the

foregoing is a true and accurate copy of my stenographic notes to the

best of my knowledge and ability.

Heather A. Ireland, RPR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(413) 427-0344

Dated:  1/11/26