**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY and S.N., *individually and on behalf of all similarly situated individuals*, | Case No. 3:24-CV-01447-VAB |
| Plaintiffs, | |
| v. | January 23, 2026 |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

**DEFENDANT AETNA'S SUPPLEMENTAL BRIEF REGARDING
POST-*SKRMETTI* CASE LAW IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION BY
PLAINTIFFS JAMIE HOMNICK AND GENNIFER HERLEY**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.      INTRODUCTION ............................................................................... 1

II.     ARGUMENT AND AUTHORITIES ............................................................ 3

        A.      The Supreme Court in *Skrmetti* expressly rejected the arguments underlying
                Plaintiffs' Amended Complaint and Motion .......................................... 5

                1.      Plaintiffs' reliance on Bostock and Title VII is misplaced. ..................... 8

                2.      The Supreme Court in Skrmetti foreclosed Plaintiffs' argument that
                        Aetna's policy, which classifies based on medical use, facially
                        discriminates based on sex. ................................................... 10

                3.      The Supreme Court in Skrmetti foreclosed Plaintiffs' argument that
                        Aetna's policy discriminates based on sex because it references
                        transgender status. ........................................................... 14

                4.      The Supreme Court in Skrmetti foreclosed Plaintiffs' argument that
                        Aetna's policy facially discriminates based on sex stereotypes. ............. 17

        B.      Plaintiffs' "motivating factor" argument likewise fails under *Skrmetti* and,
                in any event, cannot support the injunction they seek. ........................... 18

III.    CONCLUSION ................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bostock v. Clayton County,*
590 U.S. 644 (2020)................................................................................. *passim*

*Brandt by and through Brandt v. Griffin,*
147 F.4th 867 (8th Cir. 2025) .................................................................. *passim*

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861,*
96 F.4th 351 (2d Cir. 2024) ...........................................................................1

*Johnson v. Burge,*
506 Fed. Appx. 10 (2d Cir. 2012).................................................................1

*Kadel v. Folwell,*
No. 22-1721, 2025 WL 2740363 (4th Cir. Sept. 23, 2025) .........................8

*Lange v. Houston Co.,*
152 F.4th 1245 (11th Cir. 2025) (*en banc*) .............................................. *passim*

*Poe by and through Poe v. Drummond,*
149 F.4th 1107 (10th Cir. 2025) ..........................................................7, 13, 17

*Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.,*
159 F.4th 646 (9th Cir. 2025) .................................................................. *passim*

*State Farm Mutual Auto, Ins. Co. v. Tri-Borough NY Medical Practice P.C.,*
120 F.4th 59 (2d Cir. 2024) ..........................................................................1

*United States v. Skrmetti,*
605 U.S. 495 (2025)................................................................................. *passim*

STATUTES

U.S. Code § 2000.............................................................................................9

U.S. Code § 18116...........................................................................................8

Defendant Aetna Life Insurance Company ("Aetna") respectfully submits this supplemental brief in in opposition to Plaintiffs Jamie Homnick and Gennifer Herley's Motion for Preliminary Injunction.

## I.    <u>INTRODUCTION</u>

Plaintiffs Jamie Homnick and Gennifer Herley seek "a preliminary injunction to halt Aetna's enforcement of the GAFR Exclusion in CPB 0615 against them while this case is pending." PI Mot. at 1. Plaintiffs allege that Aetna's policy discriminates on the basis of sex in violation of Section 1557 of the Affordable Care Act.

A preliminary injunction "is an is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm Mutual Auto, Ins. Co. v. Tri-Borough NY Medical Practice P.C.*, 120 F.4th 59, 79 (2d Cir. 2024); *Johnson v. Burge*, 506 Fed. Appx. 10, 11 (2d Cir. 2012). Plaintiffs must show, among other things, that they are "likely to succeed on the merits." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024).

Plaintiffs face a heightened burden here. Where, as here, an injunction seeks to alter the status quo, rather than maintain the status quo pending resolution of the case, the likelihood-of-success requirement becomes "more demanding" still, requiring that the plaintiff "show a *clear or substantial* likelihood of success on the merits." *Id.* at 356 (original emphasis).[1]

Plaintiffs assert that Aetna's policy is facially discriminatory based on sex because it references transgender status and gender dysphoria and limits coverage for certain gender transition procedures. *See* Plaintiffs' Second Amended Complaint ("Am. Compl.") at ¶¶ 1, 16, 19, 152, 153, 175; Plaintiffs' Memorandum in Support of Preliminary Injunction Motion

---

[1] Internal citations, quotations and emphasis are omitted from citations unless otherwise noted.

("Mot.") at 23-31.  But Plaintiffs' complaint, and their motion for preliminary injunctive relief, cannot survive the Supreme Court's recent decision in *United States v. Skrmetti*, 605 U.S. 495 (2025).  The Court held there that a classification based on medical use is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex," including transgender status.  605 U.S. at 511-12, 517.

Aetna's clinical policy bulletins evaluate whether sufficient medical evidence exists to demonstrate that a particular medical procedure effectively treats the intended medical condition. Plaintiffs concede that Aetna' CPB 615 (Gender Affirming Surgery) recognizes that most forms of gender-affirming care have been demonstrated to be medically effective for treatment of gender dysphoria.  *See* Am. Compl. at ¶ 8.  Plaintiffs do not challenge those provisions of Aetna's CPB.  Rather, the provision of CPB 615 at issue here addresses only one specific type of gender-affirming surgery—facial surgery—and reflects Aetna's evidence-based determination that facial surgery has not been shown to be a medically effective treatment for gender dysphoria.  By its terms, CPB 615's assessments and conclusions apply irrespective of sex—the policy applies to both facial *feminization* and *masculinization* surgery alike.

Aetna's CPB 31 (Cosmetic Surgery and Procedures) also excludes cosmetic facial surgeries generally, for *all individuals*, except where the procedure has a well-established functional purpose, such as reconstruction following cancer treatment or traumatic injury—and, again, Aetna applies this cosmetic policy irrespective of sex or transgender status.[2]

Aetna's clinical guidelines, which classify procedures based on medical use, are not discriminatory under *Skrmetti.*  And the record here supports no suggestion that Aetna's policy is

---

[2] Although CPB 615 is the primary clinical policy applicable to gender-affirming surgeries, Aetna's CPB 31 also excludes cosmetic surgeries more generally.  CPB 31, by its terms, refers back to CPB 615 for procedures relating to gender dysphoria.

motivated by anything other than a neutral, reasonable concern over the medical efficacy of one particular type of surgery (facial surgery) for treatment of its intended medical condition (gender dysphoria).  Plaintiffs' motion fails as a matter of both law and fact.

## II.     ARGUMENT AND AUTHORITIES

Aetna's clinical policy has for years endorsed the medical necessity of the common forms of gender-affirming care.  These treatments include genital and chest surgical procedures, as well as hormone therapy and psychotherapy, all of which are supported by substantial medical consensus and evidence as effective for the treatment of gender dysphoria.  *See* Declaration of Robert McDonough, M.D. ("McDonough Decl.") [Dkt. 83] ¶ 12.  Indeed, Plaintiffs concede as much.  *See* Am. Compl. at ¶¶ 8, 143.

Plaintiffs complain here about one, less common subset of gender-affirming surgery—facial feminization surgery—that has been advocated as a treatment for gender dysphoria but for which solid evidence of medical efficacy is lacking.  These procedures consist of a loose constellation of surgeries and related services targeting the nose, cheeks, forehead, chin, jaw, and neck for the purpose of altering and subjectively improving the external appearance of the face. In the absence of established clinical evidence to the contrary, Aetna, and the plan sponsors whose plans Aetna administers, typically classify these surgeries as cosmetic, for all individuals, because, by definition, they alter external appearance.  *See* Aetna Clinical Policy Bulletin 31, Cosmetic Surgery and Procedures.[3]  These procedures generally are considered cosmetic for everyone, male or female, regardless of sex or transgender status.

---

[3]  *See* https://www.aetna.com/cpb/medical/data/1_99/0031.html.  These individual surgical procedures are not unique to gender dysphoria or gender-affirming care; the same procedures and procedure codes are used regardless of underlying diagnosis.

Aetna's CPB 31 on cosmetic surgery recognizes the medical efficacy of certain surgical procedures generally considered cosmetic where necessary to improve bodily function—for example, reconstruction surgery following cancer treatment or traumatic injury. *See id.*; *see also* Mot. at 9. But again, Aetna covers these functional procedures for men and women alike, regardless of sex or transgender status.

Aetna's CPB 615 extends a "not medically necessary" classification to facial gender-affirming surgeries because, unlike other gender-affirming treatments that are generally accepted by the medical community as effective, there currently exists no medical consensus that facial surgery is effective for the treatment of gender dysphoria. *See* Aetna Clinical Policy Bulletin 0615, Gender Affirming Surgery.[4] As one recent study explained, "Frequently, facial gender-affirming surgeries are classified as cosmetic due to a lack of high-level evidence in quality of life (QoL) improvements." *See* Rebuttal Declaration of Robert McDonough, M.D. ("McDonough Rebuttal Decl.") [Dkt. 120-1] ¶ 4 (quoting Caprini, et al. 2023). The authors there candidly acknowledged: "The question of whether patients were ultimately improved with long-term gender-affirming surgery will require additional study." *Id.* at ¶ 3. Those studies are still on-going, as researchers work to develop reliable outcome measures that can accurately assess whether facial surgery is an effective treatment for gender dysphoria; indeed, the most recent comprehensive systematic review of the literature addressing facial feminization surgery reviewed 12 different outcome measures utilized in various studies of facial gender-affirming surgery and concluded that "[n]one of these outcome measures were found to be valid, reliable, and responsive in individuals who had undergone FFS [facial feminization surgery], as

---

[4] *See* https://www.aetna.com/cpb/medical/data/600_699/0615.html.

the outcome measures had not been assessed for this patient population." *Id.* at ¶ 10 (quoting Uhlman, et al. 2024).

Aetna's clinical policy does not question the efficacy of facial gender-affirming surgery *because* the individuals seeking the treatment are transgender. Rather, as with any other medical procedure, the concern is that there is insufficient evidence at the present time to demonstrate that these procedures are an *effective* treatment for gender dysphoria, any more than similar facial surgeries have been shown to be effective to treat cisgender individuals for depression, social anxiety, body dysmorphia, or other emotional or psychological disorders associated with body image. *See* McDonough Decl. at ¶ 29. And Aetna applies the policy regardless of sex; the policy excludes both *feminization* and *masculinization* surgery.

The operative factor under Aetna's clinical policy is not the sex of the member requesting the procedure but, rather, whether there is sufficient, high-quality evidence and medical consensus establishing that the requested procedure is medically necessary as an effective treatment for the member's condition. *Id.* And Aetna applies the policy equally to males and females alike, regardless of sex.[5]

### A. The Supreme Court in *Skrmetti* expressly rejected the arguments underlying Plaintiffs' Amended Complaint and Motion.

In *Skrmetti*, the Supreme Court upheld a Tennessee law that disallowed certain medical treatments for gender dysphoria but allowed those same treatments for other medical conditions. The Court held that the law did not discriminate based on sex because it did not classify based on

---

[5] As explained in Aetna's previous briefing, Aetna's Clinical Policy Bulletins do not impose final decisions regarding medical necessity and, by, extension, coverage for services under a particular plan. Many plans cover facial surgery for gender dysphoria by their terms. And even where a plan is silent on that issue, a medical director must make an individualized determination regarding whether a particular request for facial surgery is medically necessary given that individual's particular circumstances. Aetna's CPBs merely gather the relevant information into a cohesive policy for reference by both the Aetna medical director and the treating physician.

sex; "[the statute] does not mask sex-based classifications [because] the law does not prohibit conduct for one sex that it permits for the other." 605 U.S. at 514-15. "[The law] does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 518-19.

The Court emphasized that "a key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address" and observed that the medical treatments addressed by the Tennessee law (puberty blockers and hormones) "can be used to treat certain overlapping indications (such as gender dysphoria), and each can be used to treat a range of other conditions." *Id.* at 513. The statute restricts which of these medical treatments are available to minors; "[t]he application of that prohibition does not turn on sex." *Id.* at 514.

The Court also held that under the "but-for" test of *Bostock v. Clayton County*, 590 U.S. 644 (2020), "changing a minor's sex or transgender status does not alter the application of [the Tennessee law]." 605 U.S. at 520. The Court reasoned:

> If a transgender boy seeks testosterone to treat his gender dysphoria, SB1 prevents a healthcare provider from administering it to him. If you change his biological sex from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury. The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. *Under the reasoning of Bostock, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone.*

*Id.* at 520-21 (emphasis added).

In sum, the Supreme Court in *Skrmetti* enunciated the following legal principles that must guide the resolution of Plaintiffs' complaint and motion here:

- *First,* a policy, such as Aetna's here, which classifies based on medical use, is not facially discriminatory, even if the policy "reference[s] sex" or "application of the

6

[policy] turns on sex." 605 U.S. at 511-12. This is so even applying the "but-for"
test of *Bostock*. *Id.* at 520-21.

- *Second*, such a policy is not facially discriminatory, even though the policy expressly
  references transgender status and gender-affirming care. *Id.* at 517-18. To hold
  otherwise "would be especially inappropriate in the medical context [where] [s]ome
  medical treatments and procedures are uniquely bound up in sex." *Id.* at 512.

- *Third*, "allegations of sex stereotyping are misplaced," even where a policy references
  transgender status, where the policy applies classifications based on medical use that
  "are neither covertly nor overtly based on sex." *Id.* at 516.

- *Finally*, a policy is not discriminatory simply because it allows a medical treatment
  for some conditions and not others: "[A] key aspect of any medical treatment" is "the
  underlying medical concern the treatment is intended to address" and where certain medical
  procedures "can be used to treat certain overlapping indications (such as gender dysphoria),
  and each can be used to treat a range of other conditions," a classification based on medical
  use "does not turn on sex." *Id.* at 513-14. "A law prohibiting the administration of
  specific drugs for particular medical uses" is not facially suspect. *Id.* at 516.

Following *Skrmetti*, multiple circuit courts have held that statutes or health benefit plans that
allow medically necessary treatments for certain diagnoses but bar the same treatments for
gender dysphoria are not facially discriminatory. *See Pritchard on behalf of C.P. v. Blue Cross
Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025) (employee health insurance plan; ACA Section
1557); *Lange v. Houston Co.,* 152 F.4th 1245 (11th Cir. 2025) (*en banc*) (employee health
insurance plan); *Brandt by and through Brandt v. Griffin*, 147 F.4th 867 (8th Cir. 2025); and *Poe
by and through Poe v. Drummond*, 149 F.4th 1107 (10th Cir. 2025). In addition, the Fourth

Circuit vacated and remanded in light of *Skrmetti* one of the principal authorities under Section 1557 upon which Plaintiffs rely in their Motion.  *See Kadel v. Folwell,* No. 22-1721, 2025 WL 2740363 (4th Cir. Sept. 23, 2025); Mot. at 26, 28.

*Skrmetti* compels the same conclusion here.

### *1.*     **Plaintiffs' reliance on Bostock and Title VII is misplaced.**

Plaintiffs rely heavily on the Supreme Court's decision under Title VII in *Bostock*.  Their Amended Complaint and Motion, and virtually every case authority they cite in support, are premised on the assumption that *Bostock's* logic applies to Section 1557 and that discrimination "on the basis of sex" under 1557 includes discrimination on the basis of gender identity.  *See* Mot. at 23-31.  That assumption is misplaced.

*Bostock* was decided under Title VII.  590 U.S. at 654 ("[W]e granted certiorari in these matters to resolve at last the disagreement among the courts of appeals over the scope of Title VII's protections for homosexual and transgender persons.").  Section 1557, on the other hand, expressly incorporates only Title VI and Title IX, as well as the Age Discrimination Act.  *See* 42 U.S. Code § 18116.  Section 1557 contains no reference to Title VII.  Plaintiffs acknowledge this.  *See* Mot. at 26 n. 5.

But the Supreme Court explained in *Skrmetti* that the Court has "not yet considered whether *Bostock's* reasoning reaches beyond the Title VII context."  605 U.S. at 520.  Indeed, the Court in *Bostock* expressly limited its holding in that case to Title VII, and even there only to one specific context of employment:

> The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination.... But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and *we do not prejudge any such question today.* Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. *The only question before us is whether an employer who fires*

> *someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'*

*Bostock*, 590 U.S. at 681 (emphasis added). *Bostock* does not purport to interpret Section 1557 or Title IX, and *Skrmetti* makes clear that the Supreme Court has never extended *Bostock* beyond Title VII.

Moreover, even assuming Title VII applies to Section 1557, the language and history of that statute do not support Plaintiffs' position here. Congress amended Title VII in 1978 expand the terms "because of sex" or "on the basis of sex" to include "pregnancy, childbirth, or related medical conditions." *See* 42 U.S. Code §§ 2000e(k). Title VII says nothing, however, about medical conditions related to gender dysphoria or gender-affirming care. As the Ninth Circuit explained in *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025), where the court rejected plaintiffs' challenge to *Skrmetti* based on the argument that Section 1557, through Title VII, prohibits discrimination against treatment for gender dysphoria: "[W]hen Congress amended Title VII, it created a rule that does not help Plaintiffs. Congress defined "because of sex" to incorporate "pregnancy, childbirth, or related medical conditions," but it changed nothing about gender dysphoria or gender reassignment. *Thus, Section 1557 bars discrimination against treatment for pregnancy and childbirth but not treatment for gender dysphoria.* 159 F.4th at 670 (emphasis added).

Aetna does not concede that either *Bostock* or Title VII applies to Section 1557 or that Title VII itself prohibits discrimination against treatment for gender dysphoria. But, in any event, as the Supreme Court made clear in *Skrmetti*, a policy like Aetna's here, which classifies based on medical use, is not discriminatory even under *Bostock*. Indeed, the Supreme Court explicitly rejected every argument Plaintiffs assert here.

### 2.    The Supreme Court in *Skrmetti* foreclosed Plaintiffs' argument that Aetna's policy, which classifies based on medical use, facially discriminates based on sex.

Plaintiffs' essential contention, underpinning both their Amended Complaint and their pending Motion, is that Aetna's clinical policy regarding facial gender-affirming surgery as reflected in CPB 615, is facially discriminatory on the basis of sex. *See* Am. Compl. at ¶¶ 1, 152, 153, 168, 175; Mot. at 25, 30. Aetna discriminates based on sex, Plaintiffs say, by "denying [Plaintiffs] health insurance coverage for medically necessary gender-affirming facial reconstruction surgeries and procedures." Am. Compl. at ¶ 1. "CPB 0615 discriminates on its face by categorically excluding facial surgeries only when performed 'as a component of gender transition,' regardless of medical necessity." *Id.* at ¶ 16. Relying heavily on *Bostock*, Plaintiffs assert that "Aetna facially discriminates on the basis of sex by withdrawing coverage for facial surgery when the person is seeking it because they are transgender." Mot. at 25; *see generally id.* at 23-31.

Plaintiffs' claims cannot survive *Skrmetti*. Aetna's policy here, like the statute before the Supreme Court, classifies, not based on sex, but rather on medical condition and treatment; Aetna's CPB 615 simply removes facial surgery from the range of gender-affirming procedures it identifies as medically necessary. Indeed, the exception at issue here is a very narrow one; Aetna's clinical policy approves as effective a wide variety of gender-affirming treatments that are supported by robust medical evidence but excepts one limited subset of surgical procedures where medical support is lacking—and each of the procedures is covered, or not, regardless of sex. Moreover, it is contested that Aetna covers these very same facial surgeries for some indications (i.e., to remediate the effects of cancer or trauma), but not for others (i.e., body

10

dysmorphia), again regardless of sex.[6]  Aetna's policy, in the words of *Skrmetti*, "does not mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions."  605 U.S. 514-15, 518-19.

In *Pritchard*, another case involving Section 1557, the Ninth Circuit held that *Skrmetti* forecloses arguments virtually identical to those Plaintiffs assert here.  In that case, the plaintiffs sued Blue Cross, as third-party administrator for certain employer-sponsored health insurance plans.  159 F.4th at 653.  The plaintiffs asserted that Blue Cross discriminated based on sex in violation of Section 1557 by refusing to approve treatment for gender dysphoria.  *Id.*  Like the Aetna policy here, the Blue Cross plans expressly addressed gender-affirming care; but unlike Aetna's clinical policy that is narrowly limited only to facial surgery, the Blue Cross policy excluded *all* gender-affirming treatments.  *Id.* at 654.  And, like Aetna here, Blue Cross covered gender-affirming procedures where the employer plan sponsor elected to do so.  *Id.*

The district court granted summary judgment for the plaintiff class, which the Ninth Circuit overturned because "we cannot square the summary-judgment ruling against BCBSIL with *Skrmetti*."  *Id.* at 673.  The Ninth Circuit held that the Blue Cross policy, like the statute in *Skrmetti*, simply removed treatment for gender dysphoria from the range of conditions its insurance plans cover.  *Id.* at 669-70.  "Without more, sex is a not a but-for cause of the exclusions' operation."  *Id.* at 670.

---

[6] *See* Aetna Clinical Policy Bulletin 31, Cosmetic Surgery and Procedures, at section III, listing conditions for which facial surgeries are considered cosmetic and not medically necessary.  *See* https://www.aetna.com/cpb/medical/data/1_99/0031.html.

The Eleventh Circuit reached the same conclusion in another case involving an employer-sponsored health plan, *Lange v. Houston Co.,* 152 F.4th 1245 (11th Cir. 2025). The plaintiff there was a transgender woman who sought coverage for male-to-female sex change surgery under a county employer-provided health benefit plan. *Id.* at 1248. The county plan excluded coverage for drugs, services and supplies for sex change or reversal of sex change procedures, and the insurer that administered the plan denied the request. *Id.* Like the blanket exclusion in *Pritchard*—but unlike Aetna's narrow exception here—the county plan excluded *all* sex-change procedures. *Id.* at 1249.

The district court held that the county policy was facially discriminatory under Title VII and granted summary judgment for the plaintiff. *Id.* at 1250. The Eleventh Circuit, sitting *en banc*, reversed under the Supreme Court's reasoning in *Skrmetti*. "The County's policy does not pay for a sex change operation for anyone regardless of their biological sex," and the plaintiff would not be entitled to coverage whether she was a man or a woman. *Id.* at 1252. "Nothing about the policy exclusion turns on whether the County's employee is a man or woman." *Id.*

The circuit court also observed that the county plan—like the Aetna policy here—approved certain of the medical procedures when performed for another medical purpose. "The same is true when we consider the specific procedures that were part of [the plaintiff's] sex change surgery." *Id.* While the plan would deny coverage for procedures performed as part of a sex change operation, "these procedures would be covered when required because of medical conditions, such as cancer or injuries from a car accident, for an employee of either sex (subject to the policy's other exclusions). Under the logic of *Bostock*, then, sex is simply not a but-for cause." *Id.*

The Eighth Circuit upheld an Arkansas statute similar to the Tennessee law in *Brandt by through Brandt v. Griffin*, 147 F.4th 867 (8th Cir. 2025), rejecting the argument that a classification

based on medical use is facially discriminatory. "The Act allows healthcare professionals to provide drugs or surgical services to address some medical concerns, but it bars healthcare professionals from providing those drugs or surgeries for other purposes. The Act thus classifies based on medical procedure, treating different medical procedures differently. … The Act does not classify based on sex." *Id.* at 879. The Tenth Circuit likewise applied *Skrmetti* to uphold a similar Oklahoma statute in *Poe by and through Poe v. Drummond,* 149 F.4th 1107 (10th Cir. 2025). The statute was not facially discriminatory, the court held, because it classified, not based on sex, but rather on medical use: whether a provider may administer a procedure "turns on the condition to be treated." *Id.* at 1122-23.

It should be noted that the Supreme Court and each of the circuit courts acknowledged that the plaintiffs in those cases presented evidence that gender-affirming treatments may be considered medically necessary for some individuals. *See Skrmetti*, 605 U.S. at 529-30 (J. Thomas, concurring); *Pritchard*, 159 F.4th at 655; *Lange*, 152 F.4th at 1250; *Brandt*, 147 F.4th at 892-93; *Poe*, 147 F.4th at 1130. But the courts all held nonetheless that a policy is not facially discriminatory simply because it removes certain medically necessary treatments from the range of covered services. The *Lange* court framed the question as follows: "[W]hether the insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for [the plaintiff's] sex change surgery, facially violates Title VII." 152 F.4th at 1250. And the court concluded that, under *Skrmetti*, it did not: "In short, the County's plan does not facially violate Title VII. The County's plan draws a line between certain treatments, which it covers, and other treatments, which it does not. That line may or may not be appropriate as a matter of health care policy, but it is not facial discrimination based on protected status." *Id.* at 1255.

13

Aetna's policy likewise draws a line based on medical use and evidence, not sex, and *Skrmetti* forecloses any argument that such a classification is facially discriminatory. [7]

### 3. The Supreme Court in Skrmetti foreclosed Plaintiffs' argument that Aetna's policy discriminates based on sex because it references transgender status.

Plaintiffs also assert that Aetna's policy is discriminatory because "by its own terms, [the policy] applies only to 'gender affirming' facial procedures 'performed as a component of gender transition.'" Mot. at 25; *see also* Am. Compl. at ¶ 16. "There is no way," Plaintiffs argue, "to apply or describe the GAFR Exclusion without referencing or relying on sex." *Mot.* at 25. "Put another way, the GAFR Exclusion targets people for being transgender, which is always sex discrimination." *Id.* at 26.

*Skrmetti* forecloses these claims as well. The Supreme Court noted there that "[t]his Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny." 605 U.S. at 512. "Such an approach, moreover, would be especially inappropriate in the medical context. Some medical treatments and procedures are uniquely bound up in sex." *Id.* "In the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny." *Id.*

The Court also rejected the contention that the statute necessarily discriminated based on sex because it specifically referenced gender dysphoria and prohibited treatments for gender identity disorders: "Nor are we persuaded that [the Tennessee law's] prohibition on the prescription of

---

[7] Plaintiffs devote most of their complaint and briefing to the contention that facial feminization surgery is a medically necessary treatment for gender dysphoria. While Aetna disputes that contention—and has presented evidence sufficient to refute Plaintiffs' arguments on the issue and to defeat Plaintiffs' motion for preliminary injunction—the question whether Aetna's policy is discriminatory does not turn on the question of medical necessity. Under *Skrmetti*, as the circuit courts applying it have recognized, a policy that classifies between certain medical treatments it will cover and other treatments it will not cover is not discriminatory, regardless of whether the treatments might be considered medically necessary.

puberty blockers and hormones to '[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex' or to '[t]rea[t] purported discomfort or distress from a discordance between the minor's sex and asserted identity,' reflects a sex-based classification." *Id.* at 515. The law "is simply a prohibition on the prescription of puberty blockers and hormones to treat gender dysphoria, gender identity disorder, or gender incongruence." *Id.* "A law prohibiting the administration of specific drugs for particular medical uses" is not facially suspect. *Id.* at 516.

Moreover, the Supreme Court rejected the assertion that the Tennessee law "discriminates against transgender individuals, who the plaintiffs assert constitute a quasi-suspect class." *Id.* at 517. "This Court has not previously held that transgender individuals are a suspect or quasi-suspect class." *Id.* And, in any event, the statute there—like the Aetna clinical policy here, which classifies on the basis of medical efficacy—"does not classify on the basis of transgender status." *Id.* The Court explained that the statute made two classifications—age and medical use—and "[t]he plaintiffs do not argue that the first classification turns on transgender status, and our case law forecloses any such argument as to the second." *Id.* at 517-18.

The Ninth Circuit rejected this same argument in *Pritchard*: "[T]he district court erred in focusing on whether the plans referenced sex or a synonym. The Supreme Court 'has never suggested that [a statute's] mere reference to sex is sufficient to trigger heightened scrutiny' by showing that the statute discriminates based on sex. Particularly '[i]n the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny.'" 159 F.4th at 670 (quoting *Skrmetti*, 605 U.S. at 512). "Here, we are in the medical context. Though BCBSIL's exclusions reference sex, and though that reference may be relevant, it is not sufficient to trigger *Bostock*'s application." *Id.*

The *Pritchard* court also rejected the contention that the Blue Cross policy facially discriminated based on sex because the policy made "direct references to transgender status." *Id.* "*Skrmetti* does not focus on whether anyone refers to transgender status or, equivalently, sex. Indeed, the statute in *Skrmetti*, bristled with references to sex." *Id.*

The Ninth Circuit also rejected the plaintiffs' argument that an exclusion for "gender reassignment" is discriminatory because it necessarily "equates with transgender status." *Id.* at 671. The circuit court held that *Skrmetti* forecloses this argument: "But the statute in *Skrmetti* also targets care leading to gender reassignment. It bars 'a medical procedure if the performance or administration of the procedure is for the purpose of,' among other things, '[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex.' We cannot distinguish *Skrmetti* this way." *Id.*

The Eleventh Circuit reached the same conclusion in *Lange*, rejecting the plaintiff's argument that the county plan there discriminated based on transgender status because it did not cover treatments for gender dysphoria to the same extent that it covers treatments for other conditions. 152 F.4th at 1252. "Neither the Supreme Court nor this Court has held that transgender status is separately protected under Title VII apart from sex. And *Bostock* did not add transgender status, as a category, to the list of classes protected by Title VII." *Id.* "But, even if this theory were viable under Title VII, the County's plan does not facially discriminate based on transgender status. Again, the Supreme Court rejected a very similar argument in *Skrmetti*." *Id.* "The Court said point blank: 'Under the reasoning of *Bostock*, neither [the plaintiff's] sex *nor his transgender status* is the but-for cause of his inability to obtain' the prohibited treatment." *Id.* at 1253 (quoting *Skrmetti*, 605 U.S. at 521) (emphasis added).

The Eighth Circuit in *Brandt* also rejected the argument that prohibiting gender transition procedures inherently discriminates based on sex. "The minors reason that the Act must classify based

on sex because it would otherwise be impossible to distinguish whether a drug or surgery for a minor was permitted or prohibited, "but that classification does not discriminate on the basis of sex under *Skrmetti*.  147 F.4th at 880.  "[T]he Act prohibits providing medical treatment for certain purposes, and these prohibitions apply even if one switches the sex of a hypothetical minor.  Thus, the Act does not discriminate on the basis of sex." *Id.*

The Tenth Circuit in *Poe* likewise held: "The Supreme Court's *Skrmetti* decision forecloses Plaintiff's argument that [the Oklahoma statute] turns on transgender status."  149 F.4th at 1124.  The Supreme Court held that the Tennessee law "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnosis—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.*

Aetna's clinical policy affirms that most gender-affirming procedures are medically necessary but excludes a select few from that category, and *Skrmetti* precludes the argument that classification by medical procedure is discriminatory simply because the procedures are claimed to be efficacious for gender transition.

        *4.*      **The Supreme Court in Skrmetti foreclosed Plaintiffs' argument that Aetna's policy facially discriminates based on sex stereotypes.**

Finally, Plaintiffs assert that Aetna's policy is discriminatory because "in singling out plan members when the care they seek is a 'component of gender transition,' Aetna penalizes them based on sex stereotypes; the stereotype that those who are assigned male at birth ought not seek facial features that are more typically feminine, even when necessary for their health, and that the facial surgery needs of transfeminine people can and should be dismissed as unimportant and unworthy of coverage." Mot. at 27; *see also* Am. Compl. at 175.

The Supreme Court rejected this argument in *Skrmetti* as well: "[W]e reject the plaintiffs' argument that, 'by design, SB1 enforces a government preference that people conform to

17

expectations about their sex.'" 605 U.S. at 516. "[T]he plaintiffs' allegations of sex stereotyping are misplaced" because "[the Tennessee] law's classifications are neither covertly nor overtly based on sex." *Id.* Moreover, the state's articulated reasons for the law "do not themselves evince sex-based stereotyping," especially given the state's expressed concern about the efficacy and safety of the subject gender-affirming procedures. *Id.* at 516-17. These are the very same considerations underlying Aetna's clinical policy.

The Eleventh Circuit likewise rejected a stereotyping argument in *Lange.* The county plan exclusion at issue there, the court held, "is not based on stereotypes" because "[o]n the contrary, the plan excludes coverage for a suite of medical procedures that change the appearance of a person's sex organs—regardless whether the goal is to differ from, or align with, natal sex." 152 F.4th at 1234. Similarly, the Eighth Circuit in *Brandt* rejected the plaintiffs' argument there that the challenged law was discriminatory because it "punishes an individual for seeking to acquire sex characteristics different from the individual's biological sex," holding that *Skrmetti* precludes such an argument. 147 F.4th at 880-81. "A concern about potentially irreversible medical procedures for a child is not a form of stereotyping. The Act does not classify based on sex." *Id.* at 881.

Plaintiffs' stereotyping argument is but a variation of their contention that a policy is facially discriminatory whenever it references transgender status or gender-affirming care. And, as with the rest of their theories, *Skrmetti* explicitly rejects this argument.

**B.    Plaintiffs' "motivating factor" argument likewise fails under *Skrmetti* and, in any event, cannot support the injunction they seek.**

At oral argument on their Motion, Plaintiffs' counsel argued that liability under Section 1557 can be established by showing that sex was a motivating factor in an action or policy that discriminates against an individual in a health program. *See* Transcript of Motion Hearing, January 8, 2026 ("Tr.") at 13. Counsel argued further that motivation is established here because Aetna's

18

policy "is discriminatory on its face" and "is motivated by pernicious stereotypes" and cannot be understood "without at least some reference to sex and gender." *Id.* at 18, 19, 21. Counsel also asserted that improper motivation can be inferred because Aetna covers facial surgery for some purposes and not others. *Id.* at 22.

Counsel's argument is but a repetition of the central theme of their briefing where they repeatedly argue that discriminatory motivation can be *presumed* or *inferred* from the face of Aetna's policy. They argue, for example, that "[w]hen a covered entity facially discriminates on the basis of sex, no more evidence of motivation is required." Mot. at 25. Similarly, they assert: "[A] classification based on sex assigned at birth is embedded within a classification based on transgender status or gender dysphoria" and "[u]nder Title VII, and thus Section 1557, sex only needs to be one motivating factor for liability." Mot. at 27. And: "Because the GAFR Exclusion facially discriminates based on sex, no further inquiry into motivation is needed." Mot. at 30. Finally, Plaintiffs assert that discriminatory motivation can be inferred because Aetna's policy "rel[ies] at least partially on gender" and because Aetna covers facial surgery "when not classified as treating gender dysphoria." Mot. at 30-31.

The problem with Plaintiffs' argument, as explained above, is that *Skrmetti* expressly forecloses each of these theories. First, *Skrmetti* repudiated the notion that determinations under Title VII automatically apply to Section 1557. Furthermore, a policy, such as Aetna's here, which classifies based on medical use, is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex." 605 U.S. at 511-12. This is so, even though the policy references transgender status and gender-affirming care. *Id.* at 517-18. To hold otherwise "would be especially inappropriate in the medical context [where] [s]ome medical treatments and procedures are uniquely bound up in sex." *Id.* at 512. Similarly, "allegations of sex

stereotyping are misplaced" where a policy applies "classifications [that] are neither covertly nor overtly based on sex." *Id.* at 516. Finally, a policy is not discriminatory simply because it allows a medical treatment for some conditions and not others: "[A] key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address" and where certain medical procedures "can be used to treat certain overlapping indications (such as gender dysphoria), and each can be used to treat a range of other conditions," a classification based on medical use "does not turn on sex." *Id.* at 513-14. "A law prohibiting the administration of specific drugs for particular medical uses" is not facially suspect. *Id.* at 516.

Aetna's policy, in the words of *Skrmetti*, "does not mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 514-15, 518-19. This is so, even applying the "but-for" test of *Bostock*: "Under the reasoning of *Bostock*, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone." *Id.* at 520. *See also Pritchard*, 159 F.4th at 669-70 (The Blue Cross policy simply removed treatment for gender dysphoria from the range of conditions its insurance plans cover, and "[w]ithout more, sex is a not a but-for cause of the exclusions' operation."); *Lange*, 152 F.4th at 1252 (While the County plan would deny coverage for procedures performed as part of a sex change operation, "these procedures would be covered when required because of medical conditions, such as cancer or injuries from a car accident, for an employee of either sex (subject to the policy's other exclusions). Under the logic of *Bostock*, then, sex is simply not a but-for cause.").

Plaintiffs' Motion, of course, predates the Supreme Court's decision in *Skrmetti*, and the many circuit court decisions applying it, and thus erroneously *presupposes* that Aetna's policy is facially discriminatory under *Bostock*, Title VII and Section 1557—and that discriminatory motivation and intent thus can be *presumed* or *inferred*—simply because the policy refers to transgender status and excludes coverage for certain gender-affirming surgeries. *Skrmetti* slams the door on that theory, and Plaintiffs cannot establish discriminatory motivation or intent here by presumption or inference alone.

Moreover, the record here effectively negates any contention that Aetna's policy is motivated by any invidious intent to discriminate against transexual individuals. First, it is undisputed that Aetna's clinical policy allows coverage for most forms of gender-affirming care. Second, Aetna's clinical policy lists many other surgeries it considers cosmetic and not medically necessary, regardless of sex. Third, the only concrete evidence in the record regarding Aetna's motivation for its policy is Aetna's own explanation that there currently exists no general consensus in the medical and scientific community that the narrow subset of gender-affirming facial surgeries at issue here are medically effective treatments for gender dysphoria. In fact, when Bausch & Lomb asked Aetna to explain its decision on Dr. Homnick's request for coverage, Aetna specifically cited the unsettled state of the medical literature on the efficacy of facial surgery to treat gender dysphoria:

> We do not cover the [WPATH] SOC8 Recommendation for facial and body contouring surgery due to a lack of evidence-based literature that these procedures improve the gender dysphoria of these individuals – SOC8 provided only one prospective study for facial feminization and commented that the study "results were direct and consistent, but somewhat imprecise because of certain study limitations." For facial masculinization, SOC8 states "While gender-affirming facial surgery for AFAB individuals is an emerging field, current limited data points toward equal benefits in select patients. Future studies are recommended." Accordingly, we "align" with most of WPATH SOC8.

*See* Aetna's Opposition to Plaintiffs' Motion for Preliminary Injunction, Goellner Declaration, Ex. F [Dkt. 86-6]. And, as Aetna's explanation makes clear, Aetna covers *neither* facial *feminization* nor *masculinization* surgery—it applies the same policy, based entirely on medical use and medical evidence, regardless of sex.

In sum, Plaintiffs' "motivating factor" argument, up to now, has been based entirely on the theory that discriminatory motivation can be presumed or inferred. Plaintiffs offer only supposition and false equivalencies wholly based upon factors the Supreme Court has now expressly rejected in *Skrmetti*. Plaintiffs have no pleadings, briefing, or evidence to suggest, much less prove, any other motivation theory.

Plaintiffs cannot show a *clear or substantial* likelihood of success on the merits, and the Court should not grant a preliminary injunction, based on untenable legal theories and a nonexistent factual record.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, Aetna respectfully requests the Court deny Plaintiffs' motion for preliminary injunction.

Dated at Hartford, Connecticut this 23rd day of January, 2026.

*Theodore J. Tucci*
Theodore J. Tucci (ct05249)
Abby M. Warren (ct30077)
Christopher A. Costain (ct31612)
Robinson & Cole LLP
One State Street
Hartford, CT 06103
Tel.: (860) 275-8200
Fax: (860) 275-8299
ttucci@rc.com
awarren@rc.com
ccostain@rc.com

Sarah Reeves (*pro hac vice*)
Earl B. Austin (*pro hac vice*)
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel.: (212) 408-2649
Fax: (212) 408-2449
sarah.reeves@bakerbotts.com
earl.austin@bakerbotts.com


*Counsel for Defendant*
*Aetna Life Insurance Company*