**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY and S.N., *individually and on behalf of all similarly situated individuals*, | Case No. 3:24-CV-01447-VAB |
| Plaintiffs, | |
| v. | January 30, 2026 |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

**DEFENDANT AETNA'S REPLY TO PLAINTIFFS'**
**SUPPLEMENTAL BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION BY**
**PLAINTIFFS JAMIE HOMNICK AND GENNIFER HERLEY**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

ARGUMENT AND AUTHORITIES............................................................................. 4

    A.   *Skrmetti*'s Analysis Governs Plaintiffs' Discrimination Claims Under Section 1557. ...... 4

    B.   Plaintiffs Cannot Show a Clear or Substantial Likelihood of Success on the Merits
       Under *Skrmetti*.................................................................................................... 7

       1.   The Second Circuit motivating-factor case law is inapplicable here and, in any event,
           cannot override the governing precedent of *Skrmetti*. .................................................. 8

       2.   *Skrmetti* forecloses Plaintiffs' argument that Aetna's policy is presumptively
           motivated by discriminatory intent. .............................................................................. 9

       3.   *Skrmetti* forecloses Plaintiffs' argument based on sex stereotyping.......................... 15

       4.   Plaintiffs have neither pleaded nor proven a proxy-discrimination theory and cannot
           support a preliminary injunction on that ground........................................................ 17

    C.   Plaintiffs Cannot Prevail Under a But-For Causation Standard Under *Skrmetti*............. 21

       1.   *Skrmetti* is not dicta; its analysis of *Bostock* is controlling here............................... 21

       2.   Plaintiffs' claims fail the but-for test as applied in *Skrmetti*...................................... 23

CONCLUSION........................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ................................................................5

*Baroni v. Port Auth. of New York & New Jersey*,
  161 F.4th 48 (2d Cir. 2025) ................................................................22

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)................................................................15, 16

*Brandt by through Brandt v. Griffin*,
  147 F.4th 867 (8th Cir. 2025) ................................................................12

*Christiansen v. Omnicom Group, Inc.*,
  852 F.3d 195 (2d Cir. 2017)................................................................9

*CompassCare v. Hochul*,
  125 F.4th 49 (2d Cir. 2025) ................................................................22

*Department of Ed. v. Louisiana*,
  603 U. S. 866 (2024) ................................................................13

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016)................................................................8

*Doe v. E. Haven Bd. of Educ.*,
  200 F. App'x 46 (2d Cir. 2006) ................................................................8

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ................................................................13

*Flack v. Wis. Dept. of Health Servs.*,
  328 F.Supp.3d 931 (W.D. Wis. 2018) ................................................................17

*Folwell v. Kadel*,
  145 S.Ct. 2838 (2025)................................................................6, 7, 22

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  973 F.3d 586 (4th Cir. 2020) ................................................................5

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) ................................................................ *passim*

*Kadel v. Folwell*,
   No. 22-1721, 2025 WL 2740363 (4th Cir. Sept. 23, 2025) .................................................7, 22

*L.B. v. Premera Blue Cross*,
   795 F. Supp. 3d 1311 (W.D. Wash. Aug. 12, 2025).........................................................26, 27

*Lange v. Houston Co.*,
   152 F.4th 1245 (11th Cir. 2025) (*en banc*) ....................................................... *passim*

*Los Angeles Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978)...........................................................................................................19

*Mallory v. Ohio Univ.*,
   76 Fed. App'x. 634 (6th Cir. 2003) ..................................................................................13

*Neese v. Becerra*,
   640 F.Supp.3d 668 (N.D. Tex 2022) ..................................................................................2

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989).....................................................................................................16, 19

*Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*,
   159 F.4th 646 (9th Cir. 2025) ......................................................................... *passim*

*Ramirez v. Town of Oxford*,
   No. 3:21-CV-240 (JAM), 2022 WL 3646203 (D. Conn. Aug. 24, 2022) ............................22

*Schiebel v. Schoharie Cent. Sch. Dist.*,
   120 F.4th 1082 (2d Cir. 2024) ...............................................................................8, 13, 14

*Seminole Tribe of Fla. V. Florida*,
   517 U.S. 44 (1996)..............................................................................................................22

*Sohm v. Scholastic Inc.*,
   959 F.3d 39 (2d Cir. 2020)..................................................................................................22

*Tovar v. Essentia Health*,
   342 F.Supp.3d 947 (D. Minn. 2018) ..................................................................................17

*United States v. Skrmetti*,
   605 U.S. 495 (2025)............................................................................................. *passim*

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..............................................................................................5

*Yusuf v. Vassar Coll.*,
   35 F.3d 709 (2d Cir. 1994)................................................................................................8, 9

*Zarda v. Altitude Express, Inc.*,
   883 F.3d 100 (2d Cir. 2018)................................................................................. *passim*

**STATUTES**

U.S. Code § 1681(a)..........................................................................................................2

U.S. Code §§ 2000e(k).......................................................................................................3

U.S. Code § 18116.........................................................................................................1, 2

Defendant Aetna Life Insurance Company ("Aetna") respectfully submits this Reply to Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction by Plaintiffs Jamie Homnick and Gennifer Herley [Dkt. 142] (hereinafter the "Pltfs' Supp. Br.").

## I.
## INTRODUCTION

Plaintiffs contend that Aetna's CPB 615 is facially discriminatory based on sex in violation of ACA Section 1557 because it limits coverage for gender-affirming facial surgeries. *See* Plaintiffs' Second Amended Complaint [Dkt. 60] ("Am. Compl.") at ¶ 1. Plaintiffs argue in their Supplemental Brief that *Skrmetti* does nothing "to narrow Section 1557's statutory protections for transgender plaintiffs." Pltfs' Supp. Br. at 4. The presumption being that Section 1557 provides "statutory protections" for coverage of gender-affirming facial surgeries by third-party benefits administrators like Aetna. Plaintiffs assert that presumption as a given. And the entirety of the rest of their brief is based on that foundational presumption.

But Plaintiffs never clearly explain the *source* of these presumed "statutory protections" for gender-affirming facial surgery under Section 1557, however. They make a passing reference to Title IX, *see id.*, where they insert the "on the basis of sex" language of Title IX into Section 1557. But they cite no authority at all for the proposition that Title IX itself extends statutory protections to gender-affirming medical care. Apart from a few allusions to Title IX, Plaintiffs devote the bulk of their brief to a renewed discussion of their previous arguments based on *Bostock* and Title VII.

The fact is Plaintiffs have no other legal option. The text of Section 1557 itself makes no mention of sex or transgender status. *See* 42 U.S. Code § 18116. Rather, Section 1557 expressly incorporates Title IX (as well as Title VI and the Age Discrimination Act). *Id.* Title IX states, "No person in the United States shall, on the basis of sex, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See* 20 U.S. Code § 1681(a). Plaintiffs cite no legal authority holding that Title IX's prohibition of discrimination "on the basis of sex" has ever been extended to embrace gender-affirming medical care.[1] It thus is not surprising that Plaintiffs make no more than a token reference to Title IX—the presumptive "statutory protections" for gender-affirming medical care upon which Plaintiffs base their case must arise elsewhere.

Indeed, Plaintiffs ultimately return, as they always have, to *Bostock* and Title VII. *See* Plaintiffs' Memorandum in Support of Preliminary Injunction Motion [Dkt. 63-1] ("Mot.") at 23-31; Pltfs' Supp. Br. at 11-15, 17. But, as Plaintiffs themselves concede, Section 1557 contains no reference to Title VII. *See* 42 U.S. Code § 18116. Thus, of necessity, Plaintiffs must rely upon the protections for transgender individuals under Title VII as enunciated in *Bostock*. *See* Mot. at 26 n. 5 ("While *Bostock* is a Title VII case, its logic applies with the same force here.").

In sum, the *source* of the presumptive "statutory protections" for gender-affirming medical care under Section 1557 upon which Plaintiffs base their complaint and motion remains what it has always been: *Bostock's* interpretation of Title VII. Plaintiffs cite no other source.

But the Supreme Court in *Skrmetti* made clear that *Bostock* and Title VII do not apply so broadly as Plaintiffs contend here. First, the Court made clear that "[t]his Court has not previously held that transgender individuals are a suspect or quasi-suspect class." 605 U.S. at 517.[2] Second, the Court explained that it has "not yet considered whether *Bostock's* reasoning reaches beyond the Title VII context." *Id.* at 520. Finally, the Court expressly held that a

---

[1] Indeed, at least one court has held that "Title IX says nothing about…'gender identity'" and that "[b]ecause Title IX does not protect…'gender identity' status, neither does Section 1557." *Neese v. Becerra*, 640 F.Supp.3d 668, 684 (N.D. Tex 2022), vacated and remanded on other grounds (Article III standing), 123 F.4th 751 (5th Cir. 2024).

[2] Internal citations, quotations and emphasis are omitted from citations unless otherwise noted.

2

classification based on medical use is not facially discriminatory, even if it "reference[s] sex" or "application of the [classification] turns on sex." *Id.* at 511-12. This is so even if the classification expressly references transgender status and gender-affirming care. *Id.* at 517-18. And this is so even applying the "but-for" test of *Bostock*. *Id.* at 520-21.

Moreover, even assuming Title VII applies to Section 1557, the language and history of that statute do not provide the presumptive "statutory protections" for gender-affirming medical care under Section 1557 that Plaintiffs assert here. Congress amended Title VII in 1978 to expand the terms "because of sex" or "on the basis of sex" to include "pregnancy, childbirth, or related medical conditions." *See* 42 U.S. Code §§ 2000e(k). Congress made no reference, however, to medical conditions related to gender dysphoria or gender-affirming care. Accordingly, "Section 1557 bars discrimination against treatment for pregnancy and childbirth *but not treatment for gender dysphoria*." *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646, 670 (9th Cir. 2025) (emphasis added).

Plaintiffs' Supplemental Brief is an exercise in verbal acrobatics. They insist, on the one hand, that *Skrmetti* is inapplicable here because the Court there discussed *Bostock* and Title VII rather than Section 1557. Yet they argue, in the next breath, that the "statutory protections" for gender-affirming medical care under Section 1557 are those arising under *Bostock* and Title VII. Stated another way, Plaintiffs assert that Section 1557 incorporates protections for gender-affirming medical care arising under *Bostock* and Title VII, but nonetheless insist that we must ignore what *Skrmetti* says about the protections for gender-affirming medical care arising under *Bostock* and Title VII.

Plaintiffs cannot have it both ways; they cannot invoke the principles of *Bostock* and Title VII but avoid the Supreme Court's most recent explanation of those principles.

3

## II.
## ARGUMENT AND AUTHORITIES

Plaintiffs contend that Section 1557 incorporates legal protections for gender-affirming facial surgery.  Prior to *Skrmetti*, Plaintiffs pointed unabashedly to *Bostock* as the source of those protections.  Now that *Skrmetti* has specifically explained how *Bostock* operates in the context of gender-affirming medical care, however, Plaintiffs insist that there must somewhere exist some other legal authority extending free-standing protections to gender-affirming medical care wholly independent of *Skrmetti*.

Their Supplemental Brief never clearly explains where these other supposed protections come from, however.  Sometimes, they are attributed to Title IX.  *See, e.g.,* Pltfs' Supp. Br. at 2, 4, 5, 8.  Eventually, however, Plaintiffs turn, as they must, to the concession that the protections under Title IX are those arising under Title VII, that "courts in this Circuit look to Title VII to interpret Title IX—as incorporated into Section 1557."  *Id.* at 11; *see also id.* at 12.  And, finally, they return right back to where they started—to *Bostock*.  *See, e.g., id.* at 11-15.  Which, in the context of gender-affirming medical care, ultimately means *Skrmetti*.

There is no free-standing body of law protecting gender-affirming medical care in the context of health benefits coverage apart from the principles enunciated by the Supreme Court in *Skrmetti*.  Plaintiffs cannot avoid that governing law here.

**A.**  ***Skrmetti*'s Analysis Governs Plaintiffs' Discrimination Claims Under Section 1557.**

Plaintiffs argue that *Skrmetti* involved a claim under the Equal Protection Clause and that "*Skrmetti*'s holding therefore does not disturb Supreme Court and Second Circuit precedent for statutory sex discrimination claims under Section 1557 and Title IX."  Pltfs' Supp. Br. at 4.  But Plaintiffs cite no precedent—Supreme Court, Second Circuit, or otherwise—holding that Section 1557 or Title IX, by themselves, extend statutory protections to gender-affirming facial surgery.

4

Rather, any protections for transgender individuals as relevant here have always been those defined by Title VII, as interpreted by the Supreme Court in *Bostock*.  In fact, prior to *Skrmetti*, when they were more forthright in their arguments, Plaintiffs freely acknowledged this: "While *Bostock* is a Title VII case, its logic applies with the same force here. … It is immaterial that Title VII prohibits discrimination 'because of sex' and Title IX prohibits discrimination 'on the basis of sex. … *Bostock* itself uses the phrases "because of sex' and 'on the basis of sex' interchangeably." *See* Mot. at 26 n. 5.  And, even now, the case law inescapably leads them back to that same foundational truth: "[C]ourts in this Circuit look to Title VII to interpret Title IX— as incorporated into Section 1557."  Pltfs' Supp. Br. at 11.

Indeed, the Title IX cases addressing transgender rights that Plaintiff cite in their motion confirm this very point.  *See* Mot. at 27.  Those cases all involved, not Section 1557 or gender-affirming medical care, but rather school restroom accommodations, and each court expressly relied upon Title VII and *Bostock* as the basis for Title IX protections.  *See, e.g., A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("Applying *Bostock*'s reasoning to Title IX we have no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 973 F.3d 586, 616 (4th Cir. 2020) ("Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX."); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047 (7th Cir. 2017) (pre-*Bostock* case; "[T]his court has looked to Title VII when construing Title IX.").

Plaintiffs argue that the standards applicable under Title VII and Title IX are different than those under the Equal Protection Clause.  *See* Pltfs' Supp. Br at 5.  While that may be true as a general proposition, Plaintiffs cannot avoid *Skrmetti*'s analysis of Title VII and *Bostock*—

the very source of the "statutory protections" they assert here.  The Ninth Circuit rejected this same argument in *Pritchard*, holding that *Skrmetti*'s analysis applies to Section 1557:

> Plaintiffs try to distinguish *Skrmetti*, cabining it to the constitutional context. Though *Skrmetti* was a constitutional case, its logic reaches more broadly. *Skrmetti* applied the *Bostock* test, which arose in "the Title VII context," not the constitutional context. 145 S. Ct. at 1834. *Skrmetti* did not decide "whether *Bostock*'s reasoning reaches" constitutional claims. *Id.* Even "[u]nder the reasoning of *Bostock*," however, the statute did not discriminate based on sex. *Id.* Thus, Plaintiffs may be right that sex discrimination works differently in constitutional and statutory cases. But because Skrmetti assumed without deciding that the standards were identical, Skrmetti's gloss on Bostock applies to statutory cases like this one.

159 F.4th at 670 (emphasis added).  *See also Lange v. Houston Co.,* 152 F.4th 1245, 1253 (11th Cir. 2025) (*en banc*) (employee health insurance plan) ("In *Skrmetti*, the plaintiffs argued that, under the reasoning of *Bostock*, they had been discriminated against based on sex and transgender status.  The Supreme Court's analysis of *Bostock* is why the Court rejected that argument.").

Indeed, the Supreme Court itself has clearly signaled that its decision in *Skrmetti* applies to statutory actions under Section 1557.  Following its decision in *Skrmetti*, the Supreme Court vacated a Fourth Circuit decision that relied on *Bostock* in holding that insurance plans violated Section 1557 by excluding coverage for gender-affirming care.   In *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), the plaintiffs contended that two defendant healthcare plans violated Section 1557 because they covered medically necessary treatments for certain diagnoses but barred coverage of those same medically necessary treatments for a diagnosis unique to transgender patients.  *Id.* at 133.  The district court granted summary judgment for the plaintiffs and the Fourth Circuit affirmed; both courts relied on *Bostock*.  *Id.* at 164.

In their briefing here, submitted prior to the *Skrmetti* decision, Plaintiffs relied heavily on both the Fourth Circuit and district court opinions in *Kadel*.  *See* Mot. at 26-29, 33; Plaintiffs' Reply in Support of Motion for Preliminary Injunction [Dkt. 114] ("Pltfs' Reply") at 14-15, 19.

They cite the Fourth Circuit opinion, for example, for the proposition that a classification based on medical use is discriminatory where it necessarily turns on gender identity. Mot. at 26. But, again, *Skrmetti* expressly rejected that argument, holding that a classification based on medical use is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex," including transgender status. 605 U.S. at 511-12, 517.

Indeed, on June 30, 2025, the Supreme Court vacated and remanded *Kadel*, "for further consideration in light of…*Skrmetti*." *See Folwell v. Kadel*, ⸺ U.S. ⸺, 145 S.Ct. 2838, 222 L.Ed.2d 1124 (2025). And the Fourth Circuit thereafter vacated its opinion in light of *Skrmetti* and remanded the matters. *Kadel v. Folwell*, No. 22-1721, 2025 WL 2740363 (4th Cir. Sept. 23, 2025). As the Ninth Circuit noted in *Pritchard*, "[W]hen the Supreme Court handed down *Skrmetti*, it held *Kadel* was no longer good law." 159 F.4th at 670. And the Supreme Court's handling of *Kadel* confirms that its reasoning in *Skrmetti* applies in the context of Section 1557.

In sum, there is no legal authority for Plaintiffs' proposition that Title IX, by itself, creates any free-standing protections for gender-affirming medical care; protection for transgender individuals has always been based on Title VII and *Bostock*. Nor are Plaintiffs correct in their insistence that *Skrmetti* applies only in the Equal Protection context; the Supreme Court itself has made clear that its reasoning applies equally to actions under Section 1557. Plaintiffs cannot avoid *Skrmetti*'s application of *Bostock*'s reasoning to gender-affirming medical care or to their Section 1557 action here.

**B.    Plaintiffs Cannot Show a Clear or Substantial Likelihood of Success on the Merits Under *Skrmetti*.**

Section B of Plaintiffs Supplemental Brief is an amalgam of Title IX case law that is inapplicable here and Title VII case law governed, in the context directly relevant to their claims,

by *Skrmetti*.  They strive mightily to cite a plethora of cases that have no bearing on their claims while strenuously avoiding discussing the one Supreme Court opinion that does.

1.  **The Second Circuit motivating-factor case law is inapplicable here and, in any event, cannot override the governing precedent of *Skrmetti*.**

Plaintiffs assert that "Section 1557 sex discrimination claims are governed by a motivating-factor causation standard."  Pltfs' Supp. Br. at 8.  Plaintiffs seem to suggest throughout their Supplemental Brief that there exists a body of case law in the Second Circuit that extends protections to gender-affirming medical care under Title IX wholly independent of Title VII, *Bostock* and *Skrmetti*.  *See id.* at 2, 4, 8.  But this is pure fiction.

First, Plaintiffs rely on Second Circuit case law under Title IX that does not involve Section 1557, health insurance, transgender rights, or medical care.  *See* Pltfs' Supp. Br. at 2, 8, 11, 12.  Their two primary authorities, *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082 (2d Cir. 2024) and *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016), both involved claims of sex-bias by male plaintiffs arising from sexual harassment investigations by educational institutions. *See Schiebel*, 120 F.4th at 1089; *Columbia Univ.*, 831 F.3d at 48.  Plaintiffs cite two other sexual harassment cases also involving educational institutions, *Yusuf v. Vassar Coll.*, 35 F.3d 709, 711 (2d Cir. 1994) and *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 47 (2d Cir. 2006).   These cases are all straight-forward Title IX decisions in the educational context; none involved transgender individuals or addressed gender-affirming medical care.  And none arose under Section 1557.

Moreover, as the caselaw Plaintiffs cite demonstrates, the Second Circuit has applied the motivating factor test principally in Title IX cases arising in the educational context (for example, school disciplinary actions). *See, e.g., Schiebel*, 120 F.4th at 1096 ("[T]he plaintiff must show that sex-based bias was a motivating factor in the [school's] decision to discipline."); *Columbia Univ.*, 831 F.3d at 53 ("Because Title IX prohibits … subjecting a person to

discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline."); *Yusuf*, 35 F.3d at 715 ("Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."). Plaintiffs' claim here arises in an entirely different context, of course, and the motivating factor test does not apply—nor can it override *Skrmetti*'s framework for analyzing gender-identity discrimination claims in the context of gender-affirming medical care.

In short, Plaintiffs cite no authority for the proposition that the Second Circuit has ever applied the motivating factor analysis of Title IX to any case involving transgender rights or gender-affirming medical care, much less to such a claim under Section 1557. This is unsurprising since the original source of civil rights protections for transgender individuals was the Supreme Court's application of Title VII in *Bostock*. Indeed, the Second Circuit expressly declined, prior to *Bostock*, to "hold that Title VII's prohibition of discrimination 'because of ... sex' encompasses discrimination on the basis of sexual orientation." *Christiansen v. Omnicom Group, Inc.*, 852 F.3d 195, 199 (2d Cir. 2017).

The putative "statutory protection" that Plaintiffs assert here thus arises from *Bostock*, not from Second Circuit case law applying the motivating factor test in contexts wholly unrelated to transgender rights or gender-affirming care. And the Supreme Court in *Skrmetti* has now addressed how those protections apply specifically in the context of gender-affirming care, and it is *Skrmetti*, not inapposite Second Circuit case law, that governs this case.

## 2. *Skrmetti* forecloses Plaintiffs' argument that Aetna's policy is presumptively motivated by discriminatory intent.

As discussed in Aetna's Supplemental Brief, Plaintiffs repeatedly argue that discriminatory motivation can be *presumed* or *inferred* from the face of Aetna's policy. They argue, for example, that "[w]hen a covered entity facially discriminates on the basis of sex, no

9

more evidence of motivation is required" and that "[b]ecause the GAFR Exclusion facially discriminates based on sex, no further inquiry into motivation is needed." *See* Mot. at 25, 30.

But *Skrmetti* expressly considered and rejected each of the factors that Plaintiffs posit here as triggers for such a presumption.

- ***First,*** **a classification based on medical use is not facially discriminatory**. *Skrmetti* holds that a policy, such as Aetna's here, which classifies based on medical use, is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex." 605 U.S. at 511-12. Aetna's policy, in the words of *Skrmetti*, "does not mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." 605 U.S. 514-15, 518-19. This is so even applying the "but-for" test of *Bostock*. *Id.* at 520-21. *See also Pritchard*, 159 F.4th at 670 (Blue Cross policy removed treatment for gender dysphoria from the range of conditions its insurance plans cover; "[w]ithout more, sex is a not a but-for cause of the exclusions' operation."); *Lange*, 152 F.4th at 1252 ("The County's policy does not pay for a sex change operation for anyone regardless of their biological sex," and thus "[n]othing about the policy exclusion turns on whether the County's employee is a man or woman.").

- ***Second***, **this is so, even if the classification references transgender status**. *Skrmetti* also held that a classification based on medical use, like Aetna's here, is not facially discriminatory, even though the policy expressly references transgender

status and gender-affirming care. 605 U.S. at 517-18. To hold otherwise "would be especially inappropriate in the medical context [where] [s]ome medical treatments and procedures are uniquely bound up in sex." *Id.* at 512. "[A] prohibition on the prescription of [particular medical services] to treat gender dysphoria, gender identity disorder, or gender incongruence" does not "reflect[] a sex-based classification." *Id.* at 515. Nor does Aetna's clinical policy, which on its face classifies different procedures based on whether they are considered medically effective, "classify on the basis of transgender status." *Id.* at 517. *See also Pritchard*, 159 F.4th at 670 (Blue Cross policy was not discriminatory even though it made "direct references to transgender status" because "*Skrmetti* does not focus on whether anyone refers to transgender status or, equivalently, sex."); *Lange*, 152 F.4th at 1253 ("The Court [in *Skrmetti*] said point blank: 'Under the reasoning of *Bostock*, neither [the plaintiff's] sex *nor his transgender status* is the but-for cause of his inability to obtain' the prohibited treatment.") (quoting *Skrmetti*, 605 U.S. at 521) (original emphasis)).

- *Third,* classification of *procedures* based on medical use is not sex stereotyping. *Skrmetti* also held that "allegations of sex stereotyping are misplaced," even where a policy references transgender status, where the policy applies classifications based on medical use that "are neither covertly nor overtly based on sex." *Id.* at 516. "[W]e reject the plaintiffs' argument that, 'by design, SB1 [which classified based on medical use] enforces a government preference that people conform to expectations about their sex.'" *Id*. *See also Pritchard*, 159 F.4th at 671 (rejecting plaintiff's argument that an exclusion for gender reassignment is discriminatory because it necessarily equates with transgender status: "[T]he statute in *Skrmetti* also targets care leading to gender

11

reassignment. It bars 'a medical procedure if the performance or administration of the procedure is for the purpose of,' among other things, '[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex.' We cannot distinguish *Skrmetti* this way."); *Lange*, 152 F.4th at 1254 (County plan exclusion "is not based on stereotypes" because "[o]n the contrary, the plan excludes coverage for a suite of medical procedures that change the appearance of a person's sex organs—regardless whether the goal is to differ from, or align with, natal sex.").

- ***Finally*, a classification is not discriminatory simply because it allows a medical treatment for some conditions and not others**. *Skrmetti* recognized that "a key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address" and where certain medical procedures "can be used to treat certain overlapping indications (such as gender dysphoria), and each can be used to treat a range of other conditions," a classification based on medical use "does not turn on sex." *Id.* at 513-14. *See also Lange*, 152 F.4th at 1252 (While County plan would deny coverage for procedures performed as part of a sex change operation, "these procedures would be covered when required because of medical conditions, such as cancer or injuries from a car accident, for an employee of either sex (subject to the policy's other exclusions). Under the logic of *Bostock*, then, sex is simply not a but-for cause."); *Brandt by through Brandt v. Griffin*, 147 F.4th 867, 879 (8th Cir. 2025) ("The Act allows healthcare professionals to provide drugs or surgical services to address some medical concerns, but it bars healthcare professionals from providing those drugs or surgeries for other purposes. The Act thus classifies based on medical procedure, treating different medical procedures differently. … The Act does not classify based on sex.").

*Skrmetti* squarely holds that none of these factors are facially discriminatory or otherwise suspect. And Plaintiffs point to no authority—Second Circuit or otherwise—for the proposition that these same factors can nonetheless trigger a presumption of discriminatory motivation in the context of gender-affirming medical care.

Moreover, even assuming, for argument's sake, that the motivating-factor test applies here, Plaintiffs' claim would still fail because—apart from their insistence that motivation can simply be presumed from factors *Skrmetti* expressly rejects—they have offered no "additional evidence [to] allow the inference that the discrimination was based on sex." *Schiebel*, 120 F.4th at 1096-97. Courts analyze several factors in determining whether discrimination was a motivating factor: (1) an "erroneous outcome," (2) "selective enforcement," (3) "deliberate indifference," and (4) "archaic assumptions." *Id.*; *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019); *Mallory v. Ohio Univ.*, 76 Fed. App'x. 634, 638–39 (6th Cir. 2003). To prove "deliberate indifference," for example, a plaintiff "must show that the [defendant] was deliberately indifferent to the truth or falsity of the accusations of sexual misconduct made against him." *Schiebel*, 120 F.4th at 1097.[3] Plaintiffs here merely assert that motivation can be presumed because they say Aetna's policy is "facially discriminatory" or "references transgender status" or "relies on impermissible sex stereotypes"—all of which *Skrmetti* expressly forecloses here. They resort to presumption alone because they cannot point to any of the "additional evidence" courts require

---

[3] One need only read *Schiebel* to recognize that the motivating factor test applied there is an analysis unique to claims of sexual harassment, particularly in the context of investigations by educational institutions. It would require considerable rewriting and extrapolation to apply those same principles to the context of gender-affirming medical care—which likely explains why Plaintiffs can cite no case where any court has ever even attempted to do so. Indeed, as Justice Thomas noted in his concurrence in *Skrmetti*, the Supreme Court has recently cautioned against presuming *Bostock's* reasoning extends to Title IX. 605 U.S. at 527, citing *Department of Ed. v. Louisiana*, 603 U. S. 866, 867 (2024) (per curiam) (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX).

13

would under the motivating factor test—for example, selective enforcement or deliberate indifference—even were that test applicable here.

Indeed, it is telling that Plaintiffs devote much of their Supplemental Brief to the argument that they need not prove the "medical necessity" of the facial surgery they seek, *see* Pltfs' Supp. Br. at 9-10, while at the same time asserting a motivating factor test that requires them to prove an "erroneous outcome" and "deliberate indifference." *See Schiebel*, 120 F.4th at 1096-97. The record here effectively negates any contention that Aetna's policy is motivated by any intent to discriminate against transexual individuals. *First*, it is undisputed that *every* request for coverage under Plaintiffs' employer-sponsored health benefits plans must be first considered "medically necessary" in order to qualify for coverage.[4]  *Second*, it is undisputed that Aetna's clinical policy allows coverage for most forms of gender-affirming care. *Third*, Aetna's clinical policy lists many other surgeries it considers cosmetic and not medically necessary, regardless of sex. *Finally*, the only concrete evidence in the record regarding Aetna's motivation for its policy

---

[4] The requirement that a requested service be "medically necessary" arises from the Plan documents of each employer. For example, Plaintiff Homnick's employer, Bausch & Lomb, stated in its Plan documents that it would only cover services that are "medically necessary," which the Plan defined as services "[i]n accordance with generally accepted standards of medical practice…that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community." Moreover, the requested service must be "considered effective for your illness, injury or disease." *See* Bausch & Lomb 2024 Plan at 64; Bausch & Lomb 2025 Plan at 61. Plaintiff Herley's MTA Plan likewise provided that it would only cover services that are "medically necessary." *See* MTA Plan at 35.

The medical necessity requirement in both employers' Plans applies to *all* services, not just those related to gender-affirming care or facial surgery. As Aetna discussed in its earlier briefing, its clinical policy does not question the efficacy of gender-affirming facial surgery because the individuals seeking the treatment are transgender. Nor does it apply a different medical necessity standard to gender-affirming facial surgery than it applies to other services. As with *any* medical procedure, the question is whether there is sufficient evidence at the present time to demonstrate that the particular procedure (facial surgery) is an *effective* treatment for the particular condition (gender dysphoria)—that is, whether the same degree of medical evidence exists for gender-affirming facial surgery as exists for the other, more common gender-affirming procedures Aetna already covers. And Aetna applies the policy to all gender-affirming procedures regardless of sex.

is Aetna's own explanation that there currently exists no general consensus in the medical and scientific community that the narrow subset of gender-affirming facial surgeries at issue here are medically effective treatments for gender dysphoria.[5]

In Plaintiffs' telling, they do not have to prove much of anything beyond disagreeing with Aetna's clinical policy because it addresses treatment for gender dysphoria. They assert that discriminatory motivation is self-evident from the face of Aetna's policy, but *Skrmetti* has now foreclosed that argument. So, they turn instead to a motivating factor test that the Second Circuit has never applied in this context and that, in any event, Plaintiffs cannot prove.

### 3.    *Skrmetti* forecloses Plaintiffs' argument based on sex stereotyping.

Ignoring the plain language of *Skrmetti*, Plaintiffs next insist that "*Skrmetti* did not change Supreme Court or Second Circuit precedent regarding unlawful discrimination based on sex stereotyping." Pltfs' Supp. Br. at 12. But, again, they rely entirely on case law involving neither Section 1557 nor gender-affirming medical care. *See id.* at 12-13. And, indeed, that case law ultimately confirms that *Skrmetti* is the controlling precedent here and that Aetna's clinical policy is not discriminatory.

Plaintiffs rely principally on *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112 (2d Cir. 2018), *aff'd sub nom.*, *Bostock*, 590 U.S. 644. Pltfs' Supp. Br. at 3, 12, 13 14. That case involved a sex discrimination claim under Title VII where the plaintiff alleged that he was fired from his job because he failed to conform to male sex stereotypes by referring to his sexual orientation. 883 F.3d at 107. The case ultimately was consolidated with, and decided by the Supreme Court in, *Bostock. See* 590 U.S. at 644. Thus, whatever its precedential value here, the *Zarda* decision is part of the *Bostock* line of case law—which *Skrmetti* applied to gender-affirming medical care,

---

[5] The Court in *Skrmetti* likewise noted the "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Skrmetti*, 605 U.S. at 525.

enunciating the principles that govern here. *Zarda* creates no protections for gender-affirming medical care independent of those recognized in *Skrmetti*.

Moreover, *Zarda* ultimately supports the conclusion that Aetna's policy here is not discriminatory, even under Second Circuit law. The court there posed the issue: "Accepting that sex stereotyping violates Title VII, the crucial question is what constitutes a gender-based stereotype." 883 F.3d at 120. The court then identified two inquiries that could be used to answer that question. First, courts may consider "whether the employer who evaluated the plaintiff in 'sex-based terms would have criticized her as sharply (or criticized her at all) if she had been a man.'" *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)). Alternatively, "the question of whether there has been improper reliance on sex stereotypes can sometimes be answered by considering whether the behavior or trait at issue would have been viewed more or less favorably if the employee were of a different sex." *Id.*

*Zarda* did not address gender-affirming medical care but rather was limited to the narrow employment issue ultimately decided in *Bostock*. *See Bostock*, 590 U.S. at 681 ("The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"). Assuming, *arguendo*, that the *Zarda* analysis even applies here, however, *Skrmetti*'s reasoning squarely answers favorably to Aetna the two sex stereotyping inquiries posed in *Zarda*. Aetna's clinical policy here is sex neutral. Aetna's CPB 615 classifies as not medically necessary (i.e. not shown to be effective) both *feminization* (male-to-female) and *masculinization* (female-to-male) facial surgery. *See* Aetna's Opposition to Plaintiffs' Motion for Preliminary Injunction, Goellner Declaration, Ex. F [Dkt. 86-6]. Similarly, Aetna's CPB 31 excludes cosmetic facial surgeries generally, for *all individuals*, except where the procedure has

a well-established functional purpose, such as reconstruction following cancer treatment or traumatic injury—an exception Aetna applies, again, irrespective of sex or transgender status. Aetna's policy, in the words of *Skrmetti*, "does not mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." 605 U.S. 514-15, 518-19.

Once again, Plaintiffs' argument necessarily circles back to *Bostock* and, ultimately, *Skrmetti*. There is no independent body of Supreme Court or Second Circuit case law that addresses gender-affirming medical care.[6]

### 4. Plaintiffs have neither pleaded nor proven a proxy-discrimination theory and cannot support a preliminary injunction on that ground.

Plaintiffs also argue that "*Skrmetti* did not foreclose that Plaintiffs have an avenue to a likelihood of success on the merits of their claim under a theory of proxy discrimination." Pltfs' Supp. Br. at 14. As discussed below, the question of whether, and to what extent, a proxy-

---

[6] Plaintiffs cite two pre-*Bostock* cases, *Flack v. Wis. Dept. of Health Servs.*, 328 F.Supp.3d 931 (W.D. Wis. 2018) and *Tovar v. Essentia Health*, 342 F.Supp.3d 947 (D. Minn. 2018) that addressed gender-affirming care in the context of Section 1557. Both cases involved categorical exclusions for all gender transition services. 328 F.Supp.3d at 934; 342 F.Supp.3d at 950. As the Supreme Court later did in *Bostock*, both courts looked to Title VII for guidance. 328 F.Supp.3d at 949 n. 23; 342 F.Supp.3d at 952.

Plaintiffs cite *Flack* for the proposition that an exclusion for "transgender surgery" is a "straight-forward case of sex discrimination" because it has an "inextricable link" with sex and "feeds into sex stereotypes." Pltfs' Supp. Br. at 11-12, 13. They cite *Tovar* for the same proposition, that an exclusion for "gender reassignment" procedures constitutes sex discrimination. *Id.* at 12

As discussed above, the Supreme Court considered and expressly rejected all these arguments in *Skrmetti*. *See* 605 U.S. at 511-12, 515-17. Moreover, the Supreme Court's subsequent action in vacating the Fourth Circuit decision in *Kadel* further cements the conclusion that the propositions for which Plaintiffs cite *Flack* and *Tovar*, just as they cited similar propositions from *Kadel*, are "no longer good law" after *Skrmetti*. *See Pritchard*, 159 F.4th at 670.

discrimination theory can survive *Skrmetti*—particularly in the context of Aetna's narrow policy here—remains open.[7]  What is clear, however, is that Plaintiffs have no pleading or evidence to support any proxy theory sufficient to support the unusual injunction they seek.  And, for present purposes, that lack of pleading and proof is all that matters.

The Ninth Circuit held in *Pritchard* that *Skrmetti* left open a "potential opportunity" for the plaintiffs there under a proxy discrimination theory.  159 F.4th at 671.  The court noted that the plaintiffs in *Pritchard* specifically argued that the defendant's actions "are a pretext for 'invidious discrimination,' [an] argument [] based on a proxy-discrimination theory."  *Id.* Setting aside for the moment the questions of what such a theory entails and whether Plaintiffs can prove such a theory here, it suffices for present purposes to note that, unlike the plaintiffs in *Pritchard*, Plaintiffs have alleged no proxy-discrimination theory in this case.  Plaintiffs currently are on their third complaint—they have already amended twice[8]—and nowhere have they alleged that Aetna's clinical policy is a mere pretext for invidious discrimination or asserted a theory of proxy discrimination.  The Court should not grant the injunctive relief they seek based on a legal theory they have not even alleged.

Moreover, as support for their proxy theory, Plaintiffs once again rely on the Second Circuit opinion in *Zarda*—one of the cases that ultimately became *Bostock*.  *See* Pltfs' Supp. Br. at 14.  In *Zarda*, the Second Circuit described the proxy discrimination test as follows: "We understand that its purpose is to determine when a trait other than sex is, in fact, a proxy for sex.  To determine whether a trait is such a proxy, the test compares a female and a male employee who both exhibit the trait at issue. In the comparison, the trait is the control, sex is the independent variable,

---

[7] *See* discussion at p. 20, *infra.*

[8] *See* Original Complaint – Dkt No. 1 (filed 9/10/24); First Amended Complaint – Dkt No. 46 (filed 12/3/24); Second Amended Complaint – Dkt No. 60 (filed 2/28/25).

and employee treatment is the dependent variable." 883 F.3d at 116-17. The court then examined two Supreme Court cases: *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711-13 (1978) (where the Court addressed a retirement plan that required female employees to make larger pension contributions than their male colleagues) and *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989) (where the Court "asked whether a female accountant would have been denied a promotion based on her aggressiveness and failure to wear jewelry and makeup if she had been a man."). 883 F.3d at 117. Based on that case law, the court in *Zarda* concluded, "To determine whether a trait operates as a proxy for sex, we ask whether the employee would have been treated differently "but for" his or her sex." *Id.* at 119.

The proxy-discrimination theory applied by the Second Circuit in *Zarda* thus invokes the same "but-for" causation test the Supreme Court later adopted in *Bostock*—and applied to gender-affirming medical care in *Skrmetti*. And it is not at all apparent—nor do Plaintiffs even attempt to explain—how the "but-for" proxy discrimination test of *Zarda* would produce any different result here than the *Bostock* "but-for" test the Supreme Court just addressed in *Skrmetti*. This is especially so in the context of gender-affirming care, where *Skrmetti* so clearly holds that—even under the "but-for" test of *Bostock*—a classification based on medical use, is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex," including transgender status. 605 U.S. at 511-12, 517. Nor does such a classification "mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 514-15, 518-19.

The Second Circuit acknowledged in *Zarda* that "the Supreme Court has not elaborated on the role that the [comparative] test plays in Title VII jurisprudence," *see* 883 F.3d at 166, though *Skrmetti* now squarely answers that question with respect to gender-affirming medical care. Moreover, the Supreme Court, following its decision in *Skrmetti*, clearly signaled how that test works in the context of Section 1557 when it vacated the Fourth Circuit decision in *Kadel*. In that case, the Fourth Circuit applied a proxy-discrimination theory in the context of Section 1557 and an insurance plan that wholly excluded coverage for gender-affirming care. 100 F.4th at 133. In its opinion, the court stated: "we answer the following questions, starting from the premise that gender identity is a protected characteristic. … (1) Is gender dysphoria a proxy for transgender identity?, (2) Can proxy discrimination be facial discrimination?, and (3) In this case, is discrimination on the basis of gender dysphoria discrimination on the basis of gender identity? We also address whether the coverage exclusions discriminate on the basis of sex. We answer each of these questions in the affirmative." *Id.* at 143. The Fourth Circuit also observed, "There is no caselaw to ground this discussion nor obvious first principles to work from." *Id.*

*Skrmetti* now provides that caselaw and the first principles that govern here. And in vacating *Kadel*, the Court calls into question whether a proxy-discrimination theory is viable in the context of gender-affirming care—certainly, nothing in *Skrmetti* itself or in the Supreme Courts' rejection of *Kadel* suggests that a proxy-discrimination "but-for" test would produce any different result in the context of gender-affirming medical care than the *Bostock* "but-for" test applied in *Skrmetti*.[9]

---

[9] Plaintiffs concede that there is nothing in the record before this Court to support a pretext theory. "Plaintiffs may also be able to show, following discovery, that Aetna's purported justifications are pretext for intentional sex-based discrimination that can be demonstrated by circumstantial evidence." Pltfs' Supp. Br. at 3 n. 1. Nor do they have any pleading articulating any pretext or proxy claim. *See* Am. Compl. But to the extent Plaintiffs would seek to assert a cause of

**C.      Plaintiffs Cannot Prevail Under a But-For Causation Standard Under *Skrmetti*.**

In Section C of their Supplemental Brief, Plaintiffs essentially ask this Court to simply disregard *Skrmetti* and to ignore binding precedent and clear guidance from the Supreme Court directly dispositive of Plaintiffs' claims here.

**1.      *Skrmetti* is not dicta; its analysis of *Bostock* is controlling here.**

Plaintiffs first assert that *Skrmetti*'s analysis of *Bostock* in the context of gender-affirming medical care is dicta.  They premise their argument on the theory that *Skrmetti* "applies a more stringent standard than the motivating factor causation standard applied to Section 1557 claims." *See* Pltfs' Supp. Br. at 16.  But, as discussed above, no standard has ever been articulated for Section 1557 other than that under Title VII and *Bostock*.  Indeed, Plaintiffs themselves have always rested their claims on *Bostock*.  *See* Mot. at 26 n. 5; *see also id.* at 23-31.  In fact, they still do.  *See* Pltfs' Supp. Br. at 11-15.

"It is passing strange [to] rely extensively on *Bostock*, and, at the same time, reject the Supreme Court's own explanation of what *Bostock* means."  *Lange*, 152 F.4th at 1254.  "We have said many times that the holding of a case comprises both the result of the case and those portions of the opinion necessary to that result.  Under that standard, *Skrmetti*'s holding about the meaning of *Bostock* is binding on us unless and until the Supreme Court says otherwise.  As lower court judges, we cannot shut our ears when the Supreme Court tells us how to apply its precedents."  *Lange*, 152 F.4th at 1254. *See also Pritchard*, 159 F.4th at 670 ("Though *Skrmetti* was a constitutional case, its logic reaches more broadly. … [B]ecause *Skrmetti* assumed without deciding that the standards [under Title

---

action for proxy-discrimination under *Zarda*, such a claim would fair no better under *Skrmetti* than their theory under *Bostock*—both apply the same "but-for" standard.  If Plaintiffs mean to assert some other claim, one based on a theory of invidious discrimination, then they have to no pleading or evidence to support such a claim.  In sum, neither theory supports the preliminary injunction presently before the Court.

21

VII and the Equal Protection Clause] were identical, *Skrmetti*'s gloss on *Bostock* applies to statutory [Section 1557] cases like this one.").

The Second Circuit applies the same standard: "We are bound not only by the result of a Supreme Court opinion, but also those portions of the opinion necessary to that result." *Sohm v. Scholastic Inc.*, 959 F.3d 39, 52 (2d Cir. 2020) (quoting *Seminole Tribe of Fla. V. Florida*, 517 U.S. 44, 67 (1996)); *see also CompassCare v. Hochul*, 125 F.4th 49, 59 (2d Cir. 2025) (noting "a portion of the [Second Circuit's] opinion necessary to the result" is "precedent"). *See also Baroni v. Port Auth. of New York & New Jersey,* 161 F.4th 48, 57 (2d Cir. 2025) ("[W]e are bound to follow the existing precedent of the Supreme Court until that Court tells us otherwise."); *Ramirez v. Town of Oxford,* No. 3:21-CV-240 (JAM), 2022 WL 3646203, at *9 (D. Conn. Aug. 24, 2022) ("[T]he result in a given Supreme Court case binds all lower courts [and] the reasoning of a Supreme Court case also binds lower courts.").

Indeed, the Supreme Court's own actions refute the notion that its decision in *Skrmetti* is mere dicta in the context of Section 1557. As discussed previously, the Court vacated, "for further consideration in light of…*Skrmetti*," the Fourth Circuit's decision in, *Kadel*, 100 F.4th 122, which was the leading case under Section 1557 prior to *Skrmetti* and the centerpiece of Plaintiffs' previous briefing here. *See Folwell v. Kadel*, ⸻ U.S. ⸻, 145 S.Ct. 2838, 222 L.Ed.2d 1124 (2025). And the Fourth Circuit itself thereafter vacated its own opinion in *Kadel* in light of *Skrmetti*. *See Kadel v. Folwell*, No. 22-1721, 2025 WL 2740363 (4th Cir. Sept. 23, 2025). The Fourth Circuit certainly did not treat *Skrmetti* as mere dicta in the Section 1557 context.

Plaintiffs here, like the plaintiffs in *Skrmetti*, argue that they were discriminated against based on sex and transgender status in the context of gender-affirming medical care, and they rely on the

reasoning of *Bostock*. But "[t]he Supreme Court's analysis of *Bostock* is why the Court rejected that argument" in *Skrmetti*, *see Lange*, 152 F.4th at 1253, and the same analysis applies equally to Plaintiffs' claims here.

### 2.    Plaintiffs' claims fail the but-for test as applied in *Skrmetti*.

Finally, Plaintiffs insist that "*Skrmetti* does not disturb the facial discrimination, sex stereotyping, and proxy theories" they assert here.[10] Plaintiffs simply ignore the plain language of *Skrmetti*.

The Supreme Court in *Skrmetti* explicitly held that a classification, like Aetna's here, which classifies based on medical use, is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex," even if the policy references transgender status and gender-affirming care. 605 U.S. at 511-12, 517-18. The Court expressly held further that under the "but-for" test of *Bostock*, "changing a minor's sex or transgender status does not alter the application of [the Tennessee law]," 605 U.S. at 520. The Court reasoned:

> If a transgender boy seeks testosterone to treat his gender dysphoria, SB1 prevents a healthcare provider from administering it to him. If you change his biological sex from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury. The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. *Under the reasoning of Bostock, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone.*

*Id.* at 520-21 (emphasis added). Relying on *Skrmetti*, the Ninth Circuit likewise held that a Blue Cross policy did not violate Section 1557 where it simply removed treatment for gender dysphoria from the range of conditions its insurance plans cover: "Without more, sex is a not a but-for

---

[10] As noted previously, Plaintiffs have no pleading to support a proxy theory. *See* p. 18, *supra*.

cause of the exclusions' operation." *Pritchard*, 159 F.4th at 670.  *See also Lange*, 152 F.4th at 1252 (While County plan would deny coverage for procedures performed as part of a sex change operation, "these procedures would be covered when required because of medical conditions, such as cancer or injuries from a car accident, for an employee of either sex (subject to the policy's other exclusions).  Under the logic of *Bostock*, then, sex is simply not a but-for cause.").

Moreover, Plaintiffs' attempt to apply the *Bostock* "but-for" test—and, by extension, any proxy-discrimination theory under *Zarda*—to their own claims only highlights the analytical flaws in their theories.  They argue:

> If Plaintiffs were assigned female at birth and sought coverage for medically necessary facial surgeries to reconstruct typically female features, CPB 0615 would not be an impediment—in fact, it would not factor into their coverage determination whatsoever.  Their claim would be evaluated under sex-neutral criteria, such as the plan definition of medical necessity, reconstructive surgery, and relevant sex-neutral CPBs (such as CPB 0031, "Cosmetic Surgery"). *See* ECF No. 62 at 32-33 (explaining the differential treatment by Aetna of transgender and non-transgender women requesting facial reconstruction surgeries).  Changing one thing—the Plaintiffs' sex assigned at birth—alters the outcome.

*See* Pltfs' Supp. Br. at 16-17.  Plaintiffs misstate Aetna's policy, however.  While it is unclear exactly what Plaintiffs mean by "reconstruct typically female features" in their hypothetical, Aetna's policy operates in a sex-neutral manner—and entirely consistent with *Skrmetti*—in each scenario:

- If Plaintiffs posit that the natal female in their hypothetical seeks facial surgery to "reconstruct typically female features" for the purpose of improving aesthetic appearance, then Aetna's CPB 31 would classify the surgery as cosmetic.  But the same would be true for a natal male seeking aesthetic facial surgery.

- If Plaintiffs posit that the natal female in their hypothetical seeks facial surgery to "reconstruct typically female features" for a functional purpose, such as

reconstruction following cancer treatment or traumatic injury, then Aetna's CPB 31 would classify the surgery as medically necessary.  And, again, the same would be true for natal male seeking functional surgery.

- If Plaintiffs posit that the natal female in their hypothetical seeks facial surgery to "reconstruct typically female features" to appear more masculine as a treatment for gender dysphoria, then Aetna's CPB 615 would apply because facial masculinization surgery has not been shown to be effective for that medical use.  But the same would be true for a natal male seeking facial feminization surgery for treatment of gender dysphoria.[11]

Aetna's clinical policy here is sex neutral; changing the sex of the subject individual does not change the outcome.  Aetna's CPB 615 classifies as cosmetic both *feminization* (male-to-female) and *masculinization* (female-to-male) facial surgery. *See* Dkt. 86-6.   Similarly, Aetna's CPB 31 excludes cosmetic facial surgeries generally, for *all individuals*, except where the procedure has a well-established functional purpose, such as reconstruction following cancer treatment or traumatic injury—which exception Aetna applies, again, irrespective of sex or transgender status. Aetna's policy, in the words of *Skrmetti*, "does not mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather

---

[11] Plaintiffs' use in their hypothetical of the term "reconstruct" is, at best, inapt, insofar as Plaintiffs seek coverage for surgeries to alter their natal facial appearance into a new form. This stands in contrast to a request to repair pre-existing features that were damaged during an accident or adverse medical event. A surgery to repair a facial feature that was damaged is not presumptively equivalent to a surgery to create a new facial aesthetic appearance.  This is especially so where, as here, there exists significant medical debate whether facial surgery is an effective treatment for gender dysphoria. At minimum, the logical disconnect further highlights the false syllogism at the heart of Plaintiffs' "but-for" discrimination allegations.

removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." 605 U.S. 514-15, 518-19.

It is not surprising that Plaintiffs ignore the substantive holdings, not only of *Skrmetti*, but also of *Pritchard, Lange, Kadel* and the rest of the post-*Skrmetti* case law, since it universally rejects the very arguments they make here. Indeed, the only other post-*Skrmetti* case they cite, *L.B. v. Premera Blue Cross*, 795 F. Supp. 3d 1311 (W.D. Wash. Aug. 12, 2025), actually supports Aetna's position here. In that case, the plaintiffs sued Blue Cross under Section 1557 because its plans excluded coverage for mastectomy or breast reduction surgery for "female to male patients" or "female to non-binary/gender neutral patients," but covered mastectomies for males to treat gynecomastia. *Id.* at 1312. The district court there held that the Blue Cross policies violated the *Skrmetti* but-for test because they provided breast surgery for males but not females, thus "treat[ing] minors differently with respect to insurance coverage for gender-affirming mastectomies based on their natal sex, as well as their transgender or cisgender status." *Id.*

But that is not how Aetna's clinical policy works here. Aetna's CPB 615 recognizes that most forms of gender-affirming care have been demonstrated to be medically effective for treatment of gender dysphoria. These treatments include genital and chest surgical procedures, as well as hormone therapy and psychotherapy. Indeed, Plaintiffs concede as much. *See* Am. Compl. at ¶¶ 8, 143. So, unlike the Blue Cross policy in *L.B*, Aetna's policy covers gender-affirming chest surgery, for *both* males and females.[12]

---

[12] Plaintiffs completely ignore the operative holding in *L.B.* and instead cite the case only for the proposition that *Skrmetti* is distinguishable because it involved an Equal Protection claim. *See* Pltfs' Supp. Br. at 6, 7. But the Washington district court's opinion there predates the Ninth Circuit decision in *Pritchard*, which governs in that circuit, and *Pritchard* expressly rejects the reasoning of that case that Plaintiffs assert here. *See Pritchard*, 159 F.4th at 670.

In sum, there is no material difference in the Aetna clinical policy at issue here from that which the Supreme Court upheld in *Skrmetti*.  In fact, Aetna's policy is much narrower than those in *Skrmetti*, *Pritchard*, *Lange*, or any of the other post-*Skrimetti* cases—it is applicable only to a limited set of facial surgeries, and Aetna applies that policy to males and females alike, regardless of sex.  Plaintiffs cannot escape the application of *Skrmetti* here.

## III.
## CONCLUSION

For the foregoing reasons, Aetna respectfully requests the Court deny Plaintiffs' motion for preliminary injunction.

Dated at Hartford, Connecticut this 30th day of January, 2026.

*Theodore J. Tucci*
Theodore J. Tucci (ct05249)
Abby M. Warren (ct30077)
Christopher A. Costain (ct31612)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel.: (860) 275-8200
Fax: (860) 275-8299
ttucci@rc.com
awarren@rc.com
ccostain@rc.com

Sarah Reeves (*pro hac vice*)
Earl B. Austin (*pro hac vice*)
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel.: (212) 408-2649
Fax: (212) 408-2449
sarah.reeves@bakerbotts.com
earl.austin@bakerbotts.com

*Counsel for Defendant*
*Aetna Life Insurance Company*

27