## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| BINAH GORDON, *et al.*,<br>    *Plaintiffs*,<br><br>        v.<br><br>AETNA LIFE INSURANCE COMPANY,<br>    *Defendant*. | No. 3:24-cv-1447 (VAB) |

### RULING AND ORDER ON PENDING MOTIONS

Binah Gordon, Kay Mayers, Alma Avalle, Jamie Homnick, Gennifer Herley, and S.N. ("Plaintiffs") filed a Complaint on behalf of themselves and a putative class of similarly situated individuals against Aetna Life Insurance Company ("Aetna" or "Defendant") alleging a violation of the prohibition of discrimination on the basis of sex in federally funded health programs and activities under Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"); Compl., ECF No. 1.

The Plaintiffs are transgender women who are seeking or have received gender-affirming facial reconstruction ("GAFR") which they allege is or was medically necessary to treat their gender dysphoria. Gender dysphoria is defined as "a marked incongruence between one's experienced/expressed gender and assigned gender of at least six months' duration," as manifested by at least two characteristics of an enumerated list. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed., text revision 2022) ("DSM-5").

They are or were enrolled in health insurance plans that are designed, sold, or administered by Aetna and funded by their or their spouses' employers. Aetna is a health insurance company that receives federal financial assistance, and is therefore required to comply

1

with the prohibition of discrimination on the basis of sex in federally funded health programs and activities under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

Aetna has filed a motion to dismiss the Second Amended Complaint asserting lack of standing under Article III of the United States Constitution, failure to join necessary and indispensable parties under Federal Rule of Civil Procedure 19, failure to exhaust statutory and administrative remedies, and failure to seek judicial review in accordance with the Federal Employees Health Benefit Act of 1959, 5 U.S.C. § 8901 *et seq.*, and its accompanying regulations, 5 C.F.R. § 890.101, *et seq.*

Dr. Homnick and Dr. Herley have filed a motion for a preliminary injunction against Aetna to enjoin the application of Aetna's Clinical Policy Bulletin 0615 ("CPB 0615"), which excludes gender-affirming facial reconstruction surgeries to treat gender dysphoria from medical insurance coverage.

For the following reasons, Aetna's motion to dismiss is **DENIED** and the motion for a preliminary injunction brought by Dr. Homnick and Dr. Herley is **GRANTED**.

As a result of this Ruling and Order, Aetna is required to make individualized coverage determinations as to Dr. Homnick and Dr. Herley only, on the basis of medical necessity, as opposed to categorically excluding their claims under CPB 0615.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

#### 1.   Aetna's Clinical Policy Bulletin 0615

An employer using a health insurance plan designed, sold, or administered by Aetna may allegedly choose whether to include or exclude certain benefits from coverage. Where a member's plan is silent on a particular benefit, Aetna allegedly uses its clinical policy bulletins

("CPB") to determine whether the procedure is medically necessary, as opposed to cosmetic, experimental, or unproven. Medically necessary procedures are generally a covered benefit. *See* Mem. in Support of Mot. for Prelim. Inj., 8-9, ECF No. 62 ("Mot. for Prelim. Inj.").

Aetna's clinical policy bulletin 0615 ("CPB 0615") governs medical necessity determinations, and subsequently coverage of gender-affirming surgery for transgender individuals. While certain gender transition procedures, like medically necessary breast and genital reconstruction, are covered under the policy, CPB 0615 allegedly characterizes all gender-affirming facial reconstruction when done to treat gender dysphoria as purely "cosmetic" rather than "medically necessary," thereby categorically excluding such treatment from coverage. *Id.* at 8. The policy states:

> "Aetna considers the following procedures that may be performed as a component of a gender transition as not medically necessary and cosmetic []:
> …
> Facial Gender Affirming Procedures, including: Brow (reduction, augmentation, lift); Hair line advancement and/or hair transplant; Facelift/mid-face lift (following alteration of the underlying skeletal structures) (platysmaplasty); Blepharoplasty (lipofilling); Rhinoplasty (+/- fillers); Cheek (implant, lipofilling); Lip (upper lip shortening, lip augmentation); Lower jaw (reduction of mandibular angle, augmentation); Chin reshaping (osteoplastic, alloplastic (implant-based)); Chondrolaryngoplasty (also known as Adam's apple reduction, thyroid cartilage reduction, or tracheal shave); Vocal cord surgery[.]"

*Gender Affirming Surgery, Clinical Policy Bulletin 0615*, Aetna Inc. (Mar. 7, 2026, at 11:08 a.m. ET), https://www.aetna.com/cpb/medical/data/600_699/0615.html.

Requests for facial reconstruction to treat a traumatic injury, illness, or congenital defect are generally granted or assessed for medical necessity on a case-by-case basis. *Id.* at 9. And Aetna covers facial reconstruction, even if coincidentally gender-affirming, to treat conditions unrelated to an individual's gender dysphoria. *Id.* at 9. When an individual requests coverage for facial reconstruction to treat gender dysphoria, however, Aetna's policy under CPB 0615

allegedly is to deny the request automatically without conducting an individualized medical necessity determination. *Id.* at 8-9.

### 2. The Plaintiffs

The six Plaintiffs in this case, Binah Gordon, Kay Mayers, Alma Avalle, Jamie Homnick, Gennifer Herley, and S.N. seek to bring a class action lawsuit on behalf of themselves and all similarly situated individuals against Aetna alleging a violation of Section 1557 of the Affordable Care Act. Ms. Gordon and Ms. N seek to represent a damages class and Ms. Avalle, Ms. Mayers, Dr. Homnick, and Dr. Herley seek to represent an injunctive and declaratory class.

#### i. Binah Gordon

Binah Gordon has allegedly suffered symptoms of gender dysphoria since childhood. Compl. ¶ 31. In 2019, Ms. Gordon began her gender transition and was formally diagnosed with gender dysphoria. Ms. Gordon has received gender-affirming treatments including feminizing hormone therapy, gender-affirming genital reconstruction surgery, and voice therapy. *Id.* ¶ 32. Despite these interventions, Ms. Gordon allegedly "continued to suffer from severe gender dysphoria specifically related to certain typically masculine facial features," which allegedly exacerbated symptoms of post-traumatic stress disorder and caused her to experience profound fear and anxiety about her safety and well-being. *Id.* ¶ 33. From 2021 to 2022, Ms. Gordon's medical providers determined that gender-affirming facial reconstruction was medically necessary to treat her gender dysphoria. *Id.* ¶¶ 36-38.

On July 1, 2022, Ms. Gordon enrolled in an Aetna plan as part of her Federal Employee Health Benefits ("FEHB") plan. *Id.* ¶ 39. In July 2022, Ms. Gordon allegedly applied for preauthorization for the prescribed medical care. *Id.* ¶ 40. On September 30, 2022, Aetna denied coverage for Ms. Gordon's requested services, citing CPB 0615. *Id.* ¶ 41. On March 27, 2023,

Ms. Gordon allegedly appealed Aetna's denial, *id.* ¶ 42, which Aetna once more denied on April 21, 2023, *id.* ¶ 43. On June 27, 2023, Ms. Gordon allegedly requested that the United States Office of Personnel Management ("OPM") conduct an external review of Aetna's denial. *Id.* ¶ 45.

OPM allegedly took months to respond to Ms. Gordon's request, *id.* ¶ 47, during which time she allegedly experienced "debilitating harms" such as panic attacks, depression, suicidality, post-traumatic stress disorder, and social avoidance, *id.* ¶¶ 44-47. Ms. Gordon allegedly began to seek money from crowdfund sources to pay for the out-of-pocket costs of the prescribed medical care. *Id.* ¶ 47. Ms. Gordon allegedly received $30,000 from a close friend, which enabled her to obtain this medical care without insurance coverage. *Id.* ¶ 48. Ms. Gordon received gender-affirming facial reconstruction on December 11, 2023, which allegedly cost $35,000. *Id.* ¶ 49. Since receiving GAFR, Ms. Gordon has allegedly experienced a significant decline in her symptoms of gender dysphoria and post-traumatic stress disorder. *Id.* ¶ 51.

OPM allegedly issued its determination, mostly reversing Aetna's denial, on November 21, 2023, but allegedly failed to notify Ms. Gordon of its decision until January 4, 2024. *Id.* ¶ 50. And on January 1, 2024, OPM allegedly began to require Aetna and other insurers to cover gender-affirming facial reconstruction surgeries under all Federal Employee Health Benefit Act ("FEHBA") plans administered by those insurers. *Id.* ¶ 148.

Ms. Gordon later left her employment and her FEHBA coverage allegedly lapsed effective December 31, 2023. Mot. to Dismiss at 8. Ms. Gordon allegedly retains the ability to request reimbursement for the gender-affirming facial reconstruction she received while still a member of the plan, but she allegedly has not yet made any requests. *Id.*

ii. <u>Kay Mayers</u>

Kay Mayers works for a public employer in Anchorage, Alaska. Compl. ¶ 52. Her plan is funded by the Anchorage School District and retains Aetna to act as claims administrator. Mot. to Dismiss at 8. Ms. Mayers has allegedly experienced gender dysphoria since childhood. Compl. ¶ 53. Ms. Mayers was diagnosed with gender dysphoria before 2021, when she began her transition. *Id.* ¶ 54. Ms. Mayers has received gender-affirming treatments including feminizing hormone therapy and gender-affirming surgical treatments. *Id.* ¶ 55. She alleges that as a child, she experienced physical violence associated with her gender presentation and has since "felt imperiled by her masculinized facial features when interacting with her community." *Id.* ¶¶ 59-60. Ms. Mayers' medical providers allegedly agree that gender-affirming facial reconstruction is medically necessary to treat her gender dysphoria. *Id.* ¶¶ 61, 63-64.

Ms. Mayers' health insurance plan covers "certain services and supplies for gender affirming (sometimes called sex change) treatment," but defers to Aetna's CPB 0615 "for detailed information about this benefit, including eligibility and medical necessity requirements." *Id.* ¶ 62. Ms. Mayers filed a pre-certification request, which Aetna denied on March 12, 2024, citing CPB 0615. *Id.* ¶ 65. Ms. Mayers appealed the decision, which Aetna again denied on October 15, 2024. *Id.* ¶ 66. In December 2024, however, Aetna allegedly reversed its denial and preauthorized coverage for certain gender-affirming facial reconstruction procedures. *Id.* Ms. Mayers has allegedly not yet received them.

### iii.  Alma Avalle

Alma Avalle has allegedly experienced gender dysphoria since childhood. Compl. ¶ 69. In July 2021, Ms. Avalle was diagnosed with gender dysphoria and began seeking treatment. *Id.* ¶ 72. In December 2021, Ms. Avalle began gender-affirming hormone replacement therapy, but her gender dysphoria allegedly persisted. *Id.* ¶ 74. In late 2022, Ms. Avalle's medical providers

found that gender-affirming facial reconstruction was medically necessary to treat her gender dysphoria. *Id.* ¶ 75.

Ms. Avalle is covered by a health benefit plan funded and sponsored by her employer, who retained Aetna to act as claims administrator. Mot. to Dismiss at 10. Ms. Avalle's plan is allegedly governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq. Id.* at 19. Ms. Avalle was allegedly aware of Aetna's CPB 0615, but she nonetheless applied for coverage. Compl. ¶ 76. Ms. Avalle allegedly began a fundraising campaign to pay for her prescribed medical care, *id.* ¶ 78, but allegedly only raised less than half of the out-of-pocket costs, *id.* ¶ 80. Aetna denied Ms. Avalle's application for prior authorization, which allegedly exacerbated her gender dysphoria and caused her to experience severe depression, eventually leading to her alleged indefinite medical leave of absence from work. *Id.* ¶¶ 81-82.

### iv.  Jamie Homnick

Jamie Homnick has allegedly suffered from gender dysphoria since she was a child. Compl. ¶¶ 84-85. In October 2023, Dr. Homnick began receiving gender-affirming treatments including hormone replacement therapy, voice therapy, and facial hair removal. *Id.* ¶ 87.

Dr. Homnick's health insurance plan is funded by her employer, Bausch & Lomb, who retained Aetna as the claims administrator. Mot. to Dismiss at 11. Dr. Homnick's plan is allegedly governed by ERISA. *Id.* at 19. Dr. Homnick's plan covers gender-affirming surgeries, subject to Aetna's CPB 0615. Compl. ¶ 89.

By June 2024, Dr. Homnick's primary care provider and therapist found that gender-affirming facial reconstruction was medically necessary. *Id.* ¶ 87. In August 2024, Dr. Morrison, a plastic surgeon, submitted a request for prior authorization to Aetna, who denied the request

the following month. *Id.* ¶ 88. Dr. Morrison allegedly appealed the decision, which Aetna once

more denied. *Id.* Dr. Morrison allegedly reached out to Dr. Homnick's employer to seek an

exception to the exclusion in her case, but the company allegedly denied Dr. Morrison's request.

*Id.* Dr. Homnick allegedly did not file a second-level appeal. Mot. to Dismiss at 12.

Dr. Homnick is unable to pay for gender-affirming facial reconstruction out-of-pocket,

and allegedly suffers from severe gender dysphoria, including severe depression and suicidality.

*Id.* ¶¶ 91-92. Dr. Homnick thus alleges that she will not be able to obtain gender-affirming facial

reconstruction so long as CPB 0615 remains in effect. *Id.* ¶ 92.

v.  <u>Gennifer Herley</u>

Gennifer Herley allegedly began experiencing gender dysphoria as a child. *Id.* ¶ 94. Dr.

Herley has received gender-affirming treatments including hormone replacement therapy, breast

augmentation, vaginoplasty surgery, facial hair removal, a hair transplant, and feminine makeup

tattooing. *Id.* ¶¶ 96-97. Despite these interventions, Dr. Herley continues to suffer from severe

and intensifying gender dysphoria. *Id.* ¶ 99.

Dr. Herley is covered under a health benefit plan sponsored by her wife's employer. Mot.

to Dismiss at 14. Her wife's employer retained Aetna to act as a third-party claims administrator.

*Id.* Dr. Herley's plan includes an administrative appeals process for the resolution of benefits that

includes two levels of appeals to Aetna as well as an external appeal to an independent external

review organization, whose decision is binding on Aetna. *Id.* at 14-15.

In November 2024, a plastic surgeon determined that gender-affirming facial

reconstruction was medically necessary for Dr. Herley. Compl. ¶ 100. Dr. Herley applied for

prior authorization for the prescribed medical care, but Aetna denied her request in mid-

December 2024. *Id.* Dr. Herley allegedly has neither appealed the denial to Aetna nor requested

external review. Mot. to Dismiss at 15. Because of the denial, Dr. Herley has allegedly experienced worsening symptoms of depression and anxiety related to her gender dysphoria. Compl. ¶ 100.

      vi.  <u>S.N.</u>

S.N. has allegedly experienced gender dysphoria since childhood. *Id.* ¶¶ 102-03. S.N. has paid out-of-pocket for gender-affirming treatments including hormone therapy, breast augmentation surgery, and a jaw reduction procedure. *Id.* ¶ 105. Nonetheless, S.N. allegedly continues to experience severe gender dysphoria because of her masculinized facial and vocal features. *Id.* ¶ 106. During the period in question, Ms. N was covered under a health insurance plan funded by her employer, who retained Aetna as a third-party claims administrator. Mot. to Dismiss at 15. Ms. N's plan is allegedly governed by ERISA. *Id.* at 19.

In 2019, her medical providers determined that gender-affirming facial reconstruction was medically necessary to treat her gender dysphoria. Compl. ¶ 107. In October 2022, Ms. N received GAFR, and her surgeon submitted a health insurance claim to Aetna for a total of $41,948. On December 8, 2022, Aetna denied her health insurance claim, stating that her procedures were cosmetic and therefore excluded from coverage. *Id.* ¶ 111. Ms. N's Aetna plan document allegedly covered certain gender-affirming services but relied on Aetna's clinical policy bulletins to determine eligibility and medical necessity requirements. *Id.* ¶ 112. On December 9, 2022, Ms. N allegedly appealed the claim denial and requested an external review. *Id.* ¶ 113. On January 17, 2023, Aetna allegedly relied on CPB 0615 to deny Ms. N's appeal. *Id.* ¶ 117. Because of Aetna's coverage denials, Ms. N allegedly paid for the surgery out of pocket. *Id.* ¶ 118. Ms. N allegedly left her employment and is no longer covered by an Aetna administered plan. Mot. to Dismiss at 31.

### B. Procedural History

On September 4, 2024, the Plaintiffs filed a Complaint on behalf of themselves and a putative class of similarly situated individuals against Aetna challenging Aetna's categorical exclusion of gender-affirming facial reconstruction procedures used to treat gender dysphoria. Complaint, ECF No. 1.

On December 3, 2024, the Plaintiffs filed an Amended Complaint. Am. Compl., ECF No. 46.

On March 3, 2025, the Plaintiffs filed a Second Amended Complaint. Second Am. Compl., ECF No. 60 ("Compl.").

On March 3, 2025, Jamie Homnick and Gennifer Herley separately filed a motion for a preliminary injunction to enjoin Aetna from enforcing the categorical exclusion of claims for gender-affirming facial reconstruction as outlined in Clinical Policy Bulletin 0615. Mot. for Prelim. Inj., ECF No. 61. On the same day, Dr. Homnick and Dr. Herley filed a memorandum in support of the motion for a preliminary injunction. Mem. in Support of Mot. for Prelim. Inj., ECF No. 62 ("Mot. for Prelim. Inj.").

On April 11, 2025, Aetna filed a motion to dismiss the Plaintiffs' Second Amended Complaint. Mot. to Dismiss, ECF No. 78 ("Mot. to Dismiss").

On April 14, 2025, Aetna filed a memorandum in opposition to Plaintiffs' motion for preliminary injunction. Mem. in Opp. to Pl. Mot. for Prelim. Inj., ECF No. 102 ("Def.'s Mem.").

On April 29, 2025, Plaintiffs filed a reply to Defendant's response. Reply to Resp. to Mot. for Prelim. Inj., ECF No. 114 ("Pl.'s Reply").

On May 9, 2025, Aetna filed a Sur-Reply to Plaintiffs' reply. Resp. re Reply to Resp. to Mot., ECF No. 120 ("Def.'s Sur-Reply").

On May 9, 2025, Plaintiffs filed a Sur-Rebuttal to Aetna's Sur-Reply. Pl.'s Sur-Rebuttal in support of Mot. for Prelim. Inj., ECF No. 121 ("Pl.'s Sur-Rebuttal").

On May 16, 2025, Plaintiffs filed a memorandum in opposition to Aetna's motion to dismiss. Pl.'s Mem. in Opp., ECF No. 123 ("Mem. in Opp.").

On June 6, 2025, Aetna filed a reply to the Plaintiff's response to the motion to dismiss. Reply to Resp., ECF No. 126 ("Reply").

On January 8, 2026, the Court held a hearing on the pending motion to dismiss, as well as the pending motion for a preliminary injunction, and ordered supplemental briefing. *See* Minute Entry, ECF No. 138.

On January 23, 2026, the parties filed supplemental memoranda. Am. Mem. in Opp., ECF No. 141; Supp. Mem., ECF No. 142.

On January 30, 2026, the parties filed their responses. Response, ECF No. 144; Response, ECF No. 145.

## II.    STANDARD OF REVIEW

### A.  Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### B. Motion for Preliminary Injunction

The Second Circuit applies similar standards for temporary restraining orders and preliminary injunctions, "and district courts have assumed them to be the same." *See Foley v. State Elections Enforcement Comm'n*, No. 3:10CV1091 (SRU), 2010 WL 2836722, at *3 (D. Conn. July 16, 2010) (quoting *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 n.2 (D. Conn. 2003)). Preliminary injunctive relief is an extraordinary remedy and is never awarded as a matter of right. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). And when a preliminary injunction is sought, a plaintiff's burden to demonstrate standing "will normally be no less than that required on a motion for summary judgment." *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard*, No. 01 Civ. 9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S. at 20); *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) ("In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor.") (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir. 1994)). The moving party, however, must

also make a "clear" or "substantial" showing of a likelihood of success if the injunction sought will alter, rather than maintain the status quo. *See Jolly*, 76 F.3d at 473.

## III. DISCUSSION

### A. The Motion to Dismiss

Aetna moves to dismiss the Plaintiffs' Second Amended Complaint on four grounds: lack of standing under Article III of the United States Constitution, failure to join necessary and indispensable parties under Federal Rule of Civil Procedure 19, failure to exhaust statutory and administrative remedies, and failure to seek judicial review in accordance with the Federal Employees Health Benefit Act of 1959, 5 U.S.C. § 8901 *et seq.*, and its accompanying regulations, 5 C.F.R. § 890.101, *et seq.*

The Court addresses each argument in turn.

### 1. Article III Standing

Article III of the Constitution provides federal courts with power that "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting Art. III § 2). The doctrine of standing is "rooted in the traditional understanding of a case or controversy." *Id.* at 338. To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2020) (quoting *Spokeo, Inc.*, 578 U.S. at 338).

Where a plaintiff seeks injunctive relief, he or she must establish "a real and immediate threat of repeated injury" demonstrated by more than "[p]ast exposure to illegal conduct." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). "[A]bstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Shain v.*

*Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (internal quotation marks and alteration omitted).

Plaintiffs seeking prospective relief "cannot rely on past injury to satisfy the injury requirement

but must show a likelihood that he or she will be injured in the future." *Deshawn E. ex rel.*

*Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

"The second and third standing requirements—causation and redressability—are often

'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367,

380–81 (2024) (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288

(2008)). Causation requires the plaintiff to show "that the injury was likely caused by the

defendant," and redressability requires the plaintiff to demonstrate "that the injury would likely

be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The

redressability prong requires that the requested relief "would provide meaningful redress for *an*

injury, not that it would relieve him of *every* injury." *Knight v. City of New York*, 164 F.4th 173,

179–80 (2d Cir. 2026) (internal citations omitted) (emphasis in original). "And even when a

plaintiff's requested relief 'cannot provide full redress' with respect to an injury, a federal court's

'ability to effectuate a partial remedy satisfies the redressability requirement.'" *Id.* (citing

*Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)); *see also Elias Bochner, 287 7th Ave.*

*Realty LLC v. City of New York*, 118 F.4th 505, 521 (2d Cir. 2024) ("[T]he law of standing does

not require that the relief sought by a plaintiff completely redress the asserted injury.").

Aetna argues that several Plaintiffs lack standing because they suffered no past injury,

face no risk of future injury as required for injunctive relief, or both. Aetna also argues that the

alleged injury is not traceable to it, since it is the Plaintiffs' employers, and not Aetna, who

controls the terms of their plans. Aetna thus argues that the relief sought would not redress the

Plaintiffs' injuries since "Aetna has no independent power . . . to award coverage or expend plan funds for benefits not authorized by the employers." Mot. to Dismiss at 45.

i.  <u>Injury in Fact</u>

Aetna argues that three of the Plaintiffs, Ms. Gordon, Ms. Mayers, and Dr. Homnick have not alleged sufficient injury-in-fact to confer Article III standing because the Plaintiffs' plans now authorize coverage for some or all of the procedures they seek.

In Ms. Gordon's case, after she received gender-affirming facial reconstruction, OPM reversed Aetna's denial of coverage in her case and also revised its FEHBA plan to expressly provide coverage for the procedures she requested. Aetna argues that Ms. Gordon could now submit a reimbursement request for the cost of her procedures but has not yet done so, since she did not pay for the procedures with her own funds and therefore lacks a monetary injury. Mot. to Dismiss at 27-28.

Aetna also argues that Ms. Mayers lacks an injury because her employer eventually authorized the procedures Ms. Mayers requested, and Aetna then approved her request for coverage. Aetna thus states that Ms. Mayers is eligible to receive the procedures under her health insurance plan, but has not alleged that she has undergone the surgeries or incurred out-of-pocket costs for them. *Id.* at 28-29. Similarly, Aetna argues that Dr. Homnick's employer revised its plan to approve coverage for some of the gender-affirming facial reconstruction procedures she seeks, but that Dr. Homnick has not alleged that she has undergone these surgeries or incurred out-of-pocket costs for them. *Id.* at 29-30.

The Plaintiffs respond that Ms. Gordon, who is only seeking compensatory relief and therefore need not allege future injury, has sufficiently pled monetary damages stemming from Aetna's denial which constitutes "a traditional form of injury-in-fact for Article III standing."

16

Mem. in Opp. at 17. Next, the Plaintiffs argue that Ms. Mayers and Dr. Homnick, as well as the

remaining injunctive relief Plaintiffs, have alleged past injuries, namely being subject to sex

discrimination and increased gender dysphoria and mental distress as a result of Aetna's denials.

The Plaintiffs also argue that they face a threat of future injury because they remain enrolled in

Aetna-administered plans and their requests for gender-affirming facial reconstruction will

continue to be subject to Aetna's policy exclusion as long as it remains in place.

In its reply, Aetna argues that because Ms. Gordon funded her gender-affirming facial

reconstruction through donations, she "does not allege that she has suffered any actual past

economic loss, much less any loss that would not have been paid had she simply submitted a

reimbursement claim under her FEHBA plan." Reply at 3. Aetna also argues that Ms. Mayers

lacks standing for both monetary relief and declaratory or injunctive relief because her coverage

request has been approved and she therefore faces no actual or imminent threat of future injury.

Reply at 4.

The Court disagrees.

"An injury in fact can be a physical injury, a monetary injury, an injury to one's property,

or an injury to one's constitutional rights, to take just a few common examples." *Food & Drug

Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).[1] Nonetheless, "a plaintiff does

---

[1] In *Heckler v. Mathews*, a decision relied upon by the Plaintiffs for the proposition that sex discrimination itself is a cognizable injury, the case concerned a violation of the equal protection component of the Due Process Clause of the Fifth Amendment regarding the administration of spousal benefits under the Social Security Act. There, the Supreme Court held that "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group." 465 U.S. 728, 738 (1984). Although the Court in *Heckler* held that sex discrimination in that case constituted an injury because it violated plaintiffs' constitutional rights, the Plaintiffs note that other district courts have applied the same principle to cases involving statutory prohibitions on sex discrimination. *See Walker v. Azar*, 480 F. Supp. 3d 417, 426 (E.D.N.Y. 2020) (relying on Heckler and finding that "both plaintiffs attest that they have, based on their transgender status, suffered past discrimination in receiving healthcare. That alone constitutes an injury in fact."); *see also Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 956 (D. Minn. 2018) (finding that a minor plaintiff alleging a discriminatory denial of benefits under a health plan had

not automatically satisfy the injury-in-fact requirement whenever a statute grants a right and purports to authorize a suit to vindicate it. Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 331 (2016). To establish past injury, Ms. Mayers and Dr. Homnick have not alleged monetary harm, but instead argue that the alleged discrimination alone and the attendant effects on their mental health constitute discrete injuries. And Ms. Mayers and Dr. Homnick's injuries are concrete: Aetna denied the Plaintiffs' requests based on an allegedly discriminatory policy, thereby delaying and/or denying access to medically necessary treatment and exacerbating the Plaintiffs' mental health symptoms.[2] Ms. Mayers and Dr. Homnick therefore have sufficiently pled an injury with respect to their claim for damages.[3] *See Baur v. Veneman*, 352 F.3d 625, 641 (2d Cir. 2003) (finding that even "exposure to a sufficiently serious risk of medical harm—not the anticipated medical harm itself" is enough to constitute injury for standing purposes).

To establish standing for prospective relief, Ms. Mayers and Dr. Homnick must show that they are likely to be injured in the future by the Defendant's challenged conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and

---

standing to sue under Section 1557, while dismissing his mother's claim because her only cognizable injury, her out-of-pocket expenses, had been reimbursed).

[2] In addition to her monetary injury, Ms. Gordon has also alleged injury in the form of discrimination that resulted in exacerbated mental health symptoms.

[3] In arguing that Ms. Mayers and Dr. Homnick lack standing for monetary relief because their coverage requests have been granted, the Defendant confuses mootness with what is actually a redressability issue. "While standing doctrine determines whether a plaintiff has a personal stake in the litigation when the complaint is filed, mootness doctrine determines what to do if an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation after its initiation." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020)) (internal quotation marks omitted). Because the Plaintiffs' employers fully or partially approved coverage before the initiation of the lawsuit, the relevant inquiry is one of redressability as a part of the standing analysis, as opposed to mootness.

immediate irreparable injury.'") (quoting *O'Shea v. Littleton,* 414 U.S. 488, 502 (1974)). Aetna argues that because Ms. Mayers and Dr. Homnick's employers have granted partial coverage for the gender-affirming facial reconstruction requested, the Plaintiffs are free to receive these procedures and are therefore unable to establish a likelihood of future harm.

But the Plaintiffs' employers only approved coverage for some of the procedures the Plaintiffs requested. The rest of the Plaintiffs' requested procedures remain subject to CPB 0615. *See* Mot. to Dismiss at 29 ("Bausch & Lomb revised its plan to cover certain facial procedures, including face and neck electrolysis, voice/communication therapy, and adult tracheal shave . . . but they declined, however, to add coverage for additional gender affirming facial surgery procedures."); *see also* Compl. ¶ 66 (stating that in December 2024, "Aetna reversed its denial and preauthorized coverage for *some* GAFR procedures") (emphasis in original).

The Plaintiffs have alleged that without these procedures, they will continue to experience gender dysphoria and related symptoms. *See* Compl. ¶ 67 ("Aetna's denials delayed [Ms. Mayers'] access to care for approximately a year. Ms. Mayers is suffering, and will continue to suffer, severe gender dysphoria and distress because of her inability to obtain her planned surgeries."); *see also id.* ¶¶ 91-92 ("Dr. Homnick's gender dysphoria is severe, and she has experienced severe depression and suicidality as a symptom of it . . . Dr. Homnick is not presently positioned to pay for her care out of pocket and therefore has no plans to obtain her medically necessary GAFR so long as it is excluded from her insurance plan coverage by Aetna's CPB 0615. She will suffer unnecessary distress as a result.").

On this record, given the persistence of their symptoms and that they remain enrolled in health insurance plans administered by Aetna, which will not authorize medical treatment to address all of their gender dysphoria-related symptoms, Ms. Mayers and Dr. Homnick have

"establish[ed] a sufficient likelihood of future injury." *Food & Drug Admin.*, 602 U.S. at 381 (citations omitted).

Next, Aetna argues that because Ms. Gordon did not pay for her procedures herself, she has suffered no injury. But Aetna is conflating the existence of an injury with Ms. Gordon's entitlement to damages for that injury. It is well established that monetary costs are an injury for Article III standing purposes. *See Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) ("Monetary costs are of course an injury.") (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)); *see also Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 55 (2d Cir. 2016) ("Any monetary loss suffered by the plaintiff satisfies this element; '[e]ven a small financial loss' suffices." (quoting *Natural Resources Defense Council, Inc. v. United States Food & Drug Administration,* 710 F.3d 71, 85 (2d Cir. 2013)). Hence, there is no doubt that Ms. Gordon suffered an injury.

She is also entitled to collect on her injury. In cases sounding in tort, "[f]ederal courts regularly apply the 'collateral source rule,' which permits a plaintiff to recover damages from a tortfeasor though the plaintiff has already received compensation for its injuries from a third-party and even when such an award would lead to double recovery." *In re State St. Bank & Tr. Co. Erisa Litig.*, 579 F. Supp. 2d 512, 517 (S.D.N.Y. 2008); *see also Hartnett v. Reiss S.S. Co.*, 421 F.2d 1011, 1016 (2d Cir. 1970) ("The general rule in the federal courts is that the collateral source rule is applied."). "[T]he principle of justice underlying the collateral source rule, is that it is the innocent victim rather than the guilty tortfeasor who is the preferable recipient of any windfall caused by outside compensation." *Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 852 F. Supp. 2d 229, 254–55 (D. Conn. 2012); *see also Williams v. Sec'y of Navy*, 853 F. Supp. 66, 72

(E.D.N.Y. 1994) (explaining that under the collateral source rule, courts decline "to use funds obtained from a source unconnected with the culpable party to reduce that party's liability").

As a result, the funds Ms. Gordon used to pay for her gender-affirming facial reconstruction, or more specifically, the source of those funds alone, does not resolve the issue of standing, and her injury is not extinguished merely because the expenses she incurred were alleviated by a collateral source. *See, e.g., Carlisle v. Bd. of Trs. of Am. Fed'n of New York State Teamsters Conf. Pension & Ret. Fund*, No. 8:21-CV-00455 (BKS/DJS), 2025 WL 438123 (N.D.N.Y. Feb. 7, 2025), *aff'd*, No. 25-511-CV, 2025 WL 3251154 (2d Cir. Nov. 21, 2025) (holding that application of collateral source rule would not run afoul of central purpose of ERISA, which was to protect beneficiaries of pension plans and stating that "the Second Circuit has relied on the principles of the collateral source rule in finding an ERISA fiduciary liable for losses caused by her breach even though others previously restored the plan's losses" (citing *Chao v. Merino*, 452 F.3d 174, 176 (2d Cir. 2006)); *see also id.* (citing *Merriam v. Demoulas*, No. 11-cv-10577, 2013 WL 2422789, at *3, 2013 U.S. Dist. LEXIS 77600 (D. Mass. June 3, 2013) to explain that a "plaintiff does not lose standing to sue a tortfeasor just because a third party has already compensated her for the injury").

Regardless of the source of her funding, because Ms. Gordon incurred monetary expenses in paying for her gender-affirming facial reconstruction procedures, she has alleged a monetary injury sufficient to confer standing for her damages claim.[4] On this record, Ms. Gordon has shown that "she has suffered or likely will suffer an injury in fact." *Food & Drug Admin.*, 602 U.S. at 382. The denial of the requested medical care has "affect[ed]" her "in a personal and individualized way"; this is not "a generalized grievance." *Id.* at 381.

---

[4] Essentially, Aetna's arguments to the contrary are merely a restatement of its causation and redressability arguments each addressed and dismissed below.

Accordingly, all of the Plaintiffs have alleged the necessary injury in fact.

        ii.  <u>Causation and Redressability</u>

Aetna argues that all six Plaintiffs have failed to establish the causation and redressability elements of standing. First, Aetna argues that because Ms. N left her employer and is no longer covered by an Aetna plan, her injury can no longer be redressed by Aetna. Second, because reimbursement is available to Ms. Gordon and Ms. Mayers for any approved surgeries they received, Aetna argues that their injuries are not traceable to it or redressable by this Court. Third, Aetna argues that the injuries of the Plaintiffs' injunctive class are traceable to their employers, not Aetna, and only their employers can offer proper redress. Specifically, Aetna argues that as claims administrator, it "neither controls the benefit design nor funds benefit payments under those plans," and therefore "has no power or authority to award additional benefits beyond those authorized by [the Plaintiffs'] employer[s]." Mot. to Dismiss at 30-31.

The Plaintiffs respond that "their injuries are fairly traceable to Aetna's challenged conduct, rather than resulting from the independent actions of a third party not before this court." Mem. in Opp. at 18. Regardless of the employers' ability to override CPB 0615 or expressly cover gender-affirming facial reconstruction, the Plaintiffs argue that their injuries are directly traceable to Aetna because their coverage requests were denied as a result of Aetna's enforcement of CPB 0615. *Id.* at 18-19.

Next, they argue that a favorable court decision will remedy Ms. Gordon and Ms. N's injuries by compensating for their out-of-pocket expenses. Ms. Gordon and Ms. N clarify that they, and the putative damages class, do not seek payment of plan benefits from their former employers, but rather from Aetna "stemming from *Aetna's* application of the GAFR Exclusion in CPB 0615." *Id.* at 21 (emphasis in original).

Finally, they argue that the requested declaratory and injunctive relief would redress the injunctive class's injuries by requiring Aetna to conduct individualized medical necessity assessments of the Plaintiffs' claims. Responding to Aetna's claim that it lacks the ability to make changes that affect the provision of benefits under the employers' plans, the Plaintiffs first argue that all of the employers' plan documents expressly delegate to Aetna the primary responsibility for making coverage determinations and medical necessity assessments. Additionally, the Plaintiffs note that Aetna routinely modifies its CPBs, including updating CPB 0615 five times in 2024 and once in 2025 by the time of the filing, and state that "there is simply no evidence that Aetna requires plan sponsors' sign-off every time Aetna makes such revisions or updates to its own clinical coverage criteria." *Id.* at 24.[5]

In its reply, Aetna argues that the "Plaintiffs' own pleadings make [] clear" that "the Court lacks the power to order the plan coverage and fund the medical care Plaintiffs ultimately seek," since when asked to make an exception and cover gender-affirming facial reconstruction, Dr. Homnick's employer declined to do so. Reply at 4-5. Aetna adds that "an injunction against *Aetna alone*" cannot "compel the Plaintiffs' *employers* to cover and fund the medical care they seek under a plan that specifically disallows it." *Id.* at 5 (emphasis in original). Aetna also reiterates that because Ms. Gordon, Ms. N, and Dr. Homnick may seek reimbursement for all or

---

[5] The Plaintiffs also argue that Aetna's reliance on *Murthy v. Missouri*, 603 U.S. 43, 57 (2024), is misplaced, since the case there dealt with an injury that was entirely the result of an independent action of a third party that was not before the court. Here, however, the injury is the result of Aetna's actions, because the plan documents expressly delegate coverage determinations for gender-affirming care to Aetna. Thus, the injuries are sufficiently traceable to the Defendant. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 358 (S.D.N.Y. 2013), *aff'd,* 769 F.3d 105 (2d Cir. 2014) ("With respect to traceability and redressability, a plaintiff needs to show that its injury is 'fairly traceable to the challenged action of the defendant[—]not the result of the *independent* action of some third party' . . . However, a plaintiff 'need not show that a particular defendant is the *only* cause of their injury, and that, therefore, absent the [defendant's] activities, [the plaintiff] would enjoy undisturbed' existence.") (internal citations omitted).

some of the gender-affirming facial reconstruction they sought, their claims are not traceable to Aetna or redressable by this Court.

The Court disagrees.

Traceability requires the Plaintiffs to "demonstrate a causal nexus between the defendant's conduct and the injury." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). It is "wrong[ ]" to "equate[ ] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). Rather, "at [the pleading] stage of the litigation," the Plaintiffs' "burden . . . of alleging that their injury is 'fairly traceable' to" the challenged act "is relatively modest." *Id.* at 171.

Here, the Plaintiffs' injuries are traceable to Aetna and redressable by the relief requested; they allegedly suffered their respective injuries because of Aetna's enforcement of CPB 0615. If the categorical exclusion against gender-affirming facial reconstruction in CPB 0615 did not exist, each of the Plaintiffs would have received individualized medical necessity determinations, and, allegedly, grants of coverage for this prescribed medical care. Because the Plaintiffs' health insurance plans delegated coverage determinations for gender-affirming surgeries to Aetna, and Aetna's enforcement of CPB 0615 categorically excluded the Plaintiffs' claims for gender-affirming facial reconstruction, the Plaintiffs' injuries are "fairly traceable" to Aetna. *See id.* at 169 ("While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." (internal citations and alterations omitted)).

The redressability inquiry focuses "on whether the injury that a plaintiff alleges is likely to be redressed through the litigation . . ." *Sprint Commc'ns Co., L.P. v. APCC Servs.*, Inc., 554 U.S. 269, 287 (2008). Ms. Gordon and Ms. N seek to recover out-of-pocket costs for the surgeries they received while members of their Aetna-administered plans, despite their plan sponsors having authorized reimbursement. A legal victory awarding Ms. Gordon and Ms. N damages thus would undoubtedly redress the monetary injuries they suffered.

It is not relevant to the Court's standing analysis whether the Plaintiffs' injuries could also be redressed through the reimbursement scheme approved by their plan sponsors.[6] *See* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5 (3d ed. 2014) ("Failure to exhaust alternative means of redress need not break the causal chain."); *see id.* at n.72 (plaintiff "had standing even though she failed to pursue the administrative remedy designed to force a prompt decision. Standing is defeated only if the injury is so completely due to the plaintiff's own fault as to break the causal chain.") (citing *Engwiller v. Pine Plains Cent. School Dist.*, 110 F. Supp. 2d 236, 246–247 (S.D. N.Y. 2000)); *see also Oklahoma Dep't of Env't Quality v. E.P.A.*, 740 F.3d 185, 190 (D.C. Cir. 2014) ("Clearly, Oklahoma has alleged an injury caused by the rule it challenges and redressable by our vacatur of that rule. The possibility of an alternative remedy, of uncertain availability and effect, does not render its injury self-inflicted.").

It is Aetna that is subject to the non-discrimination provisions of Section 1557, and it is therefore Aetna that has violated the statute under which the Plaintiffs now seek recovery. *See Klaneski v. Bristol Hosp., Inc.*, No. 3:22-CV-1158 (VAB), 2023 WL 4304925, at *3 (D. Conn.

---

[6] Aetna argues that, unlike Ms. Gordon, Ms. N cannot receive reimbursements for surgeries she received and that her employer subsequently approved while she was covered by the Aetna plan. It is unclear to the Court why Ms. N is ineligible for reimbursement. Even if Ms. N were not eligible for reimbursement, her injuries are redressable by Aetna, making the Defendant's argument immaterial to the Court's determination of Ms. N's standing.

June 30, 2023) ("Section 1557 of the Affordable Care Act [] applies to any health program or activity that receives federal funds [and] prohibits discrimination on any of the grounds specified in Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1982, the Age Discrimination Act of 1975, and the Rehabilitation Act."); Mot. for Prelim. Inj. at 8, n.3 (collecting sources demonstrating Aetna's receipt of federal funding).

Because a judgment against Aetna would fully redress Ms. Gordon and Ms. N's injuries by reimbursing them for the out-of-pocket costs expended as a result of Aetna's enforcement of CPB 0615, they have standing to pursue their claims.[7]

Similar to Ms. Gordon and Ms. N, Dr. Homnick's employer has approved coverage for certain gender-affirming surgeries, including face and neck electrolysis, voice/communication therapy, and adult tracheal shave, some of which Dr. Homnick has received. Mot. to Dismiss at 13. Aetna argues that because Dr. Homnick's employer "approved coverage for some of the procedures she seeks," she therefore "lacks Article III standing to bring this action against Aetna, as the claims administrator, because she has already been given access to the coverage her employer has authorized." *Id.* at 30. But Dr. Homnick requested additional gender-affirming facial reconstruction procedures that her employer has declined to cover and that Aetna has excluded under CPB 0615. The issue is then whether Dr. Homnick's injuries, as well as the remaining injunctive relief plaintiffs' injuries, are redressable by a decision granting the relief the Plaintiffs seek. *See California v. Texas*, 593 U.S. 659, 671 (2021) ("To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered.") (internal citation and quotation marks omitted).

---

[7] To the extent that other Plaintiffs such as Ms. Mayers seek damages for out-of-pocket expenses incurred, the same conclusions apply.

The Plaintiffs seek "a declaratory judgment that Aetna's GAFR Exclusion violates Section 1557" and "a permanent injunction barring Aetna from enforcing the GAFR Exclusion, or any other policy, practice, or procedure that categorically excludes coverage for GAFR under health insurance plans offered or administered by Aetna." Compl. ¶ 19. Although Aetna argues that it does not control the design of, or payments under, the Plaintiffs' plans, a favorable decision from this Court would not modify the plans themselves. As is, the plans delegate all coverage determinations for gender-affirming procedures to Aetna. *See, e.g.,* Exhibit Homnick, Attachment C: Bausch & Lomb Americas Choice POS II medical plan, 115, ECF No. 62-3 ("Covered services include certain services and supplies for gender affirming treatment. Visit https://www.aetna.com/health-care-professionals/clinical-policy-bulletins.html for detailed information about this benefit, including eligibility and medical necessity requirements."); *see also* Conde Nast Plan Excerpts, 7, ECF No. 79-3 ("Aetna has been designated as claims administrator for benefits under the Plan with full discretion and authority to make claim and appeal determinations . . . In exercising this fiduciary responsibility, Aetna has full discretionary authority to make factual determinations, to determine eligibility for benefits, to determine the amount of benefits for each claim received, and to construe terms of the Plan with respect to benefits.").

And as the Plaintiffs note, Aetna routinely modifies the CPBs to reflect Aetna's evolving judgment. Mem. in Opp. at 24 ("Aetna has revised or updated CPB 0615 at all relevant times— including five times in 2024 alone and once (so far) in 2025"); *see also* Aetna CPB 0615 Review History, https://www.aetna.com/cpb/medical/data/disclaimer/history/600_699/0615.html. Presumably, where an employer dislikes a change Aetna has made, it retains the authority to expressly include or exclude coverage of the contested procedure in its plan. *See, e.g.,* Conde

Nast Plan Excerpts, 7, ECF No. 79-3 ("Your coverage can change . . . This document may have amendments too. Under certain circumstances, we, the Customer/Employer or the law may change your plan."); *see also* Decl. of Cheryl Aronson, Exhibit C, 2 ECF No. 87-3 (showing that Herley's plan sponsor modified their plan to include gender dysmorphia coverage, despite CPB 0615 still excluding it).

The injunctive and declaratory relief sought by Plaintiffs thus would redress their injuries by requiring that any denial be based on a lack of medical necessity as opposed to alleged discrimination on the basis of sex. Requiring individualized medical necessity determinations would remove a significant barrier to the Plaintiffs achieving their ultimate goal of receiving gender-affirming facial reconstruction under their health insurance plans, since if Aetna were to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion, the Plaintiffs sufficiently allege that they are likely to receive coverage. *Cf. Food & Drug Admin.*, 602 U.S. at 385-86 ("Because the plaintiffs do not prescribe, manufacture, sell, or advertise mifepristone or sponsor a competing drug, the plaintiffs suffer no direct monetary injuries. Nor do they suffer injuries to their property, or to the value of their property, from FDA's actions. Because the plaintiffs do not use mifepristone, they obviously can suffer no physical injuries from FDA's actions relaxing regulation of mifepristone.").

As a result, there is a "substantial likelihood" that the relief requested will redress the Plaintiffs' injuries, and the Plaintiffs have standing to pursue their claims. *See id.* at 382 (holding that after establishing an injury in fact, there "is causation. The plaintiff must also establish that the plaintiff's injury likely was caused or likely will be caused by the defendant's conduct."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74-75, 75 n.20 (1978) (Our

recent cases have required no more than a showing that there is a "substantial likelihood" that the

relief requested will redress the injury claimed to satisfy the second prong of the constitutional

standing requirement. (citing *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S.

252, 262 (1977), *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976), and *Warth v.*

*Seldin*, 422 U.S. 490, 504, 506–507 (1975))).

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

## 2. Rule 19 Joinder

A party is "necessary" under Rule 19 if:

> (1) in the person's absence complete relief cannot be accorded among those
> already parties, or (2) the person claims an interest relating to the subject of the
> action and is so situated that the disposition of the action in the person's absence
> may (i) as a practical matter impair or impede the person's ability to protect that
> interest or (ii) leave any of the persons already parties subject to a substantial risk
> of incurring double, multiple, or otherwise inconsistent obligations by reason of
> the claimed interest.

Fed. R. Civ. P. 19(a); *see also Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n Inc.*, 471 F.3d 377,

385 (2d Cir. 2006) ("A party is necessary under Rule 19(a)(1) only if in that party's absence

'complete relief cannot be accorded *among those already parties.*'") (emphasis in original). "If a

party does not qualify as necessary under Rule 19(a), then the court need not decide whether its

absence warrants dismissal under Rule 19(b)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721 (2d

Cir. 2000) (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d

Cir.1990)). But where the court determines that a party is necessary and joinder is not feasible

for jurisdictional or other reasons, there are "four considerations that will ordinarily be among

those relevant to the analysis of whether a party is 'indispensable.'" *Marvel Characters, Inc. v.*

*Kirby*, 726 F.3d 119, 133 (2d Cir. 2013). They are:

> (1) whether a judgment rendered in a person's absence might prejudice that person
> or parties to the action, (2) the extent to which any prejudice could be alleviated,
> (3) whether a judgment in the person's absence would be adequate, and (4)
> whether the plaintiff would have an adequate remedy if the court dismissed the
> suit.

*Id.* (quoting *CP Sols. Ltd. v. Gen. Elec. Co.,* 553 F.3d 156, 159 (2d Cir. 2009)). Where an

indispensable party cannot be joined, the court must dismiss the action. *Viacom Int'l*, 212 F.3d at

725.

Aetna argues that the Plaintiffs' plan sponsors are necessary parties because "the Court

cannot award the individual relief each Plaintiff seeks without the presence of these missing

parties." Mot. to Dismiss at 37. Specifically, Aetna argues that each plan is "a creation of each

Plaintiff's respective employer" and Aetna alone cannot modify the terms of the plans or the

benefits offered under them. *Id.* at 38. Because the employers "have the sole and final authority

for the terms and funding of [the] plans," Aetna argues that proceeding without the employers

may "impair or impede [the employers'] ability to protect [their] interest[s]." *Id.* Next, Aetna

argues that the plan sponsors and plan administrators cannot feasibly be joined because "it is

highly unlikely that . . . [they] are subject to either venue or personal jurisdiction in this district."

*Id.* at 39. Finally, Aetna argues that the plan sponsors and administrators are indispensable

parties under Rule 19(b) because only they can award plan benefits or reform the terms of their

plans. Without these parties, Aetna argues that a judgment against Aetna "would be no more than

an advisory opinion in contravention of the case-or-controversy requirements of the U.S.

Constitution with no binding effect on [the plans] themselves." *Id.* at 42.

The Plaintiffs respond that Aetna is the proper defendant in this suit because complete

relief may be obtained from Aetna alone and the plan sponsors have claimed no legally protected

interest in the litigation.

First, the Plaintiffs assert that they "seek relief from *Aetna's* own policies and practices," namely "declaratory judgment that *Aetna's* GAFR Exclusion in CPB 0615 is unlawful; compensatory damages for harm resulting from *Aetna's* discriminatory conduct; and injunctive relief enjoining the enforcement of *Aetna's* GAFR Exclusion." Mem. in Opp. at 27 (emphasis in original). Because Aetna may provide complete redress for its own violations of Section 1557, the Plaintiffs argue that the plan sponsors are not necessary under Rule 19(a)(1)(A). Second, the Plaintiffs argue that the absent parties have no "legally protected interest related to the subject matter of the action" and therefore Aetna cannot assert compulsory joinder under Rule 19(a)(1)(B). *Id.* at 31. The Plaintiffs add that "the absent parties' interests are not legally impaired" because they "are not being asked to change their plan designs, being demanded to pay out benefits, or bound to do anything based on the outcome of this lawsuit." *Id.* at 32. Rather, the Plaintiffs argue that "the absent parties will continue as they were—paying for services not expressly excluded by their plans that Aetna deems medically necessary." *Id.*

Aetna replies that because "the end result Plaintiffs seek is *payment* for GAFR coverage under their respective employer's plans," the absent parties "are plainly and inextricably impacted by the outcome of this litigation." Reply at 7 (emphasis in original). Aetna states that the ACA "creates no freestanding right to plan benefits" and "any entitlement Plaintiffs may have to GAFR benefits arises solely by virtue of the plans their employers created and fund." *Id.* Aetna argues that the ultimate relief the Plaintiffs seek "can be afforded only by the employers themselves, with direct and inevitable impact to their plans and coffers" and the employers therefore have a "vital interest" in the litigation that must be protected by compulsory joinder under Rule 19.

The Court disagrees.

As discussed above, Plaintiffs have sufficiently alleged that their injuries are redressable by Aetna. While the Plaintiffs may ultimately desire coverage for all requested gender-affirming facial reconstruction procedures, that is not the specific relief they seek in this suit. Rather, they seek compensatory damages from Aetna for Aetna's alleged violation of Section 1557 and injunctive and declaratory relief to prevent Aetna from enforcing CPB 0615. This Court thus can provide complete relief among the existing parties, and the plan sponsors and administrators are not necessary parties under Rule 19(a)(1)(A).

Aetna also asserts that the plan sponsors and administrators are necessary parties under Rule 19(a)(1)(B). But "[i]t is not enough under Rule [19(a)(1)(B)] for a third party to have an interest, even a very strong interest, in the litigation. Nor is it enough for a third party to be adversely affected by the outcome of the litigation. Rather, necessary parties under Rule [19(a)(1)(B)] are only those parties whose ability to protect their interests would be impaired *because of* that party's absence from the litigation." *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006) (emphasis in original). The employers and plan administrators may have an interest in the outcome of this litigation. For example, if the Court grants the relief sought, the employers and plan administrators may decide to modify the terms of their plans. But such an interest does not suffice to make the employers and plan administrators necessary parties, because "the harm [they] may suffer is not *caused by* [their] absence from this litigation." *Id.* (emphasis in original). Because the plan sponsors and administrators are not necessary parties, the Court need not decide whether joinder is feasible.

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

### 3. Exhaustion

Aetna argues that because Ms. Avalle failed to exhaust the administrative remedies under her ERISA-governed plan, her claim must be dismissed. Mot. to Dismiss at 32-35.[8]

Ms. Avalle responds that she need not exhaust her administrative remedies because her claim does not fall under ERISA's statutory scheme, and is therefore not subject to ERISA's exhaustion requirements. Mem. in Opp. at 37. She also argues that ERISA's text expressly states that it shall not be construed to preempt other federal claims. *Id.*

In its reply, Aetna reasserts that the benefits of Ms. Avalle's plan are "expressly subject to [ERISA's] mandatory administrative review process." Reply at 6. Aetna thus argues that her claim should be dismissed without prejudice until she exhausts her administrative remedies. *Id.*

The Court disagrees.

"District courts in this Circuit have drawn a distinction between claims relating to violations of the terms of a benefit plan, and claims relating to statutory violations of ERISA, finding that the former, but not the latter, [] must be administratively exhausted." *Diamond v.*

---

[8] Aetna argues, albeit vaguely, that because Ms. N, Dr. Homnick, and Dr. Herley allegedly did not exhaust all of the administrative remedies available to them, their claims should be dismissed, Mot. to Dismiss at 35, but cites to no precedent in this Circuit requiring individuals to exhaust the remedies in their health insurance plans before bringing suit to vindicate their rights under Section 1557. Understandably, exhaustion of administrative remedies serves to put plan sponsors on notice of the alleged discrimination and allow them an opportunity to rectify it themselves. Where a policy is facially discriminatory, however, such notice may be presumed. *See, e.g., Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953-54 (D. Minn. 2018) ("Plaintiffs allege that the Plan was facially discriminatory, and therefore, Defendants had actual notice that the Plan violated Section 1557's nondiscrimination requirements. The Court agrees."). And here, Plaintiffs allege that CPB 0615's discriminatory nature is apparent on its face, since it only withholds a medical necessity determination where the procedure is sought to treat gender dysphoria, a condition that can only be experienced by transgender individuals. In any case, however, Section 1557 claims based on sex discrimination do not require exhaustion of administrative remedies seeking judicial review. *See Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11 (D. Minn. Mar. 16, 2015) ("[A] plaintiff bringing a Section 1557 age discrimination claim would have to exhaust administrative remedies and would be barred from recovering damages, but plaintiffs bringing Section 1557 race, disability, or sex discrimination claims would not have to exhaust administrative remedies and would not be barred from recovering damages.").

*Loc. 807 Lab. Mgmt. Pension Fund*, 595 F. App'x 22, 24 (2d Cir. 2014) (internal citation and quotation marks omitted).

Here, however, Ms. Avalle asserts neither a violation of the terms of her ERISA-governed plan nor a statutory violation of ERISA. Rather, she brings a claim against Aetna for violating Section 1557 of the ACA, which contains no exhaustion requirement. And the text of ERISA is clear that it does not preempt other federal claims. *See* 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States."); *see also Hogan v. Metromail*, 107 F. Supp. 2d 459, 473 (S.D.N.Y. 2000) ("While ERISA claims often preclude state common law claims, it does not pre-empt related claims under the ADEA. ERISA specifically does not 'alter, amend, modify, invalidate, impair, or supersede any law of the United States . . .'" (citing 29 U.S.C. § 1144(d))); *cf.* 29 U.S.C. § 1144(a) ("the provisions of this subchapter . . . shall supersede any and all State laws insofar . . .").

If Ms. Avalle were arguing that she was owed benefits that were denied in violation of her ERISA-governed plan, she would be required to exhaust administrative remedies. *See id.* at 25 ("Because Diamond was seeking only to receive benefits under the Plan that he contends were withheld in violation of the terms of the Plan, he was required to exhaust his administrative remedies."). While she seeks individualized review and hopes for a grant of benefits, it is neither the injury asserted nor the relief sought that dictates whether exhaustion is necessary. Rather, it is the cause of action under which the suit is brought. *See, e.g., Wheeler v. Prudential Fin., Inc.*, 499 F. Supp. 2d 219, 220 (N.D.N.Y. 2007) ("Before a plan participant can litigate under *ERISA*, he or she must exhaust the claim procedures in place." (citing *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 219 (2d Cir. 2006)); *Michael E. Jones, M.D., P.C. v. Aetna, Inc.*, No. 19-CV-9683

34

(JPO), 2020 WL 5659467 (S.D.N.Y. Sept. 23, 2020) (requiring administrative exhaustion where Plaintiff alleged a violation of "the terms of its insureds' plans, thereby entitling Plaintiff — the insureds' assignee — to damages and injunctive relief under ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3)"); *Peppiatt v. Aetna Life Ins. Co.*, No. 217CV02444ADSAKT, 2017 WL 6034641, at *1 (E.D.N.Y. Dec. 4, 2017) (requiring exhaustion where Plaintiff asserted violations of ERISA § 502(a)(1)(B) and ERISA § 502(a)(3) seeking unpaid benefits and interest); *Blessing v. J.P. Morgan Chase & Co.*, No. 02 CIV. 3874 (LMM), 2003 WL 470338, at *2 (S.D.N.Y. Feb. 24, 2003) (finding that the exhaustion requirement varies between the subsections of ERISA under which the claim is brought).

Because Ms. Avalle is not bringing suit under ERISA for a violation of the terms of her plan, but rather under Section 1557 of the ACA for a violation of its non-discrimination mandate, she was not required to exhaust the administrative remedies prescribed by her plan.

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

### 4.   FEHBA's Exclusive Remedy

Health insurance plans governed by the FEHBA are subject to regulations established by OPM. Under these regulations, "[a] covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim" by bringing suit "against OPM and not against the carrier or the carrier's subcontractors." 5 C.F.R. § 890.107(c). Aetna is a "carrier" under the governing statute. *See* 5 U.S.C. § 8901(7) (defining a carrier as a "corporation . . . which is lawfully engaged in providing, paying for, or reimbursing the cost of . . . a health benefits plan duly sponsored or underwritten by an employee organization . . .").

Ms. Gordon was previously enrolled in an Aetna plan as part of her FEHB plan. Aetna argues that under OPM's regulations, its contract with Aetna, and the relevant plan documents,

Ms. Gordon was subject to the requirements for judicial review set out in 5 C.F.R. § 890.107(c). Because Ms. Gordon's suit is against Aetna, and not OPM, Aetna argues that her claim is barred by federal law and must be dismissed.

Ms. Gordon argues that she is not challenging OPM's final decision on her appeal, but rather Aetna's discrimination in violation of Section 1557. She thus argues that the relevant regulation does not apply to her claim, and that the FEHBA "is silent on suits against FEHB carriers in their own right for their own actions." Aetna replies that because Ms. Gordon's claim is, at its core, challenging Aetna's handling of a claim for benefits, the claim "implicates the FEHBA and necessitates OPM's participation."

The Court disagrees.

OPM regulations require an individual to exhaust administrative remedies before bringing suit. 5 C.F.R. § 890.107(d)(1). Exhaustion requires a covered individual to submit a claim to the carrier of the health benefits plan, which if denied can be submitted for reconsideration. If the carrier affirms its denial or fails to respond as required by the regulations, the individual may solicit review from OPM. 5 C.F.R. § 890.105(a)(1). If OPM affirms the denial, the covered individual may seek judicial review of "OPM's final action on the denial of a health benefits claim" and such suit may be brought only "against OPM and not against the carrier or carrier's subcontractors." 5 C.F.R. § 890.107(c).

There are few cases, if any, discussing whether a plaintiff under a health insurance plan governed by the FEHBA may sue an insurance carrier, instead of OPM, for a violation of Section 1557's non-discrimination provision.[9] The cases cited by both the Plaintiffs and the Defendant

---

[9] Courts routinely analyze Section 1557 claims similarly to those brought under Section 504 of the Rehabilitation Act of 1973 because the former explicitly incorporates the latter. *See Hejmej v. Peconic Bay Med. Ctr.*, No. 17-CV-782 (JMA) (SIL), 2022 WL 5429675, at *9 (E.D.N.Y. July 5, 2022), *report and recommendation adopted*, No. 17-

are not analogous to this one. *See Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 677 (2006) (concerning the preemption provision of the FEHBA, § 8902(m)(1)); *HCA Genesis, Inc. v. Grp. Health Inc.*, No. 7:06-CV-150, 2006 WL 561243 (N.D.N.Y. Mar. 6, 2006) (granting motion to dismiss where there was no evidence of exhaustion); *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847 (9th Cir. 2002) (distinguishing medical malpractice claim from denial of benefits claim); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1005–06 (N.D. Cal. 2016) (finding that third party beneficiary claims related to breach of data privacy obligations under federal law did not constitute a health benefits claim that was subject to 5 C.F.R. § 890.107(c)).

Ms. Gordon was covered by a FEHBA plan. Compl. ¶ 39. Aetna denied her initial claim for preauthorization, *id.* ¶ 41, which Ms. Gordon appealed, *id.* ¶ 42. Aetna denied her claim on appeal, *id.* ¶ 43, and Ms. Gordon sought OPM's review, *id.* ¶ 45. While waiting for OPM's decision, Ms. Gordon underwent the GAFR procedures. *Id.* ¶ 49. Unbeknownst to her, OPM had issued its determination reversing Aetna's denial prior to her surgery. *Id.* ¶ 50. Under the allegations here, Ms. Gordon fully exhausted her administrative remedies, and received a favorable decision from OPM. And Ms. Gordon does not appeal "OPM's final action on the denial of a health benefits claim," because OPM did not deny her claim. Rather, she alleges that Aetna, the carrier under her plan, independently violated Section 1557, resulting in repeated denials of her claims for GAFR. Because Ms. Gordon's claim does not stem from an appeal of

---

CV-782 (JMA) (SIL), 2022 WL 4551696 (E.D.N.Y. Sept. 29, 2022) ("Section 1557 claims are typically analyzed identically to Rehabilitation Act Section 504 claims.") (citing *Vega-Ruiz v. Montefiore Med. Ctr.*, No. 17-CV-1804-LTS-SDA, 2019 WL 3080906, at *3 (S.D.N.Y. July 15, 2019)). And courts have found that "[u]nder section 504 of the Act, when a government procurement contract is involved, it is the procuring agency (OPM), and not the contractor (the Association), that is responsible for compliance." *Dodd v. Blue Cross & Blue Shield Ass'n*, 835 F. Supp. 888, 891 (E.D. Va. 1993); *see also Modderno v. King*, 871 F. Supp. 40, 41 (D.D.C. 1994), aff'd, 82 F.3d 1059 (D.C. Cir. 1996) (Plaintiff alleging discrimination in violation of Section 504 of the Rehabilitation Act of 1973 brought suit against the Director of OPM).

OPM's denial of her claim, Ms. Gordon is not subject to 5 C.F.R. § 890.107(c) and her suit may proceed against Aetna.[10]

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

### B.  The Motion for Preliminary Injunction

To obtain a preliminary injunction, the movant must demonstrate: "(1) that [she] is likely to succeed on the merits, (2) that [she] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in [her] favor, and (4) that an injunction is in the public interest." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025) (citing *Winter*, 555 U.S. at 20) (cleaned up).

Dr. Homnick and Dr. Herley argue that they are entitled to a preliminary injunction to enjoin Aetna from enforcing CPB 0615 because they satisfy the requirements for such extraordinary relief. Aetna argues that Dr. Homnick and Dr. Herley cannot satisfy the requirements for a preliminary injunction and also that they cannot establish the causation or redressability requirements for Article III standing.

Because the Court has already determined that Dr. Homnick and Dr. Herley have standing to proceed in their claim, the Court will only address the merits of their preliminary injunction motion.

### 1.  Irreparable Harm

Because irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," this requirement must be satisfied before the remaining requirements are

---

[10] Despite the lack of guiding caselaw, the Court finds that allowing Ms. Gordon's suit to proceed against Aetna, the alleged offender, comports with Congress's intent in creating a private right and private remedy in Section 1557 for violations of its nondiscrimination provision by expressly incorporating the enforcement provisions of the four federal civil rights statutes. *See Ass'n of New Jersey v. Horizon Healthcare Servs., Inc.*, No. CV 16-08400(FLW), 2017 WL 2560350, at *4 (D.N.J. June 13, 2017) (collecting cases).

considered. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (internal quotation marks and citation omitted). To show irreparable harm, the movant "must demonstrate that absent a preliminary injunction, [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

Dr. Homnick and Dr. Herley argue that they are likely to suffer irreparable harm because they are experiencing extreme gender dysphoria as a result of Aetna's implementation of CPB 0615 and this harm will continue in the absence of an injunction, thereby exacerbating their already severe symptoms. Mot. for Prelim. Inj. at 19. They state that the harm to their health is "actual, ongoing, significant" and "more than likely" to recur as long as CPB 0615 remains in place. *Id.* They also argue that their delayed medical care and the attendant symptoms cannot be remedied by monetary damages, thereby requiring injunctive relief. *Id.* at 19-20.

In response, Aetna argues that Dr. Homnick and Dr. Herley have not exhausted their administrative remedies and "[t]here is no need for injunctive relief where the plaintiff has an adequate legal or administrative remedy to address the same alleged injury." Def.'s Mem. at 30. The "Plaintiffs' most immediate—and effective—remedy," Aetna argues, "is the ERO review that awaits only their election to pursue it." *Id.* at 32.

Dr. Homnick and Dr. Herley reply that the availability of administrative remedies does not undermine their showing of harm. Pl.'s Reply at 11. They argue that Aetna's stance "disregards the harm and suffering Plaintiffs have already experienced from receiving adverse benefits determinations from Defendant." *Id.* at 12. They also argue that the federal regulations governing the external review process explicitly mandate that the independent review

organization apply "'any applicable clinical review criteria developed and used by the plan or issuer' to the extent the [independent review organization] considers them appropriate," making any such review futile. *Id.* at 12-13 (quoting 45 C.F.R. § 147.136(d)(2)(iii)(B)(5)(vi)). Next, they argue that because of the statute of limitations on administrative appeals, the external review process is not available to Plaintiffs unless they start their claims anew. *Id.* at 13. Finally, they note that the cases "Aetna cites to support its assertion that the ERO process is equivalent to injunctive relief" were brought "under statutes the courts found required administrative exhaustion before seeking judicial review," but Section 1557 sex discrimination claims do not require administrative exhaustion. *Id.* at 13-14.

Aetna argues that "both Plaintiffs presently have the ability to seek an external review" and notes that from 2023 to the time of the filing, eight of nine appeals requesting a reversal of a coverage denial for GAFR were granted, thereby making an external review not futile. Def.'s Sur-Reply at 4-5. Finally, Dr. Homnick and Dr. Herley state that Aetna's data on the rate of reversals through the external review process "underscores Plaintiff's point: independent reviewers overwhelmingly find GAFR medically necessary, undermining Aetna's persistent and discriminatory assertion, as memorialized in CPB 0615, that GAFR is never medically necessary." Pl.'s Sur-Rebuttal at 4.

The Court agrees.

The lack of access to medically necessary gender-affirming care and the attendant health risks meet the standard for irreparable harm. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (finding that plaintiff will "suffer irreparable harm—in the form of ongoing mental anguish and possible physical harm—if [gender confirmation surgery] is not provided"); *Clark v. Quiros*, No. 3:19-CV-575 (VAB), 2024 WL 3552472, at *21 (D. Conn. July 26, 2024) (holding

that prison's failure to treat inmate's gender dysphoria constituted deliberate indifference under the Eighth Amendment and inmate therefore satisfied irreparable harm prong for injunctive relief because she faced imminent risk to her health, safety, and life); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1358 (N.D. Ga. 2023) (finding that risks of depression, anxiety, disordered eating, self-harm, and suicidal ideation flowing from state's ban on certain medical procedures for minors experiencing gender dysphoria presented imminent risks of irreparable harm to plaintiffs); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 942−46 (W.D. Wis. 2018) (plaintiffs had presented sufficient evidence, through personal allegations and physician statements, to show that failure to access gender confirming surgery constituted irreparable harm); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *9−10 (E.D. Mo. Feb. 9, 2018) (finding irreparable harm where Plaintiff has shown she will continue suffering from depression, anxiety, and intrusive thoughts of self-castration without gender dysphoria treatment); *Brown v. Coombe*, No. 96-CV-476 (RSP/RWS), 1996 WL 507118, at *3 (N.D.N.Y. Sept. 5, 1996) (collecting cases recognizing that "gender dysphoria may be a serious medical need"); *Cano v. S.C. Dep't of Corr.*, No. 922-cv-04247-DCCMHC, 2023 WL 10286851, at *20 (D.S.C. July 31, 2023) ("Courts have described the deprivation of a prisoner's constitutional rights under the Eighth Amendment, including the denial of gender-affirming care, as sufficient to establish irreparable harm."); *see also LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004) (reductions in medical coverage that cause substantial risk to plaintiffs' health and anxiety associated with uncertainty are irreparable harm that is non-compensable in terms of money damages).

And the Second Circuit has held, in a different but related context, that the availability of insurance coverage through alternative means is not fatal to the irreparable injury prong; "[s]o

long as plaintiffs demonstrated injury non-compensable in terms of money damages, they have demonstrated irreparable injury." *LaForest*, 376 F.3d 48, 56 (2d Cir. 2004) (internal citation and quotation marks omitted).

Dr. Homnick and Dr. Herley have sufficiently alleged that the delay and denial of access to gender-affirming facial reconstruction and the resulting symptoms constitute irreparable injuries. Both plaintiffs are experiencing severe gender dysphoria that has been exacerbated by the delay in receipt of medical services. Dr. Homnick and Dr. Herley experience "daily distress, anxiety, and depression," and fear an increased risk of discrimination and harassment. Mot. for Prelim. Inj. at 1.

Dr. Homnick has experienced "severe depression and suicidality" and "finds it necessary to take safety precautions in her home." Compl. ¶ 91; *see* Mot. for Prelim. Inj. at 11 ("Dr. Homnick's severe gender dysphoria persists . . . and triggers distress, anxiety, depression, fearfulness, irritability, hopelessness, interference with relationships, low self-esteem, and feelings of self-loathing."); *see also id.* at 13 ("She has experienced profound depression and distress because of the denial and her inability to complete her gender transition."). Dr. Herley reports that the symptoms of her gender dysphoria include depression, anxiety, hypervigilance, suicidal thinking, low self-esteem, an intense desire to avoid social interactions, emotional fatigue, as well as an extreme focus on her appearance. Mot. for Prelim. Inj. at 15; *see* Compl. ¶ 99 (noting that her typically masculine facial features "often trigger distress and anxiety"). Since her requests for coverage have been denied, Dr. Herley alleges that "[h]er depression and anxiety have spiked, and she has experienced heightened feelings of dysphoria, social isolation, obsessive thoughts, as well as an increased risk of self-harm, feelings of impending danger, panic, or doom, and trouble concentrating or making decisions." *Id.* at 17. She also reports

physical symptoms including "panic attacks, dizziness, and a rash of unknown origins that worsens when she experiences distress from her gender dysphoria." *Id.*

Dr. Homnick and Dr. Herley's physicians have attested that gender-affirming facial reconstruction is necessary to treat their symptoms. Dr. Homnick's clinical psychologist, Dr. Amanda Shaw, specializes in treating adults with anxiety, depression, and trauma, and has been treating Dr. Homnick since September 2023. Decl. of Dr. Amanda M. Shaw, Ph.D. ¶¶ 3-4, ECF No. 62-4 ("Shaw Decl."). Her practice includes transgender and non-binary patients with gender dysphoria. *Id.* ¶ 3. Dr. Shaw has observed that "Dr. Homnick's gender dysphoria consistently fluctuates in severity based on whether she can access appropriate medical care. When access to medical care is restricted or threatened, Dr. Homnick's gender dysphoria, particularly her hopelessness and depressive symptoms, increase." *Id.* ¶ 11. Dr. Shaw's professional opinion is that GAFR is medically necessary to treat Dr. Homnick's gender dysphoria. *Id.* ¶ 14. Dr. Shaw states that "Dr. Homnick's mental health is harmed from being denied a medical procedure— deemed necessary by her treating providers—that would provide her with relief." *Id.* ¶ 17.

Dr. Herley's psychologist, Dr. Janice Seward, has worked with patients experiencing gender dysphoria since at least 1995, when she first became Dr. Herley's mental health provider. Decl. of Dr. Janice Stefanacci Seward, Psy D. ¶¶ 3-4, ECF No. 62-6 ("Seward Decl."). Dr. Seward has attested that gender-affirming facial reconstruction is medically necessary to treat Dr. Herley's gender dysphoria. *Id.* ¶ 15. She also states that "Dr. Herley's symptoms of gender dysphoria dramatically worsened upon learning that Aetna had rejected her request for coverage of her GAFR[.]" *Id.* ¶ 17. Since the denial, Dr. Herley's "mental and physical symptoms related to her severe gender dysphoria" have "continued to deteriorate[.]" *Id.* ¶ 19. In Dr. Seward's professional opinion, "If Dr. Herley were unable to access GAFR entirely, it is likely that her

symptoms would not only continue to worsen but would likely become so severe as to disable her. Her social isolation could become so pronounced that she is unable to work altogether. Her increasing thoughts of self-harm are likely to pose a serious risk of injury or death." *Id.* ¶ 25.

Nonetheless, Aetna argues that the Plaintiffs' injuries need not persist "in the absence of preliminary relief" because both plaintiffs may pursue the administrative remedies described in their insurance plans. *See Walsh*, 733 F.3d at 486; *see* Def.'s Resp. at 32 ("Plaintiffs' most immediate—and effective—remedy is the ERO review that awaits only their election to pursue it.").

The concepts of administrative exhaustion and irreparable injury are doctrinally linked, but where administrative exhaustion is mandatory, it may generally be excused where the plaintiff can show that exhaustion would result in irreparable harm. And courts dismissing a motion for a preliminary injunction for lack of exhaustion generally do so because the administrative exhaustion regime is mandatory. *See, e.g., Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 81-83 (2d Cir. 2021) (affirming denial of preliminary injunction where underlying claims were unexhausted, noting that administrative exhaustion under the Prison Litigation Reform Act is generally mandatory). But where exhaustion would result in irreparable harm, it is routinely excused. *See, e.g., Abbey v. Sullivan,* 978 F.2d 37, 44 (2d Cir. 1992) (noting that in order to waive mandatory exhaustion for social security appeals, claimant must show they would suffer irreparable harm if required to exhaust their administrative remedies before obtaining relief); *see also Benten v. Kessler*, 799 F. Supp. 281 (E.D.N.Y. 1992) (waiving administrative exhaustion due to irreparable harm and proceeding to analyze the merits of the preliminary

injunction motion without referencing the alleged availability of an administrative remedy to disprove the irreparable injury element).

More pointedly, requiring exhaustion of an administrative remedial process would exacerbate the irreparable injury in question, even when it is not mandatory. *See Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11 (D. Minn. Mar. 16, 2015) ("[P]laintiffs bringing Section 1557 race, disability, or sex discrimination claims would not have to exhaust administrative remedies and would not be barred from recovering damages.").

On this record, Dr. Homnick and Dr. Herley's injuries have been exacerbated by Aetna's denials. Requiring the Plaintiffs to exhaust their optional administrative remedies will only worsen their conditions. *See, e.g.,* Seward Decl. ¶ 27 ("It is my view that the longer Dr. Herley has to wait to access gender affirming facial surgery, the more likely her condition may deteriorate even further."). Put another way, "to require plaintiffs to exhaust administrative remedies would be to place them in danger of the same imminent and irreparable injury that motivated this court to grant the preliminary injunction." *Able v. United States*, 870 F. Supp. 468, 471 (E.D.N.Y. 1994).

Accordingly, Dr. Homnick and Dr. Herley have satisfied the irreparable injury prong of the preliminary injunction standard.

## 2.  The Likelihood of Success on the Merits

Section 1557 of the Affordable Care Act prohibits a "health program or activity, any part of which is receiving Federal financial assistance" from violating the non-discrimination mandate of Title IX of the Education Amendments of 1972 ("Title IX"). 42 U.S.C. § 18116(a). Title IX elaborates that "no person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," subject to a few exceptions. 20 U.S.C. § 1681(a).

The Plaintiffs argue that because Aetna receives federal financial assistance, including Medicare and Medicaid reimbursements, it is covered under Section 1557 of the Affordable Care Act and Aetna must comply with Title IX's anti-discrimination mandates. Mot. for Prelim. Inj. at 23-24. As a covered entity, the Plaintiffs argue that Aetna is violating Section 1557 because CPB 0615's categorical exclusion of gender-affirming facial reconstruction to treat gender dysphoria impermissibly discriminates on the basis of sex.

Specifically, they argue that, under Aetna's policy, the exclusion of an individual's claim depends on whether the person is seeking facial reconstruction surgery to affirm a gender inconsistent with their sex assigned at birth. In their view, the policy cannot be applied without reference to the individual's sex assigned at birth, which is discriminatory under the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). Mot. for Prelim. Inj. at 25-26.

The Plaintiffs argue that because the policy applies only to those experiencing gender dysphoria, which, by definition, can only be experienced by transgender individuals, the policy is facially discriminatory. The impermissible sex classification thus is "embedded within a classification based on transgender status or gender dysphoria," since CPB 0615 "cannot be applied without determining whether the patient is transgender or cisgender, which necessarily considers sex." Mot. for Prelim. Inj. at 26-27. Additionally, the Plaintiffs argue that CPB 0615 discriminates against transgender individuals based on sex stereotypes, namely that "those who

are assigned male at birth ought not seek facial features that are more typically feminine, even when necessary for their health[.]" *Id.* at 27-28.

Alternatively, even if the policy does not constitute facial discrimination, the Plaintiffs argue that "it, combined with Aetna's other actions and policies, would still present overwhelming direct and circumstantial evidence of having acted on the basis of sex." Mot. for Prelim. Inj. at 25. First, the Plaintiffs point to the text of the policy, which excludes the use of facial reconstruction procedures when they are a "component of gender transition." *Id.* at 30. Second, they argue that Aetna's conclusion that gender-affirming facial reconstruction is never medically necessary is contrary to medical evidence and Aetna's own state-specific policies. *Id.* at 30-31. Finally, the Plaintiffs argue that Aetna routinely conducts medical necessity assessments for facial reconstruction claims when certain criteria are met, but refuses to do so when needed to treat gender dysphoria solely because the care is needed by transgender people. *Id.* at 31.

In response, Aetna argues that CPB 0615 "necessarily and appropriately reflects the evolving state of medical science on these issues and evaluates the evidence using the same evidentiary standards it uses for all clinical policy questions." Def.'s Mem. at 35. Therefore, in Aetna's view, gender-affirming facial reconstruction is not medically necessary, a result not based on the claimants' transgender status, but rather on the inconclusive and "equivocal" nature of medical evidence and literature on the topic. *Id.* at 32-35. As Aetna states it, "[t]he operative factor is not the status of the member requesting the procedure but, rather, whether there is sufficient, high-quality evidence and medical consensus establishing that the requested procedure is medically necessary as an effective treatment for the member's condition." *Id.* at 35.

Next, Aetna argues that it did not intentionally discriminate against transgender people under the relevant standard, Section 1557 of the Affordable Care Act. *See Doe v. Columbia Univ.*, 831 F.3d 46, 55-56 (2d Cir. 2016) (stating that the Second Circuit has imported Title VII's discriminatory intent requirement into Title IX claims); *see also* 42 U.S.C. § 18116(a) (incorporating Title IX's anti-discrimination mandate into Section 1557). Finally, Aetna argues that because there are disputed questions of fact, including "complex questions that require expert testimony or that turn on intent or state of mind," the Court should not resolve the preliminary injunction on affidavits alone. *Id.* at 36.[11] [12]

The Court disagrees.

The party seeking the preliminary injunction bears the burden of establishing the likelihood "to succeed on the merits[.]" *Winter*, 555 U.S. at 20. "[A]t core," this prong "asks courts to predict how likely it is that a party seeking preliminary relief will ultimately prevail on

---

[11] The parties' remaining arguments on this prong focus on the validity of the medical evidence on gender-affirming facial reconstruction surgery.

[12] On November 13, 2025, the Court held a telephonic status conference to schedule a hearing on the pending motion to dismiss and motion for a preliminary injunction, and to determine whether an evidentiary hearing would be required to resolve the pending motions. *See* Minute Entry, ECF No. 130 ("The purpose of the conference is to determine whether both motions can be addressed at a single proceeding, and if so, how much time would be needed, and whether the taking of testimony would be required."). At the telephonic status conference, both parties indicated that an evidentiary hearing was not necessary, and that they rested on their submissions. Because the Defendant waived its right to an evidentiary hearing, and because the Court finds that the parties' submissions do not create disputed issues of fact regarding Aetna's role in the claims denial process, this preliminary injunction motion may be resolved on the legal memoranda, affidavits, and evidence submitted by the parties. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("[A]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record. However, the motion should not be resolved on the basis of affidavits which evince disputed issues of fact. A party may, of course, waive its right to an evidentiary hearing, but it is not entitled to have the court accept its untested representations as true if they are disputed.") (cleaned up); *see also State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 83 (2d Cir. 2024) ("Defendants do not appear to have requested an evidentiary hearing on the preliminary injunction motion in the district court, and they have thus forfeited their right to such a hearing."); *Edwards v. Ruffner*, 623 F. Supp. 511, 512 (S.D.N.Y. 1985) ("The parties have submitted legal memoranda, supporting affidavits and numerous exhibits. The parties agreed that the Court should resolve the preliminary injunction motion based on these submissions, and further agreed that an evidentiary hearing was not required.").

the merits of their claims." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 362–63 (2024) (Jackson, J. concurring in part) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3, p. 197 (3d ed. 2013)) (additional citation omitted).

Because Aetna is an entity that receives federal funding, it is subject to the non-discrimination provision contained in Section 1557, which directly imports Title IX's ban against sex-based discrimination. And it is well-established in this Circuit that "Title VII cases provide the proper framework for analyzing Title IX discrimination claims." *Doe v. Columbia Univ.*, 831 F.3d at 55-56; *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) ("Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VII of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VII, as well as the caselaw interpreting Title VII.").

Indeed, the Second Circuit has adopted Title VII's requirement of proof of discriminatory intent, as well as the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), into Title IX jurisprudence. *Doe v. Columbia Univ.*, 831 F.3d at 55-56. As a result, the Plaintiffs rightly rely on *Bostock v. Clayton County*, where employees sued their employers for terminating them after the employers learned of their employees' homosexuality or transgender status. The Supreme Court interpreted Title VII's language prohibiting discrimination "because of sex," language similar to Title IX's anti-discrimination provision, to encompass discrimination against transgender individuals. 590 U.S. 644, 660 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."); 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]").

"Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation" that is established "whenever a particular outcome would not have happened 'but for' the purported cause." 590 U.S. at 656. The "but-for test directs [the Court] to change one thing at a time and see if the outcome changes." *Id.* In other words, where an employer fires a man because he was assigned female at birth, but would not have fired a man who was assigned male at birth, the employee's sex is the but-for cause of the employer's adverse employment action. As a result, "when an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *Id.* at 664-66. Importantly, "the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* at 656.

Under CPB 0615, if the patient is seeking GAFR "as a component of gender transition," CPB 0615 would exclude their claim as cosmetic and not medically necessary. *See* Exhibit CPB, 5-6, ECF No. 62-7 ("Aetna considers the following procedures that may be performed as a component of a gender transition as not medically necessary and cosmetic (not an all-inclusive list) []: . . . Facial Gender Affirming Procedures"). And to determine if the procedures are requested as a component of gender transition, Aetna must determine whether a patient is transgender or cisgender, which necessarily considers sex. *See* Decl. of Jens Berli, M.D., ¶ 11 ("Transgender is a term used to describe people whose self-identified gender identity differs from their birth assigned sex.").

To be clear, the issue is not whether Aetna's policy exclusion prohibits this type of gender-affirming care[13], but rather that Aetna's policy exclusion prohibits only transgender individuals, the only individuals who can experience gender dysphoria[14], from receiving this type of gender-affirming care. Thus, when Aetna decided that facial gender-affirming procedures "performed as a component of a gender transition [were] not medically necessary and cosmetic," Aetna prohibited only transgender individuals from seeking this medical care, and thus discriminated on the basis of sex. *See* Exhibit CPB, 5-6, ECF No. 62-7; *see Bostock,* 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). In other words, because the availability of a medical necessity determination would change based on the patient's sex assigned at birth, the "but-for" test to establish sex discrimination set forth in *Bostock* has been satisfied.[15] *Cf. id.* at 661 ("There is simply no escaping the role intent plays here: Just as sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decision making.") (emphasis in original).

---

[13] *See* Theodore E. Schall & Jacob D. Moses, Gender-Affirming Care for Cisgender People, 53 HASTINGS CTR. REP. 15 (2023) (discussing how gender-affirming care extends beyond transgender individuals, such as a breast reconstruction following a double mastectomy or a breast reduction surgery to treat gynecomastia).

[14] *See* Decl. of Nicholas Gordon ¶ 14, ECF No. 62-2 (gender dysphoria "occurs when a person's internal gender identity differs from their gendered body and/or the sex they were assigned at birth.").

[15] The initial briefing in this matter preceded the Supreme Court's *Skrmetti* decision, in which the Court held that several states' statutes prohibiting minors from receiving certain gender-affirming medical treatments did not facially discriminate on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *United States v. Skrmetti*, 605 U.S. 495 (2025). In reaching this conclusion, the Supreme Court declined to consider how the logic articulated in *Bostock* affected its analysis. *Id.* at 520 ("We have not yet considered whether *Bostock's* reasoning reaches beyond the Title VII context, and we need not do so here."). As a result, the Supreme Court's reasoning in *Skrmetti* does not change this Court's analysis here; the "but-for" analysis articulated in *Bostock* remains binding on Plaintiffs' claim under Section 1557. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) ("When 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'") (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

Accordingly, Dr. Homnick and Dr. Herley have demonstrated a likelihood of success on the merits.

### 3.   The Balance of Equities and the Public Interest

Finally, the Court must determine whether "the balance of equities tips in [Plaintiffs'] favor" and whether "an injunction is in the public interest." *Walsh*, 733 F.3d at 486. In doing so, the Court "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 542 (1987)).

Dr. Homnick and Dr. Herley argue that "the value of receiving GAFR is tremendous while the harm they are suffering without it is immense." Mot. for Prelim. Inj. at 31. If the injunction is granted, they argue they will gain access to care, which is likely to alleviate the distress related to their gender dysphoria. *Id.* at 32. They also state that Aetna cannot suffer any harm from an injunction that requires it to comply with Section 1557, and any costs Aetna may incur are far outweighed by the harm to the Plaintiffs of enforcing CPB 0615. *Id.* And because Aetna already covers gender-affirming facial reconstruction in several states, "[a]ny administrative or practical burdens on Aetna would be de minimis[.]" *Id.* at 33. Finally, they argue that the public interest is best served by the injunction because "it would ensure that Plaintiffs receive medically necessary care," it would "prevent Aetna from acting unlawfully," and "it would ensure that the judgment of Plaintiffs' health care providers is respected." *Id.* at 33-34.

Aetna replies that "the balance of the equities decisively disfavors Plaintiffs" because an injunction would not bind the plan sponsors, making it "wholly ineffectual and a waste of judicial resources." Def.'s Mem. at 37. Aetna argues that the Court "must consider the impact on,

and interests of, the *absent employers* from whose coffers any benefits would be paid." *Id.* at 37-38 (emphasis in original). For these reasons, Aetna argues that the injunction will not serve the public interest. *Id.* at 39.[16]

The Plaintiffs reply that the injunction would only impose an obligation on Aetna to conduct individualized medical necessity determinations for Dr. Herley and Dr. Homnick's claims. Pl.'s Reply at 19. If their claims are found to satisfy the medical necessity requirements, they argue that "the plan sponsors will, just as they have agreed to under their Aetna contracts for all other medically necessary treatments approved by Aetna." *Id.* at 19.

The Court agrees.

Dr. Homnick and Dr. Herley have demonstrated through personal affidavits, declarations from their treating clinicians, and expert declarations that absent an injunction, they are likely to experience severe harm to their mental and physical health. *See supra* Section III(B)(1). Requiring Aetna to follow the law imposes no hardship upon it, especially where the administrative infrastructure to conduct medical necessity determinations for the Plaintiffs' coverage requests is already in place. *See L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (defendant "cannot suffer any harm from an injunction that terminates an unlawful practice") (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). And granting the injunction and requiring Aetna to make Dr. Homnick and Dr. Herley's coverage determinations on the basis of medical necessity, as opposed to categorically excluding their claims under CPB 0615, serves the public interest by furthering access to medically necessary care and requiring Aetna to administer its health insurance plans according to the law.

---

[16] Aetna also argues that because Dr. Homnick is enrolled in an ERISA-governed plan, and Congress designed ERISA with its own public policy concerns in mind, the Court's issuance of an injunction would be inappropriate. Since the Court finds that the administrative exhaustion requirements of ERISA do not apply to Dr. Homnick's plan, *see supra* Section III(A)(3), the Court declines to address this point.

Accordingly, Dr. Homnick and Dr. Herley's motion for a preliminary injunction will be granted.

### 4.  Bond Requirement

While Fed. R. Civ. P. 65(c) states that "[a] court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained[,]" the amount of any bond "rests within the sound discretion of the trial court" and "the district court may dispense with the filing of a bond" altogether. Fed. R. Civ. P. 65(c); *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (internal citations omitted); *see also Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (noting that bond is not required "where there has been no proof of likelihood of harm . . .").

Dr. Herley and Dr. Homnick argue that waiver of the bond requirement is "necessary for the relief sought to be effective, given that Plaintiffs cannot afford the surgeries they require." Mot. for Prelim. Inj. at 34. They also note that waiver is appropriate "given the high likelihood of Plaintiffs' ultimate success on the merits and minimal harm to Aetna from a preliminary injunction." *Id.*

Aetna responds that the bond requirement should not be waived because of the potential harm to the plan sponsors' funds. Def.'s Mem. at 40.

In reply, the Plaintiffs argue that "Aetna–the party–would suffer no financial loss and is not entitled to a security bond on behalf of the plan sponsors." Pl.'s Reply at 20.

The Court agrees.

Accordingly, given the likelihood of Plaintiffs' success on the merits, and the lack of proof that Aetna will be harmed from issuance of the injunction, the Court will not require the

issuance of a bond. *See Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 203 (E.D.N.Y. 2013) ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant.") (collecting cases); *see also G.F.F. v. Trump*, No. 25 CIV. 2886 (AKH), 2025 WL 1301052, at *11 (S.D.N.Y. May 6, 2025) ("Here, there is no proof of likelihood of harm to Respondents that would result from the issuance of this preliminary injunction, and thus, Petitioners need not post bond.").

## IV.    CONCLUSION

For the foregoing reasons, Aetna's motion to dismiss is **DENIED** and the motion for a preliminary injunction brought by Dr. Homnick and Dr. Herley is **GRANTED**.

As a result of this Ruling and Order, Aetna is required to make individualized coverage determinations as to Dr. Homnick and Dr. Herley only, on the basis of medical necessity, as opposed to categorically excluding their claims under CPB 0615.

**SO ORDERED** at New Haven, Connecticut, this 8th day of March, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE