**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY and S.N., *individually and on behalf of all similarly situated individuals*, | Case No. 3:24-cv-1447-VAB |
| Plaintiffs, | |
| v. | March 31, 2026 |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO STAY INJUNCTION PENDING APPEAL**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT AND AUTHORITIES............................................................................................. 4

      A.      There Is a Substantial Possibility Aetna Will Succeed on The Merits .................. 6

            1.      Aetna's policy must be evaluated under the principles of Skrmetti. .......... 6

            2.      There is a substantial possibility the Second Circuit will agree that Aetna's policy is non-discriminatory under Skrmetti. ........................................... 9

                  a.      *Skrmetti* forecloses the argument that Aetna's policy discriminates based on sex because it references transgender status. ................... 9

                  b.      *Skrmetti* forecloses the argument that Aetna's policy discriminates based on sex under the logic of the *Bostock* "but-for" test. .......... 11

      B.      Aetna Will Be Irreparably Harmed Absent a Stay............................................... 15

            1.      The injunction irreparably interferes with and impedes Aetna's ability to satisfy its contractual and legal obligations under ERISA as a third-party administrator of Plaintiffs' employer-funded health plans. ...................... 16

                  a.      Plaintiffs' employers directed Aetna to follow its CPB 615 in administering their Plans................................................................. 17

                  b.      Aetna will suffer irreparable harm because the Order interferes with Aetna's statutory and contractual duties to the employer sponsors of Plaintiffs' Plans. ....................................................... 20

                          i.      The Order conflicts with the Plans and directives of Plaintiffs' employers over whom the Court has no jurisdiction. ...................................................................... 20

                          ii.      The Order requires Aetna to violate the Plans and coverage directives of the non-party employers............................. 22

                  c.      The Order also subjects Aetna to potential monetary loss that cannot be recouped. ................................................................... 24

                  d.      Aetna's appeal may be mooted absent a stay............................... 26

      C.      A Stay Will Not Injure, But Rather Will Protect, Other Interested Parties .......... 28

      D.      A Stay Will Promote Important Public Interests ................................................. 29

CONCLUSION............................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007)......................................................................26, 27

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007) ..........................................................................26

*Anderson v. Crouch*,
  No. 22-1927, 2026 WL 667919 (4th Cir. Mar. 10, 2026).................................. *passim*

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)......................................................................... *passim*

*Brandt by and through Brandt v. Griffin*,
  147 F.4th 867 (8th Cir. 2025) ......................................................... *passim*

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 2001)..................................................................................5

*In re Broadstripe, LLC*,
  2009 WL 774401 (D. Del. Mar. 26, 2009) .................................................................23

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010)....................................................................................5

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................................................22

*Conkright v. Frommert*,
  559 U.S. 506 (2010)............................................................................................29

*Crispin v. Walker*,
  2026 WL 252140 (D. Conn. Jan. 30, 2026).........................................................26

*Crouch v. Anderson*,
  145 S. Ct. 2835 (2025)....................................................................................8, 13

*Egelhoff v. Egelhoff ex rel. Breiner*,
  532 U.S. 141 (2001).....................................................................................1, 16, 21

*FMC Corp. v. Holliday*,
  498 U.S. 52 (1990)..............................................................................................28

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)............................................................................................10

*Gobeille v. Liberty Mut. Ins. Co.*,
  577 U.S. 312 (2016)............................................................................................16

*Haaland v. Brackeen*,
  599 U.S. 255 (2023)............................................................................................22

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)...................................................................................5, 27, 29

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
  323 F.Supp.2d 525 (S.D.N.Y. 2004)...................................................................23

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024), *vacated by Folwell v. Kadel*, 145 S. Ct. 2838
  (2025)..............................................................................................................8, 13

*Lange v. Houston Co.*,
  152 F.4th 1245 (11th Cir. 2025) ................................................................. *passim*

*LaRouche v. Kezer*,
  20 F.3d 68 (2d Cir. 1994) ...............................................................................5, 15

*Levine v. B & R Acquisition Partners, LLC*,
  2024 WL 3829567 (N.D.N.Y. Aug. 15, 2024) ....................................................26

*Liberty Mut. Ins. Co. v. Donegan*,
  746 F.3d 497 (2d Cir. 2014).................................................................................16

*Lucy v. Bay Area Credit Serv LLC*,
  2011 WL 13344167 (D. Conn. July 28, 2011) ......................................................5

*Mercer Health & Benefits LLC v. DiGregorio*,
  307 F. Supp. 3d 326 (S.D.N.Y. 2018)..................................................................23

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002)...................................................................................15

*Murthy v. Missouri*,
  603 U.S. 43 (2024)...............................................................................................22

*National Institutes of Health v. Am. Pub. Health Ass'n ("NIH v. APHA")*,
  606 U.S. ---, 145 S. Ct. 2658 (2025)....................................................................25

*New Jersey v. U.S. Dep't of Transp.*,
  No. 26-282, 2026 U.S. App. LEXIS 7463 (2d Cir. Mar. 11, 2026).......................25

iii

*Nguyen v. INS*,
 533 U.S. 53 (2001)................................................................................................................11

*Nken v. Holder*.
 556 U.S. 418 (2009)...............................................................................................................5

*In re Norwich Historic Pres. Trust, LLC*,
 No. 3:05CV12, 2005 WL 977067 (D.Conn.2005) ...............................................................26

*of C.P. v. Blue Cross Blue Shield of Ill.*,
 159 F.4th 646 (9th Cir. 2025) ...................................................................................... *passim*

*Philip Morris USA Inc. v. Scott*,
 561 U. S. 1301 (2010)...........................................................................................................25

*Poe by and through Poe v. Drummond*,
 149 F.4th 1107 (10th Cir. 2025) .............................................................................4, 7, 9, 12

*Ramsteck v. Aetna Life Ins. Co.*,
 2009 WL 1796999 (E.D.N.Y. June 24, 2009) ......................................................................19

*Religious Sisters of Mercy v. Becerra*,
 55 F.4th 583 (8th Cir. 2022) ......................................................................................1, 16, 21

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
 754 F. Supp. 2d 616 (S.D.N.Y. 2010)...................................................................................23

*S.M. v. Oxford Health Plans (N.Y.) Inc.*,
 94 F.Supp.3d 481 (S.D.N.Y. 2015)........................................................................................19

*SE.R. v. UnitedHealthcare Ins. Co.*,
 248 F. Supp. 3d 348 (D. Conn. 2017).....................................................................................19

*Seneca Nation of Indians v. Paterson*,
 2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ........................................................................5

*State Emps. Fed. Credit Union v. S.G.F. Props., LLC*,
 2015 WL 7573220. (N.D.N.Y. Nov. 25, 2015) .....................................................................26

*Stern v. Oxford Health Plans, Inc.*,
 No. 12-cv-2379 (JFB)(EBT), 2013 WL 3762898 (E.D.N.Y. July 17, 2013)..............................19

*Thapa v. Gonzales*,
 460 F.3d 323 (2d Cir. 2006)....................................................................................................5

*Ticor Title Ins. Co. v. Cohen*,
 173 F.3d 63 (2d Cir. 1999).....................................................................................................24

*United States v. Skrmetti*,
    605 U.S. 495 (2025) ................................................................................... *passim*

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ........................................................................................29

*Williby v. Aetna Life Ins. Co.*,
    867 F.3d 1129 (9th Cir. 2017) ..................................................................16, 22

*Yang v. Kosinski*,
    960 F.3d 119 (2d Cir. 2020) ...........................................................................25

**Statutes**

The Affordable Care Act of 2010 ............................................................... *passim*

Employee Retirement Income and Security Act of 1974 ........................... *passim*

The Indian Child Welfare Act of 1978 .................................................................22

**Rules and Regulations**

Fed. R. Civ. P. 62 ...........................................................................................1, 4, 30

**Other Authorities**

https://www.aetna.com/cpb/medical/data/600_699/0615.html .............................8

Pursuant to FRCP 62(d), Defendant Aetna Life Insurance Company ("Aetna") respectfully submits this Memorandum in Support of Its Motion to Stay the Court's order and injunction dated March 8, 2026 [Dkt. 153] ("Order") requiring Aetna to make revised coverage determinations as to Plaintiffs Jamie Homnick ("Homnick") and Gennifer Herley ("Herley") without reference to its Clinical Policy Bulletin, pending Aetna's appeal of that order and injunction to the Second Circuit.

Plaintiffs filed a motion for preliminary injunction to enjoin the application of Aetna's Clinical Policy Bulletin 615 ("CPB 615"), and the Court's Order grants that preliminary injunction. Order at 2.  Aetna has filed a timely notice of appeal, together with this motion requesting that the Court stay and suspend the injunctive relief granted by the Order pending Aetna's appeal.

## INTRODUCTION

Plaintiffs seek coverage for facial feminization surgery under health benefit Plans sponsored and funded by their employers.  Aetna serves as third-party claims administrator under those Plans. Aetna does not insure the Plans; both are self-funded by Plaintiffs' employers. As third-party claims administrator, Aetna is legally and contractually obligated to administer the Plans in accordance with the Plan terms and the directives of the sponsoring employers.  *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 150 (2001); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 591 (8th Cir. 2022).[1]

Both employers expressly directed Aetna to utilize its CPB 615 when reviewing and administering claims for gender affirming care under the Plans.  As the Court correctly notes in its Order, Dr. Homnick's Bausch & Lomb ("B&L") Plan expressly incorporates Aetna's Clinical Policy Bulletins in the provision addressing gender affirming treatment.  Order at 27.  Dr. Homnick also

---

[1] Internal citations, quotations and emphasis are omitted from citations unless otherwise noted.

stipulates in her amended complaint that she asked B&L for "an exception to the exclusion in her case" but her employer "declined her request," *see* Dkt. 60 at ¶ 88, and it is undisputed that in rejecting her request, B&L continued to directed Aetna to adhere to its CPB 615, *see* Dkt. 102 at 4-11, 21-22. It likewise is undisputed that Dr. Herley's employer, MTA, also expressly directed Aetna to follow and apply its Clinical Policy Bulletins in reviewing and administering claims for gender affirming care. *See* Dkt. 102 at 11-12, 22-23.

Plaintiffs' employers and Plan sponsors are not parties here—indeed, Plaintiffs have resisted Aetna's efforts to join them—and the Court thus has no power to force the employers to alter or deviate from their Plans when directing Aetna or funding benefits. The Court correctly recognizes that its Order does "not modify the plans themselves." Order at 27. Plaintiffs' Plans thus remain unchanged, and their employers' coverage directives to Aetna are wholly unaffected by the Order.

The Order nonetheless enjoins Aetna from applying CPB 615 to Plaintiffs' claims and directs Aetna "to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion." *Id.* at 28. The Order thus directs Aetna to ignore the very policy the employers instructed Aetna to follow in administering their Plans.

The Court's Order puts Aetna in an untenable position: It cannot both comply with the Order and also fulfill its legal and contractual obligations as TPA to the employer plan sponsors. Aetna cannot simply remove CPB 615 from the analysis and make an individual determination about Dr. Herley and Dr. Homnick. Doing so would require Aetna to administer the Plans in a manner that is directly contrary to what the employers have directed when they incorporated CPB 615 in their Plans and directed Aetna to follow it. In short, the relief Plaintiffs seek can only be achieved by requiring Aetna to ignore the terms of Plans the Court is powerless to change, and Aetna cannot

2

both ignore the Plans and follow them.  Absent a stay pending appeal, these conflicting legal obligations will cause irreparable harm to Aetna.

There is also a substantial probability that Aetna will succeed on appeal.  The Order and resulting injunction turn upon the Court's ruling that Aetna's CPB 615 discriminates on the basis of sex in violation of Section 1557 of the Affordable Care Act.  But that ruling is inconsistent with the Supreme Court's recent decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), which squarely undercuts the reasoning underlying this Court's ruling.

- *First, Skrmetti* forecloses the conclusion that Aetna's policy discriminates on the basis of sex simply because it references or relates to gender dysphoria.  The Supreme Court expressly held that a policy, such as Aetna's here, which classifies based on medical use, is not discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex."  *Id* at 511-12.  To hold otherwise "would be especially inappropriate in the medical context [where] [s]ome medical treatments and procedures are uniquely bound up in sex."  *Id.* at 512.  Such a policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions."  *Id.* at 518-19.

- *Second*, the Supreme Court made clear that such a policy is permissible even applying the logic of the "but-for" test of *Bostock v. Clayton County*, 590 U.S. 644 (2020).  *Id.* at 520-22.  "Under the logic of *Bostock*, then, sex is simply not a but-for cause of [the policy's] operation."  *Id.* at 522.

Since the Supreme Court issued the *Skrmetti* decision, the Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits all have applied *Skrmetti* to hold that statutes or health benefit plans that allow

3

medically necessary treatments for certain diagnoses but bar the same treatments for gender dysphoria are not *per se* or facially discriminatory. *See Anderson v. Crouch,* No. 22-1927, 2026 WL 667919 (4th Cir. Mar. 10, 2026) (ACA Section 1557); *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025) (employee health insurance plan; ACA Section 1557); *Lange v. Houston Co.,* 152 F.4th 1245 (11th Cir. 2025) (*en banc*) (employee health insurance plan); *Brandt by and through Brandt v. Griffin*, 147 F.4th 867 (8th Cir. 2025); and *Poe by and through Poe v. Drummond*, 149 F.4th 1107 (10th Cir. 2025).

The Fourth Circuit's decision in *Anderson*, which was issued after the Court entered its Order here, is especially instructive because it reexamines ACA Section 1557 in light of *Skrmetti* after the Supreme Court vacated the Circuit's prior ruling on the subject. *See Anderson*, 2026 WL 667919 at *1. As the Fourth Circuit explained in its new opinion, "*Skrmetti* compels the conclusion" that such policies do not violate the Affordable Care Act. *Id.* at *1, *5. The Ninth Circuit previously reached the same conclusion under the ACA in *Pritchard.* 159 F.4th at 670. There is a substantial possibility that the Second Circuit will adopt the same reasoning rather than create a circuit split.

Aetna respectfully requests that the Court stay and suspend the injunctive relief granted by the Order so that Aetna may appeal the Order to the Second Circuit.

## ARGUMENT AND AUTHORITIES

Under Federal Rule of Civil Procedure 62(d), a court "may suspend, modify, restore, or grant an injunction" while "an appeal is pending from an interlocutory order." Courts consider four factors when determining whether to issue a stay of an order pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest

4

lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). "The first two factors…are the most critical." *Nken v. Holder*. 556 U.S. 418, 434 (2009).

Aetna must show only that it has "a substantial possibility, although less than a likelihood, of success on appeal." *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994); *see also Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010) (*Nken* "did not suggest that this factor requires a showing that the movant is 'more likely than not' to succeed on the merits"); *Seneca Nation of Indians v. Paterson*, 2010 WL 4027795, *2 (W.D.N.Y. Oct. 14, 2010) ("It is important to recognize that the standard for granting a stay pending appeal is different than the standard required to obtain a preliminary injunction.").

A party faces irreparable harm where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 2001); *see also Nken*, 556 U.S. at 421 ("if a court takes the time it needs, the court's decision may in some cases come too late for the party seeking review").

The Second Circuit weighs these factors on a "sliding scale." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006). "Simply stated, more of one excuses less of the other." *Id. See also Lucy v. Bay Area Credit Serv LLC*, 2011 WL 13344167, at *1 (D. Conn. July 28, 2011) ("The degree to which a factor must be present varies with the strength of the other factors, meaning that "more of one [factor] excuses less of the other."). To obtain a stay pending appeal, "the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *LaRouche*, 20 F.3d at 72-73.

5

## A.        There Is a Substantial Possibility Aetna Will Succeed on The Merits

In *Skrmetti*, the Supreme Court upheld a Tennessee law that disallowed certain medical treatments for gender dysphoria but allowed those same treatments for other medical conditions. The Court held that the law did not discriminate based on sex because it did not classify based on sex; "[the statute] does not mask sex-based classifications [because] the law does not prohibit conduct for one sex that it permits for the other." 605 U.S. at 514-15. "[The law] does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 518-19.

The Court emphasized that "a key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address" and observed that the medical treatments addressed by the Tennessee law (puberty blockers and hormones) "can be used to treat certain overlapping indications (such as gender dysphoria), and each can be used to treat a range of other conditions." *Id.* at 513. The statute restricts which of these medical treatments are available; "[t]he application of that prohibition does not turn on sex." *Id.* at 514.

### 1.        Aetna's policy must be evaluated under the principles of Skrmetti.

In sum, the Supreme Court in *Skrmetti* enunciated the following legal principles that this Court must apply in evaluating Aetna's CPB 615 at issue here:

- *First,* a policy, such as Aetna's here, which classifies based on medical use, is not facially discriminatory, even if the policy "reference[s] sex" or "application of the [policy] turns on sex." 605 U.S. at 511-12.

- *Second*, such a policy is not facially discriminatory, even though the policy expressly references transgender status and gender-affirming care. *Id.* at 517-18. To hold

6

otherwise "would be especially inappropriate in the medical context [where] [s]ome medical treatments and procedures are uniquely bound up in sex." *Id.* at 512.

- *Third*, "allegations of sex stereotyping are misplaced," even where a policy references transgender status, where the policy applies classifications based on medical use that "are neither covertly nor overtly based on sex." *Id.* at 516.

- *Fourth*, a policy is not discriminatory simply because it allows a medical treatment for some conditions and not others: "[A] key aspect of any medical treatment" is "the underlying medical concern the treatment is intended to address" and where certain medical procedures "can be used to treat certain overlapping indications (such as gender dysphoria), and each can be used to treat a range of other conditions," a classification based on medical use "does not turn on sex." *Id.* at 513-14. "A law prohibiting the administration of specific drugs for particular medical uses" is not facially suspect. *Id.* at 516.

- *Finally*, such a policy is permissible even applying the logic of the "but-for" test of *Bostock*. *Id.* at 520-22.

As Aetna noted in its previous briefing [*see* Dkt. 140, 145], the Eighth, Ninth, Tenth, and Eleventh Circuits all have applied *Skrmetti* to hold that statutes or health benefit plans that allow medically necessary treatments for certain diagnoses but bar the same treatments for gender dysphoria are not *per se* or facially discriminatory. *See Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025) (employee health insurance plan; ACA Section 1557); *Lange v. Houston Co.,* 152 F.4th 1245 (11th Cir. 2025) (*en banc*) (employee health insurance plan); *Brandt by and through Brandt v. Griffin*, 147 F.4th 867 (8th Cir. 2025); and *Poe by and through Poe v. Drummond*, 149 F.4th 1107 (10th Cir. 2025).

7

On March 10, 2026, the Fourth Circuit joined its sister circuits and became the fifth court to follow and apply the *Skrmetti* decision as the Supreme Court so plainly instructed. In *Anderson*[2], the court considered West Virginia's Medicaid Plan, which excludes coverage for "transexual" or "[s]ex change" surgeries and for surgical treatments for gender dysphoria. 2026 WL 667919 at *5. The district court originally found that the Plan violated the Affordable Care Act, the Equal Protection Clause, or the Medicaid Act, and the Fourth Circuit, sitting en banc, affirmed the district court's decision across the board. *Id.* at *1; *see also Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024). On reconsideration, however, the Fourth Circuit held that "*Skrmetti* compels the conclusion" that the policy does not violate the subject statutes, including the Affordable Care Act. *Anderson*, 2026 WL 667919 at *1.

The Aetna policy at issue here, Aetna's CPB 615, provides that certain "procedures that may be performed as a component of a gender transition [including] Facial Gender Affirming Procedures" are considered as not medically necessary and cosmetic.[3] The Aetna policy is functionally and legally indistinguishable from those at issue in *Skrmetti* and each of the five circuit court decisions applying the Supreme Court's directives. *See Skrmetti*, 605 U.S. at 511 (law prohibiting treatments for "gender dysphoria, gender identity disorder, or gender incongruence"); *Anderson*, 2026 WL 667919 at *5 (4th Cir.) (Medicaid Plan excluding coverage for "transexual"

---

[2] After announcing its decision in *Skrmetti*, the Supreme Court vacated and remanded several circuit court decisions for reconsideration in light of *Skrmetti*. The Fourth Circuit's recent decision in *Anderson* arises from one of those cases. *See Anderson*, 2026 WL 667919 at *1; *see also Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), *vacated by Folwell v. Kadel*, 145 S. Ct. 2838 (2025) and *Crouch v. Anderson*, 145 S. Ct. 2835 (2025).

[3] Aetna's CPB 615 recognizes that most forms of gender-affirming care have been demonstrated to be medically effective for treatment of gender dysphoria. These treatments include genital and chest surgical procedures, as well as hormone therapy and psychotherapy. Indeed, Plaintiffs concede as much. Am. Compl. at ¶¶ 8, 143. *See* Aetna Clinical Policy Bulletin 615 (Gender Affirming Surgery): https://www.aetna.com/cpb/medical/data/600_699/0615.html

or "[s]ex change" surgeries and for surgical treatments for gender dysphoria); *Brandt*, 147 F.4th at 877 (8th Cir.) (law prohibiting treatment for "gender transition procedures"); *Pritchard*, 159 F.4th at 654-55 (9th Cir.) (employee health insurance plans excluded coverage for "gender-affirming care," including treatment for "gender dysphoria"); *Poe*, 149 F.4th at 1118 (10th Cir.) (law prohibiting treatment for "gender transition procedures"); *Lange,* 152 F.4th at 1248-49 (11th Cir.) (employee health insurance plan excluding coverage for treatments for "sex change").

> **2.      *There is a substantial possibility the Second Circuit will agree that Aetna's policy is non-discriminatory under Skrmetti.***

> > **a.      *Skrmetti* forecloses the argument that Aetna's policy discriminates based on sex because it references transgender status.**

In its Order granting Plaintiffs' motion for preliminary injunction, this Court held that Aetna's policy limiting coverage for gender dysphoria necessarily discriminates on the basis of sex because "transgender individuals [are] the only individuals who can experience gender dysphoria."  Ruling and Order on Pending Motions [Dkt. 153] (Order") at 51.  But the Supreme Court explicitly rejected this analysis in *Skrmetti*.  The Supreme Court noted that "[t]his Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny."  605 U.S. at 512. "Such an approach, moreover, would be especially inappropriate in the medical context.  Some medical treatments and procedures are uniquely bound up in sex."  *Id.*  "In the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny."  *Id.*

The Supreme Court also explicitly rejected the contention that the statute necessarily discriminated based on sex because it specifically referenced gender dysphoria and prohibited treatments for gender identity disorders: "Nor are we persuaded that [the Tennessee law's] prohibition on the prescription of puberty blockers and hormones to '[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex' or to '[t]rea[t] purported discomfort or distress from

a discordance between the minor's sex and asserted identity,' reflects a sex-based classification." *Id.* at 515. The law "is simply a prohibition on the prescription of puberty blockers and hormones to treat gender dysphoria, gender identity disorder, or gender incongruence." *Id.* "A law prohibiting the administration of specific drugs for particular medical uses" is not facially suspect. *Id.* at 516.

Moreover, the Supreme Court rejected the assertion that the Tennessee law "discriminates against transgender individuals, who the plaintiffs assert constitute a quasi-suspect class." *Id.* at 517. "This Court has not previously held that transgender individuals are a suspect or quasi-suspect class." *Id.* And, in any event, the statute there—like the Aetna clinical policy here, which classifies on the basis of medical efficacy—"does not classify on the basis of transgender status." *Id.* The Court explained that the statute made two classifications—age and medical use—and "[t]he plaintiffs do not argue that the first classification turns on transgender status, and our case law forecloses any such argument as to the second." *Id.* at 517-18.

The Ninth Circuit rejected this same argument under the Affordable Care Act in *Pritchard*: "[T]he district court erred in focusing on whether the plans referenced sex or a synonym. The Supreme Court 'has never suggested that [a statute's] mere reference to sex is sufficient to trigger heightened scrutiny' by showing that the statute discriminates based on sex. Particularly '[i]n the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny.'" 159 F.4th at 670 (quoting *Skrmetti*, 605 U.S. at 512).

The Fourth Circuit in *Anderson*, another ACA case, likewise concluded that *Skrmetti* forecloses this argument. "Not every law that references or relates to sex necessarily classifies on that basis." 2026 WL 667919 at *3. For example, the court noted that the Supreme Court previously held in *Geduldig v. Aiello*, 417 U.S. 484, 494 (1974), that California's disability-insurance system, which excluded coverage for conditions related to pregnancy, did not

10

discriminate on the basis of sex, despite the fact that only women can become pregnant.  *Id.*  at \*4.

"The Court most recently reaffirmed *Geduldig* in *Skrmetti*, holding that Tennessee's ban on certain

treatments for gender dysphoric minors did not violate the Equal Protection Clause, even though 'only

transgender individuals seek treatment for gender dysphoria.'  Invoking *Geduldig*, the Court explained

that Tennessee's statute, like California's insurance program, 'does not exclude any individual from

medical treatments on the basis of' a protected characteristic, like transgender status or sex, 'but rather

removes one set of diagnoses,' including gender dysphoria, 'from the range of treatable conditions.'"

*Id.* (quoting *Skrmetti*, 605 U.S. at 518-19).[4]  There is a substantial possibility that the Second

Circuit will agree with the reasoning of its sister circuits and uphold Aetna's policy on that basis.

> **b.**     ***Skrmetti* forecloses the argument that Aetna's policy discriminates based on sex under the logic of the *Bostock* "but-for" test.**

Although the Order acknowledges that the Supreme Court upheld the law at issue, it

concluded that fact was irrelevant because "[i]n reaching this conclusion, the Supreme Court

---

[4] In its Order addressing Aetna's motion to dismiss, this Court also suggested in a footnote—but did not explicitly hold—that Aetna's policy impermissibly perpetuates sex stereotypes.  Order at 17 n. 1.  The Supreme Court rejected this argument in *Skrmetti* as well: "[W]e reject the plaintiffs' argument that, 'by design, SB1 enforces a government preference that people conform to expectations about their sex.'" 605 U.S. at 516.  "[T]he plaintiffs' allegations of sex stereotyping are misplaced" because "[the Tennessee] law's classifications are neither covertly nor overtly based on sex."  *Id.* Moreover, the state's articulated reasons for the law "do not themselves evince sex-based stereotyping," especially given the state's expressed concern about the efficacy and safety of the subject gender-affirming procedures.  *Id.* at 516-17.  These are the very same considerations underlying Aetna's clinical policy.

The Fourth Circuit also rejected a stereotyping argument in *Anderson.*  "Plaintiffs contend that the Exclusion unlawfully discriminates because it promotes sex stereotypes by punishing transgender people for nonconformity. … But that's not what's happening here.  *See Skrmetti*, 605 U.S. at 516–17 (rejecting claim of sex-based stereotyping)." 2026 WL 667919 at \*7.  "[The West Virginia] plan grants or withholds coverage based on a patient's diagnosis, *i.e.*, a certain physical condition with unique causes, risks, and susceptibility to treatment. The different coverage accorded to treatments for different diagnoses is therefore based on medical judgment of biological reality, which is not a stereotype." *Id.* (citing *Skrmetti*, 605 U.S. at 516-17; *Nguyen v. INS*, 533 U.S. 53, 68 (2001). *See also Lange*, 152 F.4th at 1234; *Brandt*, 147 F.4th at 880-81.

declined to consider how the logic articulated in *Bostock* affected its analysis." Order at 51 n. 15.

There is a substantial possibility the Second Circuit will disagree with that analysis.

The Supreme Court explicitly analyzed the Tennessee law under the *Bostock* "but-for" test and upheld the law because "changing a minor's sex or transgender status does not alter the application of [the Tennessee law]." 605 U.S. at 520. The Court reasoned:

> If a transgender boy seeks testosterone to treat his gender dysphoria, SB1 prevents a healthcare provider from administering it to him. If you change his biological sex from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury. The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. *Under the reasoning of Bostock, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone.*

*Id.* at 520-21 (emphasis added). The Court again reemphasized its analysis of the *Bostock* test: "Under the logic of *Bostock*, then, sex is simply not a but-for cause of [the law's] operation." *Id.* at 522.

The five Circuit courts that have upheld policies limiting treatments for gender dysphoria since *Skrmetti* have all recognized that the Supreme Court's analysis of the *Bostock* test is binding in this context. As the Fourth Circuit explained in *Anderson*, "Even though *Skrmetti* did not address Title VII, Title IX, or the Affordable Care Act, we are still bound to follow the Supreme Court's instructions about the correct way to apply *Bostock*." 2026 WL 667919 at *10. The Eleventh Circuit expressed the same conclusion more bluntly: "It is passing strange [to] rely extensively on *Bostock*, and, at the same time, reject the Supreme Court's own explanation of what *Bostock* means." 152 F.4th at 1254; *see also Brandt*, 147 F.4th at 880 (8th Cir.); *Pritchard*, 159 F.4th at 670 (9th Cir.); *Poe*, 149 F.4th at 1122 (10th Cir.).

In its Order, this Court applied a now-outdated *Bostock* analysis, untethered to the explicit directives from the Supreme Court about how the *Bostock* test operates in the context at issue in

this case: "[T]he Supreme Court's reasoning in *Skrmetti* does not change this Court's analysis here; the 'but-for' analysis articulated in *Bostock* remains binding on Plaintiffs' claim under Section 1557." Order at 51 n. 15.  This Court, in effect, applied the same outdated interpretation of *Bostock* that the Supreme Court rejected when, after *Skrmetti*, it vacated the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), *vacated by Folwell v. Kadel*, 145 S. Ct. 2838 (2025) *and Crouch v. Anderson*, 145 S. Ct. 2835 (2025).

Indeed, the Fourth Circuit itself recognized as much in its new opinion in *Anderson*: "Since, under Fourth Circuit precedent, *Bostock* controls our analysis of Title IX, and by extension, the Affordable Care Act, we apply *Bostock* here in the same way the Supreme Court did in *Skrmetti* and find that the [West Virgina Medicaid Plan] does not violate the Affordable Care Act's antidiscrimination provision." 2026 WL 667919 at *10.  The court reasoned:

> *Bostock*'s "traditional but-for causation standard" instructs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause. … But here, changing [Plaintiff's] sex or transgender status does not alter West Virginia's choice to decline coverage for the requested services.
>
> For example, even if we changed Plaintiff Anderson's biological sex from male to female, West Virginia would still deny Anderson coverage for a vaginoplasty and breast augmentation, because Anderson would still lack a qualifying diagnosis for the treatments.  The only way Anderson could get these treatments is if Anderson had some other diagnosis, like breast cancer, that was covered.  But if Anderson had that other diagnosis, Anderson could obtain treatment regardless of sex or transgender status.  Thus, "[u]nder the reasoning of *Bostock*," a patient's diagnosis— not sex or transgender status—is the but-for cause of the ability or inability to obtain coverage under the plan.  *Skrmetti*, 605 U.S. at 520.

*Id.* at *11.  The Fourth Circuit explicitly recognized the binding nature of the Supreme Court's directives in *Skrmetti*: "Since *Skrmetti*'s approach to *Bostock* controls our Affordable Care Act analysis, we hold that West Virginia's Exclusion does not violate § 1557." *Id.*

The Ninth Circuit reached the same conclusion in *Pritchard*: "Here, we are in the medical context. Though [defendant's] exclusions reference sex, and though that reference may be relevant,

13

it is not sufficient to trigger *Bostock*'s application." 159 F.4th at 670. The court also rejected the plaintiffs' assertion there that *Skrmetti* is inapplicable to a claim under Section 1557:

> Plaintiffs try to distinguish *Skrmetti*, cabining it to the constitutional context. Though *Skrmetti* was a constitutional case, its logic reaches more broadly. *Skrmetti* applied the *Bostock* test, which arose in the Title VII context, not the constitutional context. *Skrmetti* did not decide whether *Bostock*'s reasoning reaches constitutional claims. Even "[u]nder the reasoning of *Bostock*," however, the statute did not discriminate based on sex. [605 U.S. at 521.] *Thus, Plaintiffs may be right that sex discrimination works differently in constitutional and statutory cases. But because Skrmetti assumed without deciding that the standards were identical, Skrmetti's gloss on Bostock applies to statutory cases like this one.*

159 F.4th at 670 (emphasis added). The Ninth Circuit likewise rejected the plaintiffs' assertion that Section 1557, through Title VII, prohibits discrimination against treatment for gender dysphoria: "[W]hen Congress amended Title VII, it created a rule that does not help Plaintiffs. Congress defined "because of sex" to incorporate "pregnancy, childbirth, or related medical conditions," but it changed nothing about gender dysphoria or gender reassignment. *Thus, Section 1557 bars discrimination against treatment for pregnancy and childbirth but not treatment for gender dysphoria. Id.* (emphasis added).

Aetna's policy operates in the same sex-neutral manner—and entirely consistent with *Skrmetti* and the five Circuits that have followed it when assessing how health benefits plans operate with respect to coverage of gender dysphoria related treatments. Aetna's clinical policy endorses a wide variety of gender-affirming treatments which have been shown to be effective by high-quality medical research and evidence, but excepts one limited subset of surgical procedures where that medical support is lacking—and each of the procedures is covered, or not, regardless of sex. Aetna's CPB 615 classifies as unproven (and therefore not "medically necessary") both *feminization* (male-to-female) and *masculinization* (female-to-male) facial surgeries. *See* Dkt. 86-6. Similarly, Aetna's CPB 31 excludes cosmetic facial surgeries generally, for *all individuals*, except where the procedure has a well-established functional purpose, such as reconstruction following

14

cancer treatment or traumatic injury—which exception Aetna applies, again, irrespective of sex or transgender status. Aetna's policy, in the words of *Skrmetti*, "does not mask sex-based classifications [because] the [policy] does not prohibit conduct for one sex that it permits for the other;" the policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." 605 U.S. at 514-15, 518-19.

The merits of Aetna challenge to the Order are supported by the Supreme Court's directives in *Skrmetti*, as well as the unanimous opinions of the five circuit courts that have applied *Skrmetti* to policies that are functionally and legally indistinguishable from Aetna's policy here. Aetna thus is highly likely to succeed on the merits of its appeal. Indeed, as the Fourth Circuit recently concluded in *Anderson*, "*Skrmetti* compels the conclusion" that a policy like Aetna's here does not violate the Affordable Care Act. 2026 WL 667919 at *1.

### B.      Aetna Will Be Irreparably Harmed Absent a Stay

Under the Second Circuit's "sliding scale" balancing test, a court may "grant[] a stay pending appeal where the likelihood of success is not high but the balance of hardships favors the applicant . . . [or] where the probability of success is high and some injury has been shown." *See Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (citations and quotations omitted). To obtain a stay pending appeal, "the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *LaRouche*, 20 F.3d at 72-73.

> ### 1. The injunction irreparably interferes with and impedes Aetna's ability to satisfy its contractual and legal obligations under ERISA as a third-party administrator of Plaintiffs' employer-funded health plans.

Aetna is *not* Plaintiffs' *insurer*, nor does Aetna *underwrite* the plans of Plaintiffs' employers. Rather, Plaintiffs' health plans are entirely self-funded by their employers, who created the plans and control their benefits, and Aetna serves as third-party claims administrator at the direction of the employers. The Bausch & Lomb Plan covering Dr. Homnick is funded entirely by Bausch & Lomb and governed by ERISA; the MTA Plan covering Dr. Herley is funded by MTA and her wife's union.

Self-funded health benefit plans are not "insurance" in the conventional sense. When a health plan is self-funded, the sponsoring employer does not purchase a commercial insurance policy to cover its plan obligations; instead, the employer designs its own coverage plan, with benefit claims paid from its own coffers, and retains a third-party administrator ("TPA") to process claims. *Liberty Mut. Ins. Co. v. Donegan,* 746 F.3d 497, 501 (2d Cir. 2014); *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1131 (9th Cir. 2017). The responsibility to design and fund the benefits remains with the plan sponsor. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 317 (2016).

The third-party claims administrator—Aetna here—is obligated under ERISA to administer a self-funded plan according to its terms. "ERISA . . . requires plans to be administered consistent with their terms." *Becerra*, 55 F.4th at 591. And a third-party claims administrator has no right to unilaterally alter the benefits offered under the plan. *See, e.g., Egelhoff ex rel. Breiner*, 532 U.S. at 150 (recognizing that plans must "be administered, and benefits be paid, in accordance with plan documents").

16

### a.    Plaintiffs' employers directed Aetna to follow its CPB 615 in administering their Plans.

The Plans sponsored by Plaintiffs' employers delegate coverage determinations to Aetna, as claims administrator, including the discretionary authority to construe and apply the terms of the Plans. *See* Order at 27. The administrative agreements governing the relationship between Aetna and the employer-sponsors of Plaintiffs' plans both make clear, however, that the employers retain ultimate responsibility for the coverage terms and benefits of the plans they created and fund. The Master Services Agreement ("MSA") for Dr. Homnick's Plan provides that Bausch & Lomb "retains complete authority and responsibility for the Plan, its operation, and the benefits provided there under" and retains "the final and sole authority regarding the benefits and provisions of the Plan(s), as outlined in [the] Plan document." *See* Dkt. 102 at 3-4, 20-21. Similarly, the ASA for Dr. Herley's Plan provides that MTA retains "full and final authority and responsibility for the Plan and its operation" and had "sole authority over the design of the plan" and "possess[es] ultimate and discretionary authority to decide…benefits covered under the plan." *Id.* at 11-12, 21.

Moreover, it is undisputed that both Plaintiffs' employers explicitly exercised their discretionary control here.

- *Bausch & Lomb and Dr. Homnick.* As the Court correctly notes in its Order, Dr. Homnick's Bausch & Lomb ("B&L") Plan provided that "[c]overed services include certain services and supplies for gender affirming treatment" and then *expressly incorporated* Aetna's Clinical Policy Bulletins "for detailed information about this benefit, including eligibility and medical necessity requirements." Order at 27. Dr. Homnick sought prior authorization for gender-affirming procedures in September 2024, which Aetna denied. She then contacted her employer directly and asked that B&L either revise its Plan to include coverage for GAFR procedures or grant an exception in her case. *See* Dkt. 102 at 5-8,

17

21. In considering Dr. Homnick's request, B&L sought advice, not only from Aetna, but also from a medical director at Willis Towers Watson, a national consulting firm that specializes in employee benefits plan strategy and design. *Id.* at 8-9. 21-22. B&L thereafter advised Aetna: "B&L will not be granting an exception for this individual so if you have any standard language that you use in this case, that will be helpful as well. It will be important to reinforce this message should the member call in on this issue again." *Id.* at 9, 22. B&L also directed Aetna to confirm its position with Dr. Homnick's providers: "B&L wants to ensure that somehow the providers office is notified that this is not considered medically necessary…." *Id.* at 9-10, 22. Aetna thereafter provided the policy statement the employer requested and approved, which specifically cited to Aetna's CPB 615. *Id.* 10. Indeed, Dr. Homnick stipulates in her amended complaint that she asked B&L for "an exception to the exclusion in her case" but her employer "declined her request." *See* Dkt. 60 at ¶ 88.

- *MTA and Dr. Herley.* MTA retained Aetna to administer claims under its Plan but, by contract, expressly retained both "ultimate and discretionary authority to decide…benefits covered under the plan." and "the right to review [Aetna's] adopted procedures and practices for claims approval, claims denial, and other aspects of the administration of the plan." *See* Dkt. 102 at 12, 22. Pursuant to that authority, MTA specifically directed Aetna to follow its Clinical Policy Bulletins in processing claims for gender affirming care. *Id.* at 12, 22-23.

Aetna's CPB 615 reflects Aetna's evidence-based assessment that current research and data are insufficient to establish that facial surgery is a medically effective and necessary treatment for

18

gender dysphoria.[5]  Aetna denied Plaintiffs' coverage requests on that basis, following the very

policy the employers directed Aetna to apply, and Aetna's decision constitutes a reasonable and

sufficient determination of medical necessity under the terms of the Plans.  Courts routinely uphold

benefit denials where the administrator reasonably determines that the requested service is not

medically effective and thus not medically necessary, even where the administrator utilizes a

general evidence-based policy like Aetna's CPB 615.  This is especially so where, as the Court

notes here, a plan delegates to the TPA the discretionary authority to construe and apply the terms

of the plan and expressly incorporates clinical policy guidelines developed by the TPA.  *See, e.g.*,

*Id.* at 27.  For example, in *E.R. v. UnitedHealthcare Ins. Co.*, 248 F. Supp. 3d 348 (D. Conn. 2017),

the court granted summary judgment for a TPA and upheld its denial of benefit claims where the

TPA relied upon its own internal guidelines that classified the requested service as not medically

necessary.  The court held that a plan's grant of discretionary authority to a TPA includes "the right

to adopt such policies and guidelines as required to interpret the provisions set out in the Plan and

to make benefits determinations."  *Id.* at 361.  Similarly, in *Ramsteck v. Aetna Life Ins. Co.,* 2009

WL 1796999, *9 (E.D.N.Y. June 24, 2009), the court granted summary judgment for Aetna and

upheld a benefit denial for laser spine surgery and PT where Aetna relied on its CPB to deny

coverage for laser spine surgery and PT based on medical necessity because the effectiveness of the

procedures had not been demonstrated in the medical literature.  *See also Stern v. Oxford Health*

*Plans, Inc.*, No. 12–cv–2379 (JFB)(EBT), 2013 WL 3762898, at *8 (E.D.N.Y. July 17, 2013)

---

[5] As Plaintiffs themselves concede, Aetna has reached a different conclusion regarding the medical necessity of other, more common treatments for gender dysphoria, such as genital and breast surgery and hormone treatments.  *See* Dkt, 60 at ¶ 8.  As even WPATH recognizes, there currently is far more research and evidence-based consensus supporting the efficacy of chest and genital procedures for the treatment of gender dysphoria than exists for facial gender-affirming procedures.  And the record here is undisputed that Aetna's assessment of the medical necessity of facial gender-affirming surgery is based upon this lack of medical consensus.

(rejecting a plaintiff's argument that the adopted guidelines could not control as they were not part of the plan); *S.M. v. Oxford Health Plans (N.Y.) Inc.*, 94 F.Supp.3d 481, 508 (S.D.N.Y. 2015) (same).

In addressing Aetna's challenge to Plaintiffs' standing under Article III, the Court held that "[t]he injunctive and declaratory relief sought by Plaintiffs thus would redress their injuries by requiring that any denial be based on a lack of medical necessity as opposed to alleged discrimination on the basis of sex." Order at 28. But under ERISA, as well as the employers' directives to Aetna under their Plans, a denial that relies on CPB 615 *is a denial based on a lack of medical necessity*. Aetna applied the policy the employers directed and denied the claims for lack of medical necessity in accordance with the terms of the Plans.

> **b.**     **Aetna will suffer irreparable harm because the Order interferes with Aetna's statutory and contractual duties to the employer sponsors of Plaintiffs' Plans.**
>
> **i.**     **The Order conflicts with the Plans and directives of Plaintiffs' employers over whom the Court has no jurisdiction.**

Plaintiffs have deliberately structured this litigation to exclude their employers; indeed, they have vigorously resisted Aetna's efforts to join their employers here. Plaintiffs make no claims against their employers, and this Court has no jurisdiction over them. Plaintiffs have not asked this Court to revise the terms of their employers' Plans or to order their employers to provide or pay for GAFR benefits under their Plans, and the Court thus is powerless to do so. Nor has there been any finding that the employers' Plans are discriminatory; indeed, *Skrmetti* makes clear they are not.

Indeed, the Court acknowledges as much in its Order: "[A] favorable decision [for Plaintiffs] from this Court would not modify the plans themselves." Order at 27. Plaintiffs' Plans thus remain unchanged, and their employers' coverage directives to Aetna are wholly unaffected by this Court's Order. This Court's order that Aetna reprocess Plaintiffs' claims without the

20

application of CPB 615—that Aetna ignore the very policy both employers directed Aetna to follow in the administration of their Plans—does not carry with it any binding mandate that applies to Plaintiffs' employers or the terms of their Plans.  Simply stated, a reconsideration of Plaintiffs' claims pursuant to this Court's Order is not the same thing as a reconsideration under the terms of their employers' Plans, which fund the benefits at issue but over which the Court has no authority.[6]

Despite the Court's recognition that its Order does "not modify the plans themselves," *see* Order at 27, the Order nonetheless directs Aetna "to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion [i.e., CPB 615]," *see id.* at 28.  The Order thus purports to require Aetna to reprocess Plaintiffs' claims contrary to the directives of their employers and the terms of their Plans—indeed, contrary to the very clinical policies that B&L expressly incorporated into its Plan and that MTA explicitly directed Aetna to follow in administering its Plan.  *See* Order at 27; Dkt. 102 12, 22-23.  But Aetna is prohibited, both legally and contractually, from doing so.  It is fundamental under ERISA that a third-party claims administrator, like Aetna here, is obligated to administer a self-funded plan according to its terms.  *Egelhoff ex rel. Breiner*, 532 U.S. at 150; *Becerra*, 55 F.4th at 591.

Aetna cannot approve coverage for Plaintiffs' facial feminization surgeries, nor can Aetna expend Plan funds to pay for such services, contrary to the Plan terms and the instructions of the self-funding employers—especially now that the Supreme Court has made clear in *Skrmetti* that health plans like those here are not required to provide coverage for gender-affirming services.

---

[6] Enjoining the use of Aetna's CPB 615 can neither create medical consensus on the efficacy of GAFR where none otherwise exists nor require that employers who control and fund their own plans, and who have access to their own sources of medical authority, approve coverage and payment for Plaintiffs' GAFR—as Dr. Homnick's own direct appeals to Bausch & Lomb vividly illustrate.  Indeed, given the Supreme Court's clear directives in *Skrmetti*, there is no legal reason why they should do so.

####   ii.    The Order requires Aetna to violate the Plans and coverage directives of the non-party employers.

The Court's Order puts Aetna in an untenable position: It cannot both comply with the Order and also fulfill its legal and contractual obligations as TPA to the employer plan sponsors. Indeed, the Court's Order itself highlights this unavoidable conflict: The Order, on the one hand, states that it does "not modify the plans themselves" but then, on other, directs Aetna "to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion [i.e., CPB 615]." Order at 27-28. But, as the record here makes clear, the employers who sponsor these particular Plans *did not* choose to "override" Aetna's CPB 615; to the contrary, they expressly incorporated it and directed Aetna to follow it. Aetna cannot administer the Plans as the employers have directed by ignoring the very policy the employers instructed Aetna to follow.[7]

---

[7] Indeed, this logical inconsistency, which the Order itself highlights, only underscores that Plaintiffs lack Article III standing for the unusual injunctive relief they seek here because it cannot redress the injury they allege. The Court rightly acknowledges that it cannot modify the terms of the Plans themselves; the employer sponsors are not parties here, at Plaintiffs' specific insistence, and the Court has no power over them or their Plans. But the Court also recognizes that Plaintiffs can "acheiv[e] their ultimate goal of receiving gender-affirming facial reconstruction under their health insurance plans" only if Aetna is required "to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion [i.e., CPB 615]." Order at 28. In other words, the relief Plaintiffs seek can only be achieved by directing Aetna to ignore the terms of Plans the Court is powerless to change; enjoining *Aetna* from consulting its CPB will not compel the absent *employers* to cover and fund the medical care Plaintiffs seek. *See, e.g., Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (Plaintiffs suing federal agencies and officials for alleged censorship by non-party social media platforms alleging could not satisfy redressability requirement for Article III standing because "[t]he [social media] platforms are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced."); *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (injunction preventing federal agencies from enforcing provisions of Indian Child Welfare Act and declaring provisions unconstitutional would not redress plaintiffs' alleged injury because state agencies carry out the provisions and the state officials who implement the ICWA were not parties to the suit and thus not bound by any judgment court might enter).

Here, Plaintiffs "can only speculate about the decisions of third parties," *Murthy*, 603 U.S. at 72, and the Supreme Court has repeatedly expressed its "reluctan[ce] to endorse standing theories that

Moreover, this tension between this Court's Order and Aetna's responsibilities to the employer Plan sponsors substantially and adversely affects Aetna at an enterprise level: Plaintiffs ultimately seek to obtain the same relief, not only for the other named Plaintiffs, but on behalf of a putative nationwide class. The Order thus undermines not only Aetna's relationships with Plaintiffs' employers (over whom this Court has no jurisdiction) but also adversely impacts Aetna's contracts with other similarly-situated non-party employers (over whom this Court also has no authority).

A movant establishes irreparable harm sufficient to support a stay where the injunction, like the Court's Order here, alters or modifies the movants' contractual or legal responsibilities or liabilities to third parties over whom the court issuing the injunction has no jurisdiction. In *re Broadstripe, LLC*, 2009 WL 774401, at *5 (D. Del. Mar. 26, 2009), for example, the district court considered an injunction entered by a bankruptcy court that affected a contract between the debtor and a non-debtor party; the injunction purported to enforce the contract against the non-debtor party but modified its provisions to give the debtor more rights than it would have absent bankruptcy. The district court granted the non-debtor party's motion to stay the injunction pending its appeal challenging the bankruptcy court's power to rewrite the parties' contract. *Id.* at *5. "Without a stay of the preliminary injunction, [the non-debtor party] will incur obligations…in contravention of its rights under the [agreement with the debtor]. This is actual, if not devastating, harm not compensable by money damages and so suffices to support a stay." *Id.*

---

require guesswork as to how independent decisionmakers will exercise their judgment," *id.* at 58; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n. 5 (2013). "Redressability requires that the court be able to afford relief *though exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland*, 599 U.S. at 294 (original emphasis).

23

Irreparable harm sufficient to support a stay also exists where the injunction interferes with the movant's contracts or business relationships with third parties. For example, "loss of goodwill or business relationships" with third parties is a form irreparable harm that can support a stay. *See, e.g., Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 622 (S.D.N.Y. 2010); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018) ("It is well established in this Circuit that the loss of client relationships and customer goodwill … generally constitutes irreparable harm."); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004) (collecting cases). As the Second Circuit has recognized, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). Here, the Court has enjoined Aetna from applying the very policy the employers instructed it to follow in administering their Plans—a ruling that is highly suspect in light of *Skrmetti* and that necessarily impacts Aetna's administration of other self-funded Plans with similar requirements. That, too, is irreparable harm.

### c.    The Order also subjects Aetna to potential monetary loss that cannot be recouped.

The Court states in its Order that requiring Aetna to reprocess Plaintiffs' claims without reference to CPB 615 "would remove a significant barrier to Plaintiffs achieving their ultimate goal of receiving gender-affirming facial reconstruction under their health insurance plans." Order at 28. But that "barrier"—CPB 615—is one the employers themselves adopted; both employers expressly directed Aetna to follow its CPB 615 in administering claims for gender-affirming services under the Plans. And the Court acknowledges that it cannot "modify the plans themselves." Order at 27.

24

Plaintiffs' request for coverage under their Plans for the surgeries they seek necessarily comes down to a request that the Plans pay for those surgeries. But the Court has no power to compel the Plans to provide coverage or payment. Indeed, the injunction here purports to do so only by directing Aetna to ignore the very policy the employers instructed Aetna to follow.

Plaintiffs know this. They know this Court has no authority over their employers or their Plans—indeed, they have strenuously resisted giving this Court that power. Knowing that, Plaintiffs seek to employ the ACA to convert Aetna from a claims administrator of employer-funded plans into an *insurer* of those plans. Because neither the Court nor Aetna can compel the employers to cover or pay for the surgeries Plaintiffs seek, and because Aetna cannot itself authorize the expenditure of Plan funds to pay for these services, payment ultimately can come only from Aetna itself. Which is what Plaintiffs intend.

But Aetna could not expect to recoup any such payment from the employers or their Plans when there has been no finding that the Plans provide such coverage or that the employers are required to do so, especially in light of clear Supreme Court authority that there is no such requirement. Moreover, this tension between this Court's Order and Aetna's responsibilities to the employer Plan sponsors, and the legal question whether Aetna can be compelled under the ACA to become an insurer for the absent employers, substantially and adversely affects Aetna at an enterprise level: Plaintiffs ultimately seek to obtain the same relief, not only for the other named Plaintiffs, but on behalf of a putative nationwide class.

"While the loss of money is not typically considered irreparable harm, that changes if the funds cannot be recouped and thus are irrevocably expended." *National Institutes of Health v. Am. Pub. Health Ass'n ("NIH v. APHA"),* 606 U.S. ---, 145 S. Ct. 2658, 2659 (2025); *Philip Morris*

25

*USA Inc. v. Scott*, 561 U. S. 1301, 1304 (2010) (Scalia, J., in chambers); *New Jersey v. U.S. Dep't of Transp.*, No. 26-282, 2026 U.S. App. LEXIS 7463, at *1 (2d Cir. Mar. 11, 2026).

Plaintiffs resisted the imposition of a bond here, nor have they offered or demonstrated any ability to repay any benefits they receive in the event their claims in his litigation ultimately prove unsuccessful.  This also establishes irreparable harm sufficient to support the issuance of the stay Aetna requests.

### d.    Aetna's appeal may be mooted absent a stay.

Courts in this Circuit are especially skeptical of mandatory injunctions that function as interim monetary awards, especially where, as here, the injunction being sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits…" *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020), (citing *New York ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)); *Crispin v. Walker*, 2026 WL 252140, at *3 (D. Conn. Jan. 30, 2026).

"Where the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) (original emphasis).  "[L]oss of appellate rights is a quintessential form of prejudice." *Id.  See also In re Norwich Historic Pres. Trust, LLC*, No. 3:05CV12, 2005 WL 977067, at *3 (D.Conn.2005) (acknowledging "persuasive" arguments that although foreclosure sale would not injure appellant, appellant's concern that his appeal would be mooted satisfied the irreparable harm requirement).

Courts in this Circuit thus have held that "the potential mooting of an appeal, coupled with the risk of substantial monetary loss, is sufficient to establish irreparable injury." *E.g., Levine v. B & R Acquisition Partners, LLC*, 2024 WL 3829567, at *8 (N.D.N.Y. Aug. 15, 2024); *State Emps. Fed. Credit Union v. S.G.F. Props., LLC*, 2015 WL 7573220., at *3 (N.D.N.Y. Nov. 25, 2015).  In

*In re Adelphia Commc'ns Corp.*, for example, the court granted creditors' motion for stay pending appeal with respect to a court's order confirming a plan of reorganization. 361 B.R. 337 at 342. (S.D.N.Y. 2007). The creditors argued that if the plan were to take effect and distributions were made, there was "a very strong likelihood that any appeal will be moot." *Id*. at 351. The court agreed noting that "once the distributions are made pursuant to the Plan, it will become impracticable to ever fashion effective relief." *Id*. at 351. Accordingly, the court held that because "any appeal of the Confirmation Order after implementation of the Plan would be dismissed as moot," the creditors had "made a showing that they will suffer irreparable harm in the absence of a stay." *Id*. at 652.

Plaintiffs' entitlement to the coverage they seek is highly questionable in light of *Skrmetti*. And the coverage and payment Plaintiffs seek here, once awarded, cannot be undone. Denial of the stay Aetna requests here risks mooting its appeal of significant claims of error, which constitutes clear irreparable harm. *See In re Adelphia Commc'ns Corp*., 361 B.R. at 348.

In sum, the Court's Order purports to modify Aetna's administration of Plans sponsored and funded by nonparty employers over whom the Court has no jurisdiction and whose Plans the Court cannot revise, and Aetna cannot both comply with the Court's Order and fulfill its legal and contractual obligations to the employers. The Order adversely impacts Aetna's business relationships with these employers, as well as the multitude of other similarly-situated employers embraced by Plaintiffs' putative class. And because any monies Aetna is forced to expend to pay for the services Plaintiffs seek may not be reimbursable from Plan funds or from the plaintiffs, any such funds likely cannot be recouped and thus are irrevocably expended. Finally, enforcement of the injunction during the pendency of the appeal will so alter the status quo as to deprive the appellate court of an opportunity to address the manifest errors in the Court's Order.

For all these reasons, Aetna has demonstrated irreparable harm more than sufficient to support a stay of the injunction. This is especially so under the "sliding scale" applied in the Second Circuit, given the substantial merits of Aetna's challenge to the Court's misapplication of *Skrmetti*.

**C.    A Stay Will Not Injure, But Rather Will Protect, Other Interested Parties**

The third factor that courts weigh in considering whether to stay an injunction pending appeal is "whether issuance of the stay will substantially injure the other parties interested in the proceeding." *Hilton*, 481 U.S. at 776 (1987).

Issuance of the stay Aetna requests will have no negative impact on any third parties. And Plaintiffs themselves can demonstrate no harm from a stay. Plaintiffs filed their motion for preliminary injunction more than a year ago, and they face no meaningful harm from a short delay while the Second Circuit considers Aetna's appeal.

Granting the stay, moreover, will protect important rights of the third-party employers over whom the Court has no jurisdiction but whose Plans the injunction purports to impact. While the Court acknowledges that it cannot "modify the plans themselves," Order at 27, its injunction purports to do just that. By enjoining Aetna from applying CPB 615 to Plaintiffs' claims and ordering Aetna "to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion," *Id.* at 28, the Court directs Aetna to ignore the very policy the employers instructed Aetna to follow in administering their Plans—to, in effect, require the employers to rewrite their Plans and coverage directives to eliminate CPB 615.

The Order thus purports to adopt a prominent subtext that pervades Plaintiffs' complaint and briefing—namely, that Aetna (and, by extension, the self-funding employers whose plans Aetna administers) should be required to apply generally the regulatory mandates of a handful of states that require coverage for facial gender-affirming surgeries. *See* Dkt. 60 at ¶ 147, Dkt. 123 at 6-7, 24 n. 17. But Plaintiffs' employer-funded plans are not insurance contracts—Aetna does

28

not underwrite them—and the plans thus are not subject to state insurance regulations. *FMC Corp. v. Holliday*, 498 U.S. 52, 64 (1990) ("[I]f the plan is uninsured, the State may not regulate it."). Plaintiffs' plain, though unacknowledged, goal in this litigation is to employ the ACA as a vehicle to subject their employers—and, indeed, every self-funding employer in the country—to these state-law insurance mandates, using Aetna as a surrogate. And the Court's Order allows Plaintiffs, in effect, to change their employers' Plans without ever allowing the employers to be heard on the issue.

The stay Aetna requests is essential to protect the important interests of the employers whom Plaintiffs seek to regulate without their participation.

### D.    A Stay Will Promote Important Public Interests

The final factor to be weighed in assessing Aetna's motion to stay is "where the public interest lies." *Hilton*, 481 U.S. at 776 (1987).

Employer-sponsored and -funded health benefit plans exist principally because Congress enacted ERISA to encourage their creation.[8] "Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place. We have therefore recognized that ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). The Court's injunction here, which attempts to circumvent the terms of the employers' Plans and their instructions to Aetna regarding administration of their Plans, all without allowing the employers an opportunity to heard on the issue, undermines the public policy goals of ERISA in a

---

[8] Plaintiff Homnick's B&L Plan is governed by ERISA. Plaintiff Herley's MTA Plan, which is funded by both her wife's employer and union, is not regulated by ERISA, but the same public policy interests relevant here apply equally to both Plans.

29

manner that, if allowed to stand, might "unduly discourage employers from offering welfare plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

Finally, and most fundamentally here, is the clear public interest underlying the foundational legal doctrine of *stare decisis*, which promotes stability, predictability, and fairness in the law by requiring courts to follow established precedent.  The Supreme Court in *Skrmetti* made clear that a classification based on medical use is not facially discriminatory, even if it "reference[s] sex" or "application of the [classification] turns on sex."  605 U.S. at 511-12.  This is so even if the classification expressly references transgender status and gender-affirming care. *Id.* at 517-18.  And this is so even applying the "but-for" test of *Bostock*.  *Id.* at 520-21.  Five Circuits have now followed *Skrmetti* and applied its directives to policies that are functionally and legally indistinguishable from Aetna's CPB 615 and the employers' Plans here.  The public interest is served by the consistent application of Supreme Court law, and granting a stay of the injunction here will allow the Second Circuit an opportunity to consider that question.

## CONCLUSION

For the foregoing reasons, Aetna respectfully requests, pursuant to FRCP 62(d), that the Court stay and suspend its order and injunction dated March 8, 2026 [Dkt. 153] requiring Aetna to make individualized coverage determinations as to Plaintiffs Jamie Homnick ("Homnick") and Gennifer Herley ("Herley"), pending Aetna's appeal of that order and injunction to the Second Circuit.

Dated at Hartford, Connecticut this 31st day of March, 2026.

*Theodore J. Tucci*
Theodore J. Tucci (ct05249)
Abby M. Warren (ct30077)
Christopher A. Costain (ct31612)
Robinson & Cole LLP
One State Street
Hartford, CT 06103-3597
Tel.: (860) 275-8200
Fax: (860) 275-8299
ttucci@rc.com
awarren@rc.com
ccostain@rc.com

Sarah Reeves (*pro hac vice*)
Earl B. Austin (*pro hac vice*)
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel.: (212) 408-2649
Fax: (212) 408-2449
sarah.reeves@bakerbotts.com
earl.austin@bakerbotts.com

*Counsel for Defendant*
*Aetna Life Insurance Company*

31