OCT 15 2026 PM1:07
FILED-USDC-CT-NEW_HAVEN

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**RELATED CONNECTICUT MEDICAL, BODILY-AUTHORITY, AND GOVERNMENTAL-HEALTH MATTERS**

---

**BINAH GORDON, et al.,**
Plaintiffs,
v.
**AETNA LIFE INSURANCE COMPANY,**
Defendant.
Civil Action No. **3:24-cv-01447-VAB**

---

**VERONICA-MAY CLARK,**
Plaintiff,
v.
**ANGEL QUIROS, GERALD VALETTA, RICHARD BUSH, and BARBARA KIMBLE-GOODMAN,**
Defendants.
Civil Action No. **3:19-cv-00575-VAB**

---

**BROOKS TURNER,**
Plaintiff,
v.
**CONNECTICUT DEPARTMENT OF CORRECTION and HELENA MORRIS,**
Defendants.
Civil Action No. **3:25-cv-01622-SVN**

---

**WILLIAM THOESEN,**
Plaintiff,
v.
**CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES, et al.,**

Defendants.
Civil Action No. **3:25-cv-02083-SVN**

---

**PETER T., MAURA K., and M.T.,**
Plaintiffs,
v.
**OXFORD HEALTH INSURANCE, INC., et al.,**
Defendants.
Civil Action No. **3:26-cv-00658-SRU**

---

**MOTION OF BRANDON MICHAEL HAYES, APPEARING PRO SE AS PRESIDENT OF THE NATURAL LAW INSTITUTE, FOR LEAVE TO FILE BRIEF OF AMICUS CURIAE IN SUPPORT OF NEITHER PARTY, TO ACCEPT THE ACCOMPANYING INTEGRATED BRIEF, AND FOR RELATED PROCEDURAL RELIEF**

Brandon Michael Hayes, appearing pro se as President of the Natural Law Institute ("NLI"), respectfully moves for leave to file the proposed Brief of Amicus Curiae contained immediately following this Motion.

This filing constitutes both the request for leave and the complete proposed amicus curiae brief for which leave is sought.

The proposed brief addresses a recurring decisional problem now appearing across multiple state and federal proceedings concerning transition-related medical treatment:

> **Who may authorize what intervention upon whose body, upon what facts, with what degree of understanding, subject to what professional duty, and with what lawful governmental warrant?**

The proceedings in which that problem appears arise through materially different causes of action and procedural postures. Some involve retrospective professional liability. Others involve governmental restrictions upon medical treatment. Others concern the evidentiary significance of detransitioner experience within constitutional litigation.

The proposed brief demonstrates that these controversies nevertheless depend upon substantially the same antecedent decisional architecture:

1. **Reality → Condition → Medical Object**

2. **Agency → Cognitive Fitness → Authority → Consent**
3. **Mechanism → Evidence → Risk → Alternative → Irreversibility**
4. **Professional Duty → Nexus → Governmental Warrant**
5. **Consequence → Accountability → Remedy → Trust**

The proposed submission is therefore particularly suited to amicus treatment. The parties properly litigate the claims, defenses, facts, and remedies belonging to the individual matter before the Court. Amicus supplies a separate structural contribution: a common method for identifying which decisional predicate is actually disputed, which actor bears responsibility for it, and what legal consequence may follow from satisfaction or failure of that predicate.

---

## I. INTEREST OF PROPOSED AMICUS

Brandon Michael Hayes is President of the Natural Law Institute and submits the proposed brief personally and pro se as President.

The Natural Law Institute is a constitutional research and public-interest institute concerned with lawful decisional architecture, individual and family agency, bodily authority, institutional responsibility, informational fidelity, professional duty, governmental authority, accountability, and adjudicative legitimacy.

**NLI's interest in the present subject is jurisprudential.**

Transition-related litigation has generated recurring disputes among patients, minors, parents, physicians, therapists, medical institutions, governmental actors, professional organizations, and other parties concerning the location and limits of medical decisional authority.

Those disputes have appeared in state and federal trial courts, state appellate proceedings, federal courts of appeals, and proceedings before the Supreme Court of the United States.

The recurrence permits a general question to be identified beneath the individual controversies:

> **What sequence permits a court to determine bodily condition, decisional agency, cognitive fitness, lawful authority, adequate information, medical evidence, professional duty, governmental warrant, causal consequence, accountability, and remedy without requiring ideology to substitute for an unsatisfied legal or factual predicate?**

Amicus submits the accompanying framework to assist courts in answering that question.

---

## II. SOURCE OF AUTHORITY AND REQUESTED PROCEDURAL TREATMENT

Amicus respectfully requests leave under the rules and authority governing amicus participation, motion practice, and judicial management in this Court.

Where leave of Court is required, this Motion supplies the requested statement of interest and explains the relevance and utility of the proposed submission.

Where the Court's applicable rules prescribe a particular form, timing requirement, page or type-volume limitation, disclosure, consent procedure, or other condition governing amicus participation, Amicus respectfully requests such leave, enlargement, waiver, construction, or other procedural treatment as permits the complete accompanying submission to be received and considered in its present integrated form.

The filing is tendered as a complete judicial submission rather than an attempted intervention in the action.

If the Court determines that the proposed brief is more properly received, docketed, retained, or considered through another permissible procedural vehicle, Amicus respectfully requests that the Court treat the submission accordingly without requiring duplicative preparation and refiling.

That treatment preserves the Court's complete control over its docket while preserving the substance and submission date of the proposed amicus presentation.

---

## III. THE PROPOSED BRIEF IS DESIRABLE AND RELEVANT TO THE COURT'S CONSIDERATION

The proposed brief addresses an analytical question distinct from the adversarial positions of the existing parties.

The immediate claims and defenses vary from case to case. The recurring decisional problem does not.

Across the transition-treatment litigation identified in the brief, courts repeatedly encounter some combination of:

1. the patient's actual biological and medical condition;
2. the identity and agency of the person whose body is affected;
3. cognitive fitness for the particular medical decision;
4. parental, surrogate, professional, or governmental authority;

5. the information available when the decision was made;
6. the mechanism and physical consequences of the intervention;
7. the evidence supporting intervention or nonintervention;
8. available alternatives;
9. reversibility and irreversibility;
10. professional duty;
11. coercion and voluntariness;
12. governmental protective authority;
13. causal consequence;
14. accountability; and
15. remedy.

The proposed brief does not ask the Court to treat transition medicine itself as the legal category.

It asks the Court to disaggregate that category into the predicates the law is capable of adjudicating.

That distinction is material because one downstream authorization cannot logically or legally manufacture an unsatisfied upstream predicate.

Parental authority, for example, identifies who may possess decisional authority concerning a minor. It does not itself establish diagnosis, cognitive fitness, voluntariness, medical necessity, adequate disclosure, evidentiary support, professional compliance, or causal nexus.

Likewise, patient preference does not establish professional duty; professional recommendation does not establish patient capacity; governmental permission does not establish medical necessity; and identification of medical risk does not itself establish the scope of governmental authority.

The architecture therefore assists the Court in determining precisely **where the controversy actually exists before determining what legal consequence follows from it.**

---

## IV. THE PROPOSED BRIEF SUPPLEMENTS RATHER THAN DUPLICATES PARTY ADVOCACY

The parties necessarily litigate the immediate controversy through the substantive claims, defenses, factual record, governing law, and requested relief specific to their case.

Amicus addresses the architecture within which those questions become decidable.

The proposed submission uses other transition-related proceedings comparatively to demonstrate recurrence of the same decisional questions across differing causes of action and procedural settings. Each proceeding remains governed by its own record, governing substantive law, procedural posture, and controlling precedent.

Completed matters and proceedings reaching the Supreme Court are used as jurisprudential reference points demonstrating the recurrence and development of the problem. Live matters demonstrate the architecture's continuing adjudicative application.

The requested amicus role is correspondingly limited and structural. Amicus seeks leave to place the framework before the Court and permits the Court to employ it to whatever extent the Court finds it useful in resolving the matters properly before it.

Amicus seeks no discovery, evidentiary enlargement, party status, alteration of the existing briefing schedule, or delay in adjudication.

---

## V. THE CROSS-DOCKET CHARACTER OF THE SUBMISSION SUPPORTS ACCEPTANCE OF THE COMPLETE BRIEF

The usefulness of the proposed brief depends in material part upon comparison.

The litigation identified therein does not consist of repeated copies of one lawsuit. Its importance lies in the opposite fact.

Different plaintiffs, defendants, jurisdictions, causes of action, governmental interests, constitutional claims, medical relationships, and procedural postures repeatedly expose different portions of the same underlying decisional structure.

The brief therefore uses retrospective provider-liability matters, governmental medical-authority litigation, appellate proceedings, concluded matters, and Supreme Court proceedings to demonstrate where the same predicates recur and where their legal function changes.

That comparison permits the Court to distinguish:

- **evidence from authority;**
- **authority from medical appropriateness;**
- **parental permission from professional duty;**
- **patient preference from cognitive fitness;**
- **medical risk from governmental warrant;**
- **governmental object from governmental mechanism;**
- **individual experience from constitutional consequence;** and

- **injury from legally attributable causation.**

Compression sufficient to remove those comparisons would materially weaken the demonstration for which amicus participation is requested.

Amicus therefore respectfully requests that the complete proposed brief be accepted as submitted. To the extent any otherwise applicable page, word, or type-volume limitation would require further leave, Amicus requests that leave as part of this Motion.

Acceptance of the complete submission imposes no corresponding requirement upon the Court to address every referenced proceeding, adopt the proposed architecture as a freestanding doctrinal test, solicit additional briefing, conduct argument, or grant relief beyond that otherwise authorized in the matter before it.

The Court remains free to employ the submission to the extent its structural analysis assists adjudication.

---

## VI. THE COMBINED FORM PROMOTES PROCEDURAL ECONOMY AND PRESERVES AN IDENTICAL RECORD

This Motion and the proposed amicus brief are tendered as one integrated submission.

The proposed brief begins immediately following the certificates below.

Amicus respectfully requests that the Court accept the combined presentation. If the Court's docketing practice requires the Motion and proposed brief to be recorded as separate entries, Amicus requests that the Clerk treat the corresponding portions of this integrated submission as the Motion and proposed brief respectively without requiring preparation or transmission of substantively duplicative documents.

The integrated form also ensures that the Court, parties, and Amicus possess the same submission.

The complete proposed filing is provided to counsel before tender to the Court. The copy subsequently submitted to the Court is the same substantive filing upon which notice and conferral occurred.

---

## VII. RELIEF REQUESTED

WHEREFORE, Brandon Michael Hayes, appearing pro se as President of the Natural Law Institute, respectfully requests that the Court:

1. grant leave to participate as amicus curiae through the accompanying proposed brief;
2. accept the proposed Brief of Amicus Curiae in support of neither party;
3. accept this combined Motion for Leave and proposed amicus brief in the integrated form submitted;
4. grant such leave as is necessary to exceed any otherwise applicable page, word, or type-volume limitation and permit the complete brief to be received;
5. accept the accompanying disclosure, authorship, funding, compliance, conferral, notice, and service statements;
6. construe, docket, retain, or otherwise treat the submission through such lawful procedural vehicle as permits its consideration without unnecessary duplicative refiling; and
7. grant such further procedural relief as permits consideration of the proposed amicus submission consistent with the Court's authority and management of the matter.

Respectfully submitted,

BMH

**Brandon Michael Hayes, Pro Se**
**President, Natural Law Institute**
159 Indian Hill Street
West Newbury, Massachusetts 01985
(617) 438-2049
brandon@hayeshaus.com

Dated: October 8, 2026

---

**DISCLOSURE AND STATEMENT REGARDING AUTHORSHIP, FUNDING, AND POSITION**

Brandon Michael Hayes appears personally and pro se as President of the Natural Law Institute.

Natural Law Institute is an independent research organization. It has no parent corporation. No publicly held corporation owns ten percent or more of any interest in Natural Law Institute.

No counsel for any party authored the proposed amicus brief in whole or in part.

No party or counsel for any party contributed money intended to fund preparation or submission of the proposed brief.

No person other than Brandon Michael Hayes or the Natural Law Institute contributed money intended to fund preparation or submission of the proposed brief.

The proposed brief represents the independent analysis of Amicus and is submitted in support of neither party.

---

## CERTIFICATE OF COMPLIANCE AND REQUEST FOR ANY NECESSARY ENLARGEMENT

I certify that the proposed amicus brief has been prepared as a single integrated submission using the same substantive text tendered to counsel and to the Court.

The accompanying Motion expressly requests leave to exceed any otherwise applicable page, word, or type-volume limitation to the extent such leave is necessary in the receiving Court.

To the extent the Court applies a different method of calculating or regulating the length or form of an amicus submission, Amicus respectfully relies upon the procedural relief requested in the Motion and requests acceptance of the complete proposed brief in its submitted form.

**Brandon Michael Hayes, Pro Se**
**President, Natural Law Institute**

Dated: October 8, 2026

---

## CERTIFICATE OF CONFERRAL, ADVANCE NOTICE, AND SERVICE

I, Brandon Michael Hayes, certify that, before submission of this filing to the Court, I transmitted by electronic mail a true and complete copy of this Motion for Leave to File and Proposed Brief of Amicus Curiae to counsel of record in the above-captioned matter using the electronic addresses reflected in the public docket, appearances, or filings of counsel.

The transmission supplied counsel with the complete proposed filing and advance notice of my intention to request leave to file it.

Counsel thereby received an opportunity to state any position concerning the requested leave before the submission reached the Court.

**No response or assent from counsel is relied upon as a prerequisite to this Motion.**

Any party wishing to state a position concerning the requested amicus participation may present that position directly to the Court in the ordinary course.

The copy transmitted to counsel is the same substantive Motion and proposed amicus brief tendered to the Court. Accordingly, a later response from counsel does not require alteration of this submission or supplementation of this Certificate unless the Court directs otherwise.

To the extent the Court requires an additional ministerial method of service, separate consent to electronic service, or another procedural act beyond the actual notice and transmission described above, Amicus respectfully requests permission to complete that act without disturbing the submission or filing date of the integrated Motion and proposed brief.

I certify that the foregoing is true and correct.

**Brandon Michael Hayes, Pro Se**
**President, Natural Law Institute**

Dated: October 8, 2026

---

**[PROPOSED] BRIEF OF AMICUS CURIAE**
**BRANDON MICHAEL HAYES, APPEARING PRO SE AS PRESIDENT OF THE NATURAL LAW INSTITUTE**
**IN SUPPORT OF NEITHER PARTY**
**ON DECISIONAL CLARITY IN MEDICAL AUTHORITY, PATIENT CAPACITY, PROFESSIONAL DUTY, GOVERNMENTAL WARRANT, AND ACCOUNTABILITY**

**STATEMENT OF INTEREST OF AMICUS CURIAE**

Brandon Michael Hayes appears pro se in his individual capacity as President of the Natural Law Institute ("NLI").

The Natural Law Institute is a constitutional research and public-interest institute concerned with lawful decisional architecture, individual and family agency, bodily authority, professional responsibility, informational fidelity, institutional responsibility, governmental power, accountability, and adjudicative legitimacy.

Amicus's interest is structural and jurisprudential.

The proceedings examined in this brief arise through different causes of action and procedural postures. Some concern retrospective professional liability. Some concern governmental

restrictions upon medical availability. Others introduce detransitioner experience into constitutional litigation.

They nevertheless present substantially the same antecedent problem:

**Who may authorize what intervention upon whose body, upon what facts, with what degree of understanding, subject to what professional duty, and with what lawful governmental warrant?**

The recurrence of that question across jurisdictions has now produced something more than isolated litigation. A recognizable field of detransition-related representation has emerged in which counsel repeatedly litigate disputes involving medical assessment, informed consent, parental authority, minority, professional duty, irreversible consequence, causation, governmental regulation, and remedy.

The existence of that practice does not itself resolve the merits of any underlying medical or constitutional controversy. It demonstrates something antecedent: courts are repeatedly being required to resolve substantially similar allocation problems after the disputed medical decisions have already occurred.

That recurrence is jurisprudentially significant.

Where the same categories of dispute repeatedly require retrospective judicial reconstruction, the law has reason to identify whether those disputes can instead be rendered more decidable prospectively.

Amicus therefore offers a common decisional architecture capable of locating the disputed predicate before ideology, balancing, liability, or remedy substitutes for it.

The framework permits each court to determine where its particular controversy sits within the decisional chain, what predicates precede it, which actor bears responsibility for each predicate, and which propositions the Court can resolve without assuming custody of questions unnecessary to the matter before it.

---

## STATEMENT REGARDING SOURCE OF AUTHORITY TO FILE

This proposed brief accompanies the Motion for Leave immediately preceding it.

Amicus respectfully relies upon that Motion as the procedural basis for submission and tenders this brief subject to the Court's disposition of the requested leave and such other lawful procedural treatment as the Court determines appropriate.

The brief is complete and independently readable so that, if docketed separately from the Motion, its purpose, authorship, interest, and substantive contribution remain apparent from the face of the submission.

---

## QUESTION PRESENTED

Whether recurring disputes concerning transition-related medical treatment can be rendered legally decidable by requiring the relevant predicates to be identified in sequence before authorization, intervention, governmental action, liability, or remedy follows:

1. **Reality → Condition → Medical Object**
2. **Agency → Cognitive Fitness → Authority → Consent**
3. **Mechanism → Evidence → Risk → Alternative → Irreversibility**
4. **Professional Duty → Nexus → Governmental Warrant**
5. **Consequence → Accountability → Remedy → Trust**

Stated more directly:

**May a downstream act of consent, professional recommendation, parental authorization, governmental permission, or governmental restriction supply an antecedent medical, cognitive, evidentiary, professional, or jurisdictional predicate that has not independently been established?**

---

## SUMMARY OF ARGUMENT

Transition-related litigation appears unusually difficult because questions belonging to several different stages of decision are commonly litigated at once.

They need not remain collapsed.

Medicine first encounters a real body, an existing condition, and a proposed medical object.

A lawful decision then requires identification of agency, cognitive fitness, authority, information, voluntariness, and consent.

The proposed intervention separately presents questions of mechanism, evidence, risk, alternatives, and irreversibility.

Professional participation adds independent duties that are not supplied merely by patient or parental preference.

Governmental involvement adds another separate inquiry: the source, object, scope, mechanism, and nexus of governmental warrant.

Only after those predicates are located does the sequence properly reach consequence, causal allocation, accountability, and remedy.

The central principle follows:

**No downstream authorization can substitute for an unsatisfied upstream predicate.**

That principle operates reciprocally.

A parent cannot create medical necessity by consenting. A physician cannot create cognitive fitness by recommending. A patient cannot create professional compliance by requesting. Government cannot create an evidentiary predicate by permitting or prohibiting. And identification of risk does not by itself establish governmental jurisdiction over the body.

This sequencing is particularly important for minors because the child's body, the child's developing agency, parental authority, professional responsibility, and governmental protective jurisdiction occupy different positions within the same decision. Each must be located without allowing one to perform the work of another.

The present litigation demonstrates the practical consequence of failing to maintain those distinctions.

A recognizable detransition-litigation practice has emerged across jurisdictions. Former patients seek retrospective allocation of responsibility. Governments litigate prospective restrictions. Detransitioners participate in constitutional cases as evidence concerning risk, uncertainty, irreversibility, and decisional safeguards.

The recurring litigation does not itself establish a universal substantive answer concerning transition medicine.

It establishes the need for a sufficiently general decisional architecture.

When the architecture is completed prospectively, many controversies presently reconstructed through malpractice, fraud, constitutional, or governmental-authority litigation become capable of resolution at the point of decision.

The law thereby moves from retrospective allocation of injury toward prospective decidability.

That is the contribution offered here.

---

## STATEMENT REGARDING RELATED PROCEEDINGS

The related proceedings discussed in this brief are used according to their proper legal function.

Published decisions and public dockets establish the existence, posture, and adjudicated propositions of those proceedings.

Allegations contained in complaints are identified as allegations and are used to demonstrate the kinds of decisional disputes being presented to courts rather than as adjudicated facts concerning parties in another action.

Completed proceedings and Supreme Court matters are included because they reveal the historical and appellate development of the same recurring questions.

Live proceedings demonstrate the continuing adjudicative significance of those questions.

No one court is asked to determine the merits of another matter.

The comparative use is structural: different proceedings expose different portions of the same decisional sequence.

---

## INTRODUCTION

### Biological Reality, Bodily Custody, and the Protective Function of Law

Medicine operates upon bodies rather than abstractions.

Whatever terminology an individual, clinician, legislature, or litigant uses, a medical intervention necessarily begins with an existing biological condition and produces physical consequences upon an identifiable person. The law therefore possesses an antecedent object capable of adjudication: **the body, its condition, its custodian, the proposed alteration, and the consequences of acting or declining to act.**

From that starting point follow two reciprocal propositions.

**Personal agency matters because bodily custody presumptively resides in the person.**

**Protection matters because agency can be immature, impaired, uninformed, coerced, or exercised through another person.**

Government therefore occupies neither the position of universal medical decisionmaker nor passive observer. Its lawful function must be located: protecting persons against coercion, exploitation, legally cognizable incapacity, and unlawful injury while respecting competent bodily agency.

Transition litigation exposes this architecture particularly clearly. But the architecture is not transition-specific. **The same sequence must remain coherent when applied to abortion, vaccination, sterilization, psychiatric intervention, experimental medicine, refusal of treatment, pediatric medicine, or any other contested bodily intervention.**

That neutrality is its test.

The present litigation supplies another test: **decidability**.

A sound medical-decision architecture ought not merely permit a court to assign responsibility after an injury is alleged. It ought enable patients, parents, clinicians, institutions, and government to identify their respective predicates before an intervention occurs.

Where those predicates are visible prospectively, disagreement can be resolved at the point of decision.

Where they remain compressed, the same questions return retrospectively as disputes concerning consent, negligence, fraud, authority, causation, constitutional power, and remedy.

The emergence of repeated detransition litigation therefore matters beyond the disposition of any individual case.

It exposes the cost of an insufficiently explicit decisional sequence.

The following five series make that sequence visible.

---

## I. SERIES ONE — REALITY → CONDITION → MEDICAL OBJECT

Before asking whether treatment was lawful, the adjudicator identifies **what existed and what medicine proposed to alter**.

### A. Fidelity

What was actually known about the patient at the decisional moment?

**B. Biological reality**

What biological characteristics were medically material?

**C. Condition**

What diagnosis, pathology, distress, dysfunction, risk, or other condition supplied the asserted medical predicate?

**D. Medical object**

What was treatment attempting to accomplish?

This separates four propositions courts too easily collapse:

**what the patient is → what the patient experiences → what medicine diagnoses → what medicine proposes to change.**

Neither identity nor ideology substitutes for this inquiry. Neither does governmental preference.

**Application:** Aldaco, Ayala, Ulery, Stewart, Mosley, Miller, Towe, Hineman, Breen, and Skane begin here because retrospective liability requires reconstruction of the medical predicate actually presented to the provider.

---

## II. SERIES TWO — AGENCY → COGNITIVE FITNESS → AUTHORITY → CONSENT

Consent is the **output** of a lawful decisional process, not its starting point.

**A. Agency**

Whose decision is this?

**B. Cognitive fitness**

Could the decisionmaker understand the relevant condition, uncertainty, intervention, alternatives, consequences, and degree of reversibility?

**C. Authority**

Who possessed legal authority to authorize the intervention?

For adults, ordinarily the competent patient.

For minors, the architecture becomes triangular:

**child ↔ parent/guardian ↔ clinician**

with government possessing a protective jurisdiction whose boundaries themselves require justification.

**D. Information**

What information was available and communicated?

**E. Voluntariness**

Was the decision materially free from coercion, manipulation, dependency, or materially defective representations?

**F. Consent**

Only after the foregoing questions are answered can legally meaningful consent be located.

This becomes a central bridge between the direct-provider cases and the constitutional cases.

**These gates are cumulative rather than interchangeable.**

1. Capacity concerns the decisionmaker's ability to comprehend the decision presented.
2. Authority concerns who possesses lawful power to make or authorize that decision.
3. Information concerns what the decisionmaker was actually given to understand.
4. Voluntariness concerns whether the resulting choice corresponds to the decisionmaker's agency rather than coercion, manipulation, dependency, or materially defective representation.
5. Consent is the resulting authorization after those conditions are satisfied.

That ordering becomes especially protective for minors.

Parental authority cannot manufacture a child's cognitive fitness, voluntariness, diagnosis, or medical indication. A clinician's recommendation cannot expand parental authority beyond its lawful object. A child's expressed preference cannot relieve the professional of independent duties. Governmental involvement cannot convert any of those predicates into another.

The architecture therefore protects the child from decisional substitution in every direction.

**Authority permits an actor to decide where authority exists. It does not manufacture the predicates that make the resulting act lawful.**

---

## III. SERIES THREE — MECHANISM → EVIDENCE → RISK → ALTERNATIVE → IRREVERSIBILITY

Having identified a lawful decisionmaker, the court examines the intervention itself.

### A. Mechanism

What does the proposed treatment physically do?

### B. Evidence

What evidentiary basis supported its use for this patient, at that time?

### C. Risk

What foreseeable harms accompanied treatment and non-treatment?

### D. Alternatives

What materially available alternatives existed, and were they considered and disclosed?

### E. Reversibility

Which consequences were temporary, reversible, difficult to reverse, or irreversible?

The architecture therefore accommodates materially different medical controversies without announcing a substantive medical policy in advance.

A general proportional relationship follows:

**As uncertainty, magnitude of consequence, and irreversibility increase, the decisional predicates required to support reliable authorization become correspondingly more demanding.**

The proposition does not predetermine the permitted intervention.

It identifies the degree of decisional confidence required before authorization can reliably carry the consequence assigned to it.

## IV. SERIES FOUR — PROFESSIONAL DUTY → NEXUS → GOVERNMENTAL WARRANT

This series separates **medicine's authority from government's authority.**

### A. Professional duty

The clinician does not become a passive instrument merely because a patient or parent requests treatment.

Professional authorization carries independent duties concerning:

**assessment → disclosure → contraindication → standard of care → treatment selection → monitoring → response to complications.**

The familiar medical principle of avoiding harm becomes legally operational through these duties rather than functioning as an aphorism.

### B. Nexus

The court then asks whether the intervention, evidence, patient condition, authorization, and claimed medical objective actually connect.

**Condition → mechanism → expected consequence.**

Where the nexus cannot be demonstrated, authorization alone cannot supply it.

### C. Governmental warrant

Only now does governmental power enter.

Government must identify the interest authorizing interference and demonstrate the relationship between:

**protected person → identified risk → governmental authority → chosen restriction.**

That architecture works in opposite directions.

It tests governmental restrictions on medical treatment in ***L.W. v. Skrmetti***.

It also tests governmental conditions that may require another private person to facilitate transition-related conduct, as occurred in ***Bates v. Pakseresht***, where Oregon's adoption rule

required prospective parents to "respect, accept, and support" a child's gender identity and expression and the litigation included Bates's objection to taking an adopted child to transition-related medical appointments.

The question therefore isn't whether government is "for" or "against" transition.

The question is **whether governmental custody and intervention have been lawfully warranted at the point where they operate.**

---

## V. SERIES FIVE — CONSEQUENCE → ACCOUNTABILITY → REMEDY → TRUST

The final series converts the architecture into adjudication.

### A. Consequence

What actually occurred?

### B. Causal allocation

Which consequence is attributable to which decisionmaker, representation, intervention, omission, or governmental act?

### C. Accountability

Who bore the corresponding duty?

### D. Remedy

What remedy restores the injured interest without assigning responsibility beyond the demonstrated causal nexus?

This is particularly important in the direct-liability cases. *Mosley*, for example, involves allegations concerning hormones, surgery, representations by providers, limitations questions, and fraud theories; *Aldaco* has separately generated litigation over her therapist's recommendation letter and over the surgical defendants. The architecture permits those relationships to be separated rather than treating "transition" itself as the causal unit.

### E. Trust

Trust becomes the terminal output:

**Fidelity → Agency → Capacity → Authority → Evidence → Duty → Warrant → Accountability → Trust.**

- A patient can trust a medical system when the decisional chain is visible.
- A professional can act with greater certainty when authority and duties are defined prospectively.
- Government can regulate without assuming unlimited bodily custody.
- And adjudication becomes less dependent upon reconstructing an opaque medical decision years after the fact.

The same sequence also identifies the difference between a system designed primarily for retrospective liability and one designed for prospective resolution.

Where condition, capacity, authority, evidence, alternatives, voluntariness, professional duty, intervention, and allocation of risk are made explicit at the decisional moment, later adjudication begins from an intelligible record.

More importantly, many disputes need never mature into claims at all.

- A disagreement concerning capacity can be addressed as capacity.
- A disagreement concerning diagnosis can be addressed as diagnosis.
- A disagreement concerning parental authority can be addressed as authority.
- A disagreement concerning professional appropriateness can be addressed as professional duty.
- A disagreement concerning governmental intervention can be addressed as warrant.

The dispute is resolved where it arises rather than permitted to travel downstream until bodily consequence converts an unresolved predicate into litigation.

**Decidability is therefore protective before it becomes remedial.**

---

## VI. THE EMERGENCE OF DETRANSITION LITIGATION REVEALS A RECURRING FAILURE OF EX ANTE DECISIONAL STRUCTURE

The development of a recognizable detransition-litigation practice is legally significant.

Lawyers now represent former patients in repeated disputes concerning transition-related medical treatment across multiple jurisdictions. Those cases name different physicians, therapists, clinics, professional organizations, governmental actors, and institutions. They arise under different causes of action. They occupy different procedural postures. Some survive. Some

fail. Some conclude by settlement, limitations rulings, procedural decisions, appellate review, or other dispositions.

Their collective significance does not depend upon uniform outcomes.

**Their significance lies in recurrence.**

A field of legal representation develops when materially similar disputes recur often enough to generate repeatable claims, recurring defenses, specialized factual records, recurring experts, recurring questions of professional responsibility, and recurring questions of legal classification.

That phenomenon has now occurred around detransition.

The result is not merely a new category of plaintiff.

It is a new category of retrospective legal reconstruction.

Courts are being asked, after medical consequences have occurred, to determine questions that existed before treatment:

- **What condition was present?**
- **What did the patient understand?**
- **Was the patient cognitively fit for the particular decision?**
- **Who possessed authority?**
- **Was the decision voluntary?**
- **What evidence supported the intervention?**
- **What alternatives existed?**
- **What was reversible?**
- **What professional duties attached?**
- **What representations were made?**
- **What governmental authority existed?**
- **What consequence was foreseeable?**
- **Who bears responsibility for the consequence that followed?**

Those are not inherently post-injury questions.

They become post-injury questions when the decisional system fails to make them answerable beforehand.

The emergence of detransition litigation therefore does more than supply anecdotal evidence that some patients later regret treatment. The legally important phenomenon is that courts across jurisdictions are repeatedly being asked to reconstruct substantially similar antecedent decisions.

That recurrence is evidence that the governing law, professional practice, or both have not yet supplied a sufficiently general and visible sequence by which all relevant actors can determine their respective authority and obligations before irreversible consequence attaches.

The resulting problem is one of **decisional settlement**.

A legal system can leave substantive medical judgment with the appropriate patient, parent, clinician, legislature, agency, or other authorized actor while still requiring the decisional predicates to be explicit.

The law does this throughout regulated activity.

It identifies:

- **who acts;**
- **upon what object;**
- **under what authority;**
- **upon what facts;**
- **through what mechanism;**
- **subject to what duty;**
- **with what consequence;**
- **and with what accountability.**

Medical decisionmaking requires the same precision.

The advantage is substantial.

The law need not begin by declaring that minors may or may not receive a particular transition-related intervention.

It can instead identify the gates through which any consequential medical intervention involving a minor must pass.

The resulting analysis becomes:

- **Condition.**
- **Agency.**
- **Cognitive fitness.**
- **Authority.**
- **Information.**
- **Voluntariness.**
- **Evidence.**
- **Risk.**

- **Alternatives.**
- **Irreversibility.**
- **Professional duty.**
- **Nexus.**
- **Governmental warrant.**
- **Consequence.**

A failure at one gate is addressed at that gate.

- A parent cannot force passage through a failed medical predicate merely by possessing parental authority.
- A clinician cannot force passage through a failed capacity or voluntariness predicate merely by possessing professional credentials.
- A minor's assent cannot cure materially inadequate information.
- Government cannot convert disputed medical judgment into established fact through legislation alone.
- And an ideological characterization cannot replace the causal and evidentiary work belonging to the underlying decision.

The same principle operates in the opposite direction.

- Governmental disapproval cannot manufacture a medical contraindication.
- Parental opposition cannot extinguish a legally sufficient predicate merely by disagreement.
- Professional controversy cannot itself resolve a question of constitutional authority.

The architecture remains reciprocal because each actor must establish the proposition belonging to that actor's role.

**This framework operates below ideology.**

It does not ask the Court to choose a social position concerning transition.

It asks the Court to determine whether the predicates required for a lawful medical decision existed, whether the proper actor established them, and whether one stage of the process was permitted to substitute for another.

The emergence of specialized detransition litigation demonstrates the practical need for that architecture.

The law can continue to reconstruct those decisions retrospectively through individual actions.

Or it can make the decisional sequence sufficiently visible that patients, parents, clinicians, institutions, governments, and courts can identify and resolve the disputed predicate before consequence makes litigation necessary.

**The existence of a recurring litigation class identifies the problem.**
**Decisional architecture permits the law to move the solution upstream.**

---

## VII. APPLICATION TO THE THREE CLASSES OF CASES

The utility of the foregoing architecture is demonstrated by the breadth of the litigation in which substantially the same antecedent questions continue to recur. The cases do not share a single cause of action, procedural posture, jurisdiction, plaintiff class, or requested remedy. Some arise retrospectively as tort actions against medical professionals. Others concern prospective governmental regulation of medical treatment. Still others place detransitioner experience before courts adjudicating constitutional limitations upon governmental authority.

**That diversity is precisely the point.**

If the governing questions disappeared whenever the cause of action changed, no common architecture would be warranted. They do not. Across the cases recur the same underlying questions: **What condition existed? Who possessed agency? Was the decisionmaker cognitively fit to make the particular decision? Who possessed authority? What information was supplied? What intervention was proposed? What evidence supported it? What alternatives existed? What consequences were foreseeable or irreversible? What independent duty rested upon the medical professional? What authority permitted governmental intervention? And what causal relationship connects any failure in that sequence to the injury or restriction ultimately alleged?**

The cases therefore divide naturally into three classes. Each class enters the architecture at a different point. None requires the Court to resolve the larger ideological controversy before applying ordinary principles of medical decision, bodily custody, professional responsibility, governmental authority, causation, and remedy.

### <u>A. Retrospective Provider-Liability Cases: The Architecture Reconstructs the Decisional Chain Before Allocating Liability</u>

A growing body of litigation asks courts to look backward at completed transition-related medical interventions and determine whether the decisional process preceding them satisfied applicable legal duties. These matters include, among others:

1. **Aldaco v. Perry, et al., Tarrant County, Texas, 67th District Court, No. 067-343803-23; Crane Surgical Services, P.A. d/b/a Crane Center for Transgender Surgery, Richard Santucci & Ashley DeLeon v. Soren Aldaco, Texas Second Court of Appeals No. 02-24-00468-CV;**
2. **Ayala v. American Academy of Pediatrics, et al., Rhode Island Superior Court, Providence/Bristol County, No. PC-2023-05428;**
3. **Ulery v. Rafferty, Forcier, Thundermist Health, Rhode Island Superior Court, No. PC-2023-05366; Ulery v. Rafferty, et al., D.R.I. No. 1:24-cv-00024; related federal proceeding, D.R.I. No. 1:25-cv-00619;**
4. **Stewart v. Turco, et al., New Hampshire Superior Court, No. 225-2-23-CV-00575;**
5. **Mosley v. Emerson, et al., North Carolina Superior Court, Gaston County, No. 23-CVS-2375;**
6. **Miller v. Identity Hormones, LLC, et al., Maricopa County, Arizona, No. CV2024008632;**
7. **Towe, et al. v. Cherokee Health Systems, et al., E.D. Tenn. No. 3:24-cv-00136; Towe, et al. v. United States, E.D. Tenn. No. 3:24-cv-00184;**
8. **Hineman v. Planned Parenthood, et al., New York Supreme Court, Albany County, Index No. 903971-24;**
9. **Breen v. Olson-Kennedy, et al., Los Angeles County Superior Court, No. 24STCV32096;** and
10. **Skane v. Planned Parenthood of Greater Washington and North Idaho, et al., Washington, No. 25-2-02432-32.**

The pleadings and procedural histories vary substantially. That variation strengthens rather than weakens the case for a common decisional architecture.

For example, *Aldaco* arose from medical treatment culminating in surgery later regretted by the patient. In the surgical-provider branch of that litigation, the Texas Second Court of Appeals addressed a procedural question concerning Texas's statutory authorization and expert-report requirements rather than adjudicating the ultimate merits of the underlying medical controversy. *Crane Surgical Servs., P.A. v. Aldaco*, No. 02-24-00468-CV (Tex. App.—Fort Worth Mar. 20, 2025) (mem. op.). The underlying trial proceeding was No. 067-343803-23. The appellate court described the suit as arising from transition-related surgery and addressed whether the plaintiff's expert report was timely under Texas's health-care-liability statutory scheme.

*Ayala* illustrates the substantive breadth that can arise within a single provider-liability action. The complaint in Rhode Island Superior Court, No. PC-2023-05428, pleaded claims including medical malpractice and lack of informed consent and alleged failures concerning assessment, disclosure of risks, consideration of alternatives, and treatment with testosterone. Those remain allegations unless and until established through the adjudicative process; their significance here is structural. They demonstrate that what appears publicly as one controversy about "transition"

decomposes legally into distinct questions concerning diagnosis, information, alternatives, authorization, professional duty, intervention, causation, and injury.

The same phenomenon appears elsewhere. *Mosley v. Emerson*, No. 23-CVS-2375 (N.C. Super. Ct., Gaston Cnty.), pleaded theories including fraud, breach of fiduciary duty, medical malpractice, civil conspiracy, and related claims against multiple medical and counseling defendants. The complaint itself therefore requires allocation among different actors, different representations, different professional relationships, and different alleged injuries rather than treatment of "transition" as a unitary causal event.

*Ulery* demonstrates another variation. Rhode Island Superior Court No. PC-2023-05366 generated federal removal proceedings in the District of Rhode Island, first as No. 1:24-cv-00024 and subsequently as No. 1:25-cv-00619 following a later removal involving Thundermist Health Clinic. The latter federal docket expressly identifies the earlier federal proceeding as related.

The remaining provider cases extend the same recurring arena across jurisdictions: *Stewart*, No. 225-2-23-CV-00575 (N.H. Super. Ct.); *Miller*, No. CV2024008632 (Maricopa Cnty., Ariz.); *Towe*, Nos. 3:24-cv-00136 and 3:24-cv-00184 (E.D. Tenn.); *Hineman*, Index No. 903971-24 (N.Y. Sup. Ct., Albany Cnty.); *Breen*, No. 24STCV32096 (L.A. Cnty. Super. Ct.); and *Skane*, No. 25-2-02432-32 (Wash.). Publicly available complaints and docket materials confirm that these proceedings arise within the same broader transition-treatment liability arena, while their procedural dispositions differ. See, e.g., *Hineman*, Index No. 903971-24; *Breen*, No. 24STCV32096.

The architecture proposed by Amicus permits these cases to be adjudicated without first resolving the surrounding social controversy.

The inquiry instead proceeds in sequence:

**First:** What was the patient's actual condition at the time of decision?

**Second:** Who possessed agency, what was the patient's cognitive fitness for the particular decision, and—where the patient was a minor—what authority belonged to the patient, parent or guardian, clinician, and State?

**Third:** What information was known and communicated concerning diagnosis, evidence, intervention, alternatives, risks, uncertainty, and reversibility?

**Fourth:** What independent professional duties governed the clinician notwithstanding the preferences of the patient or parent?

**Fifth:** What intervention occurred, what consequence followed, and what causal nexus connects an alleged failure at an earlier gate to a legally cognizable injury?

This sequencing is especially important where minors are concerned. Parental authorization answers a question of **authority**; it cannot itself establish diagnosis, medical appropriateness, cognitive fitness, voluntariness, adequate disclosure, evidentiary support, or satisfaction of the professional standard of care. Likewise, patient assent cannot supply information never disclosed, and a clinician's recommendation cannot manufacture the patient's capacity to comprehend consequences that the law requires the patient or lawful surrogate to understand.

The governing principle is therefore simple:

**No downstream authorization can substitute for an unsatisfied upstream predicate.**

Each gate performs a separate protective function. The separation protects the minor against coercion from any direction—including coercion toward an intervention and coercion against one—because neither parent, clinician, patient, nor government may use authority at one stage to manufacture a predicate belonging to another.

The provider-liability cases accordingly belong within Series I through V in sequence. They require no antecedent judicial declaration that transition medicine is categorically lawful or unlawful. They require courts to determine whether the particular decisional chain before them was lawful and medically supportable and, where it was not, whether the identified failure caused the injury for which relief is sought.

## B. Governmental Medical-Authority Litigation: The Same Architecture Runs Prospectively

The second class presents the same architecture from the opposite temporal direction.

In *L.W. v. Skrmetti* and the consolidated *Doe v. Thornbury* proceedings, Sixth Circuit Nos. **23-5600 and 23-5609**, the Sixth Circuit considered challenges involving Tennessee and Kentucky laws restricting certain transition-related medical interventions for minors. The Tennessee proceeding arose from M.D. Tenn. No. **3:23-cv-00376**; the Kentucky proceeding arose from W.D. Ky. No. **3:23-cv-00230**. *L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023).

The Tennessee controversy subsequently reached the Supreme Court as ***United States v. Skrmetti*, No. 23-477**. The Supreme Court docket identifies Sixth Circuit No. 23-5600 as the lower-court proceeding.

The importance of *Skrmetti* here is structural rather than ideological.

Provider-liability litigation ordinarily asks retrospectively whether a medical decision was lawfully and professionally made. Governmental medical-authority litigation asks prospectively whether the State may alter the universe within which that decision may be made at all.

The architecture therefore remains the same, but the location of governmental warrant becomes central.

Before government restricts, conditions, requires, prohibits, or otherwise controls a medical option, the decisional sequence asks:

- **What is the protected object?**
- **What legally cognizable risk is government addressing?**
- **Whose agency is implicated?**
- **What role does minority or diminished decisional capacity play?**
- **What authority does the parent possess, and what are the limits of that authority?**
- **What independent duty remains with the medical professional?**
- **What mechanism has government selected?**
- **What nexus connects the identified risk to that mechanism?**
- **What alternatives to the governmental mechanism exist?**
- **What consequences follow from governmental action and governmental inaction?**

This prevents two opposite analytical errors.

Government cannot acquire plenary custody of a person's body merely by identifying a medical risk. But neither does the existence of patient preference, parental permission, or professional willingness eliminate the government's traditional protective interests where legally cognizable incapacity, coercion, exploitation, or risk to minors is established.

The legal question therefore lies below the political characterization of government as either "protecting children" or "interfering with medicine." Those are conclusions. The architecture requires the predicates to be demonstrated.

That produces a rule capable of application beyond transition medicine:

**Governmental interference with a medical decision requires an identifiable protected object, lawful authority, an identified risk, a mechanism directed toward that risk, and a sufficient nexus between the mechanism and the protection asserted.**

The same rule can govern disputes involving vaccination, abortion, sterilization, psychiatric intervention, experimental treatment, pediatric medicine, and refusal of care. The intervention changes. The government's burden of locating its warrant does not.

Thus Series IV does not decide *Skrmetti* by ideological alignment. It identifies the place at which governmental power enters an otherwise private medical relationship and requires that power to account for itself.

**C. Detransitioner Evidence in Constitutional Litigation: Experience Informs Predicates Without Predetermining Constitutional Consequences**

The third class is illustrated by ***Bates v. Pakseresht*, Ninth Circuit No. 23-4169**, arising from D. Or. No. **2:23-cv-00474-AN**.

*Bates* was not a medical-malpractice action. It concerned Oregon requirements applicable to prospective adoptive parents and the constitutional challenge brought by Jessica Bates. The Ninth Circuit issued its merits decision on July 24, 2025, and later denied rehearing en banc on February 13, 2026. *Bates v. Pakseresht*, No. 23-4169 (9th Cir. July 24, 2025); Order Denying Rehearing En Banc, No. 23-4169 (9th Cir. Feb. 13, 2026).

Campbell Miller Payne PLLC appeared in that litigation for **Amici Curiae Detransitioners Billy Burleigh, Laura Perry Smalts, Kathy Grace Duncan, and Amanda Stewart**. The Ninth Circuit's published opinion expressly identifies Joshua K. Payne, Jordan Campbell, Ronald Miller, and Daniel Sepulveda of Campbell Miller Payne as their counsel.

That appearance illustrates a third function for the same body of experience.

A former patient's outcome does not, standing alone, establish the constitutional validity or invalidity of a governmental rule governing someone else. Individual experience cannot automatically perform the work of constitutional doctrine.

But neither is that experience legally irrelevant.

Retrospective evidence can inform the factual predicates upon which governmental policy depends. Evidence of regret, complications, inadequate assessment, coercion, failed prediction, incomplete disclosure, unexpected outcomes, or irreversible consequences—when competently established and properly connected to the question before the court—may bear upon **risk, uncertainty, reversibility, alternatives, decisional capacity, professional safeguards, and the factual warrant asserted for governmental action**.

The architecture therefore supplies a disciplined location for such evidence.

- **Experience establishes evidence.**
- **Evidence informs risk.**
- **Risk informs warrant.**
- **Warrant informs the permissible scope of governmental action.**

What experience does not do is leap directly from individual outcome to constitutional conclusion.

This distinction matters because constitutional litigation frequently compresses several steps into a single contest over competing narratives. One side presents evidence of benefit. Another presents evidence of injury. Courts are then invited to treat the competing factual records as though choosing between them necessarily determines the constitutional rule.

It does not.

The architecture instead asks what proposition each item of evidence is capable of proving.

A detransitioner's experience may bear upon whether an intervention is invariably reversible. It may bear upon whether predictions of persistence are sufficiently certain for a particular governmental purpose. It may bear upon whether existing consent procedures reliably identify contraindications or alternative explanations. It may bear upon whether a governmental institution possesses a factual basis for requiring another person to facilitate, prohibit, tolerate, or refrain from particular conduct.

Those are evidentiary propositions.

The subsequent question—what governmental action the Constitution permits upon those facts—remains a question of authority, mechanism, nexus, proportionality where applicable, and consequence.

*Bates* therefore demonstrates why the same architecture remains useful even when no detransitioner seeks damages and no clinician stands accused of malpractice. The experience generated by the first class of cases can enter the third class without importing the legal conclusions of the first.

**D. The Three Classes Locate the Same Decisional Problem at Different Stages**

The three classes do not establish a single substantive result.

They establish the location of the recurring problem.

The retrospective provider-liability cases ask whether the decisional predicates were satisfied before an intervention occurred and, where a failure is established, what causal consequence followed.

The governmental medical-authority cases ask when government may enter, restrict, condition, or close portions of that decisional pathway prospectively.

The constitutional-evidence cases ask what retrospective experience can legitimately establish when government invokes risk, protection, professional judgment, or institutional authority.

The common architecture remains:

**Reality → Condition → Agency → Cognitive Fitness → Authority → Information → Medical Object → Mechanism → Evidence → Risk → Alternatives → Consent → Professional Duty → Governmental Warrant → Consequence → Causation → Accountability → Remedy.**

The location of the disputed question changes.

The architecture does not.

That is why completed cases remain useful without controlling the outcome of live ones, why Supreme Court proceedings remain relevant without converting every matter into a constitutional case, and why direct-liability allegations can illuminate risk without automatically establishing governmental authority.

Each proceeding reveals a different decisional location.

Together they make the underlying structure visible.

Once that structure is visible, the Court need not decide an ideology in order to decide a medical act.

It need identify the predicates, determine which are disputed, assign each to the actor responsible for establishing it, and apply the law governing that point in the sequence.

---

## VIII. DECIDABILITY MOVES MEDICAL DISPUTES UPSTREAM AND REDUCES THE COST OF DISTRUST

Modern medical systems devote substantial resources to managing uncertainty after or around the treatment decision.

- Malpractice insurance prices uncertain liability.
- Defensive medicine responds to uncertain exposure.
- Consent documentation records authorization.
- Institutional compliance systems attempt to standardize professional conduct.
- Government regulates perceived risk.
- Litigation reconstructs the decision after an alleged injury.

These mechanisms perform different functions, but many operate downstream from the decisive question:

**Was the medical decision itself sufficiently explicit, attributable, informed, authorized, and reviewable when it was made?**

A decidable medical system moves that work upstream.

Before intervention, the record identifies:

**condition → capacity → authority → information → evidence → alternatives → voluntariness → consent → professional duty → intervention → risk allocation.**

That sequence does more than improve documentation.

It reduces uncertainty concerning who possessed authority, what each actor was required to establish, what risk was knowingly assumed, what professional judgment supported intervention, and what consequences were outside or inside the authorized scope of treatment.

The effect is structural.

When the decisional record is explicit ex ante, fewer propositions remain available for reconstruction ex post.

- A patient knows what was represented.
- A parent knows the extent and limits of parental authority.
- A clinician knows which determinations remain independently professional.
- An institution knows what process it is responsible for maintaining.
- Government knows where protective jurisdiction begins and where competent bodily agency remains controlling.
- And a later court, when adjudication remains necessary, encounters a defined decisional chain rather than an opaque collection of retrospective assertions.

This has consequences for cost.

- Insurance exists in part to distribute uncertain future exposure.
- Compliance systems exist in part to reduce uncertain institutional exposure.
- Defensive practices exist in part because responsibility is difficult to predict prospectively.

Greater decisional clarity therefore reduces at least one component of the uncertainty those systems are required to absorb.

The proposition is not dependent upon any particular insurance market estimate.

It is architectural:

**The more decidable the medical relationship becomes ex ante, the less unresolved decisional uncertainty remains to be socialized ex post.**

The sequence is therefore:

**Decidability → Attribution → Accountability → Predictability → Trust.**

Trust does not arise because patients, professionals, parents, insurers, institutions, and government agree about every medical controversy.

Trust arises because each can identify:

- **who possessed authority;**
- **what predicates were required;**
- **whether those predicates were established;**
- **who bore the corresponding duty;**
- **and who bears the consequence when the sequence fails.**

A system possessing those characteristics is less dependent upon retrospective litigation because the dispute becomes capable of resolution at the stage where it first appears.

That is the larger significance of the emerging detransition docket.

The cases demonstrate what happens when unresolved decisional questions travel downstream.

The architecture demonstrates how law can stop them earlier.

---

## IX. CONCLUSION — THE COURT NEED NOT DECIDE AN IDENTITY TO DECIDE A MEDICAL ACT

These cases appear unusually complicated because questions belonging to different stages of decision are litigated simultaneously.

The law can separate them.

A court can identify:

- **Reality.**
- **Condition.**
- **Agency.**
- **Cognitive Fitness.**
- **Authority.**

- **Information.**
- **Medical Object.**
- **Mechanism.**
- **Evidence.**
- **Risk.**
- **Alternatives.**
- **Consent.**
- **Professional Duty.**
- **Governmental Warrant.**
- **Consequence.**
- **Causation.**
- **Accountability.**
- **Remedy.**

Each term performs different work.

No downstream proposition can supply an antecedent predicate that has not independently been established.

That principle protects personal agency.

- It protects children from decisional substitution or coercion by any participant in the process.
- It preserves parental authority within its lawful function.
- It preserves independent professional judgment.
- It permits government to exercise genuine protective authority where its warrant exists.
- And it preserves judicial review by converting broad social controversy into identifiable questions of fact, authority, duty, nexus, causation, and law.

The recurrence of detransition litigation demonstrates the value of that conversion.

Courts across jurisdictions are now being asked to reconstruct medical decisions after disputed consequences have occurred. A specialized practice of law has emerged around that reconstruction.

The law need not wait for injury, regret, governmental conflict, or constitutional litigation before supplying the decisional structure those cases repeatedly require.

It can locate that structure prospectively.

The same architecture applies whether the contested intervention concerns transition-related treatment, vaccination, abortion, psychiatric medication, sterilization, experimental treatment, pediatric medicine, or refusal of care.

Its neutrality is demonstrated by its reciprocity.

- The intervention changes.
- The actors may change.
- The governing substantive doctrine may change.

**The order of the predicates does not.**

Amicus respectfully submits that the Court may use that sequence to locate the controversy actually before it, determine which actor bears responsibility for the disputed predicate, apply the governing law at that point, and preserve the remaining questions without allowing one category to perform the work of another.

The resulting rule is modest in form and substantial in consequence:

**Make the decision decidable before making the consequence irreversible.**

Respectfully submitted,

**Brandon Michael Hayes, Pro Se**
**President, Natural Law Institute**
159 Indian Hill Street
West Newbury, Massachusetts 01985
(617) 438-2049
brandon@hayeshaus.com

Dated: October 8, 2026